**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CALISIA KELLEY and JOHNNIE MAE KELLEY**, Co-Administrators of the **ESTATE OF BRUCE KELLEY JR.,** deceased, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| **BRIAN O'MALLEY,** both in his Official and Individual Capacities as Sergeant for the Allegheny County Port Authority; **DOMINIC RIVOTTI,** in both his Official and Individual Capacities as Officer for the Allegheny County Port Authority**, JOHN DOE #1 POLICE OFFICER,** in his Official and Individual Capacities**; JOHN DOE #2 POLICE OFFICER,** in both his Official and Individual Capacities; **JOHN DOE #3, SUPERVISOR** OF O'MALLEY RIVOTTI and JOHN DOE POLICE OFFICERS, in his/her Official and Individual Capacities; **ALLEGHENY COUNTY PORT AUTHORITY; MATTHEW PORTER,** in his Official and Individual Capacities as Chief of the Allegheny County Port Authority Police; the **COUNTY OF ALLEGHENY;** and the **ALLEGHENY COUNTY PORT AUTHORITY POLICE DEPARTMENT,** | ) 2:17-cv-01599-NBF ) ) District Judge Nora Barry Fischer ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM OPINION

### I.    INTRODUCTION

Presently before the Court are the respective Motions to Dismiss filed by Allegheny County

Port Authority, Allegheny County Port Authority Police Department, Brian O'Malley, Matthew

Porter, and Dominic Rivotti, (Docket No. 10 (hereinafter "Port Authority Motion")), and County

of Allegheny, (Docket No. 13 (hereinafter "Allegheny County Motion")) (*collectively*, "Defendants"), pursuant to Federal Rules of Civil Procedure 12(b)(1), (5), and (6). Plaintiffs Calisia Kelley and Johnnie Mae Kelley ("Plaintiffs") have asserted claims against Defendants for excessive force in violation of the Fourth Amendment to the United States Constitution, a civil rights violation under the Civil Rights Act of 1964, 42 U.S.C. § 1983, and a *Monell* claim. Having considered Plaintiffs' Complaint, (Docket No. 1), the Port Authority Motion and the brief in support of same, (Docket No. 12 (hereinafter "Port Authority Brief"), the Allegheny County Motion and the brief in support of same, (Docket No. 14 (hereinafter "Allegheny County Brief"), Plaintiffs' responses in opposition, (Docket Nos. 15-17, 20), and Defendants' replies to Plaintiffs' responses, (Docket No. 22 (hereinafter "Port Authority Reply"), 23 (hereinafter "Allegheny County Reply")), the Port Authority Motion and the Allegheny County Motion are GRANTED.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs, Johnnie Mae Kelley and Calisia Kelley, are the co-administrators of the Estate of Bruce Kelley, Jr. (Docket No. 1, at ¶ 1). Their claims arise from an incident between the deceased, Bruce Kelley, Jr., and certain Allegheny County Port Authority Police Officers. The following is a recitation of the facts as alleged in the Complaint, which the Court will accept as true for the sole purpose of deciding the pending motions.[1]

On Sunday, January 31, 2016 in the afternoon, Bruce Kelley, Jr. was spending time with his father in a gazebo in Linear Park in the Borough of Wilkinsburg. (*Id.* at ¶¶ 23-24). Two Port Authority police officers approached and accused

---

[1] When reviewing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court must "'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Eid v. Thompson,* 740 F.3d 118, 122 (3d Cir. 2014) (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

Kelley, Jr. and his father, Kelley, Sr., of open container violations. (*Id.* at ¶ 25). While Kelley, Sr. interacted with the two officers, Kelley, Jr. stood passively hugging the gazebo. (*Id.* at ¶ 27). During the interaction between the officers and Kelley, Sr., Kelley, Jr. walked away from the officers and the gazebo. (*Id.* at ¶ 30). Back-up was called and numerous police officers responded. (*Id.* at ¶ 31). As he was walking away from the officers, Kelley, Jr. pulled out a knife. (*Id.* at ¶ 32). He carried this knife for his self-protection because he was homeless at the time. (*Id.* at ¶ 33). Kelley, Jr. walked away from the officers at a slow pace as the officers pursued him. (*Id.* at ¶ 36).

