IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


CALISIA KELLEY; and                 CIVIL ACTION
JOHNNIE MAE KELLEY,
Co-Administrators of the            No. 2:17-cv-01599-NBF
ESTATE OF BRUCE KELLEY,
JR., deceased,

Plaintiffs,

vs.                                 TRANSCRIPT

BRIAN O'MALLEY, both in his         VIDEOTAPED
Official and Individual             DEPOSITION OF
Capacities as Sergeant for          BRIAN O'MALLEY
the Allegheny County Port
Authority; and DOMINIC
RIVOTTI, in both his
Official and Individual
Capacities as Officer for
the Allegheny County Port
Authority,

Defendants,
Jointly and Severally.              TAKEN VIA ZOOM VIDEO CONFERENCE

                                    WEDNESDAY, OCTOBER 7, 2020


                                    Taken on behalf of Plaintiffs,
                                    Calisia Kelley and Johnnie Mae
                                    Kelley


                                    Counsel of Record for this Party:

                                    Noah Geary, Esquire
                                    Washington Trust Building
                                    6 South Main Street, Suite 225
                                    Washington, PA  15301
                                    724-222-3788

1  Videotaped deposition of Brian O'Malley, taken via Zoom video

2  conference on behalf of Plaintiffs, pursuant to Rule 30 of the

3  Federal Rules of Civil Procedure, by and before Rita A. Ross, a

4  Registered Professional Reporter and a Notary Public in and for

5  the Commonwealth of Pennsylvania, on Wednesday, October 7,

6  2020, commencing at 10:18 a.m., originating from the Law Office

7  of Noah Geary, 6 South Main Street, Suite 225, Washington,

8  Pennsylvania.

9                                      -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

APPEARANCES:


On Behalf of the Plaintiffs:  (Mr. Geary and the Court Reporter
physically present at Mr. Geary's Washington office.)

Noah Geary, Esquire
Washington Trust Building
6 South Main Street, Suite 225
Washington, PA  15301
724-222-3788
noahgearylawoffices@gmail.com


On Behalf of the Defendants:  (Mr. Evashavik and the Deponent
physically present at Evashavik Law, LLC)

Greg Evashavik, Esquire
Evashavik Law, LLC
310 Grant Street, Suite 2901
Pittsburgh, PA  15219
412-261-2813
greg@evashaviklaw.com


Also Present:

Robert Pealer, Videographer (Remotely)
Precise, Inc.
429 Fourth Avenue, Suite 200
Pittsburgh, PA  15219
866-277-3247

Ms. Calisia Kelley (Present at Geary Law Office)
Ms. Johnnie Mae Kelley (Present at Geary Law Office)

I N D E X

WITNESS                                                          PAGE

BRIAN O'MALLEY

Examination by Mr. Geary                                            5

Examination by Mr. Evashavik                                     125


DEPOSITION EXHIBITS PRESENTED TO THE WITNESS            PAGE

   6     Incident 16-00683 - Assault Knife - Wilkinsburg        75
         Borough - Timeline

  14     Use of Force Policy                                   104

  24     Answers to Interrogatories Directed to                 11
         Defendant Brian O'Malley

  25     Responses to Request for Production of Documents       14
         Directed to Defendant O'Malley

  26     K-9 Policy                                            120

  27     Facebook Posts                                        123

  28     Interview of Jermaine Wofford and Interview of         --
         Kevin Abramovitz (exhibit not used)

  29     NAPWDA K-9 Team Certification Test Sheet               49

  30     Interview of Sergeant Brian O'Malley                  109


DEPOSITION EXHIBIT MARKED FOR IDENTIFICATION            PAGE

  31     Audio/Video Recorded Statement of Sergeant            129
         Brian O'Malley (digital media)

5

1          (Whereupon, the deposition of Brian O'Malley

2     commenced at 10:18 a.m.)

3          THE VIDEOGRAPHER:  We are going on the record at

4     10:18 a.m. on Wednesday, October 7th, 2020.  This video is the

5     remote videotaped deposition via Zoom video conference of Brian

6     O'Malley, taken by the plaintiff in the matter of Calisia

7     Kelley versus Brian O'Malley, filed in the United States

8     District Court for the Western District of Pennsylvania.

9          My name is Bob Pealer, videographer and computer

10    technician employed by Precise, Inc.  And our court reporter is

11    Rita Ross, representing Ross Reporting Service.

12          Counsel, beginning with Plaintiff, please identify

13    yourselves for the record, and will the court reporter then

14    please swear in the witness.

15          MR. GEARY:  My name is Noah Geary.  I'm lawyer for

16    the plaintiffs in this case, Calisia Kelley and Johnnie Mae

17    Kelley, sister and mother of Bruce Kelley, Jr.

18          MR. EVASHAVIK:  I am Greg Evashavik.  I represent

19    both defendants.

20               BRIAN O'MALLEY,

21    having been first duly sworn, was examined and testified as

22    follows:

23               EXAMINATION

24    BY MR. GEARY:

25    Q.    Sir, good morning.  My name is Noah Geary.

1    Obviously, I'm the lawyer for Calisia and Johnnie Mae Kelley.

2         A.    Good morning.

3         Q.    Can you see me?

4         A.    Yes, sir.

5         Q.    And can you hear me?

6         A.    Yes, sir.

7         Q.    Have you ever had your deposition taken before?

8         A.    No.

9         Q.    Okay.  So every lawyer at the beginning of a

10   deposition kind of lays out what -- you know, how -- what it is

11   and how we're to conduct ourselves.  So just a couple things.

12             Number one, you're under oath, obviously, so you

13   must testify truthfully.

14             A deposition is a question-and-answer session.  I go

15   first, and then Mr. Evashavik goes after me.  We can go back

16   and forth a little bit after that, if necessary.

17             If my questions are unclear or vague, you can ask me

18   to repeat it or to rephrase.  I'll try to make it more clear.

19   If I go too fast, you can tell me to slow down.

20             Sometimes a witness will jump in and anticipate an

21   answer and maybe talk over the lawyer a little bit or maybe the

22   lawyer kind of talks over the witness.  If that happens, not a

23   big deal, but the stenographer will interrupt us and make sure

24   that -- she has to write down everything that everybody says

25   during this, and if we're talking over each other, she just

7

1   needs to separate us and make sure she gets it down.

2          If you give verbal responses, please -- some

3   witnesses will shake their head yes or no.  Some witnesses will

4   answer uh-huh or huh-uh.  If that happens, I'll prod you "Is

5   that a yes or a no?"

6          If you need a break, please let me know.

7          I'll show you some exhibits, and I'll ask you some

8   questions off of those exhibits.  Before I do that, I want you

9   to take your time and read the entire exhibit, be comfortable

10  with it.  So when I ask you questions off the exhibits, I just

11  want you to be comfortable with the exhibit before I ask you

12  questions.  I think that's it.

13         Do you have any questions about any of -- any of

14  those things?

15      A.    No, sir.

16      Q.    Okay.  Are you ready to proceed?

17      A.    Yes, sir.

18      Q.    Okay.  Please state your name again and spell it for

19  us.

20      A.    Brian O'Malley.  B-r-i-a-n.  O'M-a-l-l-e-y.

21      Q.    And your age, please?

22      A.    47.

23      Q.    And do you still work for the Port Authority Police

24  Department, sir?

25      A.    Correct.

1      Q.    Okay.  What's your rank as of today?

2      A.    Lieutenant.

3      Q.    And are there different levels of lieutenant or just

4  one level?

5      A.    One level.

6      Q.    Okay.  And can you give me the -- what's the

7  hierarchy at the Port Authority as far as rank?

8      A.    So it would be chief of police, lieutenant,

9  sergeant, detective sergeant, patrolman.

10     Q.    Are you on duty today, sir?

11     A.    Yes, sir.

12     Q.    What shift are you on?

13     A.    Today I work 1400 to 2200.  That's 2 p to 10 p.

14     Q.    Are you originally from the Pittsburgh area?

15     A.    Yes.

16     Q.    What part?

17     A.    South Hills.

18     Q.    And where did you go to high school, please?

19     A.    Canevin Catholic.

20     Q.    What year did you come out of there?

21     A.    1991.

22     Q.    And, what, did you go to W&J for college?

23     A.    Correct.

24     Q.    What year did you graduate from W&J?

25     A.    1995 into '96.  So '95-'96.

1    Q.    And what was your major at W&J, please?

2    A.    Sociology.

3    Q.    What did you do immediately after you graduated from

4  college as far as employment or further education?

5    A.    I was employed with Dietrich Industries.  It's a

6  steel company in La Porte, Indiana.

7    Q.    Okay.  And, roughly, how long were you there?

8    A.    Through that summer.

9    Q.    And then what was your next employment, please?

10    A.    Well, then I attended the -- I left Dietrich

11  Industries to attend the Allegheny County Police Academy.

12    Q.    And there's reference in your interrogatories you

13  worked for Bean Beverage in Pittsburgh as a manager in 1996.

14  Is that correct?

15    A.    Yes.

16    Q.    Were you still in college at that point?

17    A.    No.  I had left.  I -- so when I left college, it

18  was Dietrich Industries, went to the police academy.  So there

19  was sort of an overlap.  And then I was pre-service, so I

20  didn't have -- I didn't have a job when I left the police

21  academy because you're pre-service, so that's when I ended up

22  getting hired with Bean Beverage.

23    Q.    And what do you mean "pre-service"?

24    A.    So in the state of Pennsylvania, when you attend --

25  if you're not hired by an agency, you can -- you can obtain an

1  Act 120 certification, which is the police academy.  You can

2  pay to attend various institutions.  I know IUP.  I attended

3  the Allegheny County Police Academy, but some -- there's some

4  college institutions where you could attend and obtain that as

5  well.  So you're pre-service.  You don't have a job waiting for

6  you.

7       Q.    And then there's reference to a Banksville Beer in

8  Pittsburgh as a manager in '97.

9       A.    That's correct.

10      Q.    How long were you there roughly?

11      A.    Maybe -- I believe it might have been a few months,

12  close to a year.  Because that's when -- in '97 into '98 is

13  when I got hired with the Port Authority.

14      Q.    Okay.  So the academy, how long was the training

15  there in the academy?

16      A.    So when I attended, no longer than four months.  It

17  might have been 3 1/2 months, but it was no longer than four.

18      Q.    Okay.  And so prior to being hired by the Port

19  Authority, did you work in any job anywhere in your life in law

20  enforcement?

21      A.    Briefly, I worked for the Hanover Police Department,

22  which is -- I guess it's still called Star Lake.  They patrol

23  Star Lake.  I worked a couple shifts out there.  I don't know

24  if it's still called Star Lake.

25      Q.    Who was the chief there at the time?

1     A.    I couldn't even tell you.

2     Q.    Roughly, how long were you at Hanover?

3     A.    Weeks.

4     Q.    Okay.  Separate from Hanover, any other work

5  experience at any law enforcement agency?

6     A.    No, sir.

7     Q.    Did you serve in the military?

8     A.    No, sir.

9           (Whereupon, Deposition Exhibit 24 was presented to

10  the witness.)

11  BY MR. GEARY:

12    Q.    If you could take a look at what's Exhibit 24.  It's

13  answers to interrogatories.  You already answered some written

14  questions.  I have some questions for you on a couple answers,

15  please.  And specifically, if you could take a look at No. 20.

16          I'm sorry.  I'm sorry.  I'm going to ask you about

17  No. 12 first, then 20.  Sorry.  So let's start with No. 12.

18  Did you get a chance to reread that?

19    A.    I'm reading it now.  Okay.

20    Q.    Have you had a chance to read that?

21    A.    Yes, sir.

22    Q.    Okay.  So No. 12, "Did any citizen or other officer

23  or superior ever make any complaint against you for use of

24  excessive/unreasonable force during your employment with the

25  Port Authority Police Department?"

1          Your answer was "Yes."

2          Did I read that correctly?

3     A.    Yes.

4     Q.    Okay.  Detail for me who made the complaint against

5  you, what -- what time frame it was, and the nature of the

6  complaint.

7     A.    So that was a 2008 lawsuit.  It involved -- the

8  complainant was -- well, his last name was Bugno, and it

9  resulted from an arrest.  And it was a civil complaint, which

10 went to state court.

11    Q.    And what were the charges that you filed against

12 that person?

13    A.    I -- I did not file charges.

14    Q.    Okay.  What were the charges that were filed against

15 him, though.  The plaintiff.

16    A.    You know what, without looking at the case -- I

17 mean, this is in 2008.  I can't remember the exact charges.  I

18 believe it involved narcotics and resisting arrest.  There may

19 have been other charges.  I -- I just can't say right now.  But

20 I believe it was narcotics and resisting arrest and possibly an

21 aggravated assault.

22    Q.    What was the disposition of the criminal charges?

23    A.    I can't say.

24    Q.    And were you the only defendant named in the suit,

25 or were other officers sued as well?

1      A.    There was another officer.

2      Q.    And who was that, please?

3      A.    Ron Fukas.

4      Q.    Okay.  And what were the -- what was the nature of

5  the allegations as far as excessive force?

6      A.    Excessive force.

7      Q.    I mean, like, physical?  Was it physical touching,

8  or was it the use of an ASP or what was the allegation against

9  you?

10     A.    So the main part of the allegation against myself

11  and Sergeant Fukas was the use of a Taser.

12     Q.    Okay.  And who -- who was your attorney defending

13  you in that case?

14     A.    Nick Evashavik.

15     Q.    And did it go to trial?

16     A.    Yes, sir.

17     Q.    What was the jury verdict?

18     A.    The jury ruled in our favor.

19     Q.    And so looking at Nos. 12 and 20 there on these

20  written interrogation, 12 was "Did any citizen, officer, or

21  superior ever make a complaint against you for excessive

22  force?"

23           And, then, 20 is were you ever actually sued.  So

24  you just explained the lawsuit.  Was that the only lawsuit ever

25  filed against you in your career for excessive force?

1    A.    Yes, sir.

2    Q.    Okay.  Separate from that lawsuit, were -- were any

3  complaints made against you by citizens or suspects?  Complaint

4  being not a lawsuit, but a verbal or written complaint to your

5  chief or to the department.

6    A.    No, sir.

7    Q.    What about any other coworker make any allegation

8  against you for use of excessive or unreasonable force?

9    A.    No, sir.

10   Q.    So in your career, the only thing in your background

11  as far as allegations of excessive force was this lawsuit by

12  Bugno?  B-u-g-n-o.

13   A.    Yes.  That's correct.

14         (Whereupon, Deposition Exhibit 25 was presented to

15  the witness.)

16  BY MR. GEARY:

17   Q.    If we could go to the request for production of

18  documents, which is No. 25 -- Exhibit No. 25, No. 3, please.  I

19  asked about dashcam video and any other type of video on No. 3.

20  And your answer was "Not applicable."  Is that correct?

21   A.    Yes, sir.

22   Q.    So January of '016, the shooting and killing of

23  Bruce Kelley, Jr., were you wearing a body camera that day?

24   A.    No, sir.

25   Q.    And did the Port Authority Police Department just

1    not -- not have body cameras for officers at that time?

2         A.    That's correct.

3         Q.    Now, we'll get to the events of that day in a

4    moment.  Did you drive your unit to the scene at some point

5    that day?

6         A.    I drove my police car to Hamnett Station.

7         Q.    And did the -- did your unit have dashcam -- dash

8    camera capabilities?

9         A.    No.

10        Q.    Did any of the Port Authority units have dash camera

11   capabilities?

12        A.    No, sir.

13        Q.    Do they have that now?

14        A.    No, sir.

15        Q.    If we can move to January of '016, obviously, I'm

16   going to ask you many questions about the day of this incident,

17   January 31, '016.  Before we get to that, January of '016, how

18   many years had you had with the Port Authority at that point?

19        A.    18, into 19.

20        Q.    And were you a K-9 officer as of January of '016?

21        A.    Of January of '16?

22        Q.    Yes, sir.

23        A.    Yes.

24        Q.    And how long had you been a K-9 officer?

25        A.    Since 2003.

1    Q.    Okay.  Now, in the time period of January '016 and

2  you being a K-9 officer when you worked for the Port Authority

3  Police Department, were you always working in a role as a K-9

4  officer, or was it sometimes you were and other times you were

5  in a different type of capacity?

6    A.    Clarify the other type of capacity.

7    Q.    Just anything other than K-9.  Just, say, you were a

8  sergeant doing, say, patrol or duties that had nothing to do

9  with K-9.

10   A.    Well, K-9s are assigned to patrol.

11   Q.    Okay.

12   A.    So I was a sergeant assigned to patrol as well as

13  having a K-9.

14   Q.    So did -- every shift you worked in January of '016,

15  in that time period, were you in the capacity as a K-9 officer?

16   A.    Correct.

17   Q.    Okay.  And your K-9 partner was Aren.  Is that

18  correct?

19   A.    Correct.

20   Q.    A German Shepherd?

21   A.    Yes.  Aren was full German Shepherd.

22   Q.    Okay.  Now, is it correct that you and Aren were a

23  team, a K-9 team, as far as how it's phrased?

24   A.    That is -- that's a phrase that's often -- often

25  used and written down.  Correct.

1    Q.    And is the team you and -- and Aren, or was it, say,

2    you, another officer, and Aren?

3    A.    It was myself and Aren.

4    Q.    Okay.  How long, as of '016, had you and Aren been a

5    K-9 team or unit?

6    A.    Several years.

7    Q.    Okay.  And how many is several?

8    A.    I think I had Aren on the street for -- it was maybe

9    three, going into four.  So I don't believe it was longer than

10   four.  It was maybe coming up on four.

11   Q.    And in that time frame, how many other K-9 teams, or

12   units, did the Port Authority Police Department employ?

13   A.    We had two other teams.

14   Q.    And who were they, please?

15   A.    So that was Ron Fukas, who at the time was a

16   patrolman, and Sergeant Rob DiPippa.

17   Q.    And in the, say, three to four years you worked with

18   Aren, did you always work with Aren when you were working as a

19   K-9 officer?

20   A.    Yes, sir.

21   Q.    And DiPippa, his partner was whom?  What was the

22   name of the K-9?

23   A.    Arko, A-r-k-o.

24   Q.    And I think you said Fukas.  Can you spell Fukas,

25   please?

1      A.      F- -- F-u-k-a-s.  F-u-k-a-s.  First name is Ron,
2  R-o-n.
3      Q.      Thank you.  And what was his K-9 partner's name?
4      A.      It's slipping my mind.  Cordon, C-o-r-d-o-n.
5      Q.      Thank you.  Now, prior to Aren, did you have a
6  different K-9 partner?  A different dog?
7      A.      Yes.
8      Q.      Who was prior to Aren?
9      A.      My partner -- my first partner's name was Lord,
10  L-o-r-d.
11      Q.      What kind of dog was that, please?
12      A.      German Shepherd.
13      Q.      Okay.  So you became a K-9 officer in '03.  Is that
14  correct?
15      A.      Correct.
16      Q.      And Lord, was he your first partner?
17      A.      Yes, sir.
18      Q.      What kind of dog was Lord?
19      A.      A German Shepherd.
20      Q.      How long were you and Lord K-9 partners?
21      A.      I think Lord passed away in '10, into '11.  Around
22  that time frame.
23      Q.      So how long were you and Lord partners?
24      A.      Eight years.  It might have been eight years.
25      Q.      And then was there a K-9 partner in between Lord and

1 Aren that was your partner?

2     A.    No, sir.

3     Q.    Was there a gap in time where you did not have a K-9

4 partner?

5     A.    I mean, there's a gap for the selection period, so

6 I -- I don't know how long, but, I mean, it's -- it's -- by the

7 time -- I don't know how long that period was.  It might have

8 been a couple weeks.

9     Q.    Okay.  But -- so you've had two K-9 partners up and

10 to the date of this incident:  Lord and Aren.  Is that correct?

11     A.    Yes, sir.

12     Q.    Okay.  Explain for me, please.  How did it come

13 about that you became a K-9 officer?

14     A.    Post 9/11, the department chose to initiate a K-9

15 program.  That program was to be patrol dogs and explosive

16 detection dogs.  There was an interview process.  I interviewed

17 with the chief at the time and was selected.

18     Q.    Who was the chief at the time?

19     A.    William McArdle.

20     Q.    And at that time, '03, did the Port Authority have

21 three K-9 units?

22     MR. EVASHAVIK:  '03?

23     THE WITNESS:  Yeah.  I was the first one.

24 BY MR. GEARY:

25     Q.    Okay.  Because you said about '016, there were three

1  K-9 teams.  Fukas, DiPippa, and yourself as of '016.  So in '03

2  when it started out with K-9 teams -- the Port Authority having

3  K-9 teams -- did they start out with just one team or more than

4  one?

5          A.    I was -- I was the first one.

6          Q.    Okay.  And Lord was your partner?

7          A.    Yes, sir.

8          Q.    Okay.  Now, starting in '03 with Lord, you and Lord

9  obtained different credentials or certifications.  Is that

10 correct?

11         A.    Yes, sir.

12         Q.    And who -- who issued those citations and

13 credentials to you?

14         A.    The North American Police Work Dog Association.

15         Q.    And was there any other agency or entity that you

16 obtained credentialing through?

17         A.    With Lord, yes.

18         Q.    Okay.  Who else with Lord, please?

19         A.    The Alcohol, Tobacco and Firearms.  ATF.

20         Q.    And with Lord, with the North American -- what is

21 it? -- Man Dog Work Association?

22         A.    So it's the North American Police Work Dog

23 Association.  N-A-P-W-D-A.

24         Q.    Sorry.

25         A.    Often referred to -- referred to as NAPWDA.

1    Q.    Okay.  Police Work Dog Association.

2    A.    Yes.

3    Q.    What -- what areas did Lord get qualified in as far

4 as drug detection, bomb sniffing, suspect apprehension, so

5 forth?

6    A.    So his scent discipline -- all of our dogs up and to

7 this point -- even current -- are all explosive detection dogs.

8 And then --

9    Q.    I don't mean to interrupt.  I'm sorry.  There was

10 just one word I didn't catch.  You said his something

11 discipline.

12    A.    So all -- all of our dogs, their disciplines are

13 explosive -- their scent work are all explosive detection.  So

14 all of our dogs are explosive detection dogs.

15    Q.    Are you saying --

16    A.    So that was his scent -- that was -- his scent

17 discipline was -- Lord's discipline on the odor end was

18 explosive detection.

19    Q.    And I'm sorry.  Just -- are you saying "said" or

20 "scent"?  I just can't get the S-word.

21    A.    Scent, s- -- s-c-e-n-t.  Scent.  Scent discipline

22 was explosive detection.

23    Q.    Okay.  Thank you.  Was Lord qualified or

24 credentialed in other areas separate from the explosive

25 detection?

1          MR. EVASHAVIK:  Object to the form of the question.

2          You can answer.

3          THE WITNESS:  So his patrol discipline was -- there

4   was several areas.  That would be area search, tracking,

5   obedience, aggression control.

6   BY MR. GEARY:

7          Q.   And what is aggression control?

8          A.   So aggression control is the discipline involved in

9   making apprehensions.

10         Q.   Okay.  Now --

11         A.   It's tied in with obedience.

12         Q.   I've done some research on suspect apprehension.

13  I've read some literature on the bite-and-hold technique.  I

14  don't know if -- what words you used in the training or what,

15  you know, the proper usage in the industry is, so I'll ask.

16  Suspect apprehension, that was included under aggression

17  control?

18         A.   Correct.

19         Q.   And as of '03, was there something called a

20  bite-and-hold technique?

21         A.   I don't know.

22         Q.   Okay.  What were the -- for suspect apprehension, as

23  of '03, what were the techniques you were trained under to

24  apprehend a suspect?

25         A.   Can you clarify?

23

1    Q.    Right.  I read things about bite and hold where the
2  K-9 officer deploys the dog and the dog is supposed to bite a
3  body part or an arm of the suspect to get the suspect to comply
4  or otherwise drop a weapon.  So some literature said
5  "bite-and-hold technique" under suspect apprehension.  So I
6  think you just said -- well, I'm just asking.  On suspect
7  apprehension, what techniques were you trained to deploy Lord?
8    A.    So the techniques taught were suspect apprehension
9  on arm, shoulders.
10    Q.    Was it not called the bite-and-hold technique?
11    A.    No.  It was aggression control.
12    Q.    Okay.  So for suspect apprehension, if you deployed
13  Lord, just generally speaking, Lord was -- Lord was to do what?
14    A.    Well, I don't know what's -- you say "deployed."
15  How do you mean?
16    Q.    Well, say, in the training, what would -- yeah.
17  What would be the situations where it would be appropriate and
18  necessary to deploy Lord to apprehend a suspect?
19    A.    In training?
20    Q.    Yes.
21    A.    Well, there's different facets, but the garden
22  variety would be training a dog up to using a bite suit.
23    Q.    Okay.  And what would -- what would be the criteria
24  you were to consider for when it would be appropriate and
25  necessary to deploy Lord versus, well, maybe this is not the

1  right situation to deploy Lord to apprehend a suspect?

2              MR. EVASHAVIK:  Are you still referring to training?

3              MR. GEARY:  Yes.

4              THE WITNESS:  Well, I mean, if you are training,

5  you're setting yourself up for a training scenario.  So I -- I

6  don't understand your question.  If it's training, then you've

7  set the scenario up to train.

8  BY MR. GEARY:

9      Q.    Right.  And what scenarios were set up that you were

10 trained in?

11     A.    Well, you -- at times, you would have a person in a

12 bite suit.  At times, you would have a person -- the decoy, as

13 it's known -- to be not in a bite suit because the dog would be

14 in a muzzle.  So those are two that are probably used

15 predominantly.

16     Q.    Is decoy the suspect?

17     A.    Yeah.  So the decoy is often referred to as the

18 trainer who acts in a way as the suspect.

19     Q.    And the bite suit -- I think I know what you mean,

20 but can you describe the bite suit?

21     A.    Well, there's several -- there's many kinds.  But a

22 bite suit garden variety would be a jacket and a set of pants

23 that cover your entire body minus your feet and your hands and

24 your head, that give protection while you're decoying for a

25 particular dog through a scenario.  So it's a heavier -- sort

25

1    of the material that would be similar to, like, a heavy-duty

2    fire hose that fire departments use.  It's that type of heavy

3    material, if you were to feel it.  But there's several kinds,

4    so that's -- that's sort of the garden variety kind.

5         Q.    And what would be the scenarios that you

6    participated in with Lord in those training sessions?  Again,

7    the time frame right now I'm focusing on, say, '03 when you

8    started out.

9         A.    In training.  Correct?

10        Q.    Yes, sir.

11        A.    So those would be agitation, building searches in a

12   bite suit, suspect mocking, running from a particular area,

13   pretending to be a fleeing felon in a bite suit.  A person

14   attacking the -- the decoy would attack the officer and mimic

15   an attack on the officer to get a reaction from the dog, to

16   make an apprehension.  So anything that the dog, or Lord, would

17   see on the street, we trained.

18        Q.    And in some of those scenarios, would the decoy, or

19   suspect, be armed?

20        A.    There is a part -- so clarify being armed.

21        Q.    Well, would the decoy, you know, posing as a

22   suspect, have a knife or, say, a rubber knife in his hand, a

23   weapon, or a gun?

24        A.    No for the knife.

25        Q.    What about gun?

1    A.    Gunfire is used for a certification test.

2    Q.    Okay.  So in any of those scenarios with Lord, were

3  you trained with Lord in scenarios where the suspect has a gun?

4    A.    Yes.  Because you acclimate the K-9 to gunfire.

5    Q.    Okay.  What about --

6    A.    It's blanks.  Blanks.

7    Q.    I'm sorry.

8          THE REPORTER:  I didn't hear.

9          THE WITNESS:  It's a blank -- it's a blank gun,

10  obviously, because you're -- you know, you're not on a gun

11  range.  Yeah.  So they're shooting a blank gun, so mimicking

12  gunfire.  I should clarify.

13  BY MR. GEARY:

14    Q.    No.  I get it.

15          You said no as to the knife.  Gun, yes.  Any other

16  type of weapon that the decoy would -- would possess in these

17  scenarios where Lord was trained in suspect apprehension?

18    A.    So there's -- the other tool that's used by decoys

19  are what's called a bamboo stick, an agitation stick, padded

20  schlags.  And what those are used for is to act as a

21  distraction device when the dog is decoying and progressing

22  through training.

23    Q.    And so can you explain for me how -- how would the

24  agitation stick be used in the training of the -- of the dog?

25    A.    Well, when a dog starts to exhibit the right amount

1    of confidence and you start to progress through training, any

2    type of secondary device used as a distraction starts to get

3    implemented in training.

4            So, for instance, the bamboo stick is a rattle

5    stick.  And it does just that; it rattles.  So you're trying to

6    elicit a response from the dog that would go against any type

7    of confidence that you're trying to build up.  So if you rattle

8    and the dog -- if you rattle the stick and the dog backs off,

9    then you know that, you know, there's been that type of -- you

10   want to try to build on that confidence of him being around

11   that rattle.  That sound may not be -- he may not like that

12   sound.  So those -- those are how those tools are used.

13           Dogs -- or Lord, the dogs that we train with, we

14   never hit the dog.  So although those are called -- like, it's

15   a padded schlag and a bamboo stick, the dogs are never hit with

16   those in our training.

17       Q.    And what's the difference between an agitation stick

18   and the bamboo stick?

19       A.    Nothing really.

20       Q.    I assume the agitation stick is silent, does not

21   make noise.

22       A.    So a -- that's referred to as, like, a padded

23   schlag.  And it's, again, just something that you are

24   introducing -- introducing into the training to act as a

25   confidence builder and to elicit a response.  So it's just

1    something that the decoy can hold and -- and swing around and

2    stand above the dog to try to act as a distraction to see what

3    kind of response you've -- you're training into them.

4                MR. GEARY:  Did you get "schlag"?

5                THE REPORTER:  Uh-huh.

6                MR. GEARY:  Okay.  I just asked the stenographer if

7    she got "schlag" down.

8                THE WITNESS:  Yeah.  Don't ask me for spelling on

9    that one.  I'm not real sure.

10   BY MR. GEARY:

11       Q.   Now, as far as a gun with blanks in it, with Lord,

12   did you and Lord undergo training on suspect apprehension where

13   the decoy is holding a gun?

14       A.   I do not think I did that with Lord.

15       Q.   Okay.  At any point in your partnership with Lord,

16   did you do -- did you do that type of training?

17       A.   I can't recall if there was a changeover in the

18   NAPWDA training standards.  There are times where the board

19   looks at their standards and, when it comes to gunfire, that

20   has changed over the years.  So I don't know if Lord -- he may

21   have partaken in where the -- the decoy mocked a gun battle.  I

22   know he was exposed to the blanks as well as being exposed to

23   live fire on our range when we would go to range days.  So in

24   his time frame, I don't know if that was part of the

25   certification test.  I would have to go back and look.

1     Q.    And you say Lord was certified or credentialed
2 through ATF at some point?

3     A.    Yes, sir.

4     Q.    Was that prior to Lord obtaining Lord's
5 certification through NAPWDA?

6     A.    Well, I mean, we have -- we obtain NAPWDA
7 certification every year.  But Lord's certification through the
8 ATF was in the latter part of his career.  It might have been
9 in '08.  It was for explosive detection.

10     Q.    And was that the only thing for the ATF, their
11 purposes, explosive detection?

12     A.    Yes, sir.

13     Q.    Okay.  And did you ever -- and is the word "deploy"?
14 When I say the word "deploy," just from the literature, it's if
15 you, using layman's terms, like sic the dog on a suspect for
16 suspect apprehension.  The literature seems to use the word
17 "deploy."  I don't know if that's the correct word.  What's the
18 proper word there?

19     A.    Well, for us, it would just be a K-9 deployment, but
20 that carries many terms.  If I say I deployed -- it was a K-9
21 deployment on the aggression part of that, then that would
22 mean, to me, either an apprehension with a bite or an
23 apprehension with a no-bite.

24     Q.    Okay.  Thank you.  Can you explain to me the
25 difference between apprehension with bite versus apprehension

1    with no bite?  How was Lord trained -- and you trained?

