IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


CALISIA KELLEY; and                   CIVIL ACTION
JOHNNIE MAE KELLEY,
Co-Administrators of the              No. 2:17-cv-01599-NBF
ESTATE OF BRUCE KELLEY,
JR., deceased,

Plaintiffs,

vs.                                   TRANSCRIPT

BRIAN O'MALLEY, both in his           VIDEOTAPED
Official and Individual               DEPOSITION OF
Capacities as Sergeant for            DOMINIC RAVOTTI
the Allegheny County Port
Authority; and DOMINIC
RIVOTTI, in both his
Official and Individual
Capacities as Officer for
the Allegheny County Port
Authority,

Defendants,
Jointly and Severally.                TAKEN VIA ZOOM VIDEO CONFERENCE

                                      THURSDAY, OCTOBER 1, 2020


                                      Taken on behalf of Plaintiffs,
                                      Calisia Kelley and Johnnie Mae
                                      Kelley


                                      Counsel of Record for this Party:

                                      Noah Geary, Esquire
                                      Washington Trust Building
                                      6 South Main Street, Suite 225
                                      Washington, PA  15301
                                      724-222-3788

2

1    Videotaped deposition of Dominic Ravotti, taken via Zoom video

2    conference on behalf of Plaintiffs, pursuant to Rule 30 of the

3    Federal Rules of Civil Procedure, by and before Rita A. Ross, a

4    Registered Professional Reporter and a Notary Public in and for

5    the Commonwealth of Pennsylvania, on Thursday, October 1, 2020,

6    commencing at 10:07 a.m., originating from the Law Office of

7    Noah Geary, 6 South Main Street, Suite 225, Washington,

8    Pennsylvania.

9                              -   -   -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1  APPEARANCES:

2

3  On Behalf of the Plaintiffs:  (Mr. Geary and the Court Reporter
   physically present at Mr. Geary's Washington office.)

4  Noah Geary, Esquire
   Washington Trust Building
5  6 South Main Street, Suite 225
   Washington, PA  15301
6  724-222-3788
   noahgearylawoffices@gmail.com
7

8  On Behalf of the Defendants:  (Mr. Evashavik and the Deponent
   physically present at Evashavik Law, LLC)
9
   Greg Evashavik, Esquire
10 Evashavik Law, LLC
   310 Grant Street, Suite 2901
11 Pittsburgh, PA  15219
   412-261-2813
12 greg@evashaviklaw.com

13
   Also Present:
14
   Matt Diaddigo, Videographer (Remotely)
15 Precise, Inc.
   429 Fourth Avenue, Suite 200
16 Pittsburgh, PA  15219
   866-277-3247
17
   Ms. Calisia Kelley (Present at Geary Law Office)
18 Ms. Johnnie Mae Kelley (Present at Geary Law Office)

19

20

21

22

23

24

25

4

1                            I N D E X

2
   WITNESS                                              PAGE
3
   DOMINIC RAVOTTI
4
   Examination by Mr. Geary                            6, 96
5
   Examination by Mr. Evashavik                        91
6

7  DEPOSITION EXHIBITS PRESENTED TO THE WITNESS        PAGE

8   6      Incident 16-00683 - Assault Knife - Wilkinsburg    37
           Borough - Timeline
9
    13     Interview of Officer Dominic Ravotti              20
10
    14     Use of Force Policy                               48
11
    15     Responses to Request for Production of            15
12         Documents Directed to Defendant Dominic
           Ravotti
13
    16     Answers to Interrogatories Directed to            10
14         Defendant Dominic Ravotti

15  17     Audio/Video Recording of Statement of Officer     92
           Dominic Ravotti (Retained by Mr. Evashavik)
16

17

18

19

20

21

22

23

24

25

5

1          (Whereupon, the videotaped deposition of Dominic

2     Ravotti commenced at 10:07 a.m.)

3          THE VIDEOGRAPHER:  We are going on the video record.

4     The time is 10:07 a.m.  Here begins the deposition of Dominic

5     Ravotti in the case of Calisia Kelley and Johnnie Mae Kelley,

6     Co-Administratrixes of the Estate of Bruce Kelley, Jr.,

7     deceased, versus Brian O'Malley and Dominic Ravotti, filed in

8     the United States District Court for the Western District of

9     Pennsylvania.  Civil Action No. 2:17-cv-1599-NBF.

10          Today's date is October 1st, 2020.  The court

11     reporter is Rita Ross.  My name is Matt Diaddigo.  I'm the

12     videographer and technician employed by Precise, Inc.  This

13     video deposition is taking place via Zoom video conference.

14          Counsel, please identify yourselves and state whom

15     you represent.

16          MR. GEARY:  Good morning.  My name is Noah Geary.  I

17     represent Calisia Kelley and Johnnie Mae Kelley.  They are

18     seated right behind me here in the room.

19          MR. EVASHAVIK:  I am Greg Evashavik.  I represent

20     both defendants.

21          THE VIDEOGRAPHER:  Could I please have the court

22     reporter swear in the witness.

23                    DOMINIC RAVOTTI,

24     having been first duly sworn, was examined and testified as

25     follows:

Dominic Ravotti - Examination by Mr. Geary

6

1                      EXAMINATION

2   BY MR. GEARY:

3        Q.    Officer, good morning.  Again, my name is Noah

4   Geary.  Have you ever had your deposition taken before?

5        A.    Not for anything like this.  For a civil incident

6   that I was the officer on scene for.

7        Q.    Thank you.  So there are certain ground rules for

8   the deposition, mainly for the purpose of the stenographer.  So

9   I'll just go through those with you and ask if you understand

10  them.

11             So, number one, you're under oath and have to answer

12  truthfully.  Do you understand that?

13       A.    Yes.

14       Q.    And the reporter is taking down everything that is

15  said in the room by anyone.  So sometimes a witness -- you may

16  anticipate my question, and you may jump in with the answer and

17  speak over me a little bit, which is not a big deal.  But if it

18  happens, the reporter may ask you to -- to hang on and maybe

19  ask me to repeat the question so that she can get down what

20  we're both saying.  So I'll try not to interrupt you, and if

21  you -- you try not to interrupt me.  If it happens, not a big

22  deal.  We'll do whatever we need to do.

23             If I ask questions too quick, if I'm going too fast

24  for you, you can tell me to slow down.

25             At a certain point, I'll ask you to look at some

Dominic Ravotti - Examination by Mr. Geary

7

1   exhibits and reference the exhibits and read them and

2   understand them and have you -- ask you some questions off of

3   those exhibits.  Again, you can -- I want to make sure you read

4   the exhibits and you're comfortable with what you've read

5   before you answer any questions about the exhibits.

6           If I ask a question that's unclear, if you don't

7   know what I'm asking, you can ask me to repeat it.  I'll try to

8   make it more clear.

9           And if you need a break, just let us know.  We can

10  take a break.

11          Do you understand those so-called ground rules for a

12  deposition?

13      A.   Yes, sir.

14      Q.   Okay.  A deposition is just kind of a

15  question-and-answer session.

16          MR. GEARY:  So are we ready to proceed, Greg?

17          MR. EVASHAVIK:  Yes.

18          MR. GEARY:  Okay.  Thank you.

19  BY MR. GEARY:

20      Q.   Officer, you may have already done it, but just

21  please state your name one more time for us on the record.

22      A.   Dominic Ravotti.

23      Q.   And can you spell first and last name, please?

24      A.   First name is Dominic.  Last name is R-a-v, as in

25  Victor, o-t-t-i.

Dominic Ravotti - Examination by Mr. Geary

8

| | | |
|---|---|---|
| 1 | Q. | And what is your age, please? |
| 2 | A. | 37. |
| 3 | Q. | And are you originally from the Pittsburgh area? |
| 4 | A. | Freeport, yes. |
| 5 | Q. | Okay.  Where did you go to high school, please? |
| 6 | A. | Freeport Area High School. |
| 7 | Q. | What year did you graduate? |
| 8 | A. | 2001. |
| 9 | Q. | Are you married, sir? |
| 10 | A. | Yes, sir. |
| 11 | Q. | Do you have kids? |
| 12 | A. | Yes. |
| 13 | Q. | How many? |
| 14 | A. | One. |
| 15 | Q. | Are you employed by the Port Authority as of today? |
| 16 | A. | No. |
| 17 | Q. | Okay.  Now, what did you do after high school, |
| 18 | | please? |
| 19 | A. | What do you mean, what did I do after high school? |
| 20 | Q. | Well, did you go to college, or did you go into the |
| 21 | | workforce? |
| 22 | A. | I went to college for one semester and then started |
| 23 | | into the workforce. |
| 24 | Q. | Okay.  Where did you go for the one semester? |
| 25 | A. | Community College of Allegheny County. |

Dominic Ravotti - Examination by Mr. Geary

9

1      Q.      Okay.  And did you immediately go into law

2  enforcement, or you may have worked non-law-enforcement jobs

3  for a while?

4      A.      Correct.  I worked non-law-enforcement jobs for a

5  while.

6              MR. GEARY:  Okay.  Greg, I'm going to ask the

7  witness a couple questions on some answers to interrogatories,

8  which the stenographer has marked as Exhibit 16.  And then I'm

9  going to ask him a couple follow-ups to responses to requests

10  for production of documents, which is No. 15, just so you know.

11             MR. EVASHAVIK:  All right.  I'm marking those now

12  because they haven't been marked.  So the answers to

13  interrogatories are 16?

14             MR. GEARY:  16.  And then responses to requests for

15  production of Officer Ravotti is 15.

16             MR. EVASHAVIK:  Okay.

17             MR. GEARY:  And then, just so we're complete, 14 is

18  marked -- the use of force policy is 14.

19             And 13 is a summary of an interview of Officer

20  Ravotti by Allegheny County Police Department.  And it looks

21  like it's a -- it's a -- it's a double.  It's four pieces of

22  paper.  I think it's the same thing twice.  It was just in two

23  different places in your discovery production.  So it's 13,

24  four pages.  So the Bates stamps are 35 and 36.  And then 67

25  and 68, but it looks like it's the same document.

Dominic Ravotti - Examination by Mr. Geary

10

1              So the new exhibits as far as this case and for this

2    witness, in particular, are 13, the witness summary; 14, use of

3    force policy; 15, responses to requests for production; and 16,

4    answers to interrogatories.

5              MR. EVASHAVIK:  Okay.

6              MR. GEARY:  And then I'll refer to him -- refer him

7    to some other exhibits that have already been marked earlier in

8    the case a little bit later.

9              (Whereupon, Deposition Exhibit 16 was presented to

10   the witness.)

11   BY MR. GEARY:

12       Q.    Officer, if -- if you could look at Exhibit 16,

13   please.  And it was a Question No. 17, and I had asked any job

14   you ever worked which was non-law enforcement.

15       A.    Yes.

16       Q.    So I just -- I just want to ask you a couple

17   questions about each of those jobs, and then we'll get into

18   your law enforcement career.

19       A.    Okay.

20       Q.    King's Family Restaurant.  Where did you work there?

21   What location?

22       A.    In Sarver, Pennsylvania.

23              MR. GEARY:  Okay.  You got that?

24   BY MR. GEARY:

25       Q.    And roughly how long did you work there?

Dominic Ravotti - Examination by Mr. Geary

11

1      A.    I can't -- I was 16 years old.  I can't specifically
2  tell you how long.
3      Q.    Got you.  That's while you were in high school?
4      A.    Yes.
5      Q.    What about Eat'n Park?  What location?
6      A.    Natrona Heights.
7      Q.    And roughly what time period of your life did you
8  work there?
9      A.    High school.
10      Q.    What about the pizza delivery job?  Was that high
11  school also?
12      A.    Yes.
13      Q.    What was the name of the employer?
14      A.    It was called Wolfie's Pizza.
15      Q.    And where was that located, please?
16      A.    Freeport.
17      Q.    The next says Saxonburg VFC Ambulance.  What's the
18  VFC stand for?
19      A.    Volunteer Fire Company.
20      Q.    Okay.  When did you work there, please?
21      A.    It was -- I can't recall the specific dates, but it
22  was 2000-, I would say, -4 to 2012 maybe.  I'm not -- I can't
23  tell you the specific dates.
24      Q.    No.  That's fine.  Thank you.  What -- what was your
25  position there?

Dominic Ravotti - Examination by Mr. Geary

12

1      A.    Emergency medical technician/firefighter.

2      Q.    And then Freeport Ambulance, when did you work

3  there, please?

4      A.    About the same time frames.

5      Q.    And what was your position for Freeport Ambulance?

6      A.    The same thing.

7      Q.    And Citizens Hose Ambulance, where was that located,

8  please?

9      A.    Natrona Heights, Pennsylvania.

10     Q.    And then what time frame did you work at the Butler

11 County Prison, please?

12     A.    From -- it would have been around 2010 to 2013.

13     Q.    Were you a correctional officer?

14     A.    Yes, sir.

15     Q.    Okay.  What was your first job in law enforcement,

16 then?

17     A.    Freeport Police Department.

18     Q.    And how long were you there?  Just roughly.

19     A.    A little -- approximately a year, a year and a half.

20     Q.    And then where after Freeport did you work?

21     A.    Buffalo Township Police Department.

22     Q.    Okay.  How long were you there?  Roughly.

23     A.    Roughly six years, I think.  It may have been less

24 or more.  I'm not sure.

25     Q.    And, now, was Freeport full-time or part-time?

Dominic Ravotti - Examination by Mr. Geary

13

1      A.    Part-time.

2      Q.    What about Buffalo?

3      A.    Part-time.

4      Q.    Were you working at both places at once?

5      A.    Yes.

6      Q.    What about Saxonburg Police Department, just in the

7  chronology of your career?

8      A.    Part-time.  Same time frame.

9      Q.    Okay.  What about Leechburg?

10     A.    Leechburg was only approximately a month in that

11 time frame, around 2004 to 2005.

12     Q.    Thank you.  And what about Lower -- Lower Burrell?

13     A.    I've worked there since 2018.

14     Q.    And what about your tenure at the Port Authority?

15     A.    From 2013 to 2018.

16     Q.    And from 2018 to the present, can you please tell me

17 where you've been employed?

18     A.    Lower Burrell Police Department.

19     Q.    Anywhere else?

20     A.    No, sir.

21     Q.    And, I mean, as of today, you're employed by Lower

22 Burrell Police Department.  Is that right?

23     A.    Yes, sir.

24     Q.    Are you full-time right now?

25     A.    Yes, sir.

Dominic Ravotti - Examination by Mr. Geary

14

1    Q.    What's your rank?

2    A.    Patrolman.

3    Q.    Why did you leave the Port Authority in '018?

4    A.    To go to Lower Burrell.

5    Q.    Was -- the Bruce Kelley incident, did that have

6  anything to do with you leaving the Port Authority?

7    A.    Not at all.

8    Q.    If we could look at Question No. 22, please, on

9  these answers.  And the interrogatory was to identify every

10  medical provider for whom you sought or received treatment

11  related to this incident.

12         And your answer states "I saw the employee health

13  person from Port Authority per their request after the

14  incident.  It was one meeting only that lasted about an hour.

15  After the meeting, I was cleared to return to work."

16         Did I read that correctly?

17    A.    Yes.

18    Q.    And, roughly, when after the incident did that

19  occur?

20    A.    I believe within the -- a week after the incident,

21  but I can't specifically tell you.

22    Q.    And then I assume you were interviewed?

23    A.    By who?

24    Q.    Whoever the employee health person was.

25    A.    That was what the meeting was, yes.

Dominic Ravotti - Examination by Mr. Geary

15

1    Q.    Okay.  And you were interviewed about the Bruce

2    Kelley incident?

3    A.    Yes.

4    Q.    And was it, say, one-on-one, you with one health

5    person, or was there multiple people present?

6    A.    Just one lady.

7    Q.    And did she ask you to provide a written statement?

8    A.    No.

9    Q.    Okay.  Was that meeting -- did -- was it recorded in

10   any way?

11   A.    No.

12   Q.    Okay.  And just what was the -- the point?  What

13   kind of questions was she asking you?

14   A.    I don't completely remember what she was asking.  It

15   was more about the -- the mental health of dealing with the

16   incident.  It didn't specifically ask, like, details of the

17   incident, just -- that's why it's the -- the employee health,

18   it's more of a mental than --

19   Q.    More mental than physical.  I get it.

20         And after that one session with that health person

21   that you just described, did you meet with anyone else as far

22   as your mental health from this incident other than that --

23   that lady?

24   A.    No.

25         (Whereupon, Deposition Exhibit 15 was presented to

Dominic Ravotti - Examination by Mr. Geary

16

1   the witness.)

2   BY MR. GEARY:

3        Q.    If we could go to the Exhibit 15.  It's responses to

4   requests for production of documents.  Just a couple questions

5   off of that, please.

6        A.    Is that the same thing that I have?

7        Q.    15 is responses.  I asked six.  I just have a

8   question about three, please.  So this is marked 15.

9        A.    Okay.

10       Q.    If you could take a look at the first three, just

11  read them to yourself.  Take a moment.  Then I just have a

12  follow-up question or two on these.

13       A.    Okay.

14       Q.    Thank you.  No. 1 reads (as read) "Produce full and

15  complete copies of any/all use of force reports filled out or,

16  slash, completed by you relating to your January 31, '016,

17  encounter with Bruce Kelley, Jr."

18            And your response was "None."

19            Did I read that correctly?

20       A.    Yes.

21       Q.    Okay.  So on that day, January 31, '016, is it true

22  that you fired your service weapon at Bruce Kelley?  Is that

23  correct?

24       A.    Yes.

25       Q.    And how many times did you fire?

Dominic Ravotti - Examination by Mr. Geary

17

1    A.    Twice.

2    Q.    And it's my understanding that certain police

3  departments, state police, may require an officer who has

4  deployed force -- any use of force, even if it's lesser than

5  deadly force, they're required to fill out a use of force

6  report explaining what happened and the -- and the reasons for

7  the use of force, so forth.  Did you -- did you fill out any

8  such use of force report in this case?

9         MR. EVASHAVIK:  Object to the form.

10        You can answer.

11        THE WITNESS:  No.

12  BY MR. GEARY:

13   Q.    Okay.  Even if it was called something else?  Maybe

14  the form for the Port Authority was not called "Use of Force

15  Form."  But the equivalent of such, you did not fill out any

16  such report?

17   A.    No.

18   Q.    Do you know if you were required to by, say, policy

19  or protocol of your department?

20   A.    No.

21   Q.    No. 2 inquired about body cameras, and your answer

22  was "Not applicable."

23        So were you wearing a body camera that day?

24   A.    No.

25   Q.    And did the Port Authority Police Department utilize

Dominic Ravotti - Examination by Mr. Geary

18

1   body cameras in that time period?

2        A.    No.

3        Q.    When you left the Port Authority in '018, did they

4   use body cameras then?

5        A.    No.

6        Q.    What about Lower -- Lower Burrell right now?  Do

7   they have body cameras for officers?

8        A.    No.

9        Q.    Okay.  No. 3 says (as read) "Produce any and all

10  dash camera video/audio surveillance video from any

11  vehicle/unit you were driving on the shift you worked when

12  Bruce Kelley, Jr., was shot and killed."

13            And the response says "Not applicable."  It's No. 3.

14            Did I read that correctly?

15       A.    Yes.

16       Q.    Now, as I understand, were you on patrol and you

17  responded to a call and that's what began your involvement in

18  this incident?

19       A.    I responded to an officer that stated that he was in

20  need of assistance, yes.

21       Q.    Okay.  And where were you when you got that call?

22       A.    I was in -- I was in downtown Pittsburgh whenever we

23  started towards the incident.

24       Q.    And were you on patrol?

25       A.    Yes.

Dominic Ravotti - Examination by Mr. Geary

19

1   Q.   Did you have a partner with you?

2   A.   There was a person in the car with me, yes.

3   Q.   Who was it, please?

4   A.   Kyrone [verbatim] Sanders.

5   Q.   Was that a fellow officer?

6   A.   Yes.

7   Q.   Which one of you was driving?

8   A.   I was.

9   Q.   And do you remember what the unit number was of the

10  vehicle?

11  A.   I have no -- I have no idea.

12  Q.   Okay.  So you drove to -- to Wilkinsburg to respond

13  to the call.  Is that correct?

14  A.   Correct.

15  Q.   And do you remember when you arrived to Wilkinsburg

16  where you arrived and, you know, got out of your vehicle or

17  where you first arrived in the area of the call?

18  A.   We initially responded to Pennwood Avenue but then

19  pulled into the Hamnett Park and Ride lot.  That's where

20  Officer Sanders exited the vehicle.  I began to exit the

21  vehicle.  But that's whenever they said that Kelley was cutting

22  down through the woods, so I got back into the vehicle and went

23  back out onto Center Avenue.

24  Q.   And when you pulled into the park and ride parking

25  lot, did you have -- did the car have dash camera capabilities?

Dominic Ravotti - Examination by Mr. Geary

20

1        A.    There was no dash cams in any of the cars -- in any

2   of the Port Authority cars.

3        Q.    Okay.  So even if you wanted to activate dash

4   cameras, you could not have done so?

5        A.    I couldn't activate it because there was nothing --

6   no cameras there to activate.

7        Q.    Okay.  Understood.

8              (Whereupon, Deposition Exhibit 13 was presented to

9   the witness.)

10  BY MR. GEARY:

11       Q.    If I could have you look at Exhibit 13, please.

12  Again, it's -- it looks like a two-pager, and then I think it's

13  a repeat.  Could you look at all four pages, please, carefully

14  and just tell me if -- pages 3 and 4, is it just a duplicate of

15  1 and 2?

16             MR. EVASHAVIK:  I'm going to object to the form of

17  the question only because this is not a document that was

18  created by this witness.

19  BY MR. GEARY:

20       Q.    Yeah.  I just want to ask you, sir:  Does it -- I

21  want you to tell me what all four documents appear to be to

22  you.  I know you didn't create them.

23       A.    All right.  The -- the first one appears to be an

24  interview -- a summary of an interview that was taken from me.

25  And the second one appears to be a summary of an interview that

21

1   was taken by me.  And then an interview by somebody else

2   that -- off of somebody else.

3       Q.    Right.  Right.  On page 4 there, Detective Foley, an

4   interview of a Jermain Wofford, yeah, that -- that doesn't

5   apply.  I wasn't able to, like, separate that off the page.

6   So, yeah, I don't -- I'm not going to be asking you anything

7   about that, so...

8       A.    Okay.

9       Q.    But the first three pages and the top of page 4,

10  that appears to be a summary of an interview of you.  Is that

11  correct?

12      A.    Yes.

13      Q.    Okay.  Did you compose any reports from the Bruce

14  Kelley, Jr., incident?

15      A.    No.

16      Q.    Okay.  Did you provide anyone at any time any

17  written statements that you actually wrote down?

18      A.    No.

19      Q.    Now, I've been provided -- I believe you were

20  interviewed.  Is that correct?

21      A.    Yes.

22      Q.    And that was audio and video recorded?

23      A.    Correct.

24      Q.    Okay.  But just so I'm clear -- because I've been

25  provided a lot of documents -- you did not compose or draft or

Dominic Ravotti - Examination by Mr. Geary

22

1    create any report or statement regarding this incident.  That's

2    correct?

3        A.    Correct.

4        Q.    Okay.  If we could, then, I'd like to kind of start

5    what happened that day and just walk through the events in a --

6    kind of a chronological fashion, if that's okay.

7              So, obviously, that day you were employed by the

8    Port Authority Police Department.  Is that true?

9        A.    Yes, sir.

10       Q.    And what shift were you working that day?

11       A.    Afternoon shift.  2:00 p.m. to 10:00 p.m.

12       Q.    And you were with Officer Sanders.  Is that right?

13       A.    Correct.

14       Q.    Was Sanders, say, your partner generally or he

15   happened to be your partner that day, or...

16       A.    We all work the same shift.  But, I mean, we weren't

17   assigned specific partners day by day.

18       Q.    Okay.  And just please tell me again.  What was the

19   precise nature of the call that you received which you

20   responded to in Wilkinsburg?

21       A.    I wasn't -- we didn't specifically receive a call.

22   Officer Adams called out on the radio that he was getting out

23   with a group at the Wood Street gazebo.

24       Q.    And did you hear that on your -- your car radio or,

25   say, on the microphone on -- on your -- your shoulder?

