IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CALISIA KELLEY and JOHNNIE MAE KELLEY, Co-Administrators of the ESTATE OF BRUCE KELLEY JR., deceased, | ) ) ) | Civil Action No. 17-1599 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **BRIAN O'MALLEY**, both in his Official and Individual Capacities as Sergeant for the Allegheny County Port Authority; and **DOMINIC RIVOTTI**, in both his Official and Individual Capacities as Officer for the Allegheny County Port Authority, | ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants, | ) | |

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

A.  <u>CHRONOLOGY OF OCCURRENCE</u>

1.  On January 31, 2016 at approximately 3:30 p.m., Port Authority of Allegheny County ("PAT") Police Officers Thomas Adams and Emily Hampy were on routine patrol in a marked police car traveling on the Port Authority East Busway (the "Busway") when they observed two (2) individuals on foot duck behind a sound wall adjacent to the Busway upon the approach of their marked police car. (Appendix ¶¶ 114, 161-163)

2.  Based upon what Adams and Hampy perceived to be suspicious behavior, they parked their police vehicle, notified dispatch and exited on foot to investigate. Adams reported this on the police radio. (Appendix ¶¶ 115, 163-164, 230-233, 315-316, 346, 377-378, 391-393; Appendix at Q)

3.    The area where the two (2) unknown individuals ducked behind the sound wall is a walking path known as the Linear Trail which is adjacent to the Busway and is an access route for PAT customers to get to and from the bus stop. (Appendix ¶¶ 163-164, 439)

4.    This area, located in Wilkinsburg Borough, was known to PAT and Wilkinsburg Borough Police as a high crime area, including drug sales, drug use, vandalism of PAT property, robbery and assaults of individuals (including PAT patrons). (Appendix ¶¶ 116, 163, 201-202, 433)

5.    Adams and Hampy did not encounter any individuals on the Linear Trail, but continued walking to a set of stairs that leads down from the trail to a gazebo, which is immediately adjacent to the trail and Busway, and which is located at a lower elevation. (Appendix ¶¶ 118, 164-165)

6.    From the trail, Adams and Hampy observed two (2) men sitting in the gazebo with open and closed cans of beer around them. (Appendix ¶¶ 118, 166-174)

7.    Adams and Hampy proceeded down the steps to the entry area of the gazebo. (Appendix ¶¶ 122, 169)

8.    Adams made verbal inquiries to both men in the gazebo but neither man responded. (Appendix ¶¶ 122-123, 171-174, 179, 219-220)

9.    The men in the gazebo were later identified to be Bruce Kelley, Jr. and Bruce Kelley, Sr. (Appendix ¶¶ 125-126, 169)

10.    Kelley, Jr. began walking towards Adams, who was standing at an open entry area to the gazebo, and pushed his left shoulder into the chest/shoulder area of Adams. (Appendix ¶¶ 126-130, 180-185)

11.   Adams then attempted to place Kelley, Jr. under arrest for assault, but Kelley, Jr. would not cooperate. Kelley, Jr. refused to comply with the orders of Adams and Hampy. (Appendix ¶¶ 127-132, 186-188)

12.   A physical struggle ensued between Kelley, Jr. and Adams as Adams was attempting to place Kelley, Jr. in handcuffs. (Appendix ¶¶ 130-132, 189-199, 203)

13.   Kelley, Sr. rushed Hampy and punched her in the face, giving her a concussion. (Appendix ¶¶ 176-177, 191-198)

14.   Hampy deployed OC (pepper) spray twice in an attempt to subdue Kelley, Sr. (Appendix ¶¶ 178, 194-200)

15.   Adams deployed OC (pepper) spray on Kelley, Jr., but it had no effect. (Appendix ¶¶ 132-134)

16.   As Hampy was assisting Adams trying to take Kelley, Jr. into custody and handcuff him, Kelley, Jr. struck Hampy in her face with his right hand/fist. (Appendix ¶¶ 222)

17.   Adams suffered injuries to his left hand and shoulder in the scuffle with Kelley, Jr. (Appendix ¶¶ 143-146, 227, 431)

18.   While Adams continued his attempts to handcuff Kelley, Jr., Kelley, Jr. pulled out a knife from inside his coveralls, held it out away from him, and swung it in the direction of Adams, who was behind Kelley, Jr. at the time. (Appendix ¶¶ 137-140, 204-206, 224)

19.   Adams immediately jumped back to create distance between himself and Kelley, Jr. for his safety. Kelley, Jr. held the knife close to Adams who was in fear of being stabbed. (Appendix ¶¶ 140-141, 204-208)

20. Adams called on the police radio requesting backup assistance because Kelley, Jr. was resisting arrest and had a knife. (Appendix ¶¶ 143, 234-236, 244, 315-316, 428, 491, 509, 546; Appendix at Q)