At some point, the police officers called for the Port Authority K-9 Unit, and approximately fourteen Port Authority Officers cornered Kelley, Jr. in front of a house on Whitney Avenue. (*Id.* at ¶¶ 37-39). With guns drawn, the officers told Kelley, Jr. to drop the knife. (*Id.* at ¶ 39). Kelley, Jr. refused to do so. (*Id.* at ¶ 40). The Port Authority Police K-9 Unit arrived, including Defendants O'Malley and Rivotti and their german shepherd dog. (*Id.* at ¶ 41). Defendant O'Malley told Kelley, Jr. that he would sic the dog on Kelley, Jr. if he did not drop the knife. (*Id.* at ¶ 42). In response, Kelley, Jr. replied that he would stab the dog to protect himself. (*Id.* at ¶ 43). Defendant O'Malley released the dog and it attacked Kelley, Jr., biting Kelley, Jr.'s left arm while Kelley, Jr. held the knife in his right hand. (*Id.* at ¶¶ 44-45). Kelley, Jr. slashed at the dog to defend himself and the dog was wounded. (*Id.* at ¶¶ 46-47). Defendants O'Malley and Rivotti then shot Kelley, Jr. seven times, including two shots in the back, killing him. (*Id.* at ¶ 48). The K-9 dog also died as a result of his injuries, though this was unknown to the officers on the scene at the time of the shooting. (*Id.* at ¶ 49).

Plaintiffs filed a Complaint in this Court on December 11, 2017 asserting that Defendants O'Malley and Rivotti used unreasonable, excessive, deadly force by shooting Kelley, Jr. in the

back repeatedly and killing him. (*Id.* at ¶ 51). The Port Authority Motion was filed on May 4, 2018 on behalf of Defendants Allegheny County Port Authority, Allegheny County Port Authority Police Department, Brian O'Malley, Matthew Porter, and Dominic Rivotti (collectively, the "Port Authority Defendants"). (Docket No. 10). The Allegheny County Motion followed on May 7, 2018. (Docket No. 13). The Motions are now fully briefed and ripe for disposition. (Docket Nos. 10-11, 13, 14-17, 22-23).

### III. STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L. Ed. 2d 929 (2007)). A claim satisfies the plausibility standard when the facts alleged "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 220-21 (3d Cir. 2011) (citing *Iqbal*, 556 U.S. at 678). While the plausibility standard is not "akin to a 'probability requirement,'" *Twombly*, 550 U.S. at 556, it does require a pleading to show "more than a sheer possibility that a defendant has acted unlawfully," *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with a defendant's liability,' it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (citing *Twombly*, 550 U.S. at 557). Avoiding dismissal under Rule 12(b)(6) requires a pleading party's complaint to provide "enough factual matter" to allow the case to move beyond the pleading stage of litigation; the

pleader must "nudge his or her claims across the line from conceivable to plausible." *Phillips*, 515 F.3d at 234-35 (quoting *Twombly*, 550 U.S. at 556, 570) (brackets omitted).

In deciding a 12(b)(6) motion, the Court of Appeals has instructed district courts in the Third Circuit to apply a three-step analysis: (1) "it must 'tak[e] note of the elements [the] plaintiff must plead to state a claim;'" (2) "it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth;'" and, (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679; *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011)).

In making the third determination in this three-step analysis, the court must be mindful that the matter pleaded need not include "detailed factual allegations," *Phillips*, 515 F.3d at 231 (quoting *Twombly*, 550 U.S. at 555), and, as noted, the court must construe all alleged facts, and draw all inferences gleaned therefrom, in the light most favorable to the non-moving party. *Id.* at 228 (citing *Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651, 653 (3d Cir. 2003)). Moreover, a pleading party need only "put forth allegations that 'raise a reasonable expectation that discovery will reveal evidence of the necessary element[s].'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009) (quoting *Graff v. Subbiah Cardiology Assoc., Ltd.*, No. 08-207, 2008 WL 2312671 (W.D. Pa. June 4, 2008)). A well-pleaded complaint, even when "it strikes a savvy judge that actual proof of [the] facts is improbable," will not be dismissed as long as the pleader demonstrates that his or her claim is plausible. *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 555-56).

Nevertheless, the facts provided do need to raise the expectation of relief above a purely speculative level, and must include more than "labels and conclusions, and a formulaic recitation

of the elements of a cause of action." *Phillips*, 515 F.3d at 231 (quoting *Twombly*, 550 U.S. at 554-56). Rule 8(a)(2) "requires a 'showing,' rather than a blanket assertion, of an entitlement to relief." *Id*. "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Fowler*, 578 F.3d at 210 (quoting *Iqbal*, 556 U.S. at 678).

## IV. DISCUSSION

At the outset, the Court agrees that the Port Authority Police Department is improperly named for the reasons set forth in the Port Authority Brief, (Docket No. 11, at 6-7). Specifically, the claims set forth against the Port Authority Police Department are not viable, as the Department is not a justiciable entity. *See Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 25 n.4 (3d. Cir. 1997) ("[W]e treat the municipality and its police department as a single entity for purposes of section 1983 liability"). Hence, the Port Authority Police Department shall be dismissed as a party defendant. The Court now turns to the Defendants' remaining arguments, reviewing the Complaint by count.

### A. Count I – Section 1983 Excessive Force

In Count I of the Complaint, Plaintiffs assert claims under 42 U.S.C. § 1983 against Sergeant O'Malley, Officer Rivotti, and John Doe Officers #1 and #2. (Docket No. 1, at pp 8-9). Specifically, Plaintiffs maintain that Defendants O'Malley and Rivotti used unlawful, unreasonable, excessive, deadly force in shooting Kelley, Jr. in the back repeatedly and to death in violation of the Fourth Amendment and 42 U.S.C. § 1983. (*Id.*).