2         A.    So in your training, if you deploy a K-9 in a felony

3    situation and suspect or suspects are running and the suspect

4    surrenders, you would use a call-off technique.  And so

5    although -- that would be a deployment no bite because the

6    suspect surrendered.  You do a recall on your dog, and you call

7    the dog back to the heel because the person is no longer

8    resisting arrest and fleeing.

9         Q.    In that scenario, in the moment that you deployed

10   the dog, if the suspect had not yet surrendered, what was the

11   dog supposed to do in that deployment?

12        A.    That would be make an apprehension.

13        Q.    And how was the dog to do that?

14        A.    How he was trained.

15        Q.    And how was he trained?

16        A.    The arm/shoulder area.

17        Q.    And what about the arm/shoulder area?  What exactly

18   was the dog supposed to do to the suspect to effect a

19   successful deployment?

20        A.    To make an apprehension.

21        Q.    And how so?

22        A.    With -- with his mouth.

23        Q.    Okay.  Yeah.  I didn't know if we're talking about

24   the no-bite technique versus the bite technique.  Let's start

25   with the no-bite technique.

1          MR. EVASHAVIK:  I'm going to object to the form of

2     the question.

3     BY MR. GEARY:

4          Q.    Did you explain -- did you explain that there were

5     two techniques for suspect apprehension, and one was the bite

6     technique and one was no-bite?

7          A.    So I said the two techniques that are used in the

8     certification are the -- it would be a deployment.  We talked

9     about deployment.  It was deployment, either bite or no bite.

10         Q.    Okay.  And when you deploy the dog, though, is the

11    initial intent that the dog is to bite the suspect?

12         A.    Yes, sir.

13         Q.    And on the arm or the shoulder.  Is that correct?

14         A.    Yeah.  Arm, shoulder, middle of the back.  But

15    that -- that area.

16         Q.    Any -- on the arm, any particular area on the arm?

17    Say, you know, lower arm?  Upper arm?

18         A.    I think that would depend on the suspect, if he's

19    running away.  But physiologically how a body is moving, it's

20    hard to say.  So if they always target, like, an elbow or it's

21    just where the dog has acquisition at the time.  So it's hard

22    to say any particular area.  It's just those areas that we

23    trained in.

24         Q.    And so was there a specific -- in the training,

25    was -- was Lord supposed to bite, say, the upper arm as opposed

1  to the lower arm of a suspect?

2      A.    You pointed -- you pointed to your bicep, though.

3  Is that where you were referring to?

4      Q.    Yeah.  I just gestured to upper arm versus lower arm

5  on my own arm.

6      A.    No.

7      Q.    Okay.  There's no preference as to what area of the

8  arm the dog is to bite?

9      A.    Well, you're pointing to, like, your front bi- --

10  are you demonstrating it, or...

11      Q.    I have -- I have no -- yeah, I have no idea.  I just

12  gestured to my arm, so...

13      A.    Okay.  No.  I think it's just on the arm/shoulder

14  area, that back area, from right to left.  So those areas are

15  trained.

16      Q.    So it can be anywhere on the arm?

17      A.    Running away, it would be on the triceps/shoulder

18  area, to across the back, to the other triceps/shoulder area.

19      Q.    And what if the suspect is stationary, not moving,

20  and, say, facing the dog?

21      A.    Then it would be an apprehension to the chest area.

22      Q.    And is that an apprehension with a bite?

23      A.    Well, I don't know what scenario we're using, so...

24      Q.    Well, I just want to go through each scenario you

25  were trained in as far as, say, apprehension of any suspect

1  with the bite technique.

2      A.    So we're not talking no bite now.  Right?

3      Q.    Right.  I'd like to --

4      A.    I'll -- I'll base this off what you just said.  So

5  if the suspect is facing me and I have grounds to deploy my K-9

6  to make an apprehension?

7      Q.    Yes.

8      A.    And he does not surrender.  Correct?

9      Q.    Correct.

10     A.    Okay.  So if he's facing me.  So then that bite --

11 we teach our dogs that could be in the frontal area.  Correct.

12     Q.    And specifically the chest?

13     A.    It could be the chest, shoulders.

14     Q.    Is the dog trained to do anything other than bite?

15     A.    No, sir.

16     Q.    Is the dog trained to, say, just jump up and lunge

17 and impact the suspect and knock the suspect backwards or to

18 the ground?

19     A.    No, sir.

20     Q.    And we were -- I prefaced all this talking about

21 '03, and I just -- as of '016, January, the date of this

22 incident, was Aren trained to do anything other than bite?

23     A.    No, sir.

24          MR. EVASHAVIK:  Well, I'm going to object to the

25 form of the question.  Are you limiting that to an

1  apprehension?  Because he may have had training in other areas

2  as well.

3          MR. GEARY:  Yeah.  No.  I mean, we'll -- we'll

4  get -- okay.  We'll just -- we'll deal with Aren separately.

5  But I follow you on the bite technique.

6  BY MR. GEARY:

7      Q.    And just so we're clear, so the dog is to bite.  And

8  in the training, the dog is not trained to, say, lunge and

9  knock the suspect backwards or over?

10          MR. EVASHAVIK:  Again, object to the form of the

11  question.  You mean without a bite?

12          MR. GEARY:  With or without.

13          THE WITNESS:  I can't answer that.  You're using two

14  different -- you're saying two different things.  Are you

15  saying with their paws, knock them over?

16  BY MR. GEARY:

17      Q.    Or however.  Yeah.  Is the dog trained to --

18  separate from biting, as an alternative or in addition to

19  biting, is the dog trained to, like, knock the suspect

20  backwards or knock the suspect over?

21      A.    I think that would happen from the suspect, not the

22  dog.

23      Q.    Right.  Well, I'm just asking on the training.  What

24  the dog specifically is trained to do.  What the dog is trained

25  to do when it's released for a suspect apprehension.

1      A.    Trained to make apprehension.

2      Q.    Okay.  And that's through bite only?

3      A.    Yes.

4      Q.    Okay.  Tell me about the -- the no-bite scenario.

5      A.    A no-bite would be -- well, paint the picture.  I

6  don't know how you want to use that.  Are you referring to the

7  fleeing person again?

8      Q.    Well, let's say the person is not fleeing.  They're

9  stationary, and they're facing the dog.

10      A.    So -- and they surrender?

11      Q.    No surrender.  In this scenario so far, no surrender

12  by the suspect.

13      A.    So then it would be an apprehension then.

14      Q.    Okay.  And what does that mean?  On an apprehension

15  in that scenario we just explained, what is the dog supposed to

16  do?

17      A.    Make an apprehension in the areas we just talked

18  about.

19      Q.    And make an apprehension by biting?

20      A.    Yes.

21      Q.    Okay.  Now, did you say there's an apprehension

22  where -- that does not involve the dog biting a suspect?

23      A.    No.

24      Q.    With the NAPWDA, you were -- both you and Lord were,

25  what, certified yearly through that entity?

1    A.    Yes, sir.

2    Q.    And what were the requirements, please?  Yearly

3    requirements.

4    A.    Well, on the -- there's two different -- there was a

5    test that you would take in front of a master trainer who is

6    certified with the North American Police Work Dog in the

7    various disciplines that you wanted to certify in, the ones

8    that we -- we just talked about that were mentioned.

9    Q.    And the master trainer, is that -- is that someone

10   who is associated with NAPWDA, or is it someone, say, from a

11   different entity or agency?

12   A.    The master trainers were from NAPWDA.

13   Q.    Okay.  And how much training on suspect apprehension

14   did -- let's focus on Aren now -- was Aren required to

15   participate in and complete in the years leading up to '016,

16   including '016?

17   A.    It was the same standards through NAPWDA.

18   Q.    Okay.  What was the yearly requirement for suspect

19   apprehension training for you and the dog?

20   A.    Are you referring to the test?

21   Q.    Just -- just the training and any other requirements

22   you were obligated to undergo to obtain the certification.

23   A.    Well, the training is 16 hours a month that we did.

24   But we didn't train just in suspect apprehension.  We trained

25   in tracking, area search, building search, explosive detection.

1   So that was training monthly, four hours a week.

2       Q.    And where would the four hours a week training go?

3   Again, we're focusing on Aren, say, '014, '015, '016.  Where

4   would the training occur?

5       A.    All over the county.

6       Q.    Okay.  And -- and the trainer would be the person

7   you -- you identified as the master trainer?

8       A.    Yes.  There were several master trainers that we

9   used, that we, as a training group -- and that group consists

10  of our dogs and dogs from various other agencies.

11      Q.    So in the time period of '015, January of '016 when

12  you and Aren would undergo these four hours a week training on

13  suspect apprehension, who was the master trainer?

14      A.    There were several.  Pat Moloney.  Bill Sombo.

15  Franco Angelini.  Bill Castle.  I think that's it.

16      Q.    And you said the requirement of the NAPWDA was 16

17  hours a month.  Is that right?

18      A.    Yes.  For the disciplines that you're certifying on,

19  yes.

20      Q.    Okay.  How many -- was there a minimum requirement

21  of how many of those 16 hours a month had to be dedicated to

22  suspect apprehension?

23      A.    I'm not sure if that's mentioned in the bylaws.

24  That's more -- that's -- the training weekly is -- is left up

25  to the handlers and the unit itself.

38

1    Q.    So do you not know whether there was a minimum
2  requirement of the 16 monthly hours?
3    A.    The -- I would have to refer to the -- the bylaws
4  themselves.  I know the 16 hours that you get monthly encompass
5  the disciplines that you're certifying in.  So those 16 hours a
6  month involve tracking, aggression, building search, obedience.
7    Q.    How many hours of the 16 -- aside from whatever the
8  minimum requirement was for suspect apprehension, how many
9  hours of the 16 per month were devoted to suspect apprehension?
10  I'm talking about --
11         MR. EVASHAVIK:  I'm going to object to the form.
12  Let me object to the form of the question.  The witness didn't
13  answer affirmatively that there was a minimum number of hours
14  required of the 16 for apprehension.  That's -- that was the
15  foundation of this question.
16         MR. GEARY:  Right.
17  BY MR. GEARY:
18    Q.    So my next question is:  If you don't know what the
19  minimum number was, I understand that.  In practice, how many
20  hours a month would you train with Aren in suspect
21  apprehension?
22         MR. EVASHAVIK:  And, again, I'm going to object to
23  the form of the question.  You're presuming that there is a
24  minimum number of hours that must be dedicated to apprehension.
25  So for that basis, I object to the form of your question.

1  BY MR. GEARY:

2      Q.    Okay.  You can answer.

3      A.    So at times -- if you look at a month, our

4  training -- there's, you know, four Tuesdays.  We would train

5  on Tuesdays.  We generally try to split it eight and eight,

6  eight hours to scent detection work and eight hour to patrol

7  work.  To say we did that all the time -- there would be times

8  where we spent 12 hours a month to patrol work and four to

9  detection work only because detection work is a little easier

10  to work one-on-one while you're working the shift.  It's a

11  matter of just placing training aids out as opposed to the

12  patrol work where you require extra decoys to help you out.

13      Q.    Thank you.  So on the -- on the scent detention work

14  versus the patrol work -- the scent detention work -- sorry --

15  detection.  Scent detection, did that not involve suspect

16  apprehension?

17      A.    No.

18      Q.    Did the patrol work involve scent detection?

19      A.    No.

20      Q.    Did the patrol work involve suspect apprehension?

21      A.    It could.

22      Q.    Okay.  Did you ever -- now, not training but on a

23  shift -- deploy Lord to apprehend a suspect?

24      A.    Yes.

25      Q.    Okay.  How many times?

1      A.    Twice.

2      Q.    Okay.  What year was the first time?

3      A.    I can't recall.

4      Q.    Can you just give me an -- an approximate?

5      A.    No, I really -- I really can't.  I would have to go

6  back and look at my training records.

7      Q.    Okay.  So you were partners '03 to '010 roughly.  Is

8  that right?

9      A.    Yeah.  Into that time frame, yes.

10      Q.    Okay.  Was this first deployment of Lord closer to

11  '010 or closer to '03?

12      A.    It was probably right in the middle.

13      Q.    Thank you.  Please explain what -- what the scenario

14  was that developed and what happened and the deployment and was

15  it successful or not, so forth.

16      A.    So it was a fleeing felon with a handgun, and that

17  involved the City of Pittsburgh.  And he fled into the woods,

18  and Lord made an apprehension.

19      Q.    Were there other K-9 teams on scene?

20      A.    I don't recall.

21      Q.    Okay.  And what -- what was the name of the -- the

22  suspect?

23      A.    I don't recall.

24      Q.    Was it male or female?

25      A.    Male.

1  Q.   Okay.  And was the male -- were they white?  Black?

2  Hispanic?  Asian?

3  A.   It could have been an African American male.

4  Q.   Okay.  And describe for me, please, the actual

5  deployment.  What was happening right before you decided to

6  deploy Lord?

7  A.   The -- Lord was deployed in a section of woods that

8  were a heavy thicket.  And it was an area search, which is an

9  off-lead search.  Off lead, meaning off leash.  And he fled

10 into the woods, which posed a threat to officers actually going

11 into the woods, so the K-9 was sent.  And shortly after being

12 sent, located the suspect.

13 Q.   Was the suspect armed?

14 A.   Yes.

15 Q.   With what?

16 A.   A handgun.

17 Q.   So when you deployed Lord, could you even see the

18 suspect?

19 A.   No.

20 Q.   And was Lord to find the suspect, in part, using the

21 scent of the suspect?

22 A.   That would be part of it.  Correct.

23 Q.   And what other tools would Lord have used to locate

24 and apprehend that suspect?

25 A.   Well, he could have used scent, and he could have

1  used hearing, sight.  So, you know, probably those three.

2      Q.    And did Lord bite that suspect?

3      A.    Yes.

4      Q.    Okay.  And how -- how did you realize that Lord had

5  successfully located the suspect?

6      A.    I believe I could hear a commotion in the woods.

7      Q.    And so did you just follow whatever noises you

8  heard, and that led you to where the dog and the suspect were?

9      A.    Yes.

10     Q.    Okay.  And in that instance, did you learn where on

11  the suspect's body that Lord had bit?

12     A.    Yes.

13     Q.    Where on the suspect's body?

14     A.    He had -- there was two areas.  I think -- again, I

15  would have to go back to my records.  It was determined that he

16  was -- he was fighting Lord.  Because when we came upon him, he

17  was kicking him in the face several times.  So I believe it

18  might have been like the lower -- lower foot and arm, but I

19  would have to look at my records.

20     Q.    The suspect was kicking Lord?

21     A.    Yeah.  He was fighting him.

22     Q.    And then did you or other officers have to intervene

23  in that?

24     A.    He was -- yes, he was handcuffed.

25     Q.    And I think you said you deployed Lord for a suspect

1    apprehension one other time in your career.  Is that right?

2         A.    Correct.

3         Q.    Please lay that out for me.

4         A.    A robbery that occurred at the South Hills junction,

5    which is located in the Beltzhoover -- Beltzhoover area.  It's

6    a terminus where the Port Authority transit buses are located.

7    And the suspects ran -- it was up into Beltzhoover.  And I

8    sent -- I located them running and sent Lord on an

9    apprehension.

10        Q.    Was the suspect armed?

11        A.    No.

12        Q.    And in that instance when you deployed Lord, could

13   you see the suspect?

14        A.    Yes.

15        Q.    Okay.  And what was the distance from you and Lord

16   to that suspect, please?

17        A.    10 yards.

18        Q.    What was that suspect's name?

19        A.    I would have to look at my records.  I don't know.

20   I don't recall.

21        Q.    Male?

22        A.    It was a male.

23        Q.    Okay.  Black?  White?  Other?

24        A.    He was a black -- black male.

25        Q.    And tell me what -- when you deployed Lord, what did

1  you see Lord do?

2      A.    Lord ran downfield, which was -- downfield,

3  referring to towards the suspect.

4      Q.    And then tell me what you watched Lord do.

5      A.    I watched the suspect stop, raise his hands up in

6  the air, and say "I surrender."  And then I recalled Lord back

7  to my side.

8      Q.    And I'm sorry.  You said the suspect was armed?

9      A.    No, he was not.

10     Q.    Oh, okay.  I'm sorry.

11           So those were two deployments of Lord, is that

12  correct, in your career?

13     A.    Yes.

14     Q.    And were they both successful deployments?

15     A.    Correct.

16     Q.    Okay.  Did you ever deploy Aren prior to January 31

17  of '016 with this Bruce Kelley, Jr., incident?

18     A.    Are we -- when we use "deployment," are you

19  referring to apprehension?  Correct?

20     Q.    Yes, sir.

21     A.    No.

22     Q.    Okay.  Had Aren undergone training on how to

23  apprehend a suspect?

24     A.    Yes, sir.

25     Q.    Okay.  And would the training of Aren be the same or

1    equivalent of the training that Lord underwent?

2        A.    No.

3        Q.    Okay.  And tell me how the trainings of the two dogs

4    were different, please.

5        A.    If you remember me saying, the certification at some

6    point changed, and it involved gunfire in the actual

7    certification test.  So he -- Aren may have got more extensive

8    certification training than what Lord got in his initial

9    training.

10        Q.    Okay.

11        A.    So that -- there was a changeover.  So, actually, in

12    short, the test got harder.

13        Q.    And separate from what you just explained, were

14    there any other differences in the training between Aren and

15    Lord?

16        A.    No.

17        Q.    Lord had some credentials or qualifications through

18    ATF.  Did Aren have any certifications or qualifications

19    through any other entity separate from NAPWDA?

20        A.    No.

21        Q.    Using January 31st, '016, as a reference point, when

22    was the most recent time, the date on which Aren had undergone

23    suspect apprehension training?

24        A.    Probably that month.

25        Q.    Okay.  And when you say "probably that month," when

1  you use the word "probably," does that -- does that mean maybe

2  in January of '016 Aren did not undergo any training regarding

3  suspect apprehension?

4       A.    No, that's not what I mean.  So he -- we do -- that

5  was the end of the month, the 31st.  So during that month, we

6  did patrol training.

7       Q.    Okay.  And are there records that prove that Aren

8  actually underwent suspect apprehension training in that month

9  of January?

10            MR. EVASHAVIK:  Object to the form.

11            THE WITNESS:  Yes.

12 BY MR. GEARY:

13      Q.    Okay.  How many hours of suspect apprehension

14 training did Aren have in January of '016?

15      A.    Well, he had gone through several certification --

16 NAPWDA certification, yearlies, so Aren had had hundreds of

17 hours.

18      Q.    Well, I'm focusing on the month of January of '016.

19 This happened on January 31st.  How many hours of suspect

20 apprehension training did Aren have that month, January of

21 '016?

22      A.    I don't know.

23      Q.    Okay.  What about December of '15?

24      A.    I would have to look at my records.

25      Q.    Okay.  What about November of '15?

1      A.    Again, I would have to look at my records.

2      Q.    Okay.  Would that be the same for all the months in

3  '015?  You would have to look at your records?

4      A.    Correct.

5      Q.    Okay.  Do you have your records with you?

6      A.    No.

7      Q.    I'm looking at a -- at a document.  I can scan this

8  in and e-mail it to you.  I didn't intend to reference it, but

9  if you -- I can scan it over.  It says -- it's 10/13/015 NAPWDA

10  K-9 Team Certification Test Sheet.  Last name, O'Malley.  K-9

11  name, Aren.  James Moloney is the master trainer.  He signed

12  it.

13          And then there's pass -- there's phases tested in,

14  and then there's pass and fail.  So it has categories:

15  Obedience, pass.  Area search, pass.  Tracking, pass.  Building

16  search, pass.  Aggression control, pass.  And then Moloney

17  signs those and dates them all the same date.

18          So, for instance, on October of '015 on this

19  training session, it says -- it's titled "Certification Test

20  Sheet."  It says "Aggression Control, pass."  Can we tell from

21  this piece of paper how many hours of aggression control

22  training Aren underwent in that training session?

23          MR. EVASHAVIK:  Object to the form of the question.

24  We haven't seen the paper.

25          MR. GEARY:  Okay.  Give me -- yeah.  If you just

1     give me, like, two minutes, please, I'll just go up, scan it

2     in, and e-mail it to you, Greg.

3            MR. EVASHAVIK: Well, why don't we -- it's been an

4     hour and a half. Let's take a restroom break.

5            MR. GEARY: No. That's fine.

6            MR. EVASHAVIK: All right. Off the record.

7            THE VIDEOGRAPHER: We're going off the record at

8     11:28 a.m.

9            (Whereupon, a brief recess was taken.)

10           THE VIDEOGRAPHER: Back on the record at 11:40 a.m.

11    BY MR. GEARY:

12       Q. Okay. Lieutenant, are you ready?

13       A. Yes, sir.

14           MR. EVASHAVIK: Let me just say, Noah, for the

15    record, whatever you sent me wasn't attached. But we found it

16    anyway in -- I think what you're referring to, we found in the

17    documents that he produced to you. This document.

18           MR. GEARY: Oh, I'm sorry. Can you just, like, give

19    me ten seconds? I just want to look to my computer, because it

20    went through on my end that it was attached. I apologize.

21           MR. EVASHAVIK: I think I have the same thing, so it

22    won't matter. No, it wasn't attached on my end. But let's --

23    can you identify it? We might have it anyway, so you don't

24    have to check.

25           MR. GEARY: Sure. No. So this would be Exhibit 29.

1  Certification test date:  10 -- it looks like 13 -- '015.

2  Certificate Number Issued:  No. 39023.  Type Member:  Regular.

3  O'Malley.  Aren.  And then Master Trainer Comments:  Team

4  passed all phases testing.

5       MR. EVASHAVIK:  Yeah.  We have it.  Okay.  What's

6  the number, again?

7       MR. GEARY:  Exhibit No. 29.

8       MR. EVASHAVIK:  All right.  You can proceed.

9       MR. GEARY:  Thank you.

10       (Whereupon, Deposition Exhibit 29 was presented to

11  the witness.)

12  BY MR. GEARY:

13       Q.    Sir, could you take a look at that one piece of

14  paper?

15       A.    Go ahead.

16       Q.    And is this a K-9 Team Certification Test Sheet from

17  October of '015 involving you and Aren?

18       A.    Yes, it is.

19       Q.    And it says "Phases Tested In."  Aggression control

20  is one of them.  Is that true?

21       A.    Yes.

22       Q.    And it says "Pass."  Is that correct?

23       A.    Yes.

24       Q.    And by James Moloney, who would have been the master

25  trainer?

1      A.    Yes.

2      Q.    Thank you.  Now, so there was a training session

3  that day.  Correct?

4      A.    A certification -- a certification test that day.

5      Q.    Okay.  And when you would have a certification test,

6  would you have that on the -- on the same day that there would

7  be training, or would it be on a completely different day?

8      A.    Are you referring to our normally -- normal

9  scheduled training day?

10     Q.    Yes.

11     A.    It's hard to say.  I mean, I think we would use

12  availability of the trainer, the tester.

13     Q.    So would you sometimes have a test -- a

14  certification test the same day as a training session?

15     A.    No.  A test -- a certification test day is -- is

16  just certification because it takes a long time.

17     Q.    Okay.  How long, roughly, would the -- would the

18  test take?

19     A.    Which part?

20     Q.    Well, just -- I mean, the whole thing.  Just

21  overall.

22     A.    For just one dog or all the dogs?

23     Q.    Just, say, you and Aren.

24     A.    Several hours.

25     Q.    Okay.  And for the aggression control component,

1    what would you have to do during the test to obtain a pass?

2         A.    So at that point in time at 2015, the -- your K-9

3    would have to be at a heel position, which was next to you, off

4    leash.  The decoy would be downfield from you at a designated

5    distance.  And at that time, I believe there was that

6    distraction gunfire that was used.  Then an apprehension

7    command would be given, followed by a recall command where the

8    dog would return to the heel position.

9              Once successfully -- successfully done, the K-9

10   would be sent on an apprehension.  The handler would move

11   downfield, make an "out" call to the dog.  The dog would return

12   to a heel.

13             The handler would walk up to the decoy.  The decoy

14   would then mock an assault on the officer, at which point the

15   apprehension command would be given again.  Once successfully

16   done on an apprehension, the handler would make another out

17   command.

18             Once successfully done and the dog returned to a

19   heel position or a down position, the handler would walk up to

20   the decoy and mimic a pat-down, which is going hands-on,

21   patting somebody down as if they may have weapons, simulate an

22   arrest with handcuffs being placed on, and walking that -- the

23   decoy from the field with the dog at a heel position off leash.

24        Q.    Thank you.

25        A.    If all those are done --

1    Q.    I'm sorry.  Go ahead.

2    A.    I said if all those are successfully done, then it

3    would be marked a pass.

4    Q.    Thank you.  A couple questions.  When you say -- you

5    used the word "handler."  Would the handler be you, for Aren?

6    A.    Yes.

7    Q.    And are handler and K-9 partner interchangeable

8    terms?

9    A.    No.

10   Q.    Okay.

11   A.    I don't know how you're using that.  So the handler

12   is the handler, and the K-9 is the K-9.

13   Q.    No.  Yeah.  Understood.  No, I get it.

14         You said the decoy would be at a designated distance

15   during this test.

16   A.    Yes.

17   Q.    What -- what was the distance?

18   A.    It may have been 10 yards, 15 yards.

19   Q.    And on the apprehension, you explained the handler

20   would walk up to the decoy.  And, what, the decoy would

21   simulate -- simulate assaulting the handler?  Is that right?

22   A.    No.  So an out command would be given after the

23   handler walked up on the decoy.  After that point, an out

24   command would be given, and the dog would out and return to a

25   heel.

1      Q.    And who gives the out command?

2      A.    The handler.

3      Q.    And you reference -- you said "once the apprehension

4   was successfully done." So what would be -- for the test, for

5   passing the test, what would Aren have to do as far as for the

6   apprehension of the decoy to be successful?

7      A.    That -- that's what I just explained.

8      Q.    Does he bite the decoy?

9      A.    The whole -- the whole test?

10     Q.    Yeah. On the -- on the apprehension part of the

11  test, does Aren have to bite the decoy?

12     A.    Yes. So when I say apprehension, it's -- it's

13  apprehension with mouth.

14     Q.    And when you give your command to Aren in those --

15  for the test to apprehend the suspect, where are you? Are you

16  next to the dog? Or where are you?

17     A.    To start the test?

18     Q.    Just whenever you give the command for -- for Aren

19  to apprehend the decoy. Would you be next to the dog?

20     A.    Possibly.

21     Q.    Okay. Could you also be, say, near -- closer to the

22  suspect?

23     A.    During that test, yes.

24     Q.    So this certification test sheet, I appreciate your

25  explaining. So this Exhibit 29, it's not a -- a training

1  record?

2      A.    No.  That's a training record.

3      Q.    Okay.  And it -- like you explained it, it

4  encompasses the tests that were administered that day that you

5  and Aren took and passed.  Correct?

6      A.    Yes.

7      Q.    Are there training records that exist separate from

8  the certification tests that memorialize and document the

9  monthly training sessions and what was -- what was done and how

10  things went?

11      A.    Yes.

12      Q.    Okay.  Now, did you personally -- being a K-9

13  officer, did you personally or in conjunction with the Port

14  Authority maintain those training records?

15      A.    Yes.

16      Q.    Okay.  And I assume -- did the master trainer also

17  maintain such records?

18      A.    The master trainer maintains the records of the

19  certification.

20      Q.    And when you say "of the certification," what do you

21  mean "of the certification"?

22      A.    The test.

23      Q.    Okay.  So the master trainer does not keep records

24  of the training sessions?

25      A.    No.  At least I don't think they do.

1    Q.    Thank you.  Okay.  Let's get to the events of

2  January 31, '016.  Obviously, you were working that day, sir?

3    A.    Yes, sir.

4    Q.    What was your rank at the time?

5    A.    I was a sergeant.

6    Q.    And was there one level of sergeant or several?

7    A.    One level.

8    Q.    And what shift were you working?

9    A.    P.M. shift, which was 1400 to 2200.

10   Q.    And what was your assignment when you started that

11 shift that day?

12   A.    Shift commander.

13   Q.    And so what did that -- your duties as a shift

14 commander would include what range of duties?

15   A.    Assigning officers to particular districts within

16 the county.

17   Q.    And as the shift commander, were you stationed in

18 the Port Authority Police Department station?

19   A.    Yes.  That's where we report, correct.

20   Q.    Okay.  And then when you arrived and started your

21 shift that day, please just break down -- what were the things

22 that you did before this incident developed?

23   A.    At 1400, we have a roll call.  At that time, each

24 particular officer working that -- that shift is assigned a

25 particular patrol district.  Also at that time we use the

1    opportunity to conduct any, quote/unquote, roll call training

2    that we may want to pass on to the officers, and that could

3    involve any type of training.  I don't know if we did any that

4    day, but use that opportunity, since everybody is together, to

5    do that.

6            And once the officers are assigned their districts,

7    they're dismissed and they respond out to whatever their

8    assigned areas are.

9        Q.    How many officers on duty on that shift?

10       A.    I don't recall.  I would have to look at the

11   shift -- deployment shift sheet.

12       Q.    What's an approximate number, typically, in that

13   time frame?

14       A.    On -- on a Sunday, there could anywhere be

15   [verbatim] from nine to six.

16       Q.    And you did the roll call, and you give the

17   assignments.  And then what did you proceed to do?

18       A.    I believe I was at the station.  What I did, I don't

19   recall.  What I was -- my actual doing, I don't recall.

20       Q.    And then at some point, do you acquire information

21   that there's some incident which you responded to?

22       A.    Yes.

23       Q.    Okay.  Please walk me through that.

24       A.    Over the radio, I heard Officer Adams make a

25   reference that both he and Officer Hampy would be exiting the

1     car at the gazebo in Wilkinsburg.

2         Q.    And over the radio -- did you have a radio, say, on

3     your shoulder there as part of your uniform that day?

4         A.    Yes.

5         Q.    And then is there also, separate from that, a radio

6     at your desk or near your desk?

7         A.    We have a dispatch center located inside our police

8     department.

9         Q.    And so did you -- separate from whatever was on your

10    uniform, on your shoulder, was there a separate radio nearby to

11    you where you -- you heard this transmission coming through?

12         A.    No.

13         Q.    Okay.  Did you do anything in response to that

14    transmission?

15         A.    I entered my police car and responded out there,

16    responded to that area.

17         Q.    And why?

18         A.    Detective -- or I'm sorry -- Officer Adams made a

19    Code 2 emergency -- Code 2 reference on the audio.

20         Q.    And Code 2 meaning what?

21         A.    That's a request for backup, asking for

22    lights-and-siren response.

23         Q.    And at the time, were there different radio channels

24    that the Port Authority Police Department had?

25         A.    Well, at that time and present day, we have our own

1    channel that we're dispatched on.  But our radios have the

2    capabilities to scan and monitor most dispatch centers within

3    the county.

4        Q.    And so does that mean there's -- there's more than

5    one channel as of January of '016?

6        A.    More than one radio channel for us or for other

7    people?

8        Q.    For Port Authority officers.

9        A.    No.  We have one channel.

10       Q.    Okay.  So if you want to radio to other officers,

11   you have to use -- at the time, you had to use the one channel.

12   Is that correct?

13       A.    What other officers?  Clarify that.

14       Q.    Say, other Port Authority officers.

15       A.    Yes.  We use our -- our channel.  Correct.

16       Q.    And what -- are there call letters or a number to

17   the channel?

18       A.    An identifier?  Is that what you're asking?

19       Q.    Yes.

20       A.    I don't -- I don't know.  What do you mean?  On the

21   radio itself, or that comes up?  Like an identifier number?

22       Q.    Just like, you know, just it's channel No. 1 or it's

23   channel No. 5, and that's the channel you use to communicate

24   with other Port Authority officers.

25       A.    So the marking on our radio?  Is that -- so it's

1    channel No. 1 on the frequency band.

2        Q.    Thank you.  Then, say, you were going to communicate

3    to an officer from Edgewood.  Would that communication by you

4    be on a different channel?