Dominic Ravotti - Examination by Mr. Geary

23

1     A.     One or the other or both.  I couldn't specifically
2  tell you which one it was.  It was over the radio.
3     Q.     Okay.  And did you respond to Adams' first call?
4     A.     We started to -- we started to respond that way but
5  not in emergency mode.
6     Q.     Okay.  And then at some point, did you respond in an
7  emergency mode?
8     A.     Yes.
9     Q.     And what -- what information did you receive that
10  made you change into emergency mode?
11     A.     Whenever he said that he had -- he said to keep
12  units coming.  He had one resisting.
13     Q.     Okay.  You drive to the scene.  And I think you
14  mentioned you initially go to the parking lot -- park and ride
15  parking lot.  Is that right?
16     A.     Initially, we went down Pennwood Avenue and then
17  went to the park and ride lot, yes.
18     Q.     Okay.  Did you see anything related to this incident
19  on Pennwood Avenue?
20     A.     No.
21     Q.     Okay.  And then you go to the park and ride.  Do you
22  see anything going on there?
23     A.     Not in reference to the incident, no.
24     Q.     In the park and ride, did -- Sanders got out of the
25  vehicle.  Is that correct?

Dominic Ravotti - Examination by Mr. Geary

24

1        A.      Correct.

2        Q.      Were there any civilians in the park and ride?

3        A.      Not in the park and ride lot.  I can't speak if

4    there was any on the platform because I -- you can't see the

5    platform from the park and ride lot.

6        Q.      Okay.  And just --

7        A.      It's quite elevated.  It's quite elevated above

8    the -- the lot.

9        Q.      And just so I -- I know what you're referring to

10   specifically with "platform," what are you referring to,

11   "platform"?

12       A.      It's the -- the bus stop on the busway.  It's

13   elevated probably two to three -- at least two to three stories

14   above the actual park and ride lot.  There's a lot of steps you

15   walk up to get to the platform.  They just call it the

16   platform, where the buses -- people can sit, and you can wait

17   for your bus to come.

18       Q.      I understand.  Thank you.  And that's called the

19   busway.  Is that correct?

20       A.      Yes.

21       Q.      And then is there a sound wall along the busway?

22       A.      There -- there is a partial sound wall between the

23   Linear Trail and the busway, yes.

24       Q.      And is the sound wall up higher, like you say, on

25   the platform level?

Dominic Ravotti - Examination by Mr. Geary

25

1      A.    It's -- yeah, it's on the platform level, and it's
2  higher than -- much higher than the platform level.
3      Q.    And what is the purpose of the sound wall?
4      A.    I have no idea.
5      Q.    Okay.  Is it -- what's it made out of?  Concrete?
6      A.    I -- I would assume.  I can't speak to it.  I didn't
7  build it, so I don't know what it's made out of.  It was there
8  long before I was employed there.
9      Q.    And does the sound wall go for, say, a certain
10 length along the busway in that area?
11     A.    Yes.
12     Q.    Okay.  Now, what conversation did you have with
13 Officer Sanders right before he gets out of your unit there in
14 the park and ride?
15     A.    I don't recall really any conversation.  We were
16 just trying to stay quiet to listen to the radio transmissions
17 to hear what -- what was unfolding.
18     Q.    And then I assume he got out of the -- out of the
19 unit to continue dealing with this same incident?
20     A.    Yes.
21     Q.    Okay.
22     A.    He was able to get out faster because he was the
23 passenger.  He didn't have to secure the vehicle and
24 everything.
25     Q.    I understand.  And then when he got out of the

Dominic Ravotti - Examination by Mr. Geary

26

1  vehicle, what did you do, please?

2       A.    Whenever he got out, I went to secure the vehicle.

3  I opened the door, started to get out, and that's when they

4  said that Kelley was cutting over the hill.  So I got back into

5  the vehicle to go back -- to go back onto Center Avenue in case

6  he was -- would come that way, to try to cut him off or to get

7  eyes on where he was at at that point.

8       Q.    So you proceeded in your unit to Center Avenue.  Is

9  that right?

10      A.    Yes.

11      Q.    Okay.  And was that not far from the park and ride?

12      A.    Center Avenue is the road that is -- basically that

13  the park and ride is on, I guess you would consider it.

14      Q.    Okay.  And when you got over to Center Avenue in

15  your unit, what did you do then, please?

16      A.    I then turned onto Rebecca Street and then turned

17  left onto Jeanette Street.

18      Q.    Okay.  And before you turn left on Jeanette, did --

19  did you see anything that you thought related to the -- to the

20  incident?

21      A.    Traveling down Center Avenue, I noticed that there

22  was people outside and people walking around.  And other than

23  that, there was nothing else that I noticed.

24      Q.    And just so we're clear, so people -- civilians?

25      A.    Correct.

Dominic Ravotti - Examination by Mr. Geary

27

1      Q.    Okay.  Thank you.  Then you make a left on Jeanette,
2  and then what do you do?
3      A.    I started down Jeanette.  And that's whenever I
4  stopped because I could see Kelley walking towards me and then
5  officers following behind him.
6      Q.    Roughly, how many officers were following behind
7  him?
8      A.    I can't state specifically.  I don't know.
9      Q.    I mean, can you give me an estimate?
10     A.    I can't estimate because I cannot recall how many
11  were there.
12     Q.    When you first lay eyes on Kelley, what -- what was
13  he doing?
14     A.    He was walking on Jeanette Street towards me with a
15  knife in his right hand, and he was basically just kind of
16  walking, thrashing the knife back and forth in front of him.
17     Q.    The officers, were they all behind him?
18     A.    Correct.
19     Q.    Was there anyone in front of him?
20     A.    No officers.  There was people on their porches.
21  Civilians.
22     Q.    And, say, how close --
23     A.    And I was -- I was the only person in front of him.
24  But whenever I saw him, I started backing up away from him.
25     Q.    How close was any civilian, in feet, to Bruce

28

1   Kelley, Jr., at that point?

2        A.    I could not -- I could not guess feet.  They --

3   there was people on their porches, which is on Jeanette Street,

4   and he was on -- walking on Jeanette Street.

5        Q.    They were on their porches connected to their houses

6   on Jeanette Street.  Is that right?

7        A.    Correct.

8        Q.    And he's actually walking on the street?

9        A.    Yes.

10       Q.    Okay.  So if he's swinging his arms, is it true no

11  civilian was at risk of getting hit by the knife at that point?

12       A.    No, not at that point.

13       Q.    Okay.  Did you get out of -- I may not have walked

14  you through whether you got out of the vehicle or not.

15       A.    I did -- I did not on that spot.

16       Q.    Okay.  You remained in your vehicle?

17       A.    Yes.

18       Q.    And does he walk past your vehicle?

19       A.    No.  That's when he cut through the houses towards

20  Wagner Way.

21       Q.    Okay.  And so if you're sitting in your vehicle --

22  and your vehicle is stationary.  Correct?

23       A.    I was backing up.

24       Q.    Okay.  And then does he go to your left or to your

25  right?

29

1    A.    He goes to my left, towards Wagner Way and Center

2    Avenue, which is away from the busway.

3    Q.    Is it towards the park and ride?

4    A.    No.  The park and ride would have been behind him at

5    that point.

6    Q.    Okay.  What do you see the other officers do?

7    A.    They began to follow him.  And then that's when I

8    turned off of Jeanette Street.  And then I did not see him at

9    that point.

10   Q.    Okay.  Are there any other radio transmissions

11   coming through as you're watching him and he makes the left and

12   you're in your car there backing up?

13   A.    There's a lot of radio transmissions going on, yes.

14   Q.    And then, also, obviously, you -- you can see what's

15   happening in addition to what you -- what's coming over the

16   radio?

17   A.    Some of it, yes.

18   Q.    Okay.  What did you do next, please?

19   A.    I backed out of Jeanette Street and then went onto

20   Rebecca and then made a right again onto Center Avenue.

21   Q.    And as you're proceeding down Center Avenue, what --

22   what do you see next as far as this incident?

23   A.    As I was going down Center Avenue, I was going very

24   slow.  I had my windows down so I could hear what was going on.

25   There was people on their porches.  I was telling them to go

Dominic Ravotti - Examination by Mr. Geary

30

1  back into their houses.  I was driving past them.  And then I

2  could hear them yelling at him to drop the knife.

3          And then I encountered Sergeant -- K-9 Sergeant

4  DiPippa, and he said that he was cutting back across towards,

5  like, Whitney Avenue from, like, Wagner Way.

6      Q.    Did -- did you have your lights and/or sirens

7  activated on your unit?

8      A.    My lights but not my siren at that point.

9      Q.    Did you have your sirens activated prior to that

10 point?

11     A.    In responding to the incident, but not when I was on

12 Jeanette Street.

13     Q.    Okay.  You turned your sirens off when you got to

14 Jeanette Street?

15     A.    Yes.

16     Q.    So you had your lights going and no sirens as you're

17 proceeding down Center Avenue?

18     A.    Correct.

19     Q.    Now, on the radio calls initially by Adams, did he

20 state the name or names of the individuals he was dealing with?

21     A.    No.

22     Q.    Okay.  And prior to you arriving on Jeanette Street,

23 did any other officer state the names of who they were dealing

24 with?

25     A.    No.

Dominic Ravotti - Examination by Mr. Geary

31

1    Q.    Okay.  And when you see the person walking down the

2    street -- officers are following him -- did you know who it was

3    at that point?

4    A.    I didn't know what his name was.  I knew that that

5    was the actor that was being pursued.

6    Q.    And did you recognize him?

7    A.    No.  I have no idea who he is.

8    Q.    Did you happen to recognize him from the Wilkinsburg

9    area?

10   A.    I have never -- I have never met the man in my life.

11   Q.    Please tell me what -- what happens.  You go down

12   Center Avenue.  Just if you could walk me through it again.  I

13   mean, I'll interrupt periodically, but keep going.

14   A.    I turned onto Whitney Avenue.  And just as I turned

15   onto Whitney Avenue, I could see him cutting between houses on

16   my right-hand side.  At that time, I put the car in park, got

17   out of the car, drew my firearm, and began giving him commands

18   to drop the knife.

19   Q.    When you turned onto Whitney, did you make a right

20   onto Whitney?

21   A.    Yes.

22   Q.    Okay.  And you put the car in park and got out of

23   your vehicle?

24   A.    Yes.

25   Q.    Did you park right in the middle of the street, or

Dominic Ravotti - Examination by Mr. Geary

32

1    did you pull over?

2         A.    Right in the middle of the street.

3         Q.    Okay.  And I'm sorry.  He -- he had -- which way did

4    he proceed then?

5         A.    He came from, like, Wagner Way and Jeanette Street

6    towards Whitney Avenue.

7         Q.    So was he coming from your right, then?

8         A.    Yes.

9         Q.    And as he's coming from your right, is he walking

10   still?

11        A.    Yes.

12        Q.    And are there -- are there officers behind him?

13        A.    Yes.

14        Q.    And you got out of your vehicle and drew your

15   weapon.  What kind of weapon did you have, please?

16        A.    Smith & Wesson M&P9.

17        Q.    What happens next, please?

18        A.    He begins walking down Center Avenue towards the

19   Wilkinsburg Park and Ride lot -- or I'm sorry -- the Hamnett

20   Park and Ride lot.

21        Q.    Okay.  Do you -- I'm sorry.

22        A.    Go ahead.

23        Q.    Did you follow on foot?

24        A.    Yes.

25        Q.    Okay.  Go ahead.

Dominic Ravotti - Examination by Mr. Geary

33

1      A.    Just prior to the lot, K-9 Sergeant DiPippa deployed

2  his Taser twice, and there was no effects.

3      Q.    And where was DiPippa when he deployed the Taser?

4  Say, is he -- is he standing in Center Avenue or is he on the

5  sidewalk?

6      A.    I can't specifically say where he was standing at

7  when the Taser was deployed.  We were walking on Center Avenue

8  near the side -- the right-hand side of the sidewalk.  So I

9  can't tell you exactly where he was.

10     Q.    Okay.  How close were you from DiPippa, say?

11     A.    I -- I can't tell you specifically.  I was -- I

12 was -- I was the one with lethal cover, so, I mean, I was

13 paying attention to the actor and not where everybody else was.

14     Q.    How close was Bruce Kelley, the actor, from you?

15     A.    I can't tell you a specific range.  He was in front

16 of me.  That's all I know.

17     Q.    I mean, was he, say, within, say, 10 feet, or was

18 he, like, 40 feet away?

19     A.    He wasn't 40 feet away, but he was farther than 10

20 feet away.

21     Q.    And you said you were the one with lethal cover.  Is

22 that correct?

23     A.    Yes, sir.

24     Q.    Okay.  And is that a police term?

25     A.    I would -- I -- that's what we call it.  I had my

Dominic Ravotti - Examination by Mr. Geary

34

1    firearm out --

2         Q.    Okay.

3         A.    -- so it's lethal force.

4         Q.    Did any other officers have their guns out of their

5    holsters?

6         A.    I can't speak to any other officers.

7         Q.    Did you -- were -- did you see them?

8         A.    I was -- they were -- people were behind me.  I

9    couldn't see who, what they had in their hands.

10        Q.    DiPippa deploys the Taser, and the Taser is -- what,

11   the two metal prongs come out of the Taser?

12        A.    Yes.

13        Q.    Was there a gap in time between the two deployments?

14        A.    There was a small gap.  I can't speak to it.  He

15   deployed the first one.  It didn't work, so then he deployed

16   the second.

17        Q.    Did he strike the target, Kelley, with the first

18   Taser?  Did he -- did he strike him?

19        A.    I don't -- I can't tell you if he did or he didn't.

20        Q.    Okay.  And what about on the second deployment by

21   DiPippa?

22        A.    I can't tell you where or if it did hit him.

23        Q.    And on the deployment of the Taser, is the object

24   that ideally, what, both prongs pierce the clothing and pierce

25   the suspect's skin?  Is that correct?

Dominic Ravotti - Examination by Mr. Geary

35

```
 1              MR. EVASHAVIK:  Object to form.
 2              THE WITNESS:  Yes.
 3    BY MR. GEARY:
 4       Q.    Did you ever deploy a Taser before?
 5       A.    Yes.
 6       Q.    And do you have training in deployment of Tasers?
 7       A.    Yes.
 8       Q.    And is that the -- the goal of a Taser deployment
 9    that both metal prongs pierce the clothing and puncture the
10    skin of the suspect?
11       A.    If you're deploying the -- the Taser probes, yes.
12       Q.    Okay.  Is that what DiPippa was doing?  Deploying
13    the Taser probes?
14       A.    Yes.
15       Q.    Okay.  What do you see happen next as far as, you
16    know, whatever -- whatever plays out?
17       A.    Kelley -- after the Taser was deployed, he responded
18    to us with some -- some statement of "That doesn't hurt."  And
19    throughout the statement, the thing -- if we would speak to
20    him, he would just respond back with "Fuck you" or "You're not
21    hurting me."
22              After the Taser was deployed, Officer Kaupinis
23    attempted to OC spray him again, which, again, had no effect.
24              We continued into the park and ride lot.  Officer
25    Sanders removed his ASP and was attempting to walk -- to sneak
```

Dominic Ravotti - Examination by Mr. Geary

36

1    up and strike Kelley's right hand where the knife was.  As he

2    started to attempt to get close to him, Kelley spun around with

3    the knife, lunged at the officers with the knife in his right

4    hand.  And then that's when Officer Sanders jumped backwards.

5    And then he continued walking on in the park and ride lot, and

6    then we started to walk out of the park and ride lot.

7         Q.    Thank you.  Now, the ASP, is that the same thing as

8    what would be called a baton?

9         A.    It's a collapsible baton, yes.

10        Q.    Okay.  Like, would it be called, like, a nightstick

11   in the olden days?  Same thing?

12        A.    I -- I believe so, yes.

13        Q.    What -- what's it made out of?

14        A.    I believe his is made out of metal.

15        Q.    Okay.  Is ASP -- does that stand for something?

16   A-S-P?  Or that's just --

17        A.    I believe that's, like, the -- the product term.

18   Like that's the manufacturer of it.

19        Q.    Thank you.  Just one moment.  I'm going to look at

20   my notes for a second.

21             Now, did you personally, you, say anything to Bruce

22   Kelley, Jr.?  Okay.  Just stopping at this point in the

23   encounter, did you -- did you say anything to him or direct any

24   commands towards him?

25        A.    At this point, I gave him multiple commands to drop

Dominic Ravotti - Examination by Mr. Geary

37

1    the knife and get on the ground.

2         Q.    Did you say anything other to him besides what you

3    just explained?

4         A.    I -- not that I can recall.

5              MR. GEARY:  Okay.  There is an exhibit that we've

6    already marked and referred to, Greg.  It's this timeline of

7    events.  And I just would like to show the witness the timeline

8    of events and -- and go through the photos on there like we've

9    done for the other witnesses, if that's okay.  I think the

10   timeline has been marked as Exhibit 6 previously.

11             MR. EVASHAVIK:  He has it.

12             MR. GEARY:  Thank you.

13             (Whereupon, Deposition Exhibit 6 was presented to

14   the witness.)

15   BY MR. GEARY:

16        Q.    Okay, Officer.  This exhibit is not page numbered,

17   but if we can go through it.  I think there's four or five

18   photographs in here.  There's some aerial views of the area,

19   but I'd like to just have you look at each photo and ask you if

20   you are in the photo and what's going on.  So let me see here.

21        A.    I would be in none of the photos because they're all

22   from Google Earth.  So there would be none of us --

23             MR. EVASHAVIK:  Keep going.  Keep going.  I think

24   he's directing you to the Hamnett Street Station photo.

25             Is that correct, Noah?  Which is further down.

Dominic Ravotti - Examination by Mr. Geary

38

```
 1            MR. GEARY:  Correct.  On -- on page --
 2            THE WITNESS:  Okay.
 3            MR. GEARY:  Yeah.  On page 11 -- it's not marked 11,
 4  but it's page --
 5            MR. EVASHAVIK:  It's not marked.  Just listen to his
 6  question.
 7  BY MR. GEARY:
 8      Q.    So, sir, I'm looking at a page here.  It's, like,
 9  physically page 11 of the exhibit.  In the upper left-hand
10  corner it says "154915 Hours."
11      A.    Okay.
12      Q.    And then just the first bullet point starts out
13  "Sergeant O'Malley asks if the tunnel is secure."
14      A.    Yes.
15      Q.    Okay.  So do you see a photograph there?
16      A.    Yes, I do.
17      Q.    And this was provided to me by defense counsel, and
18  I think this is -- this is a still shot from video footage from
19  the park and ride.
20      A.    Yes.
21      Q.    Looking at the photo, are you in the photo?
22      A.    Yes, I am.
23      Q.    And can you tell us which person you are in the
24  photo?
25      A.    If you see the stop sign, I would be the person to
```

Dominic Ravotti - Examination by Mr. Geary

39

1    the right of the stop sign.

2        Q.    Okay.

3        A.    With the hat on.

4        Q.    And who are the other individuals in the photo,

5    please?

6        A.    I can't identify who they are.

7        Q.    Okay.  Do you know -- can you identify either

8    officer there?

9        A.    No.  Just what I said.

10       Q.    Okay.  Two pages afterwards, there's another photo.

11   The time on mine is 154939 hours.  Bullet point, "Officer

12   Kaupinis appears to be"...  Do you -- do you have a photo

13   there?

14       A.    Yes.

15       Q.    Okay.  Are you in that photo?

16       A.    Yes.

17       Q.    And I think I know which one you are, but just if

18   you could identify it for us.

19       A.    I'm on the right of Mr. Kelley with the hat on,

20   facing the camera.

21       Q.    And can you identify, who else is in that photo,

22   please?

23       A.    I can identify the guy that, I believe -- if you are

24   looking at it, he looks to be standing directly behind Kelley.

25   That looks like Officer White from, I believe, Edgewood.  The

40

1    person directly to his right -- which if you see Kelley's left

2    arm, the guy that's basically to the left of his left arm with

3    his arm up in the air is Officer Kaupinis.  And he's deploying

4    OC spray on him.

5         Q.    Okay.  Does Officer White have sunglasses on?

6         A.    Yes.

7         Q.    And he's Caucasian.  Is that correct?

8         A.    Correct.

9         Q.    Do you know where he works now, by the way?  White.

10        A.    I have no idea.

11        Q.    Okay.  The officer on the far left, African American

12   with sunglasses, do you know who that is?

13        A.    I have no idea.

14        Q.    And then there's an officer, looks African American,

15   behind you in the photo.  Do you see that officer?

16        A.    I see him, yes.

17        Q.    Do you know who that is?

18        A.    I do not know who he is.

19        Q.    Okay.  Next photo, please.

20        A.    Okay.

21        Q.    I think there's just two more photos, just so you

22   know.

23        A.    Okay.  Is this the black-and-white photo?

24              MR. EVASHAVIK:  Here.  Use this.

25              THE WITNESS:  Okay.

Dominic Ravotti - Examination by Mr. Geary

41

```
 1              MR. GEARY:  I -- I have a color.
 2              THE WITNESS:  Okay.  Mine is black and white.
 3  BY MR. GEARY:
 4       Q.   Okay.  And on the top left, 154948 hours.  "Suspect
 5  in Hamnett Park and Ride lot."  Are you on that page?
 6       A.   Yes.
 7       Q.   Can you identify for us if you're in that photo?
 8              THE WITNESS:  Just this?
 9              MR. EVASHAVIK:  Yeah.
10              THE WITNESS:  Identify me, you said?  I'm sorry.
11  BY MR. GEARY:
12       Q.   Please.
13       A.   I would be to the right of Kelley, where he's
14  holding -- where the knife in his right hand is.  The knife is
15  basically pointing directly where I am.  I'm the one with the
16  hat on.
17       Q.   And you have your gun drawn.  Correct?
18       A.   Correct.
19       Q.   And your gun is pointing at Kelley.  Correct?
20       A.   Correct.
21       Q.   Can you identify who the other officers are in that
22  photo, please?
23       A.   The person at the top part of the photo with the
24  sunglasses up on his head with the bald head with the yellow
25  thing in his left hand, that is K-9 Sergeant DiPippa.  And then
```

Dominic Ravotti - Examination by Mr. Geary

42

1    the person that's behind the telephone pole is Officer Sanders.

2        Q.    Can you identify any other officer in this still

3    frame?

4        A.    The plainclothes person is a detective from

5    Swissvale, but I cannot recall his name.

6        Q.    Okay.  Can you identify anyone else?

7        A.    No.  I don't know who else they are.

8        Q.    Okay.  Thank you.  Next page is the final photo or

9    still frame.  Upper left --

10       A.    Yes.

11       Q.    -- it says "155014 Hours.  Suspect is observed

12   climbing fence"...

13       A.    Yes.

14       Q.    What do you see in that photo, please?

15       A.    I see the -- Kelley climbing over the fence and

16   officers following him.  The actual picture is -- I believe

17   it's Officer Kaupinis is deploying OC spray again on the

18   suspect.

19       Q.    And are you in this photo?

20       A.    Yes, I am.

21       Q.    And which officer would you be?

22       A.    In -- on the right-hand side of the picture with the

23   hat on with my back towards the camera.

24       Q.    And there's two other officers captured in this

25   frame.  Is that true?

Dominic Ravotti - Examination by Mr. Geary

43

1      A.    Yes.

2      Q.    Do you know the identities of those officers?

3      A.    I do not.

4      Q.    Okay.  Now, in your description of what happened

5  there, you kind of got to where Bruce Kelley, I think, is

6  approaching a fence, and then I stopped you to refer you to

7  some photos here.  So just kind of picking up where you left

8  off.

9      A.    That is where -- the last picture, where he climbs

10  over the fence, he -- after he climbed over the fence, we got

11  over the fence and began to follow him towards -- he was

12  walking now back towards Whitney Avenue.

13          MR. GEARY:  Just one sec.  Sorry.

14  BY MR. GEARY:

15      Q.    If we could go back to the last photo, please.  It's

16  by the fence.  And you're in the photo there on the right with

17  the hat.  Could you take a look at that, please?

18      A.    Okay.

19      Q.    And in the photo, does it look like -- is he

20  climbing the fence right there?  He's about to climb the fence?

21      A.    I believe he's over the fence at that point.

22      Q.    Okay.  How many feet do you say, looking at the

23  photo, you were from Kelley, Jr.?

24      A.    I have no idea.

25      Q.    I mean, is it, say, 2 to 4 feet from him, looking at

Dominic Ravotti - Examination by Mr. Geary

44

1   the film?

2       A.   I couldn't tell you.  It's -- the film doesn't give

3   an accurate depiction of how far away or how close we are to

4   him.

5       Q.   Well, how does it not give an accurate depiction of

6   how far you are from Kelley?

7       A.   Because you can't tell depth in the picture.  I

8   can't tell you if I was 10 feet from the fence or 2 feet from

9   the fence in that picture.  I don't know.

10      Q.   And did you watch Kelley climb the fence?

11      A.   Yes.

12      Q.   Okay.  As he's climbing the fence with his back to

13  you, did you see that as an opportunity to subdue him?