21. Adams and Hampy gave repeated commands to Kelley, Jr., but the commands were ignored. (Appendix ¶¶ 132-138, 221-222)

22. The entire encounter at the gazebo lasted 3-5 minutes. (Appendix ¶¶ 221)

23. With knife in hand, Kelley, Jr. walked back up the steps leading towards the Linear Trail and proceeded along the trail. (Appendix ¶¶ 141-148, 207-213, 430-431, 437-441)

24. Wilkinsburg Police Officer Shawn Granger arrived on the scene as Kelley, Jr. was leaving the gazebo area and walking up the steps. (Appendix ¶¶ 143, 209-210, 430)

25. Granger gave verbal commands to Kelley, Jr., but he did not comply. Kelley, Jr. responded with profanities. (Appendix ¶¶ 188, 209, 441)

26. While pursuing Kelley, Jr. on the Linear Trail, Granger deployed his Taser twice on Kelley, Jr., but it had no effect. (Appendix ¶¶ 149, 443-446, 456)

27. Other police officers were arriving on the scene and all were in pursuit of Kelley, Jr. (Appendix ¶¶ 237-241, 391-393, 492-494, 507-510, 543-560, 566-570)

28. Police officers responded from multiple jurisdictions including PAT, Edgewood Borough, Swissvale Borough and Wilkinsburg Borough. (Appendix ¶¶ 377-378, 391-393, 446-448, 507-510, 543-547, 566-570)

29. Adams, Hampy, Granger and Wilkinsburg Police Officer Michael Catanzaro were following Kelley, Jr. on foot on the Linear Trail. (Appendix ¶¶ 147-151, 212-216, 238-240, 443-449, 566-570)

30.   Other police officers were walking on the Linear Trail simultaneously coming from the opposite direction towards Kelley Jr. (Appendix ¶¶ 151, 213, 237-241, 391-394, 447, 510-511)

31.   Officers had their guns drawn because Kelley, Jr. had assaulted a police officer, was brandishing a knife and resisting arrest. (Appendix ¶¶ 147-148, 241-242, 399, 522, 526, 532)

32.   Kelley, Jr. continued to hold the knife and continued to walk at a brisk pace. (Appendix ¶¶ 237-242, 250, 321-322, 393-400, 572)

33.   Faced with officers approaching from both directions, Kelley, Jr. then turned off of the trail and down a hillside through a wooded area to a fence that had an opening and went through the fence into a residential area of Wilkinsburg Borough. (Appendix ¶¶ 245-247, 396, 451-452, 511, 572)

34.   A foot pursuit continued by the various police officers following Kelley, Jr., who continued moving at all times walking at a fast pace. (Appendix ¶¶ 246-283, 322, 349-360, 395-408, 510-522; Appendix at Q and R)

35.   Kelley, Jr. continued to walk away from the officers by cutting through yards, between houses, and on the residential streets; he was continuously moving away from the police officers. (Appendix ¶¶ 247-274, 349-353, 395-408, 452, 514; Appendix at Q and R)

36.   During this time, multiple police officers on multiple occasions deployed Tasers and OC (pepper) spray against Kelley Jr., none of which had any effect on him. (Appendix ¶¶ 252-269, 324, 353-360, 395-408, 535, 577; Appendix at Q and R)

37.    Multiple officers gave repeated commands - dozens of times, to Kelley, Jr. to stop, to drop the knife and to get on the ground. (Appendix ¶¶ 247-289, 323, 350-353, 393-408, 455, 459, 461, 478, 529, 535, 552-555, 576-579)

38.    Kelley, Jr. could hear and understand the commands because every time commands were given he would respond with profanities. (Appendix ¶¶ 17, 23, 351-353, 393-405, 441, 458-459, 478)

39.    Kelley, Jr. never complied with any of the police commands; instead, he repeatedly raised the knife towards the officers. (Appendix ¶¶ 243, 301, 323, 350-356, 393-408, 459-460, 552-555, 572-576, 580, 591)

40.    PAT Police Officer Kyhnroe Sanders was involved in this foot pursuit and attempted to approach Kelley, Jr. from behind with his ASP baton, hoping to strike Kelley, Jr.'s right hand or wrist to knock the knife out of his hand. (Appendix ¶¶ 252, 264-265, 323-326, 520-522; Appendix at Q and R)

41.    As Sanders got close to make this attempt, Kelley, Jr. whipped around and swung the knife in the direction of Sanders, and pointed it directly at him. (Appendix ¶¶ 252, 264-265, 323-326, 342, 520-522, 531; Appendix at Q and R)