Section 1983 serves as a means of vindicating violations of federal constitutional and statutory rights and provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the

deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law….

42 U.S.C. § 1983; *see also Groman v. Twp. of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995). In order to survive a motion to dismiss on a Section 1983 claim, a plaintiff must demonstrate that a person acting under color of law violated enumerated constitutional or statutory rights. *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 268 (3d Cir. 2000). "The first step in evaluating a section 1983 claim is to identify the exact contours of the underlying right said to have been violated and to determine whether the plaintiff has alleged a deprivation of a constitutional right at all." *Dorley v. South Fayette Twp. Sch. Dist.*, 129 F. Supp. 3d 220, 226 (W.D. Pa. 2015) (quoting *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000)). Qualified immunity then attaches "when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 584 U.S. ——, 138 S.Ct. 1148 (2018) (*per curiam*) (citations omitted); *Bland v. City of Newark*, No. 17-2228, 2018 WL 3863378 (3d Cir. Aug. 15, 2018); *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015); *El v. City of Pittsburgh*, No. CV 15-834, 2018 WL 3707420, at *9 (W.D. Pa. Aug. 3, 2018). The Supreme Court "stress[es] the importance of resolving immunity questions at the earliest possible stage in litigation" because the immunity is "an immunity from suit" that is "effectively lost if a case is erroneously permitted to go to trial." *Hines v. Neuhaus*, No. CV 17-1387, 2018 WL 1768047, at *3 (E.D. Pa. Apr. 11, 2018) (citing *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)).

The Port Authority Defendants move to dismiss the Plaintiffs' Section 1983 excessive force claims against the individual officer Defendants on the grounds that the use of force was reasonable and, in any event, the officers are entitled to qualified immunity. (Docket No. 11, at 10). In resolving questions of qualified immunity, "courts engage in a two-pronged inquiry: (1)

whether the plaintiff sufficiently alleged the violation of a constitutional right, and (2) whether the right was 'clearly established' at the time of the official's conduct." *Bland*, 2018 WL 3863378, at *10 (citing *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 241 (3d Cir. 2016)). A court may evaluate these two prongs "in the order [it] deem[s] most appropriate for the particular case before [it]." *Santini*, 795 F.3d at 418 (citation omitted).

In considering whether a plaintiff has established that a defendant violated his constitutional right to be free from excessive force, the United States Supreme Court in *Kisela v. Hughes* recently explained:

> In *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Court held that the question whether an officer has used excessive force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Ibid.* And "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.*, at 396-397, 109 S.Ct. 1865.

138 S.Ct. 1148, 1152 (2018); *see also Estate of Smith v. Marasco,* 430 F.3d 140, 149-50 (3d Cir. 2005) (explaining that in determining whether the use of force is objectively reasonable, the following factors need to be considered: "'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight . . . [whether] the physical force applied was of such an extent as to lead to injury . . . the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of

persons with whom the police officers must contend at one time'"') (quoting *Sharrar v. Felsing*, 128 F.3d 810, 821-22 (3d Cir. 1997)).

With respect to whether any right allegedly violated was clearly established at the time of the defendant's conduct, the *Kisela* Court further explained:

> Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. ——, ——, 137 S.Ct. 548, 551, 196 L.Ed.2d 463 (2017) (per curiam) (alterations and internal quotation marks omitted). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam).

> Although "this Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White*, 580 U.S., at ——, 137 S.Ct., at 551 (internal quotation marks omitted). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *Ibid.* (internal quotation marks omitted). This Court has "'repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.'" *City and County of San Francisco v. Sheehan*, 575 U.S. ——, ——, 135 S.Ct. 1765, 1775–1776, 191 L.Ed.2d 856 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)); *see also Brosseau, supra*, at 198–199, 125 S.Ct. 596.

*Kisela*, 138 S.Ct. at 1152.

"Moreover, at the time the action is taken, the 'legal principle [must] clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Bland*, 2018 WL 3863378, at *11 (citing *District of Columbia v. Wesby*, —— U.S. –——, 138 S.Ct. 577, 590, 199 L.Ed.2d 453 (2018) (internal quotation marks and citation omitted)).

In this case, Plaintiffs maintain that no reasonable police officer in O'Malley and Rivotti's shoes would have believed that they were not violating Kelley, Jr.'s right to be free from unlawful seizure by shooting him in the back repeatedly and killing him. (Docket No. 20, at 4). In response,

the Port Authority Defendants concede that a seizure occurred, *see Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), but dispute whether the use of deadly force against Kelley, Jr. was unreasonable. (Docket No. 11, at 10). To that end, the Port Authority Defendants contend that the clear threat posed by the decedent with his knife makes the use of deadly force in this case objectively reasonable under the circumstances. (Docket No. 11, at 12). Based on the facts as set forth in the Complaint even when viewed in the light most favorable to Plaintiffs, drawing all inferences in their favor, the Court agrees with the Defendants.