5        A.    Yes.

6        Q.    And, obviously, Swissvale responded.  Edgewood.

7    Wilkinsburg.  Would -- would -- Port Authority officer

8    communications with officers from other municipal police

9    departments, were they each on a separate channel?

10       A.    I believe that Wilkinsburg and Edgewood might be on

11   the same channel of their own.

12       Q.    Okay.

13       A.    And I think Swissvale.  I'm not sure.

14       Q.    So --

15       A.    It's the eastern area.

16       Q.    So Port Authority, there's one channel.  Channel

17   No. 1.  Correct?

18       A.    Correct.  That we use for primary, yes.  There's

19   backup channels, but that's for administrative.

20       Q.    And, then, for communications between Port Authority

21   officers and Wilkinsburg and Edgewood and maybe Swissvale, it

22   would be a different channel.  Is that right?

23       A.    Yes.

24       Q.    What was the channel number?

25       A.    I don't recall.

1    Q.    Now, as far as the dispatcher, is -- any radio

2  transmission a Port Authority officer would make to anyone,

3  would that go through dispatch?

4    A.    Through Port Authority dispatch?

5    Q.    Correct.

6    A.    Yes.

7    Q.    Now, when you responded to the Code 2, obviously,

8  you got in your -- your unit, your vehicle.  Correct?

9    A.    Yes.

10    Q.    Now, was Aren with you?

11    A.    Yes.

12    Q.    Was Aren with you in the station before you

13  responded to that call?

14    A.    No.

15    Q.    Okay.  Where was Aren, please?

16    A.    He was in the car.

17    Q.    Okay.  So when you started out your shift doing

18  different duties, obviously you're in the police station.  Is

19  that correct?

20    A.    That day, yes.

21    Q.    Okay.  And Aren was in the car.  Is that right?

22    A.    Yes.

23    Q.    Did Aren's shift begin -- was he working the same

24  shift as you were?

25    A.    Yes.

1    Q.    Okay.  Right before that shift started, where was
2  Aren?
3    A.    Before -- at what time?
4    Q.    Like, when you say -- I think you said, what, you
5  were, what, 2:00 p.m. to 2:00 a.m. shift?
6    A.    No.  I work 2:00 p.m. to 10:00 p.m.
7    Q.    Okay.  Sorry.  So the 2:00 p.m. to 10:00 p.m. shift,
8  that's the shift you worked that day.  And did -- was Aren --
9  did he start out working that same shift that day, 2:00 p.m. to
10  10:00 p.m.?
11    A.    Yes.
12    Q.    Okay.  So before you arrived to work, I assume you
13  come from home, and you live wherever you live.  Is that right?
14    A.    Yes, sir.
15    Q.    Okay.  Where -- in January of '016, where would Aren
16  be -- where did Aren live?  Where would Aren be prior to the
17  start of that 2:00 p.m. shift?
18    A.    He was at my house.
19    Q.    Okay.  And when Aren is not working, was he at your
20  house?
21    A.    Yes.
22    Q.    Okay.  Okay.  You respond to the Code 2.  It's you
23  and Aren in the vehicle.  Correct?
24    A.    Yes, sir.
25    Q.    No other human officer?

1    A.    No.

2    Q.    Okay.  Please tell me, you know, what develops.

3    A.    So I respond in my vehicle to Hamnett Station.  And

4  prior to arriving, I had overheard that Officer Adams had

5  mentioned that the suspect had gone mobile.  And I think I

6  clarified if this was a foot chase, and his response was he

7  went mobile and something along the lines of "Be advised

8  suspect is armed with a knife and walking towards Hamnett

9  Station."

10    Q.    And I think you -- you just said you went to the --

11  you drove to the Hamnett Station?

12    A.    Yes.

13    Q.    Is that -- is that the same thing as the park and

14  ride?

15    A.    No.

16    Q.    Okay.  Please just explain for me.  Where is Hamnett

17  Station in relation to the parking lot, the park and ride?

18    A.    So if you stand in the parking lot and look up

19  towards the station, you're looking up towards the Hamnett

20  Station.  I was up on the busway.

21    Q.    Okay.  Did you get out of your vehicle when you were

22  up there?

23    A.    Yes.

24    Q.    Okay.  Were any other officers on scene up there?

25    A.    Sergeant DiPippa arrived on scene.

1    Q.    Okay.  And were you up there for, say, a period of

2  several minutes or a period of time before you did whatever you

3  did next?

4    A.    No longer than probably a minute because I overheard

5  that the suspect had now gone from the trail into the woods.

6    Q.    DiPippa -- first name, is it Robert?

7    A.    Robert.

8    Q.    Was he also a K-9 officer?

9    A.    Yes.

10   Q.    Did he have a -- a K-9 with him also?

11   A.    Yes.

12   Q.    Okay.  So you're with Aren, and he's with, I think,

13  Arko.  Is that right?

14   A.    Yes.

15   Q.    Okay.  What did you do next at that point?

16   A.    So knowing the area, the suspect had gone into the

17  woods.  I went to my car.  I grabbed -- opened the door and had

18  Arko -- Aren come out of the car with me.  And then I ran down

19  the steps into the park and ride lot.

20   Q.    And before you did that, was there any talk between

21  you and DiPippa as far as either of you possibly having to

22  deploy your K-9 partner as a response --

23   A.    Yes.

24   Q.    -- to this incident?

25   A.    Yes.

1      Q.    And what -- who said what, please?  Tell me who said
2   what.
3      A.    So when I saw the suspect run into the woods, I ran
4   back to my car and I said, "I'm going to get my dog," to Rob.
5      Q.    And was he the same rank as you?
6      A.    Yes.  It was Sergeant DiPippa, yes.
7      Q.    And what did he say?
8      A.    "Okay."
9      Q.    Okay.  And he -- could he have decided to -- that he
10  would deploy his dog instead of you deploying your dog?
11     A.    I suppose.
12     Q.    But were -- you and he were of equal rank.  Is that
13  correct?
14     A.    Yes.
15     Q.    Okay.  Now, did you actually see Bruce Kelley, Jr.,
16  on the Linear Trail at any point before he went through the
17  woods?
18     A.    Yes.
19     Q.    Okay.  And tell me, how long did you watch what he
20  was doing?
21     A.    I saw him for no longer than a couple seconds
22  because then he went right down into the woods.  He was
23  screaming, "Fuck you."   Just screaming.
24     Q.    And what was the distance between you and he at that
25  point?

1    A.    30 yards.

2    Q.    Okay.  And is there any other officers near you

3    other than DiPippa?

4    A.    No.

5    Q.    Okay.  And so you -- you got Aren out of your

6    vehicle.  Is that right?  And I think you said, what, you

7    started down the steps?

8    A.    Yes.

9    Q.    Okay.  And, then, please tell me.  When you get to

10   the bottom of the steps, where does that put you?

11   A.    When you get to the bottom of the steps, you're on

12   the sidewalk, on a landing.

13   Q.    And is that next to the park and ride, the parking

14   lot?

15   A.    Yes.

16   Q.    Thank you.  What did you do next, sir?

17   A.    Turned around and ran right back up to the car.

18   Q.    Why?

19   A.    A radio broadcast was made that the suspect was now

20   in the neighborhoods walking back towards the gazebo.

21   Q.    Okay.  And when you went back up to your car, I

22   assume you took Aren?

23   A.    Yes.

24   Q.    Okay.  What did you do at that point?

25   A.    So once I put Aren in the car, then I drove inbound

1    from Hamnett Station to an area that -- well, I was paralleling

2    the Linear Trail.  And I parked my vehicle on the busway,

3    exited the car with Aren, and went over the jersey barrier onto

4    the trail itself.

5         Q.    Is the jersey barrier -- is it also referred to

6    sometimes as a sound wall, or is that different?

7         A.    The sound wall is a little bit taller.  That's

8    the --

9         Q.    Okay.

10        A.    -- wall, the higher portion of the wall.

11        Q.    Okay.

12        A.    That's the sound wall, a sound barrier.

13        Q.    You went over the jersey barrier.  That's concrete.

14   Is that right?

15        A.    Yes.

16        Q.    What was, say, the approximate height of the jersey

17   barrier?

18        A.    3 feet.

19        Q.    Okay.  And you and the dog go over the jersey

20   barrier.  And then where do you go?

21        A.    So from that point, we ran outbound on the Linear

22   Trail, ultimately to the trail which is above Whitney Avenue.

23        Q.    And at that point when you're on the trail above

24   Whitney Avenue, you're -- you're still at the level of the

25   busway.  Is that correct?

1    A.    Correct.

2    Q.    You're higher than, say -- than where the

3    residential homes were on Whitney Avenue.  Is that right?

4    A.    Correct.

5    Q.    Okay.  What do you do next, please?

6    A.    I could hear yelling on Whitney Avenue, so I knew I

7    was in the right area of where the suspect could be walking.  I

8    could hear yelling.  I could hear the officers yelling to drop

9    the knife.  So I walked from the Linear Trail down a ramp which

10   zigzags to the bottom of the ramp, where I encountered a -- a

11   male standing at the Whitney Tunnel.  And he was looking up

12   Whitney Avenue from where that screaming was coming from.

13   Q.    And was that the suspect?

14   A.    No.  I'm assuming just a person from the

15   neighborhood.  A patron.

16   Q.    And when you zigzag down, where do you end up there

17   where you saw that -- that person?

18   A.    The bottom of the landing, which is to my right.

19   I'm looking at this guy.  To my right is the Whitney Tunnel,

20   which takes you to the busway.  And that's where he was

21   standing.  And to my left, then, is Whitney Avenue.

22   Q.    Thank you.  Are there other officers on Whitney

23   Avenue that you see?

24   A.    Not when I get down there, no.

25   Q.    Okay.  Other than that -- did you see any other

1  civilians or citizens other than the one gentleman you

2  described?

3      A.    Yeah.  So when I told him he should probably leave,

4  which he did, I then recall seeing a -- a female standing at

5  her -- at her door, looking away from me up Whitney Avenue

6  where the screaming was coming from.

7      Q.    Did the -- I'm sorry.

8      A.    Go ahead.

9      Q.    Did the male citizen say anything to you about this

10 incident or anything?

11     A.    I don't recall.

12     Q.    And you said to him something along the lines of

13 "You should get out of here"?

14     A.    Yes.

15     Q.    Did he comply?

16     A.    Yes.  I saw him start to walk.

17     Q.    Okay.  In which direction?

18     A.    Through that tunnel.

19     Q.    And you then saw a female citizen.  Is that correct?

20     A.    Yes.

21     Q.    Where exactly was she?

22     A.    So if I'm looking up Whitney Avenue to where that

23 screaming was coming from, the noise, she was at her front door

24 with another -- I think she was with a male.  And they were at

25 the door as if they were going into their house.  And they were

1   looking in that direction, and then, for some reason, she

2   looked back at me and then they quickly went in their house.

3       Q.    Was she black?  White?  Hispanic?

4       A.    She was a black female.

5       Q.    What age range?

6       A.    It's -- it's hard to say.  I mean, maybe in her 30s.

7   She was an adult.

8       Q.    And at that point in time, are you standing on

9   Whitney Avenue?

10      A.    So I'm right -- no.  I'm not on the street, no.

11      Q.    Okay.  Where were you?

12      A.    Right on the sidewalk at the bottom of that ramp.

13      Q.    Okay.  But you could look down Whitney Avenue.  Is

14  that right?

15      A.    Yeah.  Yes.

16      Q.    And then from your vantage point, there were houses

17  to the left of Whitney Avenue and to the right.  Both?  Is that

18  correct?

19      A.    Yes.

20      Q.    Okay.  And you see that female.  She goes back into

21  her house?

22      A.    That's correct.

23      Q.    Okay.  What happens next, please?

24      A.    I could still hear the yelling.  It was getting

25  louder.  And then over the radio I could hear the direction of

1   where the suspect was walking.  So a broadcast was made that he

2   was walking towards Whitney Avenue.

3        Q.    And when you say you heard yelling, is this over

4   your radio or with your ears you hear it?  Or both.

5        A.    Both.

6        Q.    Do you hear any words, or it's just noise at that

7   point?

8        A.    I heard -- I heard somebody yelling, "Go ahead.

9   Fucking shoot me.  Fucking shoot me."

10       Q.    And did you hear that over the radio or with your

11  ears?

12       A.    My ears.

13       Q.    Did you take that to be the suspect to say that?

14       A.    Yes.

15       Q.    What happens next, sir?

16       A.    Then I heard that -- another broadcast where the

17  suspect was walking away from Whitney Avenue, between the

18  houses.

19       Q.    Okay.  Did you stay put, or did you move in any

20  direction?

21       A.    So at that point, I moved.  And based off of that

22  radio transmission, I started to move in between a house

23  towards that -- away from Whitney Avenue where I assumed he was

24  going, at the rear of those houses that we referenced.

25       Q.    So if you were looking down Whitney Avenue -- houses

1  to your left and right -- did you go towards your left?

2      A.    Yes.

3      Q.    And how far did you get?

4      A.    Not far because then another broadcast stated that

5  he had now turned around and he was walking back towards

6  Whitney Avenue again.  So several feet and then I stopped.

7      Q.    Okay.  At that point in time, do you see any other

8  officers?

9      A.    No.  I could just hear a lot of things.  I could

10  just hear the yelling, "Fuck you.  Shoot me.  Fuck you."  I

11  could hear officers saying, "Drop the knife.  Stop," but I

12  didn't see any.

13      Q.    Are there any other civilians or citizens out in

14  their yards?  On the sidewalk?  In the street?  Whitney Avenue.

15      A.    I can't say.

16      Q.    Okay.  And at the end of Whitney Avenue, the

17  cross-street would be Center.  Is that right?

18      A.    I think Center Avenue is at -- at the end, yeah.

19      Q.    Okay.  Please continue and just walk -- walk us

20  through it.

21      A.    So at that point now when I reverse and I'm standing

22  back out near Whitney Avenue, I'm behind a bush.  And I see the

23  suspect start to walk down towards me, but he's on -- he's on

24  the street, and he's walking on a diagonal towards me but away.

25  So he's not perpendicular coming towards me; he's diagonal away

1    from me.

2         Q.    And where were you when you first see him, you

3    eyeball him?

4         A.    So I had concealment behind a bush, a large bush,

5    shrub, that was next to the -- next to the street.

6         Q.    Are you -- is the bush to the left of Whitney

7    Avenue?

8         A.    Yeah.  So it would be to those -- by those left

9    houses, yes.

10        Q.    And, say, how far was the suspect away from you at

11   that point?

12        A.    Maybe 20 yards, gaining rapidly.  He was walking at

13   a fast pace.

14        Q.    And then you heard some additional radio

15   communications where he's saying, "Shoot me."  Is that correct?

16        A.    No.  I heard him say that.  I heard with my ears him

17   saying that.

18        Q.    Got you.  What do you see next, please?

19        A.    I see the suspect turn.  And somebody in the group

20   made a mention of "We're going to send the police dog."  And he

21   turned back towards where I assumed the officers were, and he

22   started thrashing a knife around and he said, "I'll kill that

23   fucking dog."

24        Q.    Okay.  I'm sorry.  Just the beginning of your

25   answer, I think I got it.  What, an officer said, "We're going

1 to send the police dog"?

2     A.    Yes.

3     Q.    Okay. And you heard him say "I'm going to -- I'm

4 going to kill that dog"?

5     A.    He said, "I'm going to kill that fucking" -- He

6 goes, "Go ahead. I'll stab that fucking dog." And he turns

7 towards where I assume the officers were. He turned in that

8 direction and, like, kind of thrashed the knife around in front

9 of him.

10     Q.    How many officers were in your field of vision at

11 that moment?

12     A.    I didn't see any officers. I just saw the suspect.

13     Q.    Okay. And if -- if I'm standing on Whitney

14 Avenue -- houses to the left, to the right. Center Avenue is

15 at the end, say, 12 o'clock. Is he moving from the left to the

16 right?

17     A.    So he is moving -- you reference Center Avenue. He

18 is moving away from Center Avenue, inbound on Whitney, towards

19 the direction of the tunnel.

20     Q.    Okay. When you say "inbound," does that mean in the

21 direction of the tunnel?

22     A.    So yeah, in the direction of the tunnel. From

23 Center, in the direction of the tunnel.

24     Q.    Understood. Thank you. What do you see next?

25     A.    He turns back around. After making the slashing, he

1    turns back around and he keeps moving at a fast pace at that

2    angular motion towards me, from my right to left.  And he's

3    just angling down the street.

4        Q.    Are you still behind the bush where you had had -- I

5    think you said concealment.

6        A.    I had concealment.  Yeah, I was still behind the

7    bush.

8        Q.    Okay.  Do -- do you know if he -- did you get the

9    impression he could see you at that point?

10       A.    No.

11       Q.    I'm sorry.  Bad question.  You didn't know or your

12   impression was he -- he could not see you?

13       A.    My impression is he did not see me.

14       Q.    Okay.  And when you say "angling down the street,"

15   just the word "angling," do you mean he's walking at a specific

16   angle, or are you just using that term loosely, like he's just

17   continuing to walk down the street?

18       A.    Yeah.  So he's walking on a pace down the street,

19   but not -- not a straight line towards me.  It would be sort of

20   a -- like an angle, but down from my right to left.

21       Q.    Thank you.  What happens next?

22       A.    At that point, I have my dog.  I stepped out, and I

23   made sure my dog saw him.  Gave several commands, "Police K-9.

24   Stop."  I yelled it.  And he didn't stop.  So at that point, I

25   sent K-9 Aren on an apprehension.

1    Q.    And when you say you gave several commands, how many

2  is several?

3    A.    Two.

4          MR. GEARY:  And, Greg, if we could show the

5  witness -- it's a previously marked exhibit.  It's the time

6  line of events.  And let me get the number.

7          THE REPORTER:  6.

8          MR. GEARY:  Thank you.  It would be Exhibit 6 in

9  this case.

10          (Whereupon, Deposition Exhibit 6 was presented to

11  the witness.)

12  BY MR. GEARY:

13    Q.    Sir, this was a time line prepared by, I believe,

14  your attorney, and it's about 18 pages.  If you could go --

15          MR. EVASHAVIK:  For the record -- for the record, I

16  didn't prepare this.

17          MR. GEARY:  Okay.

18          MR. EVASHAVIK:  Go ahead.

19          MR. GEARY:  Okay.

20  BY MR. GEARY:

21    Q.    If you could go to the third-to-the-last page of the

22  entire exhibit, please.  And just so we're on the -- looking at

23  the same thing, the hours is 155136 hours.  Bullet point,

24  "Officer reports on radio coming back out to Whitney Avenue" is

25  the first entry.  Do you see that?

1       A.    Yes.

2       Q.    Okay.  And then so there's -- is there a number of

3  entries, bullet points?  And then below that on this page, is

4  there an aerial view of -- of Whitney Avenue?

5       A.    Yes.

6       Q.    Okay.  I may show you some other pages in this

7  exhibit.  But for the moment, could you please mark for me with

8  your initials when you deploy Aren towards Kelley, Jr.,

9  where -- where were you and where was Kelley, Jr.?

10      A.    From -- based off of this picture?

11      Q.    Yes, sir.

12      A.    I can't do that.

13      Q.    Why not?

14      A.    This looks like this was in the summer.  There's a

15 lot of overgrown here.  Everything is green.  This is not a

16 fair representation of that day.

17      Q.    Well, is it a fair representation as far as where

18 Whitney Avenue is in relation to the bus- -- East Busway?

19      A.    Correct.

20      Q.    And is it a fair representation as far as it shows

21 houses on both sides of Whitney Avenue?

22      A.    Yes.

23      Q.    Is it a fair representation as far as Center Avenue

24 intersects with Whitney Avenue on the far right of the photo?

25            MR. EVASHAVIK:  Let me just place an objection.  We

1   don't have any idea when this Google Map was taken, and this

2   witness did not take it.  So I want to place an objection to

3   the form of the question to this line of questioning, having

4   this witness interpret a photograph that he's already indicated

5   does not represent the time of the year when he was there.

6          MR. GEARY:  Okay.  Well, this was provided to me by

7   the defense.  I don't know who from the defense prepared it.

8   BY MR. GEARY:

9       Q.    Let's have you describe just verbally.  Where were

10  you, sir, when you deployed Aren?

11      A.    So I was on the west side of Whitney Avenue.

12      Q.    Okay.  And looking at this photo, what's -- what's

13  west?  Can you indicate where north would be?

14          MR. EVASHAVIK:  Do you know?

15          THE WITNESS:  I mean, I know directional out there.

16  East --

17          MR. EVASHAVIK:  Go ahead.

18          THE WITNESS:  East is outbound on the bus- -- I'm

19  using outbound -- I'm using the busway as a reference point.

20  BY MR. GEARY:

21      Q.    That's fine.

22      A.    Outbound on the busway is east.  So west -- on the

23  west side of Whitney Avenue --

24          THE REPORTER:  Officer, I'm sorry to interrupt, but

25  you froze just momentarily there.  If you could repeat that,

1    please.  You said, "I'm using the busway as a reference point,"
2    and that was the last I heard, please.
3              THE WITNESS:  Yeah.  So if Whitney Avenue -- so on
4    the -- the busway -- I'm using -- going outbound on the busway
5    is eastbound.  Okay?  So if I'm looking -- if the busway is
6    going outbound -- I know where the busway is.  So there's the
7    east side of Whitney Avenue, and then there's the west side of
8    Whitney Avenue.  So northbound would be towards Center Avenue
9    from Whitney.
10   BY MR. GEARY:
11        Q.    Got you.  So looking at the photo, Whitney Avenue,
12   say -- say there was a clock.  12 o'clock would be in the -- to
13   the west.  Is that right?
14        A.    No.
15             MR. EVASHAVIK:  I don't understand that question.
16             THE WITNESS:  Yeah.  I don't understand that either.
17   BY MR. GEARY:
18        Q.    I just thought you mentioned north was in the
19   direction of Center Avenue, so...
20        A.    Right.  So you said Whitney Avenue.  You said
21   Whitney would be 12.  If Center is northbound --
22        Q.    Yeah.  My question --
23        A.    -- it would be westbound.
24        Q.    Sorry.  Let me rephrase.
25             So, obviously, there's houses on -- looking at the

1  photo above Whitney and below -- just looking at the photo.

2  Correct?

3      A.    Correct.  Yeah.

4      Q.    And so would the houses above Whitney in the photo

5  be west?

6      A.    Yes.

7      Q.    Okay.  And the houses below would be east.  Is that

8  correct?

9      A.    Correct.  Outbound on the busway, that's eastbound,

10  yes.

11      Q.    Okay.  Thanks.  I just -- I'm not trying to trick

12  you.  I'm just trying to get -- so we're not talking about two

13  different things.

14          So I just asked you just verbally to tell me where

15  you and Aren were when you deployed Aren.

16      A.    The west side of Whitney Avenue.

17      Q.    Okay.  And where along Whitney Avenue?

18      A.    Near -- right near the street there's a sidewalk,

19  and so I was right next to the street.

20      Q.    And are you close to the tunnel?

21      A.    Define close.

22      Q.    Well, yeah.  I'm asking you.  I don't know.  But on

23  Whitney Avenue, there's the tunnel on the left of it and then

24  Center Avenue on the right of Whitney Avenue.  Right?

25      A.    Right.

1    Q.    So you're closer to the tunnel than you are Center
2  Avenue.  Right?
3    A.    Correct.
4    Q.    Yeah.  So how close to the tunnel were you?
5    A.    I think 10 feet, 20 feet.
6    Q.    And were you --
7    A.    I don't know.  I mean, it was -- yeah, it's -- maybe
8  30 feet.
9    Q.    Okay.
10          MR. EVASHAVIK:  Let me just say it.  We don't want
11  the witness to guess.  If you know, that's fine.  Just say it.
12          THE WITNESS:  Yeah.  I'm not --
13          MR. EVASHAVIK:  Just say it.  But don't guess.
14          THE WITNESS:  Yeah.  I don't know how far it was
15  from the tunnel.
16  BY MR. GEARY:
17    Q.    Yeah.  I certainly don't want you to guess.  I'm
18  just asking for an estimate.
19          Now, were you on the sidewalk or standing in the
20  street?
21    A.    I was behind a bush which was near the sidewalk.
22    Q.    And, again, just -- we're talking about when you
23  gave the command to Aren to apprehend Kelley, Jr.  And so
24  looking at the photo on that page, can you mark with your
25  initials where you were?

1    A.    No.

2    Q.    And why not?

3    A.    It's not a fair representation.  I -- there's

4 shadows on there and everything.  I -- it's --

5    Q.    Even an -- even an approximate as to where you were?

6    A.    No.

7    Q.    You won't do that?

8    A.    I can't.

9    Q.    You cannot?

10   A.    No.

11   Q.    Can you tell me verbally where Bruce Kelley, Jr.,

12 was when you gave the command to Aren to apprehend him?

13   A.    On the -- on the other side of the street directly

14 in front of me, like angling down.  So he was walking from my

15 left to right.  And at that point, he had reached the other

16 side of the street, so he was about 10 yards away.

17   Q.    Is he in a yard on the other side of the street?

18   A.    No.

19   Q.    Where was he?

20   A.    On the street.

21   Q.    Okay.  Were there any other citizens or civilians

22 around?

23   A.    I can't say.

24   Q.    Well, is that something you would remember, if there

25 were civilians in the immediate vicinity?

1          MR. EVASHAVIK:  Object to the form.

2          THE WITNESS:  I -- I can't say if I would remember

3    that or not.  I don't know.

4    BY MR. GEARY:

5          Q.   Well, if he was considered a threat by you and there

6    were civilians in the immediate vicinity, would he have been a

7    threat to the civilians?

8          A.   Well, he was considered a threat to me, but my --

9    that's where my focus was, on him.

10         Q.   Okay.  And as you're looking at him and he's walking

11   down Whitney Avenue, in your field of vision there's yards and

12   houses.  Correct?

13         A.   Yes.

14         Q.   And did you see any civilians or citizens other than

15   him?

16         A.   No.

17         Q.   Okay.  And when you gave the -- you said you gave

18   two warnings.  Is that right?

19         A.   Yes.

20         Q.   Was he in motion when you gave those verbal warnings

21   to him, or was he stopped?  What was he doing when you gave the

22   two warnings?

23         A.   In motion.

24         Q.   Okay.  And you released Aren.  Was Kelley, Jr.,

25   still in motion?

1     A.    Yes.

2     Q.    And when we say "in motion," was he walking?

3     A.    Rapidly.

4     Q.    Okay.  But -- but he was not running?

5     A.    No.

6     Q.    Would you say he was jogging or no?  He's walking

7  rapidly, not jogging?

8     A.    Walking rapidly.

9     Q.    Okay.  And when you release Aren, what -- what

10 direction was Bruce Kelley, Jr., walking?

11    A.    So he had made it to the point where he was right in

12 front of me.

13    Q.    So he was coming towards you?

14    A.    No.  He was walking from my right to left.  But at

15 the time -- or from my left to right.  But at the time when I

16 sent the dog, he had now made it directly in front of me.

17    Q.    Okay.  So when you release Aren, when you say

18 directly in front of you, is his body facing you?

19    A.    No.  He is directly in front of me, so he's -- his

20 back is to me.

21    Q.    Okay.  And what -- what was the command?  Is it in

22 the German language?  What exactly did you -- were the commands

23 you gave to Aren?

24    A.    After my commands for him to -- to stop -- "Police

25 K-9.  Stop," I unleashed Aren and I just -- I sent.  My send.

1      Q.    Is it a word in German that you say to Aren?

2      A.    I just said "Send."

3      Q.    And Aren -- are you holding him by a leash there for

4   a period of time before you give him the command?

5      A.    Yeah.  So he was on a leash.

6      Q.    And are you holding the leash with both of your

7   hands?

8      A.    My right hand.

9      Q.    And where was Aren right before you release him in

10  relation to your body?  Was he to your right?  Left?  In front

11  of you?

12     A.    He was directly in front of me.

13     Q.    Okay.  Did you have your gun out of its holster?

14     A.    No.

15     Q.    At that point in time in this encounter, did you

16  ever have your gun out of its holster yet?

17     A.    No.

18     Q.    Okay.  What do you see Aren do?

19     A.    Aren goes downrange and makes an apprehension.

20     Q.    Okay.  And when you say "downrange," I think I know

21  what you mean, but can you just explain that?

22     A.    So he made an apprehension on the left tricep area

23  of the suspect.

24     Q.    And when you say "apprehension," does that mean

25  bite?

1      A.    Correct.

2      Q.    And was Kelley, Jr.'s, back to Aren when Aren bit

3  Kelley, Jr.'s, left arm?

4      A.    Correct.

5      Q.    Now, would you please draw for me or just put

6  initials of where Kelley, Jr., was when you released Aren, gave

7  the command to apprehend Bruce Kelley, Jr.

8      A.    I can't do it on this photo.

9      Q.    And, again, just asking.  Why is that, sir?

10      A.    It's not a fair representation.  It's far away.

11  There's shadows.  It's not the time of year.

12      Q.    Well, what about the -- I understand the foliage --

13  you know, the trees, the leaves -- would be different and

14  barren because this was January.  Other than the leaves and the

15  trees, what -- is there something that -- where this is not a

16  fair depiction of that street and sidewalk and yards that day?

17      A.    There's shadows too.

18      Q.    Okay.  Are those the two things?  It's the shadows

19  and the leaves?

20      A.    Yes.  It's too far away.

21      Q.    Okay.  Okay.  I just want to make a note.  Too far

22  away.  Shadows.  Leaves.

23            Is there any -- can you give me a fourth reason?  Is

24  there a fourth or more reasons why you cannot simply initial

25  where Bruce Kelley, Jr., was when you deployed the dog?

1     A.    No.

2     Q.    Okay.  When you deploy Aren and give the command,

3  are there any other officers in the area?

4     A.    I don't see any.

5     Q.    Okay.  And when you -- you actually saw Aren bite

6  the left arm of Bruce Kelley, Jr.?

7     A.    The tricep/shoulder area, yes.  He raised up off his

8  hind legs and went in for an apprehension.

9     Q.    Okay.  And, now, was Bruce Kelley -- was he armed

10 when you released the dog?

11    A.    Yes.

12    Q.    What was he armed with?

13    A.    A knife.

14    Q.    Can you describe the knife from how you -- you know,

15 you're looking at him.  Can you describe the knife?

16    A.    Silver in color.  A large knife.

17    Q.    What -- say, what was the length of the blade?

18    A.    I don't know.

19    Q.    Which hand did Kelley, Jr., have the knife in?

20    A.    His right.

21    Q.    Now, Kelley, Jr., per your testimony, had said,

22 "If -- if you send the dog at me, I'm going to stab the dog."

23 Right?

24    A.    Yes.

25    Q.    And he said he would kill the dog also.  He actually

1    said that.  Is that what you're saying?

2        A.    Yes.

3        Q.    Okay.  And he was armed with a knife.  Is that

4    right?

5        A.    Yes.

6        Q.    Okay.  Well, why did you deploy the dog when Bruce

7    Kelley had just said he would -- he would kill the dog if you

8    released the dog?

9        A.    Two reasons:  One, K-9s are a tool.  And, two, to

10   preserve his life, to take him into custody and arrest him.

11       Q.    Were you putting Aren at risk of being harmed by the

12   knife?

13       A.    Yes.

14       Q.    And was that risk to Aren outweighed by other

15   things?

16       A.    Define that.

17       Q.    Other considerations.  Other risks.

18       A.    I don't know what other risks you're talking about.

19       Q.    A risk of a human being being harmed by Kelley.

20       A.    Correct.

21       Q.    And who was at risk of being physically harmed by

22   Kelley?

23       A.    Police officers, humans.

24       Q.    Okay.  Which officers, please?

25       A.    Myself, along with all the officers on scene that

1  day.

2      Q.    Now, didn't you just say that you didn't see any

3  other officers in the area when you deployed Aren?

4      A.    I heard them.  I didn't see them.  I was more

5  concerned with Mr. Kelley.