14      A.   No.

15      Q.   And why not?

16      A.   Because he was armed with a knife.

17      Q.   Okay.

18      A.   Every time an officer attempted to get close to him,

19  he would turn around and swing the knife at officers.  So I

20  felt that if I attempted to tackle him, he would have attempted

21  to stab me.

22      Q.   Okay.  And did he fall?  When he -- when he goes

23  over the fence, did he fall to the ground?

24      A.   I can't remember if he did or did not.

25      Q.   Okay.  Please walk us through.  What happens after

45

1  he goes over the fence?

2       A.    After he goes over the fence, he started walking

3  towards the front yard.  He encountered another fence.  At that

4  fence, he turned around and looked back at us.  At that point,

5  I was coming up to him.  I told him that -- I said, "Drop the

6  knife or we're going to have to shoot you because you won't

7  stop."  And his response was something along the lines of "Fuck

8  you, pussy.  You can't hurt me."

9       Q.    After he went over the fence, did you also go over

10  the fence after him?

11      A.    Yes.

12      Q.    Okay.  Did you holster your weapon before you

13  climbed the fence?

14      A.    Yes.  And then I re- -- I took my weapon back out

15  after I got over it.

16      Q.    And then these other officers in this photo, did

17  they -- along with you, did they climb the fence and continue

18  following him?

19      A.    I can't tell you if the specific officers in the

20  video went over the -- or in the picture went over the fence,

21  but officers came over the fence behind me, yes.

22      Q.    And then you just described Kelley gets to another

23  fence.  Is that right?

24      A.    It was like a gate, I believe, yes.

25      Q.    Okay.  And then -- and then what did he do?  Did he

Dominic Ravotti - Examination by Mr. Geary

46

1  turn around?

2      A.    He turned around and looked back in my direction.

3  And then that's whenever I told him that he had to -- I said,

4  "Drop the knife."  I said, "You need to drop the knife or we're

5  going to have to shoot you."  And he said, "Fuck you, pussies.

6  You can't hurt me."  Something along those lines.

7      Q.    Was he in some -- in someone's yard at that point?

8      A.    Yes.  I mean, there -- that fence is somebody's

9  yard, so he was in somebody's yard.  Well, a -- a house's yard,

10  yes.

11      Q.    How many feet were you from him when you said, "If

12  you don't stop, we're going to have to shoot you"?

13      A.    I -- I couldn't specifically tell you, but it was

14  greater than 15 feet.

15      Q.    And there were other officers near you at that point

16  in time.  Correct?

17      A.    Behind me, yes.

18      Q.    Okay.  Roughly, how many do you think at that point?

19  Other officers.

20      A.    I can't tell you how many were behind me because I

21  don't know who all came over the fence.

22      Q.    Okay.  But, say, at least two or three officers?

23      A.    I can't speak to that because, again, once I went

24  over the fence, I didn't look back to take my eyes off of where

25  he was.

Dominic Ravotti - Examination by Mr. Geary

47

1    Q.    Okay.  And then you said he -- Kelley is standing

2    next to a gate or another fence at that point.  Is that right?

3    A.    Yes.

4    Q.    Okay.  What does he do next?

5    A.    He goes over the gate.

6    Q.    And proceeds in what direction?

7    A.    Towards Whitney Street.

8    Q.    Okay.  And then do you continue to follow him?

9    A.    Yes.

10   Q.    Did you have to go over the gate as well?

11   A.    Yeah.  I can't recall if I went over it or through

12   it, but I went past it, yes.

13   Q.    Understood.  And then where is Kelley at that point?

14   After he goes through the gate or over the gate and you go

15   through the gate or over the gate, where is he at that point?

16   A.    He started -- he made a left and started walking on

17   Whitney Avenue towards the busway.

18   Q.    Are there any civilians out in their yards?

19   A.    I did not see any at that specific time.  There was

20   a person -- I could hear a female yelling at him, but I don't

21   know where she was at.  I know that was a civilian because

22   there was no female officers there at that time.

23        MR. GEARY:  Okay.  Do you mind if we just take a

24   couple-minute break?  I don't know if you need a restroom

25   break.

Dominic Ravotti - Examination by Mr. Geary

48

1          THE WITNESS:  That's fine.

2          MR. GEARY:  I just -- I need to take a restroom

3    break, if that's okay.

4          THE WITNESS:  Okay.

5          MR. GEARY:  Thank you.

6          THE VIDEOGRAPHER:  We are going off the video

7    record.  The time is 11:05.

8          (Whereupon, a brief recess was taken.)

9          THE VIDEOGRAPHER:  We are going back on the video

10   record.  The time is 11:22.

11         (Whereupon, Deposition Exhibit 14 was presented to

12   the witness.)

13   BY MR. GEARY:

14       Q.   Officer, if you could -- you and counsel could refer

15   to Deposition Exhibit 14.  It's the use of force policy.

16       A.   Okay.

17       Q.   Okay.  It's a four-page exhibit.  This was provided

18   to me by your counsel.  Could you just give this a look?  Tell

19   me, what is this?

20       A.   This is the use of force policy.

21       Q.   Okay.  Do you recognize it?

22       A.   Yes.

23       Q.   And for what department?  Whose policy was this?

24       A.   Port Authority Police Department.

25       Q.   Okay.  As of the day of this shooting?

Dominic Ravotti - Examination by Mr. Geary

49

1    A.    Yes.

2    Q.    Okay.  If you could go to the third page.  So on the

3    bottom of the third page, it has page 24 at the bottom.

4    A.    Okay.

5    Q.    There's also a Bates stamp over to the right, 93,

6    but the same page:  24, 93.  At the top of the page, it says

7    "Reporting Discharge of Firearm."  Do you see that?

8    A.    Yes.

9    Q.    And then there's a Paragraph 1 and 2, and it

10   continues into the next page, which at the bottom is page 25.

11   Is that correct?

12   A.    No.  On the bottom, it says page 24.

13   Q.    Right.  And the next page is 25.  Is that right?

14   A.    Yes.

15   Q.    Okay.  Just to yourself, if you could just read

16   page 24 to 25 up to -- up to "Post Shooting Procedures" on 25,

17   please.  If you could just read 24 and the first half of 25,

18   I'll have a couple questions for you.

19   A.    Okay.

20   Q.    Thank you.  On 24, paragraph No. 2 says "Firearm

21   discharge with injuries," and it lists nine paragraphs, going

22   into page 25.  And if I could direct you to Nos. 7 and 8 on

23   page 25, please.

24   A.    Okay.

25   Q.    It says "The officer involved will make all the

Dominic Ravotti - Examination by Mr. Geary

50

1   usual reports for the incident in question."  Did I read that
2   correctly?
3        A.    Yes.
4        Q.    So per the Port Authority Police Department's policy
5   at that time, the use of force policy, were you required to
6   make a report regarding the Bruce Kelley, Jr., incident?
7        A.    According to No. 7, it says "the usual report for
8   the incident."  It doesn't say -- yes, that's what it says.
9        Q.    Okay.  If you had an encounter or an interaction
10  with a suspect just generally in your, you know, job duties
11  prior to this incident, were you required to make a report?
12       A.    Yes.
13       Q.    Okay.  So you did not make a report from -- relating
14  to this incident.  Correct?
15       A.    I did not make a written report, no.
16       Q.    Well, report means written.  Correct?
17       A.    It doesn't mean written.  It could be a -- I gave a
18  videotaped statement.  That would be considered my report.
19       Q.    Okay.  So isn't a usual report in writing?
20       A.    It doesn't have to be.
21       Q.    Okay.  And what's the criteria for when it has to be
22  and when it does not have to be memorialized in writing?  A
23  report.
24             MR. EVASHAVIK:  Object to -- object to form.
25             THE WITNESS:  I couldn't tell you yes or no.  I just

Dominic Ravotti - Examination by Mr. Geary

51

1   know that in this incident, my report was considered to be my

2   videotaped statement.

3   BY MR. GEARY:

4       Q.    And did -- did you consider your videotaped

5   statement to be your report?

6       A.    Yes.

7       Q.    Okay.  But at any time did your chief ask you to

8   compose or draft a report?

9       A.    No.

10      Q.    Did Allegheny County Police Department at any point

11  in time ask you to sit down and compose or draft a report?

12      A.    No.  I gave a verbal statement.

13      Q.    Okay.  No. 8 says "The officer involved will make a

14  Weapon Discharge Report."  Do you see that, sir?

15      A.    Yes, I do.

16      Q.    Did I read it correctly?

17      A.    Yes, you did.

18      Q.    Okay.  Did you do that regarding this incident?

19      A.    No, I did not.

20      Q.    Okay.  Per the policy here, were you required to do

21  that?

22            MR. EVASHAVIK:  Object to the form of the question.

23            THE WITNESS:  Per the policy, yes.  But I have no

24  idea what the weapon discharge report is.  I was never provided

25  one, and they were not in our specific forms that we -- I've

Dominic Ravotti - Examination by Mr. Geary

52

1    ever seen at the Port Authority.

2    BY MR. GEARY:

3        Q.    Who was the chief at the time?  Was it Porter?

4        A.    Yes, sir.

5        Q.    Okay.  Did you ever have any conversations with

6    Porter about this shooting incident?

7        A.    What -- what do you mean?  I mean, yes, I had

8    conversations about, like, correspondence with attorneys and

9    stuff, but nothing in regards to the -- I mean, I don't know --

10   I don't know what you're really trying to ask.

11       Q.    Well, did Chief Porter ever state to you, "You need

12   to fill out a weapon discharge report relating to the --

13       A.    No.

14       Q.    -- Bruce Kelley shooting"?

15       A.    No.

16       Q.    Were you familiar with this policy as of

17   January 31st of '016?

18       A.    Yes.

19       Q.    Were you familiar with No. 8 that says "The officer

20   involved will make a Weapon Discharge Report"?

21       A.    I was familiar with the policy, yes.

22       Q.    But you did not make a weapon discharge report?

23       A.    No, because I did not know what it was, I did not

24   know where it was, and I was never provided it to fill it out.

25       Q.    Did you ever inquire or ask any questions about "Do

Dominic Ravotti - Examination by Mr. Geary

53

1   I need to fill out a weapon discharge report"?

2        A.    No, I did not.

3        Q.    Okay.  Is there any reason you didn't inquire or

4   take action to find out if you needed to fill out such a

5   report?

6        A.    No.

7        Q.    Is there any particular reason why you didn't take

8   such action?

9        A.    No.

10       Q.    Did you violate the policy by not filling out a

11  weapon discharge report?

12            MR. EVASHAVIK:  Object to the form of the question.

13            THE WITNESS:  I did not -- I feel I did not violate

14  any parts of the use of force policy.

15  BY MR. GEARY:

16       Q.    And just explain to me, what's your reasoning for

17  why you believe you did not violate the policy?

18            MR. EVASHAVIK:  Object to the form of the question.

19            THE WITNESS:  Because I used the force necessary in

20  this incident, and I followed that part of the -- that policy,

21  and I did what was required of me.

22  BY MR. GEARY:

23       Q.    Let's get back to the chronology of events.  I think

24  we had left off with you where Kelley proceeded over or through

25  a gate.  You did the same.  And he, I think, was near Whitney

Ross Reporting Service
724-695-3911

Dominic Ravotti - Examination by Mr. Geary

54

1    Avenue.  You said there were no civilians, but maybe there was

2    a woman -- a female yelled something -- because there were no

3    female officers.  That's kind of where we left it before the

4    break.  If we could pick up around there, is that okay?

5         A.    Yes.

6         Q.    Okay.  So wherever you left off with the reference

7    to you heard a female voice, just can you please walk me

8    through it?  What happened next as far as this -- this

9    encounter?

10        A.    We started -- he -- Kelley started walking on

11   Whitney Street --

12             Either on the street or on the left side of the

13   sidewalk.  I can't remember specifically which part.

14             -- down towards the busway and the Whitney Street

15   tunnel.

16             We got a short distance down there, and I heard K-9

17   Sergeant O'Malley yell, "Watch him."  And then a short time

18   later, I heard K-9 Sergeant O'Malley give his bite command for

19   his K-9.

20        Q.    Where were you?  I just want to get your vantage

21   point.  Where were you at the point you first see or hear

22   O'Malley?

23        A.    I -- whenever I heard him, I was on Whitney Avenue,

24   walking behind Bruce Kelley.

25        Q.    And where -- if you're walking behind Kelley, where

Dominic Ravotti - Examination by Mr. Geary

55

1   is O'Malley?  Say, is he at 10 o'clock?  2 o'clock?

2       A.    He would have been on the other side of the street,

3   but I don't know exactly where he was at.  I just heard him.

4       Q.    Okay.  To your right?

5       A.    Yes.

6       Q.    And were there other officers in the -- in the

7   immediate area there as well?

8       A.    They were behind me, yes.

9       Q.    Okay.  Were any officers in front of you?

10      A.    No.

11      Q.    And you heard O'Malley.  And when you heard him, did

12  you look at O'Malley?

13      A.    I -- I caught him out of my peripheral vision, yes.

14      Q.    Okay.  Did he have his K-9?

15      A.    Yes.

16      Q.    Okay.  And what was the K-9 doing?  Where was the

17  K-9 in relation to O'Malley?

18      A.    He was holding the K-9 in front of him, and the K-9

19  was barking, from what I can recall.

20      Q.    Okay.  Did O'Malley have, say, both hands on, say,

21  the leash or one hand and one hand free?

22      A.    I have no idea.

23      Q.    And where precisely was O'Malley, please?

24      A.    I can't tell you precisely.  He was off to my

25  right-hand side.

Dominic Ravotti - Examination by Mr. Geary

56

```
 1        Q.    Was he in the street?

 2        A.    I don't know.

 3        Q.    Okay.  Where -- where were you?  Were you on the

 4   sidewalk?

 5        A.    I was either on the -- on the left side of the

 6   street or the sidewalk.  I can't specifically tell you exactly

 7   where I was.

 8        Q.    Okay.

 9        A.    I was in that area.

10        Q.    Now, is it -- I think this is -- is this around

11   3:30 p.m.?

12        A.    I don't know.  It's almost 4 o'clock.

13        Q.    Okay.  So, I mean, obviously, it's daylight out.  Is

14   that -- is that true?

15        A.    Yes.

16        Q.    Okay.  Now, what was your rank at the time?

17        A.    Patrolman.

18        Q.    And what happens?  You -- you see O'Malley.  You

19   hear O'Malley.  What happens next, please?

20        A.    He released the K-9.

21        Q.    He released the K-9?

22        A.    Yes.

23        Q.    Okay.  Now, what -- what was Kelley -- was Kelley

24   walking, or was he stationary when O'Malley gives the commands?

25        A.    From what I recall, he was walking.  He was on the
```

57

1  sidewalk, walking towards like -- like kind of at a diagonal

2  away from us.

3       Q.    And he's in front of you.  Correct?

4       A.    Yes.

5       Q.    And to the extent he's walking at a diagonal, was

6  Bruce Kelley, say, walking off more to your left or more off to

7  your right?

8       A.    To the left, towards the houses on the left side of

9  the street.

10      Q.    Okay.  Were there any civilians in that immediate

11  vicinity out in their yards?

12      A.    Not outside at that point, no.

13      Q.    Okay.

14      A.    That I know of.

15      Q.    Okay.

16      A.    Again, the female that was screaming, but I don't --

17  she was -- I don't know which house she was in.

18      Q.    And the female that was screaming, what, she was in

19  a house?

20      A.    I did not -- I did not see her, so...

21      Q.    Okay.  So when O'Malley shouts the commands to stop

22  or he's going to release the dog, whatever words he used,

23  Kelley was in motion.  Is that right?

24      A.    Correct.

25      Q.    And he's walking away from you.  Is that correct?

Dominic Ravotti - Examination by Mr. Geary

58

1    A.    Yes.

2    Q.    Are you the closest officer to Kelley?

3    A.    I don't know if it was me or O'Malley.  I can't

4    specifically tell you.

5    Q.    How many feet do you say you were from Kelley?

6    A.    I -- I can't tell you.  I don't know a specific

7    distance at that point.

8    Q.    Okay.  Well, how about a general -- a general

9    distance.  Can you just give me an estimate?

10   A.    I can't.

11   Q.    10 feet?

12   A.    It was farther than 10 feet.  I can't -- again, I

13   can't tell you a specific distance.

14   Q.    Was it within, say, 10 and 20 feet?

15   A.    I can't tell you if it was that.  I can't give you a

16   specific number, sir.  I'm sorry.

17   Q.    Why can't you give me just an estimate of distance?

18   A.    Because I'm -- I can't -- I can't tell you exactly.

19   He was still moving.  We were all moving.  It was a rapidly

20   moving situation.  I was more paying attention to the suspect

21   that had a knife that was attempting stab officers every time

22   we got close to him.  So I was at least keeping distance enough

23   that if he turned around and tried to come at me, I had the

24   appropriate amount of time to react to that.

25   Q.    How far were you from O'Malley?

Dominic Ravotti - Examination by Mr. Geary

59

1      A.    I can't tell you that.  I -- again, I was more

2  focused on the suspect than how close or far away from other

3  officers I was.

4      Q.    And you just testified that Bruce Kelley, Jr., was

5  trying to stab officers.  Is that correct?

6      A.    At multiple points, he turned around and slashed the

7  knife at officers.  And I believe if they would have been close

8  enough, yes, he would have -- I believe he would have stabbed

9  them, yes.

10     Q.    What was the length of the blade of the knife?

11     A.    I have no idea.  I can't testify to that.  It was

12 large enough that I could see it from -- protruding from his

13 hand.

14     Q.    And when you say he made motions with his arms to

15 slash at officers, were any officers in his range of his arm,

16 the length of his arm, at which they actually could have been

17 stabbed?

18     A.    Any officer within 20 feet could be stabbed at any

19 specific point.  It's all in how the actor acts and how he

20 progresses or stops.  I mean, just because they weren't within

21 2 feet of him doesn't mean that they couldn't have been

22 stabbed.

23     Q.    Well, my -- my first question is:  Were any of the

24 officers, when he made those motions, actually within 2 to 3

25 feet of him where he actually could have stabbed one of them or

Dominic Ravotti - Examination by Mr. Geary

60

1  slashed one of them?

2      A.    If Officer -- specifically stating whenever Officer

3  Sanders attempted to -- to knock the knife out of his hand, if

4  Officer Sanders would not have jumped backwards and kept

5  retreating, yes, Bruce Kelley would have stabbed him.

6      Q.    Okay.  Aside from Sanders -- because you said he

7  tried to -- Bruce Kelley was trying --

8      A.    Every time -- every time an officer got any -- if he

9  felt the fact that -- the presence of somebody behind him, he

10  would spin around and slash the knife in our direction.  So

11  anytime an officer -- he felt the presence of somebody behind

12  him, he would spin around and slash the knife in our direction.

13      Q.    Okay.  But each time he did that, you were all far

14  enough away from him that he didn't slash anybody.  Correct?

15      A.    Yes.  So we did not get stabbed.  Correct.

16      Q.    Now, we're back to you say Bruce Kelley is diagonal.

17  So he's going towards the houses on Whitney Avenue, to your

18  left.  Correct?

19      A.    Yes.

20      Q.    Okay.  And as he's going towards the houses, is he

21  now in a yard?

22      A.    Yes.

23      Q.    Okay.  Please tell me what you hear or see next as

24  far as O'Malley and the dog.

25      A.    K-9 Aren engaged this -- Kelley on his left, upper

Dominic Ravotti - Examination by Mr. Geary

61

1    shoulder, arm area.

2         Q.    And when you say "engaged," what -- just what does

3    that word mean?

4         A.    He bit him.

5         Q.    When O'Malley released the dog, how was Kelley's

6    body positioned as far as -- was he facing O'Malley?  How was

7    his body positioned?

8         A.    He was walking in the manner that I already

9    described.  He was walking at a diagonal in towards that yard.

10        Q.    So when O'Malley releases the dog, Kelley was not

11   stationary?  He was moving?

12        A.    Yes.

13        Q.    Okay.  And, again, he's moving to your left.  Is

14   that right?

15        A.    Yes.

16        Q.    And when the dog bites Kelley -- right before the

17   dog gets to Kelley, how was Kelley's body positioned?

18        A.    I -- he was still walking in that manner.  I can't

19   specifically tell you exactly how he was standing.

20        Q.    Well, were you looking at Kelley?

21        A.    Yes.

22        Q.    Okay.

23        A.    And he was walking away from us.

24        Q.    So the dog was coming from your right.  Is that

25   correct?

Dominic Ravotti - Examination by Mr. Geary

62

1      A.    Yes.

2      Q.    And it would have been -- I mean, was Kelley -- was

3  Kelley in motion when the dog bit him?

4      A.    Yes.

5      Q.    Okay.  And how was Kelley's body positioned right

6  before he's bit by the dog?  As in, does the dog approach from

7  his right side?  Head -- straight on to his chest?  To his

8  back?  His left side?

9      A.    I said he bit him in the left back, shoulder area.

10     Q.    Yeah.  The question is:  How was Kelley's body

11  positioned right before the dog bit him?

12     A.    Again, I've already told you he was walking at a

13  diagonal in towards the yard.

14     Q.    Okay.  So I don't know exactly where the dog is

15  coming from when he's released.  I'm just trying to figure out

16  how was -- did he approach Kelley, like, from behind Kelley or

17  in front of Kelley?

18     A.    He came from -- O'Malley was to my right side.  I

19  didn't specifically see exactly how the K-9 got to him.  I just

20  saw the K-9 come up and engage him in the back left shoulder

21  area.

22     Q.    Okay.  And when the dog bites Kelley, is the dog,

23  like, on its hind legs or in the air or -- how is the dog's

24  body positioned when he bites Kelley?

25     A.    I believe his back legs were on the ground, and he

Dominic Ravotti - Examination by Mr. Geary

63

1   was -- his head was in -- into the bite.

2        Q.    And did Kelley have the knife in his right hand?

3        A.    Correct.

4        Q.    And the dog bit Kelley's left arm.  Is that correct?

5        A.    Yeah.  The left shoulder, arm area.  Yes.

6        Q.    Okay.  What do you see happen next, please?

7        A.    At that time, Bruce Kelley starts to turn from his

8   right to his left.  And at that time, he started slashing

9   across his body and stabbing the K-9 in the head.

10        Q.    How many slashing motions did Kelley make?

11        A.    I saw two that I recall.  It may have been more.

12        Q.    And so Kelley is -- his torso, with his right

13   hand -- his right hand is going to his left.  Is that correct?

14        A.    Correct.

15        Q.    So his back is to you.  Is that right?

16        A.    He was turning in -- in that process, he was

17   turning.

18        Q.    And in the process of turning, his back is to you.

19   Correct?

20        A.    It -- it started at the back of me and then began --

21   he turned around.  As he turned around, he was then facing us.

22        Q.    Do you know if he connected with the dog each time

23   he made a slashing motion?

24        A.    I don't know.

25        Q.    Okay.  What -- what happens right after you see

Ross Reporting Service
724-695-3911

Dominic Ravotti - Examination by Mr. Geary

64

1   those motions by Kelley?

2       A.    After that, Kelley is pretty much facing directly at

3   Sergeant O'Malley.  Aren disengaged.  Kelley took about two

4   steps towards Sergeant O'Malley.  K-9 Aren attempted to

5   re-engage.  And as K-9 Aren's head was coming up to re-engage

6   again, Kelley took the knife and stabbed it into K-9 Aren's

7   throat and continued in the direction of K-9 Sergeant O'Malley.

8       Q.    Okay.  So Kelley is facing O'Malley at this point.

9   You say he took two steps towards O'Malley?

10      A.    Yes.

11      Q.    And --

12      A.    He was slashing -- he was slashing at Aren.  As he

13  was taking the steps forward, Aren came up to attempt to engage

14  again.  And then Kelley stabbed the knife into Aren's throat

15  area.  And then after that is when K-9 Aren fell to the ground.

16          And he -- he was continuing towards Sergeant

17  O'Malley with the knife in his right hand.  His knife was out

18  in front of him, facing K-9 Sergeant O'Malley.

19      Q.    And so Aren engaged Kelley two different times.  Is

20  that right?

21      A.    He attempted to.  I don't know if he got a full

22  engagement on the second time or not.  But, yes, he attempted

23  to.

24      Q.    Now, was there a -- a gap in time between Aren's

25  first engagement of Kelley and the second, or was it just kind

Dominic Ravotti - Examination by Mr. Geary

65

1   of immediate?

2        A.    It was very short.  It was not like a large gap of

3   time.  It was pretty fluid.

4        Q.    And when does Kelley take two steps towards

5   O'Malley?

6        A.    After he -- as he spun around, after K-9 Aren

7   disengaged, he took the steps towards K-9 Sergeant O'Malley and

8   was slashing the knife at K-9 Aren.  And then K-9 Aren

9   attempted to make the second -- re-engage the second time.  And

10  then that's when he slashed -- he stabbed K-9 Aren again in the

11  throat.