42.    Videotape from the PAT Hamnett Station Park and Ride parking lot video camera Pole No. 2 captured a portion of the foot pursuit, showing numerous officers following Kelley, Jr. as he walks through the parking lot as well as Sanders' attempt to approach Kelley, Jr. from the rear with his ASP, at which time Kelley, Jr. whips around and swings the knife at Sanders. (Appendix ¶¶ 300, 307-309, 337-338, 520-522; Appendix at R)

43. After the encounter with Sanders, Kelley, Jr. continued walking away from the police officers and ignoring all commands; he then climbed over a fence and cut through some yards to Whitney Avenue; and officers' deployment of Tasers and OC (pepper spray) were made again with no effect. (Appendix ¶¶ 264-277, 396-408, 456-459, 522; Appendix at Q and R)

44. On Whitney Avenue, Kelley, Jr. walked down the sidewalk area towards the dead-end of the street which abuts the Busway when Defendant PAT Police Sergeant K-9 Handler Brian O'Malley saw him approaching; O'Malley had taken cover behind some bushes across the street. (Appendix ¶¶ 80-82)

45. K-9 Handler O'Malley stepped out into the street on Whitney Avenue and gave warnings to Kelley, Jr. to stop and drop the knife or he would release his K-9. (Appendix ¶¶ 277-286, 463, 524-525, 580)

46. Kelley, Jr. ignored the K-9 warnings and continued to walk. (Appendix ¶¶ 83, 277-286, 463, 469)

47. O'Malley released K-9 Officer Aren who rushed Kelley, Jr., jumped up and bit his upper left arm/left shoulder area. (Appendix ¶¶ 35-36, 87-89, 91, 285-288, 470-471, 581)

48. Kelley, Jr. swung around with the knife in his right hand and stabbed K-9 Aren repeatedly in the face and neck area. (Appendix ¶¶ 35-37, 91-94, 287-289, 527, 581)

49. The knife injuries caused K-9 Aren to drop off from the apprehension on Kelley, Jr. (Appendix ¶¶ 37, 92-94, 288-289)

50. Kelley, Jr. then directly faced and immediately moved in the direction of O'Malley with uplifted knife in hand who was 8 feet away. (Appendix ¶¶ 37, 40, 94-100, 106-107,288-292, 476, 582-583, 585-589, 599-600)

51.   O'Malley unholstered his gun and fired repeatedly until Kelley, Jr. fell to the ground. (Appendix ¶¶ 97-100, 106-107, 289-293, 298)

52.   O'Malley discharged his weapon multiple times continuously within a matter of 1-2 seconds. (Appendix ¶¶ 94-100, 102, 104-107)

53.   Simultaneously, Defendant PAT Police Officer Dominic Ravotti fired his weapon at Kelley, Jr. until Kelley, Jr. fell to the ground. (Appendix ¶¶ 37-40, 42, 289-293)

54.   Ravotti discharged his weapon two (2) times continuously. (Appendix ¶¶38-42)

55.   After Kelley, Jr. fell to the ground he was still holding the knife in his right hand, and the knife had to be removed by the police officers. (Appendix ¶¶ 42-43, 411-412, 419, 481)

56.   Medical aid was rendered to Kelley, Jr., but he died at the scene. (Appendix ¶¶ 218, 295, 387, 411-412, 501-504)

57.   Continuous updates of the pursuit of Kelley, Jr. were reported over the radio, including the numerous unsuccessful attempts to deploy Tasers and OC (pepper) spray. (Appendix ¶¶ 149-150, 445-446, 516-518; Appendix at Q)

58.   Defendants O'Malley and Ravotti heard this information as it was reported on the radio during the pursuit. (Appendix ¶¶ 4-5, 7, 11-12, 65-72, 78-80, 101, 109)

59.   There were numerous civilians including children in the area where the foot pursuit was occurring. (Appendix ¶¶ 8-12, 154, 224, 248-249, 297, 320, 339, 400-403, 483-485, 513-515, 536-538, 563, 584, 590)

60.   Kelley, Jr. was continuously moving at all times and never obeyed any of the police commands. (Appendix ¶¶ 17-19, 23, 49, 50-51, 53, 301-302, 341, 350-356, 378, 393-408, 478, 554-555)

61.   Kelley, Jr. never dropped the knife during the entire pursuit. (Appendix ¶¶ 49-51, 304, 351, 393-408, 457, 460, 468-469)

62.   Kelley, Jr. was never surrounded or cornered by the police officers; rather, he always had an open path in front of him as he continued to quickly walk away from the pursuing police officers. (Appendix ¶¶ 53, 304-305, 341, 456, 480-481)

63.   At various times during the pursuit, Kelley, Jr. pointed, waved and slashed with the knife he was holding in the direction of the pursuing officers. (Appendix ¶¶ 22, 31-33, 301, 397-398, 417, 421-422, 554, 572-576)