In evaluating whether the use of force was reasonable here, the Court weighs the facts "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Kisela*, 138 S.Ct. at 1152 (quoting *Graham*, 490 U.S. at 396). Qualified immunity is personal to the officers,[2] so the Court considers the facts as they would have appeared to O'Malley and Rivotti at the time of the incident, then determines whether their conduct was objectively reasonable.

As noted, during Kelley, Jr.'s encounter with the Port Authority police, the officers called for backup from the Port Authority K-9 Unit. (Docket No. 1, at ¶ 37). This Unit, consisting of Defendants O'Malley, Rivotti, and a german shepherd dog, arrived at the scene of an ongoing pursuit of a fleeing, armed suspect. (*See id.* at ¶ 41). According to the timeline as set out in the Complaint, Defendants O'Malley and Rivotti arrived to find Kelley, Jr. armed with a knife and refusing to cede to commands to drop that knife despite being cornered by fourteen officers with their guns drawn. (*See id.* at ¶ 37-41). There were also adults and children out in their yards. (*Id.*

---

[2] *Graham*, 490 U.S. at 397 ("the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.").

at ¶ 36).[3] Before releasing the dog, Defendant O'Malley warned Kelley, Jr. that he would do so. (*Id.* at ¶ 42). Kelley, Jr. still refused to drop his knife and threatened to stab the dog. (*Id.* at ¶ 43). The dog was released, and Kelley, Jr. slashed at the dog wounding it. (*Id.* at ¶¶ 44-47). Then the officers shot Kelley, Jr. (*Id.* at ¶ 48).[4] When examining these facts as an officer in O'Malley and Rivotti's position would have viewed them, the Court finds that their conduct was reasonable.

The Court is certainly guided by the Supreme Court's analysis in *Kisela*.[5] There, the police received a report of a woman "acting erratically" and "hacking at a tree with a kitchen knife." 138 S.Ct. at 1150. Upon arriving at the scene, the police officer observed the plaintiff emerge from a house carrying a large kitchen knife at her side and walking toward another woman, stopping approximately six feet from her. *Id.* at 1151. Although the plaintiff appeared calm, "she did not acknowledge the officers' presence or drop the knife" when commanded to do so. *Id.* In that case, the Supreme Court held that the police officer was entitled to qualified immunity when he shot the possibly threatening suspect after taking only "mere seconds to assess the potential danger." *Id.*

Here, there is no indication that Kelley, Jr. did not hear or understand the officers' commands to drop his knife. (Docket No. 1, at ¶¶ 39-40, 42-43). In fact, Kelley, Jr. repeatedly refused to drop his knife when so ordered by the police officers. (*Id.*).[6] He was also actively fleeing the police. (*Id.* at ¶ 30-32, 36). The Port Authority K-9 Unit was called to an active scene, and

---

[3] The Court acknowledges Plaintiffs' contention that Kelley, Jr. did not bother any of the adults and children that were out in their yards. (*Id.*). However, when considering the position of a police officer confronting a person with a knife, the Court considers the "threat that his conduct posed to those around him." *See Bland*, 2018 WL 3863378, at *5 (finding troopers who discharged their weapons did not violate clearly established constitutional rights given the troopers' reasonable belief that individual was armed and the mortal threat that his conduct posed to those around him).

[4] Plaintiffs do not challenge the use of the K-9 dog. Rather, they focus on the officers' alleged unreasonable force in firing seven shots at Kelley, Jr, killing him. (*Id.* at ¶¶ 48-54). They do, however, allege that the dog was improperly trained. (*Id.* at ¶ 54).

[5] Although issued after the events giving rise to this case, *Kisela* relies on authority that predates the events here, such as *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

[6] *Compare with Tenorio v. Pitzer*, 802 F.3d 1160 (10th Cir. 2015) (where the suspect was not given sufficient time to comply with the command to put down the knife).

arrived to find the suspect armed, dangerous, and unwilling to peacefully surrender despite being cornered in front of a house by fourteen officers with their guns drawn. (*Id.* at ¶¶ 37-41). Once he arrived, Defendant O'Malley first attempted to de-escalate the situation by warning Kelley, Jr. that he would release the dog unless Kelley, Jr. dropped his knife. (*Id.* at ¶ 42). The officers then attempted to disarm Kelley, Jr. by releasing the dog. Instead, Kelley, Jr. stabbed the dog. (*Id.* at ¶¶ 44-47). Based on all of these facts, the Court finds that it was objectively reasonable for Defendants O'Malley and Rivotti to believe that Kelley, Jr. posed a significant threat to them and others at the time the shots were fired.