6      Q.    Well, they would have been in your field of vision.

7  Yes?

8      A.    No.

9      Q.    How would they not have been in your field of

10 vision --

11         MR. EVASHAVIK:  Object to the form of the question.

12 BY MR. GEARY:

13     Q.    -- if you're looking at Kelley, Jr.?

14     A.    Because I'm looking at Kelley, Jr., and not them.

15     Q.    When you released Aren -- can you give me an

16 estimate?  How far were you and Kelley, Jr., apart when you

17 released Aren?

18     A.    20 feet.

19     Q.    In the training that you had with Aren, were -- were

20 there scenarios where the suspect threatens to harm Aren?

21     A.    Define that.

22     Q.    Well, in the training sessions you've described at

23 length different scenarios and situations you practice with the

24 decoy and suspect apprehension.  So in the training, did any

25 part of the training consist of practicing or training

1  involving a suspect who, before you release Aren, threatens to
2  harm the dog?

3       A.    Yes.

4       Q.    And how were you trained to deal with that
5  situation?

6       A.    Well, we train the dogs to make the apprehension.

7       Q.    Even in situations where the suspect threatens to
8  harm the dog?

9       A.    Yes.

10      Q.    And even though the suspect is armed with a knife?

11      A.    Yes.

12      Q.    Okay.  Did you have the discretion as a K-9 officer
13  to not deploy Aren to apprehend Kelley, Jr.?

14      A.    Yes.

15      Q.    Okay.  Tell me what you see.  You've described Aren
16  bites kind of the shoulder/upper arm area of the left.  And at
17  that point, Kelley, Jr., has the knife in his right hand.  Is
18  that correct?

19      A.    Yes.

20      Q.    What -- what do you see next?

21      A.    With the knife, he spins to his left, and he stabbed
22  Aren several times.

23      Q.    Now, as he's stabbing Aren, is -- is Kelley, Jr.'s,
24  back to you?

25      A.    He's spinning.  So as he's -- so he's going from

1    across his body.  So he's contorting his body to reach around
2    and stab Aren in the -- in the side of the head.
3        Q.    So when he stabs -- how many times did he make
4    movements like stabbing motions?
5        A.    He made several stabbing motions from right to left.
6        Q.    How many is several?
7        A.    Two or three.
8        Q.    And when he's trying to stab Aren, is Aren on the
9    ground or is Aren up off the ground?  Like attached to his
10   shoulder, biting him or --
11       A.    So he wasn't trying to stab him; he was stabbing
12   him.  And Aren initially was up off the ground, but when he
13   stabbed him, he then dropped down to all fours.
14       Q.    And from your -- the way Kelley, Jr.'s, body was
15   positioned, you could actually see his right hand moving
16   towards Aren?
17       A.    I could see the knife going into Aren.
18       Q.    Okay.  And where in Aren's body was the knife going?
19       A.    The side of his head.
20       Q.    Which side?
21       A.    Left side.
22       Q.    Okay.  What do you do at that point, sir?
23       A.    I -- you have to define that.  I'm not sure what you
24   mean.
25       Q.    I mean, do you scream something at Kelley, Jr.?  Do

1    you start running towards Kelley, Jr., and the dog?  Do you say
2    or do anything?
3        A.    Well, he wasn't done stabbing him yet, so now
4    he's -- so now he's facing Aren, and now he's making thrashing
5    motions up.  Because when Aren went down to all fours, okay,
6    from being stabbed, now he's facing Aren.  And Aren starts to
7    come back in for an apprehension again into, you know, his --
8    his -- facing Kelley.  And now he's -- now I see him thrashing
9    upwards underneath his chin -- or under -- not his chin.
10   Underneath his jaw.
11       Q.    You see Aren thrashing underneath Kelley's jaw?
12       A.    Correct.
13       Q.    Had you moved yet from where you were on the
14   sidewalk?  Had you moved yet in any direction?
15       A.    Yeah.  So I had moved forward towards Kelley, on his
16   right side.
17       Q.    Okay.  Say, how many steps did you take towards
18   Kelley?
19       A.    Several.
20       Q.    And at this point, as you're describing, the dog is
21   thrashing underneath Kelley, Jr.'s, jaw.  The dog is -- is this
22   the dog's second attempt to apprehend Kelley, Jr., from what
23   you were witnessing?
24       A.    Correct.
25       Q.    And so the second attempt, the dog got off of the

92

1    ground completely?

2        A.    Yes.  He started back in for an apprehension --

3    apprehension.  And that's when the suspect, with the knife,

4    came upwards under his jaw and started just thrashing up- --

5    upwards.

6        Q.    Do you see what part of Kelley, Jr.'s, body Aren was

7    trying to bite on the second attempt?

8        A.    He was just trying to move in towards his chest

9    area.

10       Q.    Okay.  And then is your gun out of its holster yet?

11       A.    No.

12       Q.    Okay.  Go ahead.  Walk, if you could, please --

13             MR. GEARY:  We're going to need to take a break

14   maybe in a few minutes.  Maybe just another question or two.

15   Is that okay, Greg?  I have, like, 12:49 here.

16             MR. EVASHAVIK:  Yeah.  Continue until you need to

17   break.  It's fine.

18   BY MR. GEARY:

19       Q.    Okay.  So go ahead.  Just what -- what happens next?

20   What do you see?  What do you do?

21       A.    So then once -- after he's done stabbing Aren, he

22   spins towards me and takes a step with his knife, with the

23   knife.  And that's when I drop my leash and unholster my gun

24   and -- and fire.

25       Q.    I'm sorry.  He spins towards you.  He took a step

1 towards you. And you just said something about his knife. I

2 just didn't quite catch it.

3     A.    I said he raised the knife and stepped towards me.

4 And that's when I unholstered and fired.

5     Q.    Okay. Which -- did he step towards you with the

6 left foot? Right foot?

7     A.    I don't recall.

8     Q.    Okay.

9     A.    He moved in my direction.

10     Q.    Were you still on the sidewalk at that point in

11 time?

12     A.    No.

13     Q.    Where were you, sir?

14     A.    I was on the street now.

15     MR. GEARY: Yeah. If we could take a break. Again,

16 I apologize for this interruption, and I certainly hope this

17 call is over by -- by 2 o'clock. So is that okay? Can we just

18 take our prediscussed one-hour lunch break?

19     MR. EVASHAVIK: Yes.

20     MR. GEARY: Videographer, do you need to say some

21 things?

22     THE VIDEOGRAPHER: Going off the record at

23 12:50 p.m.

24     (Whereupon, a lunch recess was taken.)

25     THE VIDEOGRAPHER: We are back on the record.

1  2:03 p.m.

2  BY MR. GEARY:

3      Q.    Okay, Lieutenant.  We took a lunch break.  Are you

4  ready to continue?

5      A.    Yes, sir.

6      Q.    And can you hear me?

7      A.    Yes.

8      Q.    Okay.  Now, where we left off is I think your gun is

9  still in its holster.  So I want to talk to you starting out

10  what happened in the several moments or time period before you

11  started shooting at Bruce Kelley, Jr., and --

12          MR. EVASHAVIK:  Just for the -- sorry.  Just for the

13  record, my notes indicate he was past that.  I mean, you can go

14  back as far as you want, obviously.  It's your examination.

15  But he had already testified about unholstering his gun and

16  firing his weapon.

17          MR. GEARY:  Oh, okay.

18          MR. EVASHAVIK:  And the record will show that.  But

19  go ahead.  Start where you want.

20  BY MR. GEARY:

21      Q.    So if we could just go back a couple questions,

22  please.  Now, before you take your gun out of its holster,

23  what -- what had you just seen happen?

24      A.    So I witnessed Aren get stabbed several times in the

25  side of the head after making an apprehension.  And then the

1  suspect spun around and uppercutted the knife several times

2  under Aren's jaw as he was going back in to re-engage.  And

3  then Mr. Kelley took a step towards me with the knife.

4       Q.    Thank you.  Was it foreseeable to you that Kelley

5  would harm the dog with the knife at the time you chose to

6  deploy the dog?

7       A.    No.

8       Q.    And why was that not foreseeable to you?

9       A.    Because I knew my partner.  And one of two things

10  was going to happen:  An apprehension or an apprehension that

11  he falls to the ground.  And at that point, I would be able to

12  take control of him under power.

13       Q.    Now, your holster, was it on your left hip?  Right

14  hip?

15       A.    Right.

16       Q.    And you pulled your gun.  You started firing at

17  Kelley.  Correct?

18       A.    Once he moved quickly in my direction, yes.

19       Q.    And before he moves in your direction, how far was

20  Kelley, Jr., from you?

21       A.    8 feet.

22       Q.    Okay.  I'll refer you back to Exhibit 6.  It's the

23  timeline of events.  We were looking at the third-to-the-last

24  page, please.  And if you could look at the -- the photo there

25  on the third-to-the-last page, the aerial view of Whitney

1  Avenue, when Kelley was 8 feet from you, where was he standing?

2       A.     It's hard to say in this photo because of the

3  shadow.  It's dark.

4       Q.     Okay.  But can you just verbally testify?  Was he

5  still in a yard?  Was he on a sidewalk?

6       A.     He was on the east side of Whitney Avenue, right

7  over the curb, like right over the curb in the grassy area.

8  Like right at the street and curb area.

9       Q.     And then where were you, please?

10      A.     I was 8 feet away from him.

11      Q.     Right.  But -- but where?

12      A.     In the street.

13      Q.     Okay.  How far into the street were you?

14      A.     8 feet.

15      Q.     You were 8 feet into the street?

16      A.     Well, I was 8 feet away from him.

17      Q.     Okay.  No.  I understand you're saying you were 8

18  feet away from him, and you just described where he was.  I'm

19  just trying to pinpoint where you were.

20      A.     Again, I was 8 feet away from him, on the street.

21      Q.     Okay.  And can you please look at that photo and put

22  your initials where you were when you started firing at Kelley?

23      A.     I can't do it.  There's a shadow in the street.

24  There's a shadow that covers that whole area.  You can't even

25  see it.

1    Q.    Okay.  Can you please mark on the exhibit -- if you

2    could circle the shadow you're talking about, just so we're

3    clear.

4    A.    I -- there's -- there's -- it's too -- there's a

5    whole shadow area.  I can't do it.  It's too large.

6    Q.    No, no, no.  I understand.  I'm asking you so the

7    record will reflect what -- where exactly you're talking about.

8    If you can just circle with a pen where the shadow is you're

9    referring to and initial it.

10   A.    It's on the east side of Whitney.

11   Q.    Okay.  Would you please circle it, sir?

12   A.    I can't do it.

13   Q.    You can't circle the shadow you're referencing?

14   A.    The shadow -- the shadow is -- it runs deep on the

15   street.  It's into the house/grass area.  I don't know where it

16   ends, where it begins.  I mean, it's on the street, but I don't

17   know where it ends as opposed to the grassy area.  I can't do

18   it.

19   Q.    Well, just to the best you can.  If you could just,

20   like, outline the whole shadow so the record is clear.

21   A.    I can't do it.

22   Q.    You can't or you won't?

23   A.    I can't do it based on this photo.

24   Q.    But I'm entitled to have you mark it because at

25   trial we -- we don't want -- well, you're referencing a

1    different shadow or a different area.  So I understand what

2    you're saying.  I'm just asking you to mark the exhibit so we

3    know what you're talking about, so there's no confusion at

4    trial.

5            MR. EVASHAVIK:  Let me object.  I've let this line

6    of questioning go on for a long time.  The witness has clearly

7    indicated he's not comfortable marking this photograph with any

8    kind of depiction where he was because of the reasons he's

9    already stated.  It's on the record.  I don't have to restate

10   it.  You can't compel him to mark a photograph if he's not

11   comfortable for the reasons he said -- he said.

12           MR. GEARY:  Well, a witness doesn't have to be

13   comfortable.  I mean, the witness can be uncomfortable but

14   still mark an exhibit in a case.  Obviously, it's at the

15   crucial point of the interaction between the defendant and

16   Bruce Kelley.

17           MR. EVASHAVIK:  Okay.  Let me change the word

18   "comfortable."  I don't want him to guess.  If he is reasonably

19   sure where the area he was from this overhead Google Map

20   photograph, then he can mark it.  I've made that clear.  But

21   he's already told you multiple times he's not.  And we don't

22   want him to guess where he -- where he was because of the

23   problems with this photograph, this Google Map.

24   BY MR. GEARY:

25       Q.   And, Lieutenant, you understand.  I don't want you

1    to guess either.  Do you understand?

2        A.    Yeah.  That's why I can't mark it.  I find myself

3    guessing.

4             MR. GEARY:  God bless you.

5    BY MR. GEARY:

6        Q.    Can you mark on here where Bruce Kelley, Jr., was

7    when you started firing at him?

8        A.    I can't do it.  It's -- it's dark.

9        Q.    You've testified as an officer before, I assume, in

10   criminal cases or in your career?

11       A.    Yes.

12       Q.    And maybe civil cases too.  Have you ever been asked

13   to mark an exhibit in court before as a witness on the stand?

14       A.    I can't say that I have.

15       Q.    How many times did you fire your weapon at Kelley?

16       A.    I fired until he fell.

17       Q.    Okay.  So how many times was that?

18       A.    Six to nine.  I mean, I know after the fact how many

19   rounds, so -- that I expended, so it was nine times.

20       Q.    And what part of his body were you aiming for when

21   you're shooting him -- or at him?

22       A.    Center -- center mass.

23       Q.    And does that mean the torso?

24       A.    That means the upper chest area.

25       Q.    And, obviously, I mean, you're looking at him as

1  you're shooting at him.  Is that correct?

2      A.    Correct.

3      Q.    And did -- the first round you fired, did you

4  connect?  Did you shoot him?

5      A.    It's hard to say.  I just pulled the trigger until

6  he -- the threat ended.

7      Q.    Okay.  How many -- a semi-automatic weapon, I

8  assume?

9      A.    Yes, sir.

10     Q.    What kind of gun, please?

11     A.    Smith & Wesson.

12     Q.    And you say you fired until, I think, he fell?

13     A.    Yes.

14     Q.    Okay.  And what direction did his body fall?

15     A.    Down.

16     Q.    So does that mean forward?  Backwards?  Sideways?

17     A.    Down.  He fell -- fell down to his back.

18     Q.    Okay.  So he fell onto his back?

19     A.    Yes.

20     Q.    Did any other officer shoot at him that day?

21     A.    Officer Ravotti.

22     Q.    Okay.  And before you started shooting, where was

23  Officer Ravotti?

24     A.    I know he was on my left.  That's all I can say.  I

25  don't know how close, how far.  I just know that somebody was

1    on my left.  And whether it was the officers, how many were

2    there -- I know there were people behind me, to my left.

3         Q.    Who fired first?  You or Ravotti?

4         A.    I don't know.  I can't say.

5         Q.    Did any other officers shoot at Bruce Kelley, Jr.,

6    that day other than you and Officer Ravotti?

7         A.    No.

8         Q.    Now, at the point in time when you release Aren to

9    apprehend Mr. Kelley, what -- what did you know as far as any

10   prior uses of force that had been attempted on Mr. Kelley?

11        A.    I know that force had been -- had been used multiple

12   times in the way of Taser and pepper spray.

13        Q.    And, say, roughly -- roughly, how long had you been

14   on scene when you deploy Aren?  Just roughly.

15        A.    On scene where?

16        Q.    Just when you -- I think you initially arrived at

17   the Hamnett Station.

18        A.    So all the way back from when I arrived on scene?

19        Q.    Yes.

20        A.    Ten minutes.

21        Q.    And had you undergone any type of crisis

22   intervention training by the Port Authority prior to that day?

23        A.    Yes.

24        Q.    And what did that consist of?

25        A.    Training with an instructor involving suspects that

1 exhibited various degrees of crises. Mostly disturbed people.

2 Delirium.

3     Q.    And in the crisis intervention training, if you make

4 a determination that an individual has mental health issues or

5 is in delirium, those types of things, what are you -- what are

6 you supposed to do per the training?

7     A.    I think that would be based on the scenario you're

8 dealing with.

9     Q.    Okay. Was -- this scenario with Mr. Kelley, did the

10 crisis intervention training you -- you participated in apply

11 to this situation?

12     A.    No.

13     Q.    And tell me how it did not apply.

14     A.    I had no dialogue with the suspect, so I had no

15 parameters to base anything off of.

16     Q.    And did you attempt any dialogue with him?

17     A.    My dialogue I had was -- was one sided. His

18 dialogue was he was going to stab the dog, and that was it.

19     Q.    And when you say your side of the dialogue was one

20 sided, what do you mean by "one sided"?

21     A.    I advised him "Police K-9" and to stop, and he

22 didn't do it.

23     Q.    So you gave him a command, obviously?

24     A.    Several.

25     Q.    Okay. Separate from giving him commands, did you

1  try to just talk to him?

2      A.    No.

3      Q.    Why not?

4      A.    I didn't have a chance.

5      Q.    Well, did you have a chance as he's walking down

6  Whitney Avenue and you're on the other side of Whitney Avenue?

7      A.    No.  Based on how fast he was walking, I did not.

8      Q.    So your testimony is at no point did you have the

9  opportunity or the time to try to talk to him?

10     A.    Correct.

11     Q.    Okay.  And when I say "talk to him," I'm thinking

12 of, like, asking him "Why won't you put down the knife?

13 What's -- what's the matter?  Can we talk this out?"  Things

14 like that.

15     A.    Correct.

16     Q.    Is that the kind of thing or -- in the crisis

17 intervention training, are you taught to try to verbally

18 de-escalate a situation like that?

19     A.    Yeah, I believe that's taught at some point during

20 the curriculum.

21     Q.    Okay.  Did you do anything before you released Aren

22 to try to de-escalate the situation?

23     A.    No.

24     Q.    Now, the death of Aren -- is it your position -- are

25 you partly responsible for the death of Aren?

1    A.    No.

2    Q.    Okay.  Say on a scale -- even like a small

3 percentage?  2 percent responsible for Aren being killed?

4    A.    Zero percent.

5    Q.    It's all Mr. Kelley's fault?

6    A.    I think I answered that already.

7    Q.    Just going through my notes.  We may bounce around

8 to some different topics, just so you know.

9          In the use of force training, are you taught about a

10 continuum of force?

11    A.    Correct.

12    Q.    And just explain your -- your understanding.  As of

13 January of '016, what is the continuum of force?

14    A.    So a continuum of force is -- in layman's terms, it

15 would start with a hands-on approach.  Pepper spray, Taser.

16 Any other type of less lethal, baton, up to deadly force.  K-9

17 involved in there as well.

18          (Whereupon, Deposition Exhibit 14 was presented to

19 the witness.)

20 BY MR. GEARY:

21    Q.    And if I could have you take a look at the Port

22 Authority's use of force policy marked as Exhibit 14, please.

23 It's a four-page exhibit.  If you could take a look at page 23,

24 up at the top it says "Non-Deadly Force Weapons and Methods."

25 If you'd just read it to yourself for a sec.

1      A.    Just the non-deadly section?

2      Q.    Yes.  I'm going to focus you on paragraph 2.  And

3  then there's a. through h.

4      A.    Yes.

5      Q.    Okay.  You've had a chance to read that?

6      A.    Yes.

7      Q.    Okay.  Are you familiar with this policy?

8      A.    Yes.

9      Q.    So in paragraph 2 it says "The following non-deadly

10  weapons are authorized," colon, and it lists a. through h.

11  E. says "40 millimeter less lethal launcher."  Is that correct?

12     A.    Yes.

13     Q.    Okay.  What -- what is that?

14     A.    A 40 milli- -- millimeter less lethal launcher is

15  used to launch less lethal devices, such as a sponge round; or

16  it can launch OC pepper spray, similar to what SWAT teams use.

17  In fact, it is what SWAT teams use.

18     Q.    Sorry.  And the Port Authority Police Department, as

19  of January '016, did they have these lethal launchers as far as

20  equipment for officers to use?

21     A.    You have to -- officers that were trained, yes.

22     Q.    Were you trained in the use of that device?

23     A.    I was not.

24     Q.    Okay.  Is there any reason why you were not trained

25  with the use of that device?

1       A.      No reason.

2       Q.      Okay.  The next one, f., it says "NFDD-Noise Flash

3  Diversionary Devices."  What is that?

4       A.      That would be known commonly as a flash-bang.

5       Q.      And what is it, please?

6       A.      A flash-bang is introduced as a noise distraction,

7  used by members of our department that are assigned to the

8  regional special response team.

9       Q.      And were you trained in the use of that device?

10      A.      Yes, I was.

11      Q.      And was that available in January -- on this day to

12  you by the Port Authority?

13      A.      No.  You're not allowed to carry those in your car.

14      Q.      Okay.  Well, you carry it on your person?

15      A.      No.  Only in the -- when assigned with the special

16  response team.

17      Q.      The next one, shotgun impact/oleresin [sic] capsicum

18  munitions.

19              And for the stenographer, it's o-l-e-r-e-s-i-n,

20  space, c-a-p-s-i-c-u-m munitions.

21              Explain what that is.

22      A.      So there's -- there's several things here.  So,

23  obviously, the first is the shotgun.

24              And then the impact are impact beanbag rounds.  And

25  the second where, after the slash, is oleoresin capsicum

munitions.  Those are munitions that are contained -- contained

inside a shotgun shell.  So it's not a -- it's not actually a

shotgun shell, but the OC is contained inside of it.  And those

would be introduced when assigned to members in the special

response team capability.

Q.    So small g., the letter, does that -- is it

referencing three different types of devices or two?

A.    Well, there's three devices but -- one is a shotgun

and the other two are -- one is the impact, which, to me, would

mean beanbag rounds, and then the OC munitions.  So the impact

and the OC are two different things.

Q.    Were you trained in the use of those?

A.    You know what, can you repeat that?  Because you

froze up a little bit.

Q.    Yeah.  Same here.  Same here.  Were you -- little

g., were you trained in the use of those?

A.    Yes.

Q.    And were those available to use on this day?

A.    No.

Q.    And why not?

A.    Those are only used at that time by members of --

assigned to the special response team.

Q.    And h., 40 millimeter launchable gas/smoke.  What is

that?

A.    So, like, I sort of explained that from e.  And

1  using h., that is inserted into the 40 millimeter less lethal

2  launcher.  So that would be OC gas and smoke.

3      Q.    And were you trained in the use of that?

4      A.    No.

5      Q.    And why not?

6      A.    That's not my forte.  Assigned to the special

7  response team.

8      Q.    Okay.  And the special response team for the Port

9  Authority Police Department, what is that?

10     A.    So it's several members that have been assigned to

11  the North Hills Special Response Team as sort of a reciprocity

12  agreement to respond to and with anything beyond patrol

13  capabilities that would end up in a -- a tactical deployment.

14     Q.    Can you give me an example of a type of scenario

15  that would develop where the special response team would be

16  called in?

17     A.    So if we had a hostage situation at the Ross Garage

18  or a barricaded gunman at the Ross Garage, special response

19  team members would respond, along with the special response

20  team members from the North Hills Special Response Team --

21          THE REPORTER:  I didn't hear the very end.  Can you

22  repeat the very end, Officer?

23          THE WITNESS:  Sorry.  I said, "Or like Harmar

24  Garage.  Any of the garages" --

25          THE REPORTER:  Thank you.

1          THE WITNESS:  -- "in a tactical environment."

2          (Whereupon, Deposition Exhibit 30 was presented to

3   the witness.)

4   BY MR. GEARY:

5          Q.   Could you take a look at Exhibit 30, please?  This

6   was provided to me in discovery.  So it appears to me it's a

7   summary of an interview of you by Patrick Miller of the

8   Allegheny County Police Department, the first two pages.  And

9   then you see they're Bates stamped 32 and 33.  And then pages 3

10  and 4 seem to me to have identical content, but it was marked

11  at different Bates stamp numbers, 65 and 66.  It looks to me

12  like the first two pages are the same as the last two, the

13  content.  If you could please just take a look at these four

14  pages, and I'll have some questions for you.

15         Okay.  Have you had a chance to look at those four

16  pages?

17         A.   Yes.

18         Q.   And is it true that -- do pages 3 and 4 look the

19  same to you as the first two pages?  And you can, you know,

20  take as much time as you want.  I'm not trying to trick you.

21         A.   On -- on page 3, there's -- Corrado's interview is

22  on there too.  Those are not on the other ones.

23         Q.   No.  Yeah, I agree.  I didn't redact it, but right.

24  So I'm not concerning you with anything about Corrado there at

25  the top part.  I just didn't take the time to redact that.

1          Aside from that, does the content --

2     A.    Yes.  Eliminating that one, it looks like those are

3 similar, yes.

4     Q.    Okay.  Now, did you compose or draft any reports

5 from the Bruce Kelley shooting incident yourself?

6     A.    No.

7     Q.    And is there a reason you did not do so?

8     A.    I had the -- my interview, which is on video and

9 recorded.  That was my statement.

10     Q.    And so why did you not do a report?

11     A.    I had my -- my statement on video and recorded, so a

12 report would have been a summation as to what I was actually

13 saying on video to the two detectives.

14     Q.    Okay.  If you can go to the use of force policy.

15 It's Exhibit 14, please.  And if you could go to the third

16 page, it's numbered 24 at the bottom, middle.  And it says at

17 the top "Reporting Discharge of Firearm."  Do you see that?

18     A.    Yes.

19     Q.    Okay.  If you go to the bottom there, No. 2, in bold

20 and underlined, "Firearm discharge with injuries."  There's

21 letter A and it goes into 1, 2, and it continues on the next

22 page through 9.  1 to 9.  If you could give 1 to 9 a look,

23 please.

24          Have you read those nine things, sir?

25     A.    Yes.

1    Q.    And per policy, does it say "When a firearm is

2 discharged and the result is injury or death to another person,

3 the following procedures will apply"?

4    A.    Yes.

5    Q.    And if you go to No. 7, does it say "The officer

6 involved will make all the usual reports for the incident in

7 question"?

8    A.    Yes.

9    Q.    And does No. 8 say "The officer involved will make a

10 Weapon Discharge Report"?

11   A.    Yes.

12   Q.    Okay.  And the language of the policy, there's no

13 language saying "Well, if you give an interview, you don't have

14 to do those two things."  Would you agree with me?

15   A.    Yeah.  Nothing states that.

16   Q.    Okay.  So did you violate this policy in regards to

17 No. 7 there?

18       MR. EVASHAVIK:  Object to the form of the question.

19       Sorry.  You can answer.

20       THE WITNESS:  Can you just repeat it real quick?

21 BY MR. GEARY:

22   Q.    Sure.  Did you violate policy, No. 7 specifically,

23 by not composing a report detailing what -- what you did and

24 saw that shift?

25   A.    No.

1      Q.    And how -- what's your reasoning?  Explain it for
2  me, how you did not violate that policy.
3      A.    Well, I knew I had been involved in a -- in a
4  shooting.  The usual report at that point would be making a
5  statement to -- it goes outside of the city, to county
6  homicide.  So I did that.
7      Q.    Okay.  And what about No. 8, "The officer involved
8  will make a Weapon Discharge Report."  You did not do that.
9  Correct?
10     A.    Correct.
11     Q.    So did you violate No. 8 of this policy?
12           MR. EVASHAVIK:  Object to form.  You can answer.
13           THE WITNESS:  I don't -- I don't know what that is.
14  BY MR. GEARY:
15     Q.    You don't know what what is?
16     A.    A weapons -- a weapon discharge report.
17     Q.    Okay.  As of January 31 of '016, how many years had
18  you been with the Port Authority?
19     A.    19.
20     Q.    Had you ever read this policy before at any point in
21  those 19 years?
22     A.    I had.
23     Q.    Okay.  Did you ever ask what the weapon discharge
24  report was?
25     A.    No.

1    Q.    After this incident, at any point did you inquire of

2  your chief what the weapon discharge report was?

3    A.    No.

4    Q.    Was there any reason you didn't ask?

5    A.    No reason.

6    Q.    When you were shooting at Bruce Kelley, was he

7  positioned in front of a house on Whitney Avenue?

8    A.    Yes.

9    Q.    Okay.  Did you know if the house was occupied?

10   A.    I -- I know from the area that some of those were

11 abandoned.  But, specifically, no, I don't know if it was

12 occupied or not.

13   Q.    And behind the houses, there are yards.  Correct?

14   A.    Yes.

15   Q.    And when you were firing at Bruce Kelley, there

16 could have been people in the yards behind the houses.  True?

17   A.    Possibly.

18   Q.    And then behind the yards, it's the park and ride.

19 Is that right?

20   A.    Yes.

21   Q.    And the park and ride, again, it's a large parking

22 lot.  Is that right?

23   A.    Yes.

24   Q.    And there could have been people in the parking lot.

25 Correct?

1      A.    Yes.

2      Q.    Now, when you were firing at Kelley, he was facing

3  you.  Correct?

4      A.    Yes.

5      Q.    Okay.  Who shot him in the back twice?

6      A.    I don't know.

7      Q.    Are the only two options you or Officer Ravotti?

8      A.    Yes.

9      Q.    Was it Ravotti?

10           MR. EVASHAVIK:  I'm going to object to the form of

11  the question.  It's a lack of foundation.

12           Go ahead.  You can answer whatever you know.

13           THE WITNESS:  I can't answer that.  I don't know.

14  BY MR. GEARY:

15     Q.    Is there something called a ballistics vest that a

16  K-9 can wear while attempting to make an apprehension?

17     A.    Yes.

18     Q.    Okay.  Was your K-9 partner, Aren, wearing a

19  ballistics vest when you deployed him to apprehend Bruce

20  Kelley?

21     A.    No.

22     Q.    Is there any reason why he wasn't wearing a

23  ballistics vest?

24     A.    No reason.

25     Q.    Do you know what -- did the Port Authority Police

1  Department have -- have those for K-9 teams?  The ballistics
2  vests.

3      A.    Yes.

4      Q.    What -- what was, let's say, the cost of a -- a
5  ballistics vest?

6      A.    I can't -- I can't say.  I don't know.

7      Q.    Now, the summary of your interview there is -- what
8  you told Officer Patrick Miller, was it the truth?

9      A.    Is this No. 30?

10     Q.    Yes, sir.

11     A.    Yes.

12     Q.    Okay.  Did you tell him the whole truth?

13     A.    Yes.

14     Q.    Did you leave anything out that would be important
15 or material?

16     A.    No.

17     Q.    Okay.  Do you have any changes, as we sit here
18 today, to the content of his summary?  And you can take your
19 time.

20     A.    This is his summary.

21     Q.    Right.  I mean, he's -- he's quoting you at times.
22 Is that right?

23     A.    Yes.  It looks like there are quotations.

24     Q.    And at other points, he's paraphrasing you.  Is
25 that -- is that correct?

1      A.    I think that's correct.

2      Q.    Okay.  And I just want to give you the opportunity.

3  Is there anything in here where you might say "I didn't say

4  that" or "I was misquoted.  He got that wrong," this phrase or

5  this sentence?  I just want to give you the opportunity to make

6  any corrections or clarifications.

7            MR. EVASHAVIK:  I'm going to object to the form of

8  the question.  It's really an unfair question.  I mean, you

9  have his recorded statement.  Ask him to verify if that's

10  accurate.  He -- otherwise, he's going to have to listen to his

11  recorded statement while he's looking at this and make sure

12  there are no discrepancies.  I don't understand the point of

13  this.

14  BY MR. GEARY:

15     Q.    Is there anything here you want to change, sir?  I'm

16  not talking -- I'm not talking about the audio and video.  I'm

17  talking about this report.  Is there anything you want to

18  change in here?

19     A.    I mean, these are his bullet points, so it's his

20  summation.

21     Q.    And nothing you want to change?

22     A.    No.

23     Q.    Did you ever before this day use deadly force?

24     A.    No.

25     Q.    Okay.  And what -- did you have a 9 millimeter?

1      A.     Yes.

2      Q.     What type of bullets?

3      A.     147 grain.

4      Q.     Were they hollow point?

5      A.     That's correct.

6      Q.     And a hollow point bullet, what -- what's the

7  distinctive characteristics of a hollow point bullet, please?