12       Q.    And what did you do?

13       A.    As soon as K-9 Aren hit the ground, K-9 Aren started

14  towards my left.  And that is when I fired my weapon.

15       Q.    Did you fire first?  Between you and O'Malley, did

16  you fire first?

17       A.    No.

18       Q.    Who fired first?

19       A.    O'Malley.

20       Q.    And now, at that point, what is your distance from

21  Kelley?

22       A.    I would say it was within 20 feet.

23       Q.    And, say, was it within 10 feet?  As close as within

24  10?

25       A.    I can't tell you yes or no.  I don't know.  I can't

Dominic Ravotti - Examination by Mr. Geary

66

1   give you a specific distance.

2          Q.    And, again, O'Malley is to your right?

3          A.    Correct.

4          Q.    Are there any officers to your left?

5          A.    No.  They were all behind us.

6          Q.    Okay.  And --

7          A.    They were to my left.  They were far enough behind

8   me that I did not know they were there.

9          Q.    Okay.  How many times did you fire your weapon?

10         A.    Twice.

11         Q.    And were you aiming for a specific, you know, area

12  of the body?

13         A.    It would be the -- the center mass area.  The

14  biggest part of the body that is a target.

15         Q.    And "center mass," does that mean the torso?

16         A.    If -- if that is available, yes.

17         Q.    And was it available as a target?

18         A.    He was turned more towards K-9 Sergeant O'Malley,

19  and he was turned so -- I mean, his -- his -- there was -- he

20  was almost midline, so I could have -- I mean, there was the --

21  the front part of the stomach and maybe the back part of the

22  back was available to me.

23         Q.    Now, in your use of force training, which we'll get

24  to later, what were you taught as far as -- if you're going to

25  deploy deadly force, are you taught that you're supposed to

Dominic Ravotti - Examination by Mr. Geary

1   fire, say, X number of times?

2       A.   You are taught to fire until the threat has been

3   taken care of.

4       Q.   And "taken care of" means what?

5       A.   There is no longer a threat.

6       Q.   And a threat of what?

7       A.   Serious bodily harm.

8       Q.   So where -- I mean, you're looking at Kelley as

9   you're shooting at him.  Correct?

10      A.   Yes.

11      Q.   Okay.  So where did you shoot him on his body?

12      A.   I -- again, I told you where I aimed.  I can't tell

13  you exactly where my -- my rounds hit.

14      Q.   And he's -- he's partly facing your direction when

15  you fire?

16      A.   No.  He was facing more towards O'Malley.  He was --

17  he was progress- -- he was actively walking, attempting to get

18  towards O'Malley.

19      Q.   And --

20      A.   That was the direction he was walking.

21      Q.   Sorry.

22      A.   Go ahead.

23      Q.   So you're taught to fire until the threat is

24  removed.  So does that mean that you're trained to make an

25  assessment after each shot, whether the threat has been

Dominic Ravotti - Examination by Mr. Geary

68

1  removed?

2      A.    I can't -- I can't specifically talk to that.

3  You're taught to -- it's deadly force.  You use deadly force

4  until you feel there is no longer a threat of imminent or

5  immediate bodily danger.

6      Q.    And if the threat is removed after one shot -- you

7  connect with one shot -- are you supposed to stop firing?

8      A.    Yes, if the threat stops.  Once the threat stops,

9  you stop firing.  Correct.

10      Q.    So after you fired the first time, did you make an

11  assessment of whether or not you needed to fire a second time?

12      A.    There was still a threat.  I fired the second time,

13  yes.

14      Q.    What -- what happened to Bruce Kelley's body after

15  the first time you fired?

16      A.    I can't tell you specifically what happened to it.

17      Q.    I mean, did his -- did his body or torso move or

18  anything like that?

19      A.    Again, I can't -- I can't tell you.  I don't know.

20      Q.    Weren't you looking at his body?

21      A.    Yes.

22      Q.    How can you not tell me how his body was moving,

23  then, when -- while being shot?

24          MR. EVASHAVIK:  Object to the form of the question.

25  BY MR. GEARY:

Dominic Ravotti - Examination by Mr. Geary

69

1      Q.    Go ahead.

2      A.    This -- this happened within seconds.  It's -- it's

3  hard to tell -- give you a specific motion by motion of how his

4  body was going like you're asking, which is -- I -- I took

5  the -- I felt that I -- after the second shot that the threat

6  was taken away, and that's why I stopped firing.

7      Q.    Okay.  And what -- what about after the second shot

8  caused you to conclude that the threat had been removed?

9      A.    He began falling to the ground.

10     Q.    And were you and O'Malley firing simultaneously?

11     A.    Yes, I believe so.

12     Q.    And how did his body fall, please?

13     A.    He fell onto his back with his legs facing Whitney

14  Avenue, and his head was facing towards the houses.  His arm

15  was laying across his chest, and he still had the knife in his

16  right hand.

17     Q.    What did you do next, sir?

18     A.    At that point, I began to yell, "Contact," meaning

19  that I was going to go up and attempt to seize the actor.  Once

20  somebody responded to me, I went up.  I put my foot -- my right

21  foot on his right hand and the knife, and I removed the knife

22  from his right hand.  And then I rolled -- we rolled him over

23  in an attempt to put him into handcuffs.

24     Q.    How -- how was the knife removed from his right

25  hand?

Dominic Ravotti - Examination by Mr. Geary

70

1      A.    I put my right boot onto the knife, and I kicked it

2    out -- and I moved it out of his hand.

3      Q.    Got you.  Okay.  You kicked it out of his hand.

4            And then I assume, what, the knife went to somewhere

5    close to his body but now out of his hand?  Is that what

6    happened to the knife?

7      A.    Yes.  It was out of his reach.

8      Q.    And you rolled him over and put him in handcuffs?

9      A.    I did not put him into handcuffs, but we rolled him

10   over.  And I attempted to put him into handcuffs, yes.  But

11   somebody else did.

12     Q.    Okay.  Someone else put him in handcuffs?

13     A.    Correct.

14     Q.    Do you know -- which officer was that, please?

15     A.    I know Officer Adams did.  And another officer

16   assisted him, but I don't know who it was.

17     Q.    And did you realize that you -- with your two shots,

18   you actually connected with him?

19     A.    I don't know.

20     Q.    I mean, what --

21     A.    I just know -- I know the threat stopped.  He fell

22   to the ground.  And that's why we -- I stopped firing.

23     Q.    But was your thinking that you connected as opposed

24   to maybe you missed -- you missed the target with either shot?

25     A.    I don't know.  I can't tell you if I did or didn't.

Ross Reporting Service
724-695-3911

Dominic Ravotti - Examination by Mr. Geary

71

1  I don't know.

2      Q.   Could you tell if O'Malley connected with at least

3  some of his shots?

4      A.   I can't tell you who did or did not hit him.  That's

5  not -- I -- I -- I can't tell you yes or no.

6      Q.   Is there something in the use of force training when

7  you deploy deadly force where you're to determine whether or

8  not you actually struck the subject, the target?

9      A.   There was multiple -- there was two officers that

10 fired, so I can't tell you who struck him and who didn't strike

11 him.

12     Q.   Now, what -- when -- why was he put in handcuffs?

13     A.   Because we have to consider -- we have to make sure

14 that he is no longer a threat before we attempt to administer

15 first aid.  He is handcuffed to make sure that everything is

16 secure, he's clear of any more weapons, if he was to have any.

17 And then he's assessed at that point, and then first aid is

18 administered.

19     Q.   Now, first aid -- I was never certified in first

20 aid.  What does first aid consist of?

21     A.   It's a -- it's a very broad question.  I don't

22 understand what you're asking.  I mean, any kind of -- if CPR

23 is needed, if bleeding control is needed, all the way up to

24 putting a band-aid on somebody.  It's a very broad question, so

25 it's hard to answer what you're asking.

Dominic Ravotti - Examination by Mr. Geary

72

1      Q.    No.   That answered it, just the range of things that
2   could be done.
3            How -- how was first aid going to help Bruce Kelley,
4   Jr., at that point?
5      A.    I don't understand what you're asking.   We felt he
6   was unresponsive, so we began to assess his injuries.   And they
7   administered whatever aid was necessary.
8      Q.    Wasn't he clearly dead?
9      A.    I can't tell you that.   I'm not -- it's not my
10  position to decide if somebody is clearly dead or not.
11     Q.    And whose position --
12     A.    He --
13     Q.    Whose position is that?
14     A.    I don't know.   The coroner is who decides if
15  someone -- or a doctor is who decides if somebody is dead or
16  not.
17     Q.    So did you actually administer first aid?
18     A.    I specifically -- I personally did not, no.   A
19  different officer did.
20     Q.    Okay.   Tell me what you -- what else you did there
21  right then at the scene, please.
22     A.    After he was hand- -- after he was secured, I was
23  removed from the specific incident area and put into an
24  unmarked patrol car and sat there until I was transported back
25  to the police station.

Dominic Ravotti - Examination by Mr. Geary

73

1    Q.    And what happened when you got to the station?

2    A.    I -- I don't specifically recall what all happened.

3    I was given a D&A test per the Port Authority's policy.  And

4    then we were transported to county homicide, where we spoke

5    with homicide for the first time.

6    Q.    Why -- why -- why was a DNA test administered to

7    you?

8    A.    Any critical incident within the Port Authority,

9    you're D&A tested -- drug-and-alcohol tested.

10   Q.    Oh, oh, oh.

11   A.    Sorry.

12   Q.    Yeah.  Okay.

13   A.    Drug and alcohol, not --

14   Q.    Understood.

15   A.    -- DNA, like that stuff.

16   Q.    Thank you for clarifying.

17         So you go to the station for the Port Authority

18   Police Department for a while.  Then you go to Allegheny County

19   homicide.  Is that correct?

20   A.    Yes.

21   Q.    And then do you go home after Allegheny County P.D.?

22   A.    Yes.

23   Q.    Okay.  Did you have any days off after this

24   incident?

25   A.    Yes.

Dominic Ravotti - Examination by Mr. Geary

74

1    Q.    And how many?

2    A.    I can't tell you the specific number.

3    Q.    Did you sustain any injuries in this incident?

4    A.    No.

5    Q.    Did you seek and obtain any type of medical

6    treatment for physical issues?

7    A.    No.

8    Q.    Aside from that session we talked about at the

9    beginning where there was the employee, woman, and she

10   interviewed you, did you undergo or participate in any type of

11   counseling or therapy at any time with any medical provider,

12   even one session?

13   A.    No.

14   Q.    Were you certified under Act 120 at some point?

15   A.    Yes.

16   Q.    Okay.  And when would that have been?

17   A.    2004.

18   Q.    Okay.  And did you have to have yearly renewals or

19   updates on that or every couple years?

20   A.    Yes.  Every year we have to do updates.

21   Q.    Okay.  Now, prior to this -- this date, how long had

22   you been with the Port Authority?

23   A.    I had been with the Port Authority since 2013, so --

24   so approximately two to four years, depending -- I would have

25   to sit here and figure it out for you if you want an exact

Dominic Ravotti - Examination by Mr. Geary

75

1   date.

2       Q.    No.  Understood.  But as of the date of this

3   incident, you were not a K-9 officer.  Is that correct?

4       A.    Correct.

5       Q.    Had you ever been a K-9 officer?

6       A.    No.

7       Q.    And from that date forward, have you become a K-9

8   officer?

9       A.    No.

10      Q.    At the Port Authority, for the police officers, did

11  you ever receive any crisis intervention training?

12      A.    No.

13      Q.    In your dealings with Bruce Kelley, Jr., that day,

14  did you get the impression he had some mental health issues?

15      A.    No.

16      Q.    Did you -- did you do anything to try to flesh out

17  whether or not he may have had some mental health issues?

18      A.    No.  I don't under- -- I don't really understand

19  what you're asking.

20      Q.    Say, did -- did you ask him any questions?  Separate

21  from giving him commands to drop the knife, did you say

22  anything to him to try to figure out why he wouldn't drop the

23  knife and he just kept walking?

24      A.    No.

25      Q.    One sec, please.

Dominic Ravotti - Examination by Mr. Geary

76

1           Now, the autopsy report of Bruce Kelley, Jr.,

2    indicates he was shot in the back twice.  How would that have

3    happened?

4           MR. EVASHAVIK:  Object to the form of the question.

5           THE WITNESS:  I cannot tell you that.

6    BY MR. GEARY:

7       Q.    Was there another K-9 unit there?  DiPippa and a dog

8    Arko?

9       A.    They were -- he was working.  I never saw his K-9

10   out of the car.

11      Q.    Okay.  What rank was DiPippa at that time, please?

12      A.    He was a sergeant.

13      Q.    And O'Malley was a sergeant as well?

14      A.    Yes.

15      Q.    Were there different ranks of sergeants at that

16   time?

17      A.    No.

18      Q.    So DiPippa and O'Malley would have been equal rank?

19      A.    Yes.

20      Q.    Okay.  Please, at the Port Authority department as

21   of January of '016, can you just give me the ranks from, you

22   know, top to bottom, please?

23      A.    There was patrolmen, detectives, sergeants.  A

24   detective sergeant, lieutenant, and then chief.  I -- I -- I

25   can't tell you the specific hierarchy other than sergeant,

Dominic Ravotti - Examination by Mr. Geary

77

1   detective sergeant, lieutenant, and chief.  I believe

2   detectives were considered ranking over patrolmen.

3        Q.    No.  I get it.  Thank you.

4              Prior to that day, had you ever deployed deadly

5   force in your career?

6        A.    On a person, no.

7        Q.    And if it wasn't on a person, who would it have been

8   on?

9        A.    An injured animal.

10       Q.    You mean --

11       A.    That's when I -- that's the only other time I would

12   have fired my weapon.

13       Q.    Okay.

14       A.    So it's con- -- it was to put down an animal that

15   was injured.

16       Q.    Okay.  Did -- how many times did that happen,

17   putting down an injured animal, in your career prior to this

18   date?

19       A.    I can't tell you how many times.

20       Q.    Okay.  I mean, what kind of animal would that be?  A

21   deer?

22       A.    Deer, raccoon.  I mean, any kind of animal that's

23   injured.  A larger animal that needed to be put down.

24       Q.    Have you ever -- did anyone ever file a lawsuit

25   against you for use of excessive force?

Dominic Ravotti - Examination by Mr. Geary

78

1    A.    No.

2    Q.    Did anybody ever get a lawyer -- and they didn't

3  file a lawsuit, but they made a claim and made a demand for

4  you -- again, excessive force?

5    A.    No.

6    Q.    Prior to this day at the Port Authority, had you

7  ever been --

8          THE REPORTER:  Excuse me.

9          MR. GEARY:  God bless you.

10 BY MR. GEARY:

11   Q.    -- had you ever been disciplined or reprimanded for

12 any disciplinary infraction of any nature?

13   A.    No.

14   Q.    What about after this incident?

15   A.    No.

16         MR. GEARY:  I may be close to wrapping up, if I

17 could just have a couple minutes to look at my notes.  You can

18 stay put or if you want to take a break.  Just so you know, I

19 don't think I have much more.  I just want to look at my notes,

20 and then we'll wrap up, if that's okay.

21         THE WITNESS:  Okay.  I'm going to use the restroom

22 real quick.

23         MR. GEARY:  Sure.

24         THE WITNESS:  Thank you.

25         THE VIDEOGRAPHER:  We are going off the video

Dominic Ravotti - Examination by Mr. Geary

79

1    record.  The time is 12:04.

2                (Whereupon, a brief recess was taken.)

3                THE VIDEOGRAPHER:  We are back on the video record.

4    The time is 12:12.

5    BY MR. GEARY:

6        Q.    Thank you, Officer.  Just -- just a few more, and we

7    can wrap up, please.

8        A.    Okay, sir.

9        Q.    I have the summary of your interview by the

10   Allegheny County Police Department, which I think is

11   Exhibit 13.  Do you have that in front of you, please?

12       A.    Yes, sir.

13       Q.    And, again, that's -- the two pages appear to be a

14   repeat of the -- of the first two pages, pages 3 and 4.  Have

15   you read this, sir?

16       A.    Yes, sir.

17       Q.    And is everything that's contained in this report,

18   the interview of you, is it -- is it true and accurate?

19                MR. EVASHAVIK:  Let me -- let me object, for the

20   record, to the form and also because the best evidence is the

21   actual video itself rather than a summary.

22                But you can answer.

23                THE WITNESS:  Yes.  This is -- I mean, this is

24   their -- their words of what I said.  So like he -- like

25   counsel said, my taped recording is exactly what I said.  This

Dominic Ravotti - Examination by Mr. Geary

80

1  is their -- this is their depiction of what I said.

2  BY MR. GEARY:

3      Q.    No, no.  I'm aware of that.  I just wanted to

4  know -- to give you the opportunity at this time, if -- if

5  there's anything in this, their summary, that you don't like or

6  you say, "I didn't say that."  If there's anything in here that

7  you would like to change or say "That's not really what I

8  said," I just want to give you that opportunity.

9          MR. EVASHAVIK:  In that case, let's have the

10  witness, if you don't mind, Noah, read it again carefully in

11  light of your question.  Okay?

12          MR. GEARY:  No, no, no.  That's fine.

13          THE WITNESS:  Yes.  It appears to all be correct.

14  BY MR. GEARY:

15      Q.    Thank you.  And I appreciate you clarifying the D&A

16  because I was initially thinking, like, not drug and alcohol.

17      A.    Sorry.  Sorry about that.

18      Q.    No, no.  Just on page 2 of the summary there, third

19  bullet -- third bullet point down from the top.  Let me just

20  read it to you.  "Ravotti stated Aren disengaged the suspect

21  but tried to re-engage the suspect and Kelley lunged at Aren

22  and thrusted the knife into him again and began to make furtive

23  movements toward O'Malley."  Did I read that correctly?

24      A.    Yes.

25      Q.    Okay.  And just "furtive movements" -- what does the

Dominic Ravotti - Examination by Mr. Geary

81

1   word "furtive" -- sorry -- "furtive" mean?

2        A.    He was, again, beginning to travel in O'Malley's

3   direction.

4        Q.    And is that -- is that what you mean by "furtive"?

5        A.    Yes.

6        Q.    Okay.  And the word "furtive," does it have any

7   other meaning other than what you just described?

8        A.    I don't know.  Again, I didn't write that word,

9   so...  I don't believe that's the word I used in the interview,

10  so that's why I said that the -- the taped interview is much

11  better than this.

12       Q.    No.  Right.  Sure.  I just wanted to ask you about

13  the one word.

14             If I could reference you just to one exhibit again.

15  It's Exhibit 6.  It's the timeline of events.

16       A.    Okay.

17       Q.    And if you could go to the -- the third page from

18  the end of the exhibit, the third page from the end, which

19  shows an aerial view of Whitney Avenue.

20       A.    Okay.

21       Q.    So in the top left it says "155136 Hours."  Bullet

22  point, "Officer reports on radio coming back out to Whitney

23  Avenue."  Are we on the same page?

24       A.    Yes, sir.

25       Q.    Okay.  And that aerial view there, does that show

82

1  Whitney Avenue and the yards and houses and some area behind

2  the houses and then the park and ride?

3       A.    Yes.

4       Q.    Okay.  And this is already No. 6.  What I would like

5  you to do, Officer, is -- let me see.  If you could put your --

6  your initials in pen as to where Bruce -- well, forgive me.  If

7  you would put "BK" where -- where Bruce Kelley was when you

8  shot him.  And then I'm going to put, you know, your -- your

9  initials where you were and where he was, your initials for

10 you, obviously, his initials for him, on -- on this aerial view

11 here.

12      A.    I could not do that specific- -- especially with

13 this picture because it's an aerial view, and I'm not sure

14 exactly which house it was.

15      Q.    Okay.  Well, you see Whitney Avenue near the top of

16 the page.  Is that the busway?  Is that correct?

17      A.    On the left-hand side, it's the busway, yes.

18      Q.    Okay.  And, I mean, you see the houses going on the

19 left of Whitney Avenue.  Right?  Houses on the left?

20      A.    Yes.

21      Q.    Okay.  So you walked us through it as to where you

22 were, Kelley was, and O'Malley with the dog, releasing.  Please

23 put Kelley's initials as to where he was when you fired twice.

24      A.    I just told you I can't do that.

25      Q.    You -- why not?

Dominic Ravotti - Examination by Mr. Geary

83

1    A.    Because I can't tell from this picture what house we
2    were in front of, sir.
3    Q.    Okay.  Well, why -- do you know -- do you have it
4    narrowed down to, say, you know, two houses?
5    A.    Even if I had it narrowed down, I can't tell you
6    specifically because I can't tell you which house it is.  So I
7    can't do that.
8    Q.    Okay.  Well, aside from what house, can you describe
9    for me, where were you standing?  Okay.  Are you -- on this
10   aerial view on Whitney Avenue when you fired.
11   A.    Again, I can't tell you where I was standing because
12   I can't specifically identify which house it was.  So I can't
13   tell you I was standing in one spot and it not be the correct
14   house.
15   Q.    Okay.  Let's say just using a compass, north,
16   west -- north at the top of the page, west, east, south.
17   Kelley would have been to your north.  Is that right?
18   A.    I don't -- which way is north on the picture?
19   Q.    At the top.  Like, just at the top.  Like a clock.
20   North at the top.  West to the left.  East to the right.  South
21   to the bottom.
22   A.    I don't understand because I was not facing north.
23   So I can't say if he was north or south of me.
24   Q.    Okay.  What direction were you facing?
25   A.    If you're saying it's north, south, east, or west

Dominic Ravotti - Examination by Mr. Geary

84

1    looking straight up, I would have been facing west.

2         Q.    Okay.  You would have been facing west.  And when

3    you fired your weapon, you fired your weapon in a westerly

4    direction?

5         A.    I mean, west -- it would have been more

6    west-southwest, yes.

7         Q.    Okay.  O'Malley the same?  In that direction,

8    southwesterly direction?

9         A.    I can't speak for O'Malley.  I would -- he would

10   have to tell you how he was.

11        Q.    Okay.  And, again, just so we're clear here, you're

12   telling me that you cannot identify on this aerial view of

13   Whitney Avenue where you were or where Bruce Kelley was when

14   you shot him?

15        A.    Not on this picture, no.

16        Q.    When you fired your two rounds at Bruce Kelley, Jr.,

17   why did you fire your rounds?

18        A.    I felt he was an immediate threat to Sergeant

19   O'Malley and the rest of the public.

20        Q.    And who in -- who in the public was he a threat to?

21        A.    Anybody that he would have encountered, I believe.

22        Q.    Well, who -- who was there that he could have

23   encountered in that yard?

24        A.    Nobody in that specific yard.

25        Q.    And you say he was a threat to O'Malley.  Is that

Dominic Ravotti - Examination by Mr. Geary

85

1    correct?

2        A.    Yes.

3        Q.    And what was the threat?  A threat of what to

4    O'Malley?

5        A.    He had a knife extended in his right arm facing

6    towards O'Malley, and he was progressing towards him.  I

7    believed that he was going to attempt to stab him.

8        Q.    And O'Malley was armed with a loaded gun.  Correct?

9        A.    Yes.

10       Q.    Okay.  And how many feet was Kelley, Jr., from

11   O'Malley when you --

12       A.    I don't know.

13       Q.    When you considered Kelley to be a threat to

14   O'Malley's safety, what was the distance between those two?

15       A.    I can't speak to that because I can't tell you

16   exactly where O'Malley was standing.

17       Q.    Okay.  Can you give me --

18       A.    All I can tell you is -- what I will tell you is

19   that after he stabbed the K-9 and he kept advancing towards

20   O'Malley, that's when I perceived him as an immediate threat

21   towards O'Malley and I used my firearm and fired two rounds.

22       Q.    And how many steps had he taken toward O'Malley?

23       A.    He had taken the two initial steps, and then he

24   stabbed the K-9 the second time.  And then after he had stabbed

25   the K-9 the second time is when he attempt- -- he made more

Dominic Ravotti - Examination by Mr. Geary

86

1    movements towards O'Malley.

2       Q.    Why didn't you shoot him after he made the first

3    step towards O'Malley?

4       A.    Because he had -- the -- the K-9 was attempting

5    re-engage him.

6       Q.    And you've testified before in court in criminal

7    proceedings, I assume?

8       A.    Yes.

9       Q.    And, I mean, you've been asked as a witness to give

10   estimates, correct, in feet, distance, before as a witness?

11      A.    Yes.

12      Q.    Okay.  So I'm just going to give you one last

13   opportunity.  Will you please give me an estimate in feet how

14   many -- how far Kelley was from O'Malley when you concluded you

15   needed to shoot Kelley.