64.   Defendants and the pursuing police officers believed that Kelley, Jr. posed a significant threat of death or serious physical injury to the officers and others. (Appendix ¶¶ 46, 54, 110, 225, 304-305, 341, 421-422, 480-481, 530-531, 536-541, 562-564, 589-591, 594-595)

65.   Defendants and the pursuing officers believed that Kelley, Jr. was actively resisting arrest and attempting to evade arrest by flight. (Appendix ¶¶ 53-54, 110, 225, 305, 341, 482-485, 533, 563, 592)

66.   O'Malley discharged his weapon at Kelley, Jr. because his life was in danger. (Appendix ¶¶ 94-97, 102-103, 110)

67.   Ravotti discharged his weapon at Kelley, Jr. because Kelley, Jr. posed a threat of death to O'Malley and others. (Appendix ¶¶ 40, 46-47, 54)

B.      DETAILS OF DEFENDANT RAVOTTI'S INVOLVEMENT

68.   Ravotti was employed by PAT as a patrolman police officer. He was on routine patrol in a police vehicle with his partner, PAT Police Officer Kyhnroe Sanders on January 31, 2016. (Appendix ¶¶ 4-5, 312-314)

69.   Ravotti heard a call on the police radio from PAT Police Officer Thomas Adams stating they were getting out with a group at the Wood Street gazebo. (Appendix ¶ 4; Appendix at Q)

70.   Consequently, Ravotti began responding by driving to that area. (Appendix ¶ 7)

71.   Ravotti heard a call on the radio from Adams that he was in need of assistance and the person was resisting. (Appendix ¶¶ 4, 7; Appendix at Q)

72.   Ravotti arrived at the PAT Hamnett Station Park and Ride lot in Wilkinsburg. Sanders exited the vehicle. Ravotti heard on the radio that the suspect was cutting down through the woods so he got back into his vehicle and drove back onto Center Avenue. (Appendix ¶¶ 5, 318; Appendix at Q)

73.   As Ravotti proceeded in his police car down Center Avenue he noticed that there were people outside and people walking around the area – civilians. (Appendix ¶ 8)

74.   Ravotti turned his police vehicle down Jeanette Street and then stopped because he could see Kelley, Jr. walking towards him with police officers on foot following behind him. (Appendix ¶ 9)

75.   Kelley, Jr. was walking on Jeanette Street towards Ravotti's police car while holding a knife in his right hand. Kelley, Jr. was thrashing the knife back and forth in front of him. All of the officers on foot where behind him. There were no officers on foot in front of Kelley, Jr. There were people on their porches along the street – civilians. Ravotti was the only person in front of Kelley, Jr., but he was in his police vehicle; Ravotti started

10

backing up away from Kelley, Jr. as he was approaching him. Ravotti saw Kelley, Jr.

then turn and cut between two houses towards Wagner Way. (Appendix ¶¶ 9-10)

76.   Ravotti saw the police officers follow Kelley, Jr. when he turned in that direction. There

were many radio transmissions coming through as this was developing. Ravotti backed

out of Jeanette Street, went onto Rebecca Street and then made a right again on Center

Avenue. As he was driving down Center Avenue very slowly he had his windows down

so he could hear what was going on. There were people on their porches. He was telling

them to go back into their houses. He could hear the people on their porches yelling at

Kelley, Jr. to drop the knife. (Appendix ¶¶ 11-12; Appendix at Q)

77.   Ravotti then turned onto Whitney Avenue and he could see Kelley, Jr. cutting between

houses on his right. He put the car in park, got out, drew his firearm, and began giving

commands to Kelley, Jr. to drop the knife. (Appendix ¶ 13)

78.   Kelley, Jr. was then walking down Center Avenue towards the Hamnett Station Park

and Ride lot with officers following behind him. (Appendix ¶ 14)

79.   Just prior to getting to the parking lot, PAT Police Sergeant DiPippa deployed his Taser

twice on Kelley, Jr., but it had no effect either time. (Appendix ¶¶ 15-16)

80.   After the Taser was deployed, Kelley, Jr. responded to the police by saying "That

doesn't hurt". Throughout the entire pursuit when the officers would speak to Kelley,

Jr., Kelley, Jr. would respond back saying things such as: "Fuck you." or "You're not

hurting me." (Appendix ¶ 17)

81.   After the Taser was deployed, PAT Police Officer Andrew Kaupinis deployed OC

(pepper spray) at Kelley, Jr. again, which again had no effect. (Appendix ¶ 17)

82.   Ravotti and the other officers continued following Kelley, Jr. then into the Hamnett Station Park and Ride lot. Sanders removed his ASP/collapsible baton and attempted to sneak up from behind Kelley, Jr. to strike his right hand where he was holding the knife. As Sanders started to get close to Kelley, Jr., Kelley, Jr. spun around with the knife and lunged at Sanders with the knife in his right hand. Sanders jumped backwards and retreated. (Appendix ¶¶ 17-19, 33; Appendix at Q and R)