While the Court acknowledges the well-pleaded facts regarding Kelley, Jr.'s conduct prior to Defendants O'Malley and Rivotti's arrival on the scene—including that he had been passively "hugging the gazebo" during the initial open container investigation, and that Kelley, Jr. did not explicitly threaten harm to any of the officers or bystanders while he was walking away, (*Id.* at ¶¶ 27, 34-36)—this conduct is not what Defendants O'Malley and Rivotti would have observed when they arrived on the scene. Instead, they would have known that they were joining a police pursuit of an armed suspect in a residential area and that the suspect had refused to drop his weapon, despite commands by the other officers to do so. (*See id.* at ¶¶ 22-41). Given the totality of Kelley Jr.'s actions, the Court further finds that a reasonable officer would have likely believed he was authorized to use deadly force against him.

Analogous cases from other circuits also favor O'Malley and Rivotti in this case. *See Blanford v. Sacramento County*, 406 F.3d 1110 (9th Cir. 2005) (where the police responded to a report that a man in a ski mask was walking through a residential neighborhood carrying a sword and acting in an erratic manner and shot him after he refused commands to drop his weapon); *Bland*, 2018 WL 3863378, at *5 (finding that officers who used deadly force against suspect at

terminus of high-speed chase did not violate any of suspect's clearly established rights, and thus officers were entitled to qualified immunity from § 1983 excessive force claims); *White v. Pauly*, 137 S.Ct. at 549, 551 (reversing the denial of qualified immunity for officer who, without giving a warning, shot and killed another individual who pointed a weapon at the officers surrounding the house and stating that "[c]learly established federal law does not prohibit a reasonable officer who arrives late to an ongoing police action in circumstances like this from assuming that proper procedures . . . have already been followed").[7]

On the other hand, the cases Plaintiffs cite are not only distinguishable, they are not persuasive. For example, in *Dawson v. Brown*, 803 F.3d 829 (7th Cir. 2015), the suspect had no weapon and was thus not actively refusing to drop a weapon when commanded by police officers. Plaintiffs also cite *Tenorio v. Pitzer*, 802 F.3d 1160 (10th Cir. 2015) for the proposition that Defendants O'Malley and Rivotti unreasonably escalated the situation to create the need to use force. In *Tenorio*, the court ruled that the suspect, who was carrying a small kitchen knife by his side, was not given sufficient time to comply with the command from police to put down the knife before police shot him immediately after yelling the command. 802 F.3d at 1160. As noted, Kelley, Jr. actively refused commands to drop his knife despite a warning that the dog would be released if he did not comply and he then proceeded to use his knife to wound the dog. (Docket No. 1, at ¶¶ 39-47). Given the officers' reasonable belief that Kelley, Jr. was armed and posed a mortal threat, the Court finds that O'Malley and Rivotti did not violate Kelley, Jr.'s clearly established constitutional rights and they are entitled to qualified immunity.[8]

---

[7] *But see Glenn v. Washington Cty.*, 673 F.3d 864, 870 (9th Cir. 2011) (where it was not clear that the decedent was actually threatening anyone, no serious crime was being committed, there was no effort to resist or evade arrest aside from failing to put down the knife, the failure to drop the knife may have been the result of confusion by an impaired person, and it might have been reasonable to use less intrusive force).

[8] Since the Court finds that Defendants O'Malley and Rivotti are entitled to qualified immunity, the punitive damages claims against them also fall away.

Plaintiffs also include in Count I claims against John Does #1 and #2 for excessive force. However, "[i]t is [ ] well-settled in the Third Circuit that the defendant's personal involvement in alleged constitutional deprivations is a requirement in a § 1983 case and that a complaint must allege such personal involvement." *Beckett v. Dep't of Corr.*, 2011 U.S. Dist. LEXIS 117547, *24, 2011 WL 4830787 (E.D. Pa. 2011) (citing *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1082 (3d Cir. 1976)). "Each named defendant must be shown, through the complaint's allegations, to have been personally involved in the events or occurrences upon which a plaintiff's claims are based." *Id.* Upon the Court's review of the Complaint related to the instant motions, the Court finds that Plaintiffs do not allege any personal involvement by John Does #1 and #2. Although Plaintiffs assert that these Defendants are liable to Plaintiffs for their unlawful use of deadly force, Plaintiffs do not specifically allege that John Doe Officers #1 and #2 shot or killed Kelley, Jr., or otherwise define any force these officers allegedly used on Kelley, Jr. Instead, the Complaint alleges that "Defendants O'Malley and Rivotti then shot Kelley 7 times – including 2 shots in the back – and killed him," (*Id.* at ¶ 48), and that "Defendants O'Malley and Rivotti used unreasonable, excessive, deadly force by shooting Kelley, Jr. in the back repeatedly and killing him," (*Id.* at ¶¶ 51, 56-57).