8      A.     When it's fired, it -- it blossoms.

9      Q.     It can do more damage internally.  Is that correct?

10         MR. EVASHAVIK:  Object to form.

11         THE WITNESS:  I can't answer that.

12  BY MR. GEARY:

13     Q.     Well, are you -- you have firearms instruction.

14  Correct?

15     A.     Correct.

16     Q.     So when you say "it blossoms," what do you -- what

17  do you mean "blossoms"?

18     A.     So how the round is constructed, it would just make

19  a blossoming effect as it exited the firearm.

20     Q.     Okay.  And what -- just what does that mean?  A

21  blossoming effect.

22     A.     Similar to as a flower would blossom out, the round

23  itself sort of opens up.  It folds back.

24     Q.     Is that before it hits the target or after?

25     A.     That, I don't know.

1    Q.    Just winding down.  Just going over my notes, so

2  you -- so that you know.

3         Before you deployed Aren, was there any thinking by

4  you to somehow get behind Bruce Kelley, Jr., physically to --

5  you get behind him and -- and try to apprehend him some way

6  from behind?

7    A.    No.  I was committed to K-9 deployment.

8    Q.    And Aren was -- was trained in other areas.  I think

9  explosives -- smelling explosives.  Is that correct?

10   A.    Yes.

11   Q.    And what other areas was Aren trained in?

12   A.    I don't know what you mean by that.  What --

13   Q.    Just say -- you may have already spoken to it.  Drug

14 sniffing, explosives, tracking.  Things like that.

15   A.    So yes.  His -- the discipline, along with explosive

16 detection, was tracking as well.

17   Q.    Okay.  Again, I'm just -- some odds and ends here to

18 wrap up.  When you started shooting at Bruce, the dog was

19 wounded.  Correct?

20   A.    Yes.

21   Q.    Okay.  And at that point when you started shooting,

22 you did not know that the dog would ultimately die.  Correct?

23   A.    Correct.

24   Q.    And you testified that he said several times, "Shoot

25 me.  Just shoot me."  Is that right?

1     A.    Yes.

2     Q.    Did you take that as an indication that he had some

3  mental health issues?

4     A.    No.

5     Q.    And why not?

6     A.    No reason.

7     Q.    In your crisis intervention training, did they ever

8  talk about someone who says things like that, like "Shoot me,"

9  maybe they have some mental health issues?

10    A.    I can't say that that's part of the curriculum.

11    Q.    So it's not part of the curriculum or you just --

12  you don't recall?

13    A.    I don't recall if it's part of the curriculum.

14    Q.    Were you disciplined by the chief or anyone from the

15  Port Authority as far as your involvement with Bruce Kelley on

16  that day?

17    A.    No.

18    Q.    To your understanding under the law that day, was

19  Aren a police officer?

20          MR. EVASHAVIK:  Object to the form of the question.

21          You can answer.

22          THE WITNESS:  Are you referring to Aren as a police

23  officer?

24  BY MR. GEARY:

25    Q.    Well, I'm asking your understanding on that day

1    under the law.  Was Aren a police officer as opposed to, say, a

2    tool?

3            MR. EVASHAVIK:  Object to the form.

4            You can answer.

5            THE WITNESS:  Aren is a police dog used in a police

6    capacity as a tool.

7    BY MR. GEARY:

8        Q.    Sorry.  Just looking at my notes here.  If you could

9    just look at one last exhibit, please.  It's the K-9 policy.

10   And we marked it as 26.

11           (Whereupon, Deposition Exhibit 26 was presented to

12   the witness.)

13   BY MR. GEARY:

14       Q.    If you could just take a minute and give that a

15   look.  I'm going to focus you on page 63 at the bottom.  It's

16   Roman numeral VIII.  Have you read that, sir?

17       A.    Yes.

18       Q.    Okay.  I want to focus on -- I'll read it aloud, if

19   that's okay.  Roman numeral VIII, third sentence, "Port

20   Authority Police K-9s are considered less lethal weapons in use

21   of force incidents so when deployed the K-9 officer will

22   consider the following:"  1, 2, and 3.

23           1 says "The type and severity of the crime."

24           2, "Whether the suspect poses an immediate threat to

25   the safety of officers or the public."

1        And No. 3, "Whether the suspect is actively
2    resisting arrest or attempting to avoid arrest by flight."
3        Did I read that correctly?
4    A.    Yes.
5    Q.    So when you -- before you deployed Aren, did you
6    consider those factors?
7    A.    Yes.
8    Q.    And right before you released the dog, what was the
9    type of crime that Mr. Kelley had committed?
10   A.    Aggravated assault.
11   Q.    On who?
12   A.    Officer Adams.
13   Q.    Okay.
14   A.    Minimum.
15   Q.    And what do you mean by "minimum"?
16   A.    Well, there was another officer there.  I didn't
17   know if it was two counts.  But I know that I at least had one
18   count.
19   Q.    Okay.  And it says -- No. 1 says "The type and
20   severity of the crime."  So did you consider the severity of
21   the crime?
22   A.    Yes.
23   Q.    And what was the severity?
24   A.    It's a felony.
25   Q.    Okay.  What was the severity, though, as far as --

1    did Adams sustain injuries?  What did you know?

2         A.    I knew he was injured.

3         Q.    And what was the -- what was the injury to Adams?

4         A.    He had an elbow injury.

5         Q.    And then No. 2 says you'll consider the following:

6    "Whether the suspect poses an immediate threat to the safety of

7    officers or the public."  Did you consider that before

8    releasing Aren?

9         A.    Yes.

10        Q.    And you concluded that Bruce posed an immediate

11   threat to whom, please?

12        A.    Both.

13        Q.    And to what officer?

14        A.    All the officers that were on scene.

15        Q.    Okay.  And the public as well?

16        A.    Yes.

17        Q.    Okay.  And then No. 3 says "Whether the suspect is

18   actively resisting arrest or attempting to avoid arrest by

19   flight."  Did you consider those two factors?

20        A.    Yes.

21        Q.    Did you consider him to be avoiding arrest by

22   flight?

23        A.    Yes.

24        Q.    Sorry.  I got to reference you to one more.  Sorry.

25   It's 27.

1    A.    It's -- oh.

2    Q.    It's a three-pager.

3          (Whereupon, Deposition Exhibit 27 was presented to

4    the witness.)

5    BY MR. GEARY:

6    Q.    Okay.  Is it -- these were taken from your Facebook

7    page.  The first page, it's a paw.  "K-9 Lives Matter."

8    September 6th, '016.  What is that there on page 1?  What is

9    that?

10   A.    It looks like a paw that says "K-9 Lives Matter."

11   Q.    Okay.  Did you post that on your Facebook page?

12   A.    I can't say if it's -- my name is at the bottom, so

13   I -- I -- possibly.

14   Q.    Okay.  To you, what does that mean, this symbol?

15   The saying "K-9 Lives Matter," what -- what does that mean?

16   A.    A K-9 life matters.

17   Q.    Okay.  Is that a -- something related to Black Lives

18   Matter?

19   A.    I think I answered your question already.

20   Q.    Yeah.  And I have a different question.  Does that

21   relate to Black Lives Matter?

22   A.    No.

23   Q.    Did you want to punish Kelley for hurting your dog?

24   A.    No.

25   Q.    When you fired the first shot at him, did you fire

1  it out of anger?

2      A.    No.

3      Q.    Even partially out of anger?

4      A.    No.

5      Q.    What about the second shot?

6      A.    No.

7      Q.    What about the third shot?

8      A.    No.

9      Q.    What about the fourth shot?

10     A.    No.

11     Q.    What was the reason you were firing after the fourth

12 shot?

13     A.    To stop the threat.

14     Q.    Well, you saw him take the bullets, right, as you

15 shot him the first four times?

16     A.    I expended my rounds in a second.

17     Q.    Well, did you reload and continue firing at him?

18     A.    No.

19     Q.    But you shooting him the first four times, that

20 halted his progress towards you, didn't it?

21     A.    I didn't process at that point.  I fired -- the

22 rounds that I fired, I fired within a second.

23     Q.    Was there any delay in your firing the number of

24 times you did?

25     A.    No.

1    Q.    Any pause?

2    A.    No.

3    Q.    And, say, shots -- if you shot ten times total,

4  shots 8, 9, 10, you're saying those were not fired out of

5  anger, sir?

6    A.    That's what I'm saying.

7    Q.    Were you ever disciplined for -- by the Port

8  Authority in your entire career for use of racially

9  inappropriate talk?  Speech?  Behavior?

10    A.    No.

11    Q.    What about at Hanover?

12    A.    No.

13    Q.    Do you have tattoos?

14    A.    Yes.

15    Q.    Are any of the tattoos you have -- any of them

16  related in any way or could be interpreted as relating to, say,

17  White Aryan Resistance?  White Power?  Swastikas?  Things like

18  this?

19    A.    No.

20          MR. GEARY:  That's all I have, sir.  Thank you.

21          THE WITNESS:  Thanks.

22          MR. EVASHAVIK:  Brian, I have a few brief questions

23  before we wrap up here.  Let me just take a look.

24                        EXAMINATION

25  BY MR. EVASHAVIK:

1      Q.    You were asked about the K-9 ballistics vest.  You

2  said you're familiar with that.  Correct, sir?

3      A.    Yes.

4      Q.    And what parts of a K-9 or a dog's body would the

5  vest cover?

6      A.    So a K-9 vest covers the chest and the ribs on both

7  sides.

8      Q.    And does that guarantee that a knife would not

9  pierce that type of vest?

10      A.    No guarantee.

11      Q.    And the areas where you saw Bruce Kelley, Jr., stab

12  K-9 Aren, would a vest have covered those parts of his body?

13      A.    It would not.

14      Q.    Now, you were asked about the -- or you just

15  testified a moment ago about the duration of time to discharge

16  your weapon.  At the time, do you -- did you know how many

17  rounds that you fired at the time this was happening?

18      A.    I did not.

19      Q.    And you continued firing until what moment?

20      A.    Until the threat stopped.

21      Q.    And when did the threat stop?

22      A.    When Mr. Kelley fell to the ground.

23      Q.    And what was your estimate of how many times it took

24  you to continuously fire your gun, not knowing how money

25  [verbatim] -- how many rounds, but multiple times?

1    A.    It was literally a second or just over.

2    Q.    And when Mr. Kelley dropped to the ground --

3  Mr. Kelley, Jr. -- did you immediately stop discharging your

4  weapon?

5    A.    I did.

6    Q.    When did you first, the first time that day,

7  unholster your weapon?  The very first time.

8    A.    The first time I unholstered, when Mr. Kelley

9  stepped towards me with the knife.

10   Q.    Was that before or after stabbing Aren?

11   A.    That was after.

12   Q.    And before he stabbed Aren and you released him,

13 what was your plan at that point with regard to how you would

14 take Mr. Kelley, Jr., into custody?

15   A.    So once an apprehension was made, I was going to go

16 hands-on and cuff him under power.

17   Q.    Did you have both hands free to -- to pursue that

18 after Aren made his initial apprehension?

19   A.    Yes.

20   Q.    In terms of timing, from -- estimate, if you can.

21 From when you first released Aren, okay, until the time that

22 you -- you discharged your weapon and he fell to the ground,

23 you describe a series of events with the stabbing and

24 everything else.  So releasing Aren, discharging your weapon,

25 Mr. Kelley, Jr., falls to the ground.  An estimate on the total

1    duration of that sequence.

2         A.    No longer than ten seconds.

3         Q.    You were asked about a summary of the recorded

4    statement that you gave to the Allegheny County police.

5    Correct?  Do you recall that?

6         A.    Yes.

7         Q.    Were you required to submit to that statement by the

8    county police?

9         A.    Yes.

10        Q.    Okay.  And did you voluntarily go down and provide a

11   statement to them?

12        A.    Yes.

13        Q.    Was this at the county police station?

14        A.    Headquarters.  Correct.

15        Q.    Headquarters.  All right.  And did you have a chance

16   before today to listen and view the recorded statement?

17        A.    Yes.

18        Q.    And is that you speaking on the video and audio

19   recorded statement?

20        A.    Yes, it is.

21        Q.    And is it true and correct, what you said that day?

22        A.    Yes.

23              MR. EVASHAVIK:  All right.  I'd like to add that

24   statement as a separate exhibit, Noah.

25              MR. GEARY:  Sure.

1          MR. EVASHAVIK:  So I think we're on -- would this be
2  No. 31?
3          MR. GEARY:  Yes.
4          MR. EVASHAVIK:  All right.  I'll identify Exhibit
5  No. 31.  And, for the record, I'll put that on a thumb drive,
6  the actual audio and video recorded statement provided by
7  Lieutenant O'Malley to the Allegheny County Police Department
8  on February 2, 2016.
9          (Whereupon, Deposition Exhibit 31 was marked for
10  identification.)
11  BY MR. EVASHAVIK:
12      Q.   At the time that you decided to deploy Aren, did you
13  already know about attempts made by other officers to use other
14  means of less than lethal force, such as a Taser?
15      A.   Yes.
16      Q.   And how did you know about that?
17      A.   From radio broadcast.
18      Q.   And how about pepper spray, also known as OC -- OC
19  spray?  Did you know about that?
20      A.   Yes.
21      Q.   How did you know about that?
22      A.   Same thing.  Radio broadcast.
23      Q.   And how did you know about the assault by Bruce
24  Kelley, Jr., on Officer Adams?
25      A.   Radio broadcast by Officer Adams.

1    Q.    And you were aware of this before you deployed K-9

2  Aren?

3    A.    Yes.

4    Q.    At the time you deployed Aren and also at the time

5  you discharged your weapon towards Bruce Kelley, Jr., did you

6  believe that he was or was not actively resisting arrest?

7    A.    He was.

8    Q.    He was what?

9    A.    He was resisting arrest.

10    Q.    Did you see him at any time cooperate or comply with

11  the directives of the other officers and the commands to stop

12  and drop the knife?

13    A.    At no time did I see him comply.

14    Q.    Did you believe Bruce Kelley, Jr., posed a

15  significant threat of death or serious physical injury to you,

16  the other officers, and other people that may have been in the

17  area?

18    A.    Yes.

19    Q.    Why did you use deadly force and discharge your

20  weapon at Bruce Kelley, Jr.?

21    A.    My life was in danger.

22          MR. EVASHAVIK:  Thank you, sir.  Those are all the

23  questions I have.  Wait.  He may have more.

24          MR. GEARY:  Nothing further.

25          MR. EVASHAVIK:  Okay.  Thank you.  The witness will

1  read the transcript.

2          THE VIDEOGRAPHER:  We are off the record at

3  3:05 p.m.  This concludes the deposition.

4          (Whereupon, the deposition concluded at 3:05 p.m.