16      A.    I will answer you again and say that I do not know

17   where O'Malley was specifically, so I cannot estimate the exact

18   feet that he was from O'Malley.

19      Q.    If you didn't know where O'Malley was specifically,

20   how did you know Kelley, Jr., was a threat to O'Malley?

21      A.    I know where -- I know the -- this general area

22   where O'Malley was standing, and I know that he was taking

23   movements towards O'Malley.  At that point, that's when I felt

24   he was a threat towards O'Malley, and I fired my weapon.

25      Q.    Did you consider -- at the time, was your

Dominic Ravotti - Examination by Mr. Geary

87

1   understanding that Aren was an officer?  Like under the law, an

2   officer, a police officer?

3       A.   Yes, he is.

4       Q.   Did you fire your gun at Bruce Kelley out of anger?

5       A.   No.

6       Q.   Because he wounded the dog?

7       A.   No.

8       Q.   Now, at the point in time that you fired your two

9   shots at Kelley, the dog had been wounded.  Correct?

10      A.   I -- I could not tell you that.  I did not know.

11      Q.   But at the -- at the point in time you fired your

12  weapon, you didn't know the dog was going to die.  Correct?

13      A.   Correct.

14      Q.   In this whole encounter, please -- well, in this

15  whole encounter, did you do anything to de-escalate the

16  situation?

17      A.   I gave him multiple commands to drop the knife and

18  to put the knife down, and he refused any command at all.

19      Q.   Okay.  Separate from giving him commands, which I

20  understand, did you do anything to de-escalate the situation?

21      A.   Giving commands -- verbal commands is a

22  de-escalation tactic.  By not using force at that point, by

23  attempting to talk to them and get them to put the weapon down,

24  that is a de-escalation tactic.

25      Q.   Okay.

88

1    A.    And he did not -- his responses were not -- he would

2    not stop.  He responded with vulgarities.

3    Q.    And I understand.  So separate from the commands,

4    did you do anything else in an attempt to de-escalate the

5    situation?

6    A.    No.

7    Q.    On use of force training, again, in the period of

8    January of '016 -- '013 to '016, you had two or three years in

9    with the Port Authority Police Department as of this date.  Did

10    you undergo use of force training?

11    A.    We did defensive tactics training and things of that

12    nature, yes.

13    Q.    Is -- defensive tactics training, is that different

14    than use of force training?

15    A.    I mean, a defensive tactic is hands-on training.

16    That's considered use of force, I mean, if you use any type of

17    force.

18    Q.    Okay.  That's fine.  How often would you have the

19    defensive tactics training?

20    A.    I can't specifically talk to it now.  That was many,

21    many years -- that was many years ago.  I can't tell you

22    exactly when.  You would have to look at their training

23    records.

24    Q.    What -- what is your age again, sir?

25    A.    37.

Dominic Ravotti - Examination by Mr. Geary

89

1     Q.     You can't remember, as we sit here, how often you

2   would have defensive tactics training when you worked for the

3   Port Authority?

4     A.     Correct.

5     Q.     Okay.  When you did have the training, what did it

6   consist of?

7     A.     I just told you.  Defensive tactics, hands-on.  You

8   know, Taser training, batons.  Different -- there was multiple

9   different trainings and things that we would train on.

10    Q.     Who would put on the training?  Would it be a fellow

11  officer for the Port Authority, or would it be some outside

12  person?

13    A.     There was -- there was training instructors within

14  the Port Authority that would give the training.

15    Q.     Who were they, please?

16    A.     I believe one of them was -- there was different

17  instructors for different things, so...

18    Q.     On use of force, who was the trainer?

19    A.     Like I said, there was different instructors for

20  different types of use of force.

21    Q.     Okay.  Do you remember who the trainers were for

22  whatever the specific topic under use of force was?

23    A.     I remember -- I believe K-9 -- I believe Sergeant

24  O'Malley and Sergeant DiPippa were K-9 -- were Taser

25  instructors, but I don't recall -- I believe they were

Dominic Ravotti - Examination by Mr. Geary

90

1  defensive tactics instructors also, but I -- again, I can't --
2  I can't tell you exactly who it was and who it wasn't.
3      Q.   Do you remember who a trainer was for use of deadly
4  force?
5      A.   Do you mean our firearms instructors?  Is that what
6  you mean?
7      Q.   No.  I'm talking about use of deadly force.  If you
8  were given any training, who was the trainer for use of deadly
9  force?
10     A.   I don't understand your -- do you mean our -- I can
11  tell you who our firearms instructors were, which is considered
12  deadly force.
13     Q.   Okay.  Who were they?
14     A.   Sergeant -- Sergeant O'Malley was a firearms
15  instructor.  Sergeant DiPippa was.  Officer Pokrant and Officer
16  DelSole.  And I believe there was others, but I can't remember.
17     Q.   Thank you.  Just for the stenographer --
18  stenographer, if you could, if you could spell, I think,
19  Pokrant and DelSole.
20     A.   P-o-k-r-a-n-t.  DelSole is D-e-l-S-o-l-e.
21     Q.   And what were you taught as far as what would
22  justify the use of deadly force?
23     A.   Serious and imminent bodily injury to myself or
24  others.
25     Q.   Okay.  Were you given in the training sessions, say,

Dominic Ravotti - Examination by Mr. Evashavik

91

```
1    any handouts?  Materials?  Things like that?

2         A.    I can't say yes or no.  I don't recall.

3              MR. GEARY:  Okay.  Sir, that's all the questions I

4    have.  I appreciate your time.

5              THE WITNESS:  Thank you.

6              MR. EVASHAVIK:  I have a few questions briefly.  Are

7    you ready to continue?

8              MR. GEARY:  Sure.

9                          EXAMINATION

10   BY MR. EVASHAVIK:

11        Q.    Okay.  Officer Ravotti, you were asked during the

12   deposition about an interview that was conducted which was

13   audio recorded and videotape recorded by the county police at

14   the county police station.  Do you recall those questions?

15        A.    Yes, I do.

16        Q.    Do you recall the interview?

17        A.    Yes, I do.

18        Q.    And before today's deposition, did you have an

19   opportunity to view the audio and video recording?

20        A.    Yes, I did.

21        Q.    And was it a true and accurate depiction and

22   demonstration of exactly what your answers were and the

23   questions that occurred in that interview?

24        A.    Yes, they are.

25        Q.    And was everything you said true and correct?
```

Dominic Ravotti - Examination by Mr. Evashavik

92

1       A.    Yes, it was.

2             MR. EVASHAVIK:  All right.  I'd like to mark that

3    interview separately, which was produced to Mr. Geary, as an

4    exhibit.  What number would that be next?  Would that be

5    No. 17?

6             MR. GEARY:  Right.  Correct.

7             MR. EVASHAVIK:  Okay.  I'd like to identify that as

8    Exhibit 17.  Thank you.

9             MR. GEARY:  I'm sorry.  I'm sorry, Greg.  I

10   apologize.  That's audio and video?

11            MR. EVASHAVIK:  Yes.

12            MR. GEARY:  Got you.  Thank you.

13            MR. EVASHAVIK:  I provided it.  It's one -- it's a

14   recording where you can hear, you know, the interviewer and

15   Officer Ravotti answer.  And you can also see them.

16            MR. GEARY:  Sure.  Yeah.  I have it somewhere.  Got

17   you.  That's 17.

18            MR. EVASHAVIK:  Okay.  Thank you.

19            (Whereupon, Deposition Exhibit 17 was marked for

20   identification.)

21   BY MR. EVASHAVIK:

22      Q.    Okay.  Officer, at any time in your pursuit when

23   Kelley, Jr., was in your view, did you ever see him put the

24   knife away?

25      A.    No, I did not.

Dominic Ravotti - Examination by Mr. Evashavik

93

1    Q.    And did he ever change hands with it?

2    A.    No, he did not.

3    Q.    And was it always held in the manner that you

4    described earlier with the blade sticking out?

5    A.    Yes.  He never closed the knife.  It was always

6    extended, and it was -- it was always in his hand.

7    Q.    Okay.  Now, you were asked in Exhibit 6, which was

8    the timeline that was put together -- I'm not going to ask you

9    to look at it now, though.  But there are still photographs

10   that were taken from the actual videotape from the Hamnett

11   Street Station.  All right?  I'm telling you that.

12   A.    Yes.

13   Q.    And the Hamnett Street Station videotape has already

14   been identified as an exhibit.  It's Exhibit No. 8.  So my

15   question to you is:  Before today's deposition, did you have an

16   opportunity to review the entire videotape of the progress and

17   your -- your involvement on the scene from Center Avenue,

18   through the parking lot, out of the parking lot, and over the

19   fence?  Have you seen that videotape?

20   A.    Yes.

21   Q.    All right.  And does it depict you in that

22   videotape?

23   A.    Yes.

24   Q.    And the still photos, are those still photos from

25   that videotape?

Dominic Ravotti - Examination by Mr. Evashavik

94

1    A.    Yes.

2    Q.    Okay.  And in your recollection, having been a

3  person present for this, does the videotape truly and

4  accurately depict what took place during that time where the

5  video shows everybody through the -- from Center Street through

6  the parking lot?

7    A.    Yes.

8    Q.    You testified earlier about Kelley, Jr., during that

9  process, which is on videotape, swinging around and swinging

10  his knife.  Do you recall saying that in answering Mr. Geary's

11  questions?

12    A.    Yes.

13    Q.    And do you recall seeing that on the videotape,

14  those actions by Kelley, Jr., that you answered to Mr. Geary?

15    A.    Yes.

16    Q.    So you believe it is shown on the videotape?

17    A.    Yes.

18    Q.    And was that once or more than once that he -- he

19  took those swinging actions with the knife or in the direction

20  of the officers?

21    A.    It was more than once.

22    Q.    And did you personally give commands to Kelley, Jr.,

23  during your interaction with him to stop, drop the knife, and

24  things of that nature?

25    A.    Yes, I did.

Dominic Ravotti - Examination by Mr. Evashavik

95

 1     Q.    And was that on multiple occasions?

 2     A.    Yes, it was.

 3     Q.    Did you hear other officers giving him similar

 4  commands?

 5     A.    Yes, I did.

 6     Q.    Was that on multiple occasions?

 7     A.    Yes, it was.

 8     Q.    At any time during this pursuit when you could see

 9  Kelley, Jr., was he ever surrounded by officers or trapped in

10  any manner and unable to escape or continue on his path away

11  from officers?

12     A.    No.

13     Q.    Okay.  Was he always moving, or was he stopped at

14  any time?

15     A.    He was always moving until the K-9 deployed.

16     Q.    Did you believe during your interaction and

17  involvement in this pursuit that Kelley, Jr., was actively

18  resisting arrest?

19     A.    Yes.

20           MR. GEARY:  Objection.  Objection.  Leading.

21  BY MR. EVASHAVIK:

22     Q.    Okay.  Did you have an opinion during your

23  involvement and pursuit in this whether or not Kelley, Jr., was

24  cooperating with the officers' attempts to arrest or not?

25     A.    He absolutely was not.  He was resisting arrest and

Dominic Ravotti - Examination by Mr. Geary

96

1    resisting any form of engagement that we gave him.

2        Q.    Did you have any opinion whether or not Kelley, Jr.,

3    during this pursuit, was willing to cooperate or was attempting

4    to evade arrest by flight?

5        A.    He was absolutely evading arrest by flight.

6        Q.    And -- and did you believe that Kelley, Jr., posed a

7    significant threat of death or serious physical injury to you

8    or others?

9        A.    Yes, I did.

10       Q.    And did you believe that at the time you discharged

11   your weapon?

12       A.    Yes, I did.

13       Q.    Did you believe that prior to the time you

14   discharged your weapon?

15       A.    Yes, I did.

16       Q.    Did you believe that during the encounter that's

17   demonstrated on the videotape, Deposition Exhibit No. 6, the

18   Hamnett Street Station Park and Ride?

19       A.    Yes.

20             MR. EVASHAVIK:  Those are all the questions I have.

21                              EXAMINATION

22   BY MR. GEARY:

23       Q.    Just one last question, please, Officer.

24   Mr. Evashavik just asked did you believe Kelley was a threat

25   prior to the time you fired your weapon, and you said yes.

Dominic Ravotti - Examination by Mr. Geary

97

1      A.     Yes.

2      Q.     So one last question for me is:  Why did you not

3  shoot him, then, earlier in this encounter?

4      A.     At the time that he turned around on Officer

5  Sanders, there was a bus that had just let off, and there was

6  people that I could see on the busway.  So I felt at that point

7  it was not a correct time to use deadly force.

8      Q.     Aside from that moment in time, were there other

9  times in this entire episode when you felt Kelley was a threat?

10     A.     Kelley was a threat from the moment he pulled -- he

11 resisted arrest and then pulled out the knife and fled from

12 officers.

13     Q.     Okay.  So separate from the moment in time you just

14 described where a bus pulled up, why did you not shoot Kelley

15 at any other point in time?

16     A.     Because they were attempting to use non-lethal means

17 to take him into custody, which all were exhausted.  We had no

18 more less-lethal means, and he had -- at that point, he

19 progressed towards an officer with the knife out.  And at that

20 point I felt that he was a serious threat to Sergeant O'Malley

21 and the rest of the public and he was not going to stop and he

22 needed to be --

23            THE REPORTER:  I'm sorry to interrupt, but I didn't

24 hear the very last thing you said, Officer.

25            THE WITNESS:  He needed to be seized.

98

1               THE REPORTER:  Thank you.

2               MR. GEARY:  That's all I have.

3               MR. EVASHAVIK:  Okay.  The -- the witness will read.

4               THE VIDEOGRAPHER:  All right.  This concludes the

5    deposition.  We are going off the video record.  It is 12:38.

6               (Whereupon, the deposition concluded at 12:38 p.m.

7    Signature was not waived.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

99

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CALISIA KELLEY; and            CIVIL ACTION
JOHNNIE MAE KELLEY,
Co-Administrators of the       No. 2:17-cv-01599-NBF
ESTATE OF BRUCE KELLEY,
JR., deceased

vs.

BRIAN O'MALLEY, both in his
Official and Individual
Capacities as Sergeant for
the Allegheny County Port
Authority; and DOMINIC
RIVOTTI, in both his
Official and Individual
Capacities as Officer for
the Allegheny County Port
Authority.

Deposition of:  Dominic Ravotti
        Date:  Thursday, October 1, 2020

                DEPONENT CERTIFICATE

     I, Dominic Ravotti, deponent herein, do hereby certify
that following my review of the transcript of my deposition
held on the above date:

_____ There are no changes.

_____ Please indicate the within changes totaling ____ number
of changes.

_____                      _____
Date                            Dominic Ravotti


Subscribed and sworn to before me, a Notary Public, on this
_____ day of _____, 2020.

_____
NOTARY PUBLIC

My Commission Expires:  _____

100

|  |  | CHANGE/ | REASON FOR |
|---|---|---|---|
| PAGE | LINE | CORRECTION | CHANGE/CORRECTION |

Page _____ of _____

_____
Dominic Ravotti

101

C E R T I F I C A T E

COMMONWEALTH OF PENNSYLVANIA  :
COUNTY OF WASHINGTON          :      SS.:

    I, Rita A. Ross, Registered Professional Reporter and Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify:

    That via Zoom video conference before me personally appeared Dominic Ravotti, who was by me first duly cautioned and sworn to testify to the truth, the whole truth, and nothing but the truth in the taking of his/her videotaped oral deposition in the cause aforesaid;

    That the testimony then given by the deponent via Zoom video conference as above set forth was reduced to stenotype by me to the best of my hearing ability and afterward transcribed by me or under my direction and is a true record of the testimony given by the deponent.

    I do further certify that the deponent did not waive reading and signing of the deposition transcript and that an electronic transcript was sent to Greg Evashavik, Esquire, on or about October 13, 2020, for the deponent's review and signature.

    I do further certify that this deposition was taken at the time and in the manner specified in the foregoing caption and was completed without adjournment.

    I do further certify that I am not a relative of any party hereto, nor am I otherwise interested in the event of this action.

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Coraopolis, Pennsylvania, on October 13, 2020.

_Rita A. Ross_

RITA A. ROSS, Notary Public
in and for the Commonwealth
of Pennsylvania

Commonwealth of Pennsylvania - Notary Seal
Rita A. Ross, Notary Public
Allegheny County
My commission expires February 14, 2022
Commission number 1141170
Member, Pennsylvania Association of Notaries

My commission expires February 14, 2022.

Ross Reporting Service
724-695-3911

**[**

**[verbatim] (1)**
19:4

**A**

**able (2)**
21:5;25:22
**above (2)**
24:7,14
**absolutely (2)**
95:25;96:5
**According (1)**
50:7
**accurate (4)**
44:3,5;79:18;91:21
**accurately (1)**
94:4
**across (3)**
30:4;63:9;69:15
**Act (1)**
74:14
**Action (3)**
5:9;53:4,8
**actions (2)**
94:14,19
**activate (3)**
20:3,5,6
**activated (2)**
30:7,9
**actively (2)**
67:17;95:17
**actor (5)**
31:5;33:13,14;
59:19;69:19
**acts (1)**
59:19
**actual (4)**
24:14;42:16;79:21;
93:10
**actually (8)**
21:17;28:8;59:16,
24,25;70:18;71:8;
72:17
**Adams (3)**
22:22;30:19;70:15
**Adams' (1)**
23:3
**addition (1)**
29:15
**administer (2)**
71:14;72:17
**administered (3)**
71:18;72:7;73:6
**advancing (1)**
85:19
**aerial (7)**
37:18;81:19,25;
82:10,13;83:10;
84:12
**African (2)**

**40:11,14**
**Afternoon (1)**
22:11
**afterwards (1)**
39:10
**Again (34)**
6:3;7:3;20:12;
22:18;29:20;31:12;
35:23,23;42:17;
46:23;57:16;58:12;
59:1;61:13;62:12;
64:6,14;65:10;66:2;
67:12;68:19;78:4;
79:13;80:10,22;81:2,
8,14;83:11;84:11;
86:16;88:7,24;90:1
**against (1)**
77:25
**age (2)**
8:1;88:24
**ago (1)**
88:21
**ahead (4)**
32:22,25;67:22;
69:1
**aid (8)**
71:15,17,19,20,20;
72:3,7,17
**aimed (1)**
67:12
**aiming (1)**
66:11
**air (2)**
40:3;62:23
**alcohol (2)**
73:13;80:16
**Allegheny (6)**
8:25;9:20;51:10;
73:18,21;79:10
**almost (2)**
56:12;66:20
**along (5)**
24:21;25:10;45:7,
17;46:6
**always (5)**
93:3,5,6;95:13,15
**Ambulance (4)**
11:17;12:2,5,7
**American (2)**
40:11,14
**amount (1)**
58:24
**and/or (1)**
30:6
**anger (1)**
87:4
**animal (6)**
77:9,14,17,20,22,
23
**answered (2)**
72:1;94:14
**anticipate (1)**
6:16

**any/all (1)**
16:15
**apologize (1)**
92:10
**appear (2)**
20:21;79:13
**appears (5)**
20:23,25;21:10;
39:12;80:13
**applicable (2)**
17:22;18:13
**apply (1)**
21:5
**appreciate (2)**
80:15;91:4
**approach (2)**
62:6,16
**approaching (1)**
43:6
**appropriate (1)**
58:24
**approximately (3)**
12:19;13:10;74:24
**area (18)**
8:3,6;19:17;25:10;
31:9;37:18;55:7;
56:9;61:1;62:9,21;
63:5;64:15;66:11,13;
72:23;82:1;86:21
**Aren (16)**
60:25;64:3,4,12,13,
15,19;65:6,8,8,10,13,
13;80:20,21;87:1
**Aren's (4)**
64:5,6,14,24
**Arko (1)**
76:8
**arm (10)**
40:2,2,3;59:15,16;
61:1;63:4,5;69:14;
85:5
**armed (2)**
44:16;85:8
**arms (2)**
28:10;59:14
**around (19)**
12:12;13:11;26:22;
36:2;44:19;45:4;
46:1,2;54:4;56:10;
58:23;59:6;60:10,12;
63:21,21;65:6;94:9;
97:4
**arrest (6)**
95:18,24,25;96:4,
5;97:11
**arrived (3)**
19:15,16,17
**arriving (1)**
30:22
**Aside (4)**
60:6;74:8;83:8;
97:8
**ASP (3)**

**35:25;36:7,15**
**A-S-P (1)**
36:16
**assess (1)**
72:6
**assessed (1)**
71:17
**assessment (2)**
67:25;68:11
**assigned (1)**
22:17
**assistance (1)**
18:20
**assisted (1)**
70:16
**assume (5)**
14:22;25:6,18;
70:4;86:7
**attempt (7)**
36:2;64:13;69:19,
23;71:14;85:7;88:4
**attempt- (1)**
85:25
**attempted (10)**
35:23;44:18,20,20;
60:3;64:4,21,22;
65:9;70:10
**attempting (7)**
35:25;58:21;67:17;
86:4;87:23;96:3;
97:16
**attempts (1)**
95:24
**attention (2)**
33:13;58:20
**attorneys (1)**
52:8
**audio (2)**
21:22;91:13,19;
92:10
**Authority (24)**
8:15;13:14;14:3,6,
13;17:14,25;18:3;
20:2;22:8;48:24;
50:4;52:1;73:8,17;
74:22,23;75:10;
76:20;78:6;88:9;
89:3,11,14
**Authority's (1)**
73:3
**autopsy (1)**
76:1
**available (3)**
66:16,17,22
**Avenue (36)**
19:18,23;23:16,19;
26:5,8,12,14,21;29:2,
20,21,23;30:5,17;
31:12,14,15;32:6,18;
33:4,7;43:12;47:17;
54:1,23;60:17;69:14;
81:19,23;82:1,15,19;
83:10;84:13;93:17

**aware (1)**
80:3
**away (14)**
27:24;29:2;33:18,
19,20;44:3;57:2,25;
59:2;60:14;61:23;
69:6;92:24;95:10

**B**

**back (34)**
19:22,23;26:4,5,5;
27:16;30:1,4;35:20;
42:23;43:12,15;
44:12;45:4,14;46:2,
24;48:9;53:23;60:16;
62:8,9,20,25;63:15,
18,20;66:21,22;
69:13;72:24;76:2;
79:3;81:22
**backed (1)**
29:19
**backing (1)**
27:24;28:23;29:12
**backwards (2)**
36:4;60:4
**bald (1)**
41:24
**band-aid (1)**
71:24
**barking (1)**
55:19
**basically (4)**
26:12;27:15;40:2;
41:15
**Bates (2)**
9:24;49:5
**baton (2)**
36:8,9
**batons (1)**
89:8
**become (1)**
75:7
**began (10)**
18:17;19:20;29:7;
31:17;43:11;63:20;
69:9,18;72:6;80:22
**beginning (2)**
74:9;81:2
**begins (1)**
5:4;32:18
**behind (22)**
5:18;27:5,6,17;
29:4;32:12;34:8;
39:24;40:15;42:1;
45:21;46:17,20;
54:24,25;55:8;60:9,
11;62:16;66:5,7;82:1
**besides (1)**
37:2
**best (1)**
79:20
**better (1)**

**81**:11

**big (2)**
6:17,21

**biggest (1)**
66:14

**bit (8)**
6:17;10:8;61:4;
62:3,6,9,11;63:4

**bite (2)**
54:18;63:1

**bites (3)**
61:16;62:22,24

**BK (1)**
82:7

**black (1)**
41:2

**black-and-white (1)**
40:23

**blade (2)**
59:10;93:4

**bleeding (1)**
71:23

**bless (1)**
78:9

**bodily (3)**
67:7;68:5;90:23

**body (22)**
17:21,23;18:1,4,7;
61:6,7,17;62:5,10,24;
63:9;66:12,14;67:11;
68:14,17,20,22;69:4,
12;70:5

**boot (1)**
70:1

**both (7)**
5:20;6:20;13:4;
23:1;34:24;35:9;
55:20

**bottom (6)**
49:3,3,10,12;
76:22;83:21

**break (7)**
7:9,10;47:24,25;
48:3;54:4;78:18

**Brian (1)**
5:7

**brief (2)**
48:8;79:2

**briefly (1)**
91:6

**broad (2)**
71:21,24

**Bruce (29)**
5:6;14:5;15:1;
16:17,22;18:12;
21:13;27:25;33:14;
36:21;43:5;50:6;
52:14;54:24;57:6;
59:4;60:5,7,16;63:7;
68:14;72:3;75:13;
76:1;82:6,7;84:13,
16;87:4