83.   The videotape from the Hamnett Street Station Park and Ride lot truly and accurately depicts what took place with Kelley, Jr. in the lot. It accurately shows Kelley, Jr. swinging the knife at Sanders. (Appendix ¶ 52; Appendix at R)

84.   Kelley, Jr. then turned and continued walking away from the officers through the parking lot. (Appendix ¶¶ 17-19; Appendix at Q and R)

85.   By that point in time, Ravotti had given Kelley, Jr. multiple commands to drop the knife and get on the ground. Kelley, Jr. did not comply. (Appendix ¶¶ 18-19)

86.   Kelley, Jr. proceeded through the parking lot, through a wooded area and climbed over a fence into a backyard when Kaupinis deployed his OC (pepper spray) again on Kelley, Jr., but it had no effect. (Appendix ¶ 20; Appendix at Q and R)

87.   When Kelley, Jr. was climbing over the fence Ravotti did not see it as an opportunity to try to subdue him because Kelley, Jr. was armed with a knife. (Appendix ¶ 22)

88.   Kelley, Jr. climbed over the fence and continued walking away from the officers toward the rear of houses on Whitney Avenue. (Appendix ¶ 21)

89.   During this entire foot pursuit every time an officer attempted to get close to Kelley, Jr., Kelley, Jr. would turn around and swing the knife at the officers. Ravotti felt that if he

attempted to tackle Kelley, Jr., Kelley, Jr. would have attempted to stab him. (Appendix ¶¶ 22, 32-33)

90.   Ravotti continued to follow Kelley, Jr. through the yard when he encountered another fence at which point Ravotti gave him further commands to drop the knife to which Kelley, Jr. responded by saying: "Fuck you, pussy. You can't hurt me." (Appendix ¶ 23)

91.   Kelley, Jr. continued cutting between the houses toward Whitney Avenue and then made a left turn walking on Whitney Avenue towards the Busway. (Appendix ¶ 25)

92.   During the pursuit, Ravotti gave multiple commands to Kelley, Jr. to drop the knife, but he refused all commands. During the pursuit of Kelley, Jr., he never put the knife away. The blade of the knife was always extended and sticking out, (Appendix ¶¶ 49-51)

93.   Ravotti and the officers were continuing to follow Kelley, Jr. down Whitney Avenue on the sidewalk towards the Busway and the Whitney Avenue tunnel. They got a short distance and Ravotti heard K-9 Sergeant O'Malley give commands to his K-9. O'Malley was on the other side of the street, but Ravotti did not know exactly where. He only heard him at that time. O'Malley was to his right. There were other officers in the area, but they were all behind Ravotti. There were no officers in front of Ravotti. He caught a glimpse of O'Malley out of his peripheral vision. O'Malley was holding the K-9 in front of him, and the K-9 was barking. (Appendix ¶¶ 27-28)

94.   At that point Ravotti was further than 10 feet away from Kelley, Jr., but cannot give a precise estimate because Kelley, Jr. was still moving. Everyone was moving. It was a rapidly moving situation. Ravotti was paying more attention to Kelley, Jr., who had a knife and was attempting to stab officers every time they got close to him. Consequently,

Ravotti was at least keeping distance enough that if Kelley, Jr. turned around and tried to come at him, he had an appropriate amount of time to react. (Appendix ¶ 31)

95. Kelley, Jr. continued to walk on the sidewalk on a diagonal away from the officers to the left towards the houses on the left side of the street. Kelley, Jr. was still in front of him. O'Malley released K-9 Aren who then bit Kelley, Jr. on his left upper arm/shoulder area. (Appendix ¶¶ 29-30, 33-34)

96. When O'Malley released the K-9, Kelley, Jr. was still moving and walking away from the officers. The K-9 came from the right of Ravotti. Kelley, Jr. was in motion when the dog bit him. O'Malley was to Ravotti's right, which is where the K-9 came from. (Appendix ¶¶ 34-35)

97. The K-9 had his back legs on the ground and his head was up into the bite. Kelley, Jr. had the knife in his right hand and started to turn from his right to his left and began slashing across his body and stabbing the K-9 in the head. (Appendix ¶¶ 35-36)

98. When this started, Kelley, Jr.'s back was to Ravotti; then Kelley, Jr. was in the process of turning around while slashing the K-9. When Kelley, Jr. finished stabbing the K-9, he was facing directly at O'Malley. The K-9 had disengaged. Kelley, Jr. took about two steps towards O'Malley. The K-9 then attempted to re-engage. As the K-9's head was coming up to re-engage again, Kelley, Jr. took the knife and stabbed it into K-9 Aren's throat and continued in the direction of O'Malley. Then K-9 Aren fell to the ground and Kelley, Jr. continued towards O'Malley with the knife in his right hand. The knife was out in front of him facing O'Malley. Ravotti then fired his weapon. (Appendix ¶ 37)