In addition, the Court notes that Plaintiffs have had sufficient time to identify these "Doe" individuals and have failed to do so. "It is well-settled that the use of John/Jane Doe defendants, absent compelling reasons, will not suffice and the district court may dismiss such defendants if plaintiff, after being granted a reasonable period of discovery, fails to identify the defendants." *James v. Varano*, No. 1:14-CV-01951, 2016 WL 4539195, at *1 (M.D. Pa. Aug. 31, 2016); *see also Blakeslee v. Clinton Cty.*, 336 F. App'x 248, 250 (3d Cir. 2009) ("Use of John Doe defendants is permissible in certain situations until reasonable discovery permits the true defendants to be

identified."). This case was initiated on December 11, 2017 and the incident is alleged to have occurred on or around January 31, 2016. Now, well over two years after the incident, there is no evidence before the Court that any investigative efforts have been made by the Plaintiffs to identify any of the John Doe Defendants during this two-and-a-half-year period. It would also seem to the Court that police reports would have identified all involved. Moreover, as noted in the Port Authority Brief, (Docket No. 11, at 5-6), the time for service on these individuals is long past. The claims against John Doe Officers #1 and #2 must likewise be dismissed.

Accordingly, the Court will dismiss all of Count I of the Complaint.

### B. Count II – Monell *Claim*

 Count II of the Complaint attempts to set forth a *Monell*[9] claim against Defendants Matthew Porter, John Doe #3 Supervisor, the County of Allegheny, and the Allegheny County Port Authority.[10] (*Id.* at ¶¶ 64-71). Plaintiffs specifically allege that Porter "was at all times material acting as Chief of the Port Authority Police Department" and "[a]s such, he was directly and personally involved in and responsible for the supervising of Defendants O'Malley, Rivotti, and the 2 John Doe Officers." (Docket No. 1, ¶¶ 65-66). John Doe #3 allegedly held a position subordinate to Defendant Porter, but superior to Defendants O'Malley, Rivotti, and John Does #1 and #2. (*Id.* at ¶ 67). Plaintiffs claim that Defendants Porter and John Doe #3 failed to supervise and/or discipline Defendants O'Malley and Rivotti for prior uses of excessive force. (*Id.* at ¶ 68).

Plaintiffs also allege that Defendants Porter, John Doe #3, the Allegheny County Port Authority, and Allegheny County "(i) had a practice and custom of acquiescing in their officers' use of excessive force; (ii) of failing to supervise and discipline Port Authority Offices who utilized

---

[9] *Monell v. Dept. of Social Svcs. of New York City*, 436 U.S. 658 (1978).
[10] The Court has already dismissed the Port Authority Police Department. Hence, no more need be said as to this Defendant.

excessive force; and (iii) of failing to provide adequate use of force training to their Officers." (Docket No. 1, at ¶ 69). "These unconstitutional practices and customs were the moving force behind the unlawful and unnecessary shooting death of Bruce Kelley, Jr." (*Id.* at ¶ 70).

In *Monell*, the United States Supreme Court held that municipalities and governmental units are "persons" subject to liability under 42 U.S.C. § 1983. *Monell*, 436 U.S. at 658-60. As a result, a governmental entity can be held liable under Section 1983 when its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . ." *Id.* at 694. To establish governmental agency liability pursuant to Section 1983, a plaintiff is required to identify the policy, custom or practice of the agency that results in the constitutional violation. *Id.* at 690-91.

"A municipality or other local government may be liable under [Section 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citing *Monell*, 436 U.S. at 691-92) ("Plaintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury.")); *Grazier ex rel. White v. City of Philadelphia*, 328 F.3d 120, 124 (3d Cir. 2003) (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989) (observing that a City "may be held liable if its policy actually causes injury.") (emphasis added)). But, under Section 1983, local governments are responsible only for "their *own* illegal acts," and "are not vicariously liable under § 1983 for their employees' actions." *See id.* (citations omitted). Rather, a plaintiff must establish the existence of a municipal "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694.

Policy is made when a "decisionmaker possess[ing] final authority to establish a municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986), *superseded in part by statute,* Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1072, § 102). Acts of municipal personnel may be imputed to a policy or custom of a municipal entity, rendering the municipal entity liable under Section 1983: (1) "where 'the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy;'" (2) "where 'no rule has been announced as policy but federal law has been violated by an act of the policymaker itself;'" and (3) "where the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.'" *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584, n. 10 (3d Cir. 2003) (quoting Justice Souter's dissenting opinion in *Bd. of County Comm'rs of Bryan County, Oklahoma v. Brown,* 520 U.S. 397, 417-18, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) for its "cogent and concise summary of the three situations in which a policy or custom sufficient to impose liability may arise"). Since a municipality "cannot be deemed to have engaged in a constitutional violation by virtue of a policy, custom, or failure to train" in the absence of a "conscious decision or deliberate indifference of some natural person," *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1063 (3d Cir. 1991), the complaint must allege facts showing "that a policymaker is responsible either for the policy or, through acquiescence, for the custom," *B.S. v. Somerset Cty.*, 704 F.3d 250, 275 (3d Cir. 2013) (quotation and citations omitted). Accordingly, to state a *Monell* claim upon which relief may be granted, a complaint must

include the identity of the municipality's final policymaker and factual allegations that "link the alleged offending policies or customs to" the final policymaker. *Rees v. Office of Children & Youth*, 473 Fed. Appx. 139, 143 (3d Cir. 2012) (holding that a complaint cannot state a *Monell* claim if it "fails to link the alleged offending policies or customs to anyone within [a municipality] who had policy-making authority").