5  Signature was not waived.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
```

CALISIA KELLEY; and          CIVIL ACTION
JOHNNIE MAE KELLEY,
Co-Administrators of the     No. 2:17-cv-01599-NBF
ESTATE OF BRUCE KELLEY,
JR., deceased

vs.

BRIAN O'MALLEY, both in his
Official and Individual
Capacities as Sergeant for
the Allegheny County Port
Authority; and DOMINIC
RIVOTTI, in both his
Official and Individual
Capacities as Officer for
the Allegheny County Port
Authority.

Deposition of:  Brian O'Malley
        Date:  Wednesday, October 7, 2020

                   DEPONENT CERTIFICATE

        I, Brian O'Malley, deponent herein, do hereby certify
that following my review of the transcript of my deposition
held on the above date:

_____ There are no changes.


_____ Please indicate the within changes totaling _____ number
of changes.


_____                     _____
Date                            Brian O'Malley


Subscribed and sworn to before me, a Notary Public, on this
_____ day of _____, 2020.


_____
NOTARY PUBLIC

My Commission Expires:  _____

|      |      | CHANGE/<br>CORRECTION | REASON FOR<br>CHANGE/CORRECTION |
|------|------|-----------------------|--------------------------------|
| PAGE | LINE | | |
| \_\_\_\_ | \_\_\_\_ | _____ | _____ |
| \_\_\_\_ | \_\_\_\_ | _____ | _____ |
| \_\_\_\_ | \_\_\_\_ | _____ | _____ |
| \_\_\_\_ | \_\_\_\_ | _____ | _____ |
| \_\_\_\_ | \_\_\_\_ | _____ | _____ |
| \_\_\_\_ | \_\_\_\_ | _____ | _____ |
| \_\_\_\_ | \_\_\_\_ | _____ | _____ |
| \_\_\_\_ | \_\_\_\_ | _____ | _____ |
| \_\_\_\_ | \_\_\_\_ | _____ | _____ |
| \_\_\_\_ | \_\_\_\_ | _____ | _____ |
| \_\_\_\_ | \_\_\_\_ | _____ | _____ |
| \_\_\_\_ | \_\_\_\_ | _____ | _____ |
| \_\_\_\_ | \_\_\_\_ | _____ | _____ |
| \_\_\_\_ | \_\_\_\_ | _____ | _____ |
| \_\_\_\_ | \_\_\_\_ | _____ | _____ |
| \_\_\_\_ | \_\_\_\_ | _____ | _____ |
| \_\_\_\_ | \_\_\_\_ | _____ | _____ |
| \_\_\_\_ | \_\_\_\_ | _____ | _____ |
| \_\_\_\_ | \_\_\_\_ | _____ | _____ |
| \_\_\_\_ | \_\_\_\_ | _____ | _____ |
| \_\_\_\_ | \_\_\_\_ | _____ | _____ |

Page \_\_\_\_ of \_\_\_\_\_

_____
Brian O'Malley

# C E R T I F I C A T E

COMMONWEALTH OF PENNSYLVANIA  :
COUNTY OF WASHINGTON           :      SS.:

    I, Rita A. Ross, Registered Professional Reporter and Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify:

    That via Zoom video conference before me personally appeared Brian O'Malley, who was by me first duly cautioned and sworn to testify to the truth, the whole truth, and nothing but the truth in the taking of his/her videotaped oral deposition in the cause aforesaid;

    That the testimony then given by the deponent via Zoom video conference as above set forth was reduced to stenotype by me to the best of my hearing ability and afterward transcribed by me or under my direction and is a true record of the testimony given by the deponent.

    I do further certify that the deponent did not waive reading and signing of the deposition transcript and that an electronic transcript was sent to Greg Evashavik, Esquire, on or about October 21, 2020, for the deponent's review and signature.

    I do further certify that this deposition was taken at the time and in the manner specified in the foregoing caption and was completed without adjournment.

    I do further certify that I am not a relative of any party hereto, nor am I otherwise interested in the event of this action.

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Coraopolis, Pennsylvania, on October 21, 2020.


*Rita A. Ross*
_____
RITA A. ROSS, Notary Public
in and for the Commonwealth
of Pennsylvania

Commonwealth of Pennsylvania - Notary Seal
Rita A. Ross, Notary Public
Allegheny County
My commission expires February 14, 2022
Commission number 1141170
Member, Pennsylvania Association of Notaries

My commission expires February 14, 2022.

**[**

**[sic] (1)**
106:17
**[verbatim] (2)**
56:15;126:25

**A**

**abandoned (1)**
113:11
**able (1)**
95:11
**above (5)**
28:2;66:22,23;
79:1,4
**Academy (7)**
9:11,18,21;10:1,3,
14,15
**acclimate (1)**
26:4
**accurate (1)**
116:10
**acquire (1)**
56:20
**acquisition (1)**
31:21
**across (2)**
32:18;90:1
**Act (4)**
10:1;26:20;27:24;
28:2
**actively (3)**
121:1;122:18;
130:6
**acts (1)**
24:18
**actual (4)**
41:4;45:6;56:19;
129:6
**actually (10)**
13:23;41:10;45:11;
46:8;64:15;86:5,25;
90:15;107:2;110:12
**Adams (8)**
56:24;57:18;62:4;
121:12;122:1,3;
129:24,25
**add (1)**
128:23
**addition (1)**
34:18
**additional (1)**
72:14
**administered (1)**
54:4
**administrative (1)**
59:19
**adult (1)**
69:7
**advised (2)**
62:7;102:21

**aerial (2)**
76:4;95:25
**affirmatively (1)**
38:13
**African (1)**
41:3
**again (19)**
7:18;25:6;27:23;
34:10;35:7;37:3;
38:22;42:14;47:1;
49:6;51:15;71:6;
80:22;85:9;91:7;
93:15;96:20;113:21;
118:17
**against (11)**
11:23;12:4,11,14;
13:8,10,21,25;14:3,8;
27:6
**age (2)**
7:21;69:5
**agencies (1)**
37:10
**agency (4)**
9:25;11:5;20:15;
36:11
**aggravated (2)**
12:21;121:10
**aggression (12)**
22:5,7,8,16;23:11;
29:21;38:6;47:16,20,
21;49:19;50:25
**agitation (5)**
25:11;26:19,24;
27:17,20
**ago (1)**
126:15
**agree (2)**
109:23;111:14
**agreement (1)**
108:12
**ahead (11)**
49:15;52:1;68:8;
70:8;73:6;75:18;
77:17;92:12,19;
94:19;114:12
**aids (1)**
39:11
**aiming (1)**
99:20
**air (1)**
44:6
**Alcohol (1)**
20:19
**allegation (3)**
13:8,10;14:7
**allegations (2)**
13:5;14:11
**Allegheny (5)**
9:11;10:3;109:8;
128:4;129:7
**allowed (1)**
106:13
**along (6)**

62:7;68:12;79:17;
87:25;108:19;118:15
**aloud (1)**
120:18
**alternative (1)**
34:18
**although (2)**
27:14;30:5
**always (3)**
16:3;17:18;31:20
**American (5)**
20:14,20,22;36:6;
41:3
**amount (1)**
26:25
**Angelini (1)**
37:15
**anger (3)**
124:1,3;125:5
**angle (2)**
74:16,20
**angling (4)**
74:3,14,15;81:14
**angular (1)**
74:2
**answered (3)**
11:13;104:6;
123:19
**anticipate (1)**
6:20
**apart (1)**
88:16
**apologize (2)**
48:20;93:16
**appears (1)**
109:6
**applicable (1)**
14:20
**apply (3)**
102:10,13;111:3
**appreciate (1)**
53:24
**apprehend (16)**
22:24;23:18;24:1;
39:23;41:24;44:23;
53:15,19;80:23;
81:12;85:7;89:13;
91:22;101:9;114:19;
118:5
**apprehension (78)**
21:4;22:12,16,22;
23:5,7,8,12;25:16;
26:17;28:12;29:16,
22,23,25,25;30:12,
20;31:5;32:21,22,25;
33:6;34:1,25;35:1,13,
14,17,19,21;36:13,
19,24;37:13,22;38:8,
9,14,21,24;39:16,20;
40:18;43:1,9;44:19;
45:23;46:3,8,13,20;
51:6,10,15,16;52:19;
53:3,6,10,12,13;

74:25;84:19,22,24;
86:8;88:24;89:6;
91:7;92:2,3;94:25;
95:10,10;114:16;
127:15,18
**apprehensions (1)**
22:9
**approach (1)**
104:15
**appropriate (2)**
23:17,24
**approximate (4)**
40:4;56:12;66:16;
81:5
**area (41)**
8:14;22:4;25:12;
30:16,17;31:15,16,
22;32:7,14,14,18,18,
21;33:11;36:25;41:8;
43:5;47:15;57:16;
59:15;63:16;66:1;
67:7;84:22;86:3,7;
88:3;89:16;92:9;
96:7,8,24;97:5,15,17;
98:1,19;99:24;
113:10;130:17
**areas (12)**
21:3,24;22:4;
31:22;32:14;34:1;
35:17;42:14;56:8;
118:8,11;126:11
**Aren (135)**
16:17,21,22;17:1,2,
3,4,8,18,18;18:5,8;
19:1,10;33:22;34:4;
36:14,14;37:3,12;
38:20;44:16,22,25;
45:7,14,18,22;46:2,7,
14,16,20;47:11,22;
49:3,17;50:23;52:5;
53:5,11,14,18;54:5;
60:10,12,15,21;61:2,
8,15,16,16,19,23;
63:12,18;65:5,22,25;
66:3;74:25;76:8;
77:10;79:15,15;
80:23;81:12;82:24;
83:9,17,23,25;84:1,3,
9,18,19;85:2,2,6;
86:2,5;87:11,14;88:3,
15,17,19,20;89:1,13,
15,22,23;90:2,8,8,9,
12,16,17;91:4,5,6,6,
11;92:6,21;94:24;
101:8,14;103:21,24,
25;104:3;114:18;
118:3,8,11;119:19,
22;120:1,5;121:5;
122:8;126:12;
127:10,12,18,21,24;
129:12;130:2,4
**Aren's (3)**
60:23;90:18;95:2

**Arko (2)**
17:23;63:13,18
**A-r-k-o (1)**
17:23
**arm (20)**
23:3,9;31:13,14,16,
16,17,17,25;32:1,4,4,
5,8,12,16;42:18;85:3;
86:6;89:16
**arm/shoulder (3)**
30:16,17;32:13
**armed (10)**
25:19,20;41:13;
43:10;44:8;62:8;
86:9,12;87:3;89:10
**Around (13)**
18:21;27:10;28:1;
65:17;71:5;72:22;
73:8,25;74:1;81:22;
90:1;95:1;104:7
**arrest (13)**
12:9,18,20;30:8;
51:22;87:10;121:2,2;
122:18,18,21;130:6,9
**arrived (5)**
55:20;61:12;62:25;
101:16,18
**arriving (1)**
62:4
**Aryan (1)**
125:17
**Asian (1)**
41:2
**aside (2)**
38:7;110:1
**ASP (1)**
13:8
**assault (4)**
12:21;51:14;
121:10;129:23
**assaulting (1)**
52:21
**assigned (11)**
16:10,12;55:24;
56:6,8;106:7,15;
107:4,22;108:6,10
**Assigning (1)**
55:15
**assignment (1)**
55:10
**assignments (1)**
56:17
**associated (1)**
36:10
**Association (4)**
20:14,21,23;21:1
**assume (7)**
27:20;54:16;61:12;
65:22;73:7;99:9;
100:8
**assumed (2)**
70:23;72:21
**assuming (1)**

67:14
**ATF (5)**
20:19;29:2,8,10;
45:18
**attached (4)**
48:15,20,22;90:9
**attack (2)**
25:14,15
**attacking (1)**
25:14
**attempt (4)**
91:22,25;92:7;
102:16
**attempted (1)**
101:10
**attempting (3)**
114:16;121:2;
122:18
**attempts (1)**
129:13
**attend (4)**
9:11,24;10:2,4
**attended (3)**
9:10;10:2,16
**attorney (2)**
13:12;75:14
**audio (4)**
57:19;116:16;
128:18;129:6
**Authority (33)**
7:23;8:7;10:13,19;
11:25;14:25;15:10,
18;16:2;17:12;19:20;
20:2;43:6;54:14;
55:18;57:24;58:8,14,
24;59:7,16,20;60:2,4;
101:22;105:18;
106:12;108:9;
112:18;114:25;
119:15;120:20;125:8
**Authority's (1)**
104:22
**authorized (1)**
105:10
**availability (1)**
50:12
**available (2)**
106:11;107:18
**Avenue (53)**
66:22,24;67:3,6,12,
21,23;68:5,22;69:9,
13,17;70:2,17,23,25;
71:6,14,16,18,22;
72:7;73:14,14,17,18;
75:24;76:4,18,21,23,
24;77:11,23;78:3,7,8,
8,11,19,20;79:16,17,
23,24,24;80:2;82:11;
96:1,6;103:6,6;113:7
**avoid (2)**
121:2;122:18
**avoiding (1)**
122:21

**aware (1)**
130:1
**away (18)**
18:21;31:19;32:17;
68:5;70:17,23;71:24,
25;72:10;73:18;
81:16;85:10,20,22;
96:10,16,18,20

**B**

**back (37)**
6:15;28:25;30:7;
31:14;32:14,18;40:6;
42:15;44:6;48:10;
64:4;65:17,22;21;
69:2,20;71:5,22;
72:21;73:25;74:1;
75:24;83:20;85:2;
89:24;91:7;92:2;
93:25;94:14,21;95:2,
22;100:17,18;
101:18;114:5;117:23
**background (1)**
14:10
**backs (1)**
27:8
**backup (1)**
57:21;59:19
**backwards (4)**
33:17;34:9,20;
100:16
**Bad (1)**
74:11
**ballistics (6)**
114:15,19,23;
115:1,5;126:1
**bamboo (4)**
26:19;27:4,15,18
**band (1)**
59:1
**Banksville (1)**
10:7
**barren (1)**
85:14
**barricaded (1)**
108:18
**barrier (6)**
66:3,5,12,13,17,20
**base (2)**
33:4;102:15
**based (5)**
70:21;76:10;97:23;
102:7;103:7
**basis (1)**
38:25
**Bates (2)**
109:9,11
**baton (1)**
104:16
**battle (1)**
28:21
**Bean (2)**

9:13,22
**beanbag (2)**
106:24;107:10
**became (2)**
18:13;19:13
**Beer (1)**
10:7
**begin (1)**
60:23
**beginning (3)**
5:12;6:9;72:24
**begins (1)**
97:16
**Behavior (1)**
125:9
**behind (12)**
71:22;72:4;74:4,6;
80:21;101:2;113:13,
16,18;118:4,5,6
**below (3)**
76:3;79:1,7
**Beltzhoover (3)**
43:5,5,7
**best (1)**
97:19
**Beverage (2)**
9:13,22
**beyond (1)**
108:12
**bi- (1)**
32:9
**bicep (1)**
32:2
**big (1)**
6:23
**Bill (2)**
37:14,15
**bit (6)**
6:16,21;42:11;
66:7;85:2;107:14
**bite (37)**
23:1,2,22;24:12,13,
19,20,22;25:12,13;
29:22,25;30:1,5,24;
31:5,9,9,11,25;32:8,
22;33:1,2,10,14,22;
34:5,7,11;35:2;42:2;
53:8,11;84:25;86:5;
92:7
**bite-and-hold (4)**
22:13,20;23:5,10
**bites (1)**
89:16
**biting (5)**
34:18,19;35:19,22;
90:10
**Black (8)**
41:1;43:23,24,24;
69:3,4;123:17,21
**blade (1)**
86:17
**blank (3)**
26:9,9,11

**Blanks (4)**
26:6,6;28:11,22
**bless (1)**
99:4
**blossom (1)**
117:22
**blossoming (2)**
117:19,21
**blossoms (3)**
117:8,16,17
**board (1)**
28:18
**Bob (1)**
5:9
**body (18)**
14:23;15:1;23:3;
24:23;31:19;42:11,
13;83:18;84:10;90:1,
1,14,18;92:6;99:20;
100:14;126:4,12
**bold (1)**
110:19
**bomb (1)**
21:4
**both (12)**
5:19;35:24;44:14;
56:25;69:17;70:4,5;
76:21;84:6;122:12;
126:6;127:17
**bottom (9)**
65:10,11;67:10,18;
69:12;110:16,19;
120:15;123:12
**bounce (1)**
104:7
**break (8)**
7:6;48:4;55:21;
92:13,17;93:15,18;
94:3
**Brian (6)**
5:1,5,7,20;7:20;
125:22
**B-r-i-a-n (1)**
7:20
**brief (2)**
48:9;125:22
**Briefly (1)**
10:21
**broadcast (7)**
65:19;70:1,16;
71:4;129:17,22,25
**Bruce (28)**
5:17;14:23;44:17;
64:15;81:11;83:10;
85:7,25;86:6,9;87:6;
94:11;98:16;99:6;
101:5;110:5;113:6,
15;114:19;118:4,18;
119:15;122:10;
126:11;129:23;
130:5,14,20
**Bugno (2)**
12:8;14:12

**B-u-g-n-o (1)**
14:12
**build (2)**
27:7,10
**builder (1)**
27:25
**building (3)**
25:11;36:25;38:6;
47:15
**Bullet (5)**
75:23;76:3;116:19;
117:6,7
**bullets (2)**
117:2;124:14
**bus- (2)**
76:18;77:18
**buses (1)**
43:6
**bush (7)**
71:22;72:4,4,6;
74:4,7;80:21
**busway (13)**
62:20;66:2,25;
67:20;76:18;77:19,
22;78:1,4,4,5,6;79:9
**bylaws (2)**
37:23;38:3

**C**

**Calisia (3)**
5:6,16;6:1
**call (8)**
30:6;51:11;55:23;
56:1,16;58:16;60:13;
93:17
**called (8)**
10:22,24;22:19;
23:10;26:19;27:14;
108:16;114:15
**call-off (1)**
30:4
**came (2)**
42:16;92:4
**camera (3)**
14:23;15:8,10
**cameras (1)**
15:1
**Can (63)**
6:3,5,15,17,19;8:6;
9:25,25;10:1,15;15:;
17:24;22:2,25;24:20;
26:23;28:1;29:24;
32:16;39:2;40:4;
47:7,9,20;48:18,23;
49:8;77:13;80:24;
81:11;84:21;85:23;
86:14,15;88:15;
93:17;94:6,13;96:4,
21;97:1,8,19;98:13,
20;99:6;100:24;
103:13;105:16;
107:13;108:14,21;

109:19;110:14;
111:19,20;112:12;
114:12,16;115:18;
117:9;119:21;120:4;
127:20
**Canevin (1)**
8:19
**capabilities (4)**
15:8,11;58:2;
108:13
**capability (1)**
107:5
**capacity (4)**
16:5,6,15;120:6
**capsicum (2)**
106:17,25
**c-a-p-s-i-c-u-m (1)**
106:20
**car (13)**
15:6;57:1,15;
60:16,21;63:17,18;
64:4;65:17,21,25;
66:3;106:13
**career (7)**
13:25;14:10;29:8;
43:1;44:12;99:10;
125:8
**carries (1)**
29:20
**carry (2)**
106:13,14
**case (5)**
5:16;12:16;13:13;
75:9;98:14
**cases (2)**
99:10,12
**Castle (1)**
37:15
**catch (2)**
21:10;93:2
**categories (1)**
47:14
**Catholic (1)**
8:19
**center (15)**
57:7;71:17,18;
73:14,17,18,23;
76:23;78:8,19,21;
79:24;80:1;99:22,22
**centers (1)**
58:2
**certainly (2)**
80:17;93:16
**Certificate (1)**
49:2
**certification (28)**
10:1;26:1;28:25;
29:5,7,7;31:8;36:22;
45:5,7,8;46:15,16;
47:10,19;49:1,16;
50:4,4,5,14,15,16;
53:24;54:8,19,20,21
**certifications (2)**

20:9;45:18
**certified (3)**
29:1;35:25;36:6
**certify (1)**
36:7
**certifying (2)**
37:18;38:5
**chance (7)**
11:18,20;103:4,5;
105:5;109:15;128:15
**change (4)**
98:17;116:15,18,
21
**changed (2)**
28:20;45:6
**changeover (2)**
28:17;45:11
**changes (1)**
115:17
**channel (18)**
58:1,5,6,9,11,15,
17,22,23,23;59:1,4,9,
11,16,16,22,24
**channels (2)**
57:23;59:19
**characteristics (1)**
117:7
**charges (6)**
12:11,13,14,17,19,
22
**chase (1)**
62:6
**check (1)**
48:24
**chest (6)**
32:21;33:12,13;
92:8;99:24;126:6
**chief (7)**
8:8;10:25;14:5;
19:17,18;113:2;
119:14
**chin (2)**
91:9,9
**chose (2)**
19:14;95:5
**circle (4)**
97:2,8,11,13
**citations (1)**
20:12
**citizen (4)**
11:22;13:20;68:9,
19
**citizens (5)**
14:3;68:1;71:13;
81:21;82:14
**City (2)**
40:17;112:5
**civil (2)**
12:9;99:12
**civilians (7)**
68:1;71:13;81:21,
25;82:6,7,14
**clarifications (1)**

116:6
**clarified (1)**
62:6
**Clarify (5)**
16:6;22:25;25:20;
26:12;58:13
**clear (5)**
6:18;34:7;97:3,20;
98:20
**clearly (1)**
98:6
**clock (1)**
78:12
**close (5)**
10:12;79:20,21;
80:4;100:25
**closer (4)**
40:10,11;53:21;
80:1
**Code (5)**
57:19,19,20;60:7;
61:22
**college (5)**
8:22;9:4,16,17;
10:4
**colon (1)**
105:10
**color (1)**
86:16
**comfortable (6)**
7:9,11;98:7,11,13,
18
**coming (8)**
17:10;57:11;67:12;
68:6,23;71:25;75:24;
83:13
**command (16)**
51:7,7,15,17;52:22,
24;53:1,14,18;80:23;
81:12;83:21;84:4;
85:7;86:2;102:23
**commander (3)**
55:12,14,17
**commands (6)**
74:23;75:1;83:22,
24;102:25;130:11
**commenced (1)**
5:2
**Comments (1)**
49:3
**committed (2)**
118:7;121:9
**commonly (1)**
106:4
**commotion (1)**
42:6
**communicate (2)**
58:23;59:2
**communication (1)**
59:3
**communications (3)**
59:8,20;72:15
**company (1)**

9:6
**compel (1)**
98:10
**complainant (1)**
12:8
**complaint (7)**
11:23;12:4,6,9;
13:21;14:3,4
**complaints (1)**
14:3
**complete (1)**
36:15
**completely (2)**
50:7;92:1
**comply (4)**
23:3;68:15;130:10,
13
**component (1)**
50:25
**compose (1)**
110:4
**composing (1)**
111:23
**computer (2)**
5:9;48:19
**concealment (3)**
72:4;74:5,6
**concerned (1)**
88:5
**concerning (1)**
109:24
**concluded (2)**
122:10;131:4
**concludes (1)**
131:3
**concrete (1)**
66:13
**conduct (2)**
6:11;56:1
**conference (1)**
5:5
**confidence (4)**
27:1,7,10,25
**confusion (1)**
98:3
**conjunction (1)**
54:13
**connect (1)**
100:4
**consider (8)**
23:24;120:22;
121:6,20;122:5,7,19,
21
**considerations (1)**
87:17
**considered (3)**
82:5,8;120:20
**consist (2)**
88:25;101:24
**consists (1)**
37:9
**constructed (1)**
117:18

**contained (3)**
107:1,1,3
**content (4)**
109:10,13;110:1;
115:18
**continue (4)**
71:19;92:16;94:4;
124:17
**continued (1)**
126:19
**continues (1)**
110:21
**continuing (1)**
74:17
**continuously (1)**
126:24
**continuum (3)**
104:10,13,14
**contorting (1)**
90:1
**control (11)**
22:5,7,8,17;23:11;
47:16,20,21;49:19;
50:25;95:12
**cooperate (1)**
130:10
**Cordon (1)**
18:4
**C-o-r-d-o-n (1)**
18:4
**Corrado (1)**
109:24
**Corrado's (1)**
109:21
**corrections (1)**
116:6
**correctly (2)**
12:2;121:3
**cost (1)**
115:4
**Counsel (1)**
5:12
**count (1)**
121:18
**counts (1)**
121:17
**County (11)**
9:11;10:3;37:5;
55:16;58:3;109:8;
112:5;128:4,8,13;
129:7
**couple (7)**
6:11;10:23;11:14;
19:8;52:4;64:21;
94:21
**Court (5)**
5:8,10,13;12:10;
99:13
**cover (2)**
24:23;126:5
**covered (1)**
126:12
**covers (2)**

96:24;126:6
**coworker (1)**
  14:7
**credentialed (2)**
  21:24;29:1
**credentialing (1)**
  20:16
**credentials (3)**
  20:9,13;45:17
**crime (4)**
  120:23;121:9,20,
  21
**criminal (2)**
  12:22;99:10
**crises (1)**
  102:1
**crisis (5)**
  101:21;102:3,10;
  103:16;119:7
**criteria (1)**
  23:23
**cross-street (1)**
  71:17
**crucial (1)**
  98:15
**cuff (1)**
  127:16
**curb (3)**
  96:7,7,8
**current (1)**
  21:7
**curriculum (4)**
  103:20;119:10,11,
  13
**custody (2)**
  87:10;127:14

**D**

**damage (1)**
  117:9
**danger (1)**
  130:21
**dark (2)**
  96:3;99:8
**dash (2)**
  15:7,10
**dashcam (2)**
  14:19;15:7
**date (5)**
  19:10;33:21;45:22;
  47:17;49:1
**dates (1)**
  47:17
**day (35)**
  14:23;15:3,5,16;
  50:3,4,6,7,9,14,15;
  54:4;55:2,11,21;
  56:4;57:3,25;60:20;
  61:8,9;76:16;85:16;
  88:1;100:20;101:6,
  22;106:11;107:18;
  116:23;119:16,18,25;

127:6;128:21
**days (1)**
  28:23
**deadly (3)**
  104:16;116:23;
  130:19
**deal (3)**
  6:23;34:4;89:4
**dealing (1)**
  102:8
**death (4)**
  103:24,25;111:2;
  130:15
**December (1)**
  46:23
**decided (3)**
  41:5;64:9;129:12
**decoy (24)**
  24:12,16,17;25:14,
  18,21;26:16;28:1,13,
  21;51:4,13,13,20,23;
  52:14,20,20,23;53:6,
  8,11,19;88:24
**decoying (2)**
  24:24;26:21
**decoys (2)**
  26:18;39:12
**dedicated (2)**
  37:21;38:24
**deep (1)**
  97:14
**de-escalate (2)**
  103:18,22
**defendant (2)**
  12:24;98:15
**defendants (1)**
  5:19
**defending (1)**
  13:12
**defense (2)**
  77:7,7
**Define (4)**
  79:21;87:16;88:21;
  90:23
**degrees (1)**
  102:1
**delay (1)**
  124:23
**Delirium (2)**
  102:2,5
**demonstrating (1)**
  32:10
**Department (17)**
  7:24;10:21;11:25;
  14:5,25;16:3;17:12;
  19:14;55:18;57:8,24;
  105:18;106:7;108:9;
  109:8;115:1;129:7
**departments (2)**
  25:2;59:9
**depend (1)**
  31:18
**depiction (2)**

85:16;98:8
**deploy (22)**
  23:7,18,25;24:1;
  29:13,14,17;30:2;
  31:10;33:5;39:23;
  41:6;44:16;63:22;
  64:10;76:8;86:2;
  87:6;89:13;95:6;
  101:14;129:12
**deployed (19)**
  23:12,14;29:20;
  30:9;41:7,17;42:25;
  43:12,25;77:10;
  79:15;85:25;88:3;
  114:19;118:3;
  120:21;121:5;130:1,
  4
**deploying (1)**
  64:10
**deployment (15)**
  29:19,21;30:5,11,
  19;31:8,9,9;40:10,14;
  41:5;44:18;56:11;
  108:13;118:7
**deployments (2)**
  44:11,14
**deploys (1)**
  23:2
**deposition (16)**
  5:1,5;6:7,10,14;
  11:9;14:14;49:10;
  75:10;104:18;109:2;
  120:11;123:3;129:9;
  131:3,4
**describe (6)**
  24:20;41:4;77:9;
  86:14,15;127:23
**described (4)**
  68:2;88:22;89:15;
  96:18
**describing (1)**
  91:20
**designated (2)**
  51:4;52:14
**desk (2)**
  57:6,6
**Detail (1)**
  12:4
**detailing (1)**
  111:23
**detection (18)**
  19:16;21:4,7,13,14,
  18,22,25;29:9,11;
  36:25;39:6,9,9,15,15,
  18;118:16
**detective (2)**
  8:9;57:18
**detectives (1)**
  110:13
**detention (2)**
  39:13,14
**determination (1)**
  102:4

**determined (1)**
  42:15
**develop (1)**
  108:15
**developed (2)**
  40:14;55:22
**develops (1)**
  62:2
**device (5)**
  26:21;27:2;105:22,
  25;106:9
**devices (4)**
  105:15;106:3;
  107:7,8
**devoted (1)**
  38:9
**diagonal (2)**
  71:24,25
**dialogue (5)**
  102:14,16,17,18,19
**die (1)**
  118:22
**Dietrich (3)**
  9:5,10,18
**difference (2)**
  27:17;29:25
**differences (1)**
  45:14
**different (27)**
  8:3;16:5;18:6,6;
  20:9;23:21;34:14,14;
  36:4,11;45:4;50:7;
  57:23;59:4,22;60:18;
  66:6;79:13;85:13;
  88:23;98:1,1;104:8;
  107:7,11;109:11;
  123:20
**DiPippa (8)**
  17:16,21;20:1;
  62:25;63:6,21;64:6;
  65:3
**direction (16)**
  68:17;69:1,25;
  70:20;73:8,19,21,22,
  23;78:19;83:10;
  91:14;93:9;95:18,19;
  100:14
**directional (1)**
  77:15
**directives (1)**
  130:11
**directly (5)**
  81:13;83:16,18,19;
  84:12
**Discharge (9)**
  110:17,20;111:10;
  112:8,16,23;113:2;
  126:15;130:19
**discharged (3)**
  111:2;127:22;
  130:5
**discharging (2)**
  127:3,24

**discipline (8)**
  21:6,11,17,17,21;
  22:3,8;118:15
**disciplined (2)**
  119:14;125:7
**disciplines (4)**
  21:12;36:7;37:18;
  38:5
**discovery (1)**
  109:6
**discrepancies (1)**
  116:12
**discretion (1)**
  89:12
**dismissed (1)**
  56:7
**dispatch (4)**
  57:7;58:2;60:3,4
**dispatched (1)**
  58:1
**dispatcher (1)**
  60:1
**disposition (1)**
  12:22
**distance (5)**
  43:15;51:5;52:14,
  17;64:24
**distinctive (1)**
  117:7
**distraction (5)**
  26:21;27:2;28:2;
  51:6;106:6
**District (3)**
  5:8,8;55:25
**districts (2)**
  55:15;56:6
**disturbed (1)**
  102:1
**Diversionary (1)**
  106:3
**document (3)**
  47:7;48:17;54:8
**documents (2)**
  14:18;48:17
**dog (92)**
  18:6,11,18;20:14,
  21,22;21:1;23:2,2,22;
  24:13,25;25:15,16;
  26:21,24,25;27:6,8,8,
  14;28:2;29:15;30:6,
  7,10,11,13,18;31:10,
  11,21;32:8,20;33:14,
  16;34:7,8,17,19,22,
  24,24;35:9,25;36:6,
  36:6,19;42:8;50:22;
  51:8,11,11,18,23;
  52:24;53:16,19;64:4,
  10,10;66:19;72:20,
  23;73:1,4,6;74:22,23;
  83:16;85:25;86:10,
  22,22,25;87:6,7,8;
  89:2,8;91:1,20,21,25;
  95:5,6;102:18;

118:18,22;120:5;
121:8;123:23
**dogs (16)**
19:15,16;21:6,7,12,
14,14;27:13,13,15;
33:11;37:10,10;45:3;
50:22;89:6
**dog's (2)**
91:22;126:4
**done (10)**
22:12;51:9,16,18,
25;52:2;53:4;54:9;
91:3;92:21
**door (4)**
63:17;68:5,23,25
**down (33)**
6:19,24;7:1;16:25;
28:7;51:19,21;55:21;
63:18;64:22;65:7;
67:9,16,24;69:13;
70:25;71:23;74:3,14,
17,18,20;81:14;
82:11;90:13;91:5;
100:15,17,17;103:5,
12;118:1;128:10
**downfield (4)**
44:2,2;51:4,11
**downrange (2)**
84:19,20
**draft (1)**
110:4
**draw (1)**
85:5
**drive (2)**
15:4;129:5
**drop (5)**
23:4;67:8;71:11;
92:23;130:12
**dropped (2)**
90:13;127:2
**drove (3)**
15:6;62:11;65:25
**drug (2)**
21:4;118:13
**duly (1)**
5:21
**duration (2)**
126:15;128:1
**during (7)**
6:25;11:24;46:5;
51:1;52:15;53:23;
103:19
**duties (4)**
16:8;55:13,14;
60:18
**duty (2)**
8:10;56:9

---

**E**

**ears (4)**
70:4,11,12;72:16
**easier (1)**

39:9
**East (8)**
76:18;77:16,18,22;
78:7;79:7;96:6;97:10
**eastbound (2)**
78:5;79:9
**eastern (1)**
59:15
**Edgewood (4)**
59:3,6,10,21
**education (1)**
9:4
**effect (3)**
30:18;117:19,21
**eight (6)**
18:24,24;39:5,5,6,6
**either (5)**
29:22;31:9;63:21;
78:16;99:1
**elbow (2)**
31:20;122:4
**elicit (2)**
27:6,25
**Eliminating (1)**
110:2
**else (1)**
20:18;127:24
**e-mail (2)**
47:8;48:2
**emergency (1)**
57:19
**employ (1)**
17:12
**employed (2)**
5:10;9:5
**employment (3)**
9:4,9;11:24
**encompass (1)**
38:4
**encompasses (1)**
54:4
**encounter (1)**
84:15
**encountered (1)**
67:10
**end (11)**
21:17;46:5;48:20,
22;67:16;71:16,18;
73:15;108:13,21,22
**ended (2)**
9:21;100:6
**ends (3)**
97:16,17;118:17
**enforcement (2)**
10:20;11:5
**entered (1)**
57:15
**entire (4)**
7:9;24:23;75:22;
125:8
**entitled (1)**
97:24
**entity (4)**

20:15;35:25;36:11;
45:19
**entries (1)**
76:3
**entry (1)**
75:25
**environment (1)**
109:1
**equal (1)**
64:12
**equipment (1)**
105:20
**equivalent (1)**
45:1
**estimate (5)**
80:18;88:16;
126:23;127:20,25
**Evashavik (51)**
5:18,18;6:15;
13:14;19:22;22:1;
24:2;31:1;33:24;
34:10;38:11,22;
46:10;47:23;48:3,6,
14,21;49:5,8;75:15,
18;76:25;77:14,17;
78:15;80:10,13;82:1;
88:11;92:16;93:19;
94:12,18;98:5,17;
111:18;112:12;
114:10;116:7;
117:10;119:20;
120:3;125:22,25;
128:23;129:1,4,11;
130:22,25
**even (10)**
11:1;21:7;41:17;
81:5,5;89:7,10;
96:24;104:2;124:3
**events (5)**
15:3;55:1;75:6;
95:23;127:23
**everybody (2)**
6:24;56:4
**exact (1)**
12:17
**exactly (1)**
30:17;68:21;83:22;
97:7
**EXAMINATION (3)**
5:23;94:14;125:24
**examined (1)**
5:21
**example (1)**
108:14
**excessive (6)**
13:5,6,21,25;14:8,
11
**excessive/unreasonable (1)**
11:24
**exhibit (33)**
7:9,11;11:9,12;
14:14,18;26:25;
48:25;49:7,10;53:25;