**Buffalo (2)**

**12:21;13:2**

**build (1)**
25:7

**bullet (5)**
38:12;39:11;80:19,
19;81:21

**Burrell (5)**
13:12,18,22;14:4;
18:6

**bus (4)**
24:12,17;97:5,14

**buses (1)**
24:16

**busway (11)**
24:12,19,21,23;
25:10;29:2;47:17;
54:14;82:16,17;97:6

**Butler (1)**
12:10

**C**

**Calisia (2)**
5:5,17

**call (9)**
18:17,21;19:13,17;
22:19,21;23:3;24:15;
33:25

**called (7)**
11:14;17:13,14;
22:22;24:18;36:8,10

**calls (1)**
30:19

**came (5)**
32:5;45:21;46:21;
62:18;64:13

**camera (5)**
17:23;18:10;19:25;
39:20;42:23

**cameras (6)**
17:21;18:1,4,7;
20:4,6

**cams (1)**
20:1

**can (36)**
6:19,24;7:3,7,9,23;
13:16;17:10;24:16,
16;27:9;29:14;37:4,
17;38:23;39:7,21,23;
41:7,21;42:2,6;54:7;
55:19;58:9;68:22;
76:21;78:17;79:7,22;
83:8;85:17,18;90:10;
92:14,15

**capabilities (1)**
19:25

**captured (1)**
42:24

**car (9)**
19:2,25;22:24;
29:12;31:16,17,22;
72:24;76:10

**care (2)**

**67**:3,4

**career (4)**
10:18;13:7;77:5,17

**carefully (2)**
20:13;80:10

**cars (2)**
20:1,2

**case (6)**
5:5;10:1,8;17:8;
26:5;80:9

**Caucasian (1)**
40:7

**caught (1)**
55:13

**caused (1)**
69:8

**Center (19)**
19:23;26:5,8,12,14,
21;29:1,20,21,23;
30:17;31:12;32:18;
33:4,7;66:13,15;
93:17;94:5

**certain (4)**
6:7,25;17:2;25:9

**certified (2)**
71:19;74:14

**change (3)**
23:10;80:7;93:1

**chest (2)**
62:7;69:15

**chief (5)**
51:7;52:3,11;
76:24;77:1

**chronological (1)**
22:6

**chronology (2)**
13:7;53:23

**Citizens (1)**
12:7

**Civil (2)**
5:9;6:5

**civilian (3)**
27:25;28:11;47:21

**civilians (6)**
24:2;26:24;27:21;
47:18;54:1;57:10

**claim (1)**
78:3

**clarifying (2)**
73:16;80:15

**clear (5)**
7:8;21:24;26:24;
71:16;84:11

**cleared (1)**
14:15

**clearly (2)**
72:8,10

**climb (3)**
43:20;44:10;45:17

**climbed (2)**
43:10;45:13

**climbing (4)**
42:12,15;43:20;

**44**:12

**climbs (1)**
43:9

**clock (1)**
83:19

**close (13)**
27:22,25;33:10,14;
36:2;44:3,18;58:22;
59:2,7;65:23;70:5;
78:16

**closed (1)**
93:5

**closest (1)**
58:2

**clothing (2)**
34:24;35:9

**Co-Administratrixes (1)**
5:6

**collapsible (1)**
36:9

**college (3)**
8:20,22,25

**color (1)**
41:1

**comfortable (1)**
7:4

**coming (10)**
23:12;29:11,15;
32:7,9;45:5;61:24;
62:15;64:5;81:22

**command (2)**
54:18;87:18

**commands (13)**
31:17;36:24,25;
56:24;57:21;75:21;
87:17,19,21,21;88:3;
94:22;95:4

**commenced (1)**
5:2

**Community (1)**
8:25

**Company (1)**
11:19

**compass (1)**
83:15

**complete (2)**
9:17;16:15

**completed (1)**
16:16

**completely (1)**
15:14

**compose (4)**
21:13,25;51:8,11

**con- (1)**
77:14

**conclude (1)**
69:8

**concluded (2)**
86:14;98:6

**concludes (1)**
98:4

**Concrete (1)**
25:5

**conducted (1)**
91:12

**conference (1)**
5:13

**connect (1)**
68:7

**connected (5)**
28:5;63:22;70:18,
23;71:2

**consider (4)**
26:13;51:4;71:13;
86:25

**considered (6)**
50:18;51:1;77:2;
85:13;88:16;90:11

**consist (2)**
71:20;89:6

**Contact (1)**
69:18

**contained (1)**
79:17

**continue (5)**
25:19;45:17;47:8;
91:7;95:10

**continued (3)**
35:24;36:5;64:7

**continues (1)**
49:10

**continuing (1)**
64:16

**control (1)**
71:23

**conversation (2)**
25:12,15

**conversations (2)**
52:5,8

**cooperate (1)**
96:3

**cooperating (1)**
95:24

**copies (1)**
16:15

**corner (1)**
38:10

**coroner (1)**
72:14

**correctional (1)**
12:13

**correctly (6)**
14:16;16:19;18:14;
50:2;51:16;80:23

**correspondence (1)**
52:8

**Counsel (5)**
5:14;38:17;48:14,
18;79:25

**counseling (1)**
74:11

**County (10)**
8:25;9:20;12:11;
51:10;73:4,18,21;
79:10;91:13,14

**couple (7)**

9:7,9;10:16;16:4;
49:18;74:19;78:17
**couple-minute (1)**
47:24
**Court (4)**
5:8,10,21;86:6
**cover (2)**
33:12,21
**CPR (1)**
71:22
**create (2)**
20:22;22:1
**created (1)**
20:18
**criminal (1)**
86:6
**crisis (1)**
75:11
**criteria (1)**
50:21
**critical (1)**
73:8
**custody (1)**
97:17
**cut (2)**
26:6;28:19
**cutting (4)**
19:21;26:4;30:4;
31:15

**D**

**D&A (3)**
73:3,9;80:15
**danger (1)**
68:5
**dash (4)**
18:10;19:25;20:1,3
**date (7)**
5:10;74:21;75:1,2,
7;77:18;88:9
**dates (2)**
11:21,23
**day (12)**
16:21;17:23;22:5,
7,10,15,17,17;48:25;
75:13;77:4;78:6
**daylight (1)**
56:13
**days (2)**
36:11;73:23
**dead (3)**
72:8,10,15
**deadly (12)**
17:5;66:25;68:3,3;
71:7;77:4;90:3,7,8,
12,22;97:7
**deal (2)**
6:17,22
**dealing (4)**
15:15;25:19;30:20,
23
**dealings (1)**

75:13
**death (1)**
96:7
**deceased (1)**
5:7
**decide (1)**
72:10
**decides (2)**
72:14,15
**deer (2)**
77:21,22
**de-escalate (3)**
87:15,20;88:4
**de-escalation (2)**
87:22,24
**defendants (1)**
5:20
**defense (1)**
38:17
**defensive (7)**
88:11,13,15,19;
89:2,7;90:1
**delivery (1)**
11:10
**DelSole (3)**
90:16,19,20
**D-e-l-S-o-l-e (1)**
90:20
**demand (1)**
78:3
**demonstrated (1)**
96:17
**demonstration (1)**
91:22
**Department (16)**
9:20;12:17,21;
13:6,18,22;17:19,25;
22:8;48:23,24;51:10;
73:18;76:20;79:10;
88:9
**departments (1)**
17:3
**Department's (1)**
50:4
**depending (1)**
74:24
**depict (2)**
93:21;94:4
**depiction (4)**
44:3,5;80:1;91:21
**deploy (3)**
35:4;66:25;71:7
**deployed (10)**
17:4;33:1,3,7;
34:15,15;35:17,22;
77:4;95:15
**deploying (4)**
35:11,12;40:3;
42:17
**deployment (4)**
34:20,23;35:6,8
**deployments (1)**
34:13

**deploys (1)**
34:10
**deposition (20)**
5:1,4,13;6:4,8;
7:12,14;10:9;15:25;
20:8;37:13;48:11,15;
91:12,18;92:19;
93:15;96:17;98:5,6
**depth (1)**
44:7
**describe (1)**
83:8
**described (6)**
15:21;45:22;61:9;
81:7;93:4;97:14
**description (1)**
43:4
**details (1)**
15:16
**Detective (4)**
21:3;42:4;76:24;
77:1
**detectives (2)**
76:23;77:2
**determine (1)**
71:7
**Diaddigo (1)**
5:11
**diagonal (5)**
57:1,5;60:16;61:9;
62:13
**die (1)**
87:12
**different (11)**
9:23;64:19;72:19;
76:15;88:13;89:8,9,
16,17,19,20
**DiPippa (13)**
30:4;33:1,3,10;
34:10,21;35:12;
41:25;76:7,11,18;
89:24;90:15
**direct (2)**
36:23;49:22
**directing (1)**
37:24
**direction (13)**
46:2;47:6;60:10,
12;64:7;67:14,20;
81:3;83:24;84:4,7,8;
94:19
**directly (4)**
39:24;40:1;41:15;
64:2
**Discharge (9)**
49:7,21;51:14,24;
52:12,20,22;53:1,11
**discharged (2)**
96:10,14
**disciplinary (1)**
78:12
**disciplined (1)**
78:11

**discovery (1)**
9:23
**disengaged (3)**
64:3;65:7;80:20
**distance (10)**
54:16;58:7,9,13,17,
22;65:20;66:1;85:14;
86:10
**District (2)**
5:8,8
**DNA (2)**
73:6,15
**doctor (1)**
72:15
**document (2)**
9:25;20:17
**documents (4)**
9:10;16:4;20:21;
21:25
**dog (21)**
57:22;60:24;61:5,
10,16,17,24;62:3,6,6,
11,14,22,22;63:4,22;
76:7;82:22;87:6,9,12
**dog's (1)**
62:23
**Dominic (6)**
5:1,4,7,23;7:22,24
**done (4)**
7:20;20:4;37:9;
72:2
**door (1)**
26:3
**double (1)**
9:21
**down (27)**
6:14,19,24;19:22;
21:17;23:16;26:21;
27:3;29:21,23,24;
30:17;31:1,11;32:18;
37:25;51:11;54:14,
16;77:14,17,23;
80:19;83:4,5;87:18,
23
**downtown (1)**
18:22
**draft (3)**
21:25;51:8,11
**drawn (1)**
41:17
**drew (2)**
31:17;32:14
**drive (1)**
23:13
**driving (3)**
18:11;19:7;30:1
**drop (10)**
30:2;31:18;36:25;
45:5;46:4,4;75:21,
22;87:17;94:23
**drove (1)**
19:12
**Drug (2)**

73:13;80:16
**drug-and-alcohol (1)**
73:9
**duly (1)**
5:24
**duplicate (1)**
20:14
**during (9)**
91:11;94:4,8,23;
95:8,16,22;96:3,16
**duties (1)**
50:10

**E**

**earlier (4)**
10:7;93:4;94:8;
97:3
**Earth (1)**
37:22
**east (3)**
83:16,20,25
**Eat'n (1)**
11:5
**Edgewood (1)**
39:25
**effect (1)**
35:23
**effects (1)**
33:2
**either (4)**
39:7;54:12;56:5;
70:24
**elevated (3)**
24:7,7,13
**else (14)**
13:19;15:21;17:13;
21:1,2;26:23;33:13;
39:21;42:6,7;70:11,
12;72:20;88:4
**Emergency (4)**
12:1;23:5,7,10
**employed (6)**
5:12;8:15;13:17,
21;22:7;25:8
**employee (4)**
14:12,24;15:17;
74:9
**employer (1)**
11:13
**encounter (8)**
16:17;36:23;50:9;
54:9;87:14,15;96:16;
97:3
**encountered (4)**
30:3;45:3;84:21,23
**end (2)**
81:18,18
**enforcement (4)**
9:2;10:14,18;12:15
**engage (2)**
62:20;64:13
**engaged (3)**

Case 2:17-cv-01599-NBF   Document 107-4   Filed 02/19/21   Page 105 of 113
Calisia Kelley and Johnnie Mae Kelley v.
Brian O'Malley and Dominic Ravotti
Dominic Ravotti
October 1, 2020

60:25;61:2;64:19
**engagement (3)**
64:22,25;96:1
**enough (5)**
58:22;59:8,12;
60:14;66:7
**entire (2)**
93:16;97:9
**episode (1)**
97:9
**equal (1)**
76:18
**equivalent (1)**
17:15
**escape (1)**
95:10
**especially (1)**
82:12
**Estate (1)**
5:6
**estimate (6)**
27:9,10;58:9,17;
86:13,17
**estimates (1)**
86:10
**evade (1)**
96:4
**evading (1)**
96:5
**Evashavik (34)**
5:19,19;7:17;9:11,
16;10:5;17:9;20:16;
35:1;37:11,23;38:5;
40:24;41:9;50:24;
51:22;53:12,18;
68:24;76:4;79:19;
80:9;91:6,10;92:2,7,
11,13,18,21;95:21;
96:20,24;98:3
**even (5)**
17:4,13;20:3;
74:12;83:5
**events (5)**
22:5;37:7,8;53:23;
81:15
**everybody (2)**
33:13;94:5
**evidence (1)**
79:20
**exact (2)**
74:25;86:17
**exactly (14)**
33:9;55:3;56:6;
58:18;61:19;62:14,
19;67:13;79:25;
82:14;85:16;88:22;
90:2;91:22
**EXAMINATION (3)**
6:1;91:9;96:21
**examined (1)**
5:24
**excessive (2)**
77:25;78:4

**Excuse (1)**
78:8
**exhausted (1)**
97:17
**Exhibit (26)**
9:8;10:9,12;15:25;
16:3;20:8,11;37:5,10,
13,16;38:9;48:11,15,
17;79:11;81:14,15,
18;92:4,8,19;93:7,14,
14;96:17
**exhibits (7)**
7:1,1,3,4,5;10:1,7
**exit (1)**
19:20
**exited (1)**
19:20
**explain (1)**
53:16
**explained (1)**
37:3
**explaining (1)**
17:6
**extended (2)**
85:5;93:6
**extent (1)**
57:5
**eyes (3)**
26:7;27:12;46:24

## F

**facing (15)**
39:20;61:6;63:21;
64:2,8,18;67:14,16;
69:13,14;83:22,24;
84:1,2;85:5
**fact (1)**
60:9
**fall (3)**
44:22,23;69:12
**falling (1)**
69:9
**familiar (3)**
52:16,19,21
**Family (1)**
10:20
**far (18)**
10:1;15:21;26:11;
29:22;35:15;40:11;
44:3,6;54:8;58:25;
59:2;60:13,24;61:6;
66:7,24;86:14;90:21
**farther (2)**
33:19;58:12
**fashion (1)**
22:6
**fast (1)**
6:23
**faster (1)**
25:22
**feel (2)**
53:13;68:4

**feet (25)**
27:25;28:2;33:17,
18,19,20;43:22,25;
44:8,8;46:11,14;58:5,
11,12,14;59:18,21,
25;65:22,23;85:10;
86:10,13,18
**fell (3)**
64:15;69:13;70:21
**fellow (2)**
19:5;89:10
**felt (10)**
44:20;60:9,11;
69:5;72:5;84:18;
86:23;97:6,9,20
**female (7)**
47:20,22;54:2,3,7;
57:16,18
**fence (31)**
42:12,15;43:6,10,
10,11,16,20,20,21;
44:8,9,10,12,23;45:1,
2,3,4,9,10,13,17,20,
21,23;46:8,21,24;
47:2;93:19
**few (2)**
79:6;91:6
**figure (3)**
62:15;74:25;75:22
**file (2)**
77:24;78:3
**filed (1)**
5:7
**fill (7)**
17:5,7,15;52:12,
24;53:1,4
**filled (1)**
16:15
**filling (1)**
53:10
**film (2)**
44:1,2
**final (1)**
42:8
**find (1)**
53:4
**fine (4)**
11:24;48:1;80:12;
88:18
**Fire (12)**
11:19;16:25;65:15,
16;66:9;67:1,2,15,23;
68:11;84:17;87:4
**firearm (5)**
31:17;34:1;49:7,
20;85:21
**firearms (3)**
90:5,11,14
**fired (18)**
16:22;65:14,18;
68:10,12,15;71:10;
77:12;82:23;83:10;
84:3,3,16;85:21;

86:24;87:8,11;96:25
**firing (5)**
68:7,9;69:6,10;
70:22
**first (32)**
5:24;7:23,24;
12:15;16:10;19:17;
20:23;21:9;23:3;
27:12;34:15,17;
38:12;49:17;54:21;
59:23;64:25;65:15,
16,18;68:10,15;
71:15,17,19,19,20;
72:3,17;73:5;79:14;
86:2
**five (1)**
37:17
**fled (1)**
97:11
**flesh (1)**
75:16
**flight (2)**
96:4,5
**fluid (1)**
65:3
**focused (1)**
59:2
**Foley (1)**
21:3
**follow (4)**
29:7;32:23;43:11;
47:8
**followed (1)**
53:20
**following (5)**
27:5,6;31:2;42:16;
45:18
**follows (1)**
5:25
**follow-up (1)**
16:12
**follow-ups (1)**
9:9
**foot (3)**
32:23;69:20,21
**footage (1)**
38:18
**force (40)**
9:18;10:3;16:15;
17:4,4,5,5,7,8,14;
34:3;48:15,20;50:5;
53:14,19;66:23,25;
68:3,3;71:6,7;77:5,
25;78:4;87:22;88:7,
10,14,16,17;89:18,
20,22;90:4,7,9,12,22;
97:7
**forgive (1)**
82:6
**form (13)**
17:9,14,15;20:16;
35:1;50:24;51:22;
53:12,18;68:24;76:4;

79:20;96:1
**forms (1)**
51:25
**forth (2)**
17:7;27:16
**forward (2)**
64:13;75:7
**four (6)**
9:21,24;20:13,21;
37:17;74:24
**four-page (1)**
48:17
**frame (6)**
12:10;13:8,11;
42:3,9,25
**frames (1)**
12:4
**free (1)**
55:21
**Freeport (8)**
8:4,6;11:16;12:2,5,
17,20,25
**front (13)**
27:16,19,23;33:15;
45:3;55:9,18;57:3;
62:17;64:18;66:21;
79:11;83:2
**Fuck (3)**
35:20;45:7;46:5
**full (2)**
16:14;64:21
**full-time (2)**
12:25;13:24
**further (1)**
37:25
**furtive (6)**
80:22,25;81:1,1,4,6

## G

**gap (4)**
34:13,14;64:24;
65:2
**gate (9)**
45:24;47:2,5,10,14,
14,15,15;53:25
**gave (5)**
36:25;50:17;51:12;
87:17;96:1
**gazebo (1)**
22:23
**Geary (59)**
5:16,16;6:2,4;7:16,
18,19;9:6,14,17;10:6,
11,23,24;16:2;17:12;
20:10,19;35:3;37:5,
12,15;38:1,3,7;41:1,
3,11;43:13,14;47:23;
48:2,5,13;51:3;52:2;
53:15,22;68:25;76:6;
78:9,10,16,23;79:5;
80:2,12,14;91:3,8;
92:3,6,9,12,16;94:14;

Case 2:17-cv-01599-NBF   Document 107-4   Filed 02/19/21   Page 106 of 113
Calisia Kelley and Johnnie Mae Kelley v.
Brian O'Malley and Dominic Ravotti
Dominic Ravotti
October 1, 2020

95:20;96:22;98:2
**Geary's (1)**
94:10
**general (3)**
58:8,8;86:21
**generally (2)**
22:14;50:10
**gets (3)**
25:13;45:22;61:17
**given (3)**
73:3;90:8,25
**gives (1)**
56:24
**giving (5)**
31:17;75:21;87:19,
21;95:3
**goal (1)**
35:8
**God (1)**
78:9
**goes (6)**
29:1;44:22;45:1,2;
47:5,14
**Good (2)**
5:16;6:3
**Google (1)**
37:22
**graduate (1)**
8:7
**greater (1)**
46:14
**Greg (5)**
5:19;7:16;9:6;
37:6;92:9
**ground (9)**
6:7;7:11;37:1;
44:23;62:25;64:15;
65:13;69:9;70:22
**group (1)**
22:23
**guess (2)**
26:13;28:2
**gun (4)**
41:17,19;85:8;87:4
**guns (1)**
34:4
**guy (2)**
39:23;40:2

**H**

**half (2)**
12:19;49:17
**Hamnett (7)**
19:19;32:19;37:24;
41:5;93:10,13;96:18
**hand (21)**
27:15;36:1,4;
41:14,23;55:21,21;
59:13;60:3;63:2,13,
13;64:17;69:16,21,
22,25;70:2,3,5;93:6
**hand- (1)**

72:22
**handcuffed (1)**
71:15
**handcuffs (6)**
69:23;70:8,9,10,
12;71:12
**handouts (1)**
91:1
**hands (3)**
34:9;55:20;93:1
**hands-on (2)**
88:15;89:7
**hang (1)**
6:18
**happen (4)**
31:8;35:15;63:6;
77:16
**happened (12)**
17:6;22:5,15;43:4;
54:8;68:14,16;69:2;
70:6;73:1,2;76:3
**happening (1)**
29:15
**happens (8)**
6:18,21;31:11;
32:17;44:25;56:18,
19;63:25
**hard (2)**
69:3;71:25
**harm (1)**
67:7
**hat (5)**
39:3,19;41:16;
42:23;43:17
**head (7)**
41:24,24;62:7;
63:1,9;64:5;69:14
**health (9)**
14:12,24;15:4,15,
17,20,22;75:14,17
**hear (11)**
22:24;25:17;29:24;
30:2;47:20;54:21;
56:19;60:23;92:14;
95:3;97:24
**heard (7)**
54:7,16,18,23;55:3,
11,11
**Heights (2)**
11:6;12:9
**held (1)**
93:3
**help (1)**
72:3
**hierarchy (1)**
76:25
**high (7)**
8:5,6,17,19;11:3,9,
10
**higher (3)**
24:24;25:2,2
**hill (1)**
26:4

**hind (1)**
62:23
**hit (5)**
28:11;34:22;65:13;
67:13;71:4
**holding (2)**
41:14;55:18
**holster (1)**
45:12
**holsters (1)**
34:5
**home (1)**
73:21
**homicide (3)**
73:4,5,19
**Hose (1)**
12:7
**hour (1)**
14:14
**Hours (5)**
38:10;39:11;41:4;
42:11;81:21
**house (8)**
57:17,19;82:14;
83:1,6,8,12,14
**houses (13)**
28:5,19;30:1;
31:15;57:8;60:17,20;
69:14;82:1,2,18,19;
83:4
**house's (1)**
46:9
**hurt (3)**
35:18;45:8;46:6
**hurting (1)**
35:21

**I**

**idea (9)**
19:11;25:4;31:7;
40:10,13;43:24;
51:24;55:22;59:11
**ideally (1)**
34:24
**identification (1)**
92:20
**identified (1)**
93:14
**identify (15)**
5:14;14:9;39:6,7,
18,21,23;41:7,10,21;
42:2,6;83:12;84:12;
92:7
**identities (1)**
43:2
**immediate (6)**
55:7;57:10;65:1;
68:5;84:18;85:20
**immediately (1)**
9:1
**imminent (2)**
68:4;90:23

**impression (1)**
75:14
**Inc (1)**
5:12
**incident (35)**
6:5;14:5,11,14,18,
20;15:2,16,17,22;
18:18,23;21:14;22:1;
23:18,23;25:19;
26:20;29:22;30:11;
50:1,6,8,11,14;51:1,
18;52:6;53:20;72:23;
73:8,24;74:3;75:3;
78:14
**indicates (1)**
76:2
**individuals (2)**
30:20;39:4
**information (1)**
23:9
**infraction (1)**
78:12
**initial (1)**
85:23
**initially (5)**
19:18;23:14,16;
30:19;80:16
**initials (5)**
82:6,9,9,10,23
**injured (4)**
77:9,15,17,23
**injuries (3)**
49:21;72:6;74:3
**injury (2)**
90:23;96:7
**inquire (2)**
52:25;53:3
**inquired (1)**
17:21
**instructor (1)**
90:15
**instructors (7)**
89:13,17,19,25;
90:1,5,11
**interaction (3)**
50:9;94:23;95:16
**interrogatories (3)**
9:7,13;10:4
**interrogatory (1)**
14:9
**interrupt (4)**
6:20,21;31:13;
97:23
**intervention (1)**
75:11
**interview (15)**
9:19;20:24,24,25;
21:1,4,10;79:9,18;
81:9,10;91:12,16,23;
92:3
**interviewed (4)**
14:22;15:1;21:20;
74:10

**interviewer (1)**
92:14
**into (22)**
8:20,23;9:1;10:17;
19:19,22,24;23:10;
26:4;30:1;35:24;
49:10,22;63:1;64:6,
14;69:23;70:9,10;
72:23;80:22;97:17
**involved (3)**
49:25;51:13;52:20
**involvement (4)**
18:17;93:17;95:17,
23
**issues (3)**
74:6;75:14,17