99. At that point, Ravotti was within 20 feet of Kelley, Jr. O'Malley fired first. O'Malley was to Ravotti's right. All of the other police officers were behind Ravotti. Ravotti fired

his weapon twice. He aimed for the center mass area; the biggest part of the body is the target. (Appendix ¶¶ 38-39)

100. At the time Ravotti discharged his weapon, Kelley, Jr. was turned towards O'Malley so that from his direction Kelley, Jr. was almost mid-line, meaning the front part of his stomach and maybe the back part of the back was available to Ravotti as a target. (Appendix ¶ 39)

101. Ravotti is trained to fire until the threat is no longer a threat. (Appendix ¶ 40)

102. As this was happening, Kelley, Jr. was facing towards O'Malley and was actively walking towards O'Malley. (Appendix ¶ 40)

103. This sequence happened in seconds. After Ravotti's second shot the threat was taken away because Kelley, Jr. fell to the ground. Ravotti believed O'Malley and Ravotti were firing simultaneously (Appendix ¶ 42)

104. At the time Ravotti discharged his weapon, Kelley, Jr. had a knife extended in his right hand facing towards O'Malley and was progressing towards him. Ravotti believed that Kelley, Jr. was going to attempt to stab O'Malley. (Appendix ¶ 47)

105. After Kelley, Jr. fell to the ground, Ravotti approached and put his right foot on Kelley, Jr.'s right hand because he was still holding the knife. Ravotti removed the knife from Kelley Jr.'s right hand with his foot and then rolled him over in an attempt to put him in handcuffs. (Appendix ¶¶ 42-43)

106. Ravotti did not know if his two shots struck Kelley, Jr. He just knew the threat stopped. Kelley, Jr. fell to the ground and that's why Ravotti stopped shooting. (Appendix ¶ 43)

107. Someone put handcuffs on Kelley, Jr. This is done because officers have to make sure that Kelley, Jr. is no longer a threat before they administer first aid. (Appendix ¶ 44)

108.   After Kelley, Jr. was secured, Ravotti was removed from the area and put into a patrol car and then transported back to the police station. (Appendix ¶ 45)

109.   Ravotti believed Kelley, Jr. was a threat to anybody that he would have encountered. (Appendix ¶ 46)

110.   Ravotti did not fire his gun at Kelley, Jr. out of anger or because Kelley, Jr. stabbed the dog. (Appendix ¶ 49)

111.   At no time during this pursuit was Kelley, Jr. ever surrounded by officers. He was never trapped or unable to escape or unable to continue on his path away from the officers. (Appendix ¶ 53)

112.   Kelley, Jr. was always moving during the pursuit. (Appendix ¶ 53)

113.   Ravotti believed Kelley, Jr. was actively resisting arrest and attempting to evade arrest by flight. (Appendix ¶¶ 53-54)

114.   Ravotti believed Kelley, Jr. posed a significant threat of death or serious physical injury to himself and others. (Appendix ¶ 54)

C.   <u>DETAILS OF DEFENDANT O'MALLEY'S INVOLVEMENT</u>

115.   On January 31, 2016, O'Malley was employed as a K-9 handler/officer for PAT. His K-9 officer/partner was Aren, a full German Shepard. (Appendix ¶ 58)

116.   O'Malley held the rank of sergeant. He was the shift commander on the date of the incident. (Appendix ¶ 64)

117.   O'Malley and K-9 Officer Aren had been a K-9 team for several years prior to the incident. (Appendix ¶ 59)

118.   K-9 Officer Aren had undergone extensive training on how to apprehend a suspect, prior to the date of the incident. (Appendix ¶ 61)

119.   K-9s are trained to do an apprehension in the arm/shoulder area of a suspect by biting the suspect. (Appendix ¶¶ 60, 344-345, 370-371)

120.   On the date of the incident, O'Malley was at the police station when he heard PAT Officer Adams report over the radio that he and Hampy were exiting their car in Wilkinsburg. (Appendix ¶¶ 65-66; Appendix at Q)

121.   In response, O'Malley entered his police car with K-9 Aren. He heard Adams on the police radio call a Code 2 emergency which is a request for backup, asking for lights and sirens response. (Appendix ¶¶ 66-69; Appendix at Q)

122.   While driving on the Busway to the PAT Hamnett Station Park and Ride, O'Malley heard on the radio Adams say the suspect was armed with a knife, had gone mobile and was walking on the trail towards Hamnett Station. (Appendix ¶ 71; Appendix at Q)