Where a claim turns on failure to train, a "municipality's culpability for a deprivation of rights is at its most tenuous." *Connick*, 563 U.S. at 61; *see also Reitz v. County of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997) ("A plaintiff pressing a § 1983 claim must identify a failure to provide specific training that has a causal nexus with their injuries and must demonstrate that the absence of that specific training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivation occurred."). "Where the policy [or custom] concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to deliberate indifference to the rights of persons with whom the employees will come into contact." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014) (citations and internal marks omitted). Consequently, in order to state a *Monell* claim for failure to train, it is "'ordinarily necessary'" for a complaint to allege facts establishing "[a] pattern of similar constitutional violations by untrained employees." *See Connick*, 563 U.S. at 61.

While *Monell* liability is ordinarily established by showing a pattern of constitutional violations, *see Bryan County*, 520 U.S. at 407, the Supreme Court has recognized that where a violation of federal rights is a "highly predictable consequence" of an inadequate municipal policy or custom in a situation that is likely to recur, municipal liability may attach upon a single application of that custom, *Id.* at 409-10. In order to establish that a failure to train constitutes deliberate indifference, a plaintiff must typically demonstrate a pattern of similar constitutional

violations by untrained employees that shows the municipality was on notice of a deficiency in its training programs. *See El v. City of Pittsburgh*, No. CV 15-834, 2018 WL 3707420 (W.D. Pa. Aug. 3, 2018); *Thomas*, 749 F.3d at 223 (quotation omitted). A single incident, however, may establish failure-to-train liability where "the need for training can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights." *Thomas*, 749 F.3d at 223; *see also Connick*, 563 U.S. at 64 (a single incident may trigger municipal liability where unconstitutional consequences for failure to train are "patently obvious"). Further, to allege a failure to supervise claim under *Monell*, the Third Circuit has required a plaintiff to show that the municipality has "contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate." *Montgomery v. De Simone*, 159 F.3d 120, 127 (3d Cir. 1998) (citing *Bonenberger v. Plymouth Tp.*, 132 F.3d 20, 25 (3d Cir. 1997)). The Court will thus dismiss Count II as Plaintiffs have failed to state a cognizable *Monell* claim.

The Port Authority Defendants move to dismiss the *Monell* claim on the grounds that (1) a government agency cannot be found liable on a *Monell* claim where there has been no underlying violation of rights under Section 1983, (Docket No. 11, at 15 (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986))), and (2) the "Plaintiffs fail to provide any details, facts or specifics averring how Defendants failed to supervise, discipline or train the police officers" involved in this incident and fail to "allege any past constitutional violations that would put [the] Port Authority on notice of prior uses of excessive force or the need to supervise, discipline or train," (*Id.* at 19). The Court agrees.

Since the Court has found no underlying violation of rights under Section 1983 by Defendants O'Malley, Rivotti, John Doe #1 or John Doe #2, the *Monell* claim fails on that basis. *Mills v. City of Harrisburg*, 350 F. App'x. 770, 773, n. 2 (3d Cir. Oct. 30, 2009) ("Absent an underlying constitutional violation by an agent of the municipality, [ . . . ] the municipality itself may not be held liable under § 1983."); *Jackson v. City of Pittsburgh*, No. CIV.A. 07-111, 2011 WL 3443951, at *27 (W.D. Pa. Aug. 8, 2011), *aff'd sub nom. Jackson v. City of Pittsburgh Pa.*, 492 F. App'x 297 (3d Cir. 2012) ("It is well-established that Plaintiff's § 1983 claim against the City of Pittsburgh under *Monell* is 'derivative' in nature"). Further, the Court finds Plaintiffs' pleading deficient because the Complaint does not provide specific facts regarding any policy or custom and the policymaker allegedly responsible for same, or the alleged failure to supervise, discipline or train the police officers. Nor does it allege any past constitutional violations or prior uses of excessive force. Plaintiffs simply allege in paragraph 65 of the Complaint that Defendant Porter "was at all times material acting as Chief of the Port Authority Police Department," but do not indicate whether Defendant Porter had a policymaking role. (Docket No. 1, at ¶ 65). Paragraphs 66 through 68 at most allege supervisory liability, which as discussed above is not enough for *Monell* liability. (*Id.* at ¶¶ 66-68). Relative to paragraph 69, all of the averments made are conclusory at best. (*Id.* at ¶ 69). Similarly, paragraphs 70 and 71 are conclusory, as once again paragraph 70 refers to the "unconstitutional practices" without delineating same and paragraph 71 at best sets forth a legal conclusion that under *Monell*, Defendants should be liable. (*Id.* at ¶¶ 70-71). Such allegations do not meet the standards for pleading *Monell* liability nor the standards set forth by *Twombly* and *Iqbal*. *See Fowler*, 578 F.3d at 210 (quoting *Iqbal*, 556 U.S. at 678) ("[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice."); *Phillips*, 515 F.3d at 231 (Rule 8(a)(2) "requires a 'showing,' rather than a blanket assertion, of an entitlement to relief.") (quoting *Twombly*, 550 U.S. at 555, n.3).