75:5,8,10,22;76:7;
95:22;97:1;98:2,14;
99:13;104:18,22,23;
109:2,5;110:15;
120:9,11;123:3;
128:24;129:4,9
**exhibited (1)**
102:1
**exhibits (3)**
7:7,8,10
**exist (1)**
54:7
**exited (2)**
66:3;117:19
**exiting (1)**
56:25
**expended (2)**
99:19;124:16
**experience (1)**
11:5
**Explain (11)**
19:12;26:23;29:24;
31:4,4;40:13;62:16;
84:21;104:12;
106:21;112:1
**explained (7)**
13:24;35:15;45:13;
52:19;53:7;54:3;
107:25
**explaining (1)**
53:25
**explosive (12)**
19:15;21:7,13,13,
14,18,22,24;29:9,11;
36:25;118:15
**explosives (3)**
118:9,9,14
**exposed (2)**
28:22,22
**extensive (1)**
45:7
**extra (1)**
39:12
**eyeball (1)**
72:3

---

**F**

**F- (1)**
18:1
**face (1)**
42:17
**Facebook (2)**
123:6,11
**facets (1)**
23:21
**facing (9)**
32:20;33:5,10;
35:9;83:18;91:4,6,8;
114:2
**fact (2)**
99:18;105:17
**factors (2)**

121:6;122:19
**fail (1)**
47:14
**fair (7)**
76:16,17,20,23;
81:3;85:10,16
**fall (1)**
100:14
**falls (2)**
95:11;127:25
**familiar (2)**
105:7;126:2
**far (32)**
8:7;9:4;13:5;
14:11;16:23;21:3;
28:11;32:25;35:11;
53:5;60:1;63:21;
71:3,4;72:10;76:17,
20,23,24;80:14;
85:10,20,21;88:16;
94:14;95:19;96:13;
100:25;101:9;
105:19;119:15;
121:25
**fast (4)**
6:19;72:13;74:1;
103:7
**fault (1)**
104:5
**favor (1)**
13:18
**February (1)**
129:8
**feel (1)**
25:3
**feet (15)**
24:23;66:18;71:6;
80:5,5,8;88:18;
95:21;96:1,10,14,15,
16,18,20
**fell (7)**
99:16;100:12,17,
17,18;126:22;127:22
**felon (2)**
25:13;40:16
**felony (2)**
30:2;121:24
**female (5)**
40:24;68:4,19;
69:4,20
**few (3)**
10:11;92:14;
125:22
**field (5)**
51:23;73:10;82:11;
88:6,9
**fighting (2)**
42:16,21
**file (1)**
12:13
**filed (4)**
5:7;12:11,14;13:25
**find (2)**

41:20;99:2
**fine (4)**
48:5;77:21;80:11;
92:17
**fire (7)**
25:2,2;28:23;
92:24;99:15;123:25;
126:24
**Firearm (4)**
110:17,20;111:1;
117:19
**Firearms (2)**
20:19;117:13
**fired (12)**
93:4;99:16;100:3,
12;101:3;117:8;
123:25;124:21,22,22;
125:4;126:17
**firing (10)**
94:16;95:16;96:22;
99:7;113:15;114:2;
124:11,17,23;126:19
**first (28)**
5:21;6:15;11:17;
18:1,9,16;19:23;
20:5;40:2,10;63:6;
72:2;75:25;100:3;
101:3;106:23;109:8,
12,19;123:7,25;
124:15,19;127:6,6,7,
8,21
**Flash (1)**
106:2
**flash-bang (2)**
106:4,6
**fled (2)**
40:17;41:9
**fleeing (5)**
25:13;30:8;35:7,8;
40:16
**flight (3)**
121:2;122:19,22
**flower (1)**
117:22
**focus (5)**
36:14;82:9;105:2;
120:15,18
**focusing (3)**
25:7;37:3;46:18
**folds (1)**
117:23
**foliage (1)**
85:12
**follow (2)**
34:5;42:7
**followed (1)**
51:7
**following (4)**
105:9;111:3;
120:22;122:5
**follows (1)**
5:22
**foot (4)**

42:18;62:6;93:6,6
**force (21)**
11:24;13:5,6,22,
25;14:8,11;101:10,
11;104:9,10,13,14,
16,22,24;110:14;
116:23;120:21;
129:14;130:19
**foreseeable (2)**
95:4,8
**form (20)**
22:1;31:1;33:25;
34:10;38:11,12,23,
25;46:10;47:23;77:3;
82:1;88:11;111:18;
112:12;114:10;
116:7;117:10;
119:20;120:3
**forte (1)**
108:6
**forth (3)**
6:16;21:5;40:15
**forward (2)**
91:15;100:16
**found (2)**
48:15,16
**foundation (2)**
38:15;114:11
**four (15)**
10:16,17;17:9,10,
10,17;37:1,2,12;39:4,
8;109:13,15;124:15,
19
**four-page (1)**
104:23
**fours (2)**
90:13;91:5
**fourth (4)**
85:23,24;124:9,11
**frame (7)**
12:5;17:11;18:22;
25:7;28:24;40:9;
56:13
**Franco (1)**
37:15
**free (1)**
127:17
**frequency (1)**
59:1
**front (12)**
32:9;36:5;68:23;
73:8;81:14;83:12,16,
18,19;84:10,12;113:7
**frontal (1)**
33:11
**froze (2)**
77:25;107:14
**Fuck (3)**
64:23;71:10,10
**Fucking (5)**
70:9,9;72:23;73:5,
6
**Fukas (6)**

13:3,11;17:15,24,
24;20:1
**F-u-k-a-s (2)**
18:1,1
**full (1)**
16:21
**further (2)**
9:4;130:24

## G

**gaining (1)**
72:12
**gap (2)**
19:3,5
**Garage (3)**
108:17,18,24
**garages (1)**
108:24
**garden (3)**
23:21;24:22;25:4
**gas (1)**
108:2
**gas/smoke (1)**
107:23
**Gave (12)**
74:23;75:1;80:23;
81:12;82:17,17,20,
21;83:23;85:6;
102:23;128:4
**gazebo (2)**
57:1;65:20
**Geary (71)**
5:15,15,24,25;
11:11;14:16;19:24;
22:6;24:3,8;26:13;
28:4,6,10;31:3;34:3,
6,12,16;38:16,17;
39:1;46:12;47:25;
48:5,11,18,25;49:7,9,
12;75:4,8,12,17,19,
20;77:6,8,20;78:10,
17;80:16;82:4;88:12;
92:13,18;93:15,20;
94:2,17,20;98:12,24;
99:4,5;104:20;109:4;
111:21;112:14;
114:14;116:14;
117:12;119:24;
120:7,13;123:5;
125:20;128:25;
129:3;130:24
**generally (2)**
23:13;39:5
**gentleman (1)**
68:1
**German (6)**
16:20,21;18:12,19;
83:22;84:1
**gestured (2)**
32:4,12
**gets (1)**
7:1

given (4)
51:7,15;52:22,24
**gives (1)**
53:1
**giving (1)**
102:25
**God (1)**
99:4
**goes (6)**
6:15;69:20;73:6;
84:19;110:21;112:5
**good (2)**
5:25;6:2
**Google (3)**
77:1;98:19,23
**grabbed (1)**
63:17
**graduate (1)**
8:24
**graduated (1)**
9:3
**grain (1)**
117:3
**grassy (2)**
96:7;97:17
**green (1)**
76:15
**Greg (4)**
5:18;48:2;75:4;
92:15
**ground (10)**
33:18;90:9,9,12;
92:1;95:11;126:22;
127:2,22,25
**grounds (1)**
33:5
**group (3)**
37:9,9;72:19
**guarantee (2)**
126:8,10
**guess (7)**
10:22;80:11,13,17;
98:18,22;99:1
**guessing (1)**
99:3
**gun (20)**
25:23,25;26:3,9,10,
11,15;28:11,13,21;
84:13,16;92:10,23;
94:8,15,22;95:16;
100:10;126:24
**Gunfire (6)**
26:1,4,12;28:19;
45:6;51:6
**gunman (1)**
108:18
**guy (1)**
67:19

## H

**half (1)**
48:4

**halted (1)**
124:20
**Hamnett (8)**
15:6;62:3,8,11,16,
19;66:1;101:17
**Hampy (1)**
56:25
**hand (5)**
25:22;84:8;86:19;
89:17;90:15
**handcuffed (1)**
42:24
**handcuffs (1)**
51:22
**handgun (2)**
40:16;41:16
**handler (13)**
51:10,13,16,19;
52:5,5,7,11,12,19,21,
23;53:2
**handlers (1)**
37:25
**hands (4)**
24:23;44:5;84:7;
127:17
**hands-on (3)**
51:20;104:15;
127:16
**Hanover (4)**
10:21;11:2,4;
125:11
**happen (3)**
34:21;94:23;95:10
**happened (3)**
40:14;46:19;94:10
**happening (2)**
41:5;126:17
**happens (6)**
6:22;7:4;69:23;
70:15;74:21;92:19
**hard (4)**
31:20,21;50:11;
69:6;96:2;100:5
**harder (1)**
45:12
**harm (4)**
88:20;89:2,8;95:5
**Harmar (1)**
108:23
**harmed (3)**
87:11,19,21
**head (5)**
7:3;24:24;90:2,19;
94:25
**Headquarters (2)**
128:14,15
**health (3)**
102:4;119:3,9
**hear (6)**
6:5;26:8;42:6;67:6,
8,8;69:24,25;70:4,6,
10;71:9,10,11;94:6;
108:21

**heard (13)**
42:8;56:24;57:11;
70:3,8,8,16;72:14,16,
16;73:3;78:2;88:4
**hearing (1)**
42:1
**heavier (1)**
24:25
**heavy (2)**
25:2;41:8
**heavy-duty (1)**
25:1
**heel (7)**
30:7;51:3,8,12,19,
23;52:25
**height (1)**
66:16
**help (1)**
39:12
**hierarchy (1)**
8:7
**high (1)**
8:18
**higher (2)**
66:10;67:2
**Hills (4)**
8:17;43:4;108:11,
20
**hind (1)**
86:8
**hip (2)**
95:13,14
**hired (4)**
9:22,25;10:13,18
**Hispanic (2)**
41:2;69:3
**hit (2)**
27:14,15
**hits (1)**
117:24
**hold (2)**
23:1;28:1
**holding (3)**
28:13;84:3,6
**hollow (3)**
117:4,6,7
**holster (6)**
84:13,16;92:10;
94:9,22;95:13
**home (1)**
61:13
**homes (1)**
67:3
**homicide (1)**
112:6
**hope (1)**
93:16
**hose (1)**
25:2
**hostage (1)**
108:17
**hour (2)**
39:6;48:4

**hours (23)**
36:23;37:1,2,12,17,
21;38:2,4,5,7,9,13,20,
24;39:6,8;46:13,17,
19;47:21;50:24;
75:23,23
**house (8)**
61:18,20;68:25;
69:2,21;70:22;113:7,
9
**house/grass (1)**
97:15
**houses (13)**
69:16;70:18,24,25;
72:9;73:14;76:21;
78:25;79:4,7;82:12;
113:13,16
**huh-uh (1)**
7:4
**human (2)**
61:25;87:19
**humans (1)**
87:23
**hundreds (1)**
46:16
**hurting (1)**
123:23

**I**

**idea (2)**
32:11;77:1
**identical (1)**
109:10
**identification (1)**
129:10
**identified (1)**
37:7
**identifier (2)**
58:18,21
**identify (3)**
5:12;48:23;129:4
**immediate (5)**
81:25;82:6;120:24;
122:6,10
**immediately (2)**
9:3;127:3
**impact (5)**
33:17;106:24,24;
107:9,10
**impact/oleoresin (1)**
106:17
**implemented (1)**
27:3
**important (1)**
115:14
**impression (3)**
74:9,12,13
**inappropriate (1)**
125:9
**inbound (3)**
65:25;73:18,20
**Inc (1)**

5:10
**incident (11)**
15:16;19:10;33:22;
44:17;55:22;56:21;
63:24;68:10;110:5;
111:6;113:1
**incidents (1)**
120:21
**include (1)**
55:14
**included (1)**
22:16
**including (1)**
36:16
**Indiana (1)**
9:6
**indicate (2)**
77:13;94:13
**indicated (2)**
77:4;98:7
**indication (1)**
119:2
**individual (1)**
102:4
**Industries (3)**
9:5,11,18
**industry (1)**
22:15
**information (1)**
56:20
**initial (5)**
31:11;45:8;85:24;
97:9;127:18
**initially (2)**
90:12;101:16
**initials (4)**
76:8;80:25;85:6;
96:22
**initiate (1)**
19:14
**injured (1)**
122:2
**injuries (2)**
110:20;122:1
**injury (4)**
111:2;122:3,4;
130:15
**inquire (1)**
113:1
**inserted (1)**
108:1
**inside (3)**
57:7;107:2,3
**instance (4)**
27:4;42:10;43:12;
47:18
**instead (1)**
64:10
**institutions (2)**
10:2,4
**instruction (1)**
117:13
**instructor (1)**

101:25
**intend (1)**
47:8
**intent (1)**
31:11
**interaction (1)**
98:15
**interchangeable (1)**
52:7
**internally (1)**
117:9
**interpret (1)**
77:4
**interpreted (1)**
125:16
**interrogation (1)**
13:20
**interrogatories (2)**
9:12;11:13
**interrupt (3)**
6:23;21:9;77:24
**interruption (1)**
93:16
**intersects (1)**
76:24
**intervene (1)**
42:22
**intervention (5)**
101:22;102:3,10;
103:17;119:7
**interview (6)**
19:16;109:7,21;
110:8;111:13;115:7
**interviewed (1)**
19:16
**into (28)**
8:25;10:12;15:19;
17:9;18:21;27:24;
28:3;40:9,17;41:10,
11;43:7;63:5,16,19;
64:3,22;68:25;69:20;
87:10;90:17;91:7;
96:13,15;97:15;
108:1;110:21;127:14
**introduced (2)**
106:6;107:4
**introducing (2)**
27:24,24
**involve (6)**
35:22;38:6;39:15,
18,20;56:3
**involved (10)**
12:7,18;22:8;
40:17;45:6;104:17;
111:6,9;112:3,7
**involvement (1)**
119:15
**involving (3)**
49:17;89:1;101:25
**issued (2)**
20:12;49:2
**issues (3)**
102:4;119:3,9

**IUP (1)**
10:2

**J**

**jacket (1)**
24:22
**James (2)**
47:11;49:24
**January (26)**
14:22;15:15,17,17,
20,21;16:1,14;33:21;
37:11;44:16;45:21;
46:2,9,14,18,19,20;
55:2;58:5;61:15;
85:14;104:13;
105:19;106:11;
112:17
**jaw (5)**
91:10,11,21;92:4;
95:2
**jersey (5)**
66:3,5,13,16,19
**job (3)**
9:20;10:5,19
**jogging (1)**
83:6,7
**Johnnie (2)**
5:16;6:1
**Jr (37)**
5:17;14:23;44:17;
64:15;76:8,9;80:23;
81:11;82:24;83:10;
85:6,7,25;86:6,19,21;
88:13,14,16;89:13,
17;90:25;91:1,22;
94:11;95:20;99:6;
101:5;118:4;126:11;
127:3,14,25;129:24;
130:5,14,20
**Jr's (6)**
85:2,3;89:23;
90:14;91:21;92:6
**jump (2)**
6:20;33:16
**junction (1)**
43:4
**jury (2)**
13:17,18

**K**

**K-9 (68)**
15:20,24;16:2,3,7,
9,13,15,17,23;17:5,
11,19,22;18:3,6,13,
20,25;19:3,9,13,14,
21;20:1,2,3;23:2;
26:4;29:19,20;30:2;
33:5;40:19;41:11;
47:10,10;49:16;51:2,
9;52:7,12,12;54:12;
63:8,10,22;74:23,25;

83:25;89:12;102:21;
104:16;114:16,18;
115:1;118:7;120:9,
21;123:7,10,15,16;
126:1,4,6,12;130:1
**K-9s (3)**
16:10;87:9;120:20
**keep (1)**
54:23
**keeps (1)**
74:1
**Kelley (76)**
5:7,16,17,17;6:1;
14:23;44:17;64:15;
76:8,9;80:23;81:11;
82:24;83:10;85:2,3,6,
7,25;86:6,9,19,21;
87:7,19,22;88:5,13,
14,16;89:13,17,23;
90:14,25;91:1,8,15,
18,21,22;92:6;94:11;
95:3,4,17,20;96:1,22;
98:16;99:6,15;101:5,
9,10;102:9;110:5;
113:6,15;114:2,20;
118:4;119:15;121:9;
123:23;126:11,22;
127:2,3,8,14,25;
129:24;130:5,14,20
**Kelley's (2)**
91:11;104:5
**kicking (2)**
42:17,20
**kill (5)**
72:22;73:4,5;
86:25;87:7
**killed (1)**
104:3
**killing (1)**
14:22
**kind (11)**
6:10,22;18:11,18;
25:4;28:3;73:8;
89:16;98:8;100:10;
103:16
**kinds (2)**
24:21;25:3
**knew (4)**
67:6;95:9;112:3;
122:2
**knife (33)**
25:22,22,24;26:15;
62:8;67:9;71:11;
72:22;73:8;86:13,14,
15,16,19;87:3,12;
89:10,17,21;90:17,
18;92:3,22,23;93:1,3;
95:1,3,5;103:12;
126:8;127:9;130:12
**knock (5)**
33:17;34:9,15,19,
20
**knowing (2)**

63:16;126:24
**known (3)**
24:13;106:4;
129:18

## L

**La (1)**
9:6
**lack (1)**
114:11
**Lake (3)**
10:22,23,24
**landing (2)**
65:12;67:18
**language (3)**
83:22;111:12,13
**large (4)**
72:4;86:16;97:5;
113:21
**last (5)**
12:8;47:10;78:2;
109:12;120:9
**latter (1)**
29:8
**launch (2)**
105:15,16
**launchable (1)**
107:23
**launcher (3)**
105:11,14;108:2
**launchers (1)**
105:19
**law (4)**
10:19;11:5;119:18;
120:1
**lawsuit (6)**
12:7;13:24,24;
14:2,4,11
**lawyer (5)**
5:15;6:1,9,21,22
**lay (1)**
43:3
**layman's (2)**
29:15;104:14
**lays (1)**
6:10
**lead (1)**
41:9
**leading (1)**
36:15
**learn (1)**
42:10
**leash (7)**
41:9;51:4,23;84:3,
5,6;92:23
**least (2)**
54:25;121:17
**leave (2)**
68:3;115:14
**leaves (4)**
85:13,14,19,22
**led (1)**

42:8
**left (34)**
9:10,17,17,20;
32:14;37:24;67:21;
69:17;71:1,1;72:6,8;
73:14,15;74:2,20;
79:23;81:15;83:14,
15;84:10,22;85:3;
86:6;89:16,21;90:5,
21;93:6;94:8;95:13;
100:24;101:1,2
**legs (1)**
86:8
**length (2)**
86:17;88:23
**less (7)**
104:16;105:11,14,
15;108:1;120:20;
129:14
**lethal (8)**
104:16;105:11,14,
15,19;108:1;120:20;
129:14
**letter (2)**
107:6;110:21
**letters (1)**
58:16
**level (5)**
8:4,5;55:6,7;66:24
**levels (1)**
8:3
**Lieutenant (7)**
8:2,3,8;48:12;94:3;
98:25;129:7
**life (4)**
10:19;87:10;
123:16;130:21
**lights-and-siren (1)**
57:22
**limiting (1)**
33:25
**line (5)**
74:19;75:6,13;
77:3;98:5
**Linear (4)**
64:16;66:2,21;67:9
**lines (2)**
62:7;68:12
**listen (2)**
116:10;128:16
**lists (1)**
105:10
**literally (1)**
127:1
**literature (4)**
22:13;23:4;29:14,
16
**little (6)**
6:16,21;39:9;66:7;
107:14,15
**live (4)**
28:23;61:13,13,16
**Lives (5)**

123:7,10,15,17,21
**locate (1)**
41:23
**located (6)**
41:12;42:5;43:5,6,
8;57:7
**long (15)**
9:7;10:10,14;11:2;
15:24;17:4;18:20,23;
19:6,7;50:16,17;
64:19;98:6;101:13
**longer (7)**
10:16,17;17:9;
30:7;63:4;64:21;
128:2
**look (27)**
11:12,15;28:25;
39:3;40:6;42:19;
43:19;46:24;47:1,3;
48:19;49:13;56:10;
62:18;69:13;95:24;
96:21;104:21,23;
109:5,13,15,18;
110:22;120:9,15;
125:23
**looked (1)**
69:2
**looking (25)**
12:16;13:19;47:7;
62:19;67:11,19;68:5,
22;69:1;70:25;75:22;
77:12;78:5,11,25;
79:1;80:24;82:10;
86:15;88:13,14;
95:23;99:25;116:11;
120:8
**looks (7)**
28:19;49:1;76:14;
109:11;110:2;
115:23;123:10
**loosely (1)**
74:16
**Lord (66)**
18:9,16,18,20,21,
23,25;19:10;20:6,8,8,
17,18,20;21:3,23;
23:7,13,13,13,18,25;
24:1;25:6,16;26:2,3,
17;27:13;28:11,12,
14,15,20;29:1,4;30:1;
31:25;35:24;39:23;
40:10,18;41:6,7,17,
20,23;42:2,4,11,16,
20,25;43:8,12,15,25;
44:1,2,4,6,11;45:1,8,
15,17
**L-o-r-d (1)**
18:10
**Lord's (3)**
21:17;29:4,7
**lot (8)**
62:17,18;63:19;
65:14;71:9;76:15;

113:22,24
**louder (1)**
69:25
**lower (5)**
31:17;32:1,4;
42:18,18
**lunch (3)**
93:18,24;94:3
**lunge (2)**
33:16;34:8

## M

**Mae (2)**
5:16;6:1
**main (1)**
13:10
**maintain (2)**
54:14,17
**maintains (1)**
54:18
**major (1)**
9:1
**makes (1)**
84:19
**making (5)**
22:9;73:25;91:4;
94:25;112:4
**male (10)**
40:24,25;41:1,3;
43:21,22,24;67:11;
68:9,24
**Man (1)**
20:21
**manager (2)**
9:13;10:8
**many (30)**
15:16,18;17:7,11;
24:21;29:20;37:20,
21;38:7,8,19;39:25;
46:13,19;47:21;56:9;
73:10;75:1;90:3,6;
91:17;99:15,17,18;
100:7;101:1;112:17;
126:16,23,25
**Map (3)**
77:1;98:19,23
**mark (11)**
76:7;80:24;97:1,
24;98:2,10,14,20;
99:2,6,13
**marked (6)**
52:3;75:5;104:22;
109:10;120:10;129:9
**marking (2)**
58:25;98:7
**mass (1)**
99:22
**master (12)**
36:5,9,12;37:7,8,
13;47:11;49:3,24;
54:16,18,23
**material (3)**

25:1,3;115:15
**matter (9)**
5:6;39:11;48:22;
103:13;123:7,10,15,
18,21
**matters (1)**
123:16
**may (14)**
12:18;27:11,11;
28:20;34:1;45:7;
51:21;52:18;56:2;
76:6;104:7;118:13;
130:16,23
**maybe (15)**
6:21,21;10:11;
17:8,10;23:25;46:1;
59:21;69:6;72:12;
80:7;92:14,14;99:12;
119:9
**McArdle (1)**
19:19
**mean (48)**
9:23;12:17;13:7;
19:5,6;21:9;23:15;
24:4,19;29:6,22;34:3,
11;35:14;46:1,4;
50:11,20;54:21;58:4,
20;69:6;73:20;74:15;
77:15;80:7;84:21,24;
90:24,25;94:13;
97:16;98:13;99:18,
23,25;100:16;
102:20;107:10;
115:21;116:8,19;
117:17,20;118:12;
121:15;123:14,15
**meaning (2)**
41:9;57:20
**means (2)**
99:24;129:14
**Member (1)**
49:2
**members (6)**
106:7;107:4,21;
108:10,19,20
**memorialize (1)**
54:8
**mental (3)**
102:4;119:3,9
**mention (1)**
72:20
**mentioned (4)**
36:8;37:23;62:5;
78:18
**Methods (1)**
104:24
**middle (3)**
31:14;40:12;
110:16
**might (9)**
10:11,17;18:24;
19:7;29:8;42:18;
48:23;59:10;116:3

**military (1)**
11:7
**Miller (2)**
109:7;115:8
**milli- (1)**
105:14
**millimeter (5)**
105:11,14;107:23;
108:1;116:25
**mimic (2)**
25:14;51:20
**mimicking (1)**
26:11
**mind (1)**
18:4
**minimum (8)**
37:20;38:1,8,13,19,
24;121:14,15
**minus (1)**
24:23
**minute (2)**
63:4;120:14
**minutes (4)**
48:1;63:2;92:14;
101:20
**misquoted (1)**
116:4
**mobile (2)**
62:5,7
**mock (1)**
51:14
**mocked (1)**
28:21
**mocking (1)**
25:12
**Moloney (4)**
37:14;47:11,16;
49:24
**moment (6)**
15:4;30:9;73:11;
76:7;126:15,19
**momentarily (1)**
77:25
**moments (1)**
94:10
**money (1)**
126:24
**monitor (1)**
58:2
**month (15)**
36:23;37:17,21;
38:6,9,20;39:3,8;
45:24,25;46:5,5,8,18,
20
**monthly (4)**
37:1;38:2,4;54:9
**months (4)**
10:11,16,17;47:2
**more (11)**
6:18;20:3;37:24;
45:7;58:4,6;85:24;
88:4;117:9;122:24;
130:23

**morning (2)**
5:25;6:2
**most (2)**
45:22;58:2
**Mostly (1)**
102:1
**mother (1)**
5:17
**motion (5)**
74:2;82:20,23,25;
83:2
**motions (3)**
90:4,5;91:5
**mouth (2)**
30:22;53:13
**move (5)**
15:15;51:10;70:19,
22;92:8
**moved (6)**
70:21;91:13,14,15;
93:9;95:18
**movements (1)**
90:4
**moves (1)**
95:19
**moving (7)**
31:19;32:19;73:15,
17,18;74:1;90:15
**much (2)**
36:13;109:20
**multiple (3)**
98:21;101:11;
126:25
**municipal (1)**
59:8
**munitions (5)**
106:18,20;107:1,1,
10
**must (2)**
6:13;38:24
**muzzle (1)**
24:14
**myself (4)**
13:10;17:3;87:25;
99:2

## N

**name (15)**
5:9,15,25;7:18;
12:8;17:22;18:1,3,9;
40:21;43:18;47:10,
11;63:6;123:12
**named (1)**
12:24
**NAPWDA (12)**
20:25;28:18;29:5,
6;35:24;36:10,12,17;
37:16;45:19;46:16;
47:9
**N-A-P-W-D-A (1)**
20:23
**narcotics (2)**

12:18,20
**nature (2)**
12:5;13:4
**near (7)**
53:21;57:6;65:2;
71:22;79:18,18;
80:21
**nearby (1)**
57:10
**necessary (3)**
6:16;23:18,25
**need (4)**
7:6;92:13,16;93:20
**needs (1)**
7:1
**neighborhood (1)**
67:15
**neighborhoods (1)**
65:20
**next (23)**
9:9;38:18;51:3;
53:16,19;63:3,15;
65:13,16;67:5;69:23;
70:15;72:5,5,18;
73:24;74:21;79:19;
89:20;92:19;106:2,
17;110:21
**NFDD-Noise (1)**
106:2
**Nick (1)**
13:14
**nine (4)**
56:15;99:18,19;
110:24
**Noah (4)**
5:15,25;48:14;
128:24
**no-bite (6)**
29:23;30:24,25;
31:6;35:4,5
**noise (4)**
27:21;68:23;70:6;
106:6
**noises (1)**
42:7
**Non-Deadly (3)**
104:24;105:1,9
**normal (1)**
50:8
**normally (1)**
50:8
**North (8)**
20:14,20,22;36:6;
77:13;78:18;108:11,
20
**northbound (2)**
78:8,21
**Nos (1)**
13:19
**note (1)**
85:21
**notes (4)**
94:13;104:7;118:1;

120:8
**November (1)**
46:25
**Number (13)**
6:12;38:13,19,24;
49:2,6;56:12;58:16,
21;59:24;75:6;76:2;
124:23
**numbered (1)**
110:16
**numbers (1)**
109:11
**numeral (2)**
120:16,19

## O

**oath (1)**
6:12
**obedience (4)**
22:5,11;38:6;47:15
**Object (20)**
22:1;31:1;33:24;
34:10;38:11,12,22,
25;46:10;47:23;82:1;
88:11;98:5;111:18;
112:12;114:10;
116:7;117:10;
119:20;120:3
**objection (2)**
76:25;77:2
**obligated (1)**
36:22
**obtain (5)**
9:25;10:4;29:6;
36:22;51:1
**obtained (1)**
20:9,16
**obtaining (1)**
29:4
**Obviously (14)**
6:1,12;15:15;
26:10;55:2;59:6;
60:7,18;78:25;94:14;
98:14;99:25;102:23;
106:23
**OC (7)**
105:16;107:3,10,
11;108:2;129:18,18
**occupied (2)**
113:9,12
**occur (1)**
37:4
**occurred (1)**
43:4
**o'clock (2)**
73:15;78:12;93:17
**October (3)**
5:4;47:18;49:17
**odds (1)**
118:17
**odor (1)**
21:17

**off (20)**
7:8,10;27:8;33:4;
41:9,9;48:6,7;51:3,
23;70:21;76:10;86:7;
90:9,12;91:25;93:22;
94:8;102:15;131:2
**officer (51)**
11:22;13:1,20;
15:20,24;16:2,4,15;
17:2,19;18:13;19:13;
23:2;25:14,15;51:14;
54:13;55:24;56:24,
25;57:18;59:3,7;
60:2;61:25;62:4;
63:8;72:25;75:24;
77:24;89:12;99:9;
100:20,21,23;101:6;
108:22;111:5,9;
112:7;114:7;115:8;
119:19,23;120:1,21;
121:12,16;122:13;
129:24,25
**officers (40)**
12:25;15:1;41:10;
42:22;55:15;56:2,6,
9;58:8,10,13,14,24;
59:8,21;62:24;65:2;
67:8,22;71:8,11;
72:21;73:7,10,12;
86:3;87:23,24,25;
88:3;101:1,5;105:20,
21;120:25;122:7,14;
129:13;130:11,16
**off-lead (1)**
41:9
**often (4)**
16:24,24;20:25;
24:17
**oleoresin (1)**
106:25
**o-l-e-r-e-s-i-n (1)**
106:19
**O'Malley (8)**
5:1,6,7,20;7:20;
47:10;49:3;129:7
**O'M-a-l-l-e-y (1)**
7:20
**Once (9)**
51:9,15,18;53:3;
56:6;65:25;92:21;
95:18;127:15
**one (36)**
6:12;8:4,5;19:23;
20:3,4,5;21:10;28:9;
31:5,6;43:1;49:13,
20;50:22;55:6,7;
58:5,6,9,11;59:16;
68:1;87:9;95:9;
102:17,19,20;106:2,
17;107:8,9;110:2;
120:9;121:17;122:24
**one-hour (1)**
93:18

**one-on-one (1)**
39:10
**ones (2)**
36:7;109:22
**only (9)**
12:24;13:24;14:10;
29:10;35:2;39:9;
106:15;107:21;114:7
**onto (2)**
66:3;100:18
**opened (1)**
63:17
**opens (1)**
117:23
**opportunity (5)**
56:1,4;103:9;
116:2,5
**opposed (4)**
31:25;39:11;97:17;
120:1
**options (1)**
114:7
**originally (1)**
8:14
**otherwise (2)**
23:4;116:10
**ourselves (1)**
6:11
**out (39)**
6:10;8:20;10:23;
20:2,3;25:8;39:11,
12;43:3;51:11,16;
52:22,23,24;53:1;
56:7;57:15;60:17;
61:9;62:21;63:18;
65:5;68:13;71:13,22;
74:22;75:24;77:15;
84:13,16;92:10;94:9,
22;103:13;115:14;
117:22;124:1,3;
125:4
**outbound (7)**
66:21;77:18,19,22;
78:4,6;79:9
**outline (1)**
97:20
**outside (1)**
112:5
**outweighed (1)**
87:14
**over (22)**
6:21,22,25;28:20;
34:9,15,20;37:5;
47:9;56:24;57:2;
66:3,13,19;69:25;
70:3,10;93:17;96:7,
7;118:1;127:1
**overall (1)**
50:21
**overgrown (1)**
76:15
**overhead (1)**
98:19

**overheard (2)**
62:4;63:4
**overlap (1)**
9:19
**own (3)**
32:5;57:25;59:11

## P

**pace (3)**
72:13;74:1,18
**padded (3)**
26:19;27:15,22
**page (14)**
75:21;76:3;80:24;
95:24,25;104:23;
109:21;110:16,22;
120:15;123:7,7,8,11
**pages (9)**
75:14;76:6;109:8,
9,12,14,16,18,19
**paint (1)**
35:5
**pants (1)**
24:22
**paper (3)**
47:21,24;49:14
**paragraph (2)**
105:2,9
**paralleling (1)**
66:1
**parameters (1)**
102:15
**paraphrasing (1)**
115:24
**park (6)**
62:13,17;63:19;
65:13;113:18,21
**parked (1)**
66:2
**parking (5)**
62:17,18;65:13;
113:21,24
**part (19)**
8:16;13:10;23:3;
25:20;28:24;29:8,21;
41:20,22;50:19;
53:10;57:3;88:25;
92:6;99:20;109:25;
119:10,11,13
**partaken (1)**
28:21
**partially (1)**
124:3
**participate (1)**
36:15
**participated (2)**
25:6;102:10
**particular (7)**
24:25;25:12;31:16,
22;55:15,24,25
**partly (1)**
103:25

**partner (13)**
16:17;17:21;18:6,
9,16,25;19:1,4;20:6;
52:7;63:22;95:9;
114:18
**partners (4)**
18:20,23;19:9;40:7
**partner's (2)**
18:3,9
**partnership (1)**
28:15
**parts (2)**
126:4,12
**pass (12)**
47:13,14,15,15,15,
16,16,20,23;49:22;51:1;
52:3;56:2
**passed (3)**
18:21;49:4;54:5
**passing (1)**
53:5
**past (1)**
94:13
**Pat (1)**
37:14
**pat-down (1)**
51:20
**Patrick (2)**
109:7;115:8
**patrol (15)**
10:22;16:8,10,12;
19:15;22:3;39:6,8,12,
14,18,20;46:6;55:25;
108:12
**patrolman (2)**
8:9;17:16
**patron (1)**
67:15
**patting (1)**
51:21
**pause (1)**
125:1
**paw (2)**
123:7,10
**paws (1)**
34:15
**pay (1)**
10:2
**Pealer (1)**
5:9
**pen (1)**
97:8
**Pennsylvania (2)**
5:8;9:24
**people (6)**
58:7;101:2;102:1;
113:16,24;130:16
**pepper (4)**
101:12;104:15;
105:16;129:18
**per (4)**
38:9;86:21;102:6;
111:1

**percent (2)**
104:3,4
**percentage (1)**
104:3
**period (9)**
16:1,15;19:5,7;
37:11;63:1,2;84:4;
94:10
**perpendicular (1)**
71:25
**person (12)**
12:12;24:11,12;
25:13;30:7;35:7,8;
37:6;67:14,17;
106:14;111:2
**personally (2)**
54:12,13
**phases (3)**
47:13;49:4,19
**photo (12)**
76:24;77:12;78:11;
79:1,1,4;80:24;85:8;
95:24;96:2,21;97:23
**photograph (5)**
77:4;98:7,10,20,23
**phrase (2)**
16:24;116:4
**phrased (1)**
16:23
**physical (3)**
13:7,7;130:15
**physically (2)**
87:21;118:4
**physiologically (1)**
31:19
**picture (2)**
35:5;76:10
**piece (2)**
47:21;49:13
**pierce (1)**
126:9
**pinpoint (1)**
96:19
**Pittsburgh (4)**
8:14;9:13;10:8;
40:17
**place (2)**
76:25;77:2
**placed (1)**
51:22
**placing (1)**
39:11
**plaintiff (3)**
5:6,12;12:15
**plaintiffs (1)**
5:16
**plan (1)**
127:13
**please (58)**
5:12,14;7:2,6,18,
21;8:18;9:1,9;11:15;
13:2;14:18;17:14,25;
18:11;19:12;20:18;

36:2;40:13;41:4;
43:3,16;45:4;48:1;
55:21;56:23;60:15;
62:2,16;64:1;65:9;
67:5;69:23;71:19;
72:18;75:22;76:7;
78:1,2;85:5;87:24;
92:12;94:22;95:24;
96:9,21;97:1,11;
100:10;104:22;
106:5;109:5,13;
110:15,23;117:7;
120:9;122:11
**PM (13)**
55:9;61:5,6,6,7,7,9,
10,17;93:23;94:1;
131:3,4
**point (53)**
9:16;15:4,18;21:7;
28:15;29:2;45:6,21;
51:2,14;52:23;56:20;
63:15;64:16,25;
65:24;66:21,23;69:8,
16;70:7,21;71:7,21;
72:11;74:9,22,24;
75:23;77:19;78:1;
81:15;83:11;84:15;
89:17;90:22;91:20;
93:10;95:11;98:15;
101:8;103:8,19;
112:4,20;113:1;
116:12;117:4,6,7;
118:21;124:21;
127:13
**pointed (2)**
32:2,2
**pointing (1)**
32:9
**points (3)**
76:3;115:24;
116:19
**Police (43)**
7:23;8:8;9:11,18,
20;10:1,3,21;11:25;
14:25;15:6;16:3;
17:12;20:14,22;21:1;
36:6;55:18;57:7,15,
24;59:8;60:18;72:20;
73:1;74:23;83:24;
87:23;102:21;
105:18;108:9;109:8;
114:25;119:19,22;
120:1,5,5,20;128:4,8,
13;129:7
**policy (11)**
104:22;105:7;
110:14;111:1,12,16,
22;112:2,11,20;120:9
**Port (34)**
7:23;8:7;10:13,18;
11:25;14:25;15:10,
18;16:2;17:12;19:20;
20:2;43:6;54:13;

55:18;57:24;58:8,14,
24;59:7,16,20;60:2,4;
101:22;104:21;
105:18;106:12;
108:8;112:18;
114:25;119:15;
120:19;125:7
**Porte (1)**
9:6
**portion (1)**
66:10
**posed (3)**
41:10;122:10;
130:14
**poses (2)**
120:24;122:6
**posing (1)**
25:21