**J**

**January (5)**
16:16,21;52:17;
76:21;88:8
**Jeanette (14)**
26:17,18;27:1,3,
14;28:3,4,6;29:8,19;
30:12,14,22;32:5
**Jermain (1)**
21:4
**job (4)**
10:13;11:10;12:15;
50:10
**jobs (3)**
9:2,4;10:17
**Johnnie (2)**
5:5,17
**Jr (24)**
5:6;16:17;18:12;
21:14;28:1;36:22;
43:23;50:6;59:4;
72:4;75:13;76:1;
84:16;85:10;86:20;
92:23;94:8,14,22;
95:9,17,23;96:2,6
**jump (1)**
6:16
**jumped (2)**
36:4;60:4
**justify (1)**
90:22

**K**

**K-9 (43)**
30:3;33:1;41:25;
54:16,18,19;55:14,
16,17,18,18;56:20,
21;60:25;62:19,20;
63:9;64:4,5,6,7,15,
18;65:6,7,8,8,10,13,
13;66:18;75:3,5,7;
76:7,9;85:19,24,25;
86:4;89:23,24;95:15
**Kaupinis (4)**

Case 2:17-cv-01599-NBF   Document 107-4   Filed 02/19/21   Page 107 of 113
Calisia Kelley and Johnnie Mae Kelley v.
Brian O'Malley and Dominic Ravotti

Dominic Ravotti
October 1, 2020

35:22;39:12;40:3;
42:17
**keep (4)**
23:11;31:13;37:23,
23
**keeping (1)**
58:22
**Kelley (105)**
5:5,5,6,17,17;14:5;
15:2;16:17,22;18:12;
19:21;21:14;26:4;
27:4,12;28:1;33:14;
34:17;35:17;36:2,22;
39:19,24;41:13,19;
42:15;43:5,23;44:6,
10;45:22;47:1,13;
50:6;52:14;53:24;
54:10,24,25;56:23,
23;57:6,23;58:2,5;
59:4;60:5,7,16,25;
61:10,16,17,20;62:2,
3,16,16,17,22,24;
63:2,7,10,12;64:1,2,
3,6,8,14,19,25;65:4,
21;67:8;72:3;75:13;
76:1;80:21;82:7,22;
83:17;84:13,16;
85:10,13;86:14,15,
20;87:4,9;92:23;
94:8,14,22;95:9,17,
23;96:2,6,24;97:9,10,
14
**Kelley's (9)**
36:1;40:1;61:5,17;
62:5,10;63:4;68:14;
82:23
**kept (3)**
60:4;75:23;85:19
**kicked (2)**
70:1,3
**kids (1)**
8:11
**killed (1)**
18:12
**kind (14)**
7:14;15:13;22:4,6;
27:15;32:15;43:5,7;
54:3;57:1;64:25;
71:22;77:20,22
**King's (1)**
10:20
**knew (1)**
31:4
**knife (48)**
27:15,16;28:11;
30:2;31:18;36:1,3,3;
37:1;41:14,14;44:16,
19;45:6;46:4,4;
58:21;59:7,10;60:3,
10,12;63:2;64:6,14,
17,17;65:8;69:15,21,
21,24;70:1,4,6;75:21,
23;80:22;85:5;87:17,

18;92:24;93:5;94:10,
19,23;97:11,19
**knock (1)**
60:3
**Kyrone (1)**
19:4

**L**

**lady (2)**
15:6,23
**large (2)**
59:12;65:2
**larger (1)**
77:23
**last (8)**
7:23,24;43:9,15;
86:12;96:23;97:2,24
**lasted (1)**
14:14
**later (3)**
10:8;54:18;66:24
**law (4)**
9:1;10:18;12:15;
87:1
**lawsuit (2)**
77:24;78:3
**lawyer (1)**
78:2
**lay (1)**
27:12
**laying (1)**
69:15
**Leading (1)**
95:20
**leash (1)**
55:21
**least (4)**
24:13;46:22;58:22;
71:2
**leave (1)**
14:3
**leaving (1)**
14:6
**Leechburg (2)**
13:9,10
**left (41)**
18:3;26:17,18;
27:1;28:24;29:1,11;
40:1,2,2,11;41:4,25;
42:9;43:7;47:16;
53:24;54:3,6,12;
56:5;57:6,8,8;60:18,
25;61:13;62:8,9,20;
63:4,5,8,13;65:14;
66:4,7;81:21;82:19,
19;83:20
**left-hand (2)**
38:9;82:17
**legs (3)**
62:23,25;69:13
**length (3)**
25:10;59:10,16

**less (1)**
12:23
**lesser (1)**
17:4
**less-lethal (1)**
97:18
**lethal (3)**
33:12,21;34:3
**level (3)**
24:25;25:1,2
**lieutenant (2)**
76:24;77:1
**life (2)**
11:7;31:10
**light (1)**
80:11
**lights (3)**
30:6,8,16
**Linear (1)**
24:23
**lines (2)**
45:7;46:6
**listen (2)**
25:16;38:5
**lists (1)**
49:21
**little (3)**
6:17;10:8;12:19
**loaded (1)**
85:8
**located (2)**
11:15;12:7
**location (2)**
10:21;11:5
**long (6)**
10:25;11:2;12:18,
22;25:8;74:21
**longer (3)**
67:5;68:4;71:14
**look (17)**
6:25;10:12;14:8;
16:10;20:11,13;
36:19;37:19;43:17,
19;46:24;48:18;
55:12;78:17,19;
88:22;93:9
**looked (2)**
45:4;46:2
**looking (9)**
38:8,21;39:24;
43:22,25;61:20;67:8;
68:20;84:1
**looks (6)**
9:20,25;20:12;
39:24,25;40:14
**lot (22)**
19:19,25;21:25;
23:14,15,17;24:3,5,8,
14,14;29:13;32:19,
20;33:1;35:24;36:5,
6;41:5;93:18,18;94:6
**Lower (7)**
13:12,12,18,21;

14:4;18:6,6
**lunged (2)**
36:3;80:21

**M**

**M&P9 (1)**
32:16
**Mae (2)**
5:5,17
**mainly (1)**
6:8
**makes (1)**
29:11
**man (1)**
31:10
**manner (4)**
61:8,18;93:3;95:10
**manufacturer (1)**
36:18
**many (20)**
8:13;16:25;27:6,
10;43:22;46:11,18,
20;58:5;63:10;66:9;
74:1;77:16,19;85:10,
22;86:14;88:20,21,21
**mark (1)**
92:2
**marked (10)**
9:8,12,18;10:7;
16:8;37:6,10;38:3,5;
92:19
**marking (1)**
9:11
**married (1)**
8:9
**mass (2)**
66:13,15
**Materials (1)**
91:1
**Matt (1)**
5:11
**may (11)**
6:15,16,18;7:20;
9:2;12:23;17:3;
28:13;63:11;75:17;
78:16
**maybe (6)**
6:18;11:22;17:13;
54:1;66:21;70:24
**mean (40)**
8:19;13:21;22:16;
27:9;31:13;33:12,17;
43:25;46:8;50:17;
52:7,7,9;56:13;59:20,
21;61:3;62:2;66:15,
19,20;67:8,24;68:17;
70:20;71:22;77:10,
20,22;79:23;81:1,4;
82:18;84:5;86:9;
88:15,16;90:5,6,10
**meaning (2)**
69:18;81:7

**means (2)**
50:16;67:4;97:16,
18
**medical (4)**
12:1;14:10;74:5,11
**meet (1)**
15:21
**meeting (4)**
14:14,15,25;15:9
**memorialized (1)**
50:22
**mental (6)**
15:15,18,19,22;
75:14,17
**mentioned (1)**
23:14
**met (1)**
31:10
**metal (3)**
34:11;35:9;36:14
**microphone (1)**
22:25
**middle (2)**
31:25;32:2
**midline (1)**
66:20
**mind (2)**
47:23;80:10
**mine (2)**
39:11;41:2
**minutes (1)**
78:17
**missed (2)**
70:24,24
**mode (3)**
23:5,7,10
**moment (5)**
16:11;36:19;97:8,
10,13
**month (1)**
13:10
**more (22)**
7:8,21;12:24;
15:15,18,19;40:21;
57:6,6;58:20;59:1;
63:11;66:18;67:16;
71:16;78:19;79:6;
84:5;85:25;94:18,21;
97:18
**morning (2)**
5:16;6:3
**motion (5)**
57:23;62:3;63:23;
69:3,3
**motions (4)**
59:14,24;63:10;
64:1
**move (1)**
68:17
**moved (1)**
70:2
**movements (4)**
80:23,25;86:1,23

Case 2:17-cv-01599-NBF   Document 107-4   Filed 02/19/21   Page 108 of 113
Calisia Kelley and Johnnie Mae Kelley v.
Brian O'Malley and Dominic Ravotti

Dominic Ravotti
October 1, 2020

**moving (8)**
58:19,19,20;61:11,
13;68:22;95:13,15
**much (4)**
25:2;64:2;78:19;
81:10
**multiple (8)**
15:5;36:25;59:6;
71:9;87:17;89:8;
95:1,6
**myself (1)**
90:23

**N**

**name (11)**
5:11,16;6:3;7:21,
23,24,24;11:13;
30:20;31:4;42:5
**names (2)**
30:20,23
**narrowed (2)**
83:4,5
**Natrona (2)**
11:6;12:9
**nature (4)**
22:19;78:12;88:12;
94:24
**near (4)**
33:8;46:15;53:25;
82:15
**necessary (2)**
53:19;72:7
**need (8)**
6:22;7:9;18:20;
46:4;47:24;48:2;
52:11;53:1
**needed (8)**
53:4;68:11;71:23,
23;77:23;86:15;
97:22,25
**new (1)**
10:1
**next (17)**
11:17;29:18,22;
32:17;35:15;40:19;
42:8;47:2,4;49:10,
13;54:8;56:19;60:23;
63:6;69:17;92:4
**nightstick (1)**
36:10
**nine (1)**
49:21
**Noah (4)**
5:16;6:3;37:25;
80:10
**Nobody (1)**
84:24
**None (3)**
16:18;37:21,22
**non-law (1)**
10:14
**non-law-enforcement (2)**

**9:2,4**
**non-lethal (1)**
97:16
**north (8)**
83:15,16,17,18,20,
22,23,25
**Nos (1)**
49:22
**notes (3)**
36:20;78:17,19
**noticed (2)**
26:21,23
**number (6)**
6:11;19:9;58:16;
67:1;74:2;92:4
**numbered (1)**
37:16

**O**

**oath (1)**
6:11
**Object (12)**
17:9;20:16;34:23;
35:1;50:24,24;51:22;
53:12,18;68:24;76:4;
79:19
**Objection (2)**
95:20,20
**observed (1)**
42:11
**obtain (1)**
74:5
**obviously (4)**
22:7;29:14;56:13;
82:10
**OC (3)**
35:23;40:4;42:17
**occasions (2)**
95:1,6
**occur (1)**
14:19
**occurred (1)**
91:23
**o'clock (3)**
55:1,1;56:12
**October (1)**
5:10
**off (19)**
7:2;16:5;21:2,5;
26:6;29:8;30:13;
43:8;46:24;48:6;
53:24;54:6;55:24;
57:6,6;73:23;78:25;
97:5;98:5
**Officer (66)**
6:3,6;7:20;9:15,19;
10:12;12:13;17:3;
18:19;19:5,20;22:12,
22;25:13;30:23;
35:22,24;36:4;37:16;
39:8,11,25;40:3,5,11,
14,15;42:1,2,17,21;

44:18;48:14;49:25;
51:13;52:19;58:2;
59:18;60:2,2,4,8,11;
70:14,15,15;72:19;
75:3,5,8;79:6;81:22;
82:5;87:1,2,2;89:11;
90:15,15;91:11;
92:15,22;96:23;97:4,
19,24
**officers (41)**
18:7;27:5,6,17,20;
29:6;31:2;32:12;
34:4,6;36:3;41:21;
42:16,24;43:2;44:19;
45:16,19,21;46:15,
19,22;47:22;54:3;
55:6,9;58:21;59:3,5,
7,15,15,24;66:4;71:9;
75:10;94:20;95:3,9,
11;97:12
**officers' (1)**
95:24
**often (2)**
88:18;89:1
**old (1)**
11:1
**olden (1)**
36:11
**O'Malley (68)**
5:7;38:13;54:17,
18,22;55:1,11,12,17,
20,23;56:18,19,24;
57:21;58:3,25;60:24;
61:5,6,10;62:18;64:3,
4,7,8,9,17,18;65:5,7,
15,19;66:2,18;67:16,
18;69:10;71:2;76:13,
18;80:23;82:22;84:7,
9,19,25;85:4,6,8,11,
16,20,21,22;86:1,3,
14,17,18,19,20,22,23,
24;89:24;90:14;
97:20
**O'Malley's (2)**
81:2;85:14
**once (7)**
13:4;46:23;68:8;
69:19;94:18,18,21
**one (39)**
6:11;7:21;8:14,22,
24;14:14;15:4,6,20;
19:7;20:23,25;23:1,2,
12;33:12,21;34:15;
36:19;39:17;41:15;
43:13;51:25;55:21,
21;59:25;60:1;68:6,
7;74:12;75:25;81:13,
14;83:13;86:12;
89:16;92:13;96:23;
97:2
**one-on-one (1)**
15:4
**only (5)**

13:10;14:14;20:17;
27:23;77:11
**onto (12)**
19:23;26:5,16,17;
29:19,20;31:14,15,
19,20;69:13;70:1
**opened (1)**
26:3
**opinion (2)**
95:22;96:2
**opportunity (6)**
44:13;80:4,8;
86:13;91:19;93:16
**opposed (1)**
70:23
**originally (1)**
8:3
**others (3)**
90:16,24;96:8
**o-t-t-i (1)**
7:25
**out (61)**
16:15;17:5,7,15;
19:16,23;22:22,22;
23:24;25:5,7,13,18,
18,22,25;26:2,3;
28:13,14;29:19;
31:17,22;32:14;34:1,
4,11;35:16;36:6,13,
14;38:12;45:14;
47:18;52:12,24;53:1,
4,4,10;55:13;56:13;
57:11;60:3;62:15;
64:17;70:2,2,3,5,7;
74:25;75:16,22;
76:10;81:22;87:4;
93:4,18;97:11,19
**outside (3)**
26:22;57:12;89:11
**over (34)**
6:17;23:2;26:4,14;
29:15;32:1;42:15;
43:10,10,11,21;
44:23;45:1,2,9,9,15,
20,20,21;46:21,24;
47:5,10,11,14,15;
49:5;53:24;69:22;
70:8,10;77:2;93:18

**P**

**page (29)**
21:3,5,9;37:16;
38:1,3,4,8,9;41:5;
42:8;49:2,3,3,6,6,10,
10,12,13,16,22,23;
80:18;81:17,18,23;
82:16;83:16
**pages (8)**
9:24;20:13,14;
21:9;39:10;79:13,14,
14
**paper (1)**

9:22
**Paragraph (2)**
49:9,20
**paragraphs (1)**
49:21
**Park (28)**
11:5;19:19,24;
23:14,17,21,24;24:2,
3,5,14;25:14;26:11,
13;29:3,4;31:16,22,
25;32:19,20;35:24;
36:5,6;38:19;41:5;
82:2;96:18
**parking (6)**
19:24;23:14,15;
93:18,18;94:6
**part (6)**
41:23;53:20;54:13;
66:14,21,21
**partial (1)**
24:22
**participate (1)**
74:10
**particular (2)**
10:2;53:7
**partly (1)**
67:14
**partner (3)**
19:1;22:14,15
**partners (1)**
22:17
**parts (1)**
53:14
**part-time (4)**
12:25;13:1,3,8
**passenger (1)**
25:23
**past (3)**
28:18;30:1;47:12
**path (1)**
95:10
**patrol (3)**
18:16,24;72:24
**Patrolman (2)**
14:2;56:17
**patrolmen (2)**
76:23;77:2
**paying (2)**
33:13;58:20
**PD (1)**
73:21
**pen (1)**
82:6
**Pennsylvania (3)**
5:9;10:22;12:9
**Pennwood (3)**
19:18;23:16,19
**people (10)**
15:5;24:16;26:22,
22,24;27:20;28:3;
29:25;34:8;97:6
**per (5)**
14:13;50:4;51:20,

23;73:3
**perceived (1)**
    85:20
**period (3)**
    11:7;18:1;88:7
**periodically (1)**
    31:13
**peripheral (1)**
    55:13
**person (18)**
    14:13,24;15:5,20;
    19:2;27:23;31:1;
    38:23,25;40:1;41:23;
    42:1,4;47:20;77:6,7;
    89:12;94:3
**personally (3)**
    36:21;72:18;94:22
**photo (25)**
    37:19,20,24;38:21,
    21,24;39:4,10,12,15,
    21;40:15,19,23;41:7,
    22,23;42:8,14,19;
    43:15,16,19,23;45:16
**photograph (1)**
    38:15
**photographs (2)**
    37:18;93:9
**photos (6)**
    37:8,21;40:21;
    43:7;93:24,24
**physical (3)**
    15:19;74:6;96:7
**physically (1)**
    38:9
**pick (1)**
    54:4
**picking (1)**
    43:7
**picture (10)**
    42:16,22;43:9;
    44:7,9;45:20;82:13;
    83:1,18;84:15
**pieces (1)**
    9:21
**pierce (3)**
    34:24,24;35:9
**Pittsburgh (2)**
    8:3;18:22
**pizza (2)**
    11:10,14
**place (2)**
    5:13;94:4
**places (2)**
    9:23;13:4
**plainclothes (1)**
    42:4
**platform (9)**
    24:4,5,10,11,15,16,
    25;25:1,2
**plays (1)**
    35:16
**please (57)**
    5:14,21;7:21,23;

8:1,5,18;10:13;11:15,
    20;12:3,8,11;13:16;
    14:8;16:5,8;19:3;
    20:11,13;22:18;26:1,
    15;29:18;31:11;
    32:15,17;39:5,22;
    40:19;41:12,22;
    42:14;43:15,17;
    44:25;49:17,23;54:7;
    55:23;56:19;60:23;
    63:6;69:12;70:14;
    72:21;75:25;76:11,
    20,22;79:7,11;82:22;
    86:13;87:14;89:15;
    96:23
**pm (4)**
    22:11,11;56:11;
    98:6
**point (46)**
    6:25;15:12;23:6;
    26:7;28:1,11,12;29:5,
    9;30:8,10;31:3;
    36:22,25;38:12;
    39:11;43:21;45:4;
    46:7,15,18;47:2,13,
    15;51:10;54:21,21;
    57:12;58:7;59:19;
    64:8;65:20;69:18;
    71:17;72:4;74:14;
    80:19;81:22;86:23;
    87:8,11,22;97:6,15,
    18,20
**pointing (2)**
    41:15,19
**points (1)**
    59:6
**Pokrant (2)**
    90:15,19
**P-o-k-r-a-n-t (1)**
    90:20
**pole (1)**
    42:1
**Police (22)**
    9:20;12:17,21;
    13:6,18,22;17:2,3,25;
    22:8;33:24;48:24;
    50:4;51:10;72:25;
    73:18;75:10;79:10;
    87:2;88:9;91:13,14
**policy (17)**
    9:18;10:3;17:18;
    48:15,20,23;50:4,5;
    51:20,23;52:16,21;
    53:10,14,17,20;73:3
**porches (4)**
    27:20;28:3,5;29:25
**Port (25)**
    8:15;13:14;14:3,6,
    13;17:14,25;18:3;
    20:2;22:8;48:24;
    50:4;52:1;73:3,8,17;
    74:22,23;75:10;
    76:20;78:6;88:9;

89:3,11,14
**Porter (3)**
    52:3,6,11
**posed (1)**
    96:6
**position (5)**
    11:25;12:5;72:10,
    11,13
**positioned (6)**
    61:6,7,17;62:5,11,
    24
**Post (1)**
    49:16
**Precise (2)**
    5:12;22:19
**precisely (2)**
    55:23,24
**presence (2)**
    60:9,11
**present (3)**
    13:16;15:5;94:3
**presented (5)**
    10:9;15:25;20:8;
    37:13;48:11
**pretty (2)**
    64:2;65:3
**previously (1)**
    37:10
**prior (10)**
    30:9,22;33:1;
    50:11;74:21;77:4,17;
    78:6;96:13,25
**Prison (1)**
    12:11
**probably (1)**
    24:13
**probes (2)**
    35:11,13
**Procedures (1)**
    49:16
**proceed (2)**
    7:16;32:4
**proceeded (2)**
    26:8;53:24
**proceeding (2)**
    29:21;30:17
**proceedings (1)**
    86:7
**proceeds (1)**
    47:6
**process (3)**
    63:16,18;94:9
**Produce (2)**
    16:14;18:9
**produced (1)**
    92:3
**product (1)**
    36:17
**production (5)**
    9:10,15,23;10:3;
    16:4
**progress (1)**
    93:16

**progress- (1)**
    67:17
**progressed (1)**
    97:19
**progresses (1)**
    59:20
**progressing (1)**
    85:6
**prongs (3)**
    34:11,24;35:9
**protocol (1)**
    17:19
**protruding (1)**
    59:12
**provide (2)**
    15:7;21:16
**provided (7)**
    21:19,25;38:17;
    48:17;51:24;52:24;
    92:13
**provider (2)**
    14:10;74:11
**public (3)**
    84:19,20;97:21
**pull (1)**
    32:1
**pulled (5)**
    19:19,24;97:10,11,
    14
**puncture (1)**
    35:9
**purpose (2)**
    6:8;25:3
**pursued (1)**
    31:5
**pursuit (5)**
    92:22;95:8,17,23;
    96:3
**pussies (1)**
    46:5
**pussy (1)**
    45:8
**put (23)**
    31:16,22;69:20,23;
    70:1,8,9,10,12;71:12;
    72:23;77:14,23;
    78:18;82:5,7,8,23;
    87:18,23;89:10;
    92:23;93:8
**putting (2)**
    71:24;77:17

## Q

**question-and-answer (1)**
    7:15
**quick (2)**
    6:23;78:22
**quiet (1)**
    25:16
**quite (2)**
    24:7,7

## R

**raccoon (1)**
    77:22
**radio (9)**
    22:22,24;23:2;
    25:16;29:10,13,16;
    30:19;81:22
**range (3)**
    33:15;59:15;72:1
**rank (4)**
    14:1;56:16;76:11,
    18
**ranking (1)**
    77:2
**ranks (2)**
    76:15,21
**rapidly (1)**
    58:19
**rather (1)**
    79:21
**R-a-v (1)**
    7:24
**Ravotti (10)**
    5:2,5,7,23;7:22;
    9:15,20;80:20;91:11;
    92:15
**re- (1)**
    45:14
**reach (1)**
    70:7
**react (1)**
    58:24
**read (18)**
    7:1,3,4;14:16;
    16:11,14,19;18:9,14;
    49:15,17;50:1;51:16;
    79:15;80:10,20,23;
    98:3
**reads (1)**
    16:14
**ready (2)**
    7:16;91:7
**real (1)**
    78:22
**realize (1)**
    70:17
**really (4)**
    25:15;52:10;75:18;
    80:7
**reason (2)**
    53:3,7
**reasoning (1)**
    53:16
**reasons (1)**
    17:6
**Rebecca (2)**
    26:16;29:20
**recall (16)**
    11:21;25:15;27:10;
    37:4;42:5;47:11;
    55:19;56:25;63:11;

73:2;89:25;91:2,14,
16;94:10,13
**receive (3)**
22:21;23:9;75:11
**received (2)**
14:10;22:19
**recess (2)**
48:8;79:2
**recognize (3)**
31:6,8;48:21
**recollection (1)**
94:2
**record (8)**
5:3;7:21;48:7,10;
79:1,3,20;98:5
**recorded (4)**
15:9;21:22;91:13,
13
**recording (3)**
79:25;91:19;92:14
**records (1)**
88:23
**re-engage (5)**
64:5,5;65:9;80:21;
86:5
**refer (4)**
10:6,6;43:6;48:14
**reference (4)**
7:1;23:23;54:6;
81:14
**referred (1)**
37:6
**referring (2)**
24:9,10
**refused (1)**
87:18
**regarding (3)**
22:1;50:6;51:18
**regards (1)**
52:9
**related (3)**
14:11;23:18;26:19
**relating (3)**
16:16;50:13;52:12
**relation (1)**
55:17
**release (1)**
57:22
**released (4)**
56:20,21;61:5;
62:15
**releases (1)**
61:10
**releasing (1)**
82:22
**remained (1)**
28:16
**remember (10)**
15:14;19:9,15;
44:24;54:13;89:1,21,
23;90:3,16
**removed (8)**
35:25;67:24;68:1,