123.   O'Malley parked his car on the Busway adjacent to Hamnett Station, exited and shortly heard on the radio that the suspect had gone from the trail into the woods. (Appendix ¶ 72; Appendix at Q)

124.   Knowing the area and that the suspect had gone into the woods, O'Malley went back to his police car, retrieved K-9 Aren and then walked down the steps from the Hamnett bus station stop into the Hamnett Park and Ride lot below the station. (Appendix ¶ 72)

125.   Just before he did that, O'Malley saw Kelley, Jr. on the Linear Trail for a couple of seconds right before he went into the woods and heard him screaming "Fuck You." (Appendix ¶ 73)

126.   At that time Kelley, Jr. was about 30 yards away from O'Malley. (Appendix ¶ 74)

127.   After O'Malley got down into the park and ride lot with K-9 Aren, he heard a radio broadcast that the suspect was now in the neighborhoods walking back towards the gazebo so O'Malley went back to his car with K-9 Aren. (Appendix ¶ 74; Appendix at Q)

128.   O'Malley then drove on the Busway back towards the gazebo, parked his vehicle on the Busway, exited with K-9 Aren, and jumped over the wall onto the Linear Trail. (Appendix ¶¶ 74-75)

129.   O'Malley and K-9 Aren ran outbound on the Linear Trail and arrived at the area above Whitney Avenue. (Appendix ¶ 75)

130.   O'Malley could hear yelling below on Whitney Avenue so he knew he was in the right location where the suspect could be walking. He could hear officers yelling to drop the knife so he walked from the Linear Trail down a ramp to the bottom at street level. (Appendix ¶¶ 76-77)

131.   O'Malley was stationary with K-9 Aren at the bottom of the ramp at the dead-end area of Whitney Avenue and he could hear yelling that was getting louder and heard a radio report that the suspect was walking towards Whitney Avenue. (Appendix ¶¶ 78-79; Appendix at Q)

132.   O'Malley then heard a radio broadcast that the suspect was walking away from Whitney Avenue between houses so at that point O'Malley moved in between two houses away from Whitney Avenue where he assumed the suspect was headed. (Appendix ¶ 79; Appendix at Q)

133. O'Malley did not get far because he then heard another radio broadcast state that the suspect had turned around and was walking back towards Whitney Avenue. (Appendix ¶ 80; Appendix at Q)

134. O'Malley could hear officers saying repeatedly "Drop the knife. Stop". (Appendix ¶ 80)

135. At that point, O'Malley reversed his course and was standing back out near Whitney Avenue behind a bush when he first saw Kelley, Jr. walking towards him on the street on a diagonal direction. (Appendix ¶ 80)

136. O'Malley had concealment behind a large bush/shrub that was next to the street. At that point, Kelley, Jr. was about 20 yards away and walking at a fast pace getting closer to O'Malley quickly. One of the officers in the group then shouted that they were going to send the police dog. In response, Kelley, Jr. turned back towards them from the direction where they were following him and started thrashing the knife around and said, "I'll kill that fucking dog." (Appendix ¶¶ 81-82)

137. At that point, O'Malley could not see any of the police officers but could hear them. O'Malley could only see Kelley, Jr. who was walking towards the tunnel at the dead-end of Whitney Avenue. (Appendix ¶ 82)

138. After Kelley, Jr. made the slashing motions with the knife in the direction of the officers, he turned around and kept moving at a fast pace in an angular direction towards O'Malley who was still concealed behind the bush. (Appendix ¶¶ 82-83)

139. Prior to deploying K-9 Aren, O'Malley knew from radio reports that multiple uses of non-lethal force had been attempted on Kelley, Jr., including Tasers and OC (pepper spray), with no effect. (Appendix ¶¶ 101, 109; Appendix at Q)

140.   O'Malley's impression at that time was that Kelley, Jr. could not see him. O'Malley then stepped out and made sure K-9 Aren could see Kelley, Jr. O'Malley gave several commands to Kelley, Jr.: "Police K-9. Stop." Kelley, Jr. kept walking so then O'Malley released K-9 Aren to perform an apprehension. (Appendix ¶¶ 83, 463, 469)

141.   O'Malley was holding K-9 Aren by his leash before he gave the command, at which point Kelley, Jr. was directly in front of him. O'Malley did not have his gun out at that time and had never removed it from its holster up to that point. (Appendix ¶ 87)

142.   O'Malley deployed K-9 Aren even though he heard Kelley, Jr. threaten to kill the dog if it was released because K-9s are a tool and he was deploying K-9 Aren to preserve the life of Kelley, Jr. and take him into custody. He deployed K-9 Aren despite the risk to K-9 Aren because police officers and other humans were at risk of being physically harmed by Kelley, Jr. (Appendix ¶ 90)