In light of the Court's ruling above, the Court need not further address the Allegheny County Motion, (Docket No. 13), as the same rationale applies to said Defendant as to the Port Authority Defendants. Moreover, the Court takes judicial notice of the Railroad and Street Railway Police Act, 22 Pa.C.S. § 3301 et seq., which is in line with the position of Allegheny County, i.e. that the police officers employed by the Port Authority are appointed by the Governor of Pennsylvania upon the application of the Port Authority. (Docket No. 13, at ¶ 6). Plaintiffs' counsel does not contest this allegation. (*See* Docket Nos. 15, 16, 20). Hence, Allegheny County is dismissed as a party to this action.

### C. Leave to Amend

The United States Court of Appeals for the Third Circuit has held that "if a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips*, 515 F.3d at 245; *see also Grayson v. Mayview State Hosp.*, 293 F.3d 103, 113 (3d Cir. 2002). "A district court need not grant leave to amend a complaint if 'the complaint, as amended, would fail to state a claim upon which relief could be granted.'" *Tanksley v. Daniels*, 259 F. Supp. 3d 271, 304 (E.D. Pa. 2017), *aff'd*, No. 17-2023, 2018 WL 4087884 (3d Cir. Aug. 28, 2018) (citations omitted); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997) ("'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted."). Here, the Court finds that amendment would prove futile because, as discussed above, (1) qualified immunity is properly applied to O'Malley and Rivotti based on the present facts; (2) the Plaintiffs have failed to state a claim against Defendants John Doe #1 and #2; and (3) absent an underlying constitutional violation

by an agent of the municipality, the municipality itself may not be held liable under § 1983. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1434 ("In assessing 'futility,' the district court applies the same standard of legal sufficiency as applies under Rule 12(b)(6)."); *see also Koreny v. Smith*, 2018 WL 1141513 (W.D. Pa. Mar. 2, 2018) (stressing the importance of resolving immunity questions at the earliest possible stage in litigation as the defense protects not only the right to avoid standing trial, but also to avoid pretrial burdens, such as discovery; holding that "[u]ltimately, even with possible amendment, the qualified immunity hurdle appears insurmountable."); *Swope v. Northumberland Nat. Bank*, 625 Fed. Appx. 83, 87 (3d Cir. 2015) (finding dismissal of mortgagor's § 1983 claims against bank with prejudice was warranted where allegations made clear that bank neither deprived him of a constitutional right nor acted under color of law, rendering any amendment futile); *Johnson v. U.S. Dept. of Justice*, 541 Fed. Appx. 160 (3d Cir. 2013) (affirming denial of leave to amend and dismissal with prejudice where claims were barred by judicial immunity). Plaintiff had the opportunity to amend as a matter of course under FED. R. CIV. P. 15(a) and chose instead to respond to the instant motions. Since Defendants O'Malley and Rivotti are entitled to qualified immunity, amendment in this case would be futile and the Court will dismiss the Complaint with prejudice. *See also Roth v. City of Hermitage*, 709 F. App'x 733, 736 (3d Cir. 2017) (remanding to allow the District Court to consider whether the claims should be dismissed with prejudice on the basis of qualified immunity); *Dietrich v. Weibel*, No. CIV.A. 13-1404, 2014 WL 807987, at *9 (W.D. Pa. Feb. 28, 2014) ("Here, however, amendment would prove futile because the Court has found that the Affidavit, on its face, provided sufficient evidence to establish probable cause to arrest Plaintiff, and that qualified immunity is properly applied based on the present facts."); *Ridge v. Campbell*, 984 F. Supp. 2d 364, 372 (M.D.

Pa. 2013) (relying on *Grayson*, 293 F.3d at 113 and holding that because judicial immunity applied to the § 1983 claims, any attempt to amend the complaint would be futile).

## V.    CONCLUSION

Based upon the foregoing, the Port Authority Motion, [10], and the Allegheny County Motion, [13], are GRANTED, and Plaintiffs' Complaint shall be dismissed, with prejudice.

An appropriate Order follows.

*/s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

cc/ecf:  All parties of record.