**position (6)**
51:3,8,19,19,23;
103:24
**positioned (2)**
90:15;113:7
**possess (1)**
26:16
**possibly (5)**
12:20;53:20;63:21;
113:17;123:13
**Post (2)**
19:14;123:11
**power (3)**
95:12;125:17;
127:16
**practice (2)**
38:19;88:23
**practicing (1)**
88:25
**Precise (1)**
5:10
**prediscussed (1)**
93:18
**predominantly (1)**
24:15
**prefaced (1)**
33:20
**preference (1)**
32:7
**prepare (1)**
75:16
**prepared (2)**
75:13;77:7
**present (1)**
57:25
**presented (8)**
11:9;14:14;49:10;
75:10;104:18;109:2;
120:11;123:3
**preserve (1)**
87:10
**pre-service (4)**
9:19,21,23;10:5
**presuming (1)**
38:23

**pretending (1)**
25:13
**previously (1)**
75:5
**primary (1)**
59:18
**prior (9)**
10:18;18:5,8;29:4;
44:16;61:16;62:4;
101:10,22
**probably (8)**
24:14;40:12;42:1;
45:24,25;46:1;63:4;
68:3
**problems (1)**
98:23
**procedures (1)**
111:3
**proceed (3)**
7:16;49:8;56:17
**process (2)**
19:16;124:21
**prod (1)**
7:4
**produced (1)**
48:17
**production (1)**
14:17
**program (2)**
19:15,15
**progress (2)**
27:1;124:20
**progressing (1)**
26:21
**proper (2)**
22:15;29:18
**protection (1)**
24:24
**prove (1)**
46:7
**provide (1)**
128:10
**provided (3)**
77:6;109:6;129:6
**public (3)**
120:25;122:7,15
**pulled (2)**
95:16;100:5
**punish (1)**
123:23
**purposes (1)**
29:11
**pursue (1)**
127:17
**put (7)**
65:10,25;70:19;
85:5;96:21;103:12;
129:5
**putting (1)**
87:11

**Q**

**qualifications (2)**
45:17,18
**qualified (2)**
21:3,23
**question-and-answer (1)**
6:14
**quick (1)**
111:20
**quickly (2)**
69:2;95:18
**quite (1)**
93:2
**quotations (1)**
115:23
**quote/unquote (1)**
56:1
**quoting (1)**
115:21

**R**

**racially (1)**
125:8
**radio (21)**
56:24;57:2,2,5,10,
23;58:6,10,21,25;
60:1;65:19;69:25;
70:4,10,22;72:14;
75:24;129:17,22,25
**radios (1)**
58:1
**raise (1)**
44:5
**raised (2)**
86:7;93:3
**ramp (3)**
67:9,10;69:12
**ran (6)**
43:7;44:2;63:18;
64:3;65:17;66:21
**range (5)**
26:11;28:23,23;
55:14;69:5
**rank (5)**
8:1,7;55:4;64:5,12
**rapidly (4)**
72:12;83:3,7,8
**rattle (4)**
27:4,7,8,11
**rattles (1)**
27:5
**Ravotti (6)**
100:21,23;101:3,6;
114:7,9
**reach (1)**
90:1
**reached (1)**
81:15
**reaction (1)**
25:15
**read (13)**
7:9;11:20;12:2;
22:13;23:1;104:25;

105:5;110:24;
112:20;120:16,18;
121:3;131:1
**reading (1)**
11:19
**ready (5)**
7:16;48:12;94:4
**real (2)**
28:9;111:20
**realize (1)**
42:4
**really (4)**
27:19;40:5,5;116:8
**rear (1)**
70:24
**reason (11)**
69:1;85:23;105:24;
106:1;110:7;113:4,5;
114:22,24;119:6;
124:11
**reasonably (1)**
98:18
**reasoning (1)**
112:1
**reasons (4)**
85:24;87:9;98:8,11
**recall (17)**
28:17;30:6;40:3,
20,23;43:20;51:7;
56:10,19,19;59:25;
68:4,11;93:7;119:12,
13;128:5
**recalled (1)**
44:6
**recent (1)**
45:22
**recess (2)**
48:9;93:24
**reciprocity (1)**
108:11
**record (19)**
5:3,13;48:6,7,10,
15;54:1,2;75:15,15;
93:22,25;94:13,18;
97:7,20;98:9;129:5;
131:2
**recorded (8)**
110:9,11;116:9,11;
128:3,16,19;129:6
**records (14)**
40:6;42:15,19;
43:19;46:7,24;47:1,3,
5;54:7,14,17,18,23
**redact (2)**
109:23,25
**re-engage (1)**
95:2
**refer (2)**
38:3;95:22
**reference (11)**
9:12;10:7;45:21;
47:8;53:3;56:25;
57:19;73:17;77:19;

78:1;122:24
**referenced (1)**
70:24
**referencing (3)**
97:13,25;107:7
**referred (5)**
20:25,25;24:17;
27:22;66:5
**referring (10)**
24:2;32:3;35:6;
36:20;44:3,19;48:16;
50:8;97:9;119:22
**reflect (1)**
97:7
**regard (1)**
127:13
**regarding (1)**
46:2
**regards (1)**
111:16
**regional (1)**
106:8
**Regular (1)**
49:2
**relate (1)**
123:21
**related (2)**
123:17;125:16
**relating (1)**
125:16
**relation (3)**
62:17;76:18;84:10
**release (5)**
83:9,17;84:9;89:1;
101:8
**released (11)**
34:25;82:24;85:6;
86:10;87:8;88:15,17;
103:21;121:8;
127:12,21
**releasing (2)**
122:8;127:24
**reload (1)**
124:17
**remember (4)**
12:17;45:5;81:24;
82:2
**remote (1)**
5:5
**repeat (5)**
6:18;77:25;107:13;
108:22;111:20
**rephrase (2)**
6:18;78:24
**report (11)**
55:19;110:10,12;
111:10,23;112:4,8,
16,24;113:2;116:17
**reporter (8)**
5:10,13;26:8;28:5;
75:7;77:24;108:21,
25
**Reporting (2)**

5:11;110:17
**reports (3)**
75:24;110:4;111:6
**represent (2)**
5:18;77:5
**representation (6)**
76:16,17,20,23;
81:3;85:10
**representing (1)**
5:11
**request (2)**
14:17;57:21
**require (1)**
39:12
**required (3)**
36:14;38:14;128:7
**requirement (5)**
36:18;37:16,20;
38:2,8
**requirements (3)**
36:2,3,21
**reread (1)**
11:18
**research (1)**
22:12
**residential (1)**
67:3
**Resistance (1)**
125:17
**resisting (7)**
12:18,20;30:8;
121:2;122:18;130:6,
9
**respond (5)**
56:7;61:22;62:3;
108:12,19
**responded (6)**
56:21;57:15,16;
59:6;60:7,13
**response (18)**
27:6,25;28:3;
57:13,22;62:6;63:22;
106:8,16;107:5,22;
108:7,8,11,15,18,19,
20
**responses (1)**
7:2
**responsible (2)**
103:25;104:3
**restate (1)**
98:9
**restroom (1)**
48:4
**result (1)**
111:2
**resulted (1)**
12:9
**return (3)**
51:8,11;52:24
**returned (1)**
51:18
**reverse (1)**
71:21

**ribs (1)**
126:6
**ride (6)**
62:14,17;63:19;
65:13;113:18,21
**right (84)**
12:19;23:1;24:1,9;
25:7;26:25;32:14;
33:2,3;34:23;37:17;
38:16;40:8,12;41:5;
43:1;48:6;49:8;
52:21;59:22;60:21;
61:1,13;63:13;64:22;
65:6,17;66:14;67:3,7,
18,19;69:10,12,14,
17;71:1,17;73:14,16;
74:2,20;76:24;78:13,
20;79:18,19,24,24,
25;80:2;81:15;82:18;
83:11,14,15;84:8,9,
10;86:20,23;87:4;
89:17;90:5,15;91:16;
93:6;95:13,15;96:6,7,
8,11;109:23;113:19,
22;115:21,22;
118:25;121:8;
124:14;128:15,23;
129:4
**risk (4)**
87:11,14,19,21
**risks (2)**
87:17,18
**Rita (1)**
5:11
**Rob (2)**
17:16;64:4
**robbery (1)**
43:4
**Robert (2)**
63:6,7
**role (1)**
16:3
**roll (3)**
55:23;56:1,16
**Roman (2)**
120:16,19
**Ron (3)**
13:3;17:15;18:1
**R-o-n (1)**
18:2
**Ross (3)**
5:11,11;108:17,18
**roughly (8)**
9:7;10:10;11:2;
40:7;50:17;101:13,
13,14
**round (4)**
100:3;105:15;
117:18,22
**rounds (7)**
99:19;106:24;
107:10;124:16,22;
126:17,25

**rubber (1)**
25:22
**ruled (1)**
13:18
**run (1)**
64:3
**running (7)**
25:12;30:3;31:19;
32:17;43:8;83:4;91:1
**runs (1)**
97:14

**S**

**s- (1)**
21:21
**safety (2)**
120:25;122:6
**same (18)**
36:17;44:25;47:2,
17;48:21;50:6,14;
59:11;60:23;61:9;
62:13;64:5;75:23;
107:15,15;109:12,19;
129:22
**saw (11)**
64:3,21;67:17;
68:16,19;73:12;
74:23;86:5;111:24;
124:14;126:11
**saying (16)**
21:15,19;34:14,15;
45:5;71:11;72:15,17;
87:1;96:17;98:2;
110:13;111:13;
123:15;125:4,6
**scale (1)**
104:2
**scan (4)**
47:7,9;48:1;58:2
**scenario (13)**
24:5,7,25;30:9;
32:23,24;35:4,11,15;
40:13;102:7,9;
108:14
**scenarios (4)**
24:9;25:5,18;26:2,
3,17;88:20,23
**scene (7)**
15:4;40:19;62:24,
25;87:25;101:14,15,
18;122:14
**scent (15)**
21:6,13,16,16,20,
21,21,21;39:6,13,14,
15,18;41:21,25
**s-c-e-n-t (1)**
21:21
**scheduled (1)**
50:9
**schlag (4)**
27:15,23;28:4,7
**schlags (1)**

26:20
**school (1)**
8:18
**scream (1)**
90:25
**screaming (5)**
64:23,23;67:12;
68:6,23
**search (8)**
22:4;36:25,25;
38:6;41:8,9;47:15,16
**searches (1)**
25:11
**sec (1)**
104:25
**second (8)**
91:22,25;92:7;
106:25;124:5,16,22;
127:1
**secondary (1)**
27:2
**seconds (3)**
48:19;64:21;128:2
**section (2)**
41:7;105:1
**seeing (1)**
68:4
**seem (1)**
109:10
**seems (1)**
29:16
**selected (1)**
19:17
**selection (1)**
19:5
**semi-automatic (1)**
100:7
**send (5)**
72:20;73:1;83:25;
84:2;86:22
**sent (9)**
41:11,12;43:8,8;
48:15;51:10;74:25;
83:16,25
**sentence (2)**
116:5;120:19
**separate (14)**
7:1;11:4;14:2;
21:24;34:18;45:13,
19;54:7;57:5,9,10;
59:9;102:25;128:24
**separately (1)**
34:4
**September (1)**
123:8
**sequence (1)**
128:1
**sergeant (10)**
8:9,9;13:11;16:8,
12;17:16;55:5,6;
62:25;64:6
**series (1)**
127:23

**serious (1)**
130:15
**serve (1)**
11:7
**Service (1)**
5:11
**session (5)**
6:14;47:19,22;
50:2,14
**sessions (4)**
25:6;54:9,24;88:22
**set (3)**
24:7,9,22
**setting (1)**
24:5
**Several (27)**
17:6,7;22:4;24:21;
25:3;37:8,14;42:17;
46:15;50:24;55:6;
63:2;71:6;74:23;
75:1,2;89:22;90:5,6;
91:19;94:10,24;95:1;
102:24;106:22;
108:10;118:24
**severity (5)**
120:23;121:20,20,
23,25
**shadow (11)**
96:3,23,24;97:2,5,
8,13,14,14,20;98:1
**shadows (5)**
81:4;85:11,17,18,
22
**shake (1)**
7:3
**Sheet (5)**
47:10,20;49:16;
53:24;56:11
**shell (2)**
107:2,3
**Shepherd (4)**
16:20,21;18:12,19
**shift (25)**
8:12;16:14;39:10,
23;55:8,9,11,12,13,
17,21,24;56:9,11,11;
60:17,23,24;61:1,5,7,
8,9,17;111:24
**shifts (1)**
10:23
**shoot (10)**
70:9,9;71:10;
72:15;100:4,20;
101:5;118:24,25;
119:8
**shooting (12)**
14:22;26:11;94:11;
99:21;100:1,22;
110:5;112:4;113:6;
118:18,21;124:19
**short (1)**
45:12
**shortly (1)**

41:11
**shot (8)**
114:5;123:25;
124:5,7,9,12,15;
125:3
**shotgun (5)**
106:17,23;107:2,3,
8
**shots (2)**
125:3,4
**shoulder (5)**
31:13,14;57:3,10;
90:10
**shoulder/upper (1)**
89:16
**shoulders (2)**
23:9;33:13
**show (4)**
7:7;75:4;76:6;
94:18
**shows (1)**
76:20
**shrub (1)**
72:5
**sic (1)**
29:15
**side (19)**
44:7;77:11,23;
78:7,7;79:16;81:13,
16,17;90:2,19,20,21;
91:16;94:25;96:6;
97:10;102:19;103:6
**sided (3)**
102:17,20,20
**sides (2)**
76:21;126:7
**sidewalk (10)**
65:12;69:12;71:14;
79:18;80:19,21;
85:16;91:14;93:10;
96:5
**Sideways (1)**
100:16
**sight (1)**
42:1
**Signature (1)**
131:5
**signed (1)**
47:11
**significant (1)**
130:15
**signs (1)**
47:17
**silent (1)**
27:20
**Silver (1)**
86:16
**similar (4)**
25:1;105:16;110:3;
117:22
**simply (1)**
85:24
**simulate (3)**

**sister (1)**
5:17
**sit (1)**
115:17
**situation (7)**
24:1;30:3;89:5;
102:11;103:18,22;
108:17
**situations (3)**
23:17;88:23;89:7
**six (2)**
56:15;99:18
**slash (1)**
106:25
**slashing (1)**
73:25
**slipping (1)**
18:4
**slow (1)**
6:19
**small (2)**
104:2;107:6
**smelling (1)**
118:9
**Smith (1)**
100:11
**smoke (1)**
108:2
**sniffing (2)**
21:4;118:14
**Sociology (1)**
9:2
**Sombo (1)**
37:14
**somebody (4)**
51:21;70:8;72:19;
100:25
**somehow (1)**
118:4
**someone (3)**
36:9,10;119:8
**Sometimes (4)**
6:20;16:4;50:13;
66:6
**sorry (27)**
11:16,16,17;20:24;
21:9,19;26:7;39:14;
44:8,10;48:18;52:1;
57:18;61:7;68:7;
72:24;74:11;77:24;
78:24;92:25;94:12;
105:18;108:23;
111:19;120:8;
122:24,24
**sort (7)**
9:19;24:25;25:4;
74:19;107:25;
108:11;117:23
**sound (6)**
27:11,12;66:6,7,12,
12
**South (2)**

**space (1)**
106:20
**speaking (2)**
23:13;128:18
**special (11)**
106:8,15;107:4,22;
108:6,8,11,15,18,19,
20
**specific (2)**
31:24;74:15
**specifically (5)**
11:15;33:12;34:24;
111:22;113:11
**Speech (1)**
125:9
**spell (2)**
7:18;17:24
**spelling (1)**
28:8
**spent (1)**
39:8
**spinning (1)**
89:25
**spins (3)**
89:21;92:22,25
**split (1)**
39:5
**spoken (1)**
118:13
**sponge (1)**
105:15
**spray (5)**
101:12;104:15;
105:16;129:18,19
**spun (1)**
95:1
**stab (7)**
73:6;86:22;90:2,8,
11;102:18;126:11
**stabbed (3)**
89:21;90:13;91:6;
94:24;127:12
**stabbing (8)**
89:23;90:4,5,11;
91:3;92:21;127:10,
23
**stabs (1)**
90:3
**stamp (1)**
109:11
**stamped (1)**
109:9
**stand (3)**
28:2;62:18;99:13
**standards (3)**
28:18,19;36:17
**standing (8)**
67:11,21;68:4;
69:8;71:21;73:13;
80:19;96:1
**Star (3)**
10:22,23,24

**start (12)**
11:17;20:3;27:1;
30:24;53:17;61:9,17;
68:16;71:23;91:1;
94:19;104:15
**started (18)**
20:2;25:8;55:10,
20;60:17;61:1;65:7;
70:22;72:22;92:2,4;
94:11;95:16;96:22;
99:7;100:22;118:18,
21
**starting (2)**
20:8;94:9
**starts (3)**
26:25;27:2;91:6
**state (3)**
7:18;9:24;12:10
**stated (2)**
71:4;98:9
**statement (12)**
110:9,11;112:5;
116:9,11;128:4,7,11,
16,19,24;129:6
**States (2)**
5:7;111:15
**Station (14)**
15:6;55:18;56:18;
60:12,18;62:3,9,11,
17,19,20;66:1;
101:17;128:13
**stationary (2)**
32:19;35:9
**stationed (1)**
55:17
**stay (1)**
70:19
**steel (1)**
9:6
**stenographer (3)**
6:23;28:6;106:19
**step (4)**
92:22,25;93:5;95:3
**stepped (3)**
74:22;93:3;127:9
**steps (5)**
63:19;65:7,10,11;
91:17
**stick (10)**
26:19,19,24;27:4,5,
8,15,17,18,20
**still (14)**
7:23;9:16;10:22,
24;24:2;66:24;69:24;
74:4,6;82:25;93:10;
94:9;96:5;98:14
**stop (11)**
44:5;71:11;74:24,
24;83:24,25;102:21;
124:13;126:21;
127:3;130:11
**stopped (3)**
71:6;82:21;126:20

**straight (1)**
74:19
**street (27)**
17:8;25:17;69:10;
71:14,24;72:5;74:3,
14,17,18;79:18,19;
80:20;81:13,16,17,
20;85:16;93:14;96:8,
12,13,15,20,23;
97:15,16
**submit (1)**
128:7
**successful (4)**
30:19;40:15;44:14;
53:6
**successfully (7)**
42:5;51:9,9,15,18;
52:2;53:4
**sued (2)**
12:25;13:23
**suit (9)**
12:24;23:22;24:12,
13,19,20,22;25:12,13
**summary (5)**
109:7;115:7,18,20;
128:3
**summation (2)**
110:12;116:20
**summer (2)**
9:8;76:14
**Sunday (1)**
56:14
**superior (2)**
11:23;13:21
**suppose (1)**
64:11
**supposed (6)**
23:2;30:11,18;
31:25;35:15;102:6
**sure (12)**
6:23;7:1;28:9;
37:23;48:25;59:13;
74:23;90:23;98:19;
111:22;116:11;
128:25
**surrender (5)**
33:8;35:10,11,11;
44:6
**surrendered (2)**
30:6,10
**surrenders (1)**
30:4
**suspect (109)**
21:4;22:12,16,22,
24;23:3,3,5,6,8,12,
18;24:1,16,18;25:12,
19,22;26:3,17;28:12;
29:15,16;30:3,3,6,10,
18;31:5,11,18;32:1,
19,25;33:5,17,17;
34:9,19,20,21,25;
35:12,22;36:13,18,
24;37:13,22;38:8,9,

20;39:15,20,23;
40:22;41:12,13,18,
20,21,24;42:2,5,8,20,
25;43:10,13,16;44:3,
5,8,23;45:23;46:3,8,
13,19;53:15,22;62:5,
8;63:5,16;64:3;
65:19;67:7,13;70:1,
13,17;71:23;72:10,
19;73:12;84:23;
88:20,24;89:1,7,10;
92:3;95:1;102:14;
120:24;121:1;122:6,
17
**suspects (4)**
14:3;30:3;43:7;
101:25
**suspect's (3)**
42:11,13;43:18
**sustain (1)**
122:1
**Swastikas (1)**
125:17
**SWAT (2)**
105:16,17
**swear (1)**
5:14
**swing (1)**
28:1
**Swissvale (3)**
59:6,13,21
**S-word (1)**
21:20
**sworn (1)**
5:21
**symbol (1)**
123:14

**T**

**tactical (2)**
108:13;109:1
**talk (9)**
6:21;63:20;94:9;
103:1,9,11,13;119:8;
125:9
**talked (3)**
31:8;35:17;36:8
**talking (14)**
6:25;30:23;33:2,
20;38:10;79:12;
80:22;87:18;97:2,7;
98:3;116:16,16,17
**talks (1)**
6:22
**taller (1)**
66:7
**target (2)**
31:20;117:24
**Taser (4)**
13:11;101:12;
104:15;129:14
**tattoos (2)**

125:13,15
**taught (4)**
23:8;103:17,19;
104:9
**teach (1)**
33:11
**team (19)**
16:23,23;17:1,5;
20:3;47:10;49:3,16;
106:8,16;107:5,22;
108:7,8,11,15,19,20,
20
**teams (9)**
17:11,13;20:1,2,3;
40:19;105:16,17;
115:1
**technician (1)**
5:10
**technique (11)**
22:13,20;23:5,10;
30:4,24,24,25;31:6;
33:1;34:5
**techniques (5)**
22:23;23:7,8;31:5,
7
**ten (4)**
48:19;101:20;
125:3;128:2
**term (1)**
74:16
**terminus (1)**
43:6
**terms (5)**
29:15,20;52:8;
104:14;127:20
**test (28)**
26:1;28:25;36:5,
20;45:7,12;47:10,19;
49:1,16;50:4,5,13,14,
15,15,18;51:1;52:15;
53:4,5,9,11,15,17,23,
24;54:22
**tested (2)**
47:13;49:19
**tester (1)**
50:12
**testified (5)**
5:21;94:15;99:9;
118:24;126:15
**testify (2)**
6:13;96:4
**testimony (2)**
86:21;103:8
**testing (1)**
49:4
**tests (2)**
54:4,8
**Thanks (2)**
79:11;125:21
**thicket (1)**
41:8
**thinking (2)**
103:11;118:3

**third (3)**
110:15;120:19;
124:7
**third-to-the-last (3)**
75:21;95:23,25
**though (5)**
12:15;31:10;32:2;
89:10;121:25
**thought (1)**
78:18
**thrashed (1)**
73:8
**thrashing (6)**
72:22;91:4,8,11,
21;92:4
**threat (12)**
41:10;82:5,7,8;
100:6;120:24;122:6,
11;124:13;126:20,
21;130:15
**threatens (3)**
88:20;89:1,7
**three (8)**
17:9,17;19:21,25;
42:1;90:7;107:7,8
**three-pager (1)**
123:2
**thumb (1)**
129:5
**tied (1)**
22:11
**timeline (1)**
95:23
**times (25)**
16:4;24:11,12;
28:18;39:3,7,25;
42:17;89:22;90:3;
94:24;95:1;98:21;
99:15,17,19;101:12;
115:21;118:24;
124:15,19,24;125:3;
126:23,25
**timing (1)**
127:20
**titled (1)**
47:19
**Tobacco (1)**
20:19
**today (5)**
8:1,10,13;115:18;
128:16
**together (1)**
56:4
**told (3)**
68:3;98:21;115:8
**took (6)**
54:5;65:22;92:25;
94:3;95:3;126:23
**tool (4)**
26:18;87:9;120:2,6
**tools (2)**
27:12;41:23
**top (3)**

104:24;109:25;
110:17
**topics (1)**
104:8
**torso (1)**
99:23
**total (2)**
125:3;127:25
**touching (1)**
13:7
**towards (34)**
44:3;62:8,19,19;
65:20;70:2,23;71:1,5,
23,24,25;72:21;73:7,
18;74:2,19;76:8;
78:8;83:13;90:16;
91:1,15,17;92:8,22,
25;93:1,3,5;95:3;
124:20;127:9;130:5
**tracking (6)**
22:4;36:25;38:6;
47:15;118:14,16
**trail (8)**
63:5;64:16;66:2,4,
22,22,23;67:9
**train (6)**
24:7;27:13;36:24;
38:20;39:4;89:6
**trained (33)**
22:23;23:7;24:10;
25:17;26:3,17;30:1,1,
14,15;31:23;32:15,
25;33:14,16,22;34:8,
17,19,24,24;35:1;
36:24;89:4;105:21,
22,24;106:9;107:12,
16;108:3;118:8,11
**trainer (13)**
21:18;36:5,9;37:6,
7,13;47:11;49:3,25;
50:12;54:16,18,23
**trainers (2)**
36:12;37:8
**training (80)**
10:14;22:14;23:16,
19,22;24:2,4,5,6;
25:6,9;26:22,24;27:1,
3,16,24;28:3,12,16,
18;30:2;31:24;34:1,
8,23;36:13,19,21,23;
37:1,2,4,9,12,24;
39:4,11,22;40:6;
44:22,25;45:1,8,9,14,
23;46:2,6,8,14,20;
47:19,22,22;50:2,7,9,
14;53:25;54:2,7,9,14,
24;56:1,3;88:19,22,
24,25,25;101:22,25;
102:3,6,10;103:17;
104:9;119:7
**trainings (1)**
45:3
**transcript (1)**

131:1
**transit (1)**
43:6
**transmission (4)**
57:11,14;60:2;
70:22
**trees (2)**
85:13,15
**trial (3)**
13:15;97:25;98:4
**tricep (1)**
84:22
**tricep/shoulder (1)**
86:7
**triceps/shoulder (2)**
32:17,18
**trick (2)**
79:11;109:20
**trigger (1)**
100:5
**true (2)**
49:20;109:18;
113:16;128:21
**truth (2)**
115:8,12
**truthfully (1)**
6:13
**try (9)**
6:18;27:10;28:2;
39:5;103:1,9,17,22;
118:5
**trying (10)**
27:5,7;79:11,12;
90:8,11;92:7,8;
96:19;109:20
**Tuesdays (2)**
39:4,5
**Tunnel (12)**
67:11,19;68:18;
73:19,21,22,23;
79:20,23;80:1,4,15
**turn (1)**
72:19
**Turned (4)**
65:17;71:5;72:21;
73:7
**turns (3)**
73:6,25;74:1
**Twice (2)**
40:1;114:5
**two (34)**
17:13;19:9;24:14;
31:5,7;34:13,14;
36:4;42:14;44:11;
45:3;48:1;75:3;
79:12;82:18,22;
85:18;87:9,9;90:7;
92:14;95:9;107:7,9,
11;109:8,12,12,19;
110:13;111:14;
114:7;121:17;122:19
**type (19)**
14:19;16:5,6;25:2;

26:16;27:2,6,9;
28:16;49:2;56:3;
101:21;104:16;
108:14;117:2;
120:23;121:9,19;
126:9
**types (2)**
102:5;107:7
**typically (1)**
56:12

**U**

**ultimately (2)**
66:22;118:22
**unclear (1)**
6:17
**uncomfortable (1)**
98:13
**under (11)**
6:12;22:16,23;
23:5;91:9;92:4;95:2,
12;119:18;120:1;
127:16
**undergo (4)**
28:12;36:22;37:12;
46:2
**undergone (4)**
44:22;45:22;
101:21
**underlined (1)**
110:20
**underneath (4)**
91:9,10,11,21
**Understood (2)**
52:13;73:24
**underwent (3)**
45:1;46:8;47:22
**unfair (1)**
116:8
**unholster (2)**
92:23;127:7
**unholstered (2)**
93:4;127:8
**unholstering (1)**
94:15
**uniform (2)**
57:3,10
**unit (5)**
15:4,7;17:5;37:25;
60:8
**United (1)**
5:7
**units (3)**
15:10;17:12;19:21
**unleashed (1)**
83:25
**unreasonable (1)**
14:8
**up (43)**
9:21;17:10;19:9;
21:6;23:22;24:5,7,9;
27:7;33:16;36:15;

37:24;43:7;44:5;
48:1;51:13,19;52:20,
23;58:21;62:18,19,
20,22,24;63:1;65:17,
21;67:11,16;68:5,22;
86:7;90:9,12;91:5;
104:16,24;107:14;
108:13;117:23;
118:18;125:23
**up- (1)**
92:4
**upon (1)**
42:16
**Upper (4)**
31:17,25;32:4;
99:24
**uppercutted (1)**
95:1
**upwards (3)**
91:9;92:4,5
**usage (1)**
22:15
**use (36)**
11:23;13:8,11;
14:8;25:2;29:16;
30:4;35:6;44:18;
46:1;50:11;55:25;
56:4;58:11,11,15,23;
59:18;104:9,22;
105:16,17,20,22,25;
106:9;107:12,16,18;
108:3;110:14;
116:23;120:20;
125:8;129:13;130:19
**used (21)**
16:25;22:14;24:14;
26:1,18,20,24;27:2,
12;31:7;37:9;41:23,
25;42:1;51:6;52:5;
101:11;105:15;
106:7;107:21;120:5
**uses (1)**
101:10
**using (13)**
23:22;29:15;32:23;
34:13;41:20;45:21;
52:11;74:16;77:19,
19;78:1,4;108:1
**usual (2)**
111:6;112:4

**V**

**vague (1)**
6:17
**vantage (1)**
69:16
**variety (3)**
23:22;24:22;25:4
**various (4)**
10:2;36:7;37:10;
102:1
**vehicle (6)**

60:8;61:23;62:3,
21;65:6;66:2
**verbal (3)**
7:2;14:4;82:20
**verbally (5)**
77:9;79:14;81:11;
96:4;103:17
**verdict (1)**
13:17
**verify (1)**
116:9
**versus (6)**
5:7;23:25;29:25;
30:24;32:4;39:14
**vest (9)**
114:15,19,23;
115:5;126:1,5,6,9,12
**vests (1)**
115:2
**via (1)**
5:5
**vicinity (2)**
81:25;82:6
**video (10)**
5:4,5;14:19,19;
110:8,11,13;116:16;
128:18;129:6
**VIDEOGRAPHER (8)**
5:3,9;48:7,10;
93:20,22,25;131:2
**videotaped (1)**
5:5
**view (3)**
76:4;95:25;128:16
**VIII (2)**
120:16,19
**violate (4)**
111:16,22;112:2,
11
**vision (4)**
73:10;82:11;88:6,
10
**voluntarily (1)**
128:10

**W**

**W&J (3)**
8:22,24;9:1
**Wait (1)**
130:23
**waiting (1)**
10:5
**waived (1)**
131:5
**walk (10)**
51:13,19;52:20;
56:23;68:16;71:19,
19,23;74:17;92:12
**walked (2)**
52:23;67:9
**walking (21)**
51:22;62:8;65:20;

67:7;70:1,2,17;71:5,
24;72:12;74:15,18;
81:14;82:10;83:2,6,8,
10,14;103:5,7
**wall (5)**
66:6,7,10,10,12
**warnings (3)**
82:18,20,22
**watch (1)**
64:19
**watched (2)**
44:4,5
**way (6)**
24:18;90:14;
101:12,18;118:5;
125:16
**weapon (18)**
23:4;25:23;26:16;
94:16;99:15;100:7;
111:10;112:8,16,23;
113:2;126:16;127:4,
7,22,24;130:5,20
**weapons (5)**
51:21;104:24;
105:10;112:16;
120:20
**wear (1)**
114:16
**wearing (3)**
14:23;114:18,22
**Wednesday (1)**
5:4
**week (3)**
37:1,2,12
**weekly (1)**
37:24
**Weeks (2)**
11:3;19:8
**Wesson (1)**
100:11
**west (3)**
77:11,13,22,23;
78:7,13;79:5,16
**westbound (1)**
78:23
**Western (1)**
5:8
**What's (15)**
8:1,6;11:12;23:14;
26:19;27:17;29:17;
49:5;56:12;77:12,12;
103:13,13;112:1;
117:6
**whenever (1)**
53:18
**Whereupon (13)**
5:1;11:9;14:14;
48:9;49:10;75:10;
93:24;104:18;109:2;
120:11;123:3;129:9;
131:4
**wherever (1)**
61:13

**white (5)**
41:1;43:23;69:3;
125:17,17
**Whitney (52)**
66:22,24;67:3,6,11,
12,19,21,22;68:5,22;
69:9,13,17;70:2,17,
23,25;71:6,14,16,22;
72:6;73:13,18;75:24;
76:4,18,21,24;77:11,
23;78:3,7,8,9,11,20,
21;79:1,4,16,17,23,
24;82:11;95:25;96:6;
97:10;103:6,6;113:7
**whole (7)**
50:20;53:9,9;
96:24;97:5,20;
115:12
**Wilkinsburg (4)**
57:1;59:7,10,21
**William (1)**
19:19
**winding (1)**
118:1
**within (3)**
55:15;58:2;124:22
**without (3)**
12:16;34:11,12
**witness (44)**
5:14;6:20,22;
11:10;14:15;19:23;
22:3;24:4;26:9;28:8;
34:13;38:12;46:11;
49:11;75:5,11;77:2,4,
15,18;78:3,16;80:11,
12,14;82:2;98:6,12,
13;99:13;104:19;
108:23;109:1,3;
111:20;112:13;
114:13;117:11;
119:22;120:5,12;
123:4;125:21;130:25
**witnessed (1)**
94:24
**witnesses (2)**
7:3,3
**witnessing (1)**
91:23
**woods (10)**
40:17;41:7,10,11;
42:6;63:5,17;64:3,17,
22
**word (11)**
21:10;29:13,14,16,
17,18;46:1;52:5;
74:15;84:1;98:17
**words (2)**
22:14;70:6
**work (25)**
7:23;8:13;10:19;
11:4;17:18;20:14,21,
22;21:1,13;36:6;
39:6,7,8,9,9,10,12,13,

14,14,18,20;61:6,12
**worked (7)**
9:13;10:21,23;
16:2,14;17:17;61:8
**working (9)**
16:3;17:18;39:10;
55:2,8,24;60:23;61:9,
19
**wounded (1)**
118:19
**wrap (2)**
118:18;125:23
**write (1)**
6:24
**written (4)**
11:13;13:20;14:4;
16:25
**wrong (1)**
116:4

## Y

**yard (2)**
81:17;96:5
**yards (12)**
43:17;52:18,18;
65:1;71:14;72:12;
81:16;82:11;85:16;
113:13,16,18
**year (7)**
8:20,24;10:12;
29:7;40:2;77:5;85:11
**yearlies (1)**
46:16
**yearly (3)**
35:25;36:2,18
**years (9)**
15:18;17:6,17;
18:24,24;28:20;
36:15;112:17,21
**yelled (1)**
74:24
**yelling (7)**
67:6,8,8;69:24;
70:3,8;71:10

## Z

**Zero (1)**
104:4
**zigzag (1)**
67:16
**zigzags (1)**
67:10
**Zoom (1)**
5:5

## 0

**010 (2)**
40:7,11
**014 (1)**
37:3

14,14,18,20;61:6,12
**015 (6)**
37:3,11;47:3,18;
49:1,17
**016 (28)**
14:22;15:15,17,17,
20;16:1,14;17:4;
19:25;20:1;33:21;
36:15,16;37:3,11;
44:17;45:21;46:2,14,
18,21;55:2;58:5;
61:15;104:13;
105:19;112:17;123:8
**03 (11)**
18:13;19:20,22;
20:1,8;22:19,23;
25:7;33:21;40:7,11
**08 (1)**
29:9

## 1

**1 (10)**
58:22;59:1,17;
110:21,22,22;120:22,
23;121:19;123:8
**1/2 (1)**
10:17
**10 (8)**
8:13;18:21;43:17;
49:1;52:18;80:5;
81:16;125:4
**10/13/015 (1)**
47:9
**10:00 (3)**
61:6,7,10
**10:18 (2)**
5:2,4
**11 (1)**
18:21
**11:28 (1)**
48:8
**11:40 (1)**
48:10
**12 (9)**
11:17,17,22;13:19,
20;39:8;73:15;78:12,
21
**12:49 (1)**
92:15
**12:50 (1)**
93:23
**120 (1)**
10:1
**13 (1)**
49:1
**14 (3)**
104:18,22;110:15
**1400 (3)**
8:13;55:9,23
**147 (1)**
117:3
**15 (3)**
46:23,25;52:18

**155136 (1)**
75:23
**16 (10)**
15:21;36:23;37:16,
21;38:2,4,5,7,9,14
**18 (2)**
15:19;75:14
**19 (3)**
15:19;112:19,21
**1991 (1)**
8:21
**1995 (1)**
8:25
**1996 (1)**
9:13

## 2

**2 (16)**
8:13;57:19,19,20;
60:7;61:22;93:17;
104:3;105:2,9;
110:19,21;120:22,24;
122:5;129:8
**2:00 (6)**
61:5,5,6,7,9,17
**2:03 (1)**
94:1
**20 (7)**
11:15,17;13:19,23;
72:12;80:5;88:18
**2003 (1)**
15:25
**2008 (2)**
12:7,17
**2015 (1)**
51:2
**2016 (1)**
129:8
**2020 (1)**
5:4
**2200 (2)**
8:13;55:9
**23 (1)**
104:23
**24 (3)**
11:9,12;110:16
**25 (3)**
14:14,18,18
**26 (2)**
120:10,11
**27 (2)**
122:25;123:3
**29 (4)**
48:25;49:7,10;
53:25

## 3

**3 (10)**
10:17;14:18,19;
66:18;109:9,18,21;
120:22;121:1;122:17

**3:05 (2)**
131:3,4
**30 (5)**
65:1;80:8;109:2,5;
115:9
**30s (1)**
69:6
**31 (7)**
15:17;44:16;55:2;
112:17;129:2,5,9
**31st (3)**
45:21;46:5,19
**32 (1)**
109:9
**33 (1)**
109:9
**39023 (1)**
49:2

## 4

**4 (2)**
109:10,18
**40 (4)**
105:11,14;107:23;
108:1
**47 (1)**
7:22

## 5

**5 (1)**
58:23

## 6

**6 (4)**
75:7,8,10;95:22
**63 (1)**
120:15
**65 (1)**
109:11
**66 (1)**
109:11
**6th (1)**
123:8

## 7

**7 (3)**
111:5,17,22
**7th (1)**
5:4

## 8

**8 (12)**
95:21;96:1,10,14,
15,16,17,20;111:9;
112:7,11;125:4

## 9

**9 (5)**
  110:22,22,22;
  116:25;125:4
**9/11 (1)**
  19:14
**95-'96 (1)**
  8:25
**96 (1)**
  8:25
**97 (2)**
  10:8,12
**98 (1)**
  10:12