6;69:8,21,24;72:23
**renewals (1)**
74:18
**repeat (4)**
6:19;7:7;20:13;
79:14
**report (27)**
17:6,8,16;22:1;
50:6,7,11,13,15,16,
18,19,23;51:1,5,8,11,
14,24;52:12,20,22;
53:1,5,11;76:1;79:17
**reporter (7)**
5:11,22;6:14,18;
78:8;97:23;98:1
**Reporting (1)**
49:7
**reports (4)**
16:15;21:13;50:1;
81:22
**represent (3)**
5:15,17,19
**reprimanded (1)**
78:11
**request (1)**
14:13
**requests (4)**
9:9,14;10:3;16:4
**require (1)**
17:3
**required (6)**
17:5,18;50:5,11;
51:20;53:21
**resisted (1)**
97:11
**resisting (4)**
23:12;95:18,25;
96:1
**respond (5)**
19:12;23:3,4,6;
35:20
**responded (7)**
18:17,19;19:18;
22:20;35:17;69:20;
88:2
**responding (1)**
30:11
**response (3)**
16:18;18:13;45:7
**responses (6)**
9:9,14;10:3;16:3,7;
88:1
**rest (2)**
84:19;97:21
**Restaurant (1)**
10:20
**restroom (3)**
47:24;48:2;78:21
**retreating (1)**
60:5
**return (1)**
14:15
**review (1)**

93:16
**Ride (24)**
19:19,24;23:14,17,
21,24;24:2,3,5,14;
25:14;26:11,13;29:3,
4;32:19,20;35:24;
36:5,6;38:19;41:5;
82:2;96:18
**right (71)**
5:18;9:11;13:22,
24;18:6;20:23;21:3,
3;22:12;23:15;25:13;
26:9;27:15;28:6,25;
29:20;31:19,25;32:2,
7,9;36:1,3;39:1,19;
40:1;41:13,14;43:16,
20;45:23;47:2;49:5,
13,13;55:4;57:7,23;
61:14,16,24;62:5,7,
11,18;63:2,8,12,13,
15,25;64:17,20;66:2;
69:16,20,21,22,24;
70:1;72:21;81:12;
82:19;83:17,20;85:5;
92:2,6;93:11,21;98:4
**right-hand (4)**
31:16;33:8;42:22;
55:25
**risk (1)**
28:11
**Rita (1)**
5:11
**road (1)**
26:12
**rolled (4)**
69:22,22;70:8,9
**room (2)**
5:18;6:15
**Ross (1)**
5:11
**roughly (8)**
10:25;11:7;12:18,
22,23;14:18;27:6;
46:18
**rounds (4)**
67:13;84:16,17;
85:21
**rules (2)**
6:7;7:11

**S**

**safety (1)**
85:14
**same (14)**
9:22,25;12:4,6;
13:8;16:6;22:16;
25:19;36:7,11;49:6;
53:25;81:23;84:7
**Sanders (13)**
19:4,20;22:12,14;
23:24;25:13;35:25;
36:4;42:1;60:3,4,6;

97:5
**Sarver (1)**
10:22
**sat (1)**
72:24
**saw (5)**
14:12;27:24;62:20;
63:11;76:9
**Saxonburg (2)**
11:17;13:6
**saying (5)**
6:20;83:25;94:10
**scene (4)**
6:6;23:13;72:21;
93:17
**school (7)**
8:5,6,17,19;11:3,9,
11
**screaming (2)**
57:16,18
**seated (1)**
5:18
**sec (2)**
43:13;75:25
**second (14)**
20:25;34:16,20;
36:20;64:22,25;65:9,
9;68:11,12;69:5,7;
85:24,25
**seconds (1)**
69:2
**secure (4)**
25:23;26:2;38:13;
71:16
**secured (1)**
72:22
**seeing (1)**
94:13
**seek (1)**
74:5
**seize (1)**
69:19
**seized (1)**
97:25
**semester (2)**
8:22,24
**separate (5)**
21:5;75:20;87:19;
88:3;97:13
**separately (1)**
92:3
**Sergeant (26)**
30:3,3;33:1;38:13;
41:25;54:17,18;64:3,
4,7,16,18;65:7;66:18;
76:12,13,24,25;77:1;
84:18;89:23,24;
90:14,14,15;97:20
**sergeants (2)**
76:15,23
**Serious (4)**
67:7;90:23;96:7;
97:20

**service (1)**
16:22
**session (4)**
7:15;15:20;74:8,12
**sessions (1)**
90:25
**shift (4)**
18:11;22:10,11,16
**shoot (8)**
45:6;46:5,12;
67:11;86:2,15;97:3,
14
**shooting (5)**
48:25;49:16;52:6,
14;67:9
**short (3)**
54:16,17;65:2
**shot (12)**
18:12;38:18;67:25;
68:6,7,23;69:5,7;
70:24;76:2;82:8;
84:14
**shots (3)**
70:17;71:3;87:9
**shoulder (5)**
22:25;61:1;62:9,
20;63:5
**shouts (1)**
57:21
**show (2)**
37:7;81:25
**shown (1)**
94:16
**shows (2)**
81:19;94:5
**side (13)**
31:16;33:8,8;
42:22;54:12;55:2,25;
56:5;57:8;62:7,8,18;
82:17
**sidewalk (6)**
33:5,8;54:13;56:4,
6;57:1
**sign (2)**
38:25;39:1
**Signature (1)**
98:7
**significant (1)**
96:7
**similar (1)**
95:3
**simultaneously (1)**
69:10
**siren (1)**
30:8
**sirens (3)**
30:6,9,13,16
**sit (4)**
24:16;51:11;74:25;
89:1
**sitting (1)**
28:21
**situation (4)**

Case 2:17-cv-01599-NBF   Document 107-4   Filed 02/19/21   Page 111 of 113
Calisia Kelley and Johnnie Mae Kelley v.                                    Dominic Ravotti
Brian O'Malley and Dominic Ravotti                                      October 1, 2020

58:20;87:16,20;
88:5
**six (2)**
  12:23;16:7
**skin (2)**
  34:25;35:10
**slash (5)**
  16:16;59:15;60:10,
  12,14
**slashed (3)**
  59:6;60:1;65:10
**slashing (6)**
  63:8,10,23;64:12,
  12;65:8
**slow (2)**
  6:24;29:24
**small (1)**
  34:14
**Smith (1)**
  32:16
**sneak (1)**
  35:25
**so-called (1)**
  7:11
**somebody (9)**
  21:1,2;60:9,11;
  69:20;70:11;71:24;
  72:10,15
**somebody's (2)**
  46:8,9
**Someone (2)**
  70:12;72:15
**someone's (1)**
  46:7
**sometimes (1)**
  6:15
**somewhere (2)**
  70:4;92:16
**soon (1)**
  65:13
**sorry (14)**
  32:3,19,21;41:10;
  43:13;58:16;67:21;
  73:11;80:17,17;81:1;
  92:9,9;97:23
**sought (1)**
  14:10
**sound (5)**
  24:21,22,24;25:3,9
**south (4)**
  83:16,20,23,25
**southwesterly (1)**
  84:8
**speak (9)**
  6:17;24:3;25:6;
  34:6,14;35:19;46:23;
  84:9;85:15
**specific (19)**
  11:21,23;22:17;
  33:15;45:19;47:19;
  51:25;58:6,13,16;
  59:19;66:1,11;69:3;
  72:23;74:2;76:25;

84:24;89:22
**specific- (1)**
  82:12
**specifically (25)**
  11:1;14:21;15:16;
  22:21;23:1;24:10;
  27:8;33:6,11;46:13;
  54:13;56:6;58:4;
  60:2;61:19;62:19;
  68:2,16;72:18;73:2;
  83:6,12;86:17,19;
  88:20
**spell (2)**
  7:23;90:18
**spin (2)**
  60:10,12
**spoke (1)**
  73:4
**spot (2)**
  28:15;83:13
**spray (3)**
  35:23;40:4;42:17
**spun (2)**
  36:2;65:6
**stab (4)**
  44:21;58:21;59:5;
  85:7
**stabbed (13)**
  59:8,17,18,22,25;
  60:5,15;64:6,14;
  65:10;85:19,24,24
**stabbing (1)**
  63:9
**stamp (1)**
  49:5
**stamps (1)**
  9:24
**stand (2)**
  11:18;36:15
**standing (10)**
  33:4,6;39:24;47:1;
  61:19;83:9,11,13;
  85:16;86:22
**start (1)**
  22:4
**started (17)**
  8:22;18:23;23:4,4;
  26:3;27:3,24;36:2,6;
  45:2;47:16,16;54:10,
  10;63:8,20;65:13
**starts (2)**
  38:12;63:7
**state (7)**
  5:14;7:21;17:3;
  27:8;30:20,23;52:11
**stated (2)**
  18:19;80:20
**statement (8)**
  15:7;22:1;35:18,
  19;50:18;51:2,5,12
**statements (1)**
  21:17
**States (2)**

5:8;14:12
**stating (1)**
  60:2
**Station (8)**
  37:24;72:25;73:1,
  17;91:14;93:11,13;
  96:18
**stationary (3)**
  28:22;56:24;61:11
**stay (2)**
  25:16;78:18
**stenographer (4)**
  6:8;9:8;90:17,18
**step (1)**
  86:3
**steps (8)**
  24:14;64:4,9,13;
  65:4,7;85:22,23
**sticking (1)**
  93:4
**still (11)**
  32:10;38:18;42:2,
  9;58:19;61:18;68:12;
  69:15;93:9,24,24
**stomach (1)**
  66:21
**stop (11)**
  24:12;38:25;39:1;
  45:7;46:12;57:21;
  68:7,9;88:2;94:23;
  97:21
**stopped (6)**
  27:4;43:6;69:6;
  70:21,22;95:13
**stopping (1)**
  36:22
**stops (3)**
  59:20;68:8,8
**stories (1)**
  24:13
**straight (2)**
  62:7;84:1
**Street (30)**
  22:23;26:16,17;
  27:14;28:3,4,6,8;
  29:8,19;30:12,14,22;
  31:2,25;32:2,5;
  37:24;47:7;54:11,12,
  14;55:2;56:1,6;57:9;
  93:11,13;94:5;96:18
**strike (2)**
  34:17,18;36:1;
  71:10
**struck (2)**
  71:8,10
**stuff (2)**
  52:9;73:15
**subdue (1)**
  44:13
**subject (1)**
  71:8
**summary (9)**
  9:19;10:2;20:24,

25;21:10;79:9,21;
80:5,18
**sunglasses (3)**
  40:5,12;41:24
**supposed (2)**
  66:25;68:7
**sure (9)**
  7:3;12:24;71:13,
  15;78:23;81:12;
  82:13;91:8;92:16
**surrounded (1)**
  95:9
**surveillance (1)**
  18:10
**suspect (9)**
  35:10;41:4;42:11,
  18;50:10;58:20;59:2;
  80:20,21
**suspect's (1)**
  34:25
**sustain (1)**
  74:3
**swear (1)**
  5:22
**swing (1)**
  44:19
**swinging (4)**
  28:10;94:9,9,19
**Swissvale (1)**
  42:5
**sworn (1)**
  5:24

---

# T

**tackle (1)**
  44:20
**tactic (3)**
  87:22,24;88:15
**tactics (6)**
  88:11,13,19;89:2,
  7;90:1
**talk (3)**
  68:2;87:23;88:20
**talked (1)**
  74:8
**talking (1)**
  90:7
**taped (2)**
  79:25;81:10
**target (5)**
  34:17;66:14,17;
  70:24;71:8
**Taser (16)**
  33:2,3,7;34:10,10,
  11,18,23;35:4,8,11,
  13,17,22;89:8,24
**Tasers (1)**
  35:6
**taught (6)**
  66:24,25;67:2,23;
  68:3;90:21
**technician (1)**

5:12
**technician/firefighter (1)**
  12:1
**telephone (1)**
  42:1
**telling (3)**
  29:25;84:12;93:11
**tenure (1)**
  13:14
**term (2)**
  33:24;36:17
**test (2)**
  73:3,6
**tested (2)**
  73:9,9
**testified (4)**
  5:24;59:4;86:6;
  94:8
**testify (1)**
  59:11
**therapy (1)**
  74:11
**thinking (2)**
  70:23;80:16
**third (6)**
  49:2,3;80:18,19;
  81:17,18
**though (1)**
  93:9
**thought (1)**
  26:19
**thrashing (1)**
  27:16
**threat (28)**
  67:2,5,6,23,25;
  68:4,6,8,8,12;69:5,8;
  70:21;71:14;84:18,
  20,25;85:3,3,13,20;
  86:20,24;96:7,24;
  97:9,10,20
**three (7)**
  16:8,10;21:9;
  24:13,13;46:22;88:8
**throat (3)**
  64:7,14;65:11
**throughout (1)**
  35:19
**thrusted (1)**
  80:22
**timeline (5)**
  37:6,7,10;81:15;
  93:8
**times (7)**
  16:25;64:19;66:9;
  67:1;77:16,19;97:9
**today (2)**
  8:15;13:21
**Today's (3)**
  5:10;91:18;93:15
**together (1)**
  93:8
**told (6)**
  45:5;46:3;62:12;

67:12;82:24;89:7
**took (8)**
45:14;64:3,6,9;
65:7;69:4;94:4,19
**top (12)**
21:9;41:4,23;49:6;
76:22;80:19;81:21;
82:15;83:16,19,19,20
**topic (1)**
89:22
**torso (3)**
63:12;66:15;68:17
**toward (2)**
80:23;85:22
**towards (42)**
18:23;27:4,14;
28:19;29:1,3;30:4;
32:6,18;36:24;42:23;
43:11,12;45:3;47:7,
17;54:14;57:1,8;
60:17,20;61:9;62:13;
64:4,9,16;65:4,7,14;
66:18;67:16,18;
69:14;85:6,6,19,21;
86:1,3,23,24;97:19
**Township (1)**
12:21
**Trail (1)**
24:23
**train (1)**
89:9
**trained (1)**
67:24
**trainer (3)**
89:18;90:3,8
**trainers (1)**
89:21
**training (20)**
35:6;66:23;71:6;
75:11;88:7,10,11,13,
14,15,19,22;89:2,5,8,
10,13,14;90:8,25
**trainings (1)**
89:9
**transmissions (3)**
25:16;29:10,13
**transported (2)**
72:24;73:4
**trapped (1)**
95:9
**travel (1)**
81:2
**Traveling (1)**
26:21
**treatment (2)**
14:10;74:6
**tried (3)**
58:23;60:7;80:21
**true (8)**
16:21;22:8;28:10;
42:25;56:14;79:18;
91:21,25
**truly (1)**

94:3
**truthfully (1)**
6:12
**try (6)**
6:20,21;7:7;26:6;
75:16,22
**trying (5)**
25:16;52:10;59:5;
60:7;62:15
**tunnel (2)**
38:13;54:15
**turn (4)**
26:18;44:19;46:1;
63:7
**turned (16)**
26:16,16;29:8;
30:13;31:14,14,19;
45:4;46:2;58:23;
59:6;63:21,21;66:18,
19;97:4
**turning (3)**
63:16,17,18
**twice (6)**
9:22;17:1;33:2;
66:10;76:2;82:23
**two (27)**
9:22;16:12;24:13,
13;34:11,13;39:10;
40:21;42:24;46:22;
63:11;64:3,9,19;
65:4;70:17;71:9;
74:24;79:13,14;83:4;
84:16;85:14,21,23;
87:8;88:8
**two-pager (1)**
20:12
**type (3)**
74:5,10;88:16
**types (1)**
89:20

**U**

**unable (1)**
95:10
**unclear (1)**
7:6
**under (4)**
6:11;74:14;87:1;
89:22
**under- (1)**
75:18
**undergo (2)**
74:10;88:10
**Understood (4)**
20:7;47:13;73:14;
75:2
**unfolding (1)**
25:17
**unit (7)**
19:9;25:13,19;
26:8,15;30:7;76:7
**United (1)**

5:8
**units (1)**
23:12
**unmarked (1)**
72:24
**unresponsive (1)**
72:6
**up (24)**
24:15,24;27:24;
28:23;29:12;36:1;
40:3;41:24;43:7;
45:5;49:16,16;54:4;
62:20;64:5,13;69:19,
20;71:23;78:16,20;
79:7;84:1;97:14
**updates (2)**
74:19,20
**upper (3)**
38:9;42:9;60:25
**use (33)**
9:18;10:2;16:15;
17:4,5,7,8,14;18:4;
40:24;48:15,20;50:5;
53:14;66:23;68:3;
71:6;77:25;78:21;
88:7,10,14,16,16;
89:18,20,22;90:3,7,8,
22;97:7,16
**used (4)**
53:19;57:22;81:9;
85:21
**using (2)**
83:15;87:22
**usual (3)**
50:1,7,19
**utilize (1)**
17:25

**V**

**vantage (1)**
54:20
**vehicle (17)**
19:10,16,20,21,22;
23:25;25:23;26:1,2,
5;28:14,16,18,21,22;
31:23;32:14
**vehicle/unit (1)**
18:11
**verbal (2)**
51:12;87:21
**versus (1)**
5:7
**VFC (2)**
11:17,18
**via (1)**
5:13
**vicinity (1)**
57:11
**Victor (1)**
7:25
**video (16)**
5:3,13,13;18:10;

21:22;38:18;45:20;
48:6,9;78:25;79:3,
21;91:19;92:10;94:5;
98:5
**video/audio (1)**
18:10
**VIDEOGRAPHER (8)**
5:3,1,2,21;48:6,9;
78:25;79:3;98:4
**videotape (12)**
91:13;93:10,13,16,
19,22,25;94:3,9,13,
16;96:17
**videotaped (4)**
5:1;50:18;51:2,4
**view (8)**
81:19,25;82:10,13;
83:10;84:12;91:19;
92:23
**views (1)**
37:18
**violate (3)**
53:10,13,17
**vision (1)**
55:13
**voice (1)**
54:7
**Volunteer (1)**
11:19
**vulgarities (1)**
88:2

**W**

**Wagner (4)**
28:20;29:1;30:5;
32:5
**wait (1)**
24:16
**waived (1)**
98:7
**walk (8)**
22:5;24:15;28:18;
31:12;35:25;36:6;
44:25;54:7
**walked (2)**
28:13;82:21
**walking (31)**
26:22;27:4,14,16;
28:4,8;31:1;32:9,18;
33:7;36:5;43:12;
45:2;47:16;54:10,24,
25;56:24,25;57:1,5,6,
25;61:8,9,18,23;
62:12;67:17,20;
75:23
**wall (5)**
24:21,22,24;25:3,9
**watch (2)**
44:10;54:17
**watching (1)**
29:11
**way (11)**

15:10;23:4;26:6;
28:20;29:1;30:5;
32:3,5;40:9;71:23;
83:18
**weapon (23)**
16:22;32:15,15;
45:12,14;51:14,24;
52:12,20,22;53:1,11;
65:14;66:9;77:12;
84:3,3;86:24;87:12,
23;96:11,14,25
**weapons (1)**
71:16
**wearing (1)**
17:23
**week (1)**
14:20
**weren't (2)**
22:16;59:20;68:20
**Wesson (1)**
32:16
**west (7)**
83:16,16,20,25;
84:1,2,5
**westerly (1)**
84:3
**Western (1)**
5:8
**west-southwest (1)**
84:6
**What's (9)**
11:17;14:1;25:5;
29:14,15;36:13;
37:20;50:21;53:16
**whenever (9)**
18:22;19:21;23:11;
26:2;27:3,24;46:3;
54:23;60:2
**Whereupon (10)**
5:1;10:9;15:25;
20:8;37:13;48:8,11;
79:2;92:19;98:6
**wherever (1)**
54:6
**White (4)**
39:25;40:5,9;41:2
**Whitney (22)**
30:5;31:14,15,19,
20;32:6;43:12;47:7,
17;53:25;54:11,14,
23;60:17;69:13;
81:19,22;82:1,15,19;
83:10;84:13
**whole (2)**
87:14,15
**Whose (3)**
48:23;72:11,13
**Wilkinsburg (5)**
19:12,15;22:20;
31:8;32:19
**willing (1)**
96:3
**windows (1)**

29:24

**within (12)**
14:20;33:17;58:14;
59:18,20,24;65:22,
23,23;69:2;73:8;
89:13

**witness (36)**
5:22;6:15;9:7;10:2,
2,10;16:1;17:11;
20:9,18;35:2;37:7,
14;38:2;40:25;41:2,
8,10;48:1,4,12;50:25;
51:23;53:13,19;76:5;
78:21,24;79:23;
80:10,13;86:9,10;
91:5;97:25;98:3

**witnesses (1)**
37:9

**Wofford (1)**
21:4

**Wolfie's (1)**
11:14

**woman (2)**
54:2;74:9

**Wood (1)**
22:23

**woods (1)**
19:22

**word (6)**
61:3;81:1,6,8,9,13

**words (2)**
57:22;79:24

**work (10)**
10:20,25;11:8,20;
12:2,10,20;14:15;
22:16;34:15

**worked (6)**
9:2,4;10:14;13:13;
18:11;89:2

**workforce (2)**
8:21,23

**working (3)**
13:4;22:10;76:9

**works (1)**
40:9

**wounded (2)**
87:6,9

**wrap (2)**
78:20;79:7

**wrapping (1)**
78:16

**write (1)**
81:8

**writing (2)**
50:19,22

**written (5)**
15:7;21:17;50:15,
16,17

**wrote (1)**
21:17

**Y**

**yard (10)**
45:3;46:7,9,9,9;
60:21;61:9;62:13;
84:23,24

**yards (3)**
47:18;57:11;82:1

**year (4)**
8:7;12:19,19;74:20

**yearly (1)**
74:18

**years (7)**
11:1;12:23;74:19,
24;88:8,21,21

**yell (2)**
54:17;69:18

**yelled (1)**
54:2

**yelling (2)**
30:2;47:20

**yellow (1)**
41:24

**Z**

**Zoom (1)**
5:13

**0**

**013 (1)**
88:8

**016 (6)**
16:16,21;52:17;
76:21;88:8,8

**018 (2)**
14:3;18:3

**1**

**1 (3)**
16:14;20:15;49:9

**10 (9)**
33:17,19;44:8;
55:1;58:11,12,14;
65:23,24

**10:00 (1)**
22:11

**10:07 (2)**
5:2,4

**11 (3)**
38:3,3,9

**11:05 (1)**
48:7

**11:22 (1)**
48:10

**12:04 (1)**
79:1

**12:12 (1)**
79:4

**12:38 (2)**
98:5,6

**120 (1)**
74:14

**13 (6)**
9:19,23;10:2;20:8,
11;79:11

**14 (5)**
9:17,18;10:2;
48:11,15

**15 (8)**
9:10,15;10:3;
15:25;16:3,7,8;46:14

**154915 (1)**
38:10

**154939 (1)**
39:11

**154948 (1)**
41:4

**155014 (1)**
42:11

**155136 (1)**
81:21

**16 (7)**
9:8,13,14;10:3,9,
12;11:1

**17 (5)**
10:13;92:5,8,17,19

**1st (1)**
5:10

**2**

**2 (10)**
17:21;20:15;43:25;
44:8;49:9,20;55:1;
59:21,24;80:18

**2:00 (1)**
22:11

**2:17-cv-1599-NBF (1)**
5:9

**20 (3)**
58:14;59:18;65:22

**2000- (1)**
11:22

**2001 (1)**
8:8

**2004 (2)**
13:11;74:17

**2005 (1)**
13:11

**2010 (1)**
12:12

**2012 (1)**
11:22

**2013 (3)**
12:12;13:15;74:23

**2018 (3)**
13:13,15,16

**2020 (1)**
5:10

**22 (1)**
14:8

**24 (6)**
49:3,6,12,16,17,20

**25 (7)**
49:10,13,16,16,17,

22,23

**3**

**3 (5)**
18:9,13;20:14;
59:24;79:14

**3:30 (1)**
56:11

**31 (2)**
16:16,21

**31st (1)**
52:17

**35 (1)**
9:24

**36 (1)**
9:24

**37 (2)**
8:2;88:25

**4**

**4 (7)**
11:22;20:14;21:3,
9;43:25;56:12;79:14

**40 (2)**
33:18,19

**6**

**6 (6)**
37:10,13;81:15;
82:4;93:7;96:17

**67 (1)**
9:24

**68 (1)**
9:25

**7**

**7 (2)**
49:22;50:7

**8**

**8 (4)**
49:22;51:13;52:19;
93:14

**9**

**93 (2)**
49:5,6