143.   When O'Malley released K-9 Aren to perform the apprehension, his plan was to follow and physically restrain Kelley, Jr. to cuff him. O'Malley had both hands free to do so. (Appendix ¶ 107)

144.   When O'Malley gave the command to K-9 Aren to apprehend Kelley, Jr., Kelley Jr. was on the other side of the street directly in front of O'Malley, walking from O'Malley's left to his right and angling away from him, about 10 yards away from O'Malley. (Appendix ¶¶ 84, 464, 468)

145.   When O'Malley deployed K-9 Aren after giving the commands, he could not see any other officers in the area. (Appendix ¶ 89)

146.   Kelley, Jr. was in motion walking rapidly when O'Malley gave the K-9 commands to Kelley, Jr. (Appendix ¶¶ 85-86)

147. K-9 Aren then ran towards Kelley, Jr. and made the apprehension on the left tricep area of Kelley, Jr. Kelley, Jr.'s back was to K-9 Aren when K-9 Aren bit Kelley, Jr.'s left arm. (Appendix ¶¶ 87-88)

148. K-9 Aren raised up off his hind legs and went in for the apprehension. Kelley, Jr. was armed with a large knife which he was holding in his right hand. (Appendix ¶ 89)

149. O'Malley watched as K-9 Aren bit the left shoulder/upper left arm of Kelley, Jr. at which point Kelley, Jr. spun to his left and stabbed K-9 Aren several times with the knife that he was holding in his right hand. During this time Kelley, Jr. was spinning. (Appendix ¶ 91)

150. Kelley, Jr. made several stabbing motions from right to left. O'Malley could see the knife going into K-9 Aren into the side of his head. K-9 Aren then dropped down to all four legs on the ground. (Appendix ¶¶ 92)

151. After K-9 Aren went down on all fours and Kelley, Jr. had spun around he was now facing K-9 Aren. K-9 Aren then started to go back for another apprehension facing Kelley, Jr. at which time Kelley, Jr. began thrashing upwards with his knife underneath the chin and jaw of K-9 Aren. O'Malley had taken several steps closer to Kelley, Jr. during this time in his plan to physically restrain Kelley, Jr. as part of the K-9 apprehension. (Appendix ¶¶ 93-94)

152. O'Malley still had not removed his gun from his holster. (Appendix ¶ 94)

153. After Kelley, Jr. was done stabbing K-9 Aren, Kelley, Jr. faced towards O'Malley with raised knife and stepped directly towards O'Malley, at which time O'Malley unholstered his gun and began firing. (Appendix ¶¶ 94-97)

154.   The first time O'Malley unholstered his gun that day was when Kelley, Jr. stepped towards him with the knife. (Appendix ¶ 107)

155.   When Kelley, Jr. stepped directly towards O'Malley he was 8 feet away, at which point O'Malley discharged his weapon. O'Malley pulled the trigger continuously until the threat ended. O'Malley was aiming for center mass on Kelley, Jr. (Appendix ¶¶ 97-100)

156.   O'Malley discharged his shots in a second. There was no delay in firing the shots that he did. There was never any pause in his discharge of shots. At the time he was firing his gun, O'Malley did not know how many rounds he had discharged. He continued firing his gun until the threat stopped when Kelley, Jr. fell to the ground. When Kelley, Jr. dropped to the ground, O'Malley immediately stopped discharging his weapon. (Appendix ¶¶ 106-107)

157.   From the time O'Malley released K-9 Aren until the time he discharged his weapon and Kelley, Jr. fell to the ground it was no longer than 10 seconds in total. (Appendix ¶¶ 107-108)

158.   At the time this was happening, O'Malley did not see the other officers, but he knew Ravotti was on his left. O'Malley did not know how close or how far he was. (Appendix ¶¶ 100, 464)

159.   O'Malley's total time on the scene from arrival until discharging his weapon was about 10 minutes (Appendix ¶ 101)

160.   O'Malley believed Kelley, Jr. posed a significant threat of death or serious physical injury to him, other officers and other people that were in the area. (Appendix ¶ 110)

161.   O'Malley considered Kelley, Jr. to be evading arrest by flight. (Appendix ¶ 110)

162.   O'Malley used deadly force and discharged his weapon at Kelley, Jr. because O'Malley's life was in danger. (Appendix ¶ 110)

## <u>CERTIFICATE OF SERVICE</u>

We hereby certify that a true and correct copy of the within *Statement of Material Facts Not In Dispute* has been served upon the following parties via electronic service:

Noah Geary, Esquire
*(Counsel for Plaintiffs)*

*/s/ Gregory A. Evashavik*
Gregory A. Evashavik, Esq.

*/s/ Nicholas J. Evashavik*
Nicholas J. Evashavik, Esq