IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CALISIA KELLEY and JOHNNIE MAE KELLEY, Co-Administrators of the ESTATE OF BRUCE KELLEY JR., deceased, | ) ) ) ) | Civil Action No. 17-1599 |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| **BRIAN O'MALLEY**, both in his Official and Individual Capacities as Sergeant for the Allegheny County Port Authority; and **DOMINIC RIVOTTI**, in both his Official and Individual Capacities as Officer for the Allegheny County Port Authority, | ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants, | ) ) | |

## APPENDIX

**Document**                                                                                                    **Page Number**

   A.  Excerpts from deposition transcript of Ravotti…………………………………………1-55

   B.  Excerpts from deposition transcript of O'Malley………………………………56-110

   C.  Excerpts from deposition transcript of Adams…………………………………..111-156

   D.  Excerpts from deposition transcript of Hampy………………………………...157-227

   E.  Excerpts from deposition transcript of Kaupinis………………………………...228-310

   F.  Excerpts from deposition transcript of Sanders………………………………….311-342

   G.  Excerpts from deposition transcript of DiPippa……………………………….343-371

   H.  Excerpts from deposition transcript of Hudek…………………………….......372-387

   I.  Excerpts from deposition transcript of Corrado……………………………….388-422

   J.  Excerpts from deposition transcript of Granger……………………………….423-485

K.  Excerpts from deposition transcript of Atkins……………………………...486-505

L.  Excerpts from deposition transcript of Hahn……………………………….506-541

M.  Excerpts from deposition transcript of Susalla…………………………….542-564

N.  Excerpts from deposition transcript of Catanzaro……………………….565-595

O.  Excerpts from deposition transcript of Costa……………………………..596-600

P.  Affidavit of PAT Police Lieutenant Shawn Hudzinski………………….…..601-602

Q.  Timeline of events with embedded radio and phone audio
    recordings titled "Incident 16-00683 Assault Knife
    Wilkinsburg Borough"
    (Also submitted on CD for review of audio recordings)…………………….603-620

R.  PAT Hamnett Station Park and Ride Lot – Pole No. 2
    surveillance camera videotape (pertinent segment is 3:49 to 3:51)
    (Submitted on CD)

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CALISIA KELLEY; and                 CIVIL ACTION
JOHNNIE MAE KELLEY,
Co-Administrators of the            No. 2:17-cv-01599-NBF
ESTATE OF BRUCE KELLEY,
JR., deceased,

Plaintiffs,

vs.                                 TRANSCRIPT

BRIAN O'MALLEY, both in his         VIDEOTAPED
Official and Individual             DEPOSITION OF
Capacities as Sergeant for          DOMINIC RAVOTTI
the Allegheny County Port
Authority; and DOMINIC
RIVOTTI, in both his
Official and Individual
Capacities as Officer for
the Allegheny County Port
Authority,

Defendants,
Jointly and Severally.              TAKEN VIA ZOOM VIDEO CONFERENCE

                                    THURSDAY, OCTOBER 1, 2020


                                    Taken on behalf of Plaintiffs,
                                    Calisia Kelley and Johnnie Mae
                                    Kelley


                                    Counsel of Record for this Party:

                                    Noah Geary, Esquire
                                    Washington Trust Building
                                    6 South Main Street, Suite 225
                                    Washington, PA  15301
                                    724-222-3788

1      A.    Part-time.

2      Q.    What about Buffalo?

3      A.    Part-time.

4      Q.    Were you working at both places at once?

5      A.    Yes.

6      Q.    What about Saxonburg Police Department, just in the

7  chronology of your career?

8      A.    Part-time.  Same time frame.

9      Q.    Okay.  What about Leechburg?

10     A.    Leechburg was only approximately a month in that

11 time frame, around 2004 to 2005.

12     Q.    Thank you.  And what about Lower -- Lower Burrell?

13     A.    I've worked there since 2018.

14     Q.    And what about your tenure at the Port Authority?

15     A.    From 2013 to 2018.

16     Q.    And from 2018 to the present, can you please tell me

17 where you've been employed?

18     A.    Lower Burrell Police Department.

19     Q.    Anywhere else?

20     A.    No, sir.

21     Q.    And, I mean, as of today, you're employed by Lower

22 Burrell Police Department.  Is that right?

23     A.    Yes, sir.

24     Q.    Are you full-time right now?

25     A.    Yes, sir.

1     Q.    What's your rank?

2     A.    Patrolman.

3     Q.    Why did you leave the Port Authority in '018?

4     A.    To go to Lower Burrell.

5     Q.    Was -- the Bruce Kelley incident, did that have

6 anything to do with you leaving the Port Authority?

7     A.    Not at all.

8     Q.    If we could look at Question No. 22, please, on

9 these answers.  And the interrogatory was to identify every

10 medical provider for whom you sought or received treatment

11 related to this incident.

12          And your answer states "I saw the employee health

13 person from Port Authority per their request after the

14 incident.  It was one meeting only that lasted about an hour.

15 After the meeting, I was cleared to return to work."

16          Did I read that correctly?

17     A.    Yes.

18     Q.    And, roughly, when after the incident did that

19 occur?

20     A.    I believe within the -- a week after the incident,

21 but I can't specifically tell you.

22     Q.    And then I assume you were interviewed?

23     A.    By who?

24     Q.    Whoever the employee health person was.

25     A.    That was what the meeting was, yes.

1  body cameras in that time period?

2      A.    No.

3      Q.    When you left the Port Authority in '018, did they

4  use body cameras then?

5      A.    No.

6      Q.    What about Lower -- Lower Burrell right now?  Do

7  they have body cameras for officers?

8      A.    No.

9      Q.    Okay.  No. 3 says (as read) "Produce any and all

10 dash camera video/audio surveillance video from any

11 vehicle/unit you were driving on the shift you worked when

12 Bruce Kelley, Jr., was shot and killed."

13          And the response says "Not applicable."  It's No. 3.

14          Did I read that correctly?

15     A.    Yes.

16     Q.    Now, as I understand, were you on patrol and you

17 responded to a call and that's what began your involvement in

18 this incident?

19     A.    I responded to an officer that stated that he was in

20 need of assistance, yes.

21     Q.    Okay.  And where were you when you got that call?

22     A.    I was in -- I was in downtown Pittsburgh whenever we

23 started towards the incident.

24     Q.    And were you on patrol?

25     A.    Yes.

1     Q.    Did you have a partner with you?

2     A.    There was a person in the car with me, yes.

3     Q.    Who was it, please?

4     A.    Kyrone [verbatim] Sanders.

5     Q.    Was that a fellow officer?

6     A.    Yes.

7     Q.    Which one of you was driving?

8     A.    I was.

9     Q.    And do you remember what the unit number was of the

10 vehicle?

11     A.    I have no -- I have no idea.

12     Q.    Okay.  So you drove to -- to Wilkinsburg to respond

13 to the call.  Is that correct?

14     A.    Correct.

15     Q.    And do you remember when you arrived to Wilkinsburg

16 where you arrived and, you know, got out of your vehicle or

17 where you first arrived in the area of the call?

18     A.    We initially responded to Pennwood Avenue but then

19 pulled into the Hamnett Park and Ride lot.  That's where

20 Officer Sanders exited the vehicle.  I began to exit the

21 vehicle.  But that's whenever they said that Kelley was cutting

22 down through the woods, so I got back into the vehicle and went

23 back out onto Center Avenue.

24     Q.    And when you pulled into the park and ride parking

25 lot, did you have -- did the car have dash camera capabilities?

22

1  create any report or statement regarding this incident.  That's
2  correct?

3     A.    Correct.

4     Q.    Okay.  If we could, then, I'd like to kind of start
5  what happened that day and just walk through the events in a --
6  kind of a chronological fashion, if that's okay.

7        So, obviously, that day you were employed by the
8  Port Authority Police Department.  Is that true?

9     A.    Yes, sir.

10    Q.    And what shift were you working that day?

11    A.    Afternoon shift.  2:00 p.m. to 10:00 p.m.

12    Q.    And you were with Officer Sanders.  Is that right?

13    A.    Correct.

14    Q.    Was Sanders, say, your partner generally or he
15 happened to be your partner that day, or...

16    A.    We all work the same shift.  But, I mean, we weren't
17 assigned specific partners day by day.

18    Q.    Okay.  And just please tell me again.  What was the
19 precise nature of the call that you received which you
20 responded to in Wilkinsburg?

21    A.    I wasn't -- we didn't specifically receive a call.
22 Officer Adams called out on the radio that he was getting out
23 with a group at the Wood Street gazebo.

24    Q.    And did you hear that on your -- your car radio or,
25 say, on the microphone on -- on your -- your shoulder?

1      A.     One or the other or both.  I couldn't specifically

2  tell you which one it was.  It was over the radio.

3      Q.     Okay.  And did you respond to Adams' first call?

4      A.     We started to -- we started to respond that way but

5  not in emergency mode.

6      Q.     Okay.  And then at some point, did you respond in an

7  emergency mode?

8      A.     Yes.

9      Q.     And what -- what information did you receive that

10 made you change into emergency mode?

11     A.     Whenever he said that he had -- he said to keep

12 units coming.  He had one resisting.

13     Q.     Okay.  You drive to the scene.  And I think you

14 mentioned you initially go to the parking lot -- park and ride

15 parking lot.  Is that right?

16     A.     Initially, we went down Pennwood Avenue and then

17 went to the park and ride lot, yes.

18     Q.     Okay.  Did you see anything related to this incident

19 on Pennwood Avenue?

20     A.     No.

21     Q.     Okay.  And then you go to the park and ride.  Do you

22 see anything going on there?

23     A.     Not in reference to the incident, no.

24     Q.     In the park and ride, did -- Sanders got out of the

25 vehicle.  Is that correct?

1  vehicle, what did you do, please?

2      A.     Whenever he got out, I went to secure the vehicle.

3  I opened the door, started to get out, and that's when they

4  said that Kelley was cutting over the hill.  So I got back into

5  the vehicle to go back -- to go back onto Center Avenue in case

6  he was -- would come that way, to try to cut him off or to get

7  eyes on where he was at at that point.

8      Q.     So you proceeded in your unit to Center Avenue.  Is

9  that right?

10     A.     Yes.

11     Q.     Okay.  And was that not far from the park and ride?

12     A.     Center Avenue is the road that is -- basically that

13  the park and ride is on, I guess you would consider it.

14     Q.     Okay.  And when you got over to Center Avenue in

15  your unit, what did you do then, please?

16     A.     I then turned onto Rebecca Street and then turned

17  left onto Jeanette Street.

18     Q.     Okay.  And before you turn left on Jeanette, did --

19  did you see anything that you thought related to the -- to the

20  incident?

21     A.     Traveling down Center Avenue, I noticed that there

22  was people outside and people walking around.  And other than

23  that, there was nothing else that I noticed.

24     Q.     And just so we're clear, so people -- civilians?

25     A.     Correct.

1    Q.    Okay.  Thank you.  Then you make a left on Jeanette,
2    and then what do you do?
3    A.    I started down Jeanette.  And that's whenever I
4    stopped because I could see Kelley walking towards me and then
5    officers following behind him.
6    Q.    Roughly, how many officers were following behind
7    him?
8    A.    I can't state specifically.  I don't know.
9    Q.    I mean, can you give me an estimate?
10   A.    I can't estimate because I cannot recall how many
11   were there.
12   Q.    When you first lay eyes on Kelley, what -- what was
13   he doing?
14   A.    He was walking on Jeanette Street towards me with a
15   knife in his right hand, and he was basically just kind of
16   walking, thrashing the knife back and forth in front of him.
17   Q.    The officers, were they all behind him?
18   A.    Correct.
19   Q.    Was there anyone in front of him?
20   A.    No officers.  There was people on their porches.
21   Civilians.
22   Q.    And, say, how close --
23   A.    And I was -- I was the only person in front of him.
24   But whenever I saw him, I started backing up away from him.
25   Q.    How close was any civilian, in feet, to Bruce

1  Kelley, Jr., at that point?

2      A.   I could not -- I could not guess feet.  They --

3  there was people on their porches, which is on Jeanette Street,

4  and he was on -- walking on Jeanette Street.

5      Q.   They were on their porches connected to their houses

6  on Jeanette Street.  Is that right?

7      A.   Correct.

8      Q.   And he's actually walking on the street?

9      A.   Yes.

10      Q.   Okay.  So if he's swinging his arms, is it true no

11  civilian was at risk of getting hit by the knife at that point?

12      A.   No, not at that point.

13      Q.   Okay.  Did you get out of -- I may not have walked

14  you through whether you got out of the vehicle or not.

15      A.   I did -- I did not on that spot.

16      Q.   Okay.  You remained in your vehicle?

17      A.   Yes.

18      Q.   And does he walk past your vehicle?

19      A.   No.  That's when he cut through the houses towards

20  Wagner Way.

21      Q.   Okay.  And so if you're sitting in your vehicle --

22  and your vehicle is stationary.  Correct?

23      A.   I was backing up.

24      Q.   Okay.  And then does he go to your left or to your

25  right?

1    A.    He goes to my left, towards Wagner Way and Center

2  Avenue, which is away from the busway.

3    Q.    Is it towards the park and ride?

4    A.    No.  The park and ride would have been behind him at

5  that point.

6    Q.    Okay.  What do you see the other officers do?

7    A.    They began to follow him.  And then that's when I

8  turned off of Jeanette Street.  And then I did not see him at

9  that point.

10    Q.    Okay.  Are there any other radio transmissions

11  coming through as you're watching him and he makes the left and

12  you're in your car there backing up?

13    A.    There's a lot of radio transmissions going on, yes.

14    Q.    And then, also, obviously, you -- you can see what's

15  happening in addition to what you -- what's coming over the

16  radio?

17    A.    Some of it, yes.

18    Q.    Okay.  What did you do next, please?

19    A.    I backed out of Jeanette Street and then went onto

20  Rebecca and then made a right again onto Center Avenue.

21    Q.    And as you're proceeding down Center Avenue, what --

22  what do you see next as far as this incident?

23    A.    As I was going down Center Avenue, I was going very

24  slow.  I had my windows down so I could hear what was going on.

25  There was people on their porches.  I was telling them to go

30

1  back into their houses.  I was driving past them.  And then I

2  could hear them yelling at him to drop the knife.

3          And then I encountered Sergeant -- K-9 Sergeant

4  DiPippa, and he said that he was cutting back across towards,

5  like, Whitney Avenue from, like, Wagner Way.

6      Q.    Did -- did you have your lights and/or sirens

7  activated on your unit?

8      A.    My lights but not my siren at that point.

9      Q.    Did you have your sirens activated prior to that

10  point?

11      A.    In responding to the incident, but not when I was on

12  Jeanette Street.

13      Q.    Okay.  You turned your sirens off when you got to

14  Jeanette Street?

15      A.    Yes.

16      Q.    So you had your lights going and no sirens as you're

17  proceeding down Center Avenue?

18      A.    Correct.

19      Q.    Now, on the radio calls initially by Adams, did he

20  state the name or names of the individuals he was dealing with?

21      A.    No.

22      Q.    Okay.  And prior to you arriving on Jeanette Street,

23  did any other officer state the names of who they were dealing

24  with?

25      A.    No.

1    Q.    Okay.  And when you see the person walking down the

2  street -- officers are following him -- did you know who it was

3  at that point?

4    A.    I didn't know what his name was.  I knew that that

5  was the actor that was being pursued.

6    Q.    And did you recognize him?

7    A.    No.  I have no idea who he is.

8    Q.    Did you happen to recognize him from the Wilkinsburg

9  area?

10    A.    I have never -- I have never met the man in my life.

11    Q.    Please tell me what -- what happens.  You go down

12  Center Avenue.  Just if you could walk me through it again.  I

13  mean, I'll interrupt periodically, but keep going.

14    A.    I turned onto Whitney Avenue.  And just as I turned

15  onto Whitney Avenue, I could see him cutting between houses on

16  my right-hand side.  At that time, I put the car in park, got

17  out of the car, drew my firearm, and began giving him commands

18  to drop the knife.

19    Q.    When you turned onto Whitney, did you make a right

20  onto Whitney?

21    A.    Yes.

22    Q.    Okay.  And you put the car in park and got out of

23  your vehicle?

24    A.    Yes.

25    Q.    Did you park right in the middle of the street, or

1  did you pull over?

2      A.    Right in the middle of the street.

3      Q.    Okay.  And I'm sorry.  He -- he had -- which way did

4  he proceed then?

5      A.    He came from, like, Wagner Way and Jeanette Street

6  towards Whitney Avenue.

7      Q.    So was he coming from your right, then?

8      A.    Yes.

9      Q.    And as he's coming from your right, is he walking

10  still?

11      A.    Yes.

12      Q.    And are there -- are there officers behind him?

13      A.    Yes.

14      Q.    And you got out of your vehicle and drew your

15  weapon.  What kind of weapon did you have, please?

16      A.    Smith & Wesson M&P9.

17      Q.    What happens next, please?

18      A.    He begins walking down Center Avenue towards the

19  Wilkinsburg Park and Ride lot -- or I'm sorry -- the Hamnett

20  Park and Ride lot.

21      Q.    Okay.  Do you -- I'm sorry.

22      A.    Go ahead.

23      Q.    Did you follow on foot?

24      A.    Yes.

25      Q.    Okay.  Go ahead.

1     A.    Just prior to the lot, K-9 Sergeant DiPippa deployed
2  his Taser twice, and there was no effects.
3     Q.    And where was DiPippa when he deployed the Taser?
4  Say, is he -- is he standing in Center Avenue or is he on the
5  sidewalk?
6     A.    I can't specifically say where he was standing at
7  when the Taser was deployed.  We were walking on Center Avenue
8  near the side -- the right-hand side of the sidewalk.  So I
9  can't tell you exactly where he was.
10    Q.    Okay.  How close were you from DiPippa, say?
11    A.    I -- I can't tell you specifically.  I was -- I
12 was -- I was the one with lethal cover, so, I mean, I was
13 paying attention to the actor and not where everybody else was.
14    Q.    How close was Bruce Kelley, the actor, from you?
15    A.    I can't tell you a specific range.  He was in front
16 of me.  That's all I know.
17    Q.    I mean, was he, say, within, say, 10 feet, or was
18 he, like, 40 feet away?
19    A.    He wasn't 40 feet away, but he was farther than 10
20 feet away.
21    Q.    And you said you were the one with lethal cover.  Is
22 that correct?
23    A.    Yes, sir.
24    Q.    Okay.  And is that a police term?
25    A.    I would -- I -- that's what we call it.  I had my

1  firearm out --

2      Q.    Okay.

3      A.    -- so it's lethal force.

4      Q.    Did any other officers have their guns out of their

5  holsters?

6      A.    I can't speak to any other officers.

7      Q.    Did you -- were -- did you see them?

8      A.    I was -- they were -- people were behind me.  I

9  couldn't see who, what they had in their hands.

10     Q.    DiPippa deploys the Taser, and the Taser is -- what,

11  the two metal prongs come out of the Taser?

12     A.    Yes.

13     Q.    Was there a gap in time between the two deployments?

14     A.    There was a small gap.  I can't speak to it.  He

15  deployed the first one.  It didn't work, so then he deployed

16  the second.

17     Q.    Did he strike the target, Kelley, with the first

18  Taser?  Did he -- did he strike him?

19     A.    I don't -- I can't tell you if he did or he didn't.

20     Q.    Okay.  And what about on the second deployment by

21  DiPippa?

22     A.    I can't tell you where or if it did hit him.

23     Q.    And on the deployment of the Taser, is the object

24  that ideally, what, both prongs pierce the clothing and pierce

25  the suspect's skin?  Is that correct?

1          MR. EVASHAVIK:  Object to form.

2          THE WITNESS:  Yes.

3    BY MR. GEARY:

4      Q.    Did you ever deploy a Taser before?

5      A.    Yes.

6      Q.    And do you have training in deployment of Tasers?

7      A.    Yes.

8      Q.    And is that the -- the goal of a Taser deployment

9    that both metal prongs pierce the clothing and puncture the

10   skin of the suspect?

11     A.    If you're deploying the -- the Taser probes, yes.

12     Q.    Okay.  Is that what DiPippa was doing?  Deploying

13   the Taser probes?

14     A.    Yes.

15     Q.    Okay.  What do you see happen next as far as, you

16   know, whatever -- whatever plays out?

17     A.    Kelley -- after the Taser was deployed, he responded

18   to us with some -- some statement of "That doesn't hurt."  And

19   throughout the statement, the thing -- if we would speak to

20   him, he would just respond back with "Fuck you" or "You're not

21   hurting me."

22          After the Taser was deployed, Officer Kaupinis

23   attempted to OC spray him again, which, again, had no effect.

24          We continued into the park and ride lot.  Officer

25   Sanders removed his ASP and was attempting to walk -- to sneak

1  up and strike Kelley's right hand where the knife was.  As he

2  started to attempt to get close to him, Kelley spun around with

3  the knife, lunged at the officers with the knife in his right

4  hand.  And then that's when Officer Sanders jumped backwards.

5  And then he continued walking on in the park and ride lot, and

6  then we started to walk out of the park and ride lot.

7       Q.    Thank you.  Now, the ASP, is that the same thing as

8  what would be called a baton?

9       A.    It's a collapsible baton, yes.

10      Q.    Okay.  Like, would it be called, like, a nightstick

11 in the olden days?  Same thing?

12      A.    I -- I believe so, yes.

13      Q.    What -- what's it made out of?

14      A.    I believe his is made out of metal.

15      Q.    Okay.  Is ASP -- does that stand for something?

16 A-S-P?  Or that's just --

17      A.    I believe that's, like, the -- the product term.

18 Like that's the manufacturer of it.

19      Q.    Thank you.  Just one moment.  I'm going to look at

20 my notes for a second.

21           Now, did you personally, you, say anything to Bruce

22 Kelley, Jr.?  Okay.  Just stopping at this point in the

23 encounter, did you -- did you say anything to him or direct any

24 commands towards him?

25      A.    At this point, I gave him multiple commands to drop

1 the knife and get on the ground.

2     Q.   Did you say anything other to him besides what you

3 just explained?

4     A.   I -- not that I can recall.

5           MR. GEARY:  Okay.  There is an exhibit that we've

6 already marked and referred to, Greg.  It's this timeline of

7 events.  And I just would like to show the witness the timeline

8 of events and -- and go through the photos on there like we've

9 done for the other witnesses, if that's okay.  I think the

10 timeline has been marked as Exhibit 6 previously.

11           MR. EVASHAVIK:  He has it.

12           MR. GEARY:  Thank you.

13           (Whereupon, Deposition Exhibit 6 was presented to

14 the witness.)

15 BY MR. GEARY:

16     Q.   Okay, Officer.  This exhibit is not page numbered,

17 but if we can go through it.  I think there's four or five

18 photographs in here.  There's some aerial views of the area,

19 but I'd like to just have you look at each photo and ask you if

20 you are in the photo and what's going on.  So let me see here.

21     A.   I would be in none of the photos because they're all

22 from Google Earth.  So there would be none of us --

23           MR. EVASHAVIK:  Keep going.  Keep going.  I think

24 he's directing you to the Hamnett Street Station photo.

25           Is that correct, Noah?  Which is further down.

1    the person that's behind the telephone pole is Officer Sanders.

2        Q.    Can you identify any other officer in this still

3    frame?

4        A.    The plainclothes person is a detective from

5    Swissvale, but I cannot recall his name.

6        Q.    Okay.  Can you identify anyone else?

7        A.    No.  I don't know who else they are.

8        Q.    Okay.  Thank you.  Next page is the final photo or

9    still frame.  Upper left --

10       A.    Yes.

11       Q.    -- it says "155014 Hours.  Suspect is observed

12   climbing fence"...

13       A.    Yes.

14       Q.    What do you see in that photo, please?

15       A.    I see the -- Kelley climbing over the fence and

16   officers following him.  The actual picture is -- I believe

17   it's Officer Kaupinis is deploying OC spray again on the

18   suspect.

19       Q.    And are you in this photo?

20       A.    Yes, I am.

21       Q.    And which officer would you be?

22       A.    In -- on the right-hand side of the picture with the

23   hat on with my back towards the camera.

24       Q.    And there's two other officers captured in this

25   frame.  Is that true?

1    A.    Yes.

2    Q.    Do you know the identities of those officers?

3    A.    I do not.

4    Q.    Okay.  Now, in your description of what happened

5  there, you kind of got to where Bruce Kelley, I think, is

6  approaching a fence, and then I stopped you to refer you to

7  some photos here.  So just kind of picking up where you left

8  off.

9    A.    That is where -- the last picture, where he climbs

10  over the fence, he -- after he climbed over the fence, we got

11  over the fence and began to follow him towards -- he was

12  walking now back towards Whitney Avenue.

13          MR. GEARY:  Just one sec.  Sorry.

14  BY MR. GEARY:

15    Q.    If we could go back to the last photo, please.  It's

16  by the fence.  And you're in the photo there on the right with

17  the hat.  Could you take a look at that, please?

18    A.    Okay.

19    Q.    And in the photo, does it look like -- is he

20  climbing the fence right there?  He's about to climb the fence?

21    A.    I believe he's over the fence at that point.

22    Q.    Okay.  How many feet do you say, looking at the

23  photo, you were from Kelley, Jr.?

24    A.    I have no idea.

25    Q.    I mean, is it, say, 2 to 4 feet from him, looking at

1  the film?

2      A.    I couldn't tell you.  It's -- the film doesn't give

3  an accurate depiction of how far away or how close we are to

4  him.

5      Q.    Well, how does it not give an accurate depiction of

6  how far you are from Kelley?

7      A.    Because you can't tell depth in the picture.  I

8  can't tell you if I was 10 feet from the fence or 2 feet from

9  the fence in that picture.  I don't know.

10      Q.    And did you watch Kelley climb the fence?

11      A.    Yes.

12      Q.    Okay.  As he's climbing the fence with his back to

13  you, did you see that as an opportunity to subdue him?

14      A.    No.

15      Q.    And why not?

16      A.    Because he was armed with a knife.

17      Q.    Okay.

18      A.    Every time an officer attempted to get close to him,

19  he would turn around and swing the knife at officers.  So I

20  felt that if I attempted to tackle him, he would have attempted

21  to stab me.

22      Q.    Okay.  And did he fall?  When he -- when he goes

23  over the fence, did he fall to the ground?

24      A.    I can't remember if he did or did not.

25      Q.    Okay.  Please walk us through.  What happens after

1  he goes over the fence?

2      A.    After he goes over the fence, he started walking

3  towards the front yard.  He encountered another fence.  At that

4  fence, he turned around and looked back at us.  At that point,

5  I was coming up to him.  I told him that -- I said, "Drop the

6  knife or we're going to have to shoot you because you won't

7  stop."  And his response was something along the lines of "Fuck

8  you, pussy.  You can't hurt me."

9      Q.    After he went over the fence, did you also go over

10 the fence after him?

11     A.    Yes.

12     Q.    Okay.  Did you holster your weapon before you

13 climbed the fence?

14     A.    Yes.  And then I re- -- I took my weapon back out

15 after I got over it.

16     Q.    And then these other officers in this photo, did

17 they -- along with you, did they climb the fence and continue

18 following him?

19     A.    I can't tell you if the specific officers in the

20 video went over the -- or in the picture went over the fence,

21 but officers came over the fence behind me, yes.

22     Q.    And then you just described Kelley gets to another

23 fence.  Is that right?

24     A.    It was like a gate, I believe, yes.

25     Q.    Okay.  And then -- and then what did he do?  Did he

1    turn around?

2         A.    He turned around and looked back in my direction.

3    And then that's whenever I told him that he had to -- I said,

4    "Drop the knife."  I said, "You need to drop the knife or we're

5    going to have to shoot you."  And he said, "Fuck you, pussies.

6    You can't hurt me."  Something along those lines.

7         Q.    Was he in some -- in someone's yard at that point?

8         A.    Yes.  I mean, there -- that fence is somebody's

9    yard, so he was in somebody's yard.  Well, a -- a house's yard,

10   yes.

11        Q.    How many feet were you from him when you said, "If

12   you don't stop, we're going to have to shoot you"?

13        A.    I -- I couldn't specifically tell you, but it was

14   greater than 15 feet.

15        Q.    And there were other officers near you at that point

16   in time.  Correct?

17        A.    Behind me, yes.

18        Q.    Okay.  Roughly, how many do you think at that point?

19   Other officers.

20        A.    I can't tell you how many were behind me because I

21   don't know who all came over the fence.

22        Q.    Okay.  But, say, at least two or three officers?

23        A.    I can't speak to that because, again, once I went

24   over the fence, I didn't look back to take my eyes off of where

25   he was.

1    Q.    Okay.  And then you said he -- Kelley is standing

2  next to a gate or another fence at that point.  Is that right?

3    A.    Yes.

4    Q.    Okay.  What does he do next?

5    A.    He goes over the gate.

6    Q.    And proceeds in what direction?

7    A.    Towards Whitney Street.

8    Q.    Okay.  And then do you continue to follow him?

9    A.    Yes.

10    Q.    Did you have to go over the gate as well?

11    A.    Yeah.  I can't recall if I went over it or through

12  it, but I went past it, yes.

13    Q.    Understood.  And then where is Kelley at that point?

14  After he goes through the gate or over the gate and you go

15  through the gate or over the gate, where is he at that point?

16    A.    He started -- he made a left and started walking on

17  Whitney Avenue towards the busway.

18    Q.    Are there any civilians out in their yards?

19    A.    I did not see any at that specific time.  There was

20  a person -- I could hear a female yelling at him, but I don't

21  know where she was at.  I know that was a civilian because

22  there was no female officers there at that time.

23         MR. GEARY:  Okay.  Do you mind if we just take a

24  couple-minute break?  I don't know if you need a restroom

25  break.

1  I need to fill out a weapon discharge report"?

2      A.    No, I did not.

3      Q.    Okay.  Is there any reason you didn't inquire or

4  take action to find out if you needed to fill out such a

5  report?

6      A.    No.

7      Q.    Is there any particular reason why you didn't take

8  such action?

9      A.    No.

10     Q.    Did you violate the policy by not filling out a

11 weapon discharge report?

12          MR. EVASHAVIK:  Object to the form of the question.

13          THE WITNESS:  I did not -- I feel I did not violate

14 any parts of the use of force policy.

15 BY MR. GEARY:

16     Q.    And just explain to me, what's your reasoning for

17 why you believe you did not violate the policy?

18          MR. EVASHAVIK:  Object to the form of the question.

19          THE WITNESS:  Because I used the force necessary in

20 this incident, and I followed that part of the -- that policy,

21 and I did what was required of me.

22 BY MR. GEARY:

23     Q.    Let's get back to the chronology of events.  I think

24 we had left off with you where Kelley proceeded over or through

25 a gate.  You did the same.  And he, I think, was near Whitney

1    Avenue.  You said there were no civilians, but maybe there was

2    a woman -- a female yelled something -- because there were no

3    female officers.  That's kind of where we left it before the

4    break.  If we could pick up around there, is that okay?

5        A.    Yes.

6        Q.    Okay.  So wherever you left off with the reference

7    to you heard a female voice, just can you please walk me

8    through it?  What happened next as far as this -- this

9    encounter?

10       A.    We started -- he -- Kelley started walking on

11   Whitney Street --

12             Either on the street or on the left side of the

13   sidewalk.  I can't remember specifically which part.

14             -- down towards the busway and the Whitney Street

15   tunnel.

16             We got a short distance down there, and I heard K-9

17   Sergeant O'Malley yell, "Watch him."  And then a short time

18   later, I heard K-9 Sergeant O'Malley give his bite command for

19   his K-9.

20       Q.    Where were you?  I just want to get your vantage

21   point.  Where were you at the point you first see or hear

22   O'Malley?

23       A.    I -- whenever I heard him, I was on Whitney Avenue,

24   walking behind Bruce Kelley.

25       Q.    And where -- if you're walking behind Kelley, where

1  is O'Malley?  Say, is he at 10 o'clock?  2 o'clock?

2      A.    He would have been on the other side of the street,

3  but I don't know exactly where he was at.  I just heard him.

4      Q.    Okay.  To your right?

5      A.    Yes.

6      Q.    And were there other officers in the -- in the

7  immediate area there as well?

8      A.    They were behind me, yes.

9      Q.    Okay.  Were any officers in front of you?

10     A.    No.

11     Q.    And you heard O'Malley.  And when you heard him, did

12  you look at O'Malley?

13     A.    I -- I caught him out of my peripheral vision, yes.

14     Q.    Okay.  Did he have his K-9?

15     A.    Yes.

16     Q.    Okay.  And what was the K-9 doing?  Where was the

17  K-9 in relation to O'Malley?

18     A.    He was holding the K-9 in front of him, and the K-9

19  was barking, from what I can recall.

20     Q.    Okay.  Did O'Malley have, say, both hands on, say,

21  the leash or one hand and one hand free?

22     A.    I have no idea.

23     Q.    And where precisely was O'Malley, please?

24     A.    I can't tell you precisely.  He was off to my

25  right-hand side.

1  Q. Was he in the street?

2  A. I don't know.

3  Q. Okay.  Where -- where were you?  Were you on the

4 sidewalk?

5  A. I was either on the -- on the left side of the

6 street or the sidewalk.  I can't specifically tell you exactly

7 where I was.

8  Q. Okay.

9  A. I was in that area.

10  Q. Now, is it -- I think this is -- is this around

11 3:30 p.m.?

12  A. I don't know.  It's almost 4 o'clock.

13  Q. Okay.  So, I mean, obviously, it's daylight out.  Is

14 that -- is that true?

15  A. Yes.

16  Q. Okay.  Now, what was your rank at the time?

17  A. Patrolman.

18  Q. And what happens?  You -- you see O'Malley.  You

19 hear O'Malley.  What happens next, please?

20  A. He released the K-9.

21  Q. He released the K-9?

22  A. Yes.

23  Q. Okay.  Now, what -- what was Kelley -- was Kelley

24 walking, or was he stationary when O'Malley gives the commands?

25  A. From what I recall, he was walking.  He was on the

1  sidewalk, walking towards like -- like kind of at a diagonal

2  away from us.

3      Q.    And he's in front of you.  Correct?

4      A.    Yes.

5      Q.    And to the extent he's walking at a diagonal, was

6  Bruce Kelley, say, walking off more to your left or more off to

7  your right?

8      A.    To the left, towards the houses on the left side of

9  the street.

10     Q.    Okay.  Were there any civilians in that immediate

11 vicinity out in their yards?

12     A.    Not outside at that point, no.

13     Q.    Okay.

14     A.    That I know of.

15     Q.    Okay.

16     A.    Again, the female that was screaming, but I don't --

17 she was -- I don't know which house she was in.

18     Q.    And the female that was screaming, what, she was in

19 a house?

20     A.    I did not -- I did not see her, so...

21     Q.    Okay.  So when O'Malley shouts the commands to stop

22 or he's going to release the dog, whatever words he used,

23 Kelley was in motion.  Is that right?

24     A.    Correct.

25     Q.    And he's walking away from you.  Is that correct?

1    A.    Yes.

2    Q.    Are you the closest officer to Kelley?

3    A.    I don't know if it was me or O'Malley.  I can't

4  specifically tell you.

5    Q.    How many feet do you say you were from Kelley?

6    A.    I -- I can't tell you.  I don't know a specific

7  distance at that point.

8    Q.    Okay.  Well, how about a general -- a general

9  distance.  Can you just give me an estimate?

10    A.    I can't.

11    Q.    10 feet?

12    A.    It was farther than 10 feet.  I can't -- again, I

13  can't tell you a specific distance.

14    Q.    Was it within, say, 10 and 20 feet?

15    A.    I can't tell you if it was that.  I can't give you a

16  specific number, sir.  I'm sorry.

17    Q.    Why can't you give me just an estimate of distance?

18    A.    Because I'm -- I can't -- I can't tell you exactly.

19  He was still moving.  We were all moving.  It was a rapidly

20  moving situation.  I was more paying attention to the suspect

21  that had a knife that was attempting stab officers every time

22  we got close to him.  So I was at least keeping distance enough

23  that if he turned around and tried to come at me, I had the

24  appropriate amount of time to react to that.

25    Q.    How far were you from O'Malley?

1    A.    I can't tell you that.  I -- again, I was more

2  focused on the suspect than how close or far away from other

3  officers I was.

4    Q.    And you just testified that Bruce Kelley, Jr., was

5  trying to stab officers.  Is that correct?

6    A.    At multiple points, he turned around and slashed the

7  knife at officers.  And I believe if they would have been close

8  enough, yes, he would have -- I believe he would have stabbed

9  them, yes.

10    Q.    What was the length of the blade of the knife?

11    A.    I have no idea.  I can't testify to that.  It was

12  large enough that I could see it from -- protruding from his

13  hand.

14    Q.    And when you say he made motions with his arms to

15  slash at officers, were any officers in his range of his arm,

16  the length of his arm, at which they actually could have been

17  stabbed?

18    A.    Any officer within 20 feet could be stabbed at any

19  specific point.  It's all in how the actor acts and how he

20  progresses or stops.  I mean, just because they weren't within

21  2 feet of him doesn't mean that they couldn't have been

22  stabbed.

23    Q.    Well, my -- my first question is:  Were any of the

24  officers, when he made those motions, actually within 2 to 3

25  feet of him where he actually could have stabbed one of them or

60

1    slashed one of them?

2        A.    If Officer -- specifically stating whenever Officer

3    Sanders attempted to -- to knock the knife out of his hand, if

4    Officer Sanders would not have jumped backwards and kept

5    retreating, yes, Bruce Kelley would have stabbed him.

6        Q.    Okay.  Aside from Sanders -- because you said he

7    tried to -- Bruce Kelley was trying --

8        A.    Every time -- every time an officer got any -- if he

9    felt the fact that -- the presence of somebody behind him, he

10   would spin around and slash the knife in our direction.  So

11   anytime an officer -- he felt the presence of somebody behind

12   him, he would spin around and slash the knife in our direction.

13       Q.    Okay.  But each time he did that, you were all far

14   enough away from him that he didn't slash anybody.  Correct?

15       A.    Yes.  So we did not get stabbed.  Correct.

16       Q.    Now, we're back to you say Bruce Kelley is diagonal.

17   So he's going towards the houses on Whitney Avenue, to your

18   left.  Correct?

19       A.    Yes.

20       Q.    Okay.  And as he's going towards the houses, is he

21   now in a yard?

22       A.    Yes.

23       Q.    Okay.  Please tell me what you hear or see next as

24   far as O'Malley and the dog.

25       A.    K-9 Aren engaged this -- Kelley on his left, upper

1    shoulder, arm area.

2        Q.    And when you say "engaged," what -- just what does

3    that word mean?

4        A.    He bit him.

5        Q.    When O'Malley released the dog, how was Kelley's

6    body positioned as far as -- was he facing O'Malley?  How was

7    his body positioned?

8        A.    He was walking in the manner that I already

9    described.  He was walking at a diagonal in towards that yard.

10       Q.    So when O'Malley releases the dog, Kelley was not

11   stationary?  He was moving?

12       A.    Yes.

13       Q.    Okay.  And, again, he's moving to your left.  Is

14   that right?

15       A.    Yes.

16       Q.    And when the dog bites Kelley -- right before the

17   dog gets to Kelley, how was Kelley's body positioned?

18       A.    I -- he was still walking in that manner.  I can't

19   specifically tell you exactly how he was standing.

20       Q.    Well, were you looking at Kelley?

21       A.    Yes.

22       Q.    Okay.

23       A.    And he was walking away from us.

24       Q.    So the dog was coming from your right.  Is that

25   correct?

1    A.    Yes.

2    Q.    And it would have been -- I mean, was Kelley -- was

3  Kelley in motion when the dog bit him?

4    A.    Yes.

5    Q.    Okay.  And how was Kelley's body positioned right

6  before he's bit by the dog?  As in, does the dog approach from

7  his right side?  Head -- straight on to his chest?  To his

8  back?  His left side?

9    A.    I said he bit him in the left back, shoulder area.

10   Q.    Yeah.  The question is:  How was Kelley's body

11 positioned right before the dog bit him?

12   A.    Again, I've already told you he was walking at a

13 diagonal in towards the yard.

14   Q.    Okay.  So I don't know exactly where the dog is

15 coming from when he's released.  I'm just trying to figure out

16 how was -- did he approach Kelley, like, from behind Kelley or

17 in front of Kelley?

18   A.    He came from -- O'Malley was to my right side.  I

19 didn't specifically see exactly how the K-9 got to him.  I just

20 saw the K-9 come up and engage him in the back left shoulder

21 area.

22   Q.    Okay.  And when the dog bites Kelley, is the dog,

23 like, on its hind legs or in the air or -- how is the dog's

24 body positioned when he bites Kelley?

25   A.    I believe his back legs were on the ground, and he

1    was -- his head was in -- into the bite.

2        Q.    And did Kelley have the knife in his right hand?

3        A.    Correct.

4        Q.    And the dog bit Kelley's left arm.  Is that correct?

5        A.    Yeah.  The left shoulder, arm area.  Yes.

6        Q.    Okay.  What do you see happen next, please?

7        A.    At that time, Bruce Kelley starts to turn from his

8    right to his left.  And at that time, he started slashing

9    across his body and stabbing the K-9 in the head.

10        Q.    How many slashing motions did Kelley make?

11        A.    I saw two that I recall.  It may have been more.

12        Q.    And so Kelley is -- his torso, with his right

13    hand -- his right hand is going to his left.  Is that correct?

14        A.    Correct.

15        Q.    So his back is to you.  Is that right?

16        A.    He was turning in -- in that process, he was

17    turning.

18        Q.    And in the process of turning, his back is to you.

19    Correct?

20        A.    It -- it started at the back of me and then began --

21    he turned around.  As he turned around, he was then facing us.

22        Q.    Do you know if he connected with the dog each time

23    he made a slashing motion?

24        A.    I don't know.

25        Q.    Okay.  What -- what happens right after you see

1 those motions by Kelley?

2     A.    After that, Kelley is pretty much facing directly at

3 Sergeant O'Malley.  Aren disengaged.  Kelley took about two

4 steps towards Sergeant O'Malley.  K-9 Aren attempted to

5 re-engage.  And as K-9 Aren's head was coming up to re-engage

6 again, Kelley took the knife and stabbed it into K-9 Aren's

7 throat and continued in the direction of K-9 Sergeant O'Malley.

8     Q.    Okay.  So Kelley is facing O'Malley at this point.

9 You say he took two steps towards O'Malley?

10     A.    Yes.

11     Q.    And --

12     A.    He was slashing -- he was slashing at Aren.  As he

13 was taking the steps forward, Aren came up to attempt to engage

14 again.  And then Kelley stabbed the knife into Aren's throat

15 area.  And then after that is when K-9 Aren fell to the ground.

16     And he -- he was continuing towards Sergeant

17 O'Malley with the knife in his right hand.  His knife was out

18 in front of him, facing K-9 Sergeant O'Malley.

19     Q.    And so Aren engaged Kelley two different times.  Is

20 that right?

21     A.    He attempted to.  I don't know if he got a full

22 engagement on the second time or not.  But, yes, he attempted

23 to.

24     Q.    Now, was there a -- a gap in time between Aren's

25 first engagement of Kelley and the second, or was it just kind

1  of immediate?

2      A.    It was very short.  It was not like a large gap of

3  time.  It was pretty fluid.

4      Q.    And when does Kelley take two steps towards

5  O'Malley?

6      A.    After he -- as he spun around, after K-9 Aren

7  disengaged, he took the steps towards K-9 Sergeant O'Malley and

8  was slashing the knife at K-9 Aren.  And then K-9 Aren

9  attempted to make the second -- re-engage the second time.  And

10  then that's when he slashed -- he stabbed K-9 Aren again in the

11  throat.

12      Q.    And what did you do?

13      A.    As soon as K-9 Aren hit the ground, K-9 Aren started

14  towards my left.  And that is when I fired my weapon.

15      Q.    Did you fire first?  Between you and O'Malley, did

16  you fire first?

17      A.    No.

18      Q.    Who fired first?

19      A.    O'Malley.

20      Q.    And now, at that point, what is your distance from

21  Kelley?

22      A.    I would say it was within 20 feet.

23      Q.    And, say, was it within 10 feet?  As close as within

24  10?

25      A.    I can't tell you yes or no.  I don't know.  I can't

1  give you a specific distance.

2      Q.    And, again, O'Malley is to your right?

3      A.    Correct.

4      Q.    Are there any officers to your left?

5      A.    No.  They were all behind us.

6      Q.    Okay.  And --

7      A.    They were to my left.  They were far enough behind

8  me that I did not know they were there.

9      Q.    Okay.  How many times did you fire your weapon?

10     A.    Twice.

11     Q.    And were you aiming for a specific, you know, area

12 of the body?

13     A.    It would be the -- the center mass area.  The

14 biggest part of the body that is a target.

15     Q.    And "center mass," does that mean the torso?

16     A.    If -- if that is available, yes.

17     Q.    And was it available as a target?

18     A.    He was turned more towards K-9 Sergeant O'Malley,

19 and he was turned so -- I mean, his -- his -- there was -- he

20 was almost midline, so I could have -- I mean, there was the --

21 the front part of the stomach and maybe the back part of the

22 back was available to me.

23     Q.    Now, in your use of force training, which we'll get

24 to later, what were you taught as far as -- if you're going to

25 deploy deadly force, are you taught that you're supposed to

1  fire, say, X number of times?

2       A.    You are taught to fire until the threat has been

3  taken care of.

4       Q.    And "taken care of" means what?

5       A.    There is no longer a threat.

6       Q.    And a threat of what?

7       A.    Serious bodily harm.

8       Q.    So where -- I mean, you're looking at Kelley as

9  you're shooting at him.  Correct?

10      A.    Yes.

11      Q.    Okay.  So where did you shoot him on his body?

12      A.    I -- again, I told you where I aimed.  I can't tell

13 you exactly where my -- my rounds hit.

14      Q.    And he's -- he's partly facing your direction when

15 you fire?

16      A.    No.  He was facing more towards O'Malley.  He was --

17 he was progress- -- he was actively walking, attempting to get

18 towards O'Malley.

19      Q.    And --

20      A.    That was the direction he was walking.

21      Q.    Sorry.

22      A.    Go ahead.

23      Q.    So you're taught to fire until the threat is

24 removed.  So does that mean that you're trained to make an

25 assessment after each shot, whether the threat has been

1  removed?

2       A.    I can't -- I can't specifically talk to that.

3  You're taught to -- it's deadly force.  You use deadly force

4  until you feel there is no longer a threat of imminent or

5  immediate bodily danger.

6       Q.    And if the threat is removed after one shot -- you

7  connect with one shot -- are you supposed to stop firing?

8       A.    Yes, if the threat stops.  Once the threat stops,

9  you stop firing.  Correct.

10      Q.    So after you fired the first time, did you make an

11 assessment of whether or not you needed to fire a second time?

12      A.    There was still a threat.  I fired the second time,

13 yes.

14      Q.    What -- what happened to Bruce Kelley's body after

15 the first time you fired?

16      A.    I can't tell you specifically what happened to it.

17      Q.    I mean, did his -- did his body or torso move or

18 anything like that?

19      A.    Again, I can't -- I can't tell you.  I don't know.

20      Q.    Weren't you looking at his body?

21      A.    Yes.

22      Q.    How can you not tell me how his body was moving,

23 then, when -- while being shot?

24           MR. EVASHAVIK:  Object to the form of the question.

25 BY MR. GEARY:

1        Q.    Go ahead.

2        A.    This -- this happened within seconds.  It's -- it's

3    hard to tell -- give you a specific motion by motion of how his

4    body was going like you're asking, which is -- I -- I took

5    the -- I felt that I -- after the second shot that the threat

6    was taken away, and that's why I stopped firing.

7        Q.    Okay.  And what -- what about after the second shot

8    caused you to conclude that the threat had been removed?

9        A.    He began falling to the ground.

10       Q.    And were you and O'Malley firing simultaneously?

11       A.    Yes, I believe so.

12       Q.    And how did his body fall, please?

13       A.    He fell onto his back with his legs facing Whitney

14   Avenue, and his head was facing towards the houses.  His arm

15   was laying across his chest, and he still had the knife in his

16   right hand.

17       Q.    What did you do next, sir?

18       A.    At that point, I began to yell, "Contact," meaning

19   that I was going to go up and attempt to seize the actor.  Once

20   somebody responded to me, I went up.  I put my foot -- my right

21   foot on his right hand and the knife, and I removed the knife

22   from his right hand.  And then I rolled -- we rolled him over

23   in an attempt to put him into handcuffs.

24       Q.    How -- how was the knife removed from his right

25   hand?

1      A.    I put my right boot onto the knife, and I kicked it

2 out -- and I moved it out of his hand.

3      Q.    Got you.  Okay.  You kicked it out of his hand.

4            And then I assume, what, the knife went to somewhere

5 close to his body but now out of his hand?  Is that what

6 happened to the knife?

7      A.    Yes.  It was out of his reach.

8      Q.    And you rolled him over and put him in handcuffs?

9      A.    I did not put him into handcuffs, but we rolled him

10 over.  And I attempted to put him into handcuffs, yes.  But

11 somebody else did.

12      Q.    Okay.  Someone else put him in handcuffs?

13      A.    Correct.

14      Q.    Do you know -- which officer was that, please?

15      A.    I know Officer Adams did.  And another officer

16 assisted him, but I don't know who it was.

17      Q.    And did you realize that you -- with your two shots,

18 you actually connected with him?

19      A.    I don't know.

20      Q.    I mean, what --

21      A.    I just know -- I know the threat stopped.  He fell

22 to the ground.  And that's why we -- I stopped firing.

23      Q.    But was your thinking that you connected as opposed

24 to maybe you missed -- you missed the target with either shot?

25      A.    I don't know.  I can't tell you if I did or didn't.

1   I don't know.

2      Q.   Could you tell if O'Malley connected with at least

3   some of his shots?

4      A.   I can't tell you who did or did not hit him.  That's

5   not -- I -- I -- I can't tell you yes or no.

6      Q.   Is there something in the use of force training when

7   you deploy deadly force where you're to determine whether or

8   not you actually struck the subject, the target?

9      A.   There was multiple -- there was two officers that

10   fired, so I can't tell you who struck him and who didn't strike

11   him.

12      Q.   Now, what -- when -- why was he put in handcuffs?

13      A.   Because we have to consider -- we have to make sure

14   that he is no longer a threat before we attempt to administer

15   first aid.  He is handcuffed to make sure that everything is

16   secure, he's clear of any more weapons, if he was to have any.

17   And then he's assessed at that point, and then first aid is

18   administered.

19      Q.   Now, first aid -- I was never certified in first

20   aid.  What does first aid consist of?

21      A.   It's a -- it's a very broad question.  I don't

22   understand what you're asking.  I mean, any kind of -- if CPR

23   is needed, if bleeding control is needed, all the way up to

24   putting a band-aid on somebody.  It's a very broad question, so

25   it's hard to answer what you're asking.

1     Q.   No.  That answered it, just the range of things that

2 could be done.

3         How -- how was first aid going to help Bruce Kelley,

4 Jr., at that point?

5     A.   I don't understand what you're asking.  We felt he

6 was unresponsive, so we began to assess his injuries.  And they

7 administered whatever aid was necessary.

8     Q.   Wasn't he clearly dead?

9     A.   I can't tell you that.  I'm not -- it's not my

10 position to decide if somebody is clearly dead or not.

11     Q.   And whose position --

12     A.   He --

13     Q.   Whose position is that?

14     A.   I don't know.  The coroner is who decides if

15 someone -- or a doctor is who decides if somebody is dead or

16 not.

17     Q.   So did you actually administer first aid?

18     A.   I specifically -- I personally did not, no.  A

19 different officer did.

20     Q.   Okay.  Tell me what you -- what else you did there

21 right then at the scene, please.

22     A.   After he was hand- -- after he was secured, I was

23 removed from the specific incident area and put into an

24 unmarked patrol car and sat there until I was transported back

25 to the police station.

1  looking straight up, I would have been facing west.

2       Q.    Okay.  You would have been facing west.  And when

3  you fired your weapon, you fired your weapon in a westerly

4  direction?

5       A.    I mean, west -- it would have been more

6  west-southwest, yes.

7       Q.    Okay.  O'Malley the same?  In that direction,

8  southwesterly direction?

9       A.    I can't speak for O'Malley.  I would -- he would

10 have to tell you how he was.

11      Q.    Okay.  And, again, just so we're clear here, you're

12 telling me that you cannot identify on this aerial view of

13 Whitney Avenue where you were or where Bruce Kelley was when

14 you shot him?

15      A.    Not on this picture, no.

16      Q.    When you fired your two rounds at Bruce Kelley, Jr.,

17 why did you fire your rounds?

18      A.    I felt he was an immediate threat to Sergeant

19 O'Malley and the rest of the public.

20      Q.    And who in -- who in the public was he a threat to?

21      A.    Anybody that he would have encountered, I believe.

22      Q.    Well, who -- who was there that he could have

23 encountered in that yard?

24      A.    Nobody in that specific yard.

25      Q.    And you say he was a threat to O'Malley.  Is that

1 correct?

2     A.    Yes.

3     Q.    And what was the threat?  A threat of what to

4 O'Malley?

5     A.    He had a knife extended in his right arm facing

6 towards O'Malley, and he was progressing towards him.  I

7 believed that he was going to attempt to stab him.

8     Q.    And O'Malley was armed with a loaded gun.  Correct?

9     A.    Yes.

10     Q.    Okay.  And how many feet was Kelley, Jr., from

11 O'Malley when you --

12     A.    I don't know.

13     Q.    When you considered Kelley to be a threat to

14 O'Malley's safety, what was the distance between those two?

15     A.    I can't speak to that because I can't tell you

16 exactly where O'Malley was standing.

17     Q.    Okay.  Can you give me --

18     A.    All I can tell you is -- what I will tell you is

19 that after he stabbed the K-9 and he kept advancing towards

20 O'Malley, that's when I perceived him as an immediate threat

21 towards O'Malley and I used my firearm and fired two rounds.

22     Q.    And how many steps had he taken toward O'Malley?

23     A.    He had taken the two initial steps, and then he

24 stabbed the K-9 the second time.  And then after he had stabbed

25 the K-9 the second time is when he attempt- -- he made more

1    movements towards O'Malley.

2        Q.    Why didn't you shoot him after he made the first

3    step towards O'Malley?

4        A.    Because he had -- the -- the K-9 was attempting

5    re-engage him.

6        Q.    And you've testified before in court in criminal

7    proceedings, I assume?

8        A.    Yes.

9        Q.    And, I mean, you've been asked as a witness to give

10   estimates, correct, in feet, distance, before as a witness?

11       A.    Yes.

12       Q.    Okay.  So I'm just going to give you one last

13   opportunity.  Will you please give me an estimate in feet how

14   many -- how far Kelley was from O'Malley when you concluded you

15   needed to shoot Kelley.

16       A.    I will answer you again and say that I do not know

17   where O'Malley was specifically, so I cannot estimate the exact

18   feet that he was from O'Malley.

19       Q.    If you didn't know where O'Malley was specifically,

20   how did you know Kelley, Jr., was a threat to O'Malley?

21       A.    I know where -- I know the -- this general area

22   where O'Malley was standing, and I know that he was taking

23   movements towards O'Malley.  At that point, that's when I felt

24   he was a threat towards O'Malley, and I fired my weapon.

25       Q.    Did you consider -- at the time, was your

1  understanding that Aren was an officer?  Like under the law, an

2  officer, a police officer?

3       A.    Yes, he is.

4       Q.    Did you fire your gun at Bruce Kelley out of anger?

5       A.    No.

6       Q.    Because he wounded the dog?

7       A.    No.

8       Q.    Now, at the point in time that you fired your two

9  shots at Kelley, the dog had been wounded.  Correct?

10      A.    I -- I could not tell you that.  I did not know.

11      Q.    But at the -- at the point in time you fired your

12 weapon, you didn't know the dog was going to die.  Correct?

13      A.    Correct.

14      Q.    In this whole encounter, please -- well, in this

15 whole encounter, did you do anything to de-escalate the

16 situation?

17      A.    I gave him multiple commands to drop the knife and

18 to put the knife down, and he refused any command at all.

19      Q.    Okay.  Separate from giving him commands, which I

20 understand, did you do anything to de-escalate the situation?

21      A.    Giving commands -- verbal commands is a

22 de-escalation tactic.  By not using force at that point, by

23 attempting to talk to them and get them to put the weapon down,

24 that is a de-escalation tactic.

25      Q.    Okay.

1        A.    Yes, it was.

2              MR. EVASHAVIK:  All right.  I'd like to mark that

3   interview separately, which was produced to Mr. Geary, as an

4   exhibit.  What number would that be next?  Would that be

5   No. 17?

6              MR. GEARY:  Right.  Correct.

7              MR. EVASHAVIK:  Okay.  I'd like to identify that as

8   Exhibit 17.  Thank you.

9              MR. GEARY:  I'm sorry.  I'm sorry, Greg.  I

10  apologize.  That's audio and video?

11             MR. EVASHAVIK:  Yes.

12             MR. GEARY:  Got you.  Thank you.

13             MR. EVASHAVIK:  I provided it.  It's one -- it's a

14  recording where you can hear, you know, the interviewer and

15  Officer Ravotti answer.  And you can also see them.

16             MR. GEARY:  Sure.  Yeah.  I have it somewhere.  Got

17  you.  That's 17.

18             MR. EVASHAVIK:  Okay.  Thank you.

19             (Whereupon, Deposition Exhibit 17 was marked for

20  identification.)

21  BY MR. EVASHAVIK:

22      Q.    Okay.  Officer, at any time in your pursuit when

23  Kelley, Jr., was in your view, did you ever see him put the

24  knife away?

25      A.    No, I did not.

1    Q.    And did he ever change hands with it?

2    A.    No, he did not.

3    Q.    And was it always held in the manner that you

4    described earlier with the blade sticking out?

5    A.    Yes.  He never closed the knife.  It was always

6    extended, and it was -- it was always in his hand.

7    Q.    Okay.  Now, you were asked in Exhibit 6, which was

8    the timeline that was put together -- I'm not going to ask you

9    to look at it now, though.  But there are still photographs

10   that were taken from the actual videotape from the Hamnett

11   Street Station.  All right?  I'm telling you that.

12   A.    Yes.

13   Q.    And the Hamnett Street Station videotape has already

14   been identified as an exhibit.  It's Exhibit No. 8.  So my

15   question to you is:  Before today's deposition, did you have an

16   opportunity to review the entire videotape of the progress and

17   your -- your involvement on the scene from Center Avenue,

18   through the parking lot, out of the parking lot, and over the

19   fence?  Have you seen that videotape?

20   A.    Yes.

21   Q.    All right.  And does it depict you in that

22   videotape?

23   A.    Yes.

24   Q.    And the still photos, are those still photos from

25   that videotape?

1    A.    Yes.

2    Q.    Okay.  And in your recollection, having been a

3 person present for this, does the videotape truly and

4 accurately depict what took place during that time where the

5 video shows everybody through the -- from Center Street through

6 the parking lot?

7    A.    Yes.

8    Q.    You testified earlier about Kelley, Jr., during that

9 process, which is on videotape, swinging around and swinging

10 his knife.  Do you recall saying that in answering Mr. Geary's

11 questions?

12    A.    Yes.

13    Q.    And do you recall seeing that on the videotape,

14 those actions by Kelley, Jr., that you answered to Mr. Geary?

15    A.    Yes.

16    Q.    So you believe it is shown on the videotape?

17    A.    Yes.

18    Q.    And was that once or more than once that he -- he

19 took those swinging actions with the knife or in the direction

20 of the officers?

21    A.    It was more than once.

22    Q.    And did you personally give commands to Kelley, Jr.,

23 during your interaction with him to stop, drop the knife, and

24 things of that nature?

25    A.    Yes, I did.

1      Q.    And was that on multiple occasions?

2      A.    Yes, it was.

3      Q.    Did you hear other officers giving him similar

4  commands?

5      A.    Yes, I did.

6      Q.    Was that on multiple occasions?

7      A.    Yes, it was.

8      Q.    At any time during this pursuit when you could see

9  Kelley, Jr., was he ever surrounded by officers or trapped in

10  any manner and unable to escape or continue on his path away

11  from officers?

12      A.    No.

13      Q.    Okay.  Was he always moving, or was he stopped at

14  any time?

15      A.    He was always moving until the K-9 deployed.

16      Q.    Did you believe during your interaction and

17  involvement in this pursuit that Kelley, Jr., was actively

18  resisting arrest?

19      A.    Yes.

20      MR. GEARY:  Objection.  Objection.  Leading.

21  BY MR. EVASHAVIK:

22      Q.    Okay.  Did you have an opinion during your

23  involvement and pursuit in this whether or not Kelley, Jr., was

24  cooperating with the officers' attempts to arrest or not?

25      A.    He absolutely was not.  He was resisting arrest and

96

1    resisting any form of engagement that we gave him.

2         Q.    Did you have any opinion whether or not Kelley, Jr.,

3    during this pursuit, was willing to cooperate or was attempting

4    to evade arrest by flight?

5         A.    He was absolutely evading arrest by flight.

6         Q.    And -- and did you believe that Kelley, Jr., posed a

7    significant threat of death or serious physical injury to you

8    or others?

9         A.    Yes, I did.

10        Q.    And did you believe that at the time you discharged

11   your weapon?

12        A.    Yes, I did.

13        Q.    Did you believe that prior to the time you

14   discharged your weapon?

15        A.    Yes, I did.

16        Q.    Did you believe that during the encounter that's

17   demonstrated on the videotape, Deposition Exhibit No. 6, the

18   Hamnett Street Station Park and Ride?

19        A.    Yes.

20              MR. EVASHAVIK:  Those are all the questions I have.

21                        EXAMINATION

22   BY MR. GEARY:

23        Q.    Just one last question, please, Officer.

24   Mr. Evashavik just asked did you believe Kelley was a threat

25   prior to the time you fired your weapon, and you said yes.

1    A.    Yes.

2    Q.    So one last question for me is:  Why did you not

3  shoot him, then, earlier in this encounter?

4    A.    At the time that he turned around on Officer

5  Sanders, there was a bus that had just let off, and there was

6  people that I could see on the busway.  So I felt at that point

7  it was not a correct time to use deadly force.

8    Q.    Aside from that moment in time, were there other

9  times in this entire episode when you felt Kelley was a threat?

10    A.    Kelley was a threat from the moment he pulled -- he

11  resisted arrest and then pulled out the knife and fled from

12  officers.

13    Q.    Okay.  So separate from the moment in time you just

14  described where a bus pulled up, why did you not shoot Kelley

15  at any other point in time?

16    A.    Because they were attempting to use non-lethal means

17  to take him into custody, which all were exhausted.  We had no

18  more less-lethal means, and he had -- at that point, he

19  progressed towards an officer with the knife out.  And at that

20  point I felt that he was a serious threat to Sergeant O'Malley

21  and the rest of the public and he was not going to stop and he

22  needed to be --

23    THE REPORTER:  I'm sorry to interrupt, but I didn't

24  hear the very last thing you said, Officer.

25    THE WITNESS:  He needed to be seized.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


CALISIA KELLEY; and                 CIVIL ACTION
JOHNNIE MAE KELLEY,
Co-Administrators of the            No. 2:17-cv-01599-NBF
ESTATE OF BRUCE KELLEY,
JR., deceased,

Plaintiffs,

vs.                                 TRANSCRIPT

BRIAN O'MALLEY, both in his         VIDEOTAPED
Official and Individual             DEPOSITION OF
Capacities as Sergeant for          BRIAN O'MALLEY
the Allegheny County Port
Authority; and DOMINIC
RIVOTTI, in both his
Official and Individual
Capacities as Officer for
the Allegheny County Port
Authority,

Defendants,
Jointly and Severally.              TAKEN VIA ZOOM VIDEO CONFERENCE

                                    WEDNESDAY, OCTOBER 7, 2020


                                    Taken on behalf of Plaintiffs,
                                    Calisia Kelley and Johnnie Mae
                                    Kelley


                                    Counsel of Record for this Party:

                                    Noah Geary, Esquire
                                    Washington Trust Building
                                    6 South Main Street, Suite 225
                                    Washington, PA  15301
                                    724-222-3788

1    not -- not have body cameras for officers at that time?

2        A.    That's correct.

3        Q.    Now, we'll get to the events of that day in a

4    moment.  Did you drive your unit to the scene at some point

5    that day?

6        A.    I drove my police car to Hamnett Station.

7        Q.    And did the -- did your unit have dashcam -- dash

8    camera capabilities?

9        A.    No.

10       Q.    Did any of the Port Authority units have dash camera

11   capabilities?

12       A.    No, sir.

13       Q.    Do they have that now?

14       A.    No, sir.

15       Q.    If we can move to January of '016, obviously, I'm

16   going to ask you many questions about the day of this incident,

17   January 31, '016.  Before we get to that, January of '016, how

18   many years had you had with the Port Authority at that point?

19       A.    18, into 19.

20       Q.    And were you a K-9 officer as of January of '016?

21       A.    Of January of '16?

22       Q.    Yes, sir.

23       A.    Yes.

24       Q.    And how long had you been a K-9 officer?

25       A.    Since 2003.

1    Q.    Okay.  Now, in the time period of January '016 and

2  you being a K-9 officer when you worked for the Port Authority

3  Police Department, were you always working in a role as a K-9

4  officer, or was it sometimes you were and other times you were

5  in a different type of capacity?

6    A.    Clarify the other type of capacity.

7    Q.    Just anything other than K-9.  Just, say, you were a

8  sergeant doing, say, patrol or duties that had nothing to do

9  with K-9.

10    A.    Well, K-9s are assigned to patrol.

11    Q.    Okay.

12    A.    So I was a sergeant assigned to patrol as well as

13  having a K-9.

14    Q.    So did -- every shift you worked in January of '016,

15  in that time period, were you in the capacity as a K-9 officer?

16    A.    Correct.

17    Q.    Okay.  And your K-9 partner was Aren.  Is that

18  correct?

19    A.    Correct.

20    Q.    A German Shepherd?

21    A.    Yes.  Aren was full German Shepherd.

22    Q.    Okay.  Now, is it correct that you and Aren were a

23  team, a K-9 team, as far as how it's phrased?

24    A.    That is -- that's a phrase that's often -- often

25  used and written down.  Correct.

1    Q.   And is the team you and -- and Aren, or was it, say,

2  you, another officer, and Aren?

3    A.   It was myself and Aren.

4    Q.   Okay.  How long, as of '016, had you and Aren been a

5  K-9 team or unit?

6    A.   Several years.

7    Q.   Okay.  And how many is several?

8    A.   I think I had Aren on the street for -- it was maybe

9  three, going into four.  So I don't believe it was longer than

10  four.  It was maybe coming up on four.

11    Q.   And in that time frame, how many other K-9 teams, or

12  units, did the Port Authority Police Department employ?

13    A.   We had two other teams.

14    Q.   And who were they, please?

15    A.   So that was Ron Fukas, who at the time was a

16  patrolman, and Sergeant Rob DiPippa.

17    Q.   And in the, say, three to four years you worked with

18  Aren, did you always work with Aren when you were working as a

19  K-9 officer?

20    A.   Yes, sir.

21    Q.   And DiPippa, his partner was whom?  What was the

22  name of the K-9?

23    A.   Arko, A-r-k-o.

24    Q.   And I think you said Fukas.  Can you spell Fukas,

25  please?

30

1  with no bite?  How was Lord trained -- and you trained?

2      A.    So in your training, if you deploy a K-9 in a felony

3  situation and suspect or suspects are running and the suspect

4  surrenders, you would use a call-off technique.  And so

5  although -- that would be a deployment no bite because the

6  suspect surrendered.  You do a recall on your dog, and you call

7  the dog back to the heel because the person is no longer

8  resisting arrest and fleeing.

9      Q.    In that scenario, in the moment that you deployed

10  the dog, if the suspect had not yet surrendered, what was the

11  dog supposed to do in that deployment?

12     A.    That would be make an apprehension.

13     Q.    And how was the dog to do that?

14     A.    How he was trained.

15     Q.    And how was he trained?

16     A.    The arm/shoulder area.

17     Q.    And what about the arm/shoulder area?  What exactly

18  was the dog supposed to do to the suspect to effect a

19  successful deployment?

20     A.    To make an apprehension.

21     Q.    And how so?

22     A.    With -- with his mouth.

23     Q.    Okay.  Yeah.  I didn't know if we're talking about

24  the no-bite technique versus the bite technique.  Let's start

25  with the no-bite technique.

44

1  you see Lord do?

2       A.    Lord ran downfield, which was -- downfield,

3  referring to towards the suspect.

4       Q.    And then tell me what you watched Lord do.

5       A.    I watched the suspect stop, raise his hands up in

6  the air, and say "I surrender."  And then I recalled Lord back

7  to my side.

8       Q.    And I'm sorry.  You said the suspect was armed?

9       A.    No, he was not.

10      Q.    Oh, okay.  I'm sorry.

11            So those were two deployments of Lord, is that

12  correct, in your career?

13      A.    Yes.

14      Q.    And were they both successful deployments?

15      A.    Correct.

16      Q.    Okay.  Did you ever deploy Aren prior to January 31

17  of '016 with this Bruce Kelley, Jr., incident?

18      A.    Are we -- when we use "deployment," are you

19  referring to apprehension?  Correct?

20      Q.    Yes, sir.

21      A.    No.

22      Q.    Okay.  Had Aren undergone training on how to

23  apprehend a suspect?

24      A.    Yes, sir.

25      Q.    Okay.  And would the training of Aren be the same or

1  equivalent of the training that Lord underwent?

2      A.    No.

3      Q.    Okay.  And tell me how the trainings of the two dogs

4  were different, please.

5      A.    If you remember me saying, the certification at some

6  point changed, and it involved gunfire in the actual

7  certification test.  So he -- Aren may have got more extensive

8  certification training than what Lord got in his initial

9  training.

10      Q.    Okay.

11      A.    So that -- there was a changeover.  So, actually, in

12  short, the test got harder.

13      Q.    And separate from what you just explained, were

14  there any other differences in the training between Aren and

15  Lord?

16      A.    No.

17      Q.    Lord had some credentials or qualifications through

18  ATF.  Did Aren have any certifications or qualifications

19  through any other entity separate from NAPWDA?

20      A.    No.

21      Q.    Using January 31st, '016, as a reference point, when

22  was the most recent time, the date on which Aren had undergone

23  suspect apprehension training?

24      A.    Probably that month.

25      Q.    Okay.  And when you say "probably that month," when

1    you use the word "probably," does that -- does that mean maybe

2    in January of '016 Aren did not undergo any training regarding

3    suspect apprehension?

4        A.    No, that's not what I mean.  So he -- we do -- that

5    was the end of the month, the 31st.  So during that month, we

6    did patrol training.

7        Q.    Okay.  And are there records that prove that Aren

8    actually underwent suspect apprehension training in that month

9    of January?

10            MR. EVASHAVIK:  Object to the form.

11            THE WITNESS:  Yes.

12   BY MR. GEARY:

13       Q.    Okay.  How many hours of suspect apprehension

14   training did Aren have in January of '016?

15       A.    Well, he had gone through several certification --

16   NAPWDA certification, yearlies, so Aren had had hundreds of

17   hours.

18       Q.    Well, I'm focusing on the month of January of '016.

19   This happened on January 31st.  How many hours of suspect

20   apprehension training did Aren have that month, January of

21   '016?

22       A.    I don't know.

23       Q.    Okay.  What about December of '15?

24       A.    I would have to look at my records.

25       Q.    Okay.  What about November of '15?

1     Q.    Thank you.  Okay.  Let's get to the events of

2  January 31, '016.  Obviously, you were working that day, sir?

3     A.    Yes, sir.

4     Q.    What was your rank at the time?

5     A.    I was a sergeant.

6     Q.    And was there one level of sergeant or several?

7     A.    One level.

8     Q.    And what shift were you working?

9     A.    P.M. shift, which was 1400 to 2200.

10    Q.    And what was your assignment when you started that

11 shift that day?

12    A.    Shift commander.

13    Q.    And so what did that -- your duties as a shift

14 commander would include what range of duties?

15    A.    Assigning officers to particular districts within

16 the county.

17    Q.    And as the shift commander, were you stationed in

18 the Port Authority Police Department station?

19    A.    Yes.  That's where we report, correct.

20    Q.    Okay.  And then when you arrived and started your

21 shift that day, please just break down -- what were the things

22 that you did before this incident developed?

23    A.    At 1400, we have a roll call.  At that time, each

24 particular officer working that -- that shift is assigned a

25 particular patrol district.  Also at that time we use the

56

1    opportunity to conduct any, quote/unquote, roll call training

2    that we may want to pass on to the officers, and that could

3    involve any type of training.  I don't know if we did any that

4    day, but use that opportunity, since everybody is together, to

5    do that.

6          And once the officers are assigned their districts,

7    they're dismissed and they respond out to whatever their

8    assigned areas are.

9    Q.    How many officers on duty on that shift?

10    A.    I don't recall.  I would have to look at the

11    shift -- deployment shift sheet.

12    Q.    What's an approximate number, typically, in that

13    time frame?

14    A.    On -- on a Sunday, there could anywhere be

15    [verbatim] from nine to six.

16    Q.    And you did the roll call, and you give the

17    assignments.  And then what did you proceed to do?

18    A.    I believe I was at the station.  What I did, I don't

19    recall.  What I was -- my actual doing, I don't recall.

20    Q.    And then at some point, do you acquire information

21    that there's some incident which you responded to?

22    A.    Yes.

23    Q.    Okay.  Please walk me through that.

24    A.    Over the radio, I heard Officer Adams make a

25    reference that both he and Officer Hampy would be exiting the

57

1  car at the gazebo in Wilkinsburg.

2      Q.    And over the radio -- did you have a radio, say, on

3  your shoulder there as part of your uniform that day?

4      A.    Yes.

5      Q.    And then is there also, separate from that, a radio

6  at your desk or near your desk?

7      A.    We have a dispatch center located inside our police

8  department.

9      Q.    And so did you -- separate from whatever was on your

10 uniform, on your shoulder, was there a separate radio nearby to

11 you where you -- you heard this transmission coming through?

12     A.    No.

13     Q.    Okay.  Did you do anything in response to that

14 transmission?

15     A.    I entered my police car and responded out there,

16 responded to that area.

17     Q.    And why?

18     A.    Detective -- or I'm sorry -- Officer Adams made a

19 Code 2 emergency -- Code 2 reference on the audio.

20     Q.    And Code 2 meaning what?

21     A.    That's a request for backup, asking for

22 lights-and-siren response.

23     Q.    And at the time, were there different radio channels

24 that the Port Authority Police Department had?

25     A.    Well, at that time and present day, we have our own

1  channel that we're dispatched on.  But our radios have the

2  capabilities to scan and monitor most dispatch centers within

3  the county.

4      Q.    And so does that mean there's -- there's more than

5  one channel as of January of '016?

6      A.    More than one radio channel for us or for other

7  people?

8      Q.    For Port Authority officers.

9      A.    No.  We have one channel.

10     Q.    Okay.  So if you want to radio to other officers,

11 you have to use -- at the time, you had to use the one channel.

12 Is that correct?

13     A.    What other officers?  Clarify that.

14     Q.    Say, other Port Authority officers.

15     A.    Yes.  We use our -- our channel.  Correct.

16     Q.    And what -- are there call letters or a number to

17 the channel?

18     A.    An identifier?  Is that what you're asking?

19     Q.    Yes.

20     A.    I don't -- I don't know.  What do you mean?  On the

21 radio itself, or that comes up?  Like an identifier number?

22     Q.    Just like, you know, just it's channel No. 1 or it's

23 channel No. 5, and that's the channel you use to communicate

24 with other Port Authority officers.

25     A.    So the marking on our radio?  Is that -- so it's

59

1    channel No. 1 on the frequency band.

2         Q.    Thank you.  Then, say, you were going to communicate

3    to an officer from Edgewood.  Would that communication by you

4    be on a different channel?

5         A.    Yes.

6         Q.    And, obviously, Swissvale responded.  Edgewood.

7    Wilkinsburg.  Would -- would -- Port Authority officer

8    communications with officers from other municipal police

9    departments, were they each on a separate channel?

10        A.    I believe that Wilkinsburg and Edgewood might be on

11   the same channel of their own.

12        Q.    Okay.

13        A.    And I think Swissvale.  I'm not sure.

14        Q.    So --

15        A.    It's the eastern area.

16        Q.    So Port Authority, there's one channel.  Channel

17   No. 1.  Correct?

18        A.    Correct.  That we use for primary, yes.  There's

19   backup channels, but that's for administrative.

20        Q.    And, then, for communications between Port Authority

21   officers and Wilkinsburg and Edgewood and maybe Swissvale, it

22   would be a different channel.  Is that right?

23        A.    Yes.

24        Q.    What was the channel number?

25        A.    I don't recall.

1      Q.    Now, as far as the dispatcher, is -- any radio

2  transmission a Port Authority officer would make to anyone,

3  would that go through dispatch?

4      A.    Through Port Authority dispatch?

5      Q.    Correct.

6      A.    Yes.

7      Q.    Now, when you responded to the Code 2, obviously,

8  you got in your -- your unit, your vehicle.  Correct?

9      A.    Yes.

10      Q.    Now, was Aren with you?

11      A.    Yes.

12      Q.    Was Aren with you in the station before you

13  responded to that call?

14      A.    No.

15      Q.    Okay.  Where was Aren, please?

16      A.    He was in the car.

17      Q.    Okay.  So when you started out your shift doing

18  different duties, obviously you're in the police station.  Is

19  that correct?

20      A.    That day, yes.

21      Q.    Okay.  And Aren was in the car.  Is that right?

22      A.    Yes.

23      Q.    Did Aren's shift begin -- was he working the same

24  shift as you were?

25      A.    Yes.

61

1    Q.   Okay.  Right before that shift started, where was

2  Aren?

3    A.   Before -- at what time?

4    Q.   Like, when you say -- I think you said, what, you

5  were, what, 2:00 p.m. to 2:00 a.m. shift?

6    A.   No.  I work 2:00 p.m. to 10:00 p.m.

7    Q.   Okay.  Sorry.  So the 2:00 p.m. to 10:00 p.m. shift,

8  that's the shift you worked that day.  And did -- was Aren --

9  did he start out working that same shift that day, 2:00 p.m. to

10  10:00 p.m.?

11    A.   Yes.

12    Q.   Okay.  So before you arrived to work, I assume you

13  come from home, and you live wherever you live.  Is that right?

14    A.   Yes, sir.

15    Q.   Okay.  Where -- in January of '016, where would Aren

16  be -- where did Aren live?  Where would Aren be prior to the

17  start of that 2:00 p.m. shift?

18    A.   He was at my house.

19    Q.   Okay.  And when Aren is not working, was he at your

20  house?

21    A.   Yes.

22    Q.   Okay.  Okay.  You respond to the Code 2.  It's you

23  and Aren in the vehicle.  Correct?

24    A.   Yes, sir.

25    Q.   No other human officer?

1    A.    No.

2    Q.    Okay.  Please tell me, you know, what develops.

3    A.    So I respond in my vehicle to Hamnett Station.  And

4    prior to arriving, I had overheard that Officer Adams had

5    mentioned that the suspect had gone mobile.  And I think I

6    clarified if this was a foot chase, and his response was he

7    went mobile and something along the lines of "Be advised

8    suspect is armed with a knife and walking towards Hamnett

9    Station."

10   Q.    And I think you -- you just said you went to the --

11   you drove to the Hamnett Station?

12   A.    Yes.

13   Q.    Is that -- is that the same thing as the park and

14   ride?

15   A.    No.

16   Q.    Okay.  Please just explain for me.  Where is Hamnett

17   Station in relation to the parking lot, the park and ride?

18   A.    So if you stand in the parking lot and look up

19   towards the station, you're looking up towards the Hamnett

20   Station.  I was up on the busway.

21   Q.    Okay.  Did you get out of your vehicle when you were

22   up there?

23   A.    Yes.

24   Q.    Okay.  Were any other officers on scene up there?

25   A.    Sergeant DiPippa arrived on scene.

1     Q.   Okay.  And were you up there for, say, a period of

2 several minutes or a period of time before you did whatever you

3 did next?

4     A.   No longer than probably a minute because I overheard

5 that the suspect had now gone from the trail into the woods.

6     Q.   DiPippa -- first name, is it Robert?

7     A.   Robert.

8     Q.   Was he also a K-9 officer?

9     A.   Yes.

10     Q.   Did he have a -- a K-9 with him also?

11     A.   Yes.

12     Q.   Okay.  So you're with Aren, and he's with, I think,

13 Arko.  Is that right?

14     A.   Yes.

15     Q.   Okay.  What did you do next at that point?

16     A.   So knowing the area, the suspect had gone into the

17 woods.  I went to my car.  I grabbed -- opened the door and had

18 Arko -- Aren come out of the car with me.  And then I ran down

19 the steps into the park and ride lot.

20     Q.   And before you did that, was there any talk between

21 you and DiPippa as far as either of you possibly having to

22 deploy your K-9 partner as a response --

23     A.   Yes.

24     Q.   -- to this incident?

25     A.   Yes.

1    Q.    And what -- who said what, please?  Tell me who said
2  what.
3    A.    So when I saw the suspect run into the woods, I ran
4  back to my car and I said, "I'm going to get my dog," to Rob.
5    Q.    And was he the same rank as you?
6    A.    Yes.  It was Sergeant DiPippa, yes.
7    Q.    And what did he say?
8    A.    "Okay."
9    Q.    Okay.  And he -- could he have decided to -- that he
10  would deploy his dog instead of you deploying your dog?
11    A.    I suppose.
12    Q.    But were -- you and he were of equal rank.  Is that
13  correct?
14    A.    Yes.
15    Q.    Okay.  Now, did you actually see Bruce Kelley, Jr.,
16  on the Linear Trail at any point before he went through the
17  woods?
18    A.    Yes.
19    Q.    Okay.  And tell me, how long did you watch what he
20  was doing?
21    A.    I saw him for no longer than a couple seconds
22  because then he went right down into the woods.  He was
23  screaming, "Fuck you."   Just screaming.
24    Q.    And what was the distance between you and he at that
25  point?

1     A.    30 yards.

2     Q.    Okay. And is there any other officers near you

3 other than DiPippa?

4     A.    No.

5     Q.    Okay. And so you -- you got Aren out of your

6 vehicle. Is that right? And I think you said, what, you

7 started down the steps?

8     A.    Yes.

9     Q.    Okay. And, then, please tell me. When you get to

10 the bottom of the steps, where does that put you?

11     A.    When you get to the bottom of the steps, you're on

12 the sidewalk, on a landing.

13     Q.    And is that next to the park and ride, the parking

14 lot?

15     A.    Yes.

16     Q.    Thank you. What did you do next, sir?

17     A.    Turned around and ran right back up to the car.

18     Q.    Why?

19     A.    A radio broadcast was made that the suspect was now

20 in the neighborhoods walking back towards the gazebo.

21     Q.    Okay. And when you went back up to your car, I

22 assume you took Aren?

23     A.    Yes.

24     Q.    Okay. What did you do at that point?

25     A.    So once I put Aren in the car, then I drove inbound

1    from Hamnett Station to an area that -- well, I was paralleling

2    the Linear Trail.  And I parked my vehicle on the busway,

3    exited the car with Aren, and went over the jersey barrier onto

4    the trail itself.

5         Q.    Is the jersey barrier -- is it also referred to

6    sometimes as a sound wall, or is that different?

7         A.    The sound wall is a little bit taller.  That's

8    the --

9         Q.    Okay.

10        A.    -- wall, the higher portion of the wall.

11        Q.    Okay.

12        A.    That's the sound wall, a sound barrier.

13        Q.    You went over the jersey barrier.  That's concrete.

14   Is that right?

15        A.    Yes.

16        Q.    What was, say, the approximate height of the jersey

17   barrier?

18        A.    3 feet.

19        Q.    Okay.  And you and the dog go over the jersey

20   barrier.  And then where do you go?

21        A.    So from that point, we ran outbound on the Linear

22   Trail, ultimately to the trail which is above Whitney Avenue.

23        Q.    And at that point when you're on the trail above

24   Whitney Avenue, you're -- you're still at the level of the

25   busway.  Is that correct?

1    A.    Correct.

2    Q.    You're higher than, say -- than where the

3 residential homes were on Whitney Avenue.  Is that right?

4    A.    Correct.

5    Q.    Okay.  What do you do next, please?

6    A.    I could hear yelling on Whitney Avenue, so I knew I

7 was in the right area of where the suspect could be walking.  I

8 could hear yelling.  I could hear the officers yelling to drop

9 the knife.  So I walked from the Linear Trail down a ramp which

10 zigzags to the bottom of the ramp, where I encountered a -- a

11 male standing at the Whitney Tunnel.  And he was looking up

12 Whitney Avenue from where that screaming was coming from.

13    Q.    And was that the suspect?

14    A.    No.  I'm assuming just a person from the

15 neighborhood.  A patron.

16    Q.    And when you zigzag down, where do you end up there

17 where you saw that -- that person?

18    A.    The bottom of the landing, which is to my right.

19 I'm looking at this guy.  To my right is the Whitney Tunnel,

20 which takes you to the busway.  And that's where he was

21 standing.  And to my left, then, is Whitney Avenue.

22    Q.    Thank you.  Are there other officers on Whitney

23 Avenue that you see?

24    A.    Not when I get down there, no.

25    Q.    Okay.  Other than that -- did you see any other

1  civilians or citizens other than the one gentleman you

2  described?

3      A.    Yeah.  So when I told him he should probably leave,

4  which he did, I then recall seeing a -- a female standing at

5  her -- at her door, looking away from me up Whitney Avenue

6  where the screaming was coming from.

7      Q.    Did the -- I'm sorry.

8      A.    Go ahead.

9      Q.    Did the male citizen say anything to you about this

10  incident or anything?

11     A.    I don't recall.

12     Q.    And you said to him something along the lines of

13  "You should get out of here"?

14     A.    Yes.

15     Q.    Did he comply?

16     A.    Yes.  I saw him start to walk.

17     Q.    Okay.  In which direction?

18     A.    Through that tunnel.

19     Q.    And you then saw a female citizen.  Is that correct?

20     A.    Yes.

21     Q.    Where exactly was she?

22     A.    So if I'm looking up Whitney Avenue to where that

23  screaming was coming from, the noise, she was at her front door

24  with another -- I think she was with a male.  And they were at

25  the door as if they were going into their house.  And they were

1    looking in that direction, and then, for some reason, she

2    looked back at me and then they quickly went in their house.

3        Q.    Was she black?  White?  Hispanic?

4        A.    She was a black female.

5        Q.    What age range?

6        A.    It's -- it's hard to say.  I mean, maybe in her 30s.

7    She was an adult.

8        Q.    And at that point in time, are you standing on

9    Whitney Avenue?

10       A.    So I'm right -- no.  I'm not on the street, no.

11       Q.    Okay.  Where were you?

12       A.    Right on the sidewalk at the bottom of that ramp.

13       Q.    Okay.  But you could look down Whitney Avenue.  Is

14   that right?

15       A.    Yeah.  Yes.

16       Q.    And then from your vantage point, there were houses

17   to the left of Whitney Avenue and to the right.  Both?  Is that

18   correct?

19       A.    Yes.

20       Q.    Okay.  And you see that female.  She goes back into

21   her house?

22       A.    That's correct.

23       Q.    Okay.  What happens next, please?

24       A.    I could still hear the yelling.  It was getting

25   louder.  And then over the radio I could hear the direction of

1  where the suspect was walking.  So a broadcast was made that he
2  was walking towards Whitney Avenue.
3      Q.    And when you say you heard yelling, is this over
4  your radio or with your ears you hear it?  Or both.
5      A.    Both.
6      Q.    Do you hear any words, or it's just noise at that
7  point?
8      A.    I heard -- I heard somebody yelling, "Go ahead.
9  Fucking shoot me.  Fucking shoot me."
10      Q.    And did you hear that over the radio or with your
11  ears?
12      A.    My ears.
13      Q.    Did you take that to be the suspect to say that?
14      A.    Yes.
15      Q.    What happens next, sir?
16      A.    Then I heard that -- another broadcast where the
17  suspect was walking away from Whitney Avenue, between the
18  houses.
19      Q.    Okay.  Did you stay put, or did you move in any
20  direction?
21      A.    So at that point, I moved.  And based off of that
22  radio transmission, I started to move in between a house
23  towards that -- away from Whitney Avenue where I assumed he was
24  going, at the rear of those houses that we referenced.
25      Q.    So if you were looking down Whitney Avenue -- houses

1  to your left and right -- did you go towards your left?

2      A.    Yes.

3      Q.    And how far did you get?

4      A.    Not far because then another broadcast stated that

5  he had now turned around and he was walking back towards

6  Whitney Avenue again.  So several feet and then I stopped.

7      Q.    Okay.  At that point in time, do you see any other

8  officers?

9      A.    No.  I could just hear a lot of things.  I could

10  just hear the yelling, "Fuck you.  Shoot me.  Fuck you."  I

11  could hear officers saying, "Drop the knife.  Stop," but I

12  didn't see any.

13      Q.    Are there any other civilians or citizens out in

14  their yards?  On the sidewalk?  In the street?  Whitney Avenue.

15      A.    I can't say.

16      Q.    Okay.  And at the end of Whitney Avenue, the

17  cross-street would be Center.  Is that right?

18      A.    I think Center Avenue is at -- at the end, yeah.

19      Q.    Okay.  Please continue and just walk -- walk us

20  through it.

21      A.    So at that point now when I reverse and I'm standing

22  back out near Whitney Avenue, I'm behind a bush.  And I see the

23  suspect start to walk down towards me, but he's on -- he's on

24  the street, and he's walking on a diagonal towards me but away.

25  So he's not perpendicular coming towards me; he's diagonal away

1 from me.

2     Q.    And where were you when you first see him, you

3 eyeball him?

4     A.    So I had concealment behind a bush, a large bush,

5 shrub, that was next to the -- next to the street.

6     Q.    Are you -- is the bush to the left of Whitney

7 Avenue?

8     A.    Yeah. So it would be to those -- by those left

9 houses, yes.

10     Q.    And, say, how far was the suspect away from you at

11 that point?

12     A.    Maybe 20 yards, gaining rapidly. He was walking at

13 a fast pace.

14     Q.    And then you heard some additional radio

15 communications where he's saying, "Shoot me." Is that correct?

16     A.    No. I heard him say that. I heard with my ears him

17 saying that.

18     Q.    Got you. What do you see next, please?

19     A.    I see the suspect turn. And somebody in the group

20 made a mention of "We're going to send the police dog." And he

21 turned back towards where I assumed the officers were, and he

22 started thrashing a knife around and he said, "I'll kill that

23 fucking dog."

24     Q.    Okay. I'm sorry. Just the beginning of your

25 answer, I think I got it. What, an officer said, "We're going

1    to send the police dog"?

2        A.    Yes.

3        Q.    Okay.  And you heard him say "I'm going to -- I'm

4    going to kill that dog"?

5        A.    He said, "I'm going to kill that fucking" --  He

6    goes, "Go ahead.  I'll stab that fucking dog."  And he turns

7    towards where I assume the officers were.  He turned in that

8    direction and, like, kind of thrashed the knife around in front

9    of him.

10        Q.    How many officers were in your field of vision at

11    that moment?

12        A.    I didn't see any officers.  I just saw the suspect.

13        Q.    Okay.  And if -- if I'm standing on Whitney

14    Avenue -- houses to the left, to the right.  Center Avenue is

15    at the end, say, 12 o'clock.  Is he moving from the left to the

16    right?

17        A.    So he is moving -- you reference Center Avenue.  He

18    is moving away from Center Avenue, inbound on Whitney, towards

19    the direction of the tunnel.

20        Q.    Okay.  When you say "inbound," does that mean in the

21    direction of the tunnel?

22        A.    So yeah, in the direction of the tunnel.  From

23    Center, in the direction of the tunnel.

24        Q.    Understood.  Thank you.  What do you see next?

25        A.    He turns back around.  After making the slashing, he

74

1   turns back around and he keeps moving at a fast pace at that

2   angular motion towards me, from my right to left.  And he's

3   just angling down the street.

4       Q.    Are you still behind the bush where you had had -- I

5   think you said concealment.

6       A.    I had concealment.  Yeah, I was still behind the

7   bush.

8       Q.    Okay.  Do -- do you know if he -- did you get the

9   impression he could see you at that point?

10      A.    No.

11      Q.    I'm sorry.  Bad question.  You didn't know or your

12  impression was he -- he could not see you?

13      A.    My impression is he did not see me.

14      Q.    Okay.  And when you say "angling down the street,"

15  just the word "angling," do you mean he's walking at a specific

16  angle, or are you just using that term loosely, like he's just

17  continuing to walk down the street?

18      A.    Yeah.  So he's walking on a pace down the street,

19  but not -- not a straight line towards me.  It would be sort of

20  a -- like an angle, but down from my right to left.

21      Q.    Thank you.  What happens next?

22      A.    At that point, I have my dog.  I stepped out, and I

23  made sure my dog saw him.  Gave several commands, "Police K-9.

24  Stop."  I yelled it.  And he didn't stop.  So at that point, I

25  sent K-9 Aren on an apprehension.

81

1      A.    No.

2      Q.    And why not?

3      A.    It's not a fair representation.  I -- there's

4    shadows on there and everything.  I -- it's --

5      Q.    Even an -- even an approximate as to where you were?

6      A.    No.

7      Q.    You won't do that?

8      A.    I can't.

9      Q.    You cannot?

10     A.    No.

11     Q.    Can you tell me verbally where Bruce Kelley, Jr.,

12   was when you gave the command to Aren to apprehend him?

13     A.    On the -- on the other side of the street directly

14   in front of me, like angling down.  So he was walking from my

15   left to right.  And at that point, he had reached the other

16   side of the street, so he was about 10 yards away.

17     Q.    Is he in a yard on the other side of the street?

18     A.    No.

19     Q.    Where was he?

20     A.    On the street.

21     Q.    Okay.  Were there any other citizens or civilians

22   around?

23     A.    I can't say.

24     Q.    Well, is that something you would remember, if there

25   were civilians in the immediate vicinity?

82

1    MR. EVASHAVIK:  Object to the form.

2    THE WITNESS:  I -- I can't say if I would remember

3    that or not.  I don't know.

4    BY MR. GEARY:

5    Q.    Well, if he was considered a threat by you and there

6    were civilians in the immediate vicinity, would he have been a

7    threat to the civilians?

8    A.    Well, he was considered a threat to me, but my --

9    that's where my focus was, on him.

10   Q.    Okay.  And as you're looking at him and he's walking

11   down Whitney Avenue, in your field of vision there's yards and

12   houses.  Correct?

13   A.    Yes.

14   Q.    And did you see any civilians or citizens other than

15   him?

16   A.    No.

17   Q.    Okay.  And when you gave the -- you said you gave

18   two warnings.  Is that right?

19   A.    Yes.

20   Q.    Was he in motion when you gave those verbal warnings

21   to him, or was he stopped?  What was he doing when you gave the

22   two warnings?

23   A.    In motion.

24   Q.    Okay.  And you released Aren.  Was Kelley, Jr.,

25   still in motion?

1    A.    Yes.

2    Q.    And when we say "in motion," was he walking?

3    A.    Rapidly.

4    Q.    Okay.  But -- but he was not running?

5    A.    No.

6    Q.    Would you say he was jogging or no?  He's walking

7 rapidly, not jogging?

8    A.    Walking rapidly.

9    Q.    Okay.  And when you release Aren, what -- what

10 direction was Bruce Kelley, Jr., walking?

11    A.    So he had made it to the point where he was right in

12 front of me.

13    Q.    So he was coming towards you?

14    A.    No.  He was walking from my right to left.  But at

15 the time -- or from my left to right.  But at the time when I

16 sent the dog, he had now made it directly in front of me.

17    Q.    Okay.  So when you release Aren, when you say

18 directly in front of you, is his body facing you?

19    A.    No.  He is directly in front of me, so he's -- his

20 back is to me.

21    Q.    Okay.  And what -- what was the command?  Is it in

22 the German language?  What exactly did you -- were the commands

23 you gave to Aren?

24    A.    After my commands for him to -- to stop -- "Police

25 K-9.  Stop," I unleashed Aren and I just -- I sent.  My send.

1     Q.    Is it a word in German that you say to Aren?

2     A.    I just said "Send."

3     Q.    And Aren -- are you holding him by a leash there for

4 a period of time before you give him the command?

5     A.    Yeah.  So he was on a leash.

6     Q.    And are you holding the leash with both of your

7 hands?

8     A.    My right hand.

9     Q.    And where was Aren right before you release him in

10 relation to your body?  Was he to your right?  Left?  In front

11 of you?

12     A.    He was directly in front of me.

13     Q.    Okay.  Did you have your gun out of its holster?

14     A.    No.

15     Q.    At that point in time in this encounter, did you

16 ever have your gun out of its holster yet?

17     A.    No.

18     Q.    Okay.  What do you see Aren do?

19     A.    Aren goes downrange and makes an apprehension.

20     Q.    Okay.  And when you say "downrange," I think I know

21 what you mean, but can you just explain that?

22     A.    So he made an apprehension on the left tricep area

23 of the suspect.

24     Q.    And when you say "apprehension," does that mean

25 bite?

1  A. Correct.

2  Q. And was Kelley, Jr.'s, back to Aren when Aren bit

3 Kelley, Jr.'s, left arm?

4  A. Correct.

5  Q. Now, would you please draw for me or just put

6 initials of where Kelley, Jr., was when you released Aren, gave

7 the command to apprehend Bruce Kelley, Jr.

8  A. I can't do it on this photo.

9  Q. And, again, just asking.  Why is that, sir?

10  A. It's not a fair representation.  It's far away.

11 There's shadows.  It's not the time of year.

12  Q. Well, what about the -- I understand the foliage --

13 you know, the trees, the leaves -- would be different and

14 barren because this was January.  Other than the leaves and the

15 trees, what -- is there something that -- where this is not a

16 fair depiction of that street and sidewalk and yards that day?

17  A. There's shadows too.

18  Q. Okay.  Are those the two things?  It's the shadows

19 and the leaves?

20  A. Yes.  It's too far away.

21  Q. Okay.  Okay.  I just want to make a note.  Too far

22 away.  Shadows.  Leaves.

23   Is there any -- can you give me a fourth reason?  Is

24 there a fourth or more reasons why you cannot simply initial

25 where Bruce Kelley, Jr., was when you deployed the dog?

1     A.    No.

2     Q.    Okay.  When you deploy Aren and give the command,

3  are there any other officers in the area?

4     A.    I don't see any.

5     Q.    Okay.  And when you -- you actually saw Aren bite

6  the left arm of Bruce Kelley, Jr.?

7     A.    The tricep/shoulder area, yes.  He raised up off his

8  hind legs and went in for an apprehension.

9     Q.    Okay.  And, now, was Bruce Kelley -- was he armed

10  when you released the dog?

11     A.    Yes.

12     Q.    What was he armed with?

13     A.    A knife.

14     Q.    Can you describe the knife from how you -- you know,

15  you're looking at him.  Can you describe the knife?

16     A.    Silver in color.  A large knife.

17     Q.    What -- say, what was the length of the blade?

18     A.    I don't know.

19     Q.    Which hand did Kelley, Jr., have the knife in?

20     A.    His right.

21     Q.    Now, Kelley, Jr., per your testimony, had said,

22  "If -- if you send the dog at me, I'm going to stab the dog."

23  Right?

24     A.    Yes.

25     Q.    And he said he would kill the dog also.  He actually

1   said that.  Is that what you're saying?

2       A.     Yes.

3       Q.     Okay.  And he was armed with a knife.  Is that

4   right?

5       A.     Yes.

6       Q.     Okay.  Well, why did you deploy the dog when Bruce

7   Kelley had just said he would -- he would kill the dog if you

8   released the dog?

9       A.     Two reasons:  One, K-9s are a tool.  And, two, to

10   preserve his life, to take him into custody and arrest him.

11       Q.     Were you putting Aren at risk of being harmed by the

12   knife?

13       A.     Yes.

14       Q.     And was that risk to Aren outweighed by other

15   things?

16       A.     Define that.

17       Q.     Other considerations.  Other risks.

18       A.     I don't know what other risks you're talking about.

19       Q.     A risk of a human being being harmed by Kelley.

20       A.     Correct.

21       Q.     And who was at risk of being physically harmed by

22   Kelley?

23       A.     Police officers, humans.

24       Q.     Okay.  Which officers, please?

25       A.     Myself, along with all the officers on scene that

1    involving a suspect who, before you release Aren, threatens to

2    harm the dog?

3       A.    Yes.

4       Q.    And how were you trained to deal with that

5    situation?

6       A.    Well, we train the dogs to make the apprehension.

7       Q.    Even in situations where the suspect threatens to

8    harm the dog?

9       A.    Yes.

10       Q.    And even though the suspect is armed with a knife?

11       A.    Yes.

12       Q.    Okay.  Did you have the discretion as a K-9 officer

13    to not deploy Aren to apprehend Kelley, Jr.?

14       A.    Yes.

15       Q.    Okay.  Tell me what you see.  You've described Aren

16    bites kind of the shoulder/upper arm area of the left.  And at

17    that point, Kelley, Jr., has the knife in his right hand.  Is

18    that correct?

19       A.    Yes.

20       Q.    What -- what do you see next?

21       A.    With the knife, he spins to his left, and he stabbed

22    Aren several times.

23       Q.    Now, as he's stabbing Aren, is -- is Kelley, Jr.'s,

24    back to you?

25       A.    He's spinning.  So as he's -- so he's going from

1  across his body.  So he's contorting his body to reach around

2  and stab Aren in the -- in the side of the head.

3      Q.    So when he stabs -- how many times did he make

4  movements like stabbing motions?

5      A.    He made several stabbing motions from right to left.

6      Q.    How many is several?

7      A.    Two or three.

8      Q.    And when he's trying to stab Aren, is Aren on the

9  ground or is Aren up off the ground?  Like attached to his

10 shoulder, biting him or --

11     A.    So he wasn't trying to stab him; he was stabbing

12 him.  And Aren initially was up off the ground, but when he

13 stabbed him, he then dropped down to all fours.

14     Q.    And from your -- the way Kelley, Jr.'s, body was

15 positioned, you could actually see his right hand moving

16 towards Aren?

17     A.    I could see the knife going into Aren.

18     Q.    Okay.  And where in Aren's body was the knife going?

19     A.    The side of his head.

20     Q.    Which side?

21     A.    Left side.

22     Q.    Okay.  What do you do at that point, sir?

23     A.    I -- you have to define that.  I'm not sure what you

24 mean.

25     Q.    I mean, do you scream something at Kelley, Jr.?  Do

1  you start running towards Kelley, Jr., and the dog?  Do you say

2  or do anything?

3      A.    Well, he wasn't done stabbing him yet, so now

4  he's -- so now he's facing Aren, and now he's making thrashing

5  motions up.  Because when Aren went down to all fours, okay,

6  from being stabbed, now he's facing Aren.  And Aren starts to

7  come back in for an apprehension again into, you know, his --

8  his -- facing Kelley.  And now he's -- now I see him thrashing

9  upwards underneath his chin -- or under -- not his chin.

10  Underneath his jaw.

11     Q.    You see Aren thrashing underneath Kelley's jaw?

12     A.    Correct.

13     Q.    Had you moved yet from where you were on the

14  sidewalk?  Had you moved yet in any direction?

15     A.    Yeah.  So I had moved forward towards Kelley, on his

16  right side.

17     Q.    Okay.  Say, how many steps did you take towards

18  Kelley?

19     A.    Several.

20     Q.    And at this point, as you're describing, the dog is

21  thrashing underneath Kelley, Jr.'s, jaw.  The dog is -- is this

22  the dog's second attempt to apprehend Kelley, Jr., from what

23  you were witnessing?

24     A.    Correct.

25     Q.    And so the second attempt, the dog got off of the

1    ground completely?

2         A.    Yes.  He started back in for an apprehension --

3    apprehension.  And that's when the suspect, with the knife,

4    came upwards under his jaw and started just thrashing up- --

5    upwards.

6         Q.    Do you see what part of Kelley, Jr.'s, body Aren was

7    trying to bite on the second attempt?

8         A.    He was just trying to move in towards his chest

9    area.

10        Q.    Okay.  And then is your gun out of its holster yet?

11        A.    No.

12        Q.    Okay.  Go ahead.  Walk, if you could, please --

13             MR. GEARY:  We're going to need to take a break

14   maybe in a few minutes.  Maybe just another question or two.

15   Is that okay, Greg?  I have, like, 12:49 here.

16             MR. EVASHAVIK:  Yeah.  Continue until you need to

17   break.  It's fine.

18   BY MR. GEARY:

19        Q.    Okay.  So go ahead.  Just what -- what happens next?

20   What do you see?  What do you do?

21        A.    So then once -- after he's done stabbing Aren, he

22   spins towards me and takes a step with his knife, with the

23   knife.  And that's when I drop my leash and unholster my gun

24   and -- and fire.

25        Q.    I'm sorry.  He spins towards you.  He took a step

93

1    towards you.  And you just said something about his knife.  I

2    just didn't quite catch it.

3        A.    I said he raised the knife and stepped towards me.

4    And that's when I unholstered and fired.

5        Q.    Okay.  Which -- did he step towards you with the

6    left foot?  Right foot?

7        A.    I don't recall.

8        Q.    Okay.

9        A.    He moved in my direction.

10       Q.    Were you still on the sidewalk at that point in

11   time?

12       A.    No.

13       Q.    Where were you, sir?

14       A.    I was on the street now.

15             MR. GEARY:  Yeah.  If we could take a break.  Again,

16   I apologize for this interruption, and I certainly hope this

17   call is over by -- by 2 o'clock.  So is that okay?  Can we just

18   take our prediscussed one-hour lunch break?

19             MR. EVASHAVIK:  Yes.

20             MR. GEARY:  Videographer, do you need to say some

21   things?

22             THE VIDEOGRAPHER:  Going off the record at

23   12:50 p.m.

24             (Whereupon, a lunch recess was taken.)

25             THE VIDEOGRAPHER:  We are back on the record.

1  2:03 p.m.

2  BY MR. GEARY:

3     Q.   Okay, Lieutenant.  We took a lunch break.  Are you

4  ready to continue?

5     A.   Yes, sir.

6     Q.   And can you hear me?

7     A.   Yes.

8     Q.   Okay.  Now, where we left off is I think your gun is

9  still in its holster.  So I want to talk to you starting out

10  what happened in the several moments or time period before you

11  started shooting at Bruce Kelley, Jr., and --

12         MR. EVASHAVIK:  Just for the -- sorry.  Just for the

13  record, my notes indicate he was past that.  I mean, you can go

14  back as far as you want, obviously.  It's your examination.

15  But he had already testified about unholstering his gun and

16  firing his weapon.

17         MR. GEARY:  Oh, okay.

18         MR. EVASHAVIK:  And the record will show that.  But

19  go ahead.  Start where you want.

20  BY MR. GEARY:

21     Q.   So if we could just go back a couple questions,

22  please.  Now, before you take your gun out of its holster,

23  what -- what had you just seen happen?

24     A.   So I witnessed Aren get stabbed several times in the

25  side of the head after making an apprehension.  And then the

1   suspect spun around and uppercutted the knife several times

2   under Aren's jaw as he was going back in to re-engage.  And

3   then Mr. Kelley took a step towards me with the knife.

4        Q.    Thank you.  Was it foreseeable to you that Kelley

5   would harm the dog with the knife at the time you chose to

6   deploy the dog?

7        A.    No.

8        Q.    And why was that not foreseeable to you?

9        A.    Because I knew my partner.  And one of two things

10  was going to happen:  An apprehension or an apprehension that

11  he falls to the ground.  And at that point, I would be able to

12  take control of him under power.

13       Q.    Now, your holster, was it on your left hip?  Right

14  hip?

15       A.    Right.

16       Q.    And you pulled your gun.  You started firing at

17  Kelley.  Correct?

18       A.    Once he moved quickly in my direction, yes.

19       Q.    And before he moves in your direction, how far was

20  Kelley, Jr., from you?

21       A.    8 feet.

22       Q.    Okay.  I'll refer you back to Exhibit 6.  It's the

23  timeline of events.  We were looking at the third-to-the-last

24  page, please.  And if you could look at the -- the photo there

25  on the third-to-the-last page, the aerial view of Whitney

1    Avenue, when Kelley was 8 feet from you, where was he standing?

2        A.    It's hard to say in this photo because of the

3    shadow.  It's dark.

4        Q.    Okay.  But can you just verbally testify?  Was he

5    still in a yard?  Was he on a sidewalk?

6        A.    He was on the east side of Whitney Avenue, right

7    over the curb, like right over the curb in the grassy area.

8    Like right at the street and curb area.

9        Q.    And then where were you, please?

10       A.    I was 8 feet away from him.

11       Q.    Right.  But -- but where?

12       A.    In the street.

13       Q.    Okay.  How far into the street were you?

14       A.    8 feet.

15       Q.    You were 8 feet into the street?

16       A.    Well, I was 8 feet away from him.

17       Q.    Okay.  No.  I understand you're saying you were 8

18   feet away from him, and you just described where he was.  I'm

19   just trying to pinpoint where you were.

20       A.    Again, I was 8 feet away from him, on the street.

21       Q.    Okay.  And can you please look at that photo and put

22   your initials where you were when you started firing at Kelley?

23       A.    I can't do it.  There's a shadow in the street.

24   There's a shadow that covers that whole area.  You can't even

25   see it.

1  to guess either.  Do you understand?

2      A.    Yeah.  That's why I can't mark it.  I find myself

3  guessing.

4          MR. GEARY:  God bless you.

5  BY MR. GEARY:

6      Q.    Can you mark on here where Bruce Kelley, Jr., was

7  when you started firing at him?

8      A.    I can't do it.  It's -- it's dark.

9      Q.    You've testified as an officer before, I assume, in

10  criminal cases or in your career?

11     A.    Yes.

12     Q.    And maybe civil cases too.  Have you ever been asked

13  to mark an exhibit in court before as a witness on the stand?

14     A.    I can't say that I have.

15     Q.    How many times did you fire your weapon at Kelley?

16     A.    I fired until he fell.

17     Q.    Okay.  So how many times was that?

18     A.    Six to nine.  I mean, I know after the fact how many

19  rounds, so -- that I expended, so it was nine times.

20     Q.    And what part of his body were you aiming for when

21  you're shooting him -- or at him?

22     A.    Center -- center mass.

23     Q.    And does that mean the torso?

24     A.    That means the upper chest area.

25     Q.    And, obviously, I mean, you're looking at him as

1  you're shooting at him.  Is that correct?

2      A.    Correct.

3      Q.    And did -- the first round you fired, did you

4  connect?  Did you shoot him?

5      A.    It's hard to say.  I just pulled the trigger until

6  he -- the threat ended.

7      Q.    Okay.  How many -- a semi-automatic weapon, I

8  assume?

9      A.    Yes, sir.

10     Q.    What kind of gun, please?

11     A.    Smith & Wesson.

12     Q.    And you say you fired until, I think, he fell?

13     A.    Yes.

14     Q.    Okay.  And what direction did his body fall?

15     A.    Down.

16     Q.    So does that mean forward?  Backwards?  Sideways?

17     A.    Down.  He fell -- fell down to his back.

18     Q.    Okay.  So he fell onto his back?

19     A.    Yes.

20     Q.    Did any other officer shoot at him that day?

21     A.    Officer Ravotti.

22     Q.    Okay.  And before you started shooting, where was

23  Officer Ravotti?

24     A.    I know he was on my left.  That's all I can say.  I

25  don't know how close, how far.  I just know that somebody was

1    on my left.  And whether it was the officers, how many were

2    there -- I know there were people behind me, to my left.

3         Q.    Who fired first?  You or Ravotti?

4         A.    I don't know.  I can't say.

5         Q.    Did any other officers shoot at Bruce Kelley, Jr.,

6    that day other than you and Officer Ravotti?

7         A.    No.

8         Q.    Now, at the point in time when you release Aren to

9    apprehend Mr. Kelley, what -- what did you know as far as any

10   prior uses of force that had been attempted on Mr. Kelley?

11        A.    I know that force had been -- had been used multiple

12   times in the way of Taser and pepper spray.

13        Q.    And, say, roughly -- roughly, how long had you been

14   on scene when you deploy Aren?  Just roughly.

15        A.    On scene where?

16        Q.    Just when you -- I think you initially arrived at

17   the Hamnett Station.

18        A.    So all the way back from when I arrived on scene?

19        Q.    Yes.

20        A.    Ten minutes.

21        Q.    And had you undergone any type of crisis

22   intervention training by the Port Authority prior to that day?

23        A.    Yes.

24        Q.    And what did that consist of?

25        A.    Training with an instructor involving suspects that

1    A.    Yes.

2    Q.    Now, when you were firing at Kelley, he was facing

3 you.  Correct?

4    A.    Yes.

5    Q.    Okay.  Who shot him in the back twice?

6    A.    I don't know.

7    Q.    Are the only two options you or Officer Ravotti?

8    A.    Yes.

9    Q.    Was it Ravotti?

10          MR. EVASHAVIK:  I'm going to object to the form of

11 the question.  It's a lack of foundation.

12          Go ahead.  You can answer whatever you know.

13          THE WITNESS:  I can't answer that.  I don't know.

14 BY MR. GEARY:

15    Q.    Is there something called a ballistics vest that a

16 K-9 can wear while attempting to make an apprehension?

17    A.    Yes.

18    Q.    Okay.  Was your K-9 partner, Aren, wearing a

19 ballistics vest when you deployed him to apprehend Bruce

20 Kelley?

21    A.    No.

22    Q.    Is there any reason why he wasn't wearing a

23 ballistics vest?

24    A.    No reason.

25    Q.    Do you know what -- did the Port Authority Police

1  did Adams sustain injuries?  What did you know?

2       A.    I knew he was injured.

3       Q.    And what was the -- what was the injury to Adams?

4       A.    He had an elbow injury.

5       Q.    And then No. 2 says you'll consider the following:

6  "Whether the suspect poses an immediate threat to the safety of

7  officers or the public."  Did you consider that before

8  releasing Aren?

9       A.    Yes.

10      Q.    And you concluded that Bruce posed an immediate

11 threat to whom, please?

12      A.    Both.

13      Q.    And to what officer?

14      A.    All the officers that were on scene.

15      Q.    Okay.  And the public as well?

16      A.    Yes.

17      Q.    Okay.  And then No. 3 says "Whether the suspect is

18 actively resisting arrest or attempting to avoid arrest by

19 flight."  Did you consider those two factors?

20      A.    Yes.

21      Q.    Did you consider him to be avoiding arrest by

22 flight?

23      A.    Yes.

24      Q.    Sorry.  I got to reference you to one more.  Sorry.

25 It's 27.

1  it out of anger?

2      A.    No.

3      Q.    Even partially out of anger?

4      A.    No.

5      Q.    What about the second shot?

6      A.    No.

7      Q.    What about the third shot?

8      A.    No.

9      Q.    What about the fourth shot?

10     A.    No.

11     Q.    What was the reason you were firing after the fourth

12 shot?

13     A.    To stop the threat.

14     Q.    Well, you saw him take the bullets, right, as you

15 shot him the first four times?

16     A.    I expended my rounds in a second.

17     Q.    Well, did you reload and continue firing at him?

18     A.    No.

19     Q.    But you shooting him the first four times, that

20 halted his progress towards you, didn't it?

21     A.    I didn't process at that point.  I fired -- the

22 rounds that I fired, I fired within a second.

23     Q.    Was there any delay in your firing the number of

24 times you did?

25     A.    No.

1    Q.    Any pause?

2    A.    No.

3    Q.    And, say, shots -- if you shot ten times total,

4    shots 8, 9, 10, you're saying those were not fired out of

5    anger, sir?

6    A.    That's what I'm saying.

7    Q.    Were you ever disciplined for -- by the Port

8    Authority in your entire career for use of racially

9    inappropriate talk?  Speech?  Behavior?

10   A.    No.

11   Q.    What about at Hanover?

12   A.    No.

13   Q.    Do you have tattoos?

14   A.    Yes.

15   Q.    Are any of the tattoos you have -- any of them

16   related in any way or could be interpreted as relating to, say,

17   White Aryan Resistance?  White Power?  Swastikas?  Things like

18   this?

19   A.    No.

20         MR. GEARY:  That's all I have, sir.  Thank you.

21         THE WITNESS:  Thanks.

22         MR. EVASHAVIK:  Brian, I have a few brief questions

23   before we wrap up here.  Let me just take a look.

24                         EXAMINATION

25   BY MR. EVASHAVIK:

1    Q.    You were asked about the K-9 ballistics vest.  You
2    said you're familiar with that.  Correct, sir?
3    A.    Yes.
4    Q.    And what parts of a K-9 or a dog's body would the
5    vest cover?
6    A.    So a K-9 vest covers the chest and the ribs on both
7    sides.
8    Q.    And does that guarantee that a knife would not
9    pierce that type of vest?
10   A.    No guarantee.
11   Q.    And the areas where you saw Bruce Kelley, Jr., stab
12   K-9 Aren, would a vest have covered those parts of his body?
13   A.    It would not.
14   Q.    Now, you were asked about the -- or you just
15   testified a moment ago about the duration of time to discharge
16   your weapon.  At the time, do you -- did you know how many
17   rounds that you fired at the time this was happening?
18   A.    I did not.
19   Q.    And you continued firing until what moment?
20   A.    Until the threat stopped.
21   Q.    And when did the threat stop?
22   A.    When Mr. Kelley fell to the ground.
23   Q.    And what was your estimate of how many times it took
24   you to continuously fire your gun, not knowing how money
25   [verbatim] -- how many rounds, but multiple times?

1    A.    It was literally a second or just over.

2    Q.    And when Mr. Kelley dropped to the ground --

3  Mr. Kelley, Jr. -- did you immediately stop discharging your

4  weapon?

5    A.    I did.

6    Q.    When did you first, the first time that day,

7  unholster your weapon?  The very first time.

8    A.    The first time I unholstered, when Mr. Kelley

9  stepped towards me with the knife.

10    Q.    Was that before or after stabbing Aren?

11    A.    That was after.

12    Q.    And before he stabbed Aren and you released him,

13  what was your plan at that point with regard to how you would

14  take Mr. Kelley, Jr., into custody?

15    A.    So once an apprehension was made, I was going to go

16  hands-on and cuff him under power.

17    Q.    Did you have both hands free to -- to pursue that

18  after Aren made his initial apprehension?

19    A.    Yes.

20    Q.    In terms of timing, from -- estimate, if you can.

21  From when you first released Aren, okay, until the time that

22  you -- you discharged your weapon and he fell to the ground,

23  you describe a series of events with the stabbing and

24  everything else.  So releasing Aren, discharging your weapon,

25  Mr. Kelley, Jr., falls to the ground.  An estimate on the total

1   duration of that sequence.

2      A.    No longer than ten seconds.

3      Q.    You were asked about a summary of the recorded

4   statement that you gave to the Allegheny County police.

5   Correct?  Do you recall that?

6      A.    Yes.

7      Q.    Were you required to submit to that statement by the

8   county police?

9      A.    Yes.

10     Q.    Okay.  And did you voluntarily go down and provide a

11  statement to them?

12     A.    Yes.

13     Q.    Was this at the county police station?

14     A.    Headquarters.  Correct.

15     Q.    Headquarters.  All right.  And did you have a chance

16  before today to listen and view the recorded statement?

17     A.    Yes.

18     Q.    And is that you speaking on the video and audio

19  recorded statement?

20     A.    Yes, it is.

21     Q.    And is it true and correct, what you said that day?

22     A.    Yes.

23          MR. EVASHAVIK:  All right.  I'd like to add that

24  statement as a separate exhibit, Noah.

25          MR. GEARY:  Sure.

1         MR. EVASHAVIK:  So I think we're on -- would this be

2  No. 31?

3         MR. GEARY:  Yes.

4         MR. EVASHAVIK:  All right.  I'll identify Exhibit

5  No. 31.  And, for the record, I'll put that on a thumb drive,

6  the actual audio and video recorded statement provided by

7  Lieutenant O'Malley to the Allegheny County Police Department

8  on February 2, 2016.

9         (Whereupon, Deposition Exhibit 31 was marked for

10  identification.)

11  BY MR. EVASHAVIK:

12     Q.   At the time that you decided to deploy Aren, did you

13  already know about attempts made by other officers to use other

14  means of less than lethal force, such as a Taser?

15     A.   Yes.

16     Q.   And how did you know about that?

17     A.   From radio broadcast.

18     Q.   And how about pepper spray, also known as OC -- OC

19  spray?  Did you know about that?

20     A.   Yes.

21     Q.   How did you know about that?

22     A.   Same thing.  Radio broadcast.

23     Q.   And how did you know about the assault by Bruce

24  Kelley, Jr., on Officer Adams?

25     A.   Radio broadcast by Officer Adams.

1    Q.    And you were aware of this before you deployed K-9

2   Aren?

3    A.    Yes.

4    Q.    At the time you deployed Aren and also at the time

5   you discharged your weapon towards Bruce Kelley, Jr., did you

6   believe that he was or was not actively resisting arrest?

7    A.    He was.

8    Q.    He was what?

9    A.    He was resisting arrest.

10    Q.    Did you see him at any time cooperate or comply with

11   the directives of the other officers and the commands to stop

12   and drop the knife?

13    A.    At no time did I see him comply.

14    Q.    Did you believe Bruce Kelley, Jr., posed a

15   significant threat of death or serious physical injury to you,

16   the other officers, and other people that may have been in the

17   area?

18    A.    Yes.

19    Q.    Why did you use deadly force and discharge your

20   weapon at Bruce Kelley, Jr.?

21    A.    My life was in danger.

22         MR. EVASHAVIK:  Thank you, sir.  Those are all the

23   questions I have.  Wait.  He may have more.

24         MR. GEARY:  Nothing further.

25         MR. EVASHAVIK:  Okay.  Thank you.  The witness will

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CALISIA KELLEY; and            CIVIL ACTION
JOHNNIE MAE KELLEY,
Co-Administrators of the       No. 2:17-cv-01599-NBF
ESTATE OF BRUCE KELLEY,
JR., deceased,

Plaintiffs,

vs.                            TRANSCRIPT

BRIAN O'MALLEY, both in his    VIDEOTAPED
Official and Individual        DEPOSITION OF
Capacities as Sergeant for     THOMAS ADAMS
the Allegheny County Port
Authority; and DOMINIC
RIVOTTI, in both his
Official and Individual
Capacities as Officer for
the Allegheny County Port
Authority,

Defendants,
Jointly and Severally.         TAKEN VIA ZOOM VIDEO CONFERENCE

                               TUESDAY, SEPTEMBER 29, 2020


                               Taken on behalf of Plaintiffs,
                               Calisia Kelley and Johnnie Mae
                               Kelley


                               Counsel of Record for this Party:

                               Noah Geary, Esquire
                               Washington Trust Building
                               6 South Main Street, Suite 225
                               Washington, PA  15301
                               724-222-3788

1      A.    2005.

2      Q.    And then can you tell me what you did after high

3  school as far as college or work experience?

4      A.    Sure.  I went to college for two years at the

5  International Academy of Design and Technology in Pittsburgh.

6  I received a degree in justice technology.

7      Q.    And are you currently employed by the Port Authority

8  Police Department?

9      A.    Yes.

10     Q.    Okay.

11     A.    Yes.

12     Q.    And how long have you been there now?

13     A.    As a police officer, sir?

14     Q.    Well, total.

15     A.    I've been employed with the Port Authority since

16  2007.

17     Q.    Okay.  Was your first position with them something

18  other than a police officer?

19     A.    Yes.

20     Q.    And what was your first position?

21     A.    It was a transit security officer.

22     Q.    And how many years did you do that?

23     A.    Approximately two years.

24     Q.    And then, what, your position changed?

25     A.    Yes.  I took a position as a police

8

1 telecommunications specialist.

2     Q.    And how many years were you in that position?

3     A.    I was in that position from 2008 to 2013.

4     Q.    And I'm sorry.  It was -- it was a communications

5 specialist?

6     A.    Police telecommunications specialist.

7     Q.    And then in '013, what position did you assume?

8     A.    In 2013 -- in August of 2013, Port Authority of

9 Allegheny County police officer.

10     Q.    Prior to working at the Port Authority as a transit

11 officer, did you work in law enforcement in any -- for anybody?

12     A.    No.

13     Q.    Okay.  And as a transit officer, was that the first

14 position with the Port Authority?

15     A.    As a transit security officer, yes.

16     Q.    Sorry.  Okay.  And the telecommunications

17 specialist, tell us what -- what were your job duties in that

18 role?

19     A.    I was a police dispatcher.  I handled taking

20 emergency calls and dispatching emergency calls.

21     Q.    Thank you.  Now, we're here today because of what

22 happened on January 31st, 2016, and so most of my questions are

23 going to be focused on that date and that time period, just so

24 you know.

25     A.    Okay.

1          West would be anything west of the West Busway.

2          We also have Oakland and the Hill District, which is

3     just as it sounds.  That would cover Oakland and the Hill

4     District.

5          We also have a zone that is a utility zone.  That

6     zone is basically the -- the entire -- all the zones combined.

7     You can travel anywhere within those zones.

8          Q.    Thank you.  And I'm going to ask you just to kind of

9     lay out what happened that day, and then I'll be interrupting

10    with questions.  But I think in your report you and Hampy are

11    on patrol, and then you notice something on the Linear Trail.

12          So can you kind of take it from there, please?

13          A.    Sure.  We were traveling outbound on the East Busway

14    at approximately 3:30 that day.  While traveling outbound, we

15    observed two individuals on the trail.  It appeared when they

16    saw our marked police unit, they ducked down behind a divider

17    wall between the East Busway and the Linear Trail as we

18    approached and passed.

19          Q.    And do you remember kind of roughly what time in

20    your shift that happened, that you noticed these two

21    individuals?

22          A.    It was around 3:30 p.m.

23          Q.    Okay.  And can you give me an identity or

24    description -- a description of the two individuals you saw?

25          A.    I don't recall.

1     Q.   Okay.  And you say you saw them duck down?

2     A.   Yes.

3     Q.   Okay.  So when -- when you're driving -- you saw

4 them when you're in your unit.  Is that correct?

5     A.   Yes, a marked police unit.

6     Q.   Okay.  Were you driving or Officer Hampy?

7     A.   I don't recall that, sir.

8     Q.   Okay.  And what was it about the two individuals

9 that got your attention?

10    A.   They ducked down behind the sound wall as our marked

11 police unit was approaching, which is, in my training and

12 experience as a police officer, suspicious in nature.

13    Q.   Okay.  And were they male?  Female?

14    A.   I -- I don't recall, sir.

15    Q.   And what about race?  Do you -- any -- do you know

16 what their race was?

17    A.   I don't recall.  We saw them at a distance.

18    Q.   Okay.  And so in response to them ducking down, what

19 did you do, please?

20    A.   We traveled outbound on the busway to Hamnett

21 Station.  We turned our marked patrol unit around, parked at --

22 at an access point on the busway, notified dispatch that we

23 would be conducting a park-and-walk up the Linear Trail.

24    Q.   And I think I -- I know, but what's a park-and-walk?

25    A.   It's where you park your vehicle, exit the vehicle,

14

1  and conduct a patrol on foot.

2      Q.    And did you -- did you decide to do the

3  park-and-walk because you saw those two individuals?

4      A.    Yes.  That coupled with the Linear Trail being a

5  very high crime area where we've had issues in the past with

6  several different crimes occurring.

7      Q.    What crimes?

8      A.    Robberies, assaults, narcotics violations,

9  disorderly conducts, graffiti, vandalism.  I'm probably not

10 naming them all, but that's the -- what I recall.

11     Q.    And as of January of '016, roughly how many arrests

12 had you made in your career?

13     A.    I don't have that number, sir.

14     Q.    Okay.  Can you give me an estimate?

15     A.    I can't.  I don't -- I don't calculate my arrests,

16 sir.

17     Q.    Well, as of January of '016, how many arrests had

18 you made for robberies occurring on the Linear Trail?

19     A.    I don't recall, sir.

20     Q.    What about assaults?

21     A.    I don't -- I -- again, I don't calculate my

22 individual numbers.

23     Q.    And you don't -- you don't have a number for

24 narcotics violations either?  On the Linear Trail.

25     A.    No, sir.  As I stated, I don't calculate statistics

1  on arrests for myself.

2      Q.    Okay.  So you and Officer Hampy, you start to walk.

3  Is that correct?  As far as the park-and-walk?

4      A.    You cut out there.  Can you say that again?

5      Q.    Oh, I'm sorry.

6      A.    You cut out.  You skipped over.

7      Q.    As far as the park-and-walk, did you and Officer

8  Hampy then begin walking?

9      A.    Yes.

10     Q.    And tell me, where were you walking and in what

11 direction?

12     A.    We -- there's a sound wall -- or I'm sorry -- a

13 small wall there that's approximately 4 to 5 feet high.  We

14 jumped over top of the wall onto the trail.  We began to walk

15 outbound on the trail towards Hamnett Station.  Did not observe

16 anybody on that part of the trail, so we began to walk inbound

17 on the trail back towards South Avenue.

18     Q.    And did you say "sound wall"?  Like s-o-u-n-d?

19     A.    There's a -- there's a divider wall that's small,

20 approximately 5 feet, in the area where we saw the two

21 individuals previously.  As you proceed outbound a little

22 further, there's about a 12-foot-high sound wall.  We were

23 about -- maybe 30 to 40 yards before the high sound wall.

24     Q.    And when you say "sound wall," why is it called the

25 sound wall?

1    A.    They put the walls up high -- because the buses are

2    diesel -- to eliminate some sound occurring for the residents

3    along that part of the -- the busway.

4    Q.    The sound walls are to try to mitigate the -- the

5    noise from the busway?

6    A.    From the buses traveling on the busway.

7    Q.    Thank you.  Okay.  So as you and Officer Hampy are

8    walking, please tell me what happens or what you see.

9    A.    We began, like I said, to walk back inbound on the

10   Linear Trail towards South Avenue.  We got to the point where

11   there's a set of stairs that lead down to where a gazebo sits

12   down below from the Linear Trail.

13          I observed two black males inside of the gazebo,

14   observed several open and closed containers of an alcoholic

15   beverage around them.

16   Q.    And where were you, please, precisely when you first

17   saw these gentlemen in the gazebo?

18   A.    We were where the Linear Trail meets the -- there's

19   like a landing where the steps lead down to the -- to the

20   gazebo.

21   Q.    And had you reached the steps yet at the point in

22   time you observed these -- these people in the gazebo?

23   A.    We were parallel with the steps.

24   Q.    Okay.  Had you started walking down the steps yet?

25   A.    No.

1    Q.    And were you able -- were you able to tell the --

2    the race of these folks in the gazebo?

3    A.    Yes.  It was two black males.

4    Q.    Okay.  If you could take a peek at the exhibits,

5    Officer.

6    A.    Sure.

7    Q.    Okay.  So the -- the first one I have is Bates

8    marked -- stamped at the bottom 14 and 15, and --

9    A.    That's my police -- police report, sir?

10    Q.    Yes, sir.

11    A.    Okay.

12    Q.    And I think maybe we left off -- and this would be

13    No. 11.  If we could mark this as 11, please, the one that's

14    Bates stamped 14 and 15.

15            MR. GEARY:  Can we mark that?

16            (Whereupon, Deposition Exhibit 11 was presented to

17    the witness.)

18            THE WITNESS:  Okay.

19    BY MR. GEARY:

20    Q.    And then the other copy, it looks like a repeat, but

21    it was in a different part of a production to me by

22    Mr. Evashavik.  Can we clarify it's just a second copy, a

23    repeat?  And if it is, then we don't need to refer to it.

24    A.    Yes.  It appears to be a repeat of the original

25    report.

18

1     Q.    Okay.  You can -- you can set that repeat aside,

2    please.  And then do you have some photos there of the gazebo

3    area?

4     A.    I do.

5     Q.    If we can mark those collectively, just all of the

6    exhibits [verbatim], as Exhibit 12.  So I'll -- I'll have you

7    at different points referring to your report and the gazebo,

8    just so you know.  And I'm marking the photos as Deposition

9    Exhibit 12 collectively, and your report is 11.  Thank you.

10        Now, you say you saw both open and closed containers

11    of -- of alcohol?

12     A.    Yes.

13     Q.    Okay.  And you did -- you saw that before you

14    started descending the steps.  Is that correct?

15     A.    Yes.

16     Q.    Okay.  How could you tell it was alcohol versus

17    nonalcoholic beverages in whatever the containers were?

18     A.    By the label, sir.

19     Q.    And what was the label?

20     A.    The label, from what I recall, on the beer cans --

21    I'm sorry -- on the beer case was Hurricane.

22        THE REPORTER:  I'm sorry.  I didn't hear the last.

23        THE WITNESS:  On the case of beer, I believe, from

24    what I recall, it was Hurricane alcoholic beverage.

25        THE REPORTER:  Thank you.

1      MR. GEARY:  Just grabbing a stapler.

2  BY MR. GEARY:

3      Q.    And then with the container, was it a can?  A

4  bottle?

5      A.    There was a -- a case and cans, sir.

6      Q.    And when you first laid eyes on these people, there

7  were two of them.  Is that right?

8      A.    Yes.

9      Q.    And were they sitting or standing?  What were

10  they -- what were they doing at the -- when you first lay eyes

11  on them?

12     A.    One was seated, and one was standing.

13     Q.    Okay.  And did -- did one of them go and throw

14  something in a garbage can that you observed?

15     A.    One of them went to the area of a garbage can.

16     Q.    Did they put something in the garbage can that you

17  saw?

18     A.    I -- I can't recall for sure, sir.

19     Q.    Okay.  So when you see them, what do you and Officer

20  Hampy do?

21     A.    We notified dispatch that we are going to approach

22  the gazebo and make contact with the two individuals.

23     Q.    Okay.  And then just tell me.  You start walking

24  down the steps.  Is that correct?

25     A.    Yes.

1     Q.    And then tell me what happens.

2     A.    We walked down the steps, approached the gazebo,

3 identified ourselves as Port Authority police officers, and

4 attempted to -- to find out what was occurring within the

5 gazebo along with the suspicious activity we observed before.

6     Q.    Were -- these two gentlemen in the gazebo, were they

7 the two that you say you saw earlier had ducked down?

8     A.    I don't -- I don't know, sir.

9     Q.    Okay.  And what was going on in the gazebo there?

10 As you come upon these two in the gazebo, what -- what were

11 they doing?

12     A.    As I stated before, one male was seated.  One male

13 was standing.  There were several open and closed containers of

14 an alcoholic beverage around them.

15     Q.    And were they committing any crime at that time?

16     A.    They were -- they were committing what I would call

17 public annoyance and alarm to the other Port Authority patrons

18 that would have to walk past them to access the Linear Trail to

19 enter either points of the busway and Hamnett Station.

20     Q.    The verbiage you're using "public alarm" and

21 "annoyance," is that, say, from a disorderly conduct statute?

22     A.    Yes.

23     Q.    Okay.  And let's just take it one by one.  Let's --

24 I mean, could you tell that one of these men was older and one

25 was a little younger?

1        A.      Yes.

2        Q.      Okay.  So the one that was a little older, precisely

3    what was he doing that would have created public alarm?

4        A.      He was in the gazebo with several open containers

5    and closed containers of an alcoholic beverage around him in an

6    area where Port Authority patrons would have to pass to enter

7    the busway.

8        Q.      Is he allowed to be sitting in the gazebo?

9        A.      Yes.

10       Q.      And the younger, what was he doing that you felt was

11   creating public alarm?

12       A.      He was in the area of the older male, again, with

13   all the open containers and closed containers of alcoholic

14   beverages around him.

15              (Whereupon, Ms. Calisia Kelley and Ms. Johnnie Mae

16   Kelley entered the conference room.)

17   BY MR. GEARY:

18       Q.      So what did you then do, please?

19       A.      I attempted to make contact with the younger of the

20   two males.

21       Q.      And when you attempted to make contact with him,

22   precisely where was he, as far as in the gazebo or near it?

23   Where was he?

24       A.      Do you want me to go off an exhibit, or would you

25   like me to just try to explain it?

1        (Whereupon, Deposition Exhibit 12 was presented to

2  the witness.)

3  BY MR. GEARY:

4     Q.    Well, how about both?  Yeah, you can explain it

5  verbally.  And then if you want to take any photo of your

6  choice, if you can mark maybe with, say, the letter "A" where

7  he was when you first encountered him, Bruce Kelley, Jr.,

8  please.  You can explain it verbally, though, first.

9     A.    Okay.  So if you're looking at the gazebo from Wood

10  Street, he was on the right side of the gazebo, in the vicinity

11  of the right side of the gazebo where there's an opening.

12     Q.    And if you -- if you would, if you would take a

13  photo there -- whatever photo you like -- and if you would

14  please -- because I may have you mark at different points in

15  time.  So just, say, with the letter "A," if you could put

16  where Bruce Kelley, Jr., was when you first, say, approach him

17  when he's in the gazebo.

18     A.    Do you want me to write on here the letter "A" where

19  he was, sir?

20     Q.    Please.  And then if you could just hold it up and

21  show me so we're -- you know, I -- I have the same photo you --

22  you do.

23     A.    Does the color red work, or would you --

24     Q.    Sure.  Yeah.

25     A.    -- like something else?

23

1    Q.    That's fine.  That's fine.

2    A.    In that area, sir.

3    Q.    Yep.  I got it.  Thank you.

4          Now, you had used, I think, two different terms as

5    far as, say, conduct of a disorderly conduct nature.  One was

6    "public alarm."  What was the other phrase you used?

7    A.    Annoyance.

8    Q.    Okay.  Now, when you came upon them in the gazebo,

9    were there any other civilians around in that area?

10   A.    I don't recall, sir.

11   Q.    And where precisely is the Linear Trail from the

12   gazebo?

13   A.    If you are looking at the gazebo from Wood Street,

14   it is directly behind the gazebo up a set of stairs that leads

15   up to the Linear Trail.

16   Q.    And was possessing the alcohol in and of itself a

17   crime?

18   A.    Possessing alcohol?

19   Q.    Those two gentlemen, to the extent they possessed

20   alcohol, was that a crime?

21   A.    It may have been a local ordinance crime, sir.  I

22   don't enforce local ordinances.

23   Q.    Now, did you recognize either individual?

24   A.    No.

25   Q.    Did you know either's name?

1     A.    No.

2     Q.    Okay.  So which one did you first address, say,

3  verbally?

4     A.    I attempted to address Bruce Kelley, Jr.

5     Q.    Okay.  Thank you.  Tell me -- tell me what you said

6  and what he said.

7     A.    I identified myself as a police officer.  I -- from

8  what I recall, I asked what was going on at that point in time

9  inside the gazebo.

10     Q.    And what did he reply?

11     A.    He didn't -- didn't respond to me.

12     Q.    Did he do anything?

13     A.    He attempted to walk past me.

14     Q.    And did you prevent him from walking past you?

15     A.    I attempted to verbally tell him that he was not

16  free to leave.

17     Q.    And did you do that?  Did you say something to him

18  so he does not walk past you?

19     A.    Yes.

20     Q.    What did you say?

21     A.    I don't recall the exact terminology that I used.

22     Q.    Okay.  And walking past you, do you mean he would

23  have walked, say, to your immediate left or your immediate

24  right?

25     A.    He attempted to walk directly in my path.

25

1     Q.    Okay.  Did you two make physical contact?

2     A.    Yes.  He pushed into me with his shoulder.

3     Q.    Which shoulder?

4     A.    I believe it was the right shoulder, sir.

5     Q.    And where on your body -- did that make contact with

6 your body?

7     A.    Yes.

8     Q.    Precisely where on your body?

9     A.    Towards my abdomen/chest area.

10     Q.    Okay.  What happened next?

11     A.    Based upon him attempting to push past me and -- and

12 assaulting me, I attempted to place handcuffs on him and place

13 him under arrest.

14     Q.    For felony aggravated assault on an officer?

15     MR. EVASHAVIK:  Object to form.

16 BY MR. GEARY:

17     Q.    Well, you said you were going to place him under

18 arrest for assault.  So that would be an assault on you.  Is

19 that right?

20     A.    I said I had -- I had attempted to place him under

21 arrest.  I didn't say for what --

22     Q.    Okay.

23     A.    -- what crime.

24     Q.    Well, place him under arrest for what?

25     A.    For pushing into me and making contact with me.

26

1     Q.    And what crime is that?

2         MR. EVASHAVIK:  Object to form.

3  BY MR. GEARY:

4     Q.    Go ahead.  You can answer.

5     A.    Assault, sir.

6     Q.    And what section of the Crimes Code would -- would

7  that be, just so we're clear?

8     A.    It would be aggravated assault.

9     Q.    Okay.  If you could go to your report, sir, page 1

10  at the bottom.

11     A.    Okay.

12     Q.    I just want to read a sentence and maybe a couple

13  questions off of it.  "Kelley, Jr., immediately attempted to

14  walk away from officers."  Is that what that says?

15     A.    Yes.

16     Q.    Okay.  So "walk away," does that mean in a direction

17  walking away from you as opposed to towards you?

18     A.    No.

19     Q.    "Away" means towards you?

20     A.    "Away" -- "away" just means to -- to vacate the

21  area.

22     Q.    Okay.  But your testimony this morning is he was --

23  he walked towards you.  Is that correct?

24     A.    Yes.

25     Q.    And where -- where was Officer Hampy?  Was she next

1  to you?

2  　　A.　　She was near me.  I don't recall exactly where she

3  was positioned.

4  　　Q.　　Okay.  Your next sentence says "I then attempted to

5  stop Kelley, Jr."  How did you attempt to stop him from walking

6  away?

7  　　A.　　Verbally telling him that he was not free to go.

8  　　Q.　　Thank you.  And then on the top of page 2 of your

9  report, the first sentence says "Kelley, Jr., attempted to

10 physically push past me in an attempt to flee," period.  So can

11 you describe that?  Attempting to physically push past you.

12 　　A.　　Correct.  As I stated before, that's when he pushed

13 his shoulder into my chest area and attempted to push past me.

14 　　Q.　　And did you make any movements or put out your arms

15 when he's coming so close to you that his shoulder is going to

16 be able to actually touch your chest?  Did you employ any

17 movement to prevent him from actually touching you?

18 　　A.　　I didn't have a chance to, sir.

19 　　Q.　　And why not?

20 　　A.　　The movement was very fast.  He attempted to push

21 past me in a fast manner.

22 　　Q.　　Okay.  Please tell me what happens next, then.

23 　　A.　　As he attempted -- as he pushed his shoulder into

24 me, it knocked me off balance slightly.  From there, I

25 attempted to get control of his arms to place him into

28

1  handcuffs.

2      Q.    And were you able to do that?

3      A.    No.

4      Q.    Did you tell him verbally, "Hey, I have to place you

5  under arrest now"?  Before you tried grabbing his arms, did you

6  tell him verbally that you were going to place him under

7  arrest?

8      A.    I don't recall that, sir.

9      Q.    Okay.  And so what happens next, please?

10      A.    I, again, attempted to gain control of his hands.  I

11  attempted to turn him around in an attempt to place him into

12  handcuffs.  He immediately started to struggle with me, pull

13  away from me.  Began to elbow his arms back in an attempt to

14  assault me and would not allow me to put handcuffs on his

15  arms -- on his hands -- wrist area.

16      Q.    What was your height and weight at the time?

17      A.    5-11.  About 200 pounds.

18      Q.    Thank you.  At that point in time, do you happen to

19  know what Officer Hampy is doing?

20      A.    I don't recall what she was doing at that moment.  I

21  was focused on Kelley, Jr.

22      Q.    Okay.  Continue, please.  I -- I think maybe you

23  used OC spray at some point.  Just --

24      A.    There was a -- again, I was struggling with him,

25  attempting to place him into handcuffs.  At that point, he

1  proceeded to the right towards where there was some support

2  posts of the gazebo and locked his arm onto one of the posts of

3  the gazebo, preventing me from securing him into handcuffs.

4      Q.    And in the manner he did that, was his back to you?

5      A.    Yes.

6      Q.    Is it a fair description to say he was hugging the

7  gazebo?  If someone looked at it, they could describe it as it

8  looked like he was hugging the gazebo?

9      A.    Absolutely not.

10     Q.    Okay.  How would you describe it, if someone is

11 looking at it?

12     A.    I can show you.  He had his arm -- one arm around

13 the gazebo like this.  His other arm was flailing back towards

14 me and attempting to assault me during the entire time.

15     Q.    Okay.  So you indicated with his right arm, and you

16 kind of had your forearm in front of your chest.  Is that a

17 fair description?

18     A.    Yes.  Just like this.

19     Q.    So with his right arm, he's holding on to the

20 gazebo.  Is that correct?

21     A.    Yes.

22     Q.    And you're saying he's -- he's trying to assault you

23 with, what, his left hand?

24     A.    Yes.  He's flailing his left hand and attempting to

25 elbow me and hit me with his left hand behind his back.

30

1  Q. Okay.  Did you have any -- get any impression that
2 this person had some mental health issues?

3  A. No.

4  Q. Do you tell him to let go of the gazebo, in whatever
5 words you used?

6  A. At this point, I'm -- I'm advising him verbally that
7 he's under arrest and to place his hands behind his back.  He's
8 not complying with any of those orders that I'm giving him.

9  Q. Okay.  So what did you decide to do then?

10  A. At that point, around that general time frame --
11 based upon him assaulting me, being noncompliant and combative,
12 around that time is when I elected to deploy a burst of OC
13 spray.

14  Q. And is OC spray considered, on the continuum of
15 force, a use of force?

16  A. Yes.

17  Q. Okay.  And did you deploy the OC spray?

18  A. Yes.

19  Q. And tell me, when you deploy OC spray, in that time
20 period, in your training, what are you aiming for with the
21 spray?

22  A. His facial area.

23  Q. And specifically his eyes?

24  A. Facial area, sir.

25  Q. Okay.  And if the deployment of the OC spray is

31

1  effective, how -- what is it supposed to do to the suspect?

2      A.    It's supposed to blur their vision.  It's supposed

3  to make their -- some of their -- their nose to begin to run,

4  begin to make them cough and have effects of like the oleoresin

5  capsicum that's inside of it to allow -- allow them to become

6  more compliant with -- with an officer.

7      Q.    Okay.  Sorry.  You just used maybe some fancy words

8  there.  Resin.  Captimum -- capti-something.  I didn't catch

9  that.

10     A.    OC spray.  Oleoresin capsicum spray is the

11 terminology for the spray.

12     Q.    Okay.  Is it -- does the OC spray have the effect of

13 burning their eyes?

14     A.    I can only go off of my experience.  When I was

15 pepper sprayed, it burned my eyes.  I can't go off of what it

16 would do to somebody else, sir.

17     Q.    Understood.  And so when you deploy the OC spray,

18 are you trained -- say, you do that in, say, two bursts or one

19 or -- what was your training?  How were you taught to deploy

20 it?

21     A.    I was taught to deploy it in one short burst.

22     Q.    Okay.  And then is that aimed at his face, then?  Is

23 that what the training is?  You aim at their face?

24     A.    The facial area, yes.

25     Q.    Okay.  And so you deployed the OC spray.  And how

1   was his body positioned when you deployed that?

2       A.   I was able to get my arm around towards his facial

3   area and deploy the spray at that point.  I was kind of

4   positioned to the right side of him.

5       Q.   Was his back still to you?

6       A.   I was on the right side of his body at this point.

7       Q.   Okay.  Was he still holding the gazebo with his

8   right arm?

9       A.   It was either at that moment or just after when he

10  broke free from the gazebo.  I don't recall the exact moment.

11      Q.   And there's reference in your report to a large gust

12  of wind.  Tell me what happened after you deploy the OC spray.

13      A.   I was very close to him when I deployed -- deployed

14  the OC spray.  Very close in proximity to him.  When I deployed

15  the OC spray, some of the -- some of the OC spray either

16  bounced off of him or some of the vapors also got on my facial

17  area and my hand.

18      Q.   And what effect did that have on you when it got in

19  your facial area?

20      A.   Just a burning sensation, an uncomfortable

21  sensation.

22      Q.   And did that distract you even, say, temporarily

23  from what you were trying to accomplish?

24      A.   No.

25      Q.   Okay.  What does he do then at that point?

1    A.    In my opinion, it didn't have any effect on him.  He

2    kind of pushed his arm up, it appeared, to try to wipe some of

3    the OC spray off.  And at that point is when he -- he broke

4    free from us and began to walk around the back of his --

5    towards -- around the gazebo, closest to the Linear Trail on

6    the back side.

7    Q.    And so he was walking away from you and Officer

8    Hampy at that point.  Is that true?

9    A.    I -- I don't know where -- I can't say to what --

10   where he was going.  I can just say that he was walking around

11   the gazebo, you know, to the left.  To the left, I should say.

12   Q.    But he's walking away from you.  Is that true?

13   A.    Yes.  Yes.

14   Q.    Okay.  And then do you and Officer Hampy then deal

15   with Bruce, Sr., for a little while, or do you proceed after

16   Bruce Kelley, Jr., at that moment?

17   A.    I stayed with Bruce Kelley, Jr.  I don't know -- I

18   can't speak for what Officer Hampy was doing at that moment.

19   Q.    Okay.  Understood.  Tell me what you do then, as

20   Bruce, Jr., is walking away from you.

21   A.    As he is walking away, attempting to flee from me, I

22   attempted to get him down onto the ground to -- to put him into

23   handcuffs at that point.

24   Q.    And do you notice, are there any other civilians

25   around in --

1      A.    I'm focused --

2      Q.    -- the area?

3      A.    I'm focused on Kelley, Jr.  I don't recall if there

4  was any other people around.

5      Q.    Okay.  Sorry.  Back to Kelley, Jr.  I interrupted

6  you.

7            Tell me what you were trying to accomplish at that

8  point.

9      A.    I was attempting to get him onto the ground so that

10 I could place him into custody, into handcuffs.  Place his

11 hands behind his back and secure him into handcuffs.

12     Q.    And were you able to get him on the ground?

13     A.    Yes.

14     Q.    Tell me how.  How were you able to get him on the

15 ground?  Like, did you -- I don't know if you took his legs out

16 from under him, but how did you do that?

17     A.    I was able to get my leg -- I don't recall what

18 leg -- in front of his legs and was able to force him over my

19 leg, which caused him to fall to the ground.

20     Q.    And is it just -- I mean, is that, say, in a way,

21 you tripped him to get him to go to the ground?

22     A.    I would call it more of a -- like a leg sweep more

23 than a trip, sir.

24     Q.    No.  No.  I'm just asking.  And then -- so did he go

25 then -- then to the ground, say, on his stomach?

1        A.      He went to the ground on his knees.

2        Q.      Okay.  And then did he fall forward onto, say, his

3    stomach or chest area?

4        A.      I don't recall if he made it that far.  I was able

5    to get him down onto his knees with his body hunched over

6    forward.  I don't -- I don't know if his chest made it all the

7    way to the ground.

8        Q.      Okay.  His hands may have been on the ground.  Is

9    that fair?

10       A.      It's -- it's possible.  I don't recall if his hands

11   ever made it to the ground.

12       Q.      Okay.  And what happens next, please?

13       A.      During that time, I'm again attempting to place him

14   into handcuffs.  He's again resisting my attempts to place him

15   into handcuffs.  He's attempting to pull away from me.  And at

16   one point, I notice Kelley, Sr., attempting to get up and

17   approach us.

18       Q.      And where was Kelley, Sr., when you laid eyes on

19   him?

20       A.      Seated in the -- in the gazebo, closest to the

21   Linear Trail.

22       Q.      And as you're trying to get Kelley, Jr., in cuffs,

23   are you -- are you saying things to him?

24       A.      I'm advising him again, as I stated earlier, that

25   he's under arrest, place his hands behind his back, stop

1    resisting.

2        Q.    Was he saying -- saying anything back to you?

3        A.    He wasn't saying anything back to me.  He did say

4    something during my interaction with him to the effect of "Help

5    me.  I'm not going" or "I'm not going."  Something to that

6    effect.

7        Q.    At any point, was he cussing you out?

8        A.    Not that I recall, sir.

9        Q.    Is that something you would have recalled?  If he

10   was cussing you out.

11            MR. EVASHAVIK:  Object to form.

12   BY MR. GEARY:

13       Q.    You can answer.

14       A.    Again, I don't recall.

15       Q.    Did he verbally threaten you with violence?

16       A.    Not -- not that I recall.

17       Q.    Okay.  Please -- again, we just got to walk through

18   it.  So what happens at that point then?  You have him on the

19   ground.  You're trying to cuff him.

20       A.    Sure.  Like I said, I -- I believe Kelley, Sr., had

21   gotten up from that point.  And, you know, Officer Hampy went

22   towards him, in that direction.  I don't recall what occurred

23   at that point.  I was focused on Kelley, Jr.  I was still

24   attempting to place him into handcuffs at that point.

25       Q.    Hampy went towards Kelley, Sr.?

1      A.    Yes.

2      Q.    Okay.  And what -- what happens with Bruce Kelley,

3  Jr., and yourself then?

4      A.    Again, I'm attempting to gain control of his hands

5  to place him into cuffs.  I was able to get ahold of his left

6  arm and began to reach for my handcuffs, when his right arm

7  went down in towards the mid section of his body.  And when it

8  came out, he had a blue and black knife in his hand with the --

9  with the blade exposed.

10     Q.    What was the length of the blade, in your

11 estimation?

12     A.    Maybe 5 inches.  I -- I can't give you an exact

13 estimation but approximately 5 inches.

14     Q.    Was it a certain type of knife?  Say, as a police

15 officer, was it a, say -- would you call it a such and such

16 type of knife or --

17     A.    I'm not a knife expert, sir.  I just know that it

18 was a blue and black knife.

19     Q.    Now, did you try to use the OC spray a second time

20 at any point?

21     A.    No.

22     Q.    Okay.  So just so we're clear, you used OC spray one

23 time.  Is that correct?

24     A.    From what I recall, yes.  One time.

25     Q.    Okay.  Did you ever deploy a Taser?

1      A.    No.

2      Q.    Okay.  For one moment on your use of the OC spray.

3   That was a use of force.  Correct?

4      A.    Yes.

5      Q.    Did you fill out a use of force form at some point

6   after this incident concluded?

7      A.    I documented my use of force in my police report,

8   sir.

9      Q.    Okay.  Separate from your report, did you fill out a

10  use of force form?

11     A.    I did not.  We do not have those forms, sir.

12     Q.    So in January of '016, the Port Authority Police

13  Department did not have use of force forms?

14     A.    Correct.

15     Q.    Okay.  All right.  So you see the knife.  And what

16  do you do?

17     A.    I see that he brings the knife up over his head,

18  kind of back towards me.  I verbally yell out loud, "Knife.

19  Knife," something to that effect.  I don't recall the exact

20  words.  I know that I said "knife."

21           I pushed off of him to gain distance so that I

22  wouldn't be stabbed.  And that's when he got up and began, on

23  foot, to walk away from us.  And I began to back away to gain

24  some distance in between him and I.

25     Q.    Did he try to stab you with the knife?

1     A.    I don't know what his intentions were, sir.  I can't

2 speak for him.

3     Q.    Yeah.  I'm not asking you what his intentions were.

4 Did he try to stab you with his knife or slash you with his

5 knife?

6     A.    He brought the knife up over his head behind him in

7 close proximity to me.  I can't speak to what he was going to

8 do at that point.

9     Q.    Okay.  And then --

10     A.    I was in fear of -- I was in fear of being stabbed

11 by him.

12     Q.    And then you yelled, "Knife.  Knife" and backed away

13 from him.  Correct?

14     A.    I pushed off of him and -- and disengaged from him

15 to gain some distance, yes.

16     Q.    And then, what, he started going up the steps to the

17 Linear Trail?  Is that right?

18     A.    He began to walk around the gazebo, up the steps to

19 the Linear Trail.

20     Q.    Okay.  Away from you?

21     A.    Yes.

22     Q.    Okay.  Say, when he got to his feet -- when he had

23 the knife in his hand and when he got to his feet, did he

24 advance towards you?  Move towards you?

25     A.    No.

1    Q.    Did he try to stab you with his knife at that point

2  in time?

3    A.    No.

4    Q.    Did he try to slash you with his knife at that point

5  in time?

6    A.    No.

7    Q.    Did he move towards Officer Hampy?

8    A.    I don't recall because I don't -- I don't recall

9  Officer Hampy's exact location during that time frame.

10    Q.    Okay.  So he proceeds up the steps.  Is that

11  correct?

12    A.    Yes.

13    Q.    And was he -- did you watch him walk up the steps?

14    A.    Yes.

15    Q.    Okay.  And then he gets up to the top, and there's

16  the Linear Trail.  Is that right?

17    A.    Yes.

18    Q.    And he could have made a left or a right.  Is that

19  correct?

20    A.    Yes.

21    Q.    Now, just so I'm clear on the geography, if he would

22  have proceeded straight, he's going to be walking onto the

23  busway.  Right?

24    A.    Correct.  There's a -- like I said earlier, there's

25  a -- approximately a 5-foot wall in that area that he would

41

1  have had to jump over to get onto the busway itself.

2      Q.    Okay.  Thank you.  Which way does he go -- left or

3  right -- on the Linear Trail?

4      A.    He went left.

5      Q.    And when you watch him walk up the steps and go up

6  there and -- and he makes a left on the Linear Trail, was he

7  walking?  Running?  How would you describe how he was moving?

8      A.    He was walking.

9      Q.    Okay.  Did he turn around at any point and threaten

10 you verbally?

11     A.    Not to my knowledge.

12     Q.    Okay.  What do you decide to do at that point in

13 time?

14     A.    During this whole time frame, I'm -- I'm -- I have

15 been on my radio notifying dispatch of what was occurring,

16 requesting backup.

17          Myself, Officer Hampy, and Wilkinsburg Officer

18 Granger began to go up the stairs in an attempt to follow him

19 in the direction that he was going.

20     Q.    And as far as him pulling the knife, so we're clear,

21 he did not make contact with you with the knife.  Correct?

22     A.    I don't believe so.  I did have a cut on my hand --

23 on my left hand after the fact.  I don't know if it was from

24 the knife or not.

25     Q.    Sorry.  Which hand?

1     A.    Left hand.

2     Q.    Can you -- can you show me?  Just hold your hand up

3  and show me where.

4     A.    It was on top of the bridge of my knuckles, here in

5  this area.

6          MR. GEARY:  Okay.  So the witness is -- ran his

7  fingers from his right hand.  He has his left hand up, palm

8  inward, and he ran his fingers over his left knuckles there.

9  BY MR. GEARY:

10    Q.    You sustained a cut on your hand.  Is that correct?

11    A.    Yes.  An abrasion, yes.

12    Q.    Okay.  When did you first notice that?

13    A.    I don't recall, sir.

14    Q.    I mean --

15    A.    I believe -- I believe it was when I was up on the

16  Linear Trail, but I don't recall the exact time.

17    Q.    And did you receive any treatment for that cut at

18  any time?

19    A.    Yes.

20    Q.    Tell me where.

21    A.    It was at Mercy Hospital -- UPMC Mercy Hospital.

22    Q.    And was that cut -- was it bleeding at any point?

23    A.    Yes, it was bleeding, sir.

24    Q.    Okay.  To what extent was it bleeding?

25    A.    I mean, I'm not a medical professional.  It was --

1  it was -- it was bleeding.  That's all I can recall.

2      Q.    Just, say, mild?  Moderate?  Or substantial

3  bleeding?

4      A.    I can't give you an exact number.  To me, we'll say

5  it was -- it was mild.

6      Q.    Did it require any stitches?

7      A.    No.

8      Q.    And what was the treatment you received for the cut

9  at Mercy Hospital?

10      A.    From what I recall, they irrigated the wound,

11  cleaned the wound out, covered it with some form of a bandage,

12  and wrapped my hand up.

13      Q.    And so you went to Mercy Hospital that day.  Is that

14  true?

15      A.    Yes.

16      Q.    And was there any follow-up treatment relating to

17  the cut on the hand?

18      A.    No.

19      Q.    Okay.  So just Mercy Hospital for the hand.  Did you

20  sustain any other injuries in this encounter?

21      A.    Yeah.  After -- at the -- at the end of this, I had

22  shoulder -- left shoulder pain.

23      Q.    Okay.  What did you do about the left shoulder pain?

24      A.    I was seen at Mercy Hospital.  I advised them of the

25  shoulder pain.  They examined me.  And that was basically the

44

1   extent of it.  They didn't do any further testing or anything

2   like that.  They just examined it and checked my range of

3   motion.

4       Q.   Okay.  So when you went to Mercy that day, did the

5   personnel there look at both the cut and your shoulder?

6       A.   Yes.

7       Q.   And so as far as any type of injuries you sustained

8   and any medical treatment, was it -- for both areas of your

9   body, shoulder and hand, it was just Mercy Hospital.  No other

10  medical provider.  Is that true?

11      A.   That's true.

12      Q.   Okay.  And then, as you sit here today, do -- do you

13  know how you cut your hand that day?

14      A.   I believe it was during the initial interaction with

15  Bruce Kelley, Jr., but I -- I don't know how it occurred.

16      Q.   Okay.

17      A.   My hand wasn't cut before interacting with him.

18      Q.   Thank you.  Okay.  Now, let's get back to the

19  sequence of events, please.  He makes a left on the Linear

20  Trail.  And I think I -- you said you, Hampy, and Granger began

21  to follow him.  Is that correct?

22      A.   Yes.

23      Q.   Do you recall what the three of you decided to do

24  about Bruce Kelley, Sr.?

25      A.   At that point in time, based upon there being an

1    armed individual walking down a trail where -- where people

2    could be, we elected to -- to go after Kelley, Jr., and leave

3    Senior behind.

4         Q.    And as Bruce Kelley, Jr., is going up the steps to

5    the Linear Trail, are there any civilians walking down the

6    steps?

7         A.    Not that I recall.

8         Q.    And was there any civilians in the area of the

9    gazebo when the three of you proceeded up the steps to follow

10   him?

11        A.    Not that I can recall, sir.

12        Q.    Okay.  Did the three of you get up to the Linear

13   Trail?

14        A.    Yes.

15        Q.    And then you -- you followed him for a while.  Is

16   that true?

17        A.    We followed behind him, yes.

18        Q.    Okay.  And was one of you, say, in the lead?  How

19   were the three of your bodies positioned as you followed Bruce

20   Kelley, Jr., on the Linear Trail?

21        A.    I don't recall, sir.  I just know that we were all

22   kind of in a -- in a horizontal line directly next to each

23   other.

24        Q.    And did you have your guns out of your holsters?

25        A.    I had my gun out of my holster at -- at a low ready,

46

1 not pointed at him.

2     Q.    And tell me why you had your gun out of its holster.

3     A.    There was a -- a fleeing felon that was armed with a

4 knife, walking down a trail that leads to our Hamnett Bus

5 Station where numerous Port Authority patrons utilize on a

6 daily basis.

7     Q.    And how long did you follow him on the trail, say,

8 roughly, in minutes? And I know you're not thinking of it at

9 the time, but, looking back, how long did you follow him on the

10 Linear Trail?

11     A.    I don't recall the exact time frame, sir.

12     Q.    Okay. What about distance? How long did you follow

13 him distance-wise?

14     A.    I couldn't give you an exact distance.

15     Q.    Okay. Now, you left some -- some space between you

16 and -- you and the two officers. Is that right? For safety

17 purposes?

18     A.    I -- can you --

19     Q.    Yeah.

20     A.    -- say the question again? I don't know what you

21 mean.

22     Q.    Sure. When you're following him on the Linear

23 Trail, you have your gun at low ready. Is there a certain

24 amount of distance or space you -- you left between him and you

25 or -- as opposed to you're walking immediately behind him.

1      A.    There was a distance.  I can't give you an exact
2  number or how far we were back from him, though.
3      Q.    Okay.  And when he's walking on the Linear Trail and
4  you're following him for however long that was or however
5  distance, is there anybody else, any civilians, up there on the
6  Linear Trail?
7      A.    I don't recall that, sir.
8      Q.    Okay.  And is that something that you would recall?
9           MR. EVASHAVIK:  Object to form.
10           THE WITNESS:  Again, I -- I don't recall if there
11  was.  And at that time, I was very focused on him.
12  BY MR. GEARY:
13      Q.    Okay.  And if there was a civilian, though, would
14  you become focused on the civilian because he might harm the
15  civilian?
16      A.    Possibly, yes.
17      Q.    Okay.  Please just continue to lay it out for me.
18  As you follow him on the Linear Trail, you know, what happens?
19      A.    I believe, from what I recall, Officer Granger
20  attempted to deploy his Taser into the back area of Kelley, Jr.
21      Q.    And what happened?
22      A.    It had no effect.  It appeared to have no effect on
23  him.  He just kept walking.  It appeared that the Taser prongs
24  did not have any positive contact with -- with his body.
25      Q.    And pardon my ignorance, but, with the Taser, the

1  point of the Taser, it's supposed to pierce the clothing and

2  actually touch the skin.  Is that true?

3      A.    Yes.

4      Q.    Okay.  And was -- Bruce Kelley, Jr., was he wearing

5  many layers of clothing?

6      A.    I -- I can't say many layers of clothing.  I can say

7  that he had a very thick, kind of like coverall or

8  overall-style -- like low -- that covered him.  And then he had

9  a thicker, dark-colored coat on, on the top.

10     Q.    But your thinking was the Taser was unsuccessful

11 because of the layers of clothing he did have on?

12     A.    Yes.

13     Q.    Okay.  What happens after Granger deploys the Taser?

14     A.    After he deploys the Taser, it has negative results.

15 During this whole time, I'm, again, notifying other officers

16 his direction of travel.

17           I notified dispatch that we had attempted to deploy

18 OC spray and deploy a Taser.  Both had negative results on --

19 on helping us subdue the suspect.

20           And from there, I overheard other officers notify us

21 that they were on the Linear Trail at Hamnett Station,

22 proceeding towards us in our direction.

23     Q.    Thank you.  One question back to the gazebo.  Sorry.

24           When he's holding the gazebo, did you -- you gave

25 him commands to -- to let go of the gazebo.  Correct?

1     A.    Yes.

2     Q.    And he did not listen.  Correct?

3     A.    No.

4     Q.    Did you use a baton at any point to hit his hands so

5 he let -- he lets go of the gazebo?

6     A.    No.

7     Q.    Did you use your baton at any time on any part of

8 his body that day?

9     A.    No.

10    Q.    Did Officer Hampy hit any part of Bruce Kelley,

11 Jr.'s, body with the baton when he's hugging the gazebo, so to

12 speak?

13    A.    Not to my knowledge.

14    Q.    Okay.  Thank you.

15         So continue, please.  Where do you see Kelley go?

16    A.    Kelley, again, is proceeding outbound on the Linear

17 Trail.  At a distance, I can see other officers beginning to

18 approach our direction, traveling inbound, towards us.  Based

19 upon a cross-fire situation, if they had to use any type of

20 force, I advised the other officers that we should move down

21 into a wooded area to avoid any cross-fire situation, if it

22 came to that point with Kelley, Jr.

23    Q.    Now, when he's proceeding down the Linear Trail, is

24 he still just walking?

25    A.    From what I recall, yes, walking.

1     Q.    Did he at any point start running?

2     A.    Not to my knowledge.

3     Q.    On the Linear Trail there, at any point did he stop

4 and, say, turn around and face you, Granger, and Hampy?

5     A.    Not that I recall.

6     Q.    Did he stop, turn around, and verbally threaten any

7 of you?

8     A.    Not that I recall.

9     Q.    Was he threatening any of you verbally as he's

10 walking forward, away from you, on the Linear Trail?

11     A.    Not -- not that I recall.

12     Q.    Okay.  So you're following him.  He's walking, and

13 he's not saying anything.  Is that fair?

14     A.    I don't recall him saying anything at that point.

15     Q.    And at that point in time, say -- it's you, Granger,

16 and Hampy.  Was there any discussion or thought among the three

17 of you that maybe he had mental health issues?

18     A.    No.

19     Q.    Okay.  Please tell me -- well, how many officers do

20 you see coming from the opposite direction?

21     A.    There was several officers.  I can't give you an

22 exact number.

23     Q.    Okay.  What do you see Kelley do at that point,

24 then, please?

25     A.    As we proceeded to the left into a small wooded area

1  on -- on the left side of the trail, I heard over the radio

2  that Kelley had gone down into the woods and through a cut into

3  the fence towards some abandoned houses on Whitney Avenue.

4      Q.    Okay.  What did you decide to do at that point?

5      A.    At that point, I kept -- we went back onto the

6  trail, kept proceeding forward to where I saw a cut in the

7  fence.  And we proceeded down through the cut in the fence in

8  the direction that he was traveling that we overheard on the

9  radio.

10      Q.    And so for a period of time, he's out of your sight.

11  Is that true?

12      A.    For a brief time, yes.

13      Q.    Okay.  And so then you go through a cut in the fence

14  and through some woods.  And then you're -- you're on the

15  street and there's homes.  Is that right?

16      A.    Yes.  It's a residential area, yes.

17      Q.    And, say, how long are you in the residential area

18  before you -- you see him again?

19      A.    I can't give you an exact number, sir.

20      Q.    Okay.  But you do see him again.  Is that right?

21      A.    I saw him at several points during this roving foot

22  pursuit at a distance.  I can't tell you exactly -- exactly,

23  you know, at what point I saw him.

24      Q.    Okay.  Well, when you first see him after -- you

25  lose sight of him.  You go through the cut in the fence.  When

52

1   you first lay eyes on him again in the residential area, what
2   was he doing?
3       A.    He was still walking with his arms down at his -- at
4   his side as he was before.
5       Q.    Do you know if he had the knife in his hand still?
6       A.    I -- I don't recall.  I was at a -- at a distance at
7   that point.  I was seeing him through cuts of -- in between
8   houses and that.  I -- I couldn't tell you if he did or not.
9       Q.    And were there any civilians out in the street?  In
10  the yard?  Sidewalks?
11      A.    From what I recall, yes, there was civilians.
12  That -- that day, weather-wise, for January, it was -- it was
13  warmer than usual, from what I recall.
14      Q.    Did you see Bruce Kelley, Jr., at any time approach
15  a civilian?
16      A.    No.
17      Q.    Did you see him make any movements toward a
18  civilian?
19      A.    No.
20      Q.    Did he verbally threaten any civilian?
21      A.    Not to my knowledge.
22      Q.    And as he's walking -- as you see him in the area
23  now, the residential area, again, is he just -- is he walking?
24      A.    Yes.
25      Q.    Okay.  And was he walking slowly?

1      A.    I can't give you an exact pace.  I don't know what
2  your -- what your "slow" is compared to my "slow."  He was
3  walking at -- at a normal pace.
4      Q.    Okay.  Do you see other officers at this point,
5  aside from Granger and Hampy?
6      A.    There was several other officers in the immediate
7  area after we had -- had called for assistance, yes.
8      Q.    Okay.  What do you see happen next, please?
9      A.    Again, I saw him during that -- this next time frame
10  at several points in between houses at a distance.  I was
11  trying to give dispatch updates of his location and direction
12  of travel.
13      Q.    Did you observe any other officers deploy any type
14  of force?  Taser?  Pepper spray?  Other than what you've
15  described so far.
16      A.    Not to -- I did not see anybody else, to my
17  knowledge, use any other type of force, no.
18      Q.    Okay.  And -- but when you did see him in the
19  residential area for the first time after cutting through the
20  fence, then you -- he was out -- out of your vision at times
21  also.  Is that -- is that fair?
22      A.    Yes.  The houses sit very close together in that
23  area of Wilkinsburg.  There's not much distance in between the
24  homes.  I would see him in between the -- you know, the small,
25  you know, openings in between the homes at several points.  And

54

1    I was trying to give an update of his location he was

2    traveling -- the direction he was traveling.

3        Q.    Was there a plan among you officers on how to

4    apprehend him?

5        A.    I -- I don't recall that, sir.  I just recall

6    giving -- giving notifications on his direction of travel.

7        Q.    And then, if you would, please continue.  Just walk

8    me through it, what happened until, you know, the end of the

9    situation.

10       A.    Just giving updates of his location, trying to keep

11   him contained in that specific area that he was traveling.

12   Towards the end of the incident, I was behind some houses on

13   Whitney Avenue.  I heard several gunshots fired.

14       Q.    Where -- sorry.  Where precisely were you when you

15   heard gunshots fired?

16       A.    I was behind some homes on Whitney Avenue.  If

17   you're looking at Whitney Avenue from the Linear Trail, on the

18   left side of Whitney Avenue in the backyards.

19       Q.    So when he was shot, he was not in your field of

20   view?

21       A.    No.

22       Q.    When the -- the K-9 officer, the dog, was deployed,

23   did you see that?

24       A.    No.

25       Q.    Did you know there was a K-9 officer on scene?

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CALISIA KELLEY; and             CIVIL ACTION
JOHNNIE MAE KELLEY,
Co-Administrators of the        No. 2:17-cv-01599-NBF
ESTATE OF BRUCE KELLEY,
JR., deceased,

Plaintiffs,

vs.                             TRANSCRIPT

BRIAN O'MALLEY, both in his     VIDEOTAPED
Official and Individual         DEPOSITION OF
Capacities as Sergeant for      EMILY (HAMPY) NIEBEL
the Allegheny County Port
Authority; and DOMINIC
RIVOTTI, in both his
Official and Individual
Capacities as Officer for
the Allegheny County Port
Authority,

Defendants,
Jointly and Severally.          TAKEN VIA ZOOM VIDEO CONFERENCE

                                MONDAY, OCTOBER 5, 2020


                                Taken on behalf of Plaintiffs,
                                Calisia Kelley and Johnnie Mae
                                Kelley


                                Counsel of Record for this Party:

                                Noah Geary, Esquire
                                Washington Trust Building
                                6 South Main Street, Suite 225
                                Washington, PA  15301
                                724-222-3788

1     Q.   Okay.  So, obviously, you're no longer employed by

2  the Port Authority Police Department.  Is that correct?

3     A.   Correct.

4     Q.   What was your last day at the Port Authority?

5     A.   It was November of 2016.

6     Q.   Okay.  When did you start at the Port Authority,

7  please?

8     A.   August of 2015.

9     Q.   So you worked for the Port Authority Police

10  Department August of '015 to November of '016.  Is that right?

11     A.   Yes.

12     Q.   What was your position while there?

13     A.   A patrolman.

14     Q.   And why did you leave the employ of the Port

15  Authority in November of '016, please?

16     A.   I wanted to work more computer-based investigations,

17  as I found that that was what I enjoyed.

18     Q.   Did your leaving the Port Authority have anything to

19  do with the killing of Bruce Kelley, Jr.?

20     A.   No.

21     Q.   Okay.  Was there a gap in time after you left the

22  Port Authority until you found other employment?

23     A.   No.

24     Q.   And so you, what, started at Mellon or BDO then?

25     A.   Correct.

13

1    detectives of an interview with you.  I may refer you to those

2    at some point.

3           18 is some photos of the steps down at the gazebo,

4    the gazebo.

5           Now, I want to take you back to the day Bruce

6    Kelley, Jr., was killed.  It's January 31, '016.  Did you work

7    that day?

8    A.    Yes.

9    Q.    And do you remember that day?

10   A.    Most of it, yes.

11   Q.    Or the events of what happened that day while you

12   were working?

13   A.    Yes.

14   Q.    Okay.  Please explain to me what shift you were on.

15   And we're just going to -- we'll have to walk through the whole

16   day.

17   A.    I worked 2:00 to 10:00.  That would be their second

18   shift.  So you want me to just go through the day?

19   Q.    Well, I'll kind of lead you.  I'll ask you a couple

20   questions and I'll interrupt and --

21          So 2:00 p.m. to 10:00 p.m.  Is that correct?

22   A.    Correct.

23   Q.    And were you assigned a partner that day?

24   A.    Yes.  Officer Adams.

25   Q.    Now, as of that day, January 31, '016, how many

14

1    months, in total, had you had with the Port Authority?

2        A.    Roughly six.  I started in August of 2015, so seven

3    months.

4        Q.    Okay.  I took the deposition of another officer --

5        A.    Six months.

6        Q.    Understood.

7              I took the deposition of another officer in this

8    case a week or two ago, and he described he was -- I think he

9    said he was an officer in training on this day.  Were you an

10   officer in training, or were you beyond the training portion of

11   the job?

12       A.    I believe I was in training at the time.

13       Q.    Okay.  Now, did you have a partner on every shift?

14   Did you have to work with a partner?

15       A.    During training, yes.

16       Q.    Okay.  Was it always Adams, or was it different

17   officers?

18       A.    There were different officers per shift.

19       Q.    Okay.  So on that day, was your partner Adams?

20       A.    Yes.

21       Q.    Had you ever worked with him prior to that day?

22       A.    Specifically, I don't recall.

23       Q.    Okay.  So please explain what your assignment was

24   that day when you started out on your -- your 2:00 p.m. shift.

25       A.    Officer Adams and I were assigned the eastern

1 district.

2     Q.    Okay. And does that mean patrol?

3     A.    Yes.

4     Q.    So were you two out in a vehicle, a unit --

5     A.    Yes.

6     Q.    -- to start out the shift?

7     A.    Yes.

8     Q.    Who was driving?

9     A.    I was driving.

10     Q.    And just tell me, how does the shift start out? Did

11 you have any interactions with any suspects or citizens prior

12 to the Kelleys in the gazebo on that shift?

13     A.    No. We had not had any interactions prior to that.

14     Q.    Thank you. And please explain just what led to you

15 having an interaction with the Kelleys in the gazebo.

16     A.    Officer Adams and I were driving along the East

17 Busway, and we saw two individuals behind what we call the

18 Linear Trail duck behind the wall. We parked our vehicle and

19 exited to walk the trail to see if we could see the individuals

20 we drove by. Officer Adams --

21     Q.    I'm sorry.

22     A.    Uh-huh.

23     Q.    Okay. You saw two individuals duck behind a wall.

24 Is that correct?

25     A.    Yes.

1    Q.    And when you say "wall," just so I'm clear, what do

2  you mean "behind a wall"?

3    A.    The Linear Trail has a large concrete wall,

4  retaining wall.  And those individuals ducked behind that wall.

5    Q.    Is that called a sound wall?

6    A.    I don't know the specific name for it, but sound

7  wall, retaining wall, yes.

8    Q.    Okay.  I don't want to -- some witnesses referred

9  to, I think, a sound wall or sound barrier in that general

10 area.  I don't know if that's the same thing as the wall you're

11 describing, so I'm just asking.

12   A.    Yes.  I believe that would be the same wall.

13   Q.    And what did you see two individuals do?

14   A.    Duck behind the wall.

15   Q.    Okay.  And were these individuals male or female?

16   A.    I believe male.

17   Q.    And what was their race?

18   A.    I do not recall.

19   Q.    What about what clothing?  What kind of description

20 of what -- what were they wearing?

21   A.    I do not recall specifics of their clothing.

22         (Whereupon, Deposition Exhibits 20 and 22 were

23 presented to the witness.)

24 BY MR. GEARY:

25   Q.    And you're free, just so you know, to look at

1  Exhibit 20 and 22 at any time.  If you want to refresh your

2  memory at any time, that's fine by me.

3      A.    Okay.

4      Q.    Now, when you say they ducked behind the wall, where

5  were they right before they ducked behind the wall?

6      A.    Walking, I believe.

7      Q.    Were they walking on the Linear Trail?

8      A.    Yes.

9      Q.    Now, are individuals allowed to walk on the Linear

10  Trail?

11      A.    Yes.

12      Q.    And what -- what was suspicious?  When you say

13  "ducked behind the wall," what was suspicious about that to

14  you?

15      A.    The Linear Trail is a known high-crime area with

16  robberies, drug activity.  And upon seeing the individuals duck

17  when they saw a police presence initiated concern on our end,

18  so we wanted to stop and ensure there was no illicit activities

19  happening.

20      Q.    So did you and Adams get out of your unit?

21      A.    Yes.

22      Q.    Where did you park, please?

23      A.    Hamnett Station, which is adjacent to the Linear

24  Trail.

25      Q.    And when these two individuals ducked behind the

1  wall, is that near the Hamnett Park and Ride?

2      A.    Yes.

3      Q.    Okay.  And what did you and Adams then set out to

4  do?

5      A.    We just wanted to walk the trail to ensure there was

6  nothing illegal happening or -- excuse me -- any patrons that

7  were, you know, either -- in harm's way, as our patrons tend to

8  walk that trail.  So we just set out to walk the trail to

9  possibly locate the individuals and see what they were doing.

10     Q.    And when you used the word "patrons," who were you

11 referring to, please?

12     A.    Port Authority bus riders.  Those who utilize the

13 park and ride or ride the transit.

14     Q.    Pardon my ignorance.  The transit there, is there a

15 bus station near the Hamnett Park and Ride?

16     A.    Yes, there is.

17     Q.    So when you say "transit," that means -- is that a

18 bus?

19     A.    Yes.

20     Q.    Thank you.  So you and Adams, you walked the Linear

21 Trail, then, for a period of time?

22     A.    Yes, we did.

23     Q.    Did you see these two individuals who you saw duck

24 down behind the wall?

25     A.    We were never able to identify who those individuals

1  were.  So, no, we never found those specific individuals --

2  individuals, to our knowledge.

3      Q.    And in the area where they ducked behind the wall,

4  were there other -- let's call them civilians or citizens, say.

5  I'll call them civilians.  Were there any other civilians in

6  the area where those two ducked behind the wall?

7      A.    Not on the trail specifically, no.

8      Q.    Where were civilians, then?

9      A.    Located down in the gazebo at the bottom of the

10 trail.

11     Q.    Now, is the gazebo several blocks from the park and

12 ride, the parking lot?

13     A.    The parking lot?  Yes.

14     Q.    So when these two ducked behind the wall, that's

15 near the park and ride.  Is that correct?

16     A.    Yes.  The Linear Trail runs inbound, whereas the

17 park and ride is located behind the trail, the opposite

18 direction.

19     Q.    So were there any civilians near where they ducked

20 behind the wall?

21     A.    No.

22     Q.    And then when you and Adams walked the Linear Trail,

23 you walked in the direction towards the gazebo.  Is that

24 correct?

25     A.    Yes.

1    Q.    And when you walked the Linear Trail up to the

2  gazebo area, can you just give me an approximate distance that

3  would be?

4    A.    I do not know the approximate distance.

5    Q.    Would it be, say, a quarter mile or several hundred

6  yards?  Something like this?

7    A.    I couldn't guess.  It has been years since I've been

8  there, so I don't feel comfortable guessing.

9    Q.    Yeah.  I don't want you to guess.  I just assumed,

10  since you walked it, you would be able to give me an estimate

11  of the distance you walked from when you started walking the

12  trail until you get to the gazebo.

13    A.    No, sir.

14    Q.    Did you and Adams see any other civilians or

15  citizens on the Linear Trail as you walked it?

16    A.    Not that I recall, no.

17    Q.    Did you see any citizens near the Linear Trail?

18    A.    Not that I recall, no.

19    Q.    So please tell me, as you get closer to the gazebo

20  area, can you just describe for me what you see, what you do?

21    A.    As we approached the end of the trail, we observed

22  two males sitting -- located in the gazebo.

23    Q.    Okay.  And where -- where were you when you first

24  see there's two males in the gazebo?

25    A.    At the end of the trail near the steps.

1          (Whereupon, Deposition Exhibit 18 was presented to

2     the witness.)

3     BY MR. GEARY:

4          Q.     Okay.  Could you look at Exhibit 18, please.  It's a

5     number of color photographs.  I count eight total photos there.

6     I don't know -- if you look at the third photograph of the set,

7     does the third photograph of this set show the area where you

8     would have been when you see the men in the gazebo?

9          A.     This point of view, I am not -- I'm not sure.  I

10    can't exactly see into the gazebo, so I wouldn't feel

11    comfortable saying where I could see in from here.

12         Q.     Okay.  On the third photograph of Exhibit 18, does

13    it depict -- the gazebo is in the far left of the photo?

14         A.     Yes.

15         Q.     And does it show steps up to the Linear Trail?  Is

16    that right?

17         A.     Yes.

18         Q.     Now, when you and Adams were walking the Linear

19    Trail, would you have been coming from the left on this photo?

20    Coming from left to right as you were walking?

21         A.     Left to right.  So this is flip-flopped.  So we

22    would have come -- honestly, I don't feel comfortable even

23    saying what direction we were on these photos.  It's been a

24    long time since I've been out there, and I don't feel

25    comfortable guessing.

1     Q.    Yeah.  Just -- you can look at other photos, too,

2  here.  I don't know if any of them help orient you.  I'm not

3  just trying to trick you.  I'm just trying to get --

4     A.    Right.

5     Q.    -- the direction you were coming from when you saw

6  them.

7     A.    Right.  I don't want to give you an inaccurate

8  location.

9     Q.    So, say, the third photograph of the set, you don't

10  recall whether you're coming left to right or right to left, as

11  you sit here today?

12     A.    I feel more comfortable with the first photo.  I

13  know we would be facing -- so it would be coming from the left.

14  So if I were to be facing the blue railing, it would be in

15  front of me, coming from my left.

16     Q.    And the blue railing, you're talking about kind of

17  in the upper right-hand corner of the photo?

18     A.    Yes.

19     Q.    And sorry.  If you can just say that one more time

20  so I'm clear.  You said from your left, just so we're clear.

21  Again, I'm not trying to trick you.

22     A.    Right.  So, essentially, if you are looking down at

23  the gazebo, we would have been walking -- I could see the

24  gazebo to my right.  So towards the blue railing, yes.

25     Q.    So were you standing near the blue railing when you

23

1   looked down to the gazebo and see two men in it?

2       A.      Specifically, I don't know if that's where I was

3   standing when I first observed them.  I don't recall the exact

4   location of where they were observed, but I do know that you

5   could see them from the stairs.  The exact location, I can't

6   pinpoint.

7       Q.      Okay.  And after you saw them, did you and Officer

8   Adams then walk down these stairs here which are visible in the

9   center of the photo?

10      A.      Yes.

11      Q.      Okay.  Now, when you see -- did you know they were

12  men right off the bat?

13      A.      Yes.

14      Q.      As opposed to female.  And what were they doing when

15  you first lay eyes on them?

16      A.      My recollection is Bruce Kelley, Sr., was seated at

17  the time, and Bruce Kelley, Jr., stood up and was standing in

18  the gazebo.

19      Q.      Was there anyone else in the gazebo other than those

20  two?

21      A.      No.

22      Q.      Were there any citizens or civilians in the area

23  around the gazebo?

24      A.      Not that I observed.

25      Q.      How about any civilians walking up or down the

24

1  stairs at that point in time?

2       A.    Not that I recall.

3       Q.    Okay.  So when you first see these two men in the

4  gazebo, are they doing anything wrong?

5             MR. EVASHAVIK:  Object to the form of the question.

6  BY MR. GEARY:

7       Q.    Wrong, meaning anything criminal in nature.

8       A.    Not that we could observe at the time.

9       Q.    And what did you and Officer Adams proceed to do

10 then?

11      A.    We walked to the gazebo to make contact with the

12 individuals.

13      Q.    And why did you feel the need to make contact with

14 them?

15      A.    Given what we had observed as we began our parking

16 lot -- our patrol zone and the initial unknown individuals

17 ducking behind the wall, we observed these two individuals with

18 open containers and wanted to just address and see what they

19 were doing in the area and make conversation.

20      Q.    Did you conclude that these two men in the gazebo

21 were the two individuals who suspiciously ducked behind a wall?

22      A.    We were unable to conclude that.

23      Q.    And tell me, now, you say open containers?  They had

24 open containers?

25      A.    Yes.

1    Q.    And open containers of what?

2    A.    Beer.

3    Q.    And is one of the reasons you wanted to speak to

4    them or have contact with them is because they had open

5    containers of beer?

6    A.    The attitude -- the situation, as I previously

7    addressed, just because we saw the two unknown males walking,

8    we were not sure what they were doing.  So we just wanted to

9    make conversation, ask what they were doing, and that was all.

10    Q.    And was one reason to initiate a conversation with

11    them because you had observed open containers of alcohol?

12    A.    Yes.

13    Q.    Now, where were you, please, when you noticed

14    open -- an open container of alcohol?

15    A.    Specifically, I don't recall if I noticed it prior

16    to entering the gazebo.  But upon entrance to the gazebo, I was

17    able to notice the open containers.

18    Q.    And what were the containers, please?

19    A.    Beer.

20    Q.    And was it -- I mean, what was the actual container,

21    though?

22    A.    I don't recall.  If you are asking brand, I don't

23    recall.

24    Q.    No.  I mean, say, a plastic mug with beer in it?  A

25    can?  A bottle?  So forth.  The container.

1    A.    I don't recall.  I believe -- I know there was a

2  beer can next to Bruce Kelley, Sr.  If there were others, I

3  can't recall.

4    Q.    And how do you know that the cans of beer were --

5  were open and contained alcohol?

6    A.    Our initial encounter with the individuals was to

7  inquire if those cans were theirs or not and if they had been

8  drinking.

9    Q.    And so did you ask them?

10    A.    Yes.

11    Q.    What did you ask?

12    A.    We asked them if the containers belonged to them and

13  just what they were doing in the gazebo.

14    Q.    And how did they respond, please?

15    A.    We were never able to get a response.

16    Q.    Okay.  So how many open containers containing

17  alcohol were there, then, that you saw?

18    A.    I do not recall.

19    Q.    Were there some containers that had not been opened

20  yet?

21    A.    I'm going to refer to my report, but --

22    Q.    That's fine.

23    A.    -- offhand, I do not recall.

24       THE REPORTER:  I'm sorry.  I didn't hear the very

25  last after "I'm going to refer to my report, but" --

1          THE WITNESS:  I can't recall offhand.

2          THE REPORTER:  Thank you.

3          THE WITNESS:  My report notes multiple open

4    containers of alcohol.

5    BY MR. GEARY:

6       Q.    And I think you initially described that Bruce

7    Kelley, Sr., was sitting down and Bruce Kelley, Jr., was

8    standing.  When you --

9       A.    That's what I recall.

10         THE REPORTER:  I'm sorry.  I didn't hear.

11         THE WITNESS:  That's what I recall.

12   BY MR. GEARY:

13      Q.    And from where Bruce Kelley, Sr., was sitting, where

14   were there open containers?

15      A.    I'm going to refer to my report.

16         I do not recall the specifics of where the

17   containers exactly were.

18      Q.    Okay.  Could you look at Exhibit 22 for a minute,

19   please?  It's the second paragraph, and it's the last two

20   sentences.  I'll read it aloud just so we know we're talking

21   about the same two sentences.  Then you can read the whole

22   paragraph, the whole report, if you want.

23         MR. EVASHAVIK:  Hold on.  What exhibit?

24   BY MR. GEARY:

25      Q.    So I'm looking at 22, page 1, second paragraph, last

28

1   two sentences.  "She said that the younger male got up and

2   walked over toward the garbage can and appeared to throw

3   something in it.  She said that she observed beer cans and said

4   that it appeared as the two had been drinking."

5           So, first of all, did I read that correctly?

6       A.    Yes.

7       Q.    Okay.  Does that refresh your memory as to -- I'm

8   asking you questions, obviously, about open containers.  Does

9   reading those two sentences refresh your memory a little bit?

10      A.    No.  I don't recall specifically.  I know there -- I

11  observed beer cans in the close vicinity of the individuals.

12  Exactly where, no.

13      Q.    Okay.  And on the sentence "She said that the

14  younger male got up and walked over toward the garbage can and

15  appeared to throw something in it," do you remember that

16  happening?

17      A.    I do not, not specifically.  I know he had stood up.

18  But as to what was the garbage can and what he was doing, I do

19  not recall.

20      Q.    And then it says "She said that she observed beer

21  cans and said that it appeared as the two had been drinking."

22  So is it true that, to you, they appeared to have been drinking

23  alcohol?

24      A.    At the time, that is what I believed, yes.

25      Q.    Okay.  Did either of them appear to be under the

1    Q.    Can you give me an estimate, please?

2    A.    No.  I do not recall.

3    Q.    You cannot give me an estimate -- say, less than 10,

4    more than 30 -- on arrests?

5    A.    No, I cannot.

6    Q.    Do you know who owned the gazebo?

7    A.    No, I do not.

8    Q.    Now, the gazebo is located in Wilkinsburg Borough.

9    Correct?

10   A.    Correct.

11   Q.    And they had their own police department.  Correct?

12   A.    Correct.

13   Q.    Okay.  So as a Port Authority police officer, did

14   you even have authority to address any criminal activity going

15   on in the gazebo?

16            MR. EVASHAVIK:  Object to the form of the question.

17   BY MR. GEARY:

18   Q.    You may answer.

19   A.    Port Authority has jurisdiction on all Port

20   Authority property as well as adjacent -- anything adjacent to

21   the properties.

22   Q.    And the gazebo was adjacent to what?

23   A.    The Linear Trail and the Port Authority Hamnett

24   Station.

25   Q.    On that day, January 31, '016, did you sustain any

32

1 injuries?

2     A.    Yes.

3     Q.    Please detail for me what injuries you sustained.

4     A.    It was a mild concussion.

5     Q.    And where were you treated for that, please?

6     A.    I'm going to refer to my report for the exact name.

7 Concentra Urgent Care.

8     Q.    Concentra Urgent Care.  Thank you.

9     Did you go to a -- a hospital at any point in

10 time --

11     A.    No.

12     Q.    -- also?

13     A.    No.

14     Q.    Okay.  And when did you go to the urgent care?

15     A.    I don't know the specific dates.  I believe the next

16 day.

17     Q.    Okay.  And what location?  Where did you go?

18     A.    There's a location in Robinson.

19     Q.    And is that where you went for treatment?

20     A.    Yes.

21     Q.    And did you go there one time or several times?

22     A.    I know there were -- was a follow-up appointment.

23 How many, I can't recall.

24     Q.    But was that still at the urgent care?

25     A.    Yes.

1    Q.    Okay.  So a mild concussion.  And you went to the

2    Concentra Urgent Care in Robinson several times for the

3    treatment for the mild conclusion.  Is that correct?

4    A.    Yes.

5    Q.    Did you treat at any other medical provider for the

6    concussion?  Say, just some doctor's office in downtown

7    Pittsburgh or anything like that or a hospital?

8    A.    No.

9    Q.    Did you sustain any other injuries besides a mild

10   concussion that day?

11   A.    No.

12   Q.    Now, Exhibit 20 is -- it's your report.  Correct?

13   A.    Yes.

14   Q.    As in -- did you compose this?  You drafted

15   Exhibit 20.  Is that right?

16   A.    Yes.

17   Q.    And then 22, you did not draft Exhibit 22.  Correct?

18   A.    No.

19   Q.    Okay.  So someone from Allegheny County Police

20   Department -- maybe a Foley, Detective Foley, or someone else

21   composed that report, but you did not.  Correct?

22   A.    Correct.

23   Q.    From this entire encounter with the Kelleys that

24   day, did you compose any other reports other than the two-page

25   report marked as Exhibit 20?

1      A.    No.

2      Q.    Did you deploy force of any kind on that day at any

3   time?

4      A.    Can you define "force," please?

5      Q.    Use of force, such as OC spray, Taser, et cetera.

6      A.    Yes.  I used my OC spray.

7      Q.    Okay.  How many times did you use the OC spray?

8      A.    From my recollection, twice.

9      Q.    Okay.  Forgive me.  I have one other question about

10   medical treatment.  Did you receive any type of counseling or

11   therapy from that day with any medical provider, just so you

12   could talk out whatever happened?  Some type of -- for mental

13   health purposes -- a counselor or a therapist?

14      A.    Yes.

15      Q.    Okay.  And who was that, please?

16      A.    I do not recall her name.

17      Q.    Was it an employee of the Port Authority?

18      A.    She was referred to me via Port Authority.  I am not

19   sure if she is just who they refer Port Authority employees to

20   or not.

21      Q.    Okay.  And what was this person's name?

22      A.    I do not recall.

23      Q.    Okay.  And you went to their office how many times?

24      A.    I do not recall.

25      Q.    Okay.  And -- but you talked about your encounter

1     Q.   One moment, please.  Okay.  Please explain for me --

2  you and Adams said some things to the Kelleys.  I think you

3  said they had no verbal response?

4     A.   Initially, Bruce Kelley, Jr., just walked away.

5  Attempted to walk away.

6     Q.   And is that a crime, to just walk away from you?

7     A.   No.

8     MR. EVASHAVIK:  Object to the form.

9  BY MR. GEARY:

10     Q.   What did Bruce Kelley, Sr., do?

11     A.   I'm going to refer to my report.  I believe he

12  stayed seated.

13     Q.   Now, in your seven months working for the Port

14  Authority up until that day, would you patrol that area on

15  other shifts?  Had you done so?

16     A.   Yes.

17     Q.   And were you ever on patrol and there were people in

18  the gazebo before?

19     A.   Not that I can recall specifically.

20     Q.   Okay.  Had you ever seen Bruce Kelley, Jr., before,

21  in the seven months leading up to this day?

22     A.   No.

23     Q.   What about Bruce -- I'm sorry.  I don't know if I

24  just said "Sr." or "Jr."  I'm sorry.  So let me just repeat

25  that.

1         Did you ever see Bruce Kelley, Sr., before that day?

2    A.    No.

3    Q.    What about Bruce Kelley, Jr.?

4    A.    No.

5    Q.    Tell me what then happens.  You say Bruce Kelley,

6  Sr., remains seated.  Is it only you and Officer Adams there at

7  that point?

8    A.    Yes.

9    Q.    Okay.  Now, are you and Adams -- had you proceeded

10  into the gazebo, or are you standing outside the gazebo at that

11  point in time?

12   A.    I do not recall specifically where I entered and

13  stood, but once Officer Adams attempted to encounter Bruce

14  Kelley, Jr., I ended up going into the gazebo.

15   Q.    So Adams starts walking after Kelley, Jr.  Is that

16  correct?

17   A.    No, not after.  He was in front of Bruce Kelley, Jr.

18   Q.    Okay.  And just if you can describe "in front of."

19   A.    So Officer Adams -- if my -- the front of the

20  gazebo -- entered the front of the gazebo.  So Bruce Kelley,

21  Sr., would have been facing the street -- Jr.  Excuse me.  And

22  Officer Adams would have been facing the Linear Trail.

23   Q.    Okay.  And just so you know, again, there's a number

24  of photos in Exhibit 18, if any of these help you.  Let's go to

25  the last exhibit of 18, please.  I'll hold mine up just so

1    you -- we're looking at the same thing.

2        A.    Right.

3        Q.    It's just kind of a -- a photo where the gazebo is

4    just kind of dead center in the photo.  Now, when you say Bruce

5    Kelley, Jr., started to walk away, can you -- can you describe

6    for me where on this photo?  When he's walking away, what

7    direction was he walking?

8        A.    He would have been exiting the gazebo, so towards --

9        Q.    And the gazebo had, say, two exit areas, so to

10   speak?  Like two open spaces?

11       A.    Correct.

12       Q.    Okay.  So which one did Bruce Kelley, Jr., walk out

13   of?

14       A.    To my recollection, the -- the front, facing the

15   street.

16       Q.    The opening closest to the camera --

17       A.    Correct.

18       Q.    -- where the photo was taken?

19             Okay.  So Bruce Kelley, Jr., he starts walking

20   towards the street.  Is that correct?

21       A.    Correct.

22       Q.    Would that be Center Avenue?

23       A.    Is that Center Avenue?  The exact street, I don't

24   recall, but I believe that is Center Avenue.

25       Q.    And then Officer Adams starts walking after Bruce

1  Kelley, Jr.  Correct?

2      A.    No.

3      Q.    Okay.  What does Officer Adams do then?

4      A.    Officer Adams was standing, attempting to make

5  conversation with Bruce Kelley, Jr., and Junior continued to

6  walk towards Officer Adams and hit him in the shoulder --

7      Q.    Okay.

8      A.    -- and proceeded to attempt to walk past.

9      Q.    Okay.  I'm sorry.  I just want to get to -- you said

10  Bruce Kelley, Jr., started to walk away, correct, from the

11  gazebo towards the street?

12      A.    Yes.

13      Q.    Okay.  And you don't go after Bruce Kelley, Jr.

14  Correct?

15      A.    Not at that time.

16      Q.    Okay.  And you stay -- because Bruce Kelley, Sr., is

17  in the gazebo.  Is that right?

18      A.    Correct.

19      Q.    Okay.  So where was Officer Adams when Bruce Kelley,

20  Jr., starts walking away and toward the street?

21      A.    Officer Adams was standing into the open -- in the

22  open -- the opening of the gazebo.

23      Q.    That is closest to where the camera would have been

24  when the photo was taken?

25      A.    Yes.

40

1    Q.    Okay.  So as Kelley, Jr., is walking away, what does

2  Adams do, please?

3    A.    Adams was standing there -- excuse me -- and Bruce

4  Kelley, Jr., ran into Officer Adams and made contact with him.

5    Q.    And if you can please mark, say, an X on this last

6  photograph of Exhibit 18.  Put an X, please, where you're

7  saying Bruce Kelley, Jr., made contact with Officer Adams.

8    A.    I don't feel comfortable putting an exact X, as I

9  wasn't standing there, but I can point to the general area.

10   Q.    Okay.  Well, let's -- let's have you point to the

11  general area, first.

12   A.    Okay.  Within this area here.

13   Q.    Okay.  Can you circle the general -- just circle the

14  general area then, please.

15   A.    (Witness complies.)

16   Q.    I think I see it.  Do you -- do you mind just like

17  with your pen or your finger just kind of follow where you drew

18  the line.

19   A.    I'll make it darker.

20   Q.    Okay.  Understood.  Thank you.

21        MR. GEARY:  And, then, Greg, we'll -- we'll have to

22  mark that last page of Exhibit 18, I guess, maybe as its own

23  separate exhibit.

24        MR. EVASHAVIK:  Well, if you want to do that.  At

25  the end of the deposition, I can scan and e-mail that to

1    everybody so we'll have it.

2            MR. GEARY:  No.  Thank you.  I think we want to --

3            MR. EVASHAVIK:  And you could -- you could

4    substitute that in -- and Rita can substitute that in into the

5    attachment that she has, if you want to do it that way.  I

6    don't know.  It's up to you.

7            MR. GEARY:  No.  That's fine.  That's fine.

8            MR. EVASHAVIK:  Okay.

9    BY MR. GEARY:

10       Q.    Officer Hampy, thank you for doing that.

11            So just please describe for me.  How was Adams' body

12   positioned when you just described that Kelley made contact

13   with Adams?

14       A.    To my recollection, he was just standing.

15       Q.    And where would Adams have been from your vantage

16   point?  Say, would Adams have been directly in front of you?

17   3 o'clock?  9 o'clock?

18       A.    He would have been pretty much directly in front of

19   me.

20       Q.    Say 12 noon?

21       A.    Let's say 1 o'clock.

22       Q.    And, again, just what -- what -- how was Kelley's

23   body positioned when -- if they had contact?

24       A.    He attempted to walk past Officer Adams and threw

25   his left shoulder into Officer Adams.

1    Q.    And you saw that happen?

2    A.    Yes.

3    Q.    And you remember that specifically?

4    A.    Yes.

5    Q.    And when you say he attempted to throw his shoulder,

6    you're describing it in a way that it appeared to be

7    intentional by Bruce Kelley, Jr.?

8         MR. EVASHAVIK:  I'm going to object to the form of

9    the question.  That's not the statement that she just testified

10   to.

11        MR. GEARY:  Well --

12        MR. EVASHAVIK:  You can answer the question.

13   BY MR. GEARY:

14   Q.    Yeah.  You described he was trying to walk by Adams,

15   so I'm just trying to get -- was the touching -- did it appear

16   to you to be intentionally done by Kelley, Jr., or, say, an

17   incidental or accidental touching?

18   A.    I can't speak to the intentionality of it.  It was a

19   forceful nudge into Officer Adams as he attempted to go around

20   him.

21   Q.    And where on Adams' body was the impact with the

22   left shoulder of Kelley, Jr.?

23   A.    I believe it would have been Officer Adams' left

24   side.

25   Q.    Okay.  Were you given any training by the Port

1 Authority Police Department that you're supposed to keep a

2 certain distance from a suspect and not be so close to them

3 that they can actually touch you?

4     A.    Specifically so they can't touch you, no.

5     Q.    Well, what was the -- were you given any training as

6 far as keeping a distance from a suspect?

7     A.    I'm sure, yes.

8     Q.    And what was it?

9     A.    I don't recall.

10     Q.    Okay.  So what happens next, then, from what you

11 see?  You say there's a touching there.  What happens next?

12     A.    Officer Adams begins to try and handcuff Bruce

13 Kelley, Jr.

14     Q.    As in to arrest him?

15     A.    Yes.  As he had just assaulted him.

16     Q.    Okay.  And tell me what happens with the handcuffs.

17     A.    I'm going to refer to our report.  Officer Adams

18 gave him multiple verbal commands to comply and -- as he was

19 being placed under arrest.

20     Q.    Okay.  Were you reading that from your report?

21     A.    Yes.

22     Q.    And how close were you to, say, Adams when -- when

23 he's giving these verbal commands then?

24     A.    I don't recall exactly how close we are.  But I

25 began to assist Officer Adams as the situation escalated.

44

1    Q.    Does -- the contact between Adams and Kelley, Jr.,

2  does it occur in the gazebo or outside of the gazebo?

3    A.    In the gazebo.

4    Q.    Okay.  And when you saw the contact, you yourself

5  were in the -- standing in the gazebo.  Is that correct?

6    A.    Yes.

7    Q.    Okay.  What happens next, please?

8    A.    I am referring to my report.  Like I said, I began

9  to help assist Officer Adams place handcuffs on Bruce Kelley,

10 Jr., and giving him multiple verbal commands to comply.

11   Q.    And what were the verbal commands?  Like what were

12 you actually saying to Bruce, Jr.?

13   A.    We were letting him know that he was under arrest

14 and that we were going to put handcuffs on him.

15   Q.    And was he saying anything in response?

16   A.    At that exact moment, no.

17   Q.    Did he try to punch you at that point in time?

18 Kelley, Jr.

19   A.    At that time, he wrapped his arm around the gazebo.

20   Q.    Okay.  And in your report at 20, the first

21 paragraph, closer to the bottom, it said "Kelley, Jr., bear

22 hugged the gazebo with his right arm and would not release

23 himself from the gazebo."  Did I read that correctly?

24   A.    Yes.

25   Q.    And are those your words?

1    A.    Yes.

2    Q.    Then it says "Myself and Officer Adams continued to

3  give multiple verbal commands to comply and release himself

4  from the gazebo and that he was under arrest, however, he did

5  not comply."  What was your thought process when he's -- when

6  he's hugging -- bear hugging the gazebo?

7    A.    That he was attempting to resist arrest.

8    Q.    Okay.  Did that -- was that peculiar or odd to you

9  that he -- he hugs the gazebo?

10   A.    No.

11   Q.    Did it give you any impression he may have mental

12 health issues?

13   A.    No.

14   Q.    Or that he was, say, mentally slow?

15   A.    No.

16   Q.    Okay.  So when he's bear hugging the gazebo, his

17 back is to you.  Correct?

18   A.    Correct.

19   Q.    And his back is to Officer Adams.  Is that right?

20   A.    Correct.

21   Q.    Are there any civilians in the area now?

22   A.    Not from my viewpoint.

23   Q.    Okay.  And your report says you're giving him verbal

24 commands to comply, and I get that.  What -- what were you

25 actually saying to him?

1      A.    I don't recall specifically what I was saying at

2  that moment.

3      Q.    Okay.  Would he let go of the gazebo?

4      A.    No.

5      Q.    Okay.  What did you need to do then to get him -- to

6  get his hands off the gazebo?  Kelly, Jr.

7      A.    I repeatedly tried to pull his arm down.

8      Q.    Were you successful?

9      A.    No.

10     Q.    Okay.  So what did you do then?

11     A.    I'm going to refer to my report.  According to my

12  report, Kelley, Jr., was able to break away from the gazebo and

13  myself and Officer Adams.

14     Q.    Okay.  And you just read that from your report?

15     A.    Yes.

16     Q.    Okay.  It's fine if you refer to it.  I'd like, just

17  initially, you testify from your recollection.  What -- what

18  ultimately got Kelley to let go of the gazebo?

19     A.    I don't know what ultimately had him let go of the

20  gazebo, but his father ended up getting up and making his way

21  to us.

22     Q.    Did you strike Kelley, Jr.'s, hands with a baton to

23  get him to stop hugging the gazebo?

24     A.    No.

25     Q.    Did you strike his hands just -- say, with your

1  hands or a fist?

2      A.    Not strike but repeated attempts to grab and bring

3  his hand down.

4      Q.    And when you were grabbing, what part of his body

5  were you grabbing?

6      A.    I believe it would have been his forearm or a little

7  higher up on his arm.

8      Q.    Okay.  Did Officer Adams strike Kelley with a baton

9  to get him to stop hugging the gazebo?

10     A.    I can't attest to what Officer Adams did.  But, no,

11  I don't recall.

12     Q.    When you say "But, no, I don't recall," does that

13  mean he did not or you don't recall?

14     A.    No, not that I saw him do.

15     Q.    Okay.  Well, you're -- you're both trying to get

16  Kelley to stop hugging the gazebo.  Correct?  You and Adams?

17     A.    Correct.  Yes.

18     Q.    So Adams was in your field of vision.  Correct?

19     A.    Not entirely, no.

20     Q.    Okay.  Did Adams use any other object, even, say,

21  his own fist, to, say, punch Bruce's hands to get him to let go

22  of the gazebo?

23     A.    No.  I did not see him do that.

24     Q.    And just so the record is clear on whether Adams

25  used a baton or any other instrument -- I'm sorry -- what is

1 your answer?

2     A.    I never saw him use a baton or any other instrument.

3     Q.    But at some point, Kelley, Jr., lets go of the

4 gazebo. Right?

5     A.    Correct.

6     Q.    Okay. Please just take me a couple steps into what

7 happened, and then I'll be chiming in with questions and

8 interruptions.

9     A.    Bruce Kelley, Sr. -- he got up from the -- the bench

10 and came over to myself as Officer Adams and Bruce Kelley, Jr.,

11 broke away from the gazebo.

12     Q.    And as far as your vantage point at that time, where

13 did Kelley, Sr., come from? From your left? From your right?

14 Behind you?

15     A.    He came slightly left. To the left, in front of me.

16     Q.    And what happened, please?

17     A.    Officer Adams and Bruce Kelley, Jr., broke away, and

18 Bruce Kelley, Sr., came over and swung at me.

19     Q.    Now, did you see him swing?

20     A.    Near the end, yes.

21     Q.    Okay. Did he make contact?

22     A.    Yes.

23     Q.    Okay. When you say "swing," what do you mean

24 "swing"?

25     A.    Swung his fist and arm in an attempt to punch.

1    Q.    Which arm?

2    A.    Left.

3    Q.    And did he connect?

4    A.    Yes.

5    Q.    Where on your body did he connect with?

6    A.    My head.

7    Q.    Okay.  Please show me where -- where on your head,

8  if you could just gesture so --

9    A.    This side.

10    Q.    Okay.  So your right-hand side.  Is that correct?

11    A.    Yes.

12    Q.    And can you just do it a little slower, please?

13    A.    Just this side of the head.

14    Q.    So a couple inches above your right ear?

15    A.    I mean, the exact spot, I don't recall.  Just the

16  general right side of my head.

17    Q.    Okay.  And how did that impact your body?

18    A.    I just took steps back at that point.

19    Q.    Did the -- did the striking cause you to take a

20  couple steps back as in, like --

21    A.    Yes.

22    Q.    Okay.  What was your height and weight at the time?

23    A.    5-7 height.  Weight, roughly 140.

24    Q.    Can you give me an estimate of what Bruce Kelley,

25  Sr.'s, height and weight was?

1      A.    No, I cannot.

2      Q.    And what happens after he -- I mean, would you

3  describe that as a punch?

4      A.    Yes.

5      Q.    Was it closed fist?

6      A.    Yes.

7      Q.    Okay.  And you said you -- you take a couple steps

8  back.  What happens next, please?

9      A.    I'm going to refer to my report.  At that time,

10  Bruce Kelley, Sr., and myself just began to struggle with one

11  another.  He began throwing punches and trying to access my

12  gear on my vest.

13      Q.    I'm sorry.  Did you say "throwing punches"?

14      A.    Yes.

15      Q.    Okay.  Was that, say, left hand and right hand?

16      A.    I don't know if he used both hands or not, but I

17  just recall that was his general motions.

18      Q.    With closed fists?

19      A.    Yes.

20      Q.    How many punches did he throw at you after that

21  first initial punch that he connected?

22      A.    I do not recall.

23      Q.    Can you give me an estimate?

24      A.    No, I cannot.

25      Q.    I mean, like, did he throw two or three punches, or

1    did he throw more than 12?

2         A.    I can't estimate that.

3         Q.    Is there any reason you can't give me an estimate?

4         A.    I do -- do not recall.

5         Q.    How did you deal with those punches he was throwing

6    at you?

7         A.    I am referring to my report.  So at that time, I had

8    lost my name tag and my radio, so I gave him verbal commands to

9    stay back and to cooperate.  And at that time, he was not

10   cooperating, so I deployed my OC spray.

11        Q.    Okay.  Back to my -- sorry.  Back to my question

12   where he's taking some additional swings at you.  Did he

13   connect?

14        A.    On my physical person, no.  Just my vest.

15        Q.    Okay.  So he did make contact with your body, even

16   though it was your clothing.  Is that right?

17        A.    Yes.

18        Q.    And your -- your vest, can you just describe for

19   me -- I mean, the vest covers the front of your torso, I

20   assume?

21        A.    Yes.

22        Q.    Okay.  How many times did he connect with the --

23   your vest then?

24        A.    I don't recall how many times.

25        Q.    But it was more than once?

1    A.    Yes.

2    Q.    Were they forceful blows?

3    A.    Yes.

4    Q.    Did they knock your body back like the first punch?

5    A.    I continued, myself, to retreat backwards to try and

6    maintain a distance.

7    Q.    And when he's punching you in the vest, were you and

8    Bruce Kelley, Sr., still in the gazebo as opposed to --

9    A.    No.

10    Q.    -- outside the gazebo?

11    A.    No.  We were outside the gazebo.

12    Q.    Okay.  Could you please draw for me on the same

13    photo -- it's the last one of Exhibit 18 -- as to where you

14    were?  Obviously, we have that kind of U-shape right in front

15    of the first open space.  That's the first marking by you.  Can

16    you please just, say, put your initials and Bruce Kelley,

17    Sr.'s, initials in the area where he was punching you and the

18    blows were landing on your -- your vest, your front torso area?

19    A.    I can't specifically say.  As I said, we were

20    moving.  It was kind of constant movement.  So I can, again,

21    just show like a general area where the first encounter took

22    place.

23    Q.    Okay.  When you say "first encounter," what are you

24    describing as first encounter?

25    A.    The first time that I deployed my OC spray to

1    Mr. Kelley, Sr.

2        Q.    Okay.  I want you to mark on that photo where you

3    were and where Bruce Kelley, Sr., was when he was punching you

4    and connecting with your vest.

5        A.    It's the general area.  Again, I'm just going to

6    circle.  I'll make it darker.  The second.

7        Q.    Okay.  Could we -- just for later when we're looking

8    at this, could you maybe put a small No. 1 kind of in the

9    bottom of the first loop and a No. 2 so we'll know that the

10   first marking, No. 1, was your first, the second marking was

11   your second, if that's okay.

12       A.    Yes.

13       Q.    Yep.  Thank you.  Thank you.

14             So at that point, you deploy your -- your OC spray.

15   Is that right?

16       A.    Yes.

17       Q.    Is pepper spray the same thing as OC spray?

18       A.    Yes.

19       Q.    And is it -- is mace the same thing as OC spray?

20       A.    Yes.

21       Q.    Okay.  So tell me about -- where on your body was

22   the OC spray?

23       A.    It's been a while since I wore my vest, but I

24   believe -- my belt -- excuse me -- it was on my right side.

25       Q.    Okay.  And tell me about your deployment of the OC

1 spray towards Bruce Kelley, Sr.

2     A.    I would have just grabbed it, warned him that I was

3 going to spray him if he did not comply and retreat, to which

4 he did not.  So it would have just been a spray into his eyes.

5     Q.    So you did give him one warning?

6     A.    Yes.

7     Q.    And what was his response to the warning?

8     A.    He continued to make way towards me, so he did not

9 comply.

10     Q.    He's still coming at you?

11     A.    Yes.

12     Q.    Okay.  And then when you deploy the OC spray, are

13 you supposed to deploy it, say, just once or two times or a

14 certain number of times?

15     A.    The objective is to incapacitate the individual to a

16 point where you can get them to either comply or they're no

17 longer a threat at that exact moment.  So I sprayed him to the

18 point where he reacted to it.

19     Q.    So how many times did you spray it then?

20     A.    I believe it was just one consecutive spray.

21     Q.    Okay.  Okay.  I under- -- so you can hold it down.

22 And, like, the duration of the spray can go more -- a little

23 bit longer if you hold it down?

24     A.    Yes.

25     Q.    Okay.  Thank you.  And you were aiming for his eyes.

1  Is that correct?

2      A.    Yes.

3      Q.    And did you get it in his eyes?

4      A.    I believe so, yes.

5      Q.    And what was his reaction to that?

6      A.    I'm going to refer to my report.  I believe that it

7  incapacitated him for a brief period of time, as I was able to

8  retreat at that point.

9      Q.    And the deployment of the OC spray by you, would

10  that be considered in your employment with the Port Authority

11  Police Department a use of force?

12      A.    I can't recall their exact use of force policy, but

13  I believe so.

14      Q.    Do you know if you filled out any type of use of

15  force form later that day or in the weeks that followed from

16  this incident in light of your use of the OC spray on Bruce

17  Kelley, Sr.?

18      A.    No.

19      Q.    Is it, no, you don't remember; or, no, you did not?

20      A.    No, I do not remember.  But I do not believe I

21  filled out a form.

22      Q.    And when you retreated, what did you do?

23      A.    I attempted to help Officer Adams, who was currently

24  struggling with Bruce Kelley, Jr.

25      Q.    And where -- if you would -- where on that photo

1  that you've marked twice, where are Adams and Kelley, Jr.,

2  struggling at that point in time?

3        A.    The general area over here closest to the wall.

4        Q.    Thank you.  If you wouldn't mind, if you could do,

5  like, a third arch there and mark it No. 3.  I appreciate it.

6        A.    (Witness complies.)

7        Q.    Thank you.  What did you do then?

8        A.    I'm just referring to my report.  So Officer Adams

9  and Bruce Kelley, Jr., were struggling, as I mentioned.  And

10 Officer Adams was attempting to put handcuffs on him, so I

11 attempted to assist in that.

12       Q.    And at one point, was Adams successful in getting

13 Kelley, Jr., on the ground?  By himself, Adams dealing with

14 Kelley, Jr.

15       A.    Yes.  That's correct.

16       Q.    Okay.  Did you have to deal with Bruce Kelley, Sr.,

17 again in the moments that follow?

18       A.    Yes.

19       Q.    Please tell me how.

20       A.    I am referring to my report.  While attempting to

21 assist Officer Adams place handcuffs on Bruce Kelley, Jr., I

22 looked up and observed Bruce Kelley, Sr., walking in our

23 direction, to which I gave him multiple commands to comply and

24 stay back and to not interfere with the arrest of Bruce Kelley,

25 Jr.

1    Q.    Did Kelley, Sr., listen to your commands?

2    A.    No, he did not.

3    Q.    And did you deploy your OC spray again?

4    A.    Yes, I did.

5    Q.    Was that successful?

6    A.    I believe he was again incapacitated for a brief

7    period of time, and I went back to assist Officer Adams.

8    Q.    Thank you.  And I'm looking at your report,

9    Exhibit 20, second paragraph.  The last sentence says "I pushed

10   Kelley back and onto the ground and again attempted to help

11   Officer Adams subdue Kelley, Jr."  Is that correct?

12   A.    Yes.

13   Q.    And is that what happened?

14   A.    Yes.

15   Q.    So you actually were able to push Kelley, Sr., to

16   the ground.  Correct?

17   A.    Yes, I -- I do believe he fell down.  As I was

18   attempting to create distance and spray him and create a

19   distance, pushed back from him, he did fall.

20   Q.    It says "I pushed Kelley back."  I mean, did you

21   actually touch him?  You pushed him?

22   A.    Yes.  To create a distance.

23   Q.    And he fell to the ground?  Kelley, Sr.

24   A.    He did, yes.

25   Q.    Okay.  Question, please:  Back to the two suspicious

1  individuals ducking behind the sound wall or whatever the wall

2  was.  You said there were problems with, I think, robberies,

3  graffiti near the Linear Trail.  Is that correct?

4      A.    Yes.  That's a known problem area.

5      Q.    And what is the known problem area?

6      A.    The Linear Trail, in general, has seen a number of

7  robberies, drug activity, et cetera, in that vicinity.

8      Q.    So, say, in the seven months in your tenure with the

9  police department there, up until the day this happened with

10  the Kelleys, had you personally arrested people for robberies

11  on that Linear Trail?

12      A.    Personally, no.

13      Q.    Okay.  Had you issued any, say, summary citations

14  for loitering or graffiti on the Linear Trail?

15      A.    Personally, no.

16      Q.    Okay.  How do you know there was a problem, then,

17  with robberies, graffiti, and loitering near the Linear Trail?

18      A.    During my training, some of the senior officers or

19  training officers will, you know, tell you -- teach you about

20  certain zones that you're in and where they see a lot of

21  activity, just so we have a heightened awareness.  To protect

22  our patrons that are going through those areas, we make it a

23  point to do recent and -- patrol zones and things in the area.

24      Q.    And -- and who told you there were problems with

25  those types of crimes on the Linear Trail?

1    A.    I can't recall specifically who.  Just that it was

2  brought to my attention that that was an area that we do patrol

3  zones and keep an eye out for our patrons.

4    Q.    And you would patrol that area.  Whether there were

5  problems or not, I mean, that's an area you would patrol

6  routinely.  Correct?

7    A.    Correct.

8    Q.    Question about training.  You were provided use of

9  force training.  Is that right?

10    A.    I believe so.

11    Q.    And were you taught something about the continuum of

12  force?

13    A.    In the police academy, yes.

14    Q.    Okay.  Did you receive any use of force training

15  after you started at the Port Authority Police Department?

16    A.    I can't recall specifically the training.

17    Q.    Okay.  What -- what's the continuum of force?

18    MR. EVASHAVIK:  Object to the form of the question.

19    THE WITNESS:  Honestly, I'm so far removed from

20  police work, you'll have to excuse, you know, my jargon, if you

21  will.  But it's just kind of the level of the force.  So you'll

22  start with the OC spray, you know, non-deadly.  It progresses.

23  You have your baton.  You have your Taser.  And if need be,

24  there's a continuum.  You draw your weapon, et cetera.

25    MR. GEARY:  Now, I don't think I have that much

61

1    It's not actually referred to by the last names.  That's just

2    how it got the acronym, the founders.  It's just part of their

3    history.

4        Q.    And as far as the session you had as far as

5    counseling, did you give any thought to who that -- who that

6    was?

7        A.    I do not recall her name.

8            MR. GEARY:  Okay.  Again, just in this case, I'll

9    ask Mr. Evashavik for that.  I'll get a letter out, if you can

10   research that for me.

11   BY MR. GEARY:

12       Q.    We are back to your description.  You were dealing

13   with Bruce Kelley, Sr.  Officer Adams was dealing with Bruce

14   Kelley, Jr.  Again, just trying to go in a chronology.  And you

15   explained about your two deployments of the OC spray at Kelley,

16   Sr.  And if you could just describe next, you know, what played

17   out, please.

18       A.    Yes.  I am referring to my report.  As I mentioned,

19   Bruce Kelley, Sr., was on the ground.  And once he attempted to

20   get up, I retreated and broke contact with Officer Adams and

21   Bruce Kelley, Jr., in an attempt to put handcuffs on Bruce

22   Kelley, Sr.

23       Q.    And what happened when you tried to put handcuffs on

24   Senior?

25       A.    I was unsuccessful in doing so.  As I observed

62

1    Officer Adams and Bruce Kelley, Jr., their altercation had
2    escalated, so I stopped what I was doing.
3        Q.    And question:  When you're trying to put a suspect
4    in handcuffs, I assume -- are you -- is the goal to have them
5    handcuffed behind their back?  Is that correct?
6        A.    Yes, sir.
7        Q.    Is handcuffing with the -- in front of them, is that
8    ever an option?
9        A.    I -- I can't speak to when that would be
10   appropriate, but in this instance it was not.  I attempted to
11   handcuff him behind his back.
12       Q.    And when you say things between Adams and Kelley,
13   Jr., had escalated, please detail for me what you saw as far as
14   escalation.
15       A.    I am referring to my report, but I observed them
16   struggling, fighting as Officer Adams was attempting to place
17   handcuffs on him.  And I observed Bruce Kelley, Jr., pull a
18   knife out from underneath him and reach backwards towards
19   Officer Adams.
20       Q.    And when you say "fighting" --
21       A.    Resisting arrest.
22       Q.    Okay.  Was -- was Bruce Kelley, Jr., trying to punch
23   Adams?
24       A.    There was a period of time I did not observe, so I
25   cannot speak to the entire incident.  But at that moment, all I

1  reached backed -- or looked back and saw was Bruce Kelley, Jr.,

2  reaching backwards with the knife.  Anything that happened

3  prior to that, I can't speak to between them as I did not see

4  it.

5       Q.    Yeah.  No.  I understand you didn't see the entire

6  interaction between Adams and Kelley, Jr.  I understand that.

7  But to the extent -- whatever you did see, interaction between

8  Kelley, Jr., and Adams, did you see Kelley, Jr., at any time

9  punch Adams?

10      A.    No.

11      Q.    Did you see Kelley, Jr., try to punch Adams?

12      A.    No.

13      Q.    Did you see Kelley, Jr., knee Adams?  Like, knee him

14 in the stomach or somewhere on his body?

15      A.    I did not see any of that happen.

16      Q.    Did you see Kelley try to knee Adams?

17      A.    No.  Most of the time they were -- they were behind

18 me, so I -- I did not see that.

19      Q.    Okay.  Now, what -- what did you see about a knife?

20      A.    I looked back at Officer Adams to ensure that he was

21 okay.  And I saw Bruce Kelley, Jr., pull a knife with his right

22 hand out from underneath him and reach backwards.

23      Q.    And was Bruce Kelley standing when he did that?

24 Sitting?  Or other?

25      A.    Other.

1    Q.    How -- where was Bruce Kelley?  Like, how was his

2  body positioned?  Or was he on the ground?

3    A.    He was on the ground.

4    Q.    Okay.  Like, how was his body positioned on the

5  ground?

6    A.    I don't specifically recall if he was prone or on

7  his knees and down.  I just know that the majority of him was

8  on the ground.  Specifically whether it was fully prone or on

9  his knees, I don't recall.  But he was on the ground.

10    Q.    And where was Adams' body in relation to Kelley's

11  body?

12    A.    He would have been behind him and to the side.

13    Q.    And did the knife have a -- a color to it or the

14  handle?  You may have said it.  I don't know.

15    A.    I'm going to refer to my report first.  In my report

16  specifically, I just indicated that I saw a knife.  There was a

17  knife.

18    Q.    Do you recall, say, the length of the blade of the

19  knife?

20    A.    I do not recall the length.

21    Q.    Okay.  What -- if you could keep going, what do

22  you -- what transpires next?

23    A.    I'm referring to my report, but Officer Adams yelled

24  "Knife."  And at that point we both retreated from both

25  individuals to create a safe distance because of the knife.

1      Q.    And then what did the two -- the two Kelleys do when
2  you both retreated?
3      A.    I'm referring to my report.  Yes.  I note this in my
4  report, but we had both deployed our OC spray, as I had
5  mentioned.  And, oftentimes, there can be a spray-back with
6  that, and it can get in your eyes.  So at that time, we both
7  just retreated, collected our bearings.  And we observed Bruce
8  Kelley, Jr., to be exiting towards the trail.
9      Q.    Your reference to OC spray, did you get OC spray in
10 your eyes?
11     A.    Yes, I did.
12     Q.    And did Adams get some in his eyes?
13     A.    I can't speak for him on that, but I do believe that
14 he did feel some effects of that as well.  Specifically, I'm
15 not sure how much and how he was feeling, but...
16     Q.    And when you say you two retreated and Bruce Kelley,
17 Jr., exited -- I think you said toward the trail or the steps
18 toward the trail.  If we could look at that photo, the same one
19 you've marked three times.  And, again, it's -- it's this one.
20 Behind the gazebo, you can see the steps that lead up to the
21 trail.  Is that correct?
22     A.    Yes.
23     Q.    So is Kelley, Jr., walking in that direction?
24     A.    Yes.
25     Q.    And did he actually start walking up the steps?

1    A.    I do believe, yes.

2    Q.    And when you and Adams retreated, can you point out

3  to me what area you retreated to?  Even if it was just

4  momentarily.  You don't have to draw on it.  Can you just first

5  kind of show me with your finger?  I don't know if I need you

6  to mark it.

7    A.    Yes.  It was just momentarily, to create distance

8  from the knife while he was still within close proximity.  So

9  we would have just backed up closer in this area.

10    Q.    Okay.  If you don't mind, just so we'll be thorough,

11  if you could do, I think, a fourth little arch there with a

12  No. 4, please.  That's where you and Adams retreated to.  I

13  appreciate that.

14    A.    (Witness complies.)

15    Q.    And I think you're going to mark it with a little

16  No. 4 as your fourth marking on that photo.  Thank you.

17    A.    (Witness complies.)

18    Q.    What did Bruce, Sr., do?

19    A.    I am referring to my report.  But he, I believe, was

20  still just down -- he remained at the site.  We left him at the

21  gazebo.

22    Q.    Was he in handcuffs yet?

23    A.    I do not recall whether or not I was successful in

24  getting handcuffs on him at that time.

25    Q.    Okay.  Now, at that point in time, are you and

1 Officer Adams still the only two officers at that scene?

2     A.    No.

3     Q.    Okay.  Did another officer or officers arrive?

4     A.    Yes.  One officer arrived.

5     Q.    And do you know who the officer was?

6     A.    Officer Granger.

7     Q.    And when in this interaction did Granger arrive?

8 Approximately.

9     A.    Officer Granger would have arrived after Bruce

10 Kelley, Jr., drew the knife and myself and Officer Adams

11 retreated.  I believe he was up and standing at that time.

12     Q.    I'm sorry.  I just didn't catch that last part,

13 something about standing at that time.

14     A.    Yes.  Bruce Kelley, Jr., was off the ground and

15 standing at that time.

16     Q.    What did you tell -- what's everything you told

17 Granger as far as getting him up to speed with what was going

18 on?

19     A.    I don't recall any conversation with Officer

20 Granger.  I'm not sure if Officer Adams said -- said anything

21 or not.  That's something I don't recall.

22     I'm going to refer to my report.  Yes.  So as my

23 report notes, Officer Granger arrived and began giving verbal

24 commands to him, and he did not comply as well.

25     Q.    And just so we're clear as to "him," is it Junior or

1  Senior?

2      A.    Junior.

3      Q.    And as Bruce Kelley, Jr., is going up the -- the

4  steps or the stairs to the Linear Trail, was he running or

5  walking?

6      A.    He was walking.

7      Q.    And as you watch -- did you watch him go as he's

8  going up the stairs?

9      A.    I don't know that I watched him go up the stairs.

10  As I said, there was a few moments where we were collecting our

11  bearings from the spray.  But I do recall seeing him in that

12  general direction, going that way.

13      Q.    Were there any citizens coming down the stairs or

14  also going up the same stairs that Kelley, Jr., was walking?

15      A.    From my point of view, at that moment, no.

16            THE REPORTER:  I didn't hear the very beginning.

17            THE WITNESS:  From my point of view, at that moment,

18  no.

19            THE REPORTER:  Thank you.

20  BY MR. GEARY:

21      Q.    Thank you.  And what do you then do next in this

22  encounter as Kelley is going up the stairs?  Junior.

23      A.    I am referring to my report.  Myself, Officer Adams,

24  and Officer Granger then went up the stairs as well and headed

25  toward the trail.

1    Q.    And when Kelley, Jr., gets to the top, does he go

2 left or right?

3    A.    Left.

4    Q.    And is it true -- when he gets to the top of the

5 stairs, that's where the Linear Trail is.  Correct?

6    A.    Correct.

7    Q.    And he could have gone left or right, is that

8 correct, on the trail?

9         MR. EVASHAVIK:  Object to the form.

10         THE WITNESS:  Yes.  I'm not sure how far the trail

11 continues to the right, but, yes, the primary trail goes to the

12 left.

13 BY MR. GEARY:

14    Q.    Thank you.  And did you and the other two officers

15 follow him?

16    A.    Yes.

17    Q.    And, say -- how long did you follow him on the

18 Linear Trail, say, in minutes?  An estimate in minutes.

19    A.    I don't know how long we were on the trail.  I do

20 not believe it was very long, but I can't speak to exactly how

21 long.

22    Q.    What about, say, a distance?  You followed him X,

23 you know, some estimate as to distance that you followed Bruce

24 Kelley, Jr., on the Linear Trail.

25    A.    I also can't -- I don't want to guess the distance.

1  I'm not comfortable with that.  So I'm not sure how far, that

2  I'm aware.

3      Q.    And as you're following him, obviously, I mean,

4  you're looking at him.  Right?  Kelley, Jr.

5      A.    Correct.  When we were within close enough

6  proximity, we could see him, yes.

7      Q.    And he's walking away from you down the Linear

8  Trail.  Correct?

9      A.    Correct.

10     Q.    Are there woods on the left?  His left.

11     A.    Yes.

12     Q.    And to his right, is it the busway?

13     A.    Yes.

14     Q.    And where he was walking there, was there that --

15  that sound wall or the wall, was that in that area as well?

16     A.    Yes.

17     Q.    Could he have walked onto the busway, or did the

18  wall prevent people from walking onto the busway?

19     A.    The wall, sort of the duration of the trail, mostly

20  prevents one from being able to access the busway.

21     Q.    Okay.  Thank you.  At some point, what do you see

22  Kelley -- well, as Kelley, Jr., is walking down the Linear

23  Trail there, were there any civilians on the Linear Trail?

24     A.    No civilians on the trail.

25     Q.    And what do you see him do at a certain point?

1      A.      I'm referring to my report.  My report notes because

2   other officers were coming from the other direction, there were

3   periods of time where we stepped off into those woods, so we

4   would lose periodic sight of Bruce Kelley, Jr.  And the radio

5   must have indicated that he had gone into the woods, as well,

6   so we walked from the trail into the woods.

7      Q.      Thank you.  I have an overall question on

8   Exhibit 20, which is your report.  We're almost done with your

9   involvement that day.  But your report here, Exhibit 20, you

10  composed this, again.  Is that right?

11     A.      Yes.

12     Q.      And then a supervisor, N. Mitchell, signed off on

13  this.  Is that right?

14     A.      Yes.

15     Q.      So are the contents of your report here true and

16  accurate to the best of your knowledge, information, and

17  belief?

18     A.      Yes.

19     Q.      Okay.  Thank you.  And then on Exhibit 22 -- I know

20  this is a summary of your interview.  Have you had a chance to

21  read this?

22     A.      Yes.

23     Q.      Okay.  And are the contents of -- this summary of

24  your interview and what you said, is it true and accurate?

25     A.      Yes.

1      Q.    Okay.  And just so you know, I just want to give you

2   the opportunity if there's something in here that you did not

3   say -- if in the summary of the interview, there's something

4   you did not say or you disagree with any of its contents, I

5   just want to give you the chance now to make any, you know,

6   corrections.  You -- you can take a moment and look at it.

7      A.    Yeah.

8            MR. EVASHAVIK:  I'm instructing the witness to read

9   it.

10           MR. GEARY:  Sure.  Yeah.

11           THE WITNESS:  They actually do have a mistake in

12   here that I would like to note.

13   BY MR. GEARY:

14     Q.    Sure.  Go ahead.

15     A.    They just note that he -- Bruce Kelley, Sr., struck

16   me on the left side of my head, but it was right.

17     Q.    Okay.  Is that on page 1 of 2?

18     A.    Yes.  It's in the second paragraph, about -- the

19   second paragraph, around midway through.  The third paragraph.

20   I'm sorry.  Third paragraph, midway through.

21     Q.    Okay.  Can you just please just read aloud the

22   sentence you're talking about as it is and then state what your

23   correction is.

24     A.    Yes.  The line says "She said that Kelley, Sr.,

25   engaged her.  She said that he threw a punch which grazed the

1  left side of her head."

2      Q.    Okay.  And that should have said what?

3      A.    Right side.

4      Q.    Okay.  Thank you.  Anything else?  Take your time.

5      A.    I believe that is the only thing.

6      Q.    Thank you.  So aside from that one change, does the

7  rest of this summary accurately memorialize the statements you

8  gave to Detective Foley that day?

9      A.    Yes, to the best of my recollection.

10      Q.    One question.  Third paragraph.  I think it's the

11  second sentence, "She said he walked away defiantly."  Third

12  paragraph, maybe second sentence.  Do you see that?

13      A.    Yes.

14      Q.    Could you describe, what do you mean by "defiantly,"

15  please?

16      A.    Yes.  Officer Adams had told him -- or just tried to

17  engage with him, make conversation, asked him to stop, as I

18  said, to inquire what they were doing there.  And he continued

19  to not comply with those commands, pushed past Officer Adams,

20  hitting him in the process.  So he defiantly walked away.

21      Q.    And he pushed Officer Adams?

22      A.    The shoulder, the nudge.

23      Q.    Okay.  Yeah.  I didn't know if there was some

24  touching separate from the shoulder touching that we already

25  went over.

74

1    A.    No.  Just the initial that I had mentioned.

2    Q.    Okay.  Please walk me through.  You're on the Linear

3    Trail.  Did you have your gun out at any point?

4    A.    I don't recall specifically at what point and when

5    it would have been out, but at some point I do believe that it

6    was out.  At what point I took it out and put it back, I don't

7    recall.

8    Q.    Do you know if it was out of your holster more than

9    once in this encounter?

10   A.    I can't recall.

11   Q.    Okay.  So tell me what happens.  You're on the

12   Linear Trail.  At a certain point you go behind some trees.  I

13   think you described you lost sight of Bruce Kelley, Jr.  Just

14   in the chronology of events, if you could just walk us through

15   until the end of this situation.

16   A.    Yes.  So as we tucked into the woods, there were

17   various periods of time where I lost sight of Bruce Kelley,

18   Jr., as he was going through the woods or through houses.  We

19   would do our best to follow in the general direction, according

20   to what we were hearing on the radio.  And so, essentially,

21   there was a period of time where we no longer could see Bruce

22   Kelley, Jr.  And over the radio -- or excuse me -- not over the

23   radio.  We were just able to hear shots had been fired at -- at

24   one point.

25   Q.    And precisely where were you when you -- I'm sorry.

1   Did you hear shots over the radio or just, like, with your ear?

2       A.    With my ear I first heard them, and then

3   subsequently it came over the radio.

4       Q.    And where were you, please, when you heard shots

5   that were fired?

6       A.    I don't know specifically what street, but I just

7   recall being in a yard, in a backyard.

8       Q.    Do you have, say, a cross-street or something like

9   that?  A reference point?

10      A.    No, I do not.

11      Q.    Do you know if your gun was out of its holster when

12  you heard those shots?

13      A.    No, I do not.

14      Q.    Were there any other officers near you when you

15  heard those shots?

16      A.    Yes.

17      Q.    What officers were near you?

18      A.    The only person I know specifically was Officer

19  Adams, as we remained together the entire time.  Who else, I'm

20  not entirely sure.

21      Q.    And if you can go to 22, the summary of your

22  interview, please.  It's the second page, the final paragraph.

23  I think it's about the third sentence from the bottom of the

24  final paragraph.  The paragraph starts "Officer Hampy said as

25  they got parallel with the busway"...  I'm counting it as the

1    seven shots.  Is that correct?

2        A.    Yep.

3        Q.    When you heard the shots, what did you do?

4        A.    We continued to the scene, based on what radio

5    was -- was coming through the radio.  So we ended up just going

6    through some backyards and ended up at the scene.

7        Q.    And when you get to the scene, that means you're on

8    Whitney Avenue.  Is that correct?

9        A.    Yes.

10       Q.    And tell me what you saw when you get onto Whitney

11   Avenue and get to the scene.

12       A.    I saw officers rendering aid to Mr. Kelley, Jr., and

13   at that time I believe also putting handcuffs on.

14       Q.    Which officers were -- were doing that?  Rendering

15   aid and putting handcuffs on him.

16       A.    I believe there were a couple, but I specifically

17   remember Officer Ravotti rendering aid.

18       Q.    Where was Kelley, Jr.'s, body?  Meaning was it in

19   the street?  On the sidewalk?  In a yard?  Where was his body?

20       A.    I believe it was a -- a front yard.

21       Q.    And when you saw his body there, where were -- what

22   was your vantage point?  When you first see his body and

23   there's officers rendering aid to him, what was -- what was

24   your vantage point as far as where were you on Whitney?

25       A.    Essentially it was a bird's-eye view.  I was able to

1  questions.

2                        EXAMINATION

3  BY MR. EVASHAVIK:

4      Q.    All right.  You, in your -- in answering the

5  questions today posed by Mr. Geary, you frequently and

6  regularly referred -- referred to your written report,

7  Deposition Exhibit 20.  Why is that?

8      A.    This was 4 1/2 years ago now, so the memories aren't

9  completely there.  So I'm just using it as a reference point to

10  accurately describe what happened that day.

11      Q.    And when you made the written report, were the

12  events fresh in your mind?

13      A.    Yes.

14      Q.    And were the events fresher in your memory then as

15  opposed to today?

16      A.    Yes.

17      Q.    But you did review the report identified as

18  Exhibit 20.  And do you believe, to the best of your knowledge

19  as we sit here today, that everything you wrote in there is

20  true and correct?

21      A.    Yes.

22      Q.    When you approached the gazebo area and first

23  encountered Kelley, Sr., and Kelley, Jr., did you and/or

24  Officer Adams identify yourselves as police officers?

25      A.    Yes.  We both did.

1     Q.   Okay.  Did you do anything before that, or was that

2  the -- the thing that you did initially upon coming into

3  contact with them?

4     A.   That was initially what we -- we identified

5  ourselves.

6     Q.   Okay.  You testified --

7     THE REPORTER:  I'm sorry.  I didn't hear the

8  witness's answer.  "That was initially when" --

9     THE WITNESS:  We would have identified ourselves

10  first.

11  BY MR. EVASHAVIK:

12     Q.   And as you've testified earlier, Adams asked a

13  question of -- was it both Junior and Senior, or was it

14  directed to Junior?  Do you remember?

15     A.   Which part?  I'm sorry.

16     Q.   When Adams asked the question.  You said you wanted

17  to ask them what they were doing or something --

18     A.   Right.

19     Q.   -- was said.

20     A.   And generally directed at both.

21     Q.   And did either one of them respond?

22     A.   No.

23     Q.   And how much time passed, approximately, from the

24  time that nobody answered the question that Adams posed that

25  you already talked about until Kelley, Jr., put his shoulder

1  into Adams, as you've already testified to, and pushed past

2  him?

3      A.    The entire incident was only roughly, like, three to

4  five minutes, so it was only --

5      Q.    When you say "the entire incident" --

6      THE REPORTER:  I didn't hear the very end.  I'm

7  sorry.  I'm sorry.  I did not hear the very end.

8      THE WITNESS:  The entire incident only lasted about

9  three to five minutes.  So that initial shoulder into Officer

10  Adams would have been very -- fairly quickly, within a matter

11  of seconds, if not --

12  BY MR. EVASHAVIK:

13      Q.    All right.  So when you say "the entire incident,"

14  from the time you walked to the gazebo area and identified

15  yourselves as police officers until Kelley, Jr., pulls out the

16  knife, approximately how much time?  Is that three to five

17  minutes?  Lesser?  Longer?

18      A.    Yes.  Three to five minutes.

19      Q.    All right.  And during that time, all the things

20  occurred that you've already talked about, including your

21  interaction with Kelley, Sr., and Adams' interaction with

22  Kelley, Jr., that you observed.  Is that correct?

23      A.    Yes.

24      Q.    At any time, did Kelley, Jr., comply or cooperate

25  with the verbal commands that were given by Officer Adams and

1  yourself in the gazebo area?

2      A.    No.

3      Q.    And when you were attempting to assist Officer Adams

4  to take Kelley, Jr., into custody and handcuff him, were you at

5  any time struck by Kelley, Jr., during your attempts to do so?

6      A.    Yes.

7      Q.    All right.  Explain how that happened.

8      A.    Officer Adams was attempting to put handcuffs on

9  Bruce Kelley, Jr.'s, left hand.  I was attempting to grab his

10 right hand, to which he swung backwards and was able to make

11 contact.

12     Q.    Okay.  Where did he contact your body?

13     A.    The left side of my head.

14     Q.    All right.  And you're pointing to that now?

15     A.    Yes.

16     Q.    And what part of his body was used to contact the

17 left side of your head?

18     A.    Hand.  Fist.  I don't know whether it was open or

19 closed, but right hand.

20     Q.    And this is Kelley, Jr.?

21     A.    Yes.

22     Q.    All right.  And this was before he pulled out the

23 knife?

24     A.    Yes.

25     Q.    How did you lose your name tag and radio?  What

1  happened?

2      A.    I lost both my name tag and radio when I was

3  struggling with Bruce Kelley, Sr.

4      Q.    Okay.  Did he -- how many times -- well, strike

5  that.

6            You already testified that Kelley, Sr., struck you

7  once in the face with a closed fist.  Is that correct?

8      A.    Yes.

9      Q.    And did he make contact with your body with any

10 other punches that he threw?

11     A.    Just in my vest area, which would be my chest in

12 general.

13     Q.    And where is your name tag typically?  Where would

14 that be?

15     A.    My name tag was on my left chest, by my heart.

16     Q.    And where would the radio be?

17     A.    My radio was on my right hip, the base of it.  And

18 my microphone came around my right shoulder and connected to

19 the center of my chest.

20     Q.    Did you see Kelley, Jr., pull out the knife when

21 Officer Adams was attempting to place him in handcuffs?

22     A.    Yes.

23     Q.    And did you see -- what did he -- how did he hold

24 the knife?  Did he -- did he just keep in front of him?  Did he

25 move it in any direction?

1    A.    He had it in his hand like so and --

2    Q.    Okay.  So you're holding -- let's just --

3          THE REPORTER:  I apologize, Counsel.  The witness

4    needs to repeat that, please.  I didn't get it.

5          THE WITNESS:  He held it in his hand, his right

6    hand, and swung backwards.

7    BY MR. EVASHAVIK:

8    Q.    All right.  And you're holding right now a pen in

9    your hand.  Okay.  And he swung it backwards?

10   A.    Yes.  Kind of on a backwards angle.

11   Q.    Towards -- where was Adams at the time?

12   A.    He would have been behind and off to the left.

13   Q.    Okay.  During your pursuit, which you talked about,

14   through the Wilkinsburg area -- and you said you periodically

15   saw Kelley, Jr., then you would lose sight of him.  Is that

16   correct?

17   A.    Yes.

18   Q.    And were you listening to radio reports during this

19   time?

20   A.    Yes.

21   Q.    And during that pursuit prior to hearing the shots,

22   did you see any civilians outside in the area where you were

23   walking in pursuit of Kelley, Jr.?

24   A.    Yes.

25   Q.    Where did you see them?

1       A.     The exact names of the streets, I can't recall.  But

2   they were just generally out in the area and on the streets,

3   coming out of their homes.

4       Q.     Did you have an opinion during this encounter with

5   Kelley, Jr., whether or not he was or was not actively

6   resisting arrest?

7       A.     Yes.

8       Q.     What was your opinion?

9       A.     He was actively resisting arrest.

10      Q.     And did you have an opinion during your encounter

11  with Kelley, Jr., whether he was or was not attempting to evade

12  arrest by flight?

13      A.     Yes.

14      Q.     What was your opinion?

15      A.     That he was attempting to evade arrest by flight.

16      Q.     And did you have a belief during your encounter with

17  Kelley, Jr., whether he posed an immediate threat to the safety

18  of you and/or other officers or civilians?

19      A.     Yes.

20      Q.     What was your opinion?

21      A.     That he was a threat.

22          MR. EVASHAVIK:  Those are all the questions I have,

23  Noah.

24          MR. GEARY:  I think I just have four follow-up.

25                          EXAMINATION

1  BY MR. GEARY:

2      Q.    Ma'am, as far as -- you say you were struck in the

3  left side of the head by Kelley, Jr., as Adams is trying to

4  handcuff him.  Is that correct?

5      A.    Yes.

6      Q.    And do you know if that -- is your impression that

7  that was an intentional striking of you by Kelley, Jr.?

8      A.    No.  It -- I don't know that it was intentional in

9  where, just an attempt to get me away from him and off of him.

10     Q.    What part of Kelley, Jr.'s, body impacted the left

11  side of your head?

12     A.    Whether it be part of the arm or hand, I don't

13  recall exactly.  Just that it came back from here.

14     Q.    And how would you describe the impact there?  Was

15  it, say, minor?  Moderate?  Severe?

16     A.    Moderate.

17     Q.    And as far as reference to civilians or citizens

18  that may have been out in their yard or in -- on the sidewalk,

19  did Kelley, Jr., at any time walk towards any civilians?

20     A.    I -- there were periods of time that I did not see

21  him, so I can't say for sure whether or not he did.

22     Q.    But what about -- I'm sorry.  What about when you --

23  you know, he was in your field of vision and you are looking at

24  him?

25     A.    Right.  On the trail, I -- I did not see him in

1    front of any civilians.  But there was, like I said, a period

2    of time where I did not see him.

3         Q.    Okay.  Did he verbally threaten any civilians at any

4    time?  Kelley, Jr.

5         A.    No.

6         Q.    Did he try to stab or slash at any civilians in the

7    whole encounter?

8         A.    I can't speak for the whole encounter, but when he

9    was in front of me, no.

10        MR. GEARY:  Okay.  Thank you, ma'am.  That's all I

11   have.

12        MR. EVASHAVIK:  Just one more.  Sorry.  One more

13   follow-up.

14                        EXAMINATION

15   BY MR. EVASHAVIK:

16        Q.    During this encounter in the gazebo area, do you

17   know whether or not Officer Adams suffered any injury during

18   his engagement with Kelley, Jr.?

19        A.    He did.

20        Q.    Okay.  How do you know that?  Did you see something?

21        A.    I did.  I recall blood on his hand.  I'm not -- I

22   can't recall which hand, but I do remember seeing that he was

23   bleeding.

24        MR. EVASHAVIK:  That's all I have.

25        MR. GEARY:  Just one follow-up.  I'm sorry.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


CALISIA KELLEY; and                    CIVIL ACTION
JOHNNIE MAE KELLEY,
Co-Administrators of the               No. 2:17-cv-01599-NBF
ESTATE OF BRUCE KELLEY,
JR., deceased,

Plaintiffs,

vs.                                    TRANSCRIPT

BRIAN O'MALLEY, both in his            DEPOSITION OF
Official and Individual                ANDREW KAUPINIS
Capacities as Sergeant for
the Allegheny County Port
Authority; and DOMINIC
RIVOTTI, in both his
Official and Individual
Capacities as Officer for
the Allegheny County Port
Authority,

Defendants,
Jointly and Severally.                 TAKEN VIA ZOOM VIDEO CONFERENCE

                                       THURSDAY, SEPTEMBER 24, 2020


                                       Taken on behalf of Plaintiffs,
                                       Calisia Kelley and Johnnie Mae
                                       Kelley


                                       Counsel of Record for this Party:

                                       Noah Geary, Esquire
                                       Washington Trust Building
                                       6 South Main Street, Suite 225
                                       Washington, PA  15301
                                       724-222-3788

1       A.      37.

2       Q.      And are you currently employed by the Port Authority

3   Police Department?

4       A.      Yes.

5       Q.      What is your current rank?

6       A.      Patrolman.

7       Q.      And how long have you worked for the Port Authority

8   Police Department?

9       A.      Eight years.

10      Q.      Eight?

11      A.      Eight.  Yes.

12      Q.      Thank you.  And have you been a -- the same rank the

13  entire eight years?

14      A.      Yes.

15      Q.      And are you originally from the Pittsburgh area?

16      A.      South Hills.

17      Q.      Okay.  Where did you go to high school, please?

18      A.      South Fayette.

19      Q.      And what year did you graduate?

20      A.      2002.

21      Q.      I'm not going to get into your background.  Just two

22  more questions.  Are you married?

23      A.      Yes.

24      Q.      Any children?

25      A.      Yes.

13

1   had some interactions with him on the same day.

2           And then you did a -- I have a two-page report that

3   you authored, and your attorney has a copy there.  So I'm going

4   to ask you about that in a few minutes.

5           Most of my questions, of course, are going to be

6   about that day that Bruce Kelley, Jr., was shot and killed.  Do

7   you remember that day, sir?

8       A.   Yes.

9       Q.   Okay.  And, obviously, were you working that day?

10      A.   Yes.

11      Q.   What shift?

12      A.   2:00 p.m. to 10:00 p.m.

13      Q.   And your report mentions you were on a station

14  detail.  Is that correct?

15      A.   Yes.

16      Q.   And in the course of your duties in that time

17  period, a station detail, what did that mean?  What were your

18  job duties?

19      A.   That is just anytime you go out at the station for

20  anything.  It could be for lunch or paperwork.  You'd call out

21  as a station detail.

22      Q.   But that means you're not on patrol that day, on

23  that shift.  Is that correct?

24      A.   I was on patrol, yes, but I was at the station.  I'm

25  not sure exactly what I was doing at the station, but I was at

14

1   the station at the time of the beginning of this incident.

2        Q.    Thank you.  So -- and you responded to a call.  Is

3   that right?

4        A.    I responded to back up Officer Adams, yes.

5        Q.    Okay.  Okay.  So thank you.  Just so I'm clear, so

6   when you were on a station detail, that just -- that's what you

7   were doing at the moment you got called here and you responded.

8   You were at the station doing something there.  Correct?

9        A.    Yes.

10       Q.    That doesn't mean you were assigned that entire

11  shift to work at the station?

12       A.    Correct.

13       Q.    Thank you for clarifying.

14             Do you know what -- do you remember what you were

15  doing when you got the call?

16       A.    I was in the roll call room.  I'm not sure exactly

17  what I was working on.

18       Q.    Thank you.  And who did you receive a call from?

19       A.    Well, I had heard Officer Adams call out, and then I

20  called to ask what his status was.

21       Q.    And when you say you heard him, is that -- how did

22  you hear him?  Is that on a radio?  A dispatch?

23       A.    Yes, on the radio.  He called out, "At the" --

24             THE REPORTER:  I didn't hear the end.  He called

25  out, "At the" --

1          MR. GEARY:  I think the witness said "the Wood

2     Street gazebo."

3     BY MR. GEARY:

4          Q.    Is that --

5          A.    Yes.

6          Q.    Just -- the stenographer just didn't hear the last

7     part of your sentence.  Is that correct?  The Wood Street

8     gazebo?

9          A.    Yes.

10         Q.    Thank you.  Now, when you heard Adams, did you hear

11    him on, say, your own personal radio, which is, say, a mike on

12    your shoulder?

13         A.    Yes.

14         Q.    Okay.  And at that time, did the Port Authority have

15    its own dispatcher?

16         A.    Yes.

17         Q.    And I assume the dispatcher worked in the police

18    station for the Port Authority.  Is that correct?

19         A.    Yes.

20         Q.    Okay.  Now, what was the -- what do you recall was

21    the nature of Adams' communication?

22         A.    He called out with a group consuming alcohol within

23    the Wood Street gazebo.

24         Q.    And did he initially ask for others to respond, or

25    did he just communicate what he was doing?

16

1    A.    He just stated that he was getting out there.  He

2    didn't ask for backup at that time.

3    Q.    And during the course of your duties on that shift,

4    prior to receiving his call, did you hear other officers

5    communicating on your radio just as to things they were doing

6    on -- on their shifts?

7    A.    You're asking just on -- for different incidents

8    or --

9    Q.    Correct.  Just that shift prior to -- to Adams

10   making that communication, on your radio did you hear other

11   officers communicating to you or other officers as to what

12   they -- what they were doing?

13   A.    Yes.

14   Q.    And so I understand it, for the Port Authority

15   department at that time, when would an officer be required to

16   communicate to other officers what he or she was doing as

17   opposed to, say, it's optional?  Like what --

18        MR. EVASHAVIK:  Object -- object to form.

19   BY MR. GEARY:

20   Q.    What -- is there a specific reason why an officer

21   will communicate to other officers what he or she is doing, on

22   the radio system at that time?

23   A.    Whether it's we're requesting backup or if they're,

24   you know, getting out with any individuals or anything.  We

25   call out on our radios when we're getting gas.  There's

1  multiple reasons why we're using the radio.

2      Q.    Thank you.  So initially, was Adams asking for

3  backup?  Initially.

4      A.    Initially, no.

5      Q.    Okay.  And then please just -- we're going to have

6  to walk through the whole episode.  So please tell me what

7  happened next or what you heard or what you did.

8      A.    That's when I started out -- I started -- I got to

9  my car.  I started going towards that direction.  He called a

10 Code 1 response, which means no lights, no sirens.

11          While I was en route, he called out a Code 2.  That

12 would be they were resisting with the officers.

13          And then before I even got to the scene, he was

14 calling a Code 3.

15     Q.    And Code 1 means what?

16     A.    Code 1 is just a -- I'm responding to the area, but

17 I'm not going lights; I'm not going sirens.  I'm just going at

18 a normal -- normal speed, following the traffic laws.

19     Q.    And so when you initially left the station to go

20 there in your patrol unit, had he not requested for backup yet?

21     A.    When I asked him if he was -- his code status, I

22 can't recall if he -- I can't recall his response at this time.

23     Q.    And what is the Code 2, please?

24     A.    Code 2 is lights and sirens.  It's a -- a fast

25 response.

1    Q.    It's a what?

2    A.    It will be a faster response.

3    Q.    Okay.  And what about Code 3?

4    A.    Code 3 is when there's a high emergency and you need

5    other backup as soon as possible.

6    Q.    Okay.  Do you know if you were the first or one of

7    the first responders to go to Adams?

8    A.    I am not aware if there was any other units from

9    different departments that were closer than I was, but I

10   believe I was the first Port Authority officer to be -- to

11   arrive for backup.

12   Q.    And did you have a partner, or were you alone in

13   your unit?

14   A.    I was alone in my unit.

15   Q.    Thank you.  And the gazebo we're talking about, is

16   it located in Wilkinsburg Borough?

17   A.    Yes.

18   Q.    Okay.  At that time, do you know who owned the

19   gazebo?

20   A.    No.  I'm not aware.

21         THE REPORTER:  I didn't hear.  I'm sorry.

22         MR. GEARY:  I think he said, "No.  I'm not aware."

23         THE WITNESS:  Correct.

24   BY MR. GEARY:

25   Q.    And I'm not trying to -- if I don't get exactly what

1 you say, Officer, please just clarify.

2      A.    Right.  Right.

3      Q.    Do you know, as we sit here today, who owned the

4 gazebo?

5      A.    I believe it was Wilkinsburg Borough.

6      Q.    And before you arrived, did Adams or any other

7 officers communicate the identities or names of who the actors

8 were in the gazebo?

9      A.    No.

10      Q.    And was it that this was suspicious activity, or had

11 they committed a crime?  What -- what were you responding to

12 precisely that you thought?

13      A.    Initially, I just wanted to establish what the

14 status was when I started towards them.  I was only aware that

15 they were drinking in public.

16      Q.    Okay.  And at that time, was there an open container

17 ordinance in Wilkinsburg Borough?

18      A.    I don't know the ordinances of Wilkinsburg.

19      Q.    Okay.  And when you arrived, please tell me what you

20 saw.  I assume you pull up, you park somewhere, you get out of

21 your unit.  Please just tell me what was going on and what you

22 saw.

23      A.    Before I had arrived is when Officer Adams had

24 called Code 2 and then Code 3, so I was aware that the

25 individuals were fighting with officers at that time.

1           When I arrived -- I actually, on the busway, went
2   past where the gazebo would be because there's no entrance.  I
3   would either have to park well before or well after where the
4   gazebo is.  I went to -- on the busway, it's called Hamnett
5   Station.  That's where I parked and went on from there.
6       Q.   And when you -- when you parked, initially could you
7   even -- could you see the gazebo from where you parked?
8       A.   No.
9       Q.   Did you have to walk a certain distance before you
10  could see the gazebo?
11      A.   Yes.
12      Q.   Okay.  And when you parked your vehicle on the
13  busway and got out, were there any other officers on scene that
14  you could see?
15      A.   At the gazebo, I couldn't see.  When I parked, there
16  were two officers from other departments.  I'm not sure who the
17  officers were, which departments they were from, but they were
18  with me as well.
19      Q.   And did you -- did you know they were responding to
20  the same call you were responding to?
21      A.   I assumed it, yes.
22      Q.   Okay.  So when you get out of your vehicle, what did
23  you do, please?
24      A.   I entered the Linear Trail, which is behind the
25  Hamnett Station.  And it's a walkway that leads from the

1   Hamnett Station down -- I believe it's South Avenue in

2   Wilkinsburg.  I entered there and started walking towards the

3   gazebo.

4        Q.   And as you got closer to the gazebo, did you see

5   Adams or -- what happened next that got your attention?

6        A.   I first had seen Mr. Kelley walking towards me with

7   a knife in his right hand.  At that time, I directed him, with

8   my firearm out, to drop his weapon multiple times.

9        Q.   Okay.  And just so you and I are clear, I'll try

10  to -- every time, I'll try to refer to Bruce Kelley, Jr., as

11  Bruce Kelley, Jr., or maybe Bruce, Jr.  And then Bruce Kelley,

12  Sr., as Bruce Kelley, Sr., or maybe Bruce, Sr.  Just so we're

13  clear and the record is clear.

14            So did you just reference -- was it Bruce Kelley,

15  Jr.?

16       A.   Yes.

17       Q.   Did you also -- when you first saw him, did you see

18  Bruce Kelley, Sr.?

19       A.   No.

20       Q.   Did you see Adams?

21       A.   Yes.

22       Q.   And did you see Officer Hampy?

23       A.   Yes.

24       Q.   Okay.  So when you first lay eyes on Bruce Kelley,

25  Jr., is he walking?  Is he standing still?  What was he doing?

22

1          A.     He was walking towards me, away from the Wood Street

2     gazebo, towards the Hamnett Station.

3          Q.     Okay.  And then my understanding of the Linear Trail

4     and the busway is the trail is, in certain areas, lower than

5     the busway.  The busway is up higher, and the Linear Trail is

6     lower.  But then sometimes the trail goes up, and it's on the

7     same level as the busway.  Is that true?

8          A.     I would say it's mostly level, but there's a barrier

9     that -- like a jersey barrier that is lower at one point and

10    then raises up.

11         Q.     Okay.  So when you first see Bruce Kelley, Jr., is

12    he, say, up higher on the trail or on a lower part of the

13    trail?

14         A.     I can't recall.

15         Q.     Before you see him, what was the conversation

16    between you and the two other officers from the other

17    departments?

18         A.     Well, we didn't have no conversations.

19         Q.     Okay.  And when you first see Bruce Kelley, Jr., you

20    say he's walking towards you?

21         A.     Yes.

22         Q.     And just if you could give me an estimate.  When you

23    first lay eyes on him, how far away is he from you?

24         A.     I would say maybe 35 to 40 feet away from me.

25         Q.     And he's walking.  What was Adams doing?

23

1    A.    Adams was, I would assume, 60 to 70 feet away from

2    Bruce Kelley, Jr.  Sorry.  And he was following him.

3         MR. EVASHAVIK:  Let me give an instruction to the

4    witness, Noah.  And I know you agree on this.  We don't want

5    the witness to guess or assume anything.

6         If you don't know something, that's fine.  Tell us

7    that.  If you have a reasonable idea and you think you do know,

8    then we want that answer.

9         Do you agree with that, Noah?

10        MR. GEARY:  Sure.

11        MR. EVASHAVIK:  Okay.  He said he assumed something.

12   That's why I said that.

13   BY MR. GEARY:

14   Q.    Where was Adams?  Was he directly behind Kelly or

15   off to the side?  I know he's a distance away from Kelley.

16   Where was he as far as -- directly behind him?  To the side?

17   As far as your field of view.

18   A.    I was able to see him, so that would make him to the

19   side.

20   Q.    And did you see Hampy as well?

21   A.    Yes.

22   Q.    And then did you say you saw Bruce Kelley, Jr., had

23   a knife?

24   A.    Yes.

25   Q.    Which hand did he have a knife in?

1       A.      His right hand.

2       Q.      And at that point in time when you first saw the

3   knife, can you describe what the -- what the color was?

4       A.      I -- I don't recall what the color was.

5       Q.      What about, say, the size of the knife, the length

6   of the blade, when you first say you noticed a knife?

7       A.      I noticed it was a -- a utility blade.

8       Q.      And just so I know, what does "utility blade" mean

9   as far as length?

10      A.      Maybe a 6- -- a 6-inch handle with a blade coming

11  out about an inch or two.

12      Q.      A blade coming out about an inch or two.  Is that

13  correct?

14      A.      Yes.

15      Q.      Did Adams have his gun out of his holster?

16      A.      I don't remember seeing it.

17      Q.      At that point in time, did Hampy have her gun out of

18  her holster?

19      A.      I don't recall.

20      Q.      Thank you.  So what happens then?  You see him.

21  He's walking in your direction.  It seems like you've described

22  you're walking in his direction.  You have two officers with

23  you from neighboring jurisdictions.  If you could just -- just

24  keep going, and we'll just -- we'll go through it.

25      A.      As Kelley, Jr., was walking towards me, I had him at

1    gunpoint at that time, shouting at him to drop his weapon

2    multiple times.  I had stopped advancing towards him.  He

3    continued to walk towards me.  And then he made a left-hand

4    turn, from his angle, down towards the fence line.

5         Q.    And when you see him, did you recognize him?

6         A.    I recognized him as the male carrying the knife.  I

7    had never dealt with him prior to this incident.

8         Q.    Had you ever seen him before in the area?

9         A.    Not that I can recall.

10         Q.    When you were looking at him there at that point in

11    time, did you know his name?

12         A.    No.

13         Q.    Now, you took your gun out of its holster.  Is that

14    correct?

15         A.    Yes.

16         Q.    And was it pointed at him?

17         A.    Yes.

18         Q.    Okay.  Why -- why did you take your gun out of your

19    holster and point it at him at that point in time?

20         A.    Because he was refusing to drop his weapon and still

21    advancing towards me.

22         Q.    Okay.  The other officers who were from the

23    neighboring jurisdictions, where are they in relation to you?

24         A.    Both were behind me.

25         Q.    Do you know if they had weapons drawn?

1      A.    I don't know.

2      Q.    Okay.  And did you give him a directive?  You may

3  have just said that.  I just -- did you give him any verbal

4  commands?

5      A.    Yes.  I repeatedly had told him to drop the knife.

6      Q.    Okay.  And did he answer you?

7      A.    No.

8      Q.    Okay.  So he was silent?

9      A.    Yes.

10     Q.    Okay.  And when you're giving him commands, did you

11 stop and you're stationary, or are you walking towards his

12 direction when you're giving verbal commands?

13     A.    I was walking when I initially started giving him

14 commands.  But when he was not stopping and continuing towards

15 me, I had stopped and stood my ground.

16     Q.    And when you stop, did he stop, or did he continue

17 walking?

18     A.    He continued toward me.

19     Q.    Okay.  And as you gave him a number of verbal

20 commands, did he continue walking towards you, or did he stop

21 at any point in time?

22     A.    He did not stop.  He continued walking towards me.

23     Q.    Okay.  And was there some discussion at that point

24 in time as far as "Watch out for cross-fire"?

25     A.    Yes.  Officer Adams called that over the radio.

27

1     Q.   And so you heard that on your radio.  Is that right?

2     A.   Yes.

3     Q.   And, again, at that point in time, is Adams behind

4 Kelley, Jr., following him?

5     A.   Yes.

6     Q.   Okay.  As far as cross-fire, were you the only

7 officer with their weapon drawn at that point?

8     A.   I don't know if the officers behind me had their

9 weapons out, and I don't know about -- if Adams or Hampy had

10 their weapons out either.

11    Q.   Okay.  Did you ask any questions when you arrived on

12 scene, over the radio, as to what exactly had happened at the

13 gazebo?

14    A.   I don't recall asking any questions.

15    Q.   Did Adams say anything over the radio or even just

16 shouting to you as to what happened at the gazebo?

17    A.   Well, he was calling Code 3 into the radio.  He was

18 calling that they were fighting with individuals and that one

19 had a knife.

20    THE REPORTER:  I didn't hear the very end.  "The

21 one" --

22    THE WITNESS:  One had a knife.

23 BY MR. GEARY:

24    Q.   Okay.  So there was reference by Adams to

25 "individuals," but you only see so far in this scenario one

28

1   person.  Correct?  Which turns out to be Bruce Kelley, Jr.  Is

2   that correct?

3       A.    Correct.

4       Q.    Thank you.  Did -- did you learn anything at that

5   point in time so far in this scenario that Bruce Kelley, Jr.,

6   had been hugging the gazebo?

7       A.    No.  I don't recall that.

8       Q.    So when there's mention of possible cross-fire,

9   "Watch out for cross-fire," did you give any commands or give

10  any response over the radio or even shouting to the other

11  officers for officer safety?

12      A.    No.  I had sidestepped to my right as to more get an

13  angle that I was aiming my firearm only at Bruce Kelley, Jr.

14  Whereas, if I were -- if I had fired and missed, I wouldn't put

15  the other officers in the line of fire.

16      Q.    And then what did Bruce Kelley, Jr., do?

17      A.    He made a left-hand turn and walked into a small

18  wooded area towards the fence line, which there was a hole in

19  the fence that he had gone through.

20      Q.    That he had gone through?

21      A.    Yes.

22      Q.    Okay.  So when he makes a left-hand turn, is that in

23  front of you?

24      A.    Yes.

25      Q.    Okay.  So he didn't pass you and then make a

29

1  left-hand turn?

2      A.    No.

3      Q.    Gotcha.  And, say, how many -- approximately how

4  many feet away from you was he when he makes the left-hand turn

5  to go through the hole in the fence?

6      A.    I'd say 15 to 20 feet away.

7      Q.    And at that point, is there five officers there,

8  including yourself?

9      A.    Yes.

10     Q.    And you -- you watch him go through a hole in the

11 fence.  Is that right?

12     A.    Yes.

13     Q.    Okay.  Now, I don't -- I've been to the scene but

14 not to the exact area you're describing.  The hole in the

15 fence, is it -- are there trees and bushes in that area where

16 he's going through the hole in the fence?

17     A.    Normally, yes.  But at the time, in January, they

18 were all pretty much dead, so there was a path that he could

19 walk through.

20     Q.    I'm sorry.  Did you say there was a path he could

21 walk through?

22     A.    Yes.

23     Q.    But he did climb through a hole?  He actually went

24 through a hole in the fence.  Is that right?

25     A.    Yes.  There was a large hole in the fence.

30

1    Q.    Do you know if he put the knife away momentarily to
2    crawl through the hole in the fence?
3    A.    He didn't need to crawl.  You could step right
4    through it.  It was --
5    Q.    And you --
6    A.    -- a large enough hole.
7    Q.    I'm sorry.  I talked over you.
8    A.    It was a large enough hole.
9    Q.    And you saw him walk through the hole in the fence?
10   A.    Yes.
11   Q.    Okay.  And then when he goes through the hole, where
12   does he go?
13   A.    I lost track of him at that time.
14   Q.    And why?  Is that because there's trees or -- I'm
15   just curious.
16   A.    There is some trees.  There was an abandoned garage
17   and a few abandoned houses that had no doors.  And by the time
18   I had made it to the fence, I slowed down because I was unaware
19   of where he went, if he was hiding.
20   Q.    Okay.  Did you go through the hole in the fence?
21   A.    Yes.
22   Q.    What about the other officers?  Did they do the
23   same?
24   A.    The two that were with me from the neighboring
25   departments did.  I am not aware if Officer Adams and Hampy did

1   as well.

2          Q.    Okay.  What's the conversation between you and the

3   two officers from the neighboring jurisdictions at this point?

4   As you go through the fence and you're going to have to keep

5   following him, what's the conversation?  Who is saying what?

6          A.    We were -- I'm not sure exactly who was saying what.

7   I know we were discussing slowing our pace down as there were

8   open doors to the garage, open doors to the houses.  There was

9   a lot of trees there that he could have been walking in

10  between.  So we slowed down from there and tried to come up

11  with a solution as to the right way to try to clear the area.

12         Q.    And so you're -- now, say, you're on street level.

13  Is that right?

14         A.    Yes.  Behind the houses.

15         Q.    Okay.  So it's --

16               THE REPORTER:  I'm sorry.  Was it "Behind the

17  houses"?

18               THE WITNESS:  Behind the houses.  Yes.

19  BY MR. GEARY:

20         Q.    So it's late January.  Are there any -- is there

21  anybody outside -- we'll call them civilians -- outside in

22  their yards?  On the sidewalk?

23         A.    I don't recall seeing anybody, but I do remember

24  hearing people talking.

25         Q.    And if you heard them talking, are you saying

32

1    they're inside their houses and talking?

2        A.    They would have been outside.

3        Q.    Okay.  And what do you proceed to do then, sir?

4        A.    Well, we would have gone to the area.  We would have

5    started to check -- me and the neighboring department two

6    officers started to check the garage that was back there.  And

7    then we heard other officers call out that he was on the street

8    in front of the houses.

9            THE REPORTER:  In front of?  I'm sorry.

10           THE WITNESS:  In front of the houses.

11   BY MR. GEARY:

12       Q.    And then -- so for a period of time, you lost him,

13   so to speak.  You couldn't -- you didn't see where he was for a

14   period of time.  Is that correct?

15       A.    Correct.

16       Q.    But then you were able to find him, and you're

17   eyeballing him again.  Is that right?

18       A.    Yes.

19       Q.    Can you just give me an approximate amount of time

20   that you, quote/unquote, say, lost him?

21       A.    Less than two minutes.

22       Q.    Thank you.  And when you -- when you see him again,

23   where are you?  Where is he?

24       A.    He was on the street, and I was coming from around

25   the house that was next to where the hole in the fence was.

1      Q.    Do you know what street that was?

2      A.    Not without seeing the street, no, I wouldn't know.

3      Q.    Okay.  In a few moments -- there's this timeline of

4 events that may refresh your memory.  We'll get to that.

5            So when you -- he's in your sights again.  Is your

6 gun back in its holster, or is it -- when you go through the

7 fence, did you put it in the holster?

8      A.    No.  I had it in my hand.

9      Q.    Okay.  And what was Bruce Kelley, Jr., doing when

10 he's in your sights again?

11     A.    Still continuing to walk away from us.

12     Q.    Okay.  And is it true that he -- he was never

13 running away?  Is that true?

14     A.    No.  He never -- he never ran.  He was walking at a

15 brisk pace.

16     Q.    And what happened next, please?  Did you give him

17 some more commands or you watch him go in a certain direction?

18     A.    Again, without seeing the picture of the roads, I'm

19 not sure of the names of the roads.  He had gone between

20 another set of houses, I believe, into an alleyway, which I

21 followed him through, and then came back out onto Center Avenue

22 in front of the Hamnett Park and Ride.

23     Q.    I'm sorry.

24           MR. EVASHAVIK:  For the record -- excuse me, Noah.

25 For the record, the witness is saying he can't recall the names

34

1   of the streets.  He does have a report, as you know, that was

2   prepared shortly after the occurrence that may refresh his

3   memory on that, but he hasn't asked to look at it during this

4   line of questioning, just for the record.

5           MR. GEARY:  Sure.  Yeah.  We're going to get to the

6   report in a couple minutes.

7   BY MR. GEARY:

8       Q.    Just -- did you just -- so the stenographer heard,

9   Officer, you just mentioned something.  The Hamnett Street

10  Station?

11      A.    He came out of -- between some houses through an

12  alleyway onto Center Avenue by the Hamnett Park and Ride lot.

13      Q.    The Hamnett Park and Ride lot.  Thank you.

14            Now, do you see other officers now in your field of

15  view who have responded?

16      A.    Yes.

17      Q.    And how many officers do you see besides the

18  officers we've already talked about?

19      A.    I would say maybe ten.

20      Q.    Okay.  So, say, including the five, including

21  yourself -- you, Hampy, being -- the five being you, Hampy,

22  Adams, and the two original responders from the other

23  jurisdictions, that's five.  But, say, there are about, say,

24  ten additional officers now?

25      A.    I would say ten in total.

1    Q.    Okay.  And what do you see happen next, as far as

2    what Bruce Kelley, Jr., does or any officer?

3    A.    Bruce Kelley, Jr., walked towards the Hamnett Park

4    and Ride.  As he was getting into the lot, I attempted to

5    OC spray him without effect.  The wind took it away, so it did

6    not hit him.  He continued to walk away at that point.

7         Officer Sanders then approached him with his ASP

8    baton out, trying to strike him.  Bruce Kelley, Jr., then

9    turned around and took a swing with his knife in his right hand

10   at Officer Sanders, turned around again, and continued to walk

11   away.

12   Q.    You -- would the word be "deployed" your OC spray,

13   or what would the word be?  You used it?  What would the word

14   be?

15   A.    Deployed.

16   Q.    And what was -- generally, what's the purpose of

17   deploying the OC spray?

18   A.    When you get hit with the OC spray, it narrows the

19   vision.  It causes a heat sensation to try to interact with the

20   vision, to get you off your equilibrium.

21   Q.    And so are you aiming specifically for the person's

22   eyes?

23   A.    Yes.

24   Q.    Okay.  And let's go to the timeline, because I think

25   maybe there's a still shot that captures you using the

36

1  OC spray, I believe.

2          MR. GEARY:  So, Greg, that was Exhibit 6 from the

3  last depos, if we could go to that, please.

4          (Whereupon, Deposition Exhibit 6 was presented to

5  the witness.)

6  BY MR. GEARY:

7      Q.   And I may have a couple questions before we get

8  right back to your deploying the OC spray.  Do you have this

9  exhibit in front of you, Officer?

10     A.   Yes.

11     Q.   Okay.  So the cover page for me says "Incident

12  16-00683.  Assault Knife.  Wilkinsburg Borough."

13          The next page, there's a photo with some red arrows

14  and an entry there "152349 Hours."  And I have a question.

15  It's a reference to "Officer Adams calls out..."  And it says

16  "...are operating a two-officer patrol unit in the East Zone."

17  Is that correct?

18     A.   Yes.

19     Q.   So Wilkinsburg Borough, is it in four zones:  north,

20  south, east, and west?

21     A.   I don't know how Wilkinsburg does theirs.  This zone

22  is referring to the Port Authority.

23     Q.   Okay.  Thank you.  So how is the Port Authority --

24  at that time, how was the jurisdiction broken down as far as

25  reference to here, say, East Zone?

1    A.    The East Zone contains anywhere from 26th Street

2  downtown, all the way out to Monroeville.  It also covers

3  Oakland to -- through Wilkinsburg into Penn -- what is it?  I

4  can't remember the name of the township.  But it's -- it's a

5  large zone.

6    Q.    And then for Port Authority jurisdiction at that

7  time, was there also a North, West and South Zone?

8    A.    We have an East, a South, a Central.  Occasionally

9  we have a Northwest and an Oakland/Hill.

10    Q.    I'm sorry.  What's just the last thing you said?

11    A.    Oakland/Hill, covering Oakland and the Hill

12  District.

13    Q.    Okay.  Thank you.  I'm turning the pages.  On the

14  fourth page -- it's not numbered.  I apologize.  But on the

15  fourth page, second to the bottom, the entry there in the box.

16  It says "153947 Hours."  And the third bullet point says

17  "Officer Kaupinis (5561) reports that he is on the Brilliant

18  Bridge heading there."

19    A.    Yes.  I see that.

20    Q.    Okay.  So there are radio communications

21  interspersed with this timeline.  So is that bullet point --

22  that's referencing that you were on the way responding to the

23  incident, and you radioed just where you were at that moment.

24  Is that right?

25    A.    Yes.

1    Q.    Thank you.  Okay.  If we can keep turning pages.

2    And the first page that has a photo in it, in the upper

3    left-hand corner the box says "154915 Hours."  And it has a

4    bullet point "Sergeant O'Malley (5580K) asks if the tunnel is

5    secure."  So I'm just going to ask you if you can go to that

6    page.

7    A.    What were the hours on the top?  I'm not --

8    Q.    Sure.  154915.

9    A.    Okay.  I have it.

10   Q.    Thank you.  And, again, I'm not trying to trick you.

11   I'm just trying to kind of match up with the timeline of events

12   as to where you testified a few moments ago that you deployed

13   the OC spray.  Now, in the photo there, are you in that photo?

14   A.    No.

15   Q.    Okay.  Can you please identify the officers who are

16   in that photo?

17   A.    The officer to the far right is Officer Ravotti of

18   the Port Authority.  And the officer in the center, his name is

19   Officer Stubbs.  I believe he's with Wilkinsburg.  And the one

20   on the left would be Officer White.  I can't remember which

21   department he was from.

22   Q.    Thank you.  Now, looking at this photo, does this

23   jog your memory yet if -- in how it all went down, had you

24   employed your OC spray yet?

25   A.    No.

1     Q.    You had not?

2     A.    No.

3     Q.    Okay.  Now, two pages later, there's another photo.

4 And the time in the upper left is 154939 hours.  There's a

5 bullet point that says "Officer Kaupinis appears to be

6 employing pepper spray."  Do you see the photo there?

7     A.    Yes.

8     Q.    Thank you.  Are you in that photo?

9     A.    Yes.

10    Q.    Okay.  Please identify who the officers are in the

11 photo.

12    A.    From left to right, the far-left officer with the

13 sunglasses, I do not know who that officer is.  The next one to

14 his right is myself, which you can see me with the OC spray in

15 my hand.  And directly to my right on this picture is Officer

16 White.  Then you have Officer Ravotti with his firearm out.

17 And behind him is Officer Stubbs.

18    Q.    And you tried with your right hand to deploy the OC

19 spray.  Is that correct?

20    A.    Yes.

21    Q.    And, again, you're aiming for Bruce Kelley, Jr.'s,

22 eyes.  Is that right?

23    A.    Yes.

24    Q.    And I think you mentioned a few moments ago

25 something about the wind or -- was the deployment of the OC

1  spray successful?

2      A.    No.

3      Q.    And why not?

4      A.    When I sprayed it, I could see the spray moving with

5  the wind away from Bruce Kelley, Jr.

6      Q.    And I've never dealt with mace or anything like

7  that.  I mean, when you spray it, is it visible?  The spray?

8      A.    It's an orange aerosol spray, yes.

9      Q.    Okay.  Was it -- do you recall, was it a windy day,

10  an especially windy day?

11      A.    I don't recall it being very windy, no.

12      Q.    And in your training to deploy the OC spray, are you

13  trained that you should be, say, a certain distance from a

14  person?  You should be -- say, 3 feet away is optimum or 6 feet

15  or 1 feet?  How are you -- how are you trained on that?

16      A.    Usually, the training says up to 15 feet.  Up to 15

17  feet, the OC spray is most effective.

18      Q.    In your deployment of the OC spray at that time, do

19  you think it was even partially successful?  Do you think you

20  did get some spray in his eyes?

21      A.    No.

22      Q.    If you could go to the next page, sir, of our

23  timeline.  Do you have another photo there?

24      A.    Yes.

25      Q.    Okay.  Please describe or identify who the officers

1   are in this photo.

2       A.      The officer that's behind the pole nearest to

3   Kelley, Jr., that's Officer Sanders.  Up top, the furthest one

4   to the top, I'm not aware of who that is.  The one that appears

5   to be looking down is -- I believe that is Officer DiPippa.

6       Q.      Sorry.  The looking down, does the officer appear to

7   be maybe bald with sunglasses up on his forehead?

8       A.      Yes.

9       Q.      That's DiPippa.  Thank you.  Please continue.

10      A.      To his right, the officer in plain clothes, I am

11  unaware of who he is.  To his right, I also am unaware of those

12  two officers -- one is a white officer, and one is a

13  light-skinned black officer wearing sunglasses.  Those two, I

14  don't know who they are.  And Officer Ravotti is seen in front

15  of them, still with his firearm.

16      Q.      Thank you.  And then to the far right of the photo,

17  are there two shadows in the photo?

18      A.      Yes.

19      Q.      And would those be two other officers who just

20  aren't fully captured in this photo?

21      A.      Correct.

22      Q.      Okay.  I'm sorry.  Are you in this photo?

23      A.      I believe that the -- the first -- the shadow lower

24  where you can see the partial hand, I believe that's -- that is

25  me.

42

1     Q.    Thank you.  Now, when you deployed your OC spray,

2   were you, to your knowledge, the first officer to attempt any

3   type of use of force, such as OC spray, Taser, so forth?

4     A.    No.  I believe it was used prior to that as well.

5     Q.    Okay.  What officer -- or which officer or officers

6   utilized force prior to your OC spray?

7     A.    I recall Officer Adams claiming that he had

8   attempted to use an OC spray as well.

9     Q.    Okay.  Did you see that happen?

10    A.    No.

11    Q.    So was that in the period before you even arrived on

12  the scene, or was that in the period when you lost Kelley for a

13  little while?

14    A.    That was before I arrived.

15    Q.    Okay.  Anyone other than Adams utilize force prior

16  to your deployment of the OC spray?

17          MR. EVASHAVIK:  Object to the form.

18  BY MR. GEARY:

19    Q.    To your knowledge, anybody other than Adams?

20    A.    I don't recall.

21    Q.    Okay.  If we could go back just one page, to the

22  photo that captures you -- with the right hand, you're

23  deploying the OC spray?

24    A.    Yes.

25    Q.    Now, there are no civilians in the area.  Correct?

1        A.    I don't recall.

2        Q.    But from the photo, just based on the photo, there's

3   no civilians in the area.  Is that true?

4        A.    Not in the -- not in the photo.

5        Q.    Okay.  And then the next photo is a broader -- and

6   that's where Bruce Kelley -- is he standing, at that point in

7   time, in the park and ride?

8        A.    Yes.

9        Q.    And the park and ride, that means it's a parking

10  lot.  Correct?

11       A.    Yes.

12       Q.    And there's no civilians in the area depicted in

13  this photo.  Is that correct?

14       A.    In the photo, no.

15       Q.    Now, back to your testimony.  Right before I showed

16  you the timeline, you testified that Bruce Kelley, Jr., took a

17  swing with his knife at Officer Sanders?

18       A.    Yes.

19       Q.    So I'd like you to go to your report now.  It's a

20  two-pager.

21            (Whereupon, Deposition Exhibit 7 was presented to

22  the witness.)

23            MR. GEARY:  And we're going to mark it as Deposition

24  Exhibit No. 7.  So, Greg, just so we're clear, we had six

25  exhibits in the first day of depos.  And the stenographer wants

44

1  to work off those six and keep those six.  So this would be 7.

2  It's Officer Kaupinis's two-page report.

3  BY MR. GEARY:

4      Q.   Officer, if you could take a look at your report.  I

5  assume you read it before the depo, but I have a couple

6  questions for you off of your report.

7           In the first paragraph, it states "The gazebo is

8  owned by the Port Authority of Allegheny County and is

9  immediately adjacent to the Linear Trail of the Port Authority

10 Transit System."  The second sentence of Paragraph 1, did I

11 read that correctly?

12     A.   Yes.

13     Q.   Can you please give me an estimate in feet?  How far

14 was the gazebo from the Linear Trail?

15     A.   It's directly off the Linear Trail.  There's a set

16 of steps that lead from the Linear Trail into the gazebo.

17     Q.   And the next paragraph, there's the last sentence

18 that says "I shouted, 'Police, drop the weapon' multiple times

19 with no compliance, with Kelley, Jr., continuing to advance

20 toward the assisting officers and I."  Are you with me there?

21 Are you with me?

22     A.   Yes.

23     Q.   Okay.  So that's before he makes the left and goes

24 through the hole in the fence?

25     A.   I'm sorry.  You were -- you were cutting out there.

45

1  It was kind of a lag.

2      Q.    Okay.  The sentence at paragraph 2, the last

3  sentence, "I shouted, 'Police, drop the weapon' multiple times

4  with no compliance, with Kelley, Jr., continuing to advance

5  toward the assisting officers and I."

6      A.    Yes.

7      Q.    As far as the chronology in your report, you're

8  talking about the point in time on the busway before Kelley

9  makes a left to go through the hole in the fence.  Is that

10  correct?

11     A.    Yes.  On the Linear Trail.  Before.

12     Q.    Thank you.  Now, when it says in your report there,

13  second paragraph, last sentence, "...with Kelley, Jr.,

14  continuing to advance toward the assisting officers and I,"

15  when you say he's advancing towards you, he's walking in your

16  direction.  Is that correct?

17     A.    Correct.

18     Q.    Did he at any point in time -- at that juncture, did

19  he threaten you verbally with violence?

20     A.    No.

21     Q.    Did he make any movements towards you?  Instead of

22  making a left to go through the hole in the fence, did he start

23  coming towards you?  Make any movements actually towards you?

24     A.    He was walking towards me, then made the left.

25     Q.    Okay.  And if he had not made the left and kept

46

1    walking straight, you and he would be walking right into one

2    another, essentially.  Is that right?

3            MR. EVASHAVIK:  Object to the form of the question.

4    BY MR. GEARY:

5        Q.    I mean, you would have -- you would have passed each

6    other, or you would have been walking -- you're walking right

7    toward each other.  Correct?

8            MR. EVASHAVIK:  Object to the form of the question.

9    You're misstating the witness's testimony.  He said he stopped.

10           MR. GEARY:  Okay.

11   BY MR. GEARY:

12       Q.    So if you stopped and he had not made the left-hand

13   turn and he just kept walking, would he have just walked right

14   up to you or into you or past you, as far as how close you were

15   to him?

16           MR. EVASHAVIK:  Object to the form of the question.

17           You can answer.

18           THE WITNESS:  He -- there's no other way out, other

19   than turning towards the left and making that -- walking

20   through the hole in the fence.  The only way to exit would have

21   been past myself and the other officers.

22   BY MR. GEARY:

23       Q.    Yeah.  I understand.  I get it.  But when he makes

24   the left to go to the hole in the fence, he doesn't verbally

25   threaten you or the other officers there?

1      A.    No.

2      Q.    And he didn't take the knife and swing it at you or

3    anything like that?

4      A.    No.

5      Q.    Now -- thank you.  Back to your report.  In

6    paragraph 3, there's reference -- kind of in the middle, it

7    says "Kelley, Jr., continued fleeing from police, ignoring

8    commands to stop and drop the weapon.  Kelley, Jr., fled

9    through a yard."  So when you're using the words in your report

10   "fleeing" and "fled," just so we're clear, at all times he was

11   walking.  Is that correct?

12     A.    Yes.

13     Q.    Okay.  If we could go to the fourth paragraph of

14   your report, please.  It says "Kelley, Jr., then entered the

15   Hamnett Park and Ride lot.  At this time, Officer Sanders

16   attempted strike [sic] Kelley, Jr., with his ASP, but when

17   close, Kelley, Jr., turned toward officers and took a fighting

18   stance.  Kelley, Jr., then turned and fled toward a fence line

19   leading to the yards of residences on Whitney Avenue."  Now, I

20   want to focus there.  First of all, what is an ASP?

21     A.    It's a collapsible baton.

22     Q.    Okay.  And did you actually see Sanders try to

23   strike Kelley with the ASP?

24     A.    Yes.

25     Q.    Where on Kelley's body did it appear that Sanders

48

1   was trying to hit him with the ASP?

2       A.      I believe he was trying to strike him in his right

3   arm, where he was holding the knife.

4       Q.      Okay.  And then your report says "But when close,

5   Kelley, Jr., turned toward officers and took a fighting

6   stance."

7       A.      Yes.

8       Q.      "Kelley, Jr., then turned and fled toward a fence

9   line."  Now, a few moments ago, you testified under oath that

10  Bruce Kelley, Jr., took a swing with his knife at Officer

11  Sanders.  Would you agree that's not in your report?

12      A.      Correct.

13      Q.      Okay.  So is it the truth that he did not take a

14  swing with his knife at Officer Sanders?

15      A.      I recall him swinging and using a swinging motion as

16  he turned towards Officer Sanders.

17      Q.      Okay.  When did you compose this report, sir?

18      A.      A few days afterwards.

19      Q.      Okay.  Now, that would be very significant in the

20  whole scenario.  If Bruce Kelley, Jr., actually swung his knife

21  at a -- at a fellow officer, that would be a significant fact.

22  Correct?

23      A.      Yes.

24      Q.      Why was it not put in your report?

25              MR. EVASHAVIK:  Object to the form of the question.

BY MR. GEARY:

Q.    Why was it not included in your report?

A.    I don't recall.  I must not have recalled that at the time.

Q.    You must not have recalled that at the time?

A.    Yes.

Q.    But you're recalling it now?

A.    Yes.

Q.    Now, you sometimes file an amended report.  Is that true?

A.    Yes.

Q.    Okay.  So anytime from January 31 of '016 to the present day, you could have amended this original report and added this allegation of fact that you're now testifying to, that Bruce Kelley took a swing with his knife at Officer Sanders.  Correct?

A.    Correct.

Q.    But you did not do that in the last four years.  Is that true?

A.    Correct.

Q.    Why not?

A.    I don't know.

Q.    Now, if we can please continue.  I just want to have you testify verbally to what happened, and then we'll reference the document.  So Bruce Kelley at this point now -- you've

50

1  walked us through, which I appreciate, he's standing in the

2  park and ride, the parking lot.

3       And it says at this time "he turned and fled toward

4  a fence line leading to the yards of residences on Whitney

5  Avenue."  He "attempted to jump the fence but fell to the

6  ground."  So as he turns and is walking away from you, did you

7  continue to follow him on foot?

8      A.    Yes.

9      Q.    Did you have your gun out of its holster at that

10  point in time?

11      A.    Yes.

12      Q.    And if you could go to the next page, please, and

13  tell me if it's a photo.

14      A.    Yes, I have a photo.

15      Q.    And is the upper left time -- is it 155014 hours?

16      A.    Yes.

17      Q.    And does the entry at the top read "Suspect is

18  observed climbing fence and proceeding back towards Whitney

19  Avenue.  Officer Kaupinis is observed deploying mace on suspect

20  as he climbs over fence."  Are we on the same page?

21      A.    Yes.

22      Q.    Thank you.  Now, the photo there, what does the

23  photo depict?

24      A.    At this time, Bruce Kelley, Jr., is on the other

25  side of the fence.  And I am the one that's deploying the

51

1  OC spray at that time.

2      Q.    Using your right hand, again?

3      A.    Yes.

4      Q.    And are you -- of the -- are there four officers in

5  the photo?

6      A.    Yes.

7      Q.    And from left to right, are you on the far left?

8      A.    Yes.

9      Q.    And can you identify who the other three officers

10  who are captured in that photo, please?

11      A.    To my right, closest to the fence with the hat on is

12  Officer Ravotti.  Behind me is Officer White.  To his right,

13  behind Ravotti, I do not know who that officer is.

14      Q.    Thank you.  Now, when you're spraying him with the

15  OC spray there, his back was to you.  Is that right?

16      A.    Yes.

17      Q.    Now, if the goal is to get somebody in the eyes with

18  the spray, how were you going to get him in the eyes with the

19  spray if his back was to you?

20      A.    When he fell, that's when I originally started to

21  deploy my spray and, in the picture, as he was getting up.  So

22  my spray was from the time he was on the ground until the time

23  he was standing up and continuing away from me.

24      Q.    So in this picture right here, when you're spraying

25  him, you appear to be pretty close to him.  Is that fair?

52

1   Within several feet?

2       A.    Yes.

3       Q.    Okay.  And then Ravotti is to your right.  Is that

4   correct?  In the photo?

5       A.    Yeah.  Yes.

6       Q.    And does Ravotti appear to be 2 to 3 feet from Bruce

7   Kelley, Jr., at that point in time?

8             MR. EVASHAVIK:  Do not guess.

9             MR. GEARY:  Well, just -- you can give me an

10  estimate.

11            THE WITNESS:  I would estimate within 4 feet, yes.

12  BY MR. GEARY:

13      Q.    And right before this photo, Bruce Kelley, Jr., had

14  climbed the fence.  Is that right?

15      A.    Yes.

16      Q.    And you watched him do that.  Is that correct?

17      A.    Yes.

18      Q.    And do you know, did he put his knife away

19  momentarily as he was climbing the fence?

20      A.    No.  It was still in his right hand.

21      Q.    And then you said he fell.  Is that right?

22      A.    Yes.

23      Q.    Is that correct?  He fell?

24      A.    Yes.

25      Q.    And when he fell, did he fell [verbatim] on the

53

1  other side of the fence?

2      A.    Correct.

3      Q.    Now, before he climbed the fence -- or as -- I'm

4  sorry.  As he's climbing the fence -- did you see that as an

5  opportunity to subdue him at that point in time as he's

6  climbing the fence?

7      A.    When he climbed the fence, he literally just put his

8  foot up over the fence and then fell right over it.  There was

9  not enough time.

10      Q.    What about "not at that time" [verbatim]?

11      A.    As he climbed the fence, he fell over the fence.  So

12  he didn't climb the fence and then fall.  He basically fell

13  over the fence.  And there wasn't time to grab him.

14      Q.    There wasn't time to grab him as he was climbing the

15  fence?

16      A.    Correct.

17      Q.    Was he vulnerable to being physically subdued when

18  he was climbing the fence?

19      A.    No.  I would say no.

20      Q.    And why not?

21      A.    Because as he climbed the fence, he fell over it

22  immediately.  There was maybe a second between him starting to

23  climb the fence and falling over the fence.

24      Q.    And before he climbs the fence -- I mean, did you

25  see the fence is coming up?  You're behind him; the other

54

1    officers are walking behind him.  Do you see the fence is

2    coming up?

3        A.    Yes.

4        Q.    Okay.  Did you at any time attempt to, say, push him

5    very, very forcefully from behind?  At any point in time, did

6    you do that?

7        A.    No.

8        Q.    Was that considered by you as perhaps a way where

9    you could cause him to fall forward, trip, and then maybe be on

10   the ground and then a bunch of you jump on him?

11       A.    I didn't think of it at the time, no.

12       Q.    Did any of the officers, as you're walking behind

13   him, mention that, say, tactic to subdue him, pushing him very

14   forcefully from behind?

15       A.    Not that I know of.

16       Q.    Okay.  That could have been done, though, as far as

17   you were close enough to push him from behind.  Correct?

18            MR. EVASHAVIK:  Object to form.

19   BY MR. GEARY:

20       Q.    You can answer.

21       A.    Yeah.  I would say -- I would say it could have been

22   possible.

23       Q.    Okay.  Just so you know, I think we're done with the

24   timeline.

25            Okay.  Let's just pick up with your testimony.

1  We'll refer to your report in a little bit.  What do you do

2  then?  He goes over the -- he goes over the fence.  He falls,

3  but he gets up.  What do you see him do?

4      A.    From that point, he walked towards the front of the

5  residence that he was in the backyard of.  And I climbed over

6  the fence and began to follow him as well.

7      Q.    Now, you had your gun out of its holster before you

8  climbed the fence.  Is that correct?

9      A.    Yes.

10     Q.    Did you holster your weapon as you were climbing the

11  fence?

12     A.    Yes.

13     Q.    Okay.  And then when you climbed the fence, did you

14  pull your weapon out of its holster again?

15     A.    Yes.

16     Q.    Thank you.  And then you see him walking through

17  some backyards?

18     A.    It was from the backyard of -- that was fenced in,

19  towards the front of that house.

20     Q.    Okay.  Were there any civilians in that backyard or

21  side yard?

22     A.    No.

23     Q.    Okay.  Were you the closest officer to him

24  physically as far as there -- in the photos, there's officers

25  to your left, to your right at various points.  There's some

56

1   officers behind you at various points.  At this point in time,

2   were you the closest officer to him?

3       A.    At that time, no.

4       Q.    Who was?

5       A.    I don't know.

6       Q.    And then where do you see Bruce Kelley, Jr., go?

7       A.    Toward -- I believe it was Whitney Avenue, towards

8   the front of the house on Whitney Avenue.

9       Q.    Okay.  Now, say, at that point in time, did he turn

10  around and face you officers and threaten to kill you?

11      A.    At that point, I was well behind.  The other

12  officers had gotten in front of me.  And I don't know if there

13  were any threats made at that point.

14      Q.    How was it that now you got so far behind everyone?

15      A.    I didn't jump the fence right away.  There was a

16  gate to the right that others had gone through.

17      Q.    Okay.  But up until this point in time in this whole

18  scenario, did Kelley ever stop, turn around, face you or any

19  other officers, and say -- and threaten to kill any of you?

20      A.    In the Hamnett Park and Ride, when he was approached

21  by Officer Sanders, he did turn around and make the physical

22  act with the knife, holding it up in the air.  I don't recall

23  if he said anything at that time.

24      Q.    Now, what about holding the knife in the air?  Is

25  this what -- are you referencing what's not in your report?

1      A.    I'm -- I'm referencing when he was in the park and
2  ride lot, yes.
3      Q.    Okay.  Because, again, in your report, it says
4  "Kelley, Jr., turned toward officers and took a fighting
5  stance."  Is that --
6      A.    Yes.
7      Q.    -- what your report says?
8      A.    Yes.
9      Q.    Okay.  So what about now you're saying the knife in
10 the air?
11     A.    Well, in this fighting stance, he had a knife in his
12 right hand in the air towards officers.
13     Q.    Okay.  When you say "in the air," is the knife, say,
14 at his side?  Like at his waist?
15     A.    I'd say between the shoulder and waist.
16     Q.    Okay.  Understood.  But, say, after that.  As he
17 climbs the fence, falls, keeps going, did he ever even just
18 turn and face all of you officers?
19     A.    When he was in the yard, I was behind the other
20 officers, and I was unable to see him at that time.
21     Q.    Okay.  What do you do next?  What does he do next?
22     A.    He had crossed over Whitney Avenue and then doubled
23 back, came back towards the houses where the fence was, on that
24 side of the street.  And he was walking towards the busway at
25 that point.

1      Q.    I'm sorry.  Just your voice trailed off.  He was

2   walking toward the busway?

3      A.    Yeah.  At that point, yes.

4      Q.    Okay.  And then where does he end up?

5      A.    He was in the -- on the sidewalk in front of a

6   residence on Whitney Avenue facing where the busway is.

7      Q.    Thank you.  And then where did you end up?

8      A.    I would have been behind him, close -- I'm trying to

9   think of the best way to put it.  If you are looking at the

10   residences where the incident took place, I would have been to

11   the left, which would have been behind him at that point.

12      Q.    Which would have been behind Bruce Kelley?

13      A.    Yes.

14      Q.    Now, at a certain point in time, does he have his

15   back to a house?

16      A.    He would have been sideways towards the house as

17   he's walking on the side, towards the busway.

18      Q.    Okay.  But at a certain point in time, is he

19   standing in front of a house, his back is to the house, and

20   he's facing officers?

21      A.    Yes.

22      Q.    Okay.  How many officers were there at that point in

23   time?  An estimate.

24           MR. EVASHAVIK:  At what point?  I object to the form

25   of the question.  At what point in time?

1       MR. GEARY:  Well, obviously, I'm leading up to when

2  O'Malley releases the dog and the shooting occurs.

3  BY MR. GEARY:

4      Q.    So I just want to know from you:  What does Kelley

5  do from the point you've already walked us through until he's

6  standing in front of the house right before O'Malley releases

7  the dog?

8       MR. EVASHAVIK:  I'm going to object to the form of

9  the question.  You're misstating his testimony.

10      MR. GEARY:  Well, what have I misstated?

11      MR. EVASHAVIK:  You're saying he's standing in front

12  of a house before the dog was released.  You don't let him

13  offer his testimony.  You're putting words in his mouth.

14      MR. GEARY:  Well, I'm asking him.  I'm just

15  saying --

16  BY MR. GEARY:

17      Q.    What I'm about to get to, Officer, is, obviously,

18  what happened right before O'Malley releases the dog.  So we're

19  going to get to that very shortly.

20       Now, you've described so far that Kelley is kind of

21  turned sideways in front of a house on Whitney Avenue.  Is that

22  correct?

23      A.    Yes.

24      Q.    Okay.  And then just take it from there.  What does

25  he do?  What do you officers do?

1    A.    He's continuing to walk towards the busway.  That's

2  when Officer O'Malley had given the K-9 commands, stop or he's

3  going to release the K-9.  That would be when Bruce Kelley,

4  Jr., turned towards the house, had his back towards the

5  officers at that point.  And that's when O'Malley released K-9

6  Aren.

7    Q.    Okay.  Just so we're clear, Bruce Kelley, Jr., had

8  his back to whom?

9    A.    Towards the officers.  After he was given the K-9

10  commands, he was turning to walk away from officers, towards

11  the house.

12    Q.    Okay.  Now, let's just pause there.  Where were you

13  at that point in time?

14    A.    Looking at the house, I was to the left of Bruce

15  Kelley, Jr.

16    Q.    And were you in the yard?  Were you on the sidewalk?

17  The street?

18    A.    I was -- I was on the sidewalk.

19    Q.    And did you have your gun out of its holster?

20    A.    Yes.

21    Q.    Okay.  Now, some questions as far as -- we'll get to

22  O'Malley giving commands, releasing the dog.  We'll get to that

23  in a few moments.

24         Was there an on-scene supervisor present at the

25  point right before O'Malley releases the dog?

1          MR. EVASHAVIK:  Object to the form.

2          THE WITNESS:  Officer O'Malley, I believe, was the

3    sergeant at the time.

4    BY MR. GEARY:

5        Q.    So was he the supervisor?

6        A.    Yes.

7        Q.    Did you know when O'Malley arrived on the scene?

8        A.    I don't know when he arrived on the scene, no.

9        Q.    Okay.  As you initially encounter Kelley -- he goes

10   through the hole in the fence, down through the yards, down in

11   the park and ride, follow, he goes over the fence -- who was

12   the supervisor of all the police officers there?

13       A.    Officer O'Malley would have been.  Sergeant

14   O'Malley.  At the time, he was a sergeant.

15       Q.    Okay.  And, then, there's Wilkinsburg officers

16   there, correct, also?

17       A.    Yes.

18       Q.    And as far as -- what was the protocol as far as

19   jurisdiction?

20          MR. EVASHAVIK:  Object to the form.

21          MR. GEARY:  What's wrong with the form?

22          MR. EVASHAVIK:  You're asking for a legal question.

23   Jurisdiction.

24          MR. GEARY:  I'm asking for --

25          MR. EVASHAVIK:  A legal conclusion.

1      MR. GEARY:  No.  I'm asking for what was the

2 protocol.

3 BY MR. GEARY:

4      Q.    Officer, as an officer for the Port Authority Police

5 Department, what was your training and teaching as far as if

6 you have different responding agencies in a certain geographic

7 area?  Does one department have primary authority or

8 jurisdiction?  What were you trained?

9      A.    As far as my jurisdiction -- I'm not -- I'm not

10 understanding exactly what you're asking for.

11      Q.    Well, if an incident happens like this in the gazebo

12 in Wilkinsburg and Wilkinsburg officers respond, which they

13 did, and Port Authority officers respond, which they did, does

14 one of the two agencies have superior, say, or primary

15 authority or jurisdiction to take action?

16      A.    I'm not sure exactly who would have the primary

17 jurisdiction.

18      Q.    Are you a K-9 officer?

19      A.    No.

20      Q.    Were you ever a K-9 officer?

21      A.    No.

22      Q.    Okay.  Just, by the way, do you want to take a

23 break?  I'm thinking maybe 40 more minutes, just so you know,

24 if you want to use the restroom or just take five.

25      A.    I could use a restroom break, yes.

63

1        MR. GEARY:  Sure.

2        THE REPORTER:  So we'll go off the record?

3        MR. GEARY:  We'll resume in five or ten minutes.

4        (Whereupon, a brief recess was taken.)

5   BY MR. GEARY:

6        Q.   Good morning, again, Officer.  We're almost done.

7   Like I said, maybe 20, 30 more minutes.

8        We left off where Kelley is in front of the house.

9   And we'll get to O'Malley releasing the dog and everything in a

10  moment.

11       Up until that point in time, did you learn anything

12  as far as any injuries that Officer Hampy had allegedly

13  sustained from whatever happened at the gazebo?

14       A.   All I know at that time was that the individuals

15  that were on scene were resisting and fighting back.  I don't

16  know of any injuries.

17       Q.   Did -- was Hampy part of the following of Bruce

18  Kelley, to your knowledge?  Did you see her?

19       A.   I don't recall seeing her, no.

20       Q.   What about Adams?

21       A.   I don't recall seeing him as well.

22       Q.   Okay.  And you've been with the Port Authority how

23  many years as of today?

24       A.   Eight years.

25       Q.   Okay.  So you were there about four years when this

64

1   happened.  In the four years that you were with the Port

2   Authority, up until that point in time, had you ever cited

3   anyone with an open container violation?

4           A.    Yes.

5           Q.    Okay.  Did you also have instances where you

6   exercised your discretion and did not issue the citation

7   because the person was compliant or, otherwise, you just said

8   "Get rid of it" and they did, and then you just didn't issue

9   the citation?

10          A.    Yes.

11          Q.    Now, and I don't -- I don't intend at any time to

12  put words in your mouth.  So I want to get to the point where

13  Kelley is in front of the house right before O'Malley releases

14  the dog.  Okay?

15          A.    Okay.

16          Q.    And you described before we took a little break

17  where you were situated.  And where was O'Malley situated with

18  the dog?

19          A.    In the -- in the street, Whitney Avenue.

20          Q.    Was there another officer there with a K-9?  Did

21  DiPippa have a dog there named Arko?

22          A.    Arko was still in the vehicle.  He didn't take Arko

23  out of the vehicle.

24          Q.    Okay.  So there was -- there was just reference in

25  one report.  It was a little vague.  I didn't know if I was

1 misreading it, but -- so there was a second K-9 unit there.  Is

2 that right?

3     A.    Yes.

4     Q.    And the unit was DiPippa and Arko?

5     A.    Yes.

6     Q.    But Arko remained in Arko's vehicle.  Is that right?

7     A.    Yes.

8     Q.    Okay.  Now, where is Bruce Kelley right before

9 O'Malley has the dog and starts issuing commands to Kelley?

10     A.    He is on the sidewalk, still walking towards the

11 busway.

12     Q.    Okay.  And how far away, in feet, is O'Malley from

13 Kelley?

14     A.    I can't say.

15     Q.    Can you give me an estimate?

16     A.    I would estimate 35 feet.

17     Q.    And you said O'Malley, he was in the -- standing in

18 the street?

19     A.    Yes.

20     Q.    And Kelley is at that point walking on the sidewalk?

21     A.    Yes.

22     Q.    Okay.  Where was Ravotti positioned at that point in

23 time?

24     A.    Behind Kelley, Jr., and in front of me.

25     Q.    And when you say -- no.  I understand.  I

1  understand.

2          And then -- so when O'Malley is issuing commands to

3  Bruce Kelley, what was he saying?

4      A.    "Stop.  Police.  Drop the weapon or I'll release the

5  K-9."

6      Q.    And is he --

7      A.    I'm not sure --

8      Q.    I'm sorry.

9      A.    I'm sorry.  I'm not sure of their exact verbiage of

10 how they give the commands.

11     Q.    Were other officers shouting commands to Kelley?

12     A.    Yes.

13     Q.    Were you shouting or giving verbal commands to

14 Kelley as well?

15     A.    I was still yelling at him to drop the weapon.

16     Q.    And were other officers besides you and O'Malley

17 doing the same?

18     A.    Yes.

19     Q.    And this is near the busway.  Is that correct?

20     A.    Yes.

21     Q.    And was there cars or buses, traffic, going along --

22 along the busway?

23     A.    I don't recall.

24     Q.    And tell me what Kelley does after -- at some point,

25 he's walking along the sidewalk.  Where does he go?

1    A.    When O'Malley starts giving him the commands to stop

2    or he'll release the dog, Kelly turns towards the house that

3    was directly in front of -- I'm sorry -- directly to his left

4    and walked into that front yard.

5    Q.    Okay.  Were there any civilians in that yard?

6    A.    No.

7    Q.    Were there any civilians in the yard next to Kelley?

8    A.    No.

9    Q.    Now, at that point in time, are all the officers who

10   responded to this -- to your knowledge, are they in the front

11   of the house?

12   A.    Yes.

13   Q.    Okay.  Are there any officers in the back of the

14   house?

15   A.    Not that I'm aware of.

16   Q.    And so Bruce Kelley, he has his back to O'Malley,

17   and he's walking towards the house.  Is that correct?

18   A.    Yes.

19   Q.    And that's when O'Malley is giving the commands.  Is

20   that right?

21   A.    He was giving the commands.  And then Bruce Kelley,

22   Jr., turned and walked towards the front of the house.

23   Q.    I'm sorry.  It just -- it trailed off.

24   A.    Before -- before Bruce Kelley, Jr., turned, Officer

25   O'Malley was giving him the commands to stop, giving the K-9

1    commands.  That's when Bruce Kelley turned and --

2              THE REPORTER:  I'm sorry.  I didn't hear the very

3    end.  "That's when he started"?

4              THE WITNESS:  That's when he turned and entered the

5    yard.

6    BY MR. GEARY:

7         Q.    Thank you.  How many times did O'Malley say to

8    Kelley, "If you don't drop the knife, I'm releasing the dog"?

9         A.    I don't recall.

10        Q.    Can you give me an estimate?

11             MR. EVASHAVIK:  Don't guess.

12   BY MR. GEARY:

13        Q.    I'm not asking you to guess, but you can give an

14   estimate.

15        A.    It was more than once.

16        Q.    Okay.  I mean, was it six times?  16 times?  Just if

17   you can give an estimate.

18        A.    All I can say is more than once.

19        Q.    Can you give me just a limit on the upper number of

20   times?

21             MR. EVASHAVIK:  Object to form.  This is ridiculous.

22   He's answered the question three times, Noah.

23             MR. GEARY:  More than once could be 39 times.

24   BY MR. GEARY:

25        Q.    I mean, Officer, you can give me an upper limit to

 1   how many times he gave the command.  I mean, you were there.

 2                MR. EVASHAVIK:  Object to form.

 3   BY MR. GEARY:

 4        Q.    You can answer.

 5        A.    I would say no more than six times.

 6        Q.    And what does Kelley do then?  He's walking with his

 7   back to O'Malley.  He's walking towards the house.  What does

 8   Kelley do then?

 9                MR. EVASHAVIK:  Object to form.

10                THE WITNESS:  He's still walking towards the house

11   at that point.

12   BY MR. GEARY:

13        Q.    Okay.  And then what happens?

14        A.    Officer O'Malley then released K-9 Aren.  K-9 Aren

15   then went towards Kelley.

16        Q.    And a few moments ago, you described -- I think

17   maybe you were near the sidewalk.  Did your vantage point

18   change when O'Malley releases the dog?  Where were you?

19        A.    Still in the general area of where I was prior to

20   that.

21        Q.    Okay.  Is O'Malley to your right?

22        A.    If we're looking at the house, yes, he would have

23   been to my right.

24        Q.    Thank you.  Where was Ravotti?

25        A.    To my right.

1    Q.    Thank you.  What -- what do you see the dog do?

2    A.    Aren had bit Bruce Kelley, Jr., on his left arm.

3    Q.    Now, was Kelley still holding the knife at that

4    point?

5    A.    Yes.

6    Q.    In which hand?

7    A.    Right hand.

8    Q.    Now, as the dog is going towards Bruce Kelley, was

9    Bruce Kelley's back still to the dog?

10   A.    Yes.

11   Q.    And please tell me as precisely as you can what you

12   see the dog did.  Does he bite the back of the arm or the front

13   of the arm?

14   A.    He bites the back of the arm.  I believe it was

15   between -- right around the elbow.

16   Q.    And when he bites that, the way Kelley's body is

17   positioned, was his body still positioned with his back to

18   O'Malley and the dog?

19   A.    As Aren got on the bite, it pulled Kelley down

20   slightly to his left.  That's when Kelley, Jr., turned around

21   and stabbed Aren multiple times at that point.

22   Q.    And you saw Kelley stab Aren multiple times?

23   A.    Yes.

24   Q.    Where on Aren's body?

25   A.    The head and face area.

1     Q.    And I'll just read from your report, and I have a

2  couple questions off of it.  "At this time, Sergeant O'Malley

3  sent K-9 Aren in for an apprehension.  As K-9 Aren made contact

4  with Kelley, Jr., he turned and stabbed K-9 Aren with a

5  cross-body motion with his right hand.  K-9 Aren disengaged,

6  then re-engaged for a second time."

7          So can you just explain that, about he engaged

8  Kelley, then re-engaged?  Just what you saw.

9     A.    Engaged is when Aren first made contact with Kelley.

10  He bit him on the arm.  That's when Bruce Kelley turned and

11  stabbed him multiple times.  Aren came off the bite and then

12  went back onto a bite and was stabbed again.

13     Q.    And when Aren goes back onto the bite, is Aren,

14  like, jumping upwards or on his hind legs?

15     A.    No.  He had bit him on the arm.

16     Q.    And so for Kelley to have stabbed Aren multiple

17  times, there would have been multiple -- would there have been

18  multiple motions with Kelley's arm?

19     A.    Yes.

20     Q.    Is it fair to say there would be, say, one motion

21  for each stab?

22     A.    Yeah.  That makes sense.

23     Q.    What does the dog then do?

24     A.    After stabbed, the dog released, went back on, was

25  stabbed again.  Then released and ran away.

1      Q.    And ran away in what direction?

2      A.    To the left.

3      Q.    Did the dog run, say, back towards an officer or

4  just -- did it appear --

5      A.    Towards -- just to the left.  Just ran off to the

6  side.

7      Q.    Okay.  And then what do you see happen?

8      A.    That's when Bruce Kelley, Jr., then turned, held his

9  knife up towards officers and started making forward motions

10 towards Officer O'Malley.

11     Q.    Okay.  So your report says "Immediately after Kelly,

12 Jr., stabbed K-9 Aren, he turned to face officers and made

13 motions toward officers on scene."  Is that what your report

14 said?

15     A.    Yes.

16     Q.    Okay.  And, then, now you're testifying he made

17 forward motions toward officers on scene.  Is that your

18 testimony now?

19     A.    Yes.

20           MR. EVASHAVIK:  Object to the form of the question.

21 BY MR. GEARY:

22     Q.    Okay.  So in your report "he turned to face officers

23 and made motions toward officers on scene."  How was his body

24 positioned, Kelley, before he turned to face the officers?

25     A.    That's -- when he was with the dog on him?

1    Q.   Yeah.  After he stabbed -- after he stabs the dog,

2 how is Kelley's body positioned?

3    A.   He had turned back around towards officers at that

4 point.

5    Q.   Okay.  And in your report, it says "he turned to

6 face officers and made motions toward officers on scene."  So

7 describe, please, what motions he made.

8    A.   That was raising the knife up and walking towards

9 Sergeant O'Malley.

10    Q.   Okay.  Do you admit there's no reference in your

11 report here that he starts walking toward O'Malley?

12          MR. EVASHAVIK:  Object to the form of the question.

13          THE WITNESS:  That's how I -- I wrote the motion

14 being, as him motioning towards O'Malley.

15 BY MR. GEARY:

16    Q.   Right.  There's no mention in your report about

17 Kelley walking towards O'Malley.  Is that true?

18    A.   That is not in the report.  Correct.

19    Q.   Why would that -- I mean, wouldn't that be a

20 significant fact?  If he is actually walking towards O'Malley,

21 would that be a significant fact that you would want to include

22 in your report?

23          MR. EVASHAVIK:  Object to the form of the question.

24 It says the same thing in different words in the report.

25          MR. GEARY:  That's -- that's argumentative.

74

1   BY MR. GEARY:

2       Q.   Sir, would that be a significant fact?  If Bruce

3   Kelley, Jr., actually started walking towards O'Malley, is that

4   something that you would have included in your report?

5       A.   Yes.

6       Q.   Okay.  And in the last four years, you've had the

7   opportunity to file an amended report to include this testimony

8   of this morning where Kelley was walking towards O'Malley.  You

9   could have filed an amended report to include that.  True?

10      A.   True.

11      Q.   And you did not do so?

12      A.   Correct.

13      Q.   How many feet would you estimate O'Malley was from

14  Kelley when he releases the dog?

15      A.   Within 15 to 20 feet.

16      Q.   Okay.  And now you're claiming that Kelley started

17  walking towards O'Malley.  So how many steps did he take

18  towards O'Malley?

19      A.   Several.

20      Q.   Okay.  I mean, how many is several?

21      A.   Five.

22      Q.   He took five steps towards O'Malley.  And what was

23  he doing and saying as he takes five steps towards O'Malley?

24      A.   I don't recall what he was saying, but he was

25  holding the knife up and out towards O'Malley.

1    Q.    And in your report, it says he turned to face

2  officers and made motions towards officers.  Separate from

3  taking five steps towards O'Malley, what were the motions

4  Kelley made?

5    A.    The motions were raising the knife up and advancing

6  towards the officer.

7    Q.    Okay.  And when you say "raising the knife up," just

8  can you -- what do you mean?  Where was the knife originally?

9  Is it at waist level, and he raises it up 6 inches?  Or

10  what's -- what's the movement with the knife?

11    A.    After stabbing K-9 Aren, he had it out in front of

12  him.  I would say chest level and out towards the officers as

13  he walked towards them.

14    Q.    And then -- okay.  He takes five steps towards

15  O'Malley.  What happens next?

16    A.    That's when Officer O'Malley and Ravotti fired their

17  weapons.

18    Q.    And they were to your immediate right.  Is that

19  correct?

20    A.    Yes.

21    Q.    And when Kelley is stabbing Aren, what is O'Malley

22  saying?  Does he -- what did he say?

23    A.    I don't recall.

24    Q.    Did he say something, though?

25    A.    I -- I don't recall.

1  Q.  What about -- what about Ravotti?  What's he saying
2 as Kelley is stabbing the dog?

3  A.  I don't recall.

4  Q.  Do you recall any officer saying anything?

5  A.  I know things were shouted, but I don't know what
6 was said by who.

7  Q.  So Kelley is walking towards O'Malley when O'Malley
8 and Ravotti start shooting at Kelley.  Is that correct?

9  A.  Yes.

10  Q.  And his body is facing them because he's walking
11 towards them.  Is that correct?

12  A.  Yes.

13  Q.  And did you see him get shot?

14  A.  Yes.

15  Q.  Okay.  And tell me what happened to his body.  As he
16 gets shot, what happens to Kelley's body?

17  A.  He falls to the ground.  I believe he landed
18 facedown.

19  Q.  And when you say you "believe he landed facedown,"
20 are you -- are you certain on that or not so certain as far as
21 the way his body fell?

22  A.  I don't know how he landed.  I know he fell.

23  Q.  What happened to the knife?  Did he -- did he
24 release the knife as he's getting shot?

25  A.  I don't recall.

1    Q.    And what's done then immediately after he's shot?

2  What do you do?

3    A.    As that was happening, I was calling to Aren as he

4  was running away.  And Aren came back towards me.

5    Q.    Okay.  Did you deal with Aren then?

6    A.    I grabbed him.  And as soon as I grabbed him, that's

7  when O'Malley then took him.  And they -- he got into the car

8  with Officer DiPippa, and they went for treatment for Aren.

9    Q.    O'Malley learned that Aren was wounded or bleeding?

10    A.    Yes.  He was bleeding from his head and face.

11    Q.    What did O'Malley -- what was -- what was O'Malley's

12  reaction to that?  Just you looking at O'Malley, like his

13  physical reaction, his face, his demeanor.

14    A.    He just grabbed the dog and ran towards the car that

15  was there.

16    Q.    But what was his demeanor?

17    A.    I -- I don't remember seeing his face.  I just

18  remember him coming and grabbing the dog.

19    Q.    Did he -- did he say anything?

20    A.    No.

21    Q.    Okay.  So O'Malley and DiPippa, they take -- they

22  take the dog somewhere.  What then happens on the scene there?

23  What did you do next?

24    A.    Myself and -- I believe it was a Wilkinsburg officer

25  went towards Kelley, Jr., and placed him in handcuffs while

78

1   Officer Ravotti grabbed a medical bag from his car to render
2   treatment.
3       Q.   Why was Kelley, Jr., placed in handcuffs?
4       A.   It's procedure with anyone that's with police
5   officers in that situation.
6       Q.   I mean, wasn't he dead?
7       A.   I don't know if he died immediately.  I just
8   remember taking him into custody.
9       Q.   What -- what -- and by "taking him into custody,"
10  you mean placing him in handcuffs.  Is that what you mean by
11  "taking him into custody"?
12      A.   Yes.
13      Q.   Okay.  So then what happened to his knife?  If you
14  put him in handcuffs, you're dealing with his hands.  What
15  happened to Bruce Kelley, Jr.'s, knife?
16      A.   I'm not sure who collected that as evidence or if
17  they stood by and kept it secure.
18      Q.   And then did you say Ravotti went to get a medical
19  bag?
20      A.   Yes.
21      Q.   And what did Ravotti do with the medical bag?
22      A.   He began to render treatment.  I don't know exactly
23  what he was doing.
24      Q.   After you handcuffed Kelley, what next did you do?
25      A.   I just assisted in securing the scene, making sure

79

1    evidence stayed in the place where it was.

2        Q.    And what was the evidence that was being secured?

3        A.    The knife.  Officer O'Malley's leash for K-9 Aren

4    was dropped in the street.  And I believe -- I don't know if

5    there was anything else on the scene.

6        Q.    Were you wearing a body camera?

7        A.    No.

8        Q.    Did your department utilize body cameras in -- as of

9    January of '016?

10       A.    No.

11       Q.    Did you have Tasers that had a video footage, video

12   surveillance component to them?

13       A.    No.

14       Q.    Now, you deployed the OC spray at two different

15   points.  Is that correct?

16       A.    Yes.

17       Q.    Okay.  And is that considered a use of force?

18       A.    Yes.

19       Q.    Did you fill out use of force forms?

20       A.    No.

21       Q.    And why not?

22       A.    I believe that's handled by our supervisors.

23       Q.    And who was your -- who were your supervisors?

24       A.    O'Malley was the supervisor that day.  And I can't

25   recall if -- at the time, DiPippa might have been a sergeant as

1  well.

2       Q.    And when Bruce Kelley, Jr., is taking five steps

3  towards O'Malley, there's no civilians in that yard, in front

4  of that house.  Correct?

5       A.    In the yard, no.

6       Q.    And are there any civilians anywhere in the area?

7       A.    There was in a house.  I'm not sure how far away.

8  Before the shooting took place, the person was yelling out of

9  her window saying, "Stop.  They don't want to kill you.  Just

10  drop the knife."

11       Q.    And that was a woman who was in her house?

12       A.    Yes.

13       Q.    Almost done.  I'm just looking at my notes.  Just

14  wrapping up here.

15             Did you leave the scene on Whitney Avenue there at

16  some point?

17       A.    Yeah.  I was asked by Officer DiPippa to secure his

18  vehicle with K-9 Arko inside.

19       Q.    Okay.  And did you do that?

20       A.    I did.

21       Q.    And then what did you do after that?

22       A.    I just stayed with the car until we were able to get

23  the car back to the station.

24       Q.    Did you have an interaction with Bruce Kelley, Sr.,

25  that day?

88

facing O'Malley and Ravotti as he's shot, how did the man get

shot in the back?

        MR. EVASHAVIK:  Object to form.

        THE WITNESS:  As he was getting shot, he was falling

to the ground.  So he was in, like, a twisting motion.

BY MR. GEARY:

    Q.    That's your testimony?  That's -- that's a fact?

That's a fact?

    A.    That's how I recall it.

    Q.    And then just page 2.  It's Roman numeral VI.

"Penetrating gunshot wound of the trunk.  A. Entrance location:

Right mid back.  D. Direction:  Back to front, right to left

and upwards."  Do you see that?

    A.    Yes.

    Q.    And what is your explanation for that, if you have

one?

        MR. EVASHAVIK:  Object to form.

BY MR. GEARY:

    Q.    Do you have an explanation?

    A.    I would have a guess.  I wouldn't have a medical

explanation for it.

        MR. GEARY:  Okay.  That's all I have, sir.  Thank

you.

        MR. EVASHAVIK:  Okay.  I have some questions.  And I

want to attempt to play the video, but I'll go through my

1    questions first.

2                        EXAMINATION

3    BY MR. EVASHAVIK:

4        Q.    Okay.  Officer, Exhibit 7, which has been identified

5    as your report, you looked at that today during your

6    examination.  Correct?

7        A.    Yes.

8        Q.    And was this typed by you?

9        A.    Yes.

10       Q.    Is it true and correct?

11       A.    Yes.

12       Q.    You were asked to review earlier this timeline of

13   events, which is Exhibit --

14             What number does that say?

15       A.    6.

16       Q.    -- 6.  And there are some still photos on there

17   which were taken from the Hamnett Street Station camera, which

18   you were asked to identify individuals in the photos.  Correct?

19       A.    Yes.

20       Q.    And do you recall being in that parking lot during

21   the encounter with Kelley, Jr., on the day of this incident?

22       A.    Yes.

23       Q.    And is there a full videotape which shows the entire

24   occurrence?

25       A.    Yes.  There's some --

1    Q.    Okay.

2          THE REPORTER:  I'm sorry, Counsel, to interrupt.  I

3    didn't hear the witness's answer there.

4          THE WITNESS:  Yes.  There is video of the parking

5    lot.

6    BY MR. EVASHAVIK:

7    Q.    And prior to coming here today, did you have a

8    chance to review the videotape from the Hamnett Street Station

9    Park and Ride?

10   A.    Yes.

11   Q.    And did you see yourself in there?

12   A.    Yes.

13   Q.    And what was shown on the video, was that true and

14   correct what you observed on the video as being present on the

15   day of the incident and observing it in person?

16   A.    Yes.

17   Q.    And on the video which you watched, did you observe

18   Kelley, Jr., taking a swiping or swinging motion with the knife

19   at Officer Sanders?

20   A.    Yes.

21         MR. GEARY:  Objection just to the characterization,

22   but the video will speak for itself.  But go ahead.

23   BY MR. EVASHAVIK:

24   Q.    You testified earlier that -- or strike that.

25         Was Kelley, Jr., on the move the entire time of this

1  pursuit, to your knowledge, or at any time did he stop and was

2  he was stationary?

3      A.    He was always on the move.  When he did stop, it was

4  very brief.  It was -- as we talked about the video, he would

5  stop, turn around, and then could turn back around and continue

6  on.

7      Q.    And when he would stop and turn around, you mean

8  turn around to face the officers?

9      A.    Yes.

10     Q.    And what would he do when he did that?

11     A.    He would shout at officers.  He would raise the

12 knife towards officers.

13     Q.    Okay.  And did you -- did you perceive his actions

14 to be a threat?

15     A.    Yes.

16     Q.    And after he would make those actions of turn around

17 to interrupt his forward progress and -- and make the threat to

18 the officers, what would he do immediately after that?

19     A.    I'm sorry.  Can you --

20     Q.    After he would turn around -- while he was walking,

21 you say he would turn around and face officers?

22     A.    Yes.

23     Q.    And do what?

24     A.    He would shout at us.  He would raise his knife.

25     Q.    And as soon as he did that, then what did he do?

1      A.    He would turn around and continue walking.

2      Q.    All right.  At the time that the K-9 released and

3  leading up to that, was Kelley, Jr., still moving?

4      A.    Yes.

5      Q.    Was he moving away from officers?

6      A.    Yes.

7      Q.    And you said he was moving -- this occurred on

8  Whitney -- Whitney Street or Whitney Avenue?

9      A.    Whitney Avenue.

10     Q.    Is that correct?  Whitney Avenue?

11     A.    Yes.

12     Q.    And he was headed towards -- is that a dead-end

13  street?

14     A.    Yes.

15     Q.    Was he headed towards the dead-end portion of

16  Whitney Avenue?

17     A.    Yes.

18     Q.    At the end of the dead-end portion of Whitney

19  Avenue, is that where the busway is located?

20     A.    It's the Linear Trail, and then there's the busway.

21     Q.    All right.  How do you get from the dead-end portion

22  of Whitney Avenue to the Linear Trail?

23     A.    There's a ramp.

24     Q.    And then how do you get from the Linear Trail up to

25  the busway?

1     A.   You would have to make a left or a right and then

2 walk a significant distance either way to get to an opening.

3     Q.   All right.  And also at the end of Whitney Avenue,

4 is there a pedestrian tunnel that goes underneath the busway?

5     A.   Yes.

6     Q.   Where does that pedestrian tunnel lead to?

7     A.   It leads to the other side of the busway.  I don't

8 know the name of the street offhand.

9     Q.   All right.  And do you know what's located on the

10 other side of that tunnel?

11     A.   It's --

12     Q.   Is it a commercial area, or is it residential?  Do

13 you know?

14     A.   It's residential.

15     Q.   Residential.  Do you know what municipality that is?

16     A.   I believe it's Edgewood in that area.

17     Q.   And there are houses located on either side of that

18 tunnel?

19     A.   Yes.

20     Q.   How long is the tunnel?

21     A.   I would estimate 60 to 80 feet.

22     Q.   When -- right before -- shortly before K-9 Aren was

23 released and you officers were pursuing Kelley, you say he was

24 headed towards the dead-end street and the Linear Trail in the

25 area of that tunnel.  Do I understand that correctly?

1    A.    Yes.

2    Q.    Was there any officer in front of Kelley at that

3 time blocking him -- his ability to continue moving away from

4 you towards the tunnel and the Linear Trail?

5    A.    At one point, Officer O'Malley would have been in

6 front of him but not directly.  Kelley, Jr., would have had a

7 way to get past Officer O'Malley at that point.

8    Q.    What about all the other officers that you would

9 encounter during the situation?  Where were they located, if

10 you know?

11    A.    In my general area.

12    Q.    Would that be behind Kelley in the direction he was

13 traveling or some other direction?

14    A.    Behind Kelley.

15    Q.    At any time during this pursuit, did Kelley -- when

16 I say "Kelley," I'm talking about Kelley, Jr.  Do you

17 understand that?

18    A.    Yes.

19    Q.    At any time during this pursuit, did he ever put the

20 knife away?

21    A.    No.

22    Q.    During this pursuit, did you have an opinion or

23 belief whether or not you thought Kelley, Jr., posed a threat

24 of death or serious injury to you and the police officers?

25    A.    From the time I was on the scene until the end, yes,

1    I believed he was a threat the entire time.

2         Q.    Okay.  To you and the other officers?

3         A.    Correct.

4         Q.    And what about civilians?

5         A.    Yes.  I believe he would have been.

6         Q.    And did you have an opinion whether or not during

7    this entire pursuit that Kelley, Jr., was actively resisting

8    arrest?

9         A.    He walked away.  Yes, I believe he was.

10        Q.    All right.  And did you have an opinion or belief

11   whether or not he was attempting to evade arrest by flight?

12        A.    Yes.

13        Q.    What did you believe?

14        A.    I believe he was trying to get away from officers.

15        Q.    At any time during the pursuit, did Kelley, Jr.,

16   ever comply with your orders or any other officers' verbal

17   orders to stop his flight and drop the knife?

18        A.    No.

19             MR. EVASHAVIK:  Okay.  At this time, Noah, I'm going

20   to have my paralegal come in and get this video on.  So just

21   give me a moment.  All right?  Thank you.

22             MR. GEARY:  Yes, sir.

23             (Whereupon, there was a brief pause in the

24   proceedings.)

25             MR. EVASHAVIK:  So we're on record.  This is --

1    MR. EVASHAVIK:  So can you see it now?

2    MR. GEARY:  Yes.

3    (Whereupon, Deposition Exhibit 8 was presented to

4  the witness.)

5    MR. EVASHAVIK:  Okay.  Now we're playing the video.

6  This is going to play all the way through until everyone is out

7  of sight, and then I'll go through it again with questions.

8    (Whereupon, the video is played.)

9    MR. EVASHAVIK:  Okay.  At this point, Kelley, Jr.,

10  is out of sight.  I'm going to stop the video and first ask

11  some questions.

12  BY MR. EVASHAVIK:

13    Q.    All right.  Officer Kaupinis, did you view the video

14  that we all watched, which I have now identified as Deposition

15  Exhibit 8, from the Hamnett Street Station video cameras in the

16  parking lot?

17    A.    Yes.

18    Q.    Okay.  And what is depicted in the video, do you

19  recall seeing that in person on the day of this event?

20    A.    Yes.

21    THE REPORTER:  I'm sorry, Attorney Evashavik.  I

22  think the witness is a little farther from the mike, so he

23  needs to really keep his voice up, please.  Thank you.

24    MR. EVASHAVIK:  Did you get his last answer?

25    THE REPORTER:  I think it was just "Yes."

1      THE WITNESS:  Correct.

2  BY MR. EVASHAVIK:

3      Q.   And does the video accurately, correctly depict what

4  happened in that area on the date of January 31st, 2016, in the

5  Hamnett Street Park and Ride?

6      A.   Yes.

7      Q.   All right.  Let's go back to some specifics here

8  just to --

9           (Whereupon, the video is played again.)

10  BY MR. EVASHAVIK:

11      Q.   Okay.  We're playing it again now.  I'm going to

12  stop it at certain points.  Okay.  Right here.  Now, this is, I

13  think, similar to the still photo that you were asked about.

14  Can you see yourself in this part where it's stopped?

15      A.   Yes.

16      Q.   And immediate -- do you recognize Kelley, Jr.

17      A.   Yes.

18      Q.   And he has his back to us, in the overalls?

19      A.   Yes.

20      Q.   And where were you located?

21      A.   I am just to his left on the screen.

22      Q.   All right.  And this is similar to the still photo

23  from the timeline that was taken from this video?

24      A.   Yes.

25      Q.   And you have your hand raised.  What's in your hand?

1    A.    A can of OC spray.

2    Q.    And did you attempt to OC-spray him at that point?

3    A.    Yes.

4    Q.    Did it have any effect?

5    A.    No.

6    Q.    And do you think it actually reached his face?

7    A.    No.

8    Q.    Okay.  All right.  Continuing on.

9          Okay.  Right now, where is Officer Sanders?

10   A.    I can see him right behind the pole.

11   Q.    So is -- his right arm is blocked by the pole that

12   we see in the video?

13   A.    Yes.

14   Q.    All right.  And is this the officer you testified to

15   earlier that attempted to use his ASP?

16   A.    Yes.

17   Q.    All right.  Is this the scene where it happened?

18   A.    Yes.

19   Q.    All right.  Let's play this.

20         All right.  I'm going to go click by click.  So can

21   we see in this video Officer Sanders approaching Kelley, Jr.

22   A.    Yes.

23   Q.    What does Kelley, Jr., do in response?

24   A.    That's when he turns around and takes a swing

25   towards Officer Sanders.

1    Q.    He takes a swing with what?

2    A.    His right hand, with the knife.

3    Q.    Does the video show his right hand making that

4 motion you're describing?

5    A.    Yes.

6          MR. GEARY:  I'll just object to the

7 characterization.  I mean, the video speaks for itself, but...

8 BY MR. EVASHAVIK:

9    Q.    Okay.  And as we continue in the video, does the

10 video demonstrate Kelley, Jr., at any time holding out the

11 knife pointed directly at Officer Sanders?

12   A.    Yes.

13   Q.    And do you recall seeing that on the scene that day?

14   A.    Yes.

15   Q.    All right.  And we see Kelley, Jr., continuing to

16 walk towards the fence.  Is this the area that you described

17 your second attempt to deploy the OC spray?

18   A.    Yes.

19   Q.    And this is the fence that he climbed over.  Is that

20 right?

21   A.    Yes.

22   Q.    All right.  Let's stop this.  All right.  So this

23 fence, is it -- is it taller or shorter than Kelley, Jr., when

24 he goes over it?

25   A.    Shorter.

1     Q.    All right.  Does he have any difficulty getting

2  over?

3     A.    No.

4     Q.    All right.  When he -- and we're continuing to

5  follow the video.  As soon as he gets to the other side, is

6  that when he goes down to the ground?

7     A.    Yes.

8     Q.    How long is he on the ground?

9     A.    Maybe a second or two.

10     Q.    Is that when you approached again to try to use the

11  OC --

12     A.    Yes.

13     Q.    -- pepper spray?

14          Is that you approaching the fence and nearing?  His

15  back is to you?

16     A.    Yes.

17     Q.    Did the OC spray have any -- did you -- did you

18  discharge the OC spray?

19     A.    Yes.

20     Q.    Did it have any effect on him?

21     A.    Minimal.

22     Q.    And what did he do in response?  Did he stop, or did

23  he continue to move?

24     A.    He got up and continued walking.

25          MR. EVASHAVIK:  Okay.  Those are all the questions I

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


CALISIA KELLEY; and      CIVIL ACTION
JOHNNIE MAE KELLEY,
Co-Administrators of the   No. 2:17-cv-01599-NBF
ESTATE OF BRUCE KELLEY,
JR., deceased,

Plaintiffs,

vs.                TRANSCRIPT

BRIAN O'MALLEY, both in his
Official and Individual    DEPOSITION OF
Capacities as Sergeant for  KYHNROE SANDERS
the Allegheny County Port
Authority; and DOMINIC
RIVOTTI, in both his
Official and Individual
Capacities as Officer for
the Allegheny County Port
Authority,

Defendants,
Jointly and Severally.    TAKEN VIA ZOOM VIDEO CONFERENCE

                       MONDAY, OCTOBER 12, 2020


                       Taken on behalf of Plaintiffs,
                       Calisia Kelley and Johnnie Mae
                       Kelley


                       Counsel of Record for this Party:

                       Noah Geary, Esquire
                       Washington Trust Building
                       6 South Main Street, Suite 225
                       Washington, PA  15301
                       724-222-3788

8

1      A.      General studies.

2      Q.      Okay.  And then did you go into the workforce at

3  that time?

4      A.      After, yes.  I went to the police academy.

5      Q.      Thank you.  Now, you're employed by the Port

6  Authority as of today?

7      A.      Yes.

8      Q.      What is your rank today?

9      A.      Patrolman.

10      Q.      And what year did you start with the Port Authority?

11      A.      2013.

12      Q.      And do you remember exactly what date -- well, no.

13  Sorry.  Can you give me a month on that?

14      A.      August.

15      Q.      Thank you.  Now, did you have any -- separate from

16  going to the academy, did you work or have any experience with

17  any other law enforcement agency or department other than the

18  Port Authority Police Department when you started there?

19      A.      Yes.

20      Q.      Where did you work, please?

21      A.      Swissvale Police Department.

22      Q.      And roughly how long did you work there?

23      A.      Three years.

24      Q.      Was that full-time or part-time?

25      A.      Part-time.

1    Q.   Okay.  Anywhere else besides Swissvale Police

2  Department?

3    A.   No.

4    Q.   Okay.  And when you started at the Port Authority,

5  did you also work at Swissvale for a while?  Did they kind of

6  overlap?

7    A.   Yes.

8    Q.   And when -- when -- Swissvale ended in roughly when?

9    A.   I don't recall.

10    Q.   Okay.  But aside from Swissvale, up to the present,

11  have you worked at any other department or for any other law

12  enforcement agency?

13    A.   No.

14    Q.   Thank you, sir.  I've been given a report of yours.

15  It's a two-pager.  We've marked it as Exhibit No. 33.  And I'm

16  going to ask you some questions off of that today, just so you

17  know.  Have you had a chance to read that before we started

18  today?

19    A.   Yes.

20    Q.   Okay.  And I'm going to ask you some questions about

21  your use of force policy at the Port Authority that was in

22  effect as of the date of this incident, which is Deposition

23  Exhibit No. 14.  Have you had a chance to look at that before

24  we started today?

25    A.   No.

1    Q.    I'll give you a chance.  And then there's a timeline

2  of events.  It's Exhibit 6.  And I may ask you to refer to that

3  at different points in time also.

4         So on the day in question, January 31st, '016, were

5  you working for the Port Authority Police Department?

6    A.    Yes.

7    Q.    And your rank at that time, please?

8    A.    Patrolman.

9    Q.    And do you recall what your shift was on that day?

10   A.    The afternoon, 2:00 p.m. to 10:00 p.m.

11   Q.    And in that time period when you worked, did you

12  have a partner?

13   A.    Yes.

14   Q.    And who was your partner that day?

15   A.    Officer Ravotti.

16   Q.    And what -- what was your assignment that day?

17  Before you got a call on this incident, just what was your

18  assignment, please?

19   A.    Patrol the downtown central business district area.

20   Q.    Okay.  And on this day before you got a call on this

21  incident, did you have any interactions with citizens or

22  anything that was noteworthy or memorable?

23   A.    Can you -- you froze for a second.  Can you redo the

24  question, please?

25   Q.    Sure.  Prior to responding to calls from this

1 incident on that shift that day, did you have any other

2 interactions with any suspects or citizens that was memorable

3 or eventful?

4     A.    Not that I recall.

5     Q.    Okay.  Please describe what you were doing when you

6 got a call about this situation.

7     A.    I believe in the car, just patrolling.

8     Q.    And do you remember if you were driving or Ravotti

9 was driving?

10     A.    Officer Ravotti was driving.

11     Q.    Okay.  And I just read your report, and it

12 references there was a call for a Code 2 and then a Code 3.  So

13 just kind of off of that, I'd like to ask you -- just your

14 words -- as far as what information came through and how did

15 you respond to it?

16     A.    The officer requested backup at the Eastern Zone

17 area out in Wilkinsburg, and we responded --

18     Q.    And --

19     A.    -- lights and sirens.

20     Q.    Sorry to interrupt.

21           What information did you receive as far as why the

22 officer needed backup?

23     A.    He was with two individuals at the Wood Street

24 gazebo --

25     Q.    And --

1    A.    -- and they were becoming combative.

2    Q.    Okay.  Do you recall if you asked any questions for

3 additional or further information?

4    A.    No, I do not.

5    Q.    Okay.  Do you recall if Officer Ravotti asked for

6 additional information?

7    A.    No, I do not.

8    Q.    Okay.  So lights and sirens.  And I assume you start

9 heading towards Wilkinsburg to respond to this call.  Is that

10 correct?

11    A.    Correct.

12    Q.    Okay.  And en route, did you listen to other radio

13 communications about this situation?

14    A.    Yes.  I listened to the Port Authority radio

15 channel.

16    Q.    Okay.  And what -- what else did you learn from the

17 subsequent calls?

18    A.    It went from a Code 2 to a Code 3 when one of the

19 actors presented a knife.

20    Q.    Were the names or identities of the two actors

21 disclosed on the radio transmissions?

22    A.    Not that I recall.

23           (Whereupon, Deposition Exhibit 33 was presented to

24 the witness.)

25 BY MR. GEARY:

13

1    Q.    Okay.  In your report, first paragraph kind of in

2    the middle it says "At that time I immediately switched the

3    radio in No. 224 to 'East PD5' channel to update units

4    responding that there was a weapon now involved and units on

5    scene were requesting a 'Code 3' response."

6    A.    (Witness nods.)

7    Q.    What channel would you have been on before you

8    switched it to East PD5 channel?

9    A.    Port Authority police, Channel 1.

10   Q.    And on Channel 1, does that -- did that mean that

11   only Port Authority officers could give and receive information

12   on Channel 1?

13   A.    Yes.

14   Q.    And then it says "East PD5 channel."  So did East

15   PD5 channel include other police departments?

16   A.    Yes.

17   Q.    And I've been provided some tape recordings from

18   Mr. Evashavik with radio communications.  And would any -- any

19   radio transmissions be recorded, whether you were on

20   Channel 1 or Channel 5?

21   A.    Yes.

22        MR. EVASHAVIK:  Object to form.

23        You can answer.

24        THE WITNESS:  Yes.

25   BY MR. GEARY:

14

1    Q.    Okay.  And I asked a question -- this question of a

2  couple witnesses, like, three weeks ago, so I forgive to ask it

3  again.  But did the Port Authority have its own dispatcher?

4    A.    Yes.

5    Q.    And that would be a dispatcher separate from

6  Allegheny County 911?

7    A.    Yes.

8    Q.    Okay.  Thank you.  As you start getting closer to

9  your destination, just please tell me what -- what happens.

10    A.    As we get closer to the destination, we're updated

11  with locations of the actor, and we exited our vehicle at the

12  Hamnett Street Park and Ride.

13    Q.    And the park and ride is a parking lot?

14    A.    Yes.

15    Q.    Okay.  And there was a report by an Officer Hampy

16  giving a description that Bruce Kelley, Jr., had bear-hugged

17  the gazebo.  Was that information relayed to you over the

18  radio?

19    A.    No.

20    Q.    Okay.  When you get to the parking lot, please tell

21  me what you did.

22    A.    Exited my vehicle with Officer Ravotti and proceeded

23  up the ramp towards the East Busway and Linear Trail.

24    Q.    And did you get up to the top there?

25    A.    No.

15

1     Q.   Okay.  Tell me what happened when you were en route.

2     A.   As we were on our way up the ramp, we were advised

3 that the actor was no longer on the Linear Trail and he has cut

4 through a fence in the woods of the trail and was in the

5 residential neighborhood of Wilkinsburg.

6     Q.   Okay.  Did you receive that info over the radio or,

7 say, another officer, like, verbally telling it to you?

8     A.   I don't recall.

9     Q.   Okay.  What did you and Ravotti do at that point?

10    A.   Proceeded back down the ramp.  Ravotti got into the

11 vehicle.  I stayed on foot.

12    Q.   And did you head in a particular direction when you

13 were on foot?

14    A.   Yes.

15    Q.   What --

16    A.   Towards Center --

17    Q.   Sorry.

18    A.   Towards Center Avenue or Center Street.  I'm not --

19 I can't be sure what -- it's toward Center.

20    Q.   Thank you.  Now, when you're on foot walking towards

21 Center, do you see any other officers?

22    A.   Yes.

23    Q.   And tell me, where were you when you saw them and

24 what -- where were you when you saw the other officers?

25    A.   I don't recall.

1     Q.    Okay.  And what were they doing when you saw them?

2     A.    Looking for the actor.

3     Q.    Okay.  How many officers are we talking about?

4     A.    I don't recall.

5     Q.    Okay.  Can you give me an estimate?  Like, was it

6 two or three or closer to seven or eight?

7     A.    I'm not sure.  I can't give an estimate.

8     Q.    Okay.  And what did you do when you see other

9 officers?

10    A.    I was talking to people who were outside walking

11 around or on their porches, telling them to go back in the

12 house.

13    Q.    So the people you just reference were civilians?

14    A.    Yes.

15    Q.    And would these have been people on Whitney Avenue

16 or Center Avenue or both?

17    A.    They were on Center Avenue.

18    Q.    Okay.  And did they comply with your commands?  The

19 civilians.

20    A.    Some did; some did not.

21    Q.    Okay.  And had you seen the suspect yet at the point

22 in time you told civilians to go into their homes?

23    A.    No.

24    Q.    Okay.  And the civilians who did not comply and go

25 into their homes, did you follow up with them and tell them, "I

1  said go in the house.  Please go in the house"?  This type of

2  thing?

3      A.    No.

4      Q.    Okay.  Is there any particular reason you did not do

5  that?

6      A.    We were still actively looking for the suspect.

7      Q.    Okay.  And at that point in time, did you have, say,

8  any -- a weapon or a Taser?  Anything in your hands yet at this

9  point?

10     A.    No.

11     Q.    Okay.  And please tell me what you do or where you

12 go after you give some verbal commands to the civilians.

13     A.    After I give verbal commands, I stayed on Center,

14 where we then seen the suspect walking from that area.

15     Q.    Okay.  And is that when you saw him for the first

16 time?

17     A.    Yes.

18     Q.    And when you first laid eyes on him, what was he

19 doing, please?

20     A.    He was very aggravated, walking with a knife in his

21 hand.

22     Q.    Sorry.  Just your voice dropped a little bit.

23 Something about aggravated.

24     A.    Very aggravated, walking with a knife in his hand.

25     Q.    Okay.  When you say "very aggravated," what, he

18

1    looked very aggravated?

2         A.    Yes.

3         Q.    Okay.  Do you know which hand he had a knife in?

4         A.    His right hand.

5         Q.    Were you able to notice, say, the length of the

6    blade?

7         A.    Yes.  It was big.

8         Q.    And you were on Center Avenue when you first see

9    him.  That's right?

10        A.    Yes.

11        Q.    Okay.  Was he coming from your right to your left?

12   From your left to your right?

13        A.    He was directly in front of me.  I was coming from,

14   I believe, Rebecca, running up Center, and he was directly in

15   front of me.  There were officers in front of me and then him.

16        Q.    How many officers in front of you?  Roughly.

17        A.    I don't recall.

18        Q.    Do you then -- what do you do then when you first

19   see him?

20        A.    Just started running to get closer to them.

21        Q.    Okay.  Was he running or walking?

22        A.    Walking fast.

23        Q.    Okay.  And did you catch up to the other officers?

24        A.    Yes.

25        Q.    Okay.  And when you caught up to them, what did you

1  see or hear them do?  The other officers.

2      A.    Just give him commands to drop the knife and get

3  down on the ground, put his hands up in the air, drop the

4  knife.  Just giving him police commands, "Stop.  Police."

5      Q.    And was he -- was he walking as they were doing that

6  or did he stop?  Was he stationary?

7      A.    Yes.  He was still walking.

8      Q.    Okay.  And did you also give commands at some point?

9      A.    I don't recall.

10     Q.    Okay.  And so he was not putting the knife down.  Is

11  that correct?

12     A.    Correct.

13     Q.    Okay.  Did any officers at that point in time have

14  guns drawn?  Tasers drawn?  Anything like that?

15     A.    Yes.  There were guns drawn and Tasers drawn and, I

16  believe, OC spray.

17     Q.    Okay.  At that point, did you draw any weapon or

18  device or Taser?

19     A.    Once I caught up to the group, I drew -- I deployed

20  my ASP baton.

21     Q.    Okay.  And when you drew that, why did you draw it

22  at that time?

23     A.    In hopes to disarm the actor.

24     Q.    Thank you.  And what happened next in this

25  encounter?

20

1    A.    The actor is hit with OC spray again and, I believe,

2  a Taser.  I then approached to try to disarm him with my ASP,

3  which he then swings -- he then swings around with the knife

4  and points it at me.

5    Q.    The ASP, what -- what was your ASP made of, please?

6    A.    Metal.

7    Q.    Okay.  And, then, is there also -- in the use of

8  force policy, there's reference to a nightstick.  Were you

9  armed with a nightstick?

10    A.    No, I was not armed with a nightstick.  The ASP

11  baton is basically your nightstick.  It's just collapsible.

12    Q.    Okay.  How much does it weigh, an ASP?  Your ASP.

13    A.    I can't estimate the weight.

14    Q.    Is it, like, one or two pounds or something like

15  that?

16    A.    I can't estimate.

17    Q.    Okay.  And, then, the ASP -- ASP can be extended so

18  that it's -- it's longer?

19    A.    Yes.

20    Q.    Before it's extended, what's the length of the ASP?

21    A.    I don't know.  I do not know.

22    Q.    Okay.  And when you extend it, how long does the ASP

23  get?

24    A.    I do not know.

25    Q.    Okay.  Tell me what you were intending to do with

1    your ASP then, please.

2         A.    I was going to strike his right wrist in hopes to

3    have him release the knife out of his hand.

4         Q.    If you could go to page 1 of your report, please.

5    It's the fourth paragraph on page 1, fourth paragraph from the

6    top.  So the paragraph starts "Officers that were pursuing him

7    stated that"...  Then it continues.  And let me see.  It's

8    maybe about the fourth or fifth sentence.  It says "The actor

9    then turned into the parking lot, where I then extended my ASP

10   baton and approached in an attempt to disarm the actor.  While

11   approaching the actor he was made aware I was approaching and

12   turned around and swung/pointed the knife in his right hand at

13   me while stating 'Don't you do it, you can't sneak up on me!'"

14        A.    Correct.

15        Q.    First of all, did I read that correctly?

16        A.    Correct.

17        Q.    Okay.

18        A.    Yes.

19        Q.    And when you were approaching Mr. Kelley, his back

20   was to you.  Correct?

21        A.    Yes.

22        Q.    And he was -- when you were approaching, he was

23   walking away from you.  Is that correct?

24        A.    Yes.

25        Q.    Okay.  It says "While approaching the actor he was

22

1   made aware I was approaching and turned around."  How was he
2   made aware you were approaching, please?
3        A.    I don't recall.  Possibly noise.
4        Q.    Did you say anything to him as you were approaching?
5        A.    No.
6        Q.    Did any other officers?
7        A.    No.
8        Q.    And your report indicates he turned around and
9   swung/pointed the knife at you while stating "Don't you do it,
10  you can't sneak up on me!"  And is that correct as to what
11  happened?
12       A.    Correct.
13       Q.    Okay.  Did you ever try during this encounter to use
14  your ASP again to try to strike his wrist?
15       A.    No.
16       Q.    Is there any particular reason why you didn't try
17  that again after the first unsuccessful attempt?
18       A.    He -- sorry.  He presented himself as a threat with
19  the knife when he pointed it at me, so I collapsed the baton
20  and put it away.
21       Q.    Did he appear to be intoxicated to you?
22       A.    No.
23       Q.    Okay.  I assume you've had DUI pullovers and arrests
24  in your career prior to this date?
25       A.    Yes.

1      Q.     And you have training in what the indicators, or

2   clues, are of someone that's intoxicated?

3      A.     Yes.  He showed no signs of impairment.

4      Q.     Okay.  Was -- was -- the original call that you were

5   responding to, did it involve him drinking alcohol at the

6   gazebo?

7      A.     I don't recall.

8      Q.     Okay.  Did you -- did you recognize him?  Once

9   you're following him and you look, you eyeball him, did you

10  recognize him from the area or anywhere?

11     A.     No.  I've never seen him before.

12     Q.     Okay.  Did his behavior in any way give you the

13  indication he had some mental health issues?

14     A.     No.

15     Q.     Okay.  There was some testimony that he said "Just

16  shoot me.  Just shoot me" at some point during this encounter.

17  Did you hear him say that at any point?

18     A.     No.

19     Q.     Please tell me what develops next in the

20  interaction.

21     A.     After I collapsed my baton, the actor then proceeds

22  through the parking lot, over a fence where he was hit with the

23  Taser and OC spray again.  And then he goes to the houses back

24  towards Whitney Avenue.  I proceeded back towards Center

25  Avenue, towards Whitney, in hopes to flank the actor.

1  Q. And I think I know what you mean by "flank."  But

2 just so we're crystal clear, what do you mean by "flank"?

3  A. Give him less of an escape area or come up from

4 behind him.

5  Q. Or -- when you say "flank," that means -- can also

6 mean -- it's less of an escape area or you can come up from

7 behind him?  Is that what --

8  A. Yes.

9  Q. Now, he climbed the fence.  Is that correct?

10  A. Yes.  From the parking lot to --

11  Q. Okay.

12  A. While leaving the parking lot, he jumped over a

13 fence.

14  (Whereupon, Deposition Exhibit 6 was presented to

15 the witness.)

16 BY MR. GEARY:

17  Q. If you could take a look at No. 6, please.  It's a

18 timeline of events.  There's some photographs contained in it,

19 some still shots from the park and ride video surveillance.

20  A. No. 6?

21  Q. It's Exhibit 6.  Right.  It's not page numbered.

22 But if you start turning the pages, there's some aerial views,

23 and then it gets to some photos of some officers.  So if you

24 could take a turn to -- it's not numbered, but the upper left

25 is 154915 hours.

1      A.    Yes.  I'm here.

2      Q.    And the first bullet point starts out "Sergeant

3 O'Malley (5580K) asks if the tunnel is secure," and there's a

4 photo there.  Are you on that page?

5      A.    Yes, I'm on the page.

6      Q.    Okay.  Yes, sir.  Thank you.

7            With the stop sign.  Are you in that photograph on

8 that page?

9      A.    No.

10     Q.    Okay.  Can you tell me what officers you recognize

11 from that photo?

12     A.    Officer White -- he's from Edgewood police --

13 Officer Stubbs from Wilkinsburg Police Department, and Officer

14 Ravotti from Port Authority Police Department.

15     Q.    Thank you.  If you could turn two pages, there's

16 another still shot, a photo.  And I wanted to see if -- are you

17 in this photo?

18     A.    No.

19     Q.    Okay.  And this one is 154939.  Bullet point,

20 "Officer Kaupinis appears to be deploying pepper spray."

21 You're on the same page as me?

22     A.    Yes.

23     Q.    Okay.  Can you identify the officers in this photo?

24     A.    From left to right, it will be Officer Burrell,

25 Swissvale Police Department; Officer Kaupinis, Port Authority

1  Police Department; Officer White, who is Edgewood Police

2  Department; Officer Stubbs, Wilkinsburg Police Department; and

3  Officer Ravotti.

4      Q.    And Ravotti has his gun drawn.  Is that correct?

5      A.    Correct.

6      Q.    Okay.  If you could look at the next photo, please.

7  Are you in that photo anywhere?

8      A.    Yes.

9      Q.    And please tell me where.  I think I know, but tell

10  me where.

11     A.    I'm behind the pole directly in front of the actor.

12     Q.    And can you identify the other officers that are

13  depicted in that photo?

14     A.    It's kind of blurry, but I will do my best.  Officer

15  Hahn; Officer -- or Sergeant Hahn of Swissvale Police

16  Department; Sergeant DiPippa, Port Authority Police Department;

17  Detective Catanzaro; an unknown officer I do not know; Officer

18  Burrell; Officer Ravotti.  And then there's two shadows of the

19  officers outside of the frame.

20     Q.    Thank you.  Which is Hahn?

21     A.    He is -- if you see, Sergeant DiPippa has sunglasses

22  on his head.  Sergeant Hahn is right behind him.

23     Q.    Got you.  Thank you.  One last photo, I believe.

24  Next page.  Are you in the photo on the next page?

25     A.    No.

27

1    Q.    Okay.  The next page is 15501- -- 014 hours.
2  "Suspect is observed climbing fence."  Can you tell us, who are
3  the officers in this photo?
4    A.    From what I can see, it looks like Officer Kaupinis,
5  Officer White, and Officer Ravotti.  I cannot tell who the
6  fourth man is -- officer is.
7    Q.    Thank you.  Now, when Kelley climbed that fence,
8  were you near there?
9    A.    I was in the parking lot.
10   Q.    Okay.  Say, how far were you from the fence?
11   A.    I don't recall.  I can't estimate the distance.
12   Q.    Were you close -- close to the fence or not really?
13 Not close?
14   A.    I can't estimate -- I can't estimate because I'm not
15 good at estimates -- sorry -- estimations for distance and
16 stuff.  Sorry.
17   Q.    Tell me what happens next, please.
18   A.    I believe that's -- he climbs the fence then goes in
19 between the houses with officers following behind.  I go back
20 towards Center Avenue with Sergeant DiPippa.
21   Q.    Is DiPippa a K-9 officer?
22   A.    Yes.  He was at the time.  He is no longer.
23   Q.    Did he have his dog, the K-9, out with him?
24   A.    No.
25   Q.    And he -- was he on foot like you were?

1       A.      Yes.

2       Q.      Did you see Bruce Kelley -- did he fall?  When he

3  climbed that fence, did he fall to the ground?

4       A.      Yes.  He was on the ground.

5       Q.      Was he on the ground for a certain period of time?

6       A.      Less than a second.

7       Q.      And when he got up, what did he do?

8       A.      Continued through the yard -- backyard of that

9  residence and on to the left side of the house.

10      Q.      Okay.  So did he continue walking away from the

11 officers?

12      A.      Yes.

13      Q.      And what direction --

14              THE REPORTER:  Officer, can you repeat?  I'm sorry.

15              THE WITNESS:  Yes.  He continued walking away from

16 officers with his knife in his hand.

17 BY MR. GEARY:

18      Q.      And at that point, what direction was he headed as

19 far as, say, towards what street?

20      A.      He was headed towards Whitney Avenue.

21      Q.      Okay.  And you and DiPippa, instead of following

22 him, what, you went in a certain -- a certain direction?

23      A.      We went back to Center, down Center, towards Rebecca

24 to see if we would see him come up Whitney towards Center or

25 see where he was.

1    Q.   Okay.  And does anything happen when you and DiPippa

2   are doing what you just described?

3    A.   We do not see him.  So at that point, they said he

4   crossed over Center, on the radio, and he went into the rear of

5   another residence where he couldn't get through.  And then he

6   came back towards Whitney -- or he crossed over Whitney, on the

7   radio -- I'm sorry about that.  He went to the rear of a

8   residence where he couldn't get through, and he came back onto

9   Whitney.

10   Q.   And as he was doing those things, you were on foot,

11   trying to track him down.  Correct?

12   A.   Trying to locate, yes, on Center, on foot.

13   Q.   What happens next?

14   A.   He then goes back onto Whitney for the second time.

15   Myself and Sergeant DiPippa get into a vehicle and drive

16   towards Whitney Avenue.

17   Q.   So you lost sight of Kelley for a while?

18   A.   Yes.

19   Q.   After he goes over the fence, falls, gets up, and

20   continues towards Whitney --

21   A.   That was the last time I seen him.

22   Q.   Okay.  And then -- I'm sorry -- you and DiPippa get

23   in a unit?

24   A.   Yes.  Unit 224.

25   Q.   And where did you get in the unit?

1      A.    It was parked on Center Avenue.

2      Q.    And you two start driving where?

3      A.    Towards Whitney Avenue.

4      Q.    Okay.  And as you're driving, what -- what happens?

5      A.    As we were driving towards Whitney Avenue, we heard

6   gunshots go off.  We arrived, and there is -- the actor was on

7   the ground.

8      Q.    How many gunshots did you hear?

9      A.    I don't recall.

10     Q.    Had you ever before been involved in an incident

11  where guns, you know, were used and shots were fired?

12     A.    Yes.

13     Q.    Okay.  And I'm talking prior to January 31st, '016.

14     A.    Yes.

15     Q.    Sorry.  There's a little delay.  How many times have

16  you been involved in an encounter where guns were deployed and

17  fired?

18     A.    I don't recall.

19     Q.    What did you do at that point after you heard the

20  gunshots?

21     A.    Went to -- directly to the area the shots were

22  fired, exited our vehicle.

23     Q.    And so, what, as you were driving up Whitney, were

24  the shots coming from in front of you?

25     A.    We were driving up Center when the shots were fired.

31

1  By the time we turned onto Whitney, there were no more shots

2  being fired.

3      Q.    Okay.  And how far did you drive up Whitney before

4  you got out of the unit?

5      A.    I can't recall.

6      Q.    But you got out of the unit at some point after

7  turning onto Whitney?

8      A.    Yes.  Once we arrived with the rest of the officers

9  on Whitney.

10     Q.    What's the first thing you did when you got out of

11 your unit?

12     A.    Just looked around for scene security -- security to

13 make sure everybody was okay.

14     Q.    And was the scene secure?

15     A.    As far as I could tell, yes.

16     Q.    Was there any civilians/citizens out in their yards

17 or out in the street?

18     A.    I did not see any civilians or citizens at that

19 time.

20     Q.    And you observed the scene is secure.  What did you

21 do next, sir?

22     A.    At that time, I just -- I seen the actor down on the

23 ground.  He was being handcuffed.  And I also observed the

24 police K-9 Aren walking with blood dripping from his mouth.  He

25 was walking with Sergeant O'Malley.

1    A.    No.

2    Q.    What about Adams?

3    A.    No.

4    Q.    What about Hampy?

5    A.    She was new.  No, I never seen anything.

6         MR. GEARY:  Sir, that's all I have.  I appreciate

7    your time.

8         THE WITNESS:  Thank you.

9         MR. EVASHAVIK:  Wait, wait.  I have some questions.

10        THE WITNESS:  Sorry.

11                        EXAMINATION

12   BY MR. EVASHAVIK:

13   Q.    Okay, Officer.  All right.  Just before we started

14   today, I played the video for you to watch taken from the

15   Hamnett Street Station Park and Ride.  In fact, you were asked

16   about Exhibit 6, and there are some still photos in there that

17   are actually taken from that videotape.

18        So my first question is:  Do you recall just about

19   an hour ago you and I -- I played that video for you from the

20   Hamnett Street Station Park and Ride?

21   A.    Yes.

22   Q.    And does the -- do you recognize the photos that you

23   were asked to look at as still photos from that entire video?

24   A.    Yes.

25   Q.    Okay.  And having watched the video, do you remember

1  the events that are depicted in the video?

2      A.    Yes.

3      Q.    And does the video accurately and correctly depict

4  the events that you were there to personally observe what

5  happened between the officers, including yourself, and Bruce

6  Kelley, Jr., in and around the Hamnett Street Station Park and

7  Ride?

8      A.    Yes.

9           MR. EVASHAVIK:  And for the record, that is

10 identified, I think -- is that -- is that Exhibit 18?  I can't

11 remember.  I'm looking for guidance here.  Not from you,

12 Officer.  From --

13          MR. GEARY:  I'm sorry.  What?  The timeline?

14          MR. EVASHAVIK:  No, no.  The video.  The Hamnett --

15 the Hamnett parking lot video.  I've already identified that as

16 an exhibit.  It's in the record.  I just don't recall.

17          MR. GEARY:  I have maybe 17, although -- well, yeah,

18 17 I have -- my notes are audio and video deposition, interview

19 of Ravotti.

20          MR. EVASHAVIK:  No, no.  I'm talking about the video

21 from the parking lot.

22          MR. GEARY:  No, no, no.  I know.  I think maybe 8,

23 Greg.  I think maybe 8.

24          MR. EVASHAVIK:  Oh, 8.  8.  Yeah, I was thinking 18.

25 8.  Yeah, I believe that's correct.  Thank you.  So it's

48

identified as Exhibit 8. Of course, Officer Sanders wouldn't
know how it's numbered.

BY MR. EVASHAVIK:

Q. But, anyway, for the record, I am stating that I
showed you what's already been identified as Exhibit 8 and that
is the videotape from the Hamnett Street Station Park and Ride
from the date of this incident. And can you confirm that the
video depicts what you personally observed and what is shown in
the video?

A. Yes.

Q. Going to your report, Officer, at the first page,
Exhibit 33, the end of the third paragraph, you have something
in parentheses. Can you read that?

A. Yes. I said -- it was a note made to be aware that
multiple civilians were in the area. All were told to get
inside their vehicles or homes due to a male running around
with a knife.

Q. Okay. So why did you feel it was necessary for you
to direct multiple civilians in the area to either get in their
homes or get in their vehicles?

A. I was unsure of the --

THE REPORTER: I'm sorry to interrupt. Officer,
could you start your answer again, please? It kind of cut out.
Could you start your answer again, please? "I was unsure of
the" --

1          THE WITNESS:  I was unsure of the motive of the

2    actor at the time.  I didn't know if he was going to try to

3    stab or cut somebody else or take them inside their home or

4    their car and hold them hostage.

5    BY MR. EVASHAVIK:

6          Q.    Did you or did you not have concern for the safety

7    of those civilians, based on your knowledge of the actions of

8    Bruce Kelley, Jr.?

9          A.    I did have safety -- or concerns about the safety of

10   civilians.

11         Q.    And how about -- on page 2, you -- it would be the

12   top paragraph.  You include in your report specific statements

13   you put in quotes by, I believe, civilians.  It's the last

14   sentence.  Can you read that?

15         A.    Yes.  "As we exited the vehicle, I heard a woman

16   screaming, 'They shot him,' and another woman yelling from a

17   third floor window, 'I told him to just drop the knife, they

18   gonna shoot you, I don't know why he just didn't drop the

19   knife.'".

20         Q.    And you recorded those two statements in quotation

21   marks.  Is that correct?

22         A.    Correct.

23         Q.    Does that mean you tried to report word for word

24   what you heard them say?

25         A.    Correct.

1    Q.    And did you report it that way?

2    A.    Correct.

3    Q.    And were these statements made by civilians or

4  police officers?

5    A.    These were statements made by female civilians.  One

6  female, I just heard -- the first one that said "They shot

7  him," I did not see her, but I heard her scream it.

8          And the second one said, "I told him to just drop

9  the knife."  She was in the third-story window yelling -- out

10  the window, yelling it.

11    Q.    Was this on Whitney Avenue?

12    A.    Yes.

13    Q.    And the other civilians you mentioned earlier, were

14  they in the area -- in and around the area where Bruce Kelley,

15  Jr., was seen and being pursued?

16    A.    Yes.

17    Q.    Did you have any idea how many times verbal commands

18  were given by multiple different officers for Bruce Kelley,

19  Jr., to stop and drop the knife and get on the ground?

20    A.    No, I do not recall at the time.

21    Q.    Was it more than ten?

22    A.    I do not recall exactly how many times.

23    Q.    During your encounter and in the times that you

24  could observe Bruce Kelley, Jr., did he ever stop and stand

25  still and comply with the commands of the officers?

1     A.     Not that I recall, no.

2     Q.     And was he moving continuously or not, when you

3  observed him?

4     A.     Yes, continuously moving.

5     Q.     Was he ever surrounded and trapped and unable to

6  escape, based on your observation?

7     A.     No.

8     Q.     Did you have an opinion whether Bruce Kelley, Jr.,

9  was actively resisting arrest during this pursuit?

10    A.     Yes.

11    Q.     What was your opinion?

12    A.     I believe he was resisting arrest by fleeing and

13  eluding us.  He was resisting arrest by not stopping and

14  surrendering and dropping the knife.  And after he engaged with

15  the officers at the gazebo, he became combative.  He was under

16  arrest at that point.

17    Q.     And did -- did you have an opinion whether Bruce

18  Kelley, Jr., posed an immediate threat to the safety of you,

19  the police officers, and/or civilians?

20    A.     Yes, he did.

21    Q.     Okay.  Why did you believe that?

22    A.     He was walking around with a knife in his hand,

23  refusing to stop.  Officers were trying to stop him.  He swung

24  the knife and pointed it at me and just refused to drop the

25  knife.

52

1          Q.    And when he swung the knife and pointed it at you,

2     how did you feel at that moment about whether you were in

3     danger?

4          A.    I felt like I was in -- my life was in danger at

5     that point.  It was a wake-up call, should I say.

6               MR. EVASHAVIK:  All right.  Those are all the

7     questions I have.

8               Hold on one second.  Mr. Geary may have some

9     follow-up.

10              THE WITNESS:  Okay.

11              MR. GEARY:  Just, I think, three or four, Officer.

12              THE WITNESS:  Yes.

13                            EXAMINATION

14    BY MR. GEARY:

15         Q.    The reference to your report, page 1, last sentence

16    in paragraph 3, the parentheses, "Note:  Multiple civilians in

17    area, all were told to get inside there [sic] vehicles or home

18    due to a male running around with a knife."

19         A.    Yes.

20         Q.    At that point in time that you communicated that to

21    those civilians, you had not yet seen Kelley yet.  Correct?

22         A.    Correct.

23         Q.    Okay.  And at any point when you arrived on scene,

24    whether on the radio or just verbally to another officer, did

25    you ask for any information other than what had been

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


CALISIA KELLEY; and            CIVIL ACTION
JOHNNIE MAE KELLEY,
Co-Administrators of the       No. 2:17-cv-01599-NBF
ESTATE OF BRUCE KELLEY,
JR., deceased,

Plaintiffs,

vs.                            TRANSCRIPT

BRIAN O'MALLEY, both in his
Official and Individual        DEPOSITION OF
Capacities as Sergeant for     ROBERT DiPIPPA
the Allegheny County Port
Authority; and DOMINIC
RIVOTTI, in both his
Official and Individual
Capacities as Officer for
the Allegheny County Port
Authority,

Defendants,
Jointly and Severally.         TAKEN VIA ZOOM VIDEO CONFERENCE

                               WEDNESDAY, OCTOBER 14, 2020


                               Taken on behalf of Plaintiffs,
                               Calisia Kelley and Johnnie Mae
                               Kelley


                               Counsel of Record for this Party:

                               Noah Geary, Esquire
                               Washington Trust Building
                               6 South Main Street, Suite 225
                               Washington, PA  15301
                               724-222-3788

1  BY MR. GEARY:

2      Q.    Officer --

3          MR. EVASHAVIK:  Okay.

4          MR. GEARY:  I'm sorry.

5          MR. EVASHAVIK:  Okay.

6  BY MR. GEARY:

7      Q.    Officer, are you ready, sir?

8      A.    Yes, sir.

9      Q.    Okay.  Thank you.  Just please state your name and

10  spell your last name.

11     A.    Robert DiPippa, D-i, capital P-i-p-p-a.

12     Q.    And you're employed by the Port Authority Police

13  Department?

14     A.    Yes.

15     Q.    What is your current rank?

16     A.    Lieutenant.

17     Q.    And for how long have you worked for the Port

18  Authority Police Department?

19     A.    18 years.

20     Q.    And roughly what year did you begin?

21     A.    January of '02.

22     Q.    And since January of '02, have you worked for any

23  other police department or law enforcement agency?

24     A.    No.

25     Q.    Okay.  Prior to beginning your employment at the

1     Q.    Okay.  So have you had a chance to read that?

2     A.    Yes, sir.

3     Q.    So I've been provided this by Attorney Evashavik, so

4   I have to ask you some questions about your observations of

5   that day and what you did, so forth.  So we'll kind of walk

6   through your report.

7          Do you know -- and this is your report.  Is that

8   correct?

9     A.    That is correct.

10    Q.    Do you know if you composed any other report

11  regarding the Bruce Kelley shooting incident aside from this

12  two-page report?

13    A.    This is the only one.

14    Q.    Okay.  Thank you.

15    A.    You're welcome.

16    Q.    Can you just tell me, what shift were you on that

17  day?

18    A.    It was the afternoon shift.

19    Q.    Which would be what time to what time?

20    A.    It would be 2:00 to 10:00.

21    Q.    Okay.

22    A.    2:00 a.m. -- I'm sorry -- 2:00 p.m. to 10:00 p.m.

23    Q.    And did you have a partner that day?

24    A.    I did.

25    Q.    And who was it, please?

13

1      A.    Arko.

2      Q.    Okay.  But aside from Arko, you did not have a

3  human-being partner?

4      A.    Correct.

5      Q.    And what was your assignment that day, please?

6      A.    Sergeant.  Patrol sergeant.

7      Q.    And do you remember getting a call over the radio or

8  dispatch that you responded to?

9      A.    Yes.

10     Q.    Okay.  Please tell me what you were doing in the

11 course of your duties when you got that call.

12     A.    I was at the station.  I'm not sure exactly what I

13 was doing, but I know I was at the station.

14     Q.    Thank you.  And what was the nature of the call you

15 received?

16     A.    Two of our officers called out with, I believe, two

17 males in a gazebo.

18     Q.    And how -- did you then -- did you go to the gazebo?

19     A.    No.

20     Q.    Okay.  What did you do initially?

21     A.    I started to my vehicle to head out that direction.

22     Q.    Okay.  And then did you go to the gazebo?

23     A.    No.

24     Q.    Okay.  Where did you go initially?

25     A.    I went to the Hamnett stop on the busway.

14

1    Q.    And when you say "stop," that means bus stop?

2    A.    Yes.  It's a bus -- on the busway.

3    Q.    And is there any particular reason that you went

4  there?

5    A.    That's the direction he was going.

6    Q.    Okay.  And, roughly, what was the -- how long did it

7  take you to get from the station to the bus stop?

8    A.    I don't remember.

9    Q.    I mean, is this close to the station?  I know the

10  geography a little bit, but not that well.  It is just, say,

11  five minutes or less?

12    A.    No.  It's longer than that.

13    Q.    Okay.  And when you're driving there to the bus

14  stop, did you hear any additional radio communications?

15    A.    I did.

16    Q.    Did you ask any questions through the radio

17  transmission system to acquire any more information about the

18  precise nature of what the incident was and what was going on?

19    A.    I don't recall.

20    Q.    Okay.  Okay.  And when you got to the bus stop, tell

21  me what happened.

22    A.    I exited my marked vehicle and proceeded in the

23  direction that the officer said that they were at.

24    Q.    And which was in what direction?

25    A.    Inbound, towards town.

1      Q.   I'm sorry?

2      A.   I would say west.

3      Q.   Okay.  I'm sorry.  Did you say, "Inbound, towards

4  town"?

5      A.   Correct.

6      Q.   And towards --

7      A.   I would say -- if you're standing at the bus stop,

8  it's -- that's the direction.  It's not away from town.  It's

9  towards downtown Pittsburgh.

10     Q.   Okay.  Just I wanted to make it clear.  I thought

11 you were referring to Pittsburgh when you said "town."

12     A.   Yes.

13     Q.   Were there any other officers there in the area of

14 the bus stop when you arrived?

15     A.   When I arrived, O'Malley was the only one there that

16 I know for sure.  But I know there was other officers there as

17 well.

18     Q.   And did you speak with O'Malley when you arrived on

19 scene?

20     A.   Briefly.

21     Q.   What -- what was the conversation between you and

22 he?

23     A.   Just that what -- you know, where we -- what

24 direction we were going.  That's all.

25     Q.   Okay.  So he was also a K-9 officer.  Correct?

1     A.    Correct.

2     Q.    And what did you do at that point?

3     A.    I continued in the direction that Mr. Kelley was

4 going.

5     Q.    And was this on foot?

6     A.    Correct.

7     Q.    Was Arko with you at that point in time or remained

8 in the car?

9     A.    He remained in the car.

10    Q.    Okay.  And so you followed Mr. Kelley for a period

11 of time?

12    A.    Very short because I lost him in the woods.

13    Q.    Okay.  When you initially eyeballed him, where was

14 he?

15    A.    On the trail, the Linear -- Linear Trail.

16    Q.    And then did you observe him go into the woods?

17    A.    Yes.

18    Q.    And you followed -- did you follow him?

19    A.    Yes.

20    Q.    Okay.  At that point in time, did you have your gun

21 out of its holster?

22    A.    No.

23    Q.    Did you have your Taser out or anything yet?

24    A.    No.

25    Q.    Did you say anything to Mr. Kelley at that point?

1       A.      No.

2       Q.      Okay.  Did he say anything to you or to anyone?

3       A.      I don't recall.

4       Q.      Okay.  Please just continue to lay it out for me.

5  He goes through the woods.  You follow him.  And how long do

6  you follow him?

7       A.      Off and on because I know he was going in and out

8  of -- between houses.  I'm not sure of the time frame.

9       Q.      Okay.  Did other officers in addition to you follow

10 him through the woods?

11      A.      Yes.

12      Q.      And when he got through the woods, does it then

13 become a residential area?

14      A.      Yes.

15      Q.      Okay.  So at some point in time, did you lose sight

16 of him?

17      A.      Yes.

18      Q.      Is there any particular reason as to why you lost

19 sight of him?

20      A.      I wasn't close enough to him to follow him directly

21 right into the woods.  I wasn't that close.

22      Q.      Okay.  Please tell me what you did.  Do you continue

23 just on foot, looking for him in that residential area?

24      A.      Yes.  And then officers gave their location of where

25 he was, and then I met up with -- like, a group of us met up

1  together.

2      Q.    And Arko was still in your unit.  Is that correct?

3      A.    Correct.

4      Q.    And when you officers met up, say, how many officers

5  met up?

6      A.    I don't recall.

7      Q.    Okay.  What was the conversation?

8      A.    There was no conversation.  It was just engaging

9  Mr. Kelley.

10     Q.    Okay.  And what did you learn had occurred at the

11  gazebo at that point in time as far as what you knew or did not

12  know?

13     A.    From what I know from over the radio is that he --

14  OC was used and that the knife was displayed and that the male

15  was walking on the -- towards the Linear Trail.

16     Q.    When you saw him walking on the Linear Trail, did

17  you see a knife?

18     A.    I did.

19     Q.    Okay.  At any point, did he put the knife away?

20     A.    No.

21     Q.    So you were at the point where some officers and you

22  had gathered.  And at that point, is that when you had lost

23  sight of him?

24     A.    Whenever I met up with the other officers?

25     Q.    Yes.

1     A.    No.  Because Kelley was with them.  It was a -- it

2 was a roving pursuit.

3     Q.    Okay.

4     A.    It was walking throughout the neighborhood.

5     Q.    So at the point you're describing where there's

6 other officers, you had lost sight of him.  But now you

7 re-acquired sight of him.  Is that right?

8     A.    Yes, sir.

9     Q.    Okay.  And when you re-acquired sight of him, what

10 was he doing?

11     A.    He was walking.

12     Q.    And was there some conversation between you and the

13 other officers as far as coming up with a plan to apprehend

14 him?

15     A.    No.  It was just officers asking him to drop the

16 knife several times.

17     Q.    And did you ask him to drop the knife at any point

18 in time?

19     A.    I did.  Yes, sir.

20     Q.    Okay.  When the other officers told him to drop the

21 knife, did he have any response?

22     A.    No.

23     Q.    Okay.  How about when you told him to drop the

24 knife?  Did you get any response from him?

25     A.    He told me -- I believe he said, "I'm sick of you

1 motherfuckers fucking with me."

2     Q.   Okay. Did you say anything in response to what

3 he -- what you just described he said to you?

4     A.   No.

5     Q.   Okay. And your report indicates he appeared upset

6 and very agitated. Is that accurate?

7     A.   Right.

8     Q.   Okay. And just so I know what you mean, because

9 words can mean different things to different people. You say

10 he appeared upset. Can you just describe what -- what you mean

11 by that?

12     A.   Just -- he just looked angry, like he was just mad

13 at something.

14     Q.   And then it says "very agitated." Can you describe

15 what you meant by "very agitated"?

16     A.   Yeah. "I'm sick of you motherfuckers fucking with

17 me."

18     Q.   Okay. Please go on. If you could just walk us

19 through your encounter with him and what he did next or what

20 you did next.

21     A.   Yeah. I -- I told him I was going to tase him. And

22 he said, "Go ahead. That shit don't bother me." So I deployed

23 my Taser. And he looked over his shoulder and said, "Ha-ha.

24 That tickled."

25     Q.   Do you know, say, what street you were on when you

1 deployed that?

2     A.    No, sir.

3     Q.    Okay.  There's some photos -- still shots captured

4 from the video surveillance camera in the park and ride parking

5 lot I'll show you in a few minutes.  When you --

6     A.    It was actually right before that lot, though, so

7 whatever that main street is that our lot is on.  I want to say

8 Center.  It was right there, right before the lot.

9     Q.    Thank you.  And when you --

10     A.    You're welcome.

11     Q.    -- deployed your Taser, why did you deploy your

12 Taser at that time?

13     A.    To try to get compliance off of him.

14     Q.    And is the Taser -- to my information, there may be

15 some different types of Tasers.  I may be wrong.  Did it have,

16 like, two metal prongs come out of it?

17     A.    Yes, sir.

18     Q.    Okay.  So when you deployed the Taser, how was his

19 body positioned?

20     A.    Standing up.

21     Q.    Okay.  Was he facing you?  Back to you?

22     A.    Back to me.

23     Q.    Okay.  And what were you aiming for when you

24 deployed the Taser?

25     A.    Splitting the belt line.  His upper shoulder --

22

1   like, his back and his thigh area, hamstring.

2       Q.    And did the -- where did the two metal prongs of the

3   Taser go?

4       A.    I do not know.

5       Q.    Okay.  Were you able to see whether you connected

6   with them, or did you miss with one of them?  Could you see?

7       A.    I -- from his response, I'm going to, you know,

8   think that there was no connection or heavy clothing.

9       Q.    Okay.  And so, what, he was wearing heavy clothing

10  that day?

11      A.    From what I remember, yes.

12      Q.    Okay.  Had you ever dealt with him before?

13      A.    No, sir.

14      Q.    Did you -- at that point, did you know his name?

15      A.    No, sir.

16      Q.    Okay.  And there was reference in this case that he

17  had been at the gazebo with his father, Bruce Kelley, Sr.  Was

18  his father's name mentioned to you at any point in this

19  encounter up to what you've just described?

20      A.    Not that I recall.

21      Q.    Okay.  And did your Taser have a video footage

22  surveillance component or capability?

23      A.    No, sir.

24      Q.    Okay.  When you tased him, did he say anything to

25  you or acknowledge that you had just deployed the Taser?

23

1      A.    Yes.  He laughed and said, "Ha-ha.  That tickled."

2      Q.    Okay.  Does he continue walking away from you?

3      A.    Yes, sir.

4      Q.    Okay.  What happens next, please?

5      A.    I deployed a second cartridge, with no response.

6      Q.    Okay.  Was there, say, a little lapse in time

7    between the first and the second deployment of the Taser, or

8    was it just, say, a minute or two or something like that?

9      A.    Seconds.

10     Q.    And were you able to tell if the metal prongs on the

11   second deployment made connection with his body or clothing?

12     A.    No, sir.

13     Q.    Okay.  And when you deployed the Taser the second

14   time, how was his body positioned as far as facing you?  Back

15   to you?  Side?

16     A.    Continued -- continued walking away from me with his

17   back facing me.

18     Q.    Okay.  And what happened next, please, in this

19   encounter?

20     A.    He walks into the Hamnett Park and Ride.  And just

21   prior to walking into the Hamnett Park and Ride, someone

22   sprayed OC in Mr. Kelley's direction, and it blew into my face.

23          (Whereupon, Deposition Exhibit 6 was presented to

24   the witness.)

25   BY MR. GEARY:

24

1    Q.    Okay.  If we could, this might be a good time to go

2  to the timeline of events, which has been marked in this case

3  as Exhibit No. 6.  It's an 18-page document, sir, and there's

4  bullet points with some content and some aerial views, but

5  there are, I think, four or five still photos.

6          If you could turn to the first page that has a photo

7  on it.  It's not numbered, but in the upper left-hand corner,

8  it says "154915 Hours" with a bullet point that starts out

9  "Sergeant O'Malley (5580K) asks if the tunnel is secure,"

10  continuing.  Are you on that page?

11    A.    Not yet.

12    Q.    Okay.

13    A.    I am on there now.

14    Q.    Thank you.  And do you see --

15    A.    You're welcome.

16    Q.    Do you see a still shot there, a still photograph,

17  on that page?

18    A.    Yes, sir.

19    Q.    Okay.  And if you would, if you could turn two

20  pages, and there's another photo.

21    A.    Okay.

22    Q.    And then there's two more photos after that.  If you

23  just want to look at them all together, maybe, you know, just

24  give you your bearings.  So if we go back to the first photo

25  there, now, are you in the first photo?

1    A.    No, sir.

2    Q.    Okay.  And can you identify who is in the first

3  photo?

4    A.    The only one I know is Officer Ravotti.

5    Q.    Okay.  Does he have his gun drawn and pointed at

6  Kelley?

7    A.    He does.

8    Q.    Okay.  Two pages afterwards, do you see a photograph

9  there?

10    A.    I do.

11    Q.    And is it 154939 hours?

12    A.    Yes, sir.

13    Q.    Okay.  And are you in that photo?

14    A.    No, sir.

15    Q.    And on that photo, the caption bullet point says

16  "Officer Kaupinis appears to be deploying pepper spray."  Is

17  that correct?

18    A.    That's correct.

19    Q.    Okay.  The next page is another photo, and it's

20  154948 hours.  Do you see that photo?

21    A.    Yes, sir.

22    Q.    Are you in that photo?

23    A.    Yes, sir.

24    Q.    Okay.  Can you tell me where you are, please?

25    A.    I am the one with -- I'm the one with the sunglasses

1  on the head, Taser in the left hand, chevrons on the sleeve,

2  and my head is down.

3      Q.    Thank you.

4      A.    You're welcome.

5      Q.    Now, from looking at this photo that we're on here,

6  as far as the sequence of events, can you remember, had you

7  already deployed your Taser at this point in time that's

8  depicted on this photo?

9      A.    Yes, sir.

10     Q.    Okay.  And you had deployed it twice?

11     A.    Before this parking lot, yes.

12     Q.    And do you remember being in this parking lot, as

13 the photo depicts, during this encounter?

14     A.    Yes, sir.

15     Q.    Okay.  One more photograph.  Next page, please.  Do

16 you see -- it's a tree, a fence, and some officers there, and

17 it's timelined at 155014 hours.

18     A.    Yes, sir.

19     Q.    Are you in that photo?

20     A.    No, sir.

21     Q.    Okay.  Now, you had left off that someone had

22 sprayed OC spray.  And did it get in your eyes?  Is that what

23 happened?

24     A.    Yes, sir.

25     Q.    Do you know which officer deployed the OC spray?

1      A.    Kaupinis.

2      Q.    Okay.  And going back to the second photo, please,

3   on the timeline, 154939 hours.  It says "Officer Kaupinis

4   appears to be deploying pepper spray."  Again, you're not

5   depicted in that photo.  Is that correct?

6      A.    That's correct.

7      Q.    Okay.

8      A.    But if you expand it, I am just outside that to the

9   left there where that last officer is on your left.

10     Q.    Okay.  The African American officer with the

11  sunglasses on?

12     A.    Yes, sir.

13     Q.    You would be to the left of the photo?

14     A.    Yes.  Right on the sidewalk.  Right behind him.

15     Q.    Thank you.

16     A.    You're welcome.

17     Q.    And can you describe what -- the effect the OC spray

18  had on you or your ability to see or function?

19     A.    Yeah.  It looked like temporary blindness.

20     Q.    And --

21     A.    That's why you see me backing off.

22     Q.    Got you.  And, say, temporary, is that -- I've never

23  dealt with OC spray.  Is that, say, like a 20-second thing or,

24  like, a 2- to 3-minute thing?

25     A.    It varies on everyone's, you know, body.  Some

28

1  people are affected by -- you know, just like allergies.  You

2  know, OC affects people differently.

3      Q.    Okay.  So at some point, did you recover from the OC

4  spray?

5      A.    Yes, sir.

6      Q.    Did -- the OC spray, does it affect your breathing,

7  like your lungs, also, if you breathe it in?

8      A.    It all depends on the wind and how much you got.

9      Q.    Okay.  So on that day, did the OC spray -- it

10  affected your eyes?

11      A.    Yes, sir.

12      Q.    Did it affect your breathing in any way?

13      A.    No, sir.

14      Q.    Okay.  After you recovered from the OC spray, what

15  did you do next, sir?

16      A.    I turned around and went back towards the main road

17  and was heading towards a marked unit, Unit 224.

18      Q.    The main road, would that be Center?

19      A.    Yes, sir.

20      Q.    And did you say --

21      A.    The main road to the lot.

22          THE REPORTER:  I'm sorry.  I didn't hear.

23          THE WITNESS:  The main road to the lot, which is

24  Center.

25  BY MR. GEARY:

1  Q. I'm sorry.  What did you say about Unit 224?

2  A. I was going toward one of the police vehicles.

3  Q. Okay.  What was your vehicle number?

4  A. 231.

5  Q. And who was in 224?

6  A. I do not know.

7  Q. Okay.

8  A. It was empty.

9  Q. Oh.  What did you do next, please?

10  A. Myself and Officer Sanders got in the vehicle to try

11 to go around, since he cut through the lot.  Mr. Kelley cut

12 through the back of the yards.  We were trying to go around and

13 cut him off.

14  Q. And what -- what street did you -- were you

15 traveling on when you were trying to -- attempting to cut him

16 off?

17  A. We only made it to Center Street.

18  Q. Where was the unit that you got into?

19  A. I'm not exactly sure where it was.

20  Q. Okay.

21  A. It was in that general area.

22  Q. You and Sanders get in there.  And were you driving

23 or Sanders?

24  A. I was.

25  Q. Okay.  Now, this whole time, is Arko still in your

1 unit?

2     A.    Yes, sir.

3     Q.    Okay. And as you're driving, what happens -- what

4 happens next?

5     A.    We proceeded in one direction and then got radio

6 communication that he was cutting back towards the direction he

7 just came from, so we turned around and was heading back.

8     Q.    And when you turned around, what street would you

9 have been on when you turned around?

10     A.    I was still on Center.

11     Q.    Okay. So in your -- in your vehicle, you reversed

12 course on Center Avenue?

13     A.    (Witness nods.)

14     Q.    What, are there radio communications that you can

15 hear in that unit?

16     A.    Yes, sir.

17     Q.    And then also you have a microphone on your shoulder

18 as well?

19     A.    Yes, sir.

20     Q.    What -- what were you hearing as far as what was

21 going on as far as radio transmissions, please?

22     A.    Just like I said, it was the direction that he was

23 going. They got on the radio and said he was backtracking. We

24 turned around and was trying to head back to the direction that

25 he was going.

1    Q.    Okay.  And as you're traveling towards the direction

2  you thought he was going, what happens then, please?

3    A.    Then we hear over the radio "Shots fired" from one

4  of the officers.

5    Q.    Did you actually hear shots fired?

6    A.    No, sir.

7    Q.    You just heard over the radio an officer say the

8  words "Shot fired."  Is that right?

9    A.    Yes.  Correct.

10    Q.    Where -- were you on Center Avenue when that came

11  through on the radio?

12    A.    Yes, sir.

13    Q.    And what did you do in response?

14    A.    I proceeded to the location they called out with.

15    Q.    Which was what location?

16    A.    I believe it was Whitney.

17    Q.    And what did you do when you pulled onto Whitney

18  Avenue?

19    A.    I exited my vehicle and proceeded in the direction

20  on foot where the other officers were headed.

21    Q.    And where were they headed?

22    A.    Towards the busway.

23    Q.    Okay.  And is Whitney Avenue a dead-end street?

24    A.    Yes, sir.

25    Q.    And is the -- the busway in the same direction to

32

1  where Whitney Avenue dead ends?

2      A.    Yes, sir.

3      Q.    Okay.  Now, are officers walking?  Running?  How are

4  they moving?

5      A.    I don't recall.

6      Q.    Okay.

7      A.    Everything was happening so fast.

8      Q.    How many years had you been a police officer at that

9  point in time?

10      A.    At that time, probably 22 years.

11      Q.    Had you ever been on a call before where shots had

12  been fired?

13      A.    I have.

14      Q.    Okay.  Can you give me, like, how many?  Just a

15  handful of times or more than that?

16      A.    Less than a handful.

17      Q.    Okay.  And what did you -- when you get out of the

18  vehicle, what did you do, please?

19      A.    I proceeded in the direction the other officers were

20  going.

21      Q.    Okay.  And were you walking?  Running?

22      A.    I ran.

23      Q.    Okay.  What did Sanders do?

24      A.    I don't know.

25      Q.    Okay.  And as you're running, are you on Whitney

33

1    Avenue on foot?

2        A.    Yes, sir.

3        Q.    Okay.  Were there any civilians/citizens out in

4    their yards or out in the street?

5        A.    I don't recall seeing any.

6        Q.    Okay.  What did you do?  You ran to a certain point.

7    And then what do you see or what do you do?

8        A.    Can I ask you a question?

9        Q.    Yes, sir.

10       A.    The lady over your right shoulder, why is she

11   laughing and shaking her head?

12       Q.    This shoulder?

13       A.    Yes, sir.

14       Q.    I -- I don't know.  I didn't --

15       A.    I mean, I didn't know if I said something -- you

16   know, it just didn't look right.

17       Q.    I don't know if she was doing that.  Actually, when

18   I lean forward, I can't see either of my clients, so...

19       A.    I'm just -- I'm just letting you know.

20       Q.    What do you do when you -- you run up the street.

21   What do you do?  What do you see?

22       A.    I see officers running in the direction to the left.

23   And then I look to my right, and there's Sergeant O'Malley

24   standing there with his partner.

25       Q.    And that's Aren?

1    A.    Correct.

2    Q.    And what's going on with O'Malley and Aren there?

3    A.    I looked over, and Sergeant O'Malley said, "He's

4  hurt bad."

5    Q.    O'Malley said that to you?

6    A.    Yes.

7    Q.    And you're, obviously, at the time, a fellow K-9

8  officer.  Correct?

9    A.    Correct.

10    Q.    Were you the only other fellow K-9 officer at the

11  scene?

12    A.    I believe I was.

13    Q.    What did O'Malley -- what did he look like, like his

14  face, when he said Aren is hurt bad?

15    A.    I don't recall the look.

16    Q.    Okay.  Was he -- was he -- did he say that in a

17  casual way or was he in an excited state when he said that?

18    A.    I don't remember.

19    Q.    Okay.  What did you say or do in response?

20    A.    I looked over with the officers that -- I noticed

21  that they were going over to, you know, what -- I assumed that

22  was Mr. Kelley, in his direction.  And I looked to my right

23  again and said, "Get him in the car.  Let's get out of here and

24  get him help."

25    Q.    And you and O'Malley get in what?

1     A.    224.

2     Q.    Okay.  And you start driving where, please?

3     A.    To Northview Animal Hospital.

4     Q.    Thank you.

5     A.    You're welcome.

6     Q.    And your report indicates "While in route, we were

7 diverted to PVSC [sic] in O'Hara Township."  First off, what is

8 Northview Animal Hospital?  I mean, I can kind of gather, but

9 what is Northview Animal Hospital?

10    A.    It's where we take our pets for routine checkups.

11    Q.    Okay.  And PVSC [verbatim], what was or is that?

12    A.    It's more of a trauma unit where, you know, they

13 have better equipment and are able to be suited to help the dog

14 out.

15    Q.    And I don't -- I'm not familiar with that neck of

16 the woods.  Is O'Hara Township -- is that near Wilkinsburg or

17 not?

18    A.    It is not.  It is in the North Hills.

19    Q.    Okay.  And what did you and O'Malley do with Aren

20 when you got there?

21    A.    I ran inside to get help, and he carried his partner

22 in.

23    Q.    Okay.  And I assume you and O'Malley were there for

24 a while just waiting?

25    A.    Yes.

36

1      Q.    Okay.  And, like, roughly how long were you there

2  before whatever you're ultimately told as far as the status of

3  Aren?

4      A.    I do not recall.

5      Q.    Okay.  Were you and O'Malley, like, sitting in a

6  waiting room?

7      A.    No, sir.

8      Q.    Were you back with Aren?

9      A.    I was -- we were kind of separated just -- you know,

10  I don't recall, really, the whole incident while we were there,

11  but I know we weren't together the whole time.

12      Q.    And en route, was Aren bleeding?

13      A.    Yes.

14      Q.    Okay.  And when you got to the PVSC and you spoke

15  with the doctors, nurses, the treaters, what -- what were they

16  telling you as far as the nature of the injuries?

17      A.    They didn't tell me anything.

18      Q.    Okay.  And, what, you and O'Malley are informed at

19  some point that Aren had died?

20      A.    Correct.

21      Q.    Okay.  What was O'Malley's reaction to that?

22      A.    He was obviously upset about it.

23      Q.    Yeah.  I mean, was he angry?  Started crying?  A

24  mixture of both?

25      A.    I don't -- I don't believe he was angry.  I just

44

1    officer acting as a suspect, holding a weapon.  You deploy the

2    dog to apprehend the suspect, and then the dog goes after the

3    suspect and tries to bite the suspect or knock him down.  Just

4    those types of things.

5        A.    Yeah.  The dog is trained to apprehend and listen to

6    the handler --

7        Q.    Okay.

8        A.    -- in any scenario.

9        Q.    Okay.  And apprehend means what?

10       A.    To make contact.

11       Q.    Okay.  And make contact means what?

12       A.    To bite.

13       Q.    Okay.  And to apprehend -- is the only form of

14   apprehension to bite?

15       A.    Yes.

16       Q.    Is there any form of apprehension with the K-9 where

17   the K-9, say, jumps and knocks the suspect -- knocks into the

18   suspect but does not bite?

19       A.    No, sir.

20       Q.    Thank you.  On the bite, what is the -- what are the

21   dogs -- are they trained to bite a specific body part on a

22   suspect apprehension?

23       A.    It's normally the shoulders, the back shoulders.

24       Q.    Okay.

25       A.    That's the first usually exposed area of the body.

1      Q.    The back of the shoulders?

2      A.    Yes, sir.

3      Q.    And is there, say, a second area of the body that

4   kind of comes in as number two that's likely to be exposed?

5      A.    No.  Whatever is first, comes first.

6      Q.    Okay.  If a suspect had a knife in his right hand

7   and the dog is deployed to apprehend that suspect, the dog

8   is -- can bite where on the body for it to be a successful

9   deployment?

10      A.    First exposed.

11      Q.    Okay.  Can that be the legs?

12      A.    Whatever is closest to the dog.

13      Q.    Okay.  If a suspect possesses a weapon of any kind,

14   in the training, the K-9 training, are you even -- do you have

15   the discretion to not deploy the K-9?

16      A.    It is the handler's discretion.

17      Q.    Okay.  In your career, have you ever had an actual

18   deployment with -- with Arko?

19      A.    I have not.  Have I had -- yeah, I have had

20   deployments, yes.

21      Q.    Okay.  How many, please?

22      A.    Two.

23      Q.    Okay.  Let's take the first one.  Can you describe

24   for me, what was the scenario and describe the deployment of

25   Arko, please?

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


CALISIA KELLEY; and       CIVIL ACTION
JOHNNIE MAE KELLEY,
Co-Administrators of the    No. 2:17-cv-01599-NBF
ESTATE OF BRUCE KELLEY,
JR., deceased,

Plaintiffs,

vs.                    TRANSCRIPT

BRIAN O'MALLEY, both in his   DEPOSITION OF
Official and Individual      MICHAEL HUDEK
Capacities as Sergeant for
the Allegheny County Port
Authority; and DOMINIC
RIVOTTI, in both his
Official and Individual
Capacities as Officer for
the Allegheny County Port
Authority,

Defendants,
Jointly and Severally.      TAKEN VIA ZOOM VIDEO CONFERENCE

                              THURSDAY, SEPTEMBER 24, 2020


                              Taken on behalf of Plaintiffs,
                              Calisia Kelley and Johnnie Mae
                              Kelley


                              Counsel of Record for this Party:

                              Noah Geary, Esquire
                              Washington Trust Building
                              6 South Main Street, Suite 225
                              Washington, PA   15301
                              724-222-3788

1     A.     Well, I'm here, so take as much time as you need.

2     Q.     Okay.  Thank you, sir.

3            And where -- just where are you and Attorney

4 Evashavik right now?  Just curious.  In his office?

5     A.     Yeah.  Well, no.  It's, like, a conference room, I

6 guess.

7     Q.     Oh, okay.

8     A.     A small conference room.

9     Q.     Okay.  And how are you currently employed, sir?

10    A.     Port Authority of Allegheny County Police.

11    Q.     Thank you.  What is your rank?

12    A.     Patrolman.

13    Q.     And how long have you been employed there?

14    A.     It will be five years November 23rd.  So just under

15 five years.

16    Q.     And what is your age, please?

17    A.     I'm 42 years old.

18    Q.     Thank you.  Are you -- what -- are you from

19 Pittsburgh originally?

20    A.     Yeah.  I grew up in Penn Hills.

21    Q.     Okay.  And what high school did you graduate from?

22    A.     Penn Hills High School.

23    Q.     Thank you.  Did you work in any law enforcement

24 agency or capacity prior to Port Authority?

25    A.     Yes.  I worked at East Pittsburgh Police Department

8

1 and North Braddock Police Department.

2     Q.    Which one was first?

3     A.    East Pittsburgh.

4     Q.    And how many years at each?

5     A.    I think it was East Pittsburgh for maybe 2 1/2, 3

6 years and North Braddock for about a year.

7     Q.    Thank you.  And then when you started for the Port

8 Authority, were you full-time?

9     A.    No.  I was part-time at those other two departments,

10 and I was -- I got hired at the Port Authority full-time.

11     Q.    Okay.  So when you started at the Port Authority,

12 you started full-time?

13     A.    Yes.

14     Q.    Got you.  Just one second, please.  I'm just making

15 a note.  Sorry about that.

16         (Whereupon, Deposition Exhibit 9 was presented to

17 the witness.)

18 BY MR. GEARY:

19     Q.    Now, I just want to ask you about the events of the

20 day that this all happened, which was January 31, 2016.  I've

21 read your report.  Obviously, you were working for the Port

22 Authority Police Department at that time.  Is that correct?

23     A.    Yes, sir.

24     Q.    And what shift were you on?

25     A.    I was still in training, and I was with -- it was my

9

first day with the detectives.  And I don't recall -- I might

have come in at 9:00 that day.  I was with Detective Atkins.

Q.    And what's Atkins' first name?

A.    Kevin.

Q.    Thank you.  And your report reads you were in the

passenger seat of Unit 292 with Atkins, responding to a Code 3

call, a male with a knife that fled after fighting with

officers.  So do you know where you were, just roughly, when

you got this call?

A.    We were -- I don't recall if we were still in the

city or if we were, like, south of the city.  We were going to

go get the detective car washed.  Like, it was towards -- it

was coming towards the end of the -- the end of the shift.  It

was in the afternoon.

Q.    And you and Atkins, were you on patrol?

A.    I was still in training.  He was training me, like

letting me know what the detective unit does and the computer

and stuff.

Q.    Okay.  And paragraph two of your report starts "When

we arrived on scene, I observed a large black male" and then it

goes.  So if we could -- you could just walk me through it.

I'll interrupt a lot, but if you could just walk me through.

What was the nature of the call; what you did when you got

there, so forth.  I just need to find out what you know from

that day.

10

1       A.      The call came out.  Officer Adams and former Officer

2   Hampy were checking the trail and the gazebo, just doing, like,

3   a patrol-zone-type thing, like -- just like a

4   property-check-type deal.  You know, you check, see if any new

5   spray paint, anybody drinking back there, anybody doing any

6   drugs.  You know, any illegal activities, criminal, whatever,

7   suspicious.

8           And I guess it came over the radio that they were

9   getting out.  A couple males -- I guess at that point, they

10  wanted to ID the males, and the males didn't give them their

11  IDs.  And then a fight ensued.

12      Q.      Okay.  And that was the nature of the call?

13      A.      Yes.

14      Q.      And sorry.  When -- so as of January 31, '016, how

15  long had you been with the Port Authority?  I understand you

16  were in training.

17      A.      Yes.  Two months, seven, eight days.

18      Q.      Got you.  Thank you.  So when you and Atkins are

19  driving over to the scene, do you and he talk about the nature

20  of the call Adams had placed?

21      A.      Yeah.  We were discussing it.  We had the radio on.

22  The car radio was on our channel.  And then we had handheld

23  radios -- like, for my handheld radio -- on East PD5, which was

24  the area it was in, the other boroughs around, to see what they

25  were saying on the radio.  So we had both perspectives of where

1  the officers were.

2      Q.    And do you switch the channel on the radio,

3  depending on what geographic area you're in?

4      A.    Like on regular patrol?

5      Q.    Yes.

6      A.    Yes.  We scan, like, where -- our radio would be

7  primary.  So if it's something -- like, if you were talking to

8  me through a different channel, it would cut you off and our

9  channel would come in first.  Like, our channel is the priority

10  channel.  And we would scan other channels to see what was

11  going on.

12      Q.    I'm sorry.  What was the priority channel?

13      A.    Port Authority Police.

14      Q.    Okay.  And do you remember if you or Atkins

15  requested any information from Adams to just gain more

16  information about the nature of the call as you're en route

17  there?

18      A.    I don't recall.

19      Q.    Okay.  If you can tell me, what -- where did you --

20  where did you go whenever you arrived?  Where were you?  What

21  happened?

22      A.    We responded directly to Whitney Street because, at

23  that point, they were -- I think that's where -- the general

24  area where they were at at that time.  Because they were in the

25  Hamnett Park and Ride lot when we were en route, and we were on

12

1   the East Busway.  And there's -- there's only two exits to get

2   off near there.

3        Q.    Thank you.  And did you -- you got out of the unit?

4        A.    Yes.

5        Q.    Atkins as well?

6        A.    No.  I think he tried to circle the block.

7        Q.    Okay.  So you got out on foot, and he's going to

8   circle the block in his -- in his unit?

9        A.    Yes.

10       Q.    Got you.  Thank you.  And when you got out,

11  precisely where were you when you got out of the vehicle?

12       A.    I want to say it was like mid-block Whitney, on the

13  right side.

14       Q.    And what did you see?

15       A.    As we were coming down Whitney, I saw a large black

16  male, just like my report says, you know, with a bunch of

17  officers following him, giving him commands, "Stop.  Police.

18  Get on the ground."

19           And I just -- he walked, like, in between two

20  houses.

21       Q.    And --

22       A.    So as we pulled up -- go ahead.

23       Q.    No.  I'm sorry.

24       A.    As we pulled up, I just got out of the car and went

25  in between like --

1      THE REPORTER:  I'm sorry to interrupt, but you froze

2  right there, Officer, for just a second, so I didn't get your

3  answer.  You said, "As we pulled up, I just got out of the

4  car," and that's all I got.

5      THE WITNESS:  Okay.  The actor, the black male, he

6  was going -- he was crossing the street in front of our car,

7  and he went into a backyard.  At the time, I didn't know it was

8  totally fenced in.  And I went in the neighbor's yard because

9  that's where we were positioned.

10  BY MR. GEARY:

11      Q.    What did you -- what did you just say?  That's where

12  who was positioned?

13      A.    That's where we -- where we were positioned with the

14  car.  Like, he had several officers following him.  So I

15  figured if I went through the neighbor's yard, I could be on

16  the other side.  I'm not just in a group of officers.

17      Q.    Understood.  And when you first saw him, is he

18  coming from your right or from your left?  Or maybe he was

19  right in front of you.

20      A.    He was right in front of us when we first saw him --

21  when I first saw him.

22      Q.    And as far as what --

23      A.    Coming from the --

24      Q.    Yeah.  Coming from your left --

25      A.    Yes.

1    Q.    -- heading to your right?

2    A.    Yes.

3    Q.    And how many officers would you estimate were -- I

4  mean, were they following him?

5    A.    Yes.

6    Q.    How many officers were there at that point?

7    A.    I don't have a precise number.  You know, somewhere

8  less than ten.

9    Q.    And did any of the officers have their guns out?

10    A.    I don't recall.

11    Q.    And what was -- what was he doing?  He was walking.

12  Other than that, was he doing anything?

13    A.    Turning around.  Like, looking behind him.

14    Q.    Could you tell if he was armed?

15    A.    I don't recall.

16    Q.    And then which direction did you go as far as to

17  your left or to your right or straight?  You wanted to kind of

18  go through someone's yard and maybe cut him off?

19    A.    Yeah.  He went -- he walked straight in front of the

20  car, straight to the right.  I got out of the car.  And where

21  the car was parked, I got out of the passenger side door and

22  just went through that yard.  And I was in the -- so looking at

23  the house that he was in, I was at the house -- in the house to

24  the right -- the yard he was in.

25    Q.    Thank you.  And then go ahead.  If you could, just

15

describe.  You went -- you went down the path you chose.  And then what happened next?

A.    When he went through that yard, he realized it was fenced in.  And Officer Hampy and Officer Adams were on the other side of the -- I think it's called Jeanette Street.  It's like a little alley.  Officer Hampy and Officer Adams were on the one corner of the street, and I was approaching the other corner of the yard he was in.

So while I was in that yard, I think one officer deployed a Taser, and it didn't have an effect on him.  And he walked around the other side of the house and went back out the front towards Whitney.

Q.    Do you know the name of the officer who deployed the Taser?

A.    No.  I don't -- I don't recall.

Q.    Was it some -- was it someone other than Hampy and Adams?

A.    Yes.

Q.    And right at that point in time, did you communicate at all with Hampy or Adams?  Anything about the situation or how to apprehend him?  Anything like that?  Any conversation with Adams and Hampy?

A.    I just said, "Hey, you guys all right?"  Both of their faces -- Hampy's face was red and, like, swollen a little bit.  And Adams' face was red.

1    Q.    You could see swelling on Hampy's face?

2    A.    Yes.

3    Q.    Where on her face was there swelling?

4    A.    I don't recall.  I just remember her cheeks being

5    red.

6    Q.    Did they say anything to you about any injuries they

7    had at that point?

8    A.    No.

9    Q.    Okay.  So as far as in your field of view, it would

10   be you; Kelley, Jr.; Hampy; Adams; and another officer who

11   tried to Tase him.  And you don't know the identity of that

12   officer.  Is that correct?

13   A.    That's correct.

14   Q.    Okay.  And then, what, Kelley goes in another

15   direction because he's fenced in?

16   A.    Yes.  He just -- he pretty much turns and goes back

17   towards where he came from.

18   Q.    And what did you do?

19   A.    Well, I was on the opposite side of the fence, so I

20   just followed the fence line.  And I think two houses -- maybe

21   three houses down, there was a vacant lot.  And I went through

22   the vacant lot and started heading back towards Whitney.

23   Q.    And when you say where you were, are you closer to

24   the park and ride?

25   A.    No.

17

1          THE REPORTER:  I'm sorry, Officer.  You froze a

2     little.  All we heard was "No" for your answer.

3          THE WITNESS:  No.  I was in the opposite direction.

4     BY MR. GEARY:

5          Q.    Okay.  And it looks like from a photo, on the other

6     side of Whitney, one block across, is Jeanette Street.  So you

7     were closer to Jeanette Street.  Is that correct?

8          A.    Yes.  Yes.

9          Q.    Did you have your weapon drawn at that time, or did

10    you --

11         A.    No, I did not.

12         Q.    Were you armed with a Taser?

13         A.    No, I was not.

14         THE REPORTER:  I'm sorry, Officer.  We didn't hear.

15    All we heard was, "No, I was not."

16         THE WITNESS:  I don't recall if I had a Taser or

17    not.  I know I had my firearm.

18    BY MR. GEARY:

19         Q.    But your firearm was holstered?

20         A.    Yes.

21         Q.    Thank you.  Just the screen is freezing a little bit

22    here and there.  Just so you know.

23         A.    I understand.

24         Q.    And what did you do next, then, as just this

25    scenario plays out?

18

1      A.      I was going through that vacant lot, like I was

2   saying.  And it was a warm day, so I guess, like -- because of

3   the cold, like, it was mushy.  And I was dressed in, like,

4   plainclothes, kind of like what I am now.  And I remember

5   stepping in the mud and my boots -- trudging a little bit.  And

6   then as I was trudging, I looked down and I heard a series of

7   gunshots.

8      Q.      And when you were trudging and you hear gunshots,

9   you're in someone's yard at that point?

10     A.      A vacant lot.  It might have been a house at one

11  point, but it was just -- there was nothing there.

12     Q.      Was there any other officer in your field of view?

13     A.      No.

14     Q.      And from however your body was oriented, you hear

15  shots.  Is it coming from your left?  Your right?  Behind you?

16  In front of you?

17     A.      I want to say in front of me, to my left.

18     Q.      Okay.  What did you do?

19     A.      I headed in that direction.

20     Q.      Okay.  And what -- what did you find?  Just -- if

21  you can just, you know, walk us through.  I got to interrupt

22  periodically, but just as far as --

23     A.      That's fine.  I walked through --

24             THE REPORTER:  I'm sorry to interrupt, Officer, but

25  you froze again there.  You said, "That's fine.  I walked

1  through" --

2        THE WITNESS:  When I was on the other side, like,

3  where the sidewalk is and I was through the vacant lot, I

4  noticed K-9 Aren.  And K-9 Aren was always very loud, like, he

5  barked a lot.  And he wasn't barking.  He was bleeding from the

6  mouth.  And I just assumed -- I mean, I didn't know what

7  happened.  Like, I heard gunshots.

8        THE REPORTER:  And you froze again, Officer.  I'm

9  sorry about the problems here that we're having.  The last

10  thing I have is "And I just assumed -- I mean, I didn't know

11  what happened.  Like, I heard gunshots."  That's the last I

12  could hear.

13        THE WITNESS:  So I headed towards the gunshots.  And

14  when I was heading that direction, I saw K-9 Aren sitting on

15  the street, bleeding from his mouth.

16  BY MR. GEARY:

17     Q.    And when you see him sitting on the street, are you

18  then on Whitney Avenue?

19     A.    Yes.  Yes.

20     Q.    And were there other officers around?

21     A.    Yes.  There was officers taking Mr. Kelley, Jr.,

22  into custody.

23     Q.    Okay.  What do you mean taking him into custody?

24     A.    Well, they -- they put him in handcuffs.

25     Q.    Did you watch them do that?

1    A.   Yes.

2    Q.   Okay.  Where was Aren just in relation to, say, I

3 mean, Bruce Kelley's body?  Because you said Aren was on the

4 sidewalk or maybe the --

5    A.   As I recall, Kelley's body was in the yard, and Aren

6 was, like, right on the sidewalk.

7    Q.   And do you know what officers were handcuffing

8 Kelley, Jr.

9    A.   No.  I didn't even --

10   Q.   Okay.  Did you --

11   A.   At that point, it was a shock.  I didn't --

12   Q.   Did you tend to Aren?

13   A.   No, I did not.

14   Q.   Okay.  What -- what did you do?

15   A.   At that point, I went to the detective car with

16 Atkins and grabbed the medical bag.

17   Q.   And what was in the medical bag?

18   A.   It's his medical bag.  I don't know.  I just was

19 helping him grab it.

20   Q.   Okay.  And what did Atkins do?

21   A.   -- injuries.

22        THE REPORTER:  All I heard was "injuries," Officer.

23 I'm sorry.

24 BY MR. GEARY:

25   Q.   Sorry.  It's --

1      A.      He went towards -- no.  That's all right.  I
2  understand.

3              He went towards Mr. Kelley.

4      Q.      Got you.  I don't know if it's freezing on your end,
5  but on our end, it's just -- you're freezing.

6      A.      No, it's not.

7      Q.      Okay.  Just -- so the stenographer just has to get
8  it down precisely.

9      A.      I understand.

10     Q.      What did Atkins -- what did you see Atkins do then?

11     A.      He was rendering aid.

12     Q.      And, like, what kind of aid?

13     A.      At that point, I wasn't even paying attention to
14  him.  There was a crowd of people, and I started putting up
15  caution tape.

16     Q.      Give me one moment.  I just want to read the final
17  paragraph in your report one last time.

18     A.      Sure.  Okay.

19     Q.      I don't think I have much more.  And I don't mean to
20  inconvenience you to come here and have so few questions.  I
21  just needed to know --

22     A.      No, no.  It's --

23     Q.      -- what you knew.  Just give me one second.  Let me
24  read this for a moment.

25              Okay.  Thank you for your patience.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


CALISIA KELLEY; and            CIVIL ACTION
JOHNNIE MAE KELLEY,
Co-Administrators of the       No. 2:17-cv-01599-NBF
ESTATE OF BRUCE KELLEY,
JR., deceased,

Plaintiffs,

vs.                            TRANSCRIPT

BRIAN O'MALLEY, both in his
Official and Individual        DEPOSITION OF
Capacities as Sergeant for     JOHN CORRADO
the Allegheny County Port
Authority; and DOMINIC
RIVOTTI, in both his
Official and Individual
Capacities as Officer for
the Allegheny County Port
Authority,

Defendants,
Jointly and Severally.         TAKEN VIA ZOOM VIDEO CONFERENCE

                               THURSDAY, NOVEMBER 5, 2020


                               Taken on behalf of Plaintiffs,
                               Calisia Kelley and Johnnie Mae
                               Kelley


                               Counsel of Record for this Party:

                               Noah Geary, Esquire
                               Washington Trust Building
                               6 South Main Street, Suite 225
                               Washington, PA  15301
                               724-222-3788

6

1  record.)

2          (Whereupon, there was a pause in the proceedings

3  until the deponent was able to reconnect to Zoom.)

4  BY MR. GEARY:

5      Q.    Detective, can you see me?

6      A.    I can.  How about you?

7      Q.    Yes.  And can you hear me?

8      A.    Yes, sir.

9      Q.    Okay.  Thank you.

10          MR. GEARY:  Do you mind, Rita, just what was the

11  last question?

12          (Whereupon, the record was read as requested.)

13  BY MR. GEARY:

14      Q.    Okay.  So, sir, you're presently a detective

15  sergeant for the Swisvale Police Department.  Is that correct?

16      A.    Yes, sir.

17      Q.    Okay.  Now, I provided to Attorney McTiernan, who I

18  assume forwarded to you, one exhibit for this deposition.  And

19  it was a two-page report -- I'm calling it a report -- created

20  by the Allegheny County Police Department.  And it's page 23 of

21  36 in the bottom right-hand corner, and lower than that is a

22  Bates stamp 64.  It goes into the next page.  And it appears to

23  be the summary of an interview of you, Detective, by a

24  Detective Todd Dolfi.  Do you have that with you?

25      A.    I've -- I've read it.  I don't have it with me right

1 now.

2   Q. Okay.

3   A. It's in my phone, but I don't want to mess with my

4 phone right now.

5   Q. Sure.

6    MR. GEARY:  Attorney McTiernan, do you have a copy

7 of that?

8    MR. McTIERNAN:  Yes.  I can bring it up on my

9 screen.

10    MR. GEARY:  Thank you.

11    And so for the case, we'll mark this two-page

12 exhibit as No. 51 in this case.

13    (Whereupon, Deposition Exhibit 51 was marked for

14 identification.)

15 BY MR. GEARY:

16   Q. And, Detective, a couple background questions real

17 quick.  What is your age, sir?

18   A. 50.

19   Q. And are you originally from Pittsburgh?

20   A. Yes.

21   Q. What area?  Sorry.

22   A. I was born in the city, and then I was -- I grew up

23 in Monroeville and lived in Swisvale.  Now I reside in Plum.

24   Q. What high school did you go to?

25   A. Serra Catholic.

8

1      Q.    What year did you graduate?

2      A.    1989.

3      Q.    I went to Mon Valley Catholic in Monongahela.  Class

4   of '89.  We may have played each other in some sports.

5            Now, you had a chance to review the two-page report

6   I just referenced -- or the summary of your interview?

7      A.    Yes.  I reviewed my summary, yes.

8      Q.    Okay.  Now, separate from that, on January 31st,

9   2016, did you respond to an incident in Wilkinsburg?

10     A.    If that was the date of what we're talking about,

11  yes, sir.

12     Q.    Okay.  Did you create or compose any reports related

13  to your response to that incident?

14     A.    No, sir.

15     Q.    Okay.  And as of January of '016, how long had you

16  been with the Swisvale Police Department?

17     A.    Oh, at that point, about -- you said '16?  I believe

18  it was 16 -- well, 16 years.

19     Q.    Thank you.  And did you, in fact, respond to this

20  incident in Wilkinsburg which involved Bruce Kelley, Jr.?

21     A.    Yes, sir.

22     Q.    Okay.  Now, we'll get into what you did, what you

23  saw, so forth.

24            Is there a reason you didn't compose a report

25  memorializing your observations and your participation that

1    day?

2         A.    It wasn't a Swisvale incident, so I didn't feel a

3    need to.

4         Q.    Who was the chief in Swisvale at the time?

5         A.    Greg Geppert.

6         Q.    Thank you.  And I'm just going to walk -- ask you to

7    walk through what happened that day.  Do you remember what you

8    were doing or what shift you were working that day?

9         A.    That's back when I worked 11:00 a.m. to 7:00 p.m.

10   on -- was that a Sunday?

11        Q.    Yes.

12        A.    Yeah.  On Sundays, I worked 11:00 a.m. to 7:00 p.m.

13   And then on Sundays, like, occasionally I would go ride around

14   with the supervisor from the 3:00 to 11:00 shift when he came

15   in, like at the beginning of the shift, just to go over what

16   happened over the weekend and things like that.  And that's

17   when we got the call to Wilkinsburg.  Well, we heard screaming

18   in the radio coming from Wilkinsburg.  It was something going

19   on there, more than a normal stop.

20        Q.    And so you were on, say, patrol?

21        A.    We were kind of just riding around.

22        Q.    Got you.  And when you say you heard screaming, is

23   that over, what, your radio or the dispatcher, car radio?

24        A.    The radio.  Yeah, the radio.

25        Q.    Is that your own -- like a microphone on your

1  shoulder or the car?

2      A.    It was the car.  I believe it was the car.

3      Q.    Okay.  Were you driving?

4      A.    No.

5      Q.    Okay.  And what did you hear as far as, you say,

6  screaming?

7      A.    I don't really remember.

8      Q.    Okay.  And what -- what did you do in response?

9      A.    Well, Sergeant Hahn and I responded to that -- I

10  believe it was Hamnett Station in Wilkinsburg, on the busway.

11     Q.    Okay.  So it's you and Hahn together?

12     A.    Yes.

13     Q.    Okay.  And were you somewhere in Swisvale when you

14  heard this call?

15     A.    Yeah.  When the call came in, we were definitely in

16  Swisvale.

17     Q.    Okay.  As you're driving to the Hamnett Station, do

18  you hear any other radio transmissions as you're driving there?

19     A.    I don't -- I don't recall.

20     Q.    Okay.  When you arrive, please tell me what you do.

21     A.    I got out of the car.  At that point -- at the

22  station, there's a path that goes along the busway.  And so we

23  got out of the car, and we started down the path.  And at that

24  place, we saw the male coming at us with officers behind him.

25  And at that point, he's coming at me.  I could see that he had

1  a knife.  I gave him a command, "Drop the knife."

2          He responded, "Fuck you.  I'm not dropping the

3  knife."

4          And at that point, I had a Taser, and I was looking

5  for something -- he had a thick jumpsuit on.  And before he got

6  even in Taser range, that's when he turned and went over a

7  hill.

8      Q.    Thank you.  Now, if we could break that down a

9  little bit.  When you say you saw the actor, can you describe

10 him?  I mean --

11     A.    A black male.  He looked like he was in his 40s, to

12 me.  Probably about my height.  I couldn't tell his weight

13 because, like I said, he had a -- in my memory, he had a thick,

14 like, gray jumpsuit on.  Like a mechanic's-type jumpsuit, but

15 it had insulation or padding.  And he was coming at me.  And

16 that's when I said, "Drop the knife.  Drop the knife."  And

17 that's when he replied to me.

18     Q.    Okay.  And you said there were officers behind him?

19     A.    Yeah.  They were following him up the path towards

20 me.

21     Q.    Roughly, how many officers were behind him?

22     A.    I want to say at least two.

23     Q.    And when you get out of your unit, did you and Hahn

24 get out together?

25     A.    I wasn't really paying attention to him at first

12

1  because I was on the passenger side, which was the station

2  side.  So I knew he got out, obviously, because he was in close

3  proximity to me when this was -- when he was coming to me.

4      Q.    Understood.  Were there other officers in the

5  vicinity of you and Hahn?

6      A.    I don't remember.

7      Q.    Okay.  So is this -- is this on the Linear Trail?

8      A.    It was a dirt path that ran along the busway.  I

9  don't know the name of it.

10     Q.    Okay.  And had you ever seen this -- the actor, had

11 you ever seen him before?

12     A.    No, sir.

13     Q.    Did you know his name?

14     A.    No.

15     Q.    And he's walking in your direction.  Is that

16 correct?

17     A.    Yeah.

18     Q.    Okay.

19     A.    He was coming right at me.

20     Q.    Okay.  Is he just walking?  Is he running?  Can you

21 describe?

22     A.    It was a -- I would say a brisk walk.

23     Q.    And when you first eyeball him, say, how far was he

24 from you?

25     A.    I would say probably 30 yards.

13

1    Q.    And you gave him a command.  Is that right?

2    A.    Yeah.  Yes.

3    Q.    To drop the knife.  Correct?

4    A.    Yes, sir.

5    Q.    And then he did not drop the knife?

6    A.    No, sir.

7    Q.    And at some point, did you say he made a left?

8    A.    He turned down -- well, it would have been my right,

9  his left.  He turned down the hill, down like into the woods,

10 like -- I don't know if there was even another path there.  But

11 he turned and went down away from me, so he stopped coming at

12 me.  At that point, he was probably -- maybe 15 yards away, 10

13 yards away.  Somewhere in there, he turns and goes down the

14 path -- or down into the woods.  I don't know if there was

15 actually a path there because he was up further than me.

16   Q.    Okay.  So he goes to his left and to your right?

17   A.    Yes, sir.

18   Q.    And did you lose sight of him at that point?

19   A.    I lost sight of him a couple times.  I don't -- it's

20 not real clear when I lost sight of him.  I mean, it's been a

21 long time.  I know at some point he -- there's houses and

22 fences there, and I lost sight of him a couple times during

23 this whole incident.  And I wasn't -- I didn't jump over any

24 fences after him, you know.

25   Q.    Got you.  Now, when you first see him, he's walking

14

1  up on the busway in your direction.  Correct?

2       A.    On the path next to the busway.

3       Q.    Okay.  And which hand did he have a knife in?

4       A.    I was trying to think about this.  And I remember

5  him lifting it up and saying, "I'm not dropping the knife.

6  Fuck you.  I'm not dropping the knife."  And I remember he

7  lifted it up to his, like, chest level.  Not like, you know,

8  waving it around, but he lifted it up.  "Fuck you.  I'm not

9  dropping the knife."

10             And I was, like --

11      Q.    I didn't mean to interrupt you.  Go ahead.  You

12  said, "I was, like" --

13             THE REPORTER:  I'm sorry, Officer.  The audio is

14  kind of stuttering.  Can you start again, please?

15             THE WITNESS:  Can you guys hear me?

16             MR. GEARY:  The video -- the video is frozen at the

17  moment.

18  BY MR. GEARY:

19      Q.    But my question is:  You say he held the knife up

20  at, say, chest height?

21             (Whereupon, a brief discussion was held off the

22  record.)

23             (Whereupon, there was a pause in the proceedings

24  until the deponent was able to reconnect to Zoom.)

25  BY MR. GEARY:

1    Q.    Detective, can you hear me?

2    A.    I can, sir.

3    Q.    And you can see me?

4    A.    Yes, sir.

5    Q.    Okay.  Are you ready to pick up where we left off?

6    A.    I hope so.

7    Q.    Yeah.  Now, you had just described the actor had

8  raised the knife up to chest level.  So my question is:  How

9  long did he -- did he keep the knife at chest level?

10    A.    Just like -- he brought it up, said, "Fuck you.  I'm

11  not dropping the knife."  And I believe that's right when he

12  turned.  He might have taken another step or two, but, I mean,

13  he just turned and went down the hill.

14    Q.    And before the knife was at chest level, where was

15  the knife?

16    A.    He was, like, walking with it down by his side.

17    Q.    And did you -- did you happen to see him do anything

18  with the knife in his hand after he held it at chest level

19  there?

20    A.    I would be guessing, to give you an honest answer.

21    Q.    That's fine.  And, again, when he held the knife up

22  to his chest there, how far were you from him?

23    A.    15 yards.

24    Q.    Okay.

25    A.    Like I said, it's right before he turned.

16

1     Q.   Did you have -- when you gave him that verbal

2  command, did you have a Taser in your hand?  Anything?

3     A.   Yes, sir.

4     Q.   Okay.  Your gun was in its holster?

5     A.   Yes, sir, I believe, at that point.  At one point, I

6  got -- I had a gun in my hand, but Officer Hahn -- or Sergeant

7  Hahn handed me a Taser, so I holstered my gun.

8     Q.   Okay.

9     A.   That was, like, right at the beginning, though.

10  This is before he got closer.

11     Q.   So initially you had your gun out of its holster

12  but --

13     A.   When I got out of the car, yeah, and we started

14  going towards the field.  And then he handed it -- Sergeant

15  Hahn handed me a Taser, so that's why I had my gun holstered.

16     Q.   Okay.  Why did you have your gun out of its holster

17  there initially?

18     A.   When we were starting down the path, they said there

19  were -- at some point, we knew there was a male with a knife

20  coming somewhere towards our area.

21     Q.   Okay.  Do you know roughly how long you had your gun

22  out of its holster?

23     A.   A couple seconds.  Enough time for where he came

24  back around and handed me the Taser, which that was -- I was

25  glad I had the Taser at that point.

1     Q.   And when Kelly makes the turn to his left and your

2  right, what do you then do, please?

3     A.   I kind of stood up and, like, looked as he walked --

4  went over the hill.  And then I went over the hill, but not

5  right behind him.  I went towards him but not at him.  Like, I

6  went in the same direction but not -- catercorner towards him.

7     Q.   And is there a section there of woods that you

8  walked through?

9     A.   Trees and stuff.  I wouldn't call them, like, deep

10  woods.  It was, you know, along the busway in between breaks in

11  towns.

12     Q.   Understood.  And then as you walked through the

13  trees, is it then streets and houses?

14     A.   Yes.

15     Q.   Okay.  Please describe for me what you did when you

16  get through the trees.  You get down to where the streets and

17  the houses are.  What did you do?

18     A.   The next time I really remember seeing him, he was

19  heading towards -- there was a group of kids down the street

20  from him.  And I started screaming to the kids, "Get in the

21  house.  Get in the house."  And he was walking towards them for

22  a little while, and then -- then he turned again.

23     Q.   Okay.  When you said there was a group of kids down

24  the street from him, when you -- when you saw that, where were

25  you?

1      A.    I was behind him.

2      Q.    Okay.  Do you know what street you were on?

3      A.    No, sir.

4      Q.    And, roughly, what was your distance behind him?

5      A.    Probably still about 15 or 20 yards.

6      Q.    And where -- if you're walking behind him and, say,

7  he's at 12 o'clock walking away from you, where were these

8  children?

9      A.    They were in front of him.  They were 12 o'clock to

10  me, but they were further down the street.  But, again, I

11  didn't want to wait until we were right up on them before I

12  started yelling for them to get out of there.

13      Q.    How many --

14      A.    So that's why I started --

15      Q.    Sorry.

16      A.    I want to say there was probably four or five kids

17  maybe.  And, again, I'm guessing at the number, but there was

18  children there.

19      Q.    Do you have, say, an age range?  Are these, say,

20  8-year-olds or teenagers?

21      A.    No, no.  They weren't teenagers.  I want to say,

22  like -- they were, like, you know, below -- probably below 12

23  years old.  Between, like, you know, 10-, 12-year-old kids.

24  Maybe younger.

25      Q.    And when you initially saw them, what was the

1    distance between them and the actor?

2         A.    Probably 30 yards still, 40 yards maybe.  They were

3    pretty -- they were up the street.  But him heading in that

4    direction concerned me, so that's why I screamed for the kids

5    to go inside and get off of the street.  Get off -- go inside.

6         Q.    And could you tell if the kids heard you?

7         A.    They definitely were looking at us.

8         Q.    And did they react to your directive?

9         A.    I would be guessing if I said I remembered that

10   clearly.  In my mind, they did.  Like, they stood up, you know.

11   I mean, that could have been just because the police officers

12   were following this guy down the street, you know.

13        Q.    Did the actor -- did you hear him say anything to

14   those kids?

15        A.    No, sir.

16        Q.    Did you see him gesture in any way to those kids?

17        A.    No, sir.

18        Q.    And then you say -- did you say he -- he turned off

19   in another direction?

20        A.    Yeah.

21        Q.    So if he's at, say -- I'm sorry.  If he's at, say,

22   12 noon and they're further down the street at 12 noon, which

23   direction did he go then?

24        A.    I want to say to my right.  He turned right.  But

25   I'm not a hundred percent sure.  I remember he turned again and

1   then we turned again.  And then I lost sight of him for a

2   little bit.

3       Q.    Understood.  And when he --

4       A.    Okay.

5       Q.    When he turns in whatever direction, is he then

6   going in a direction away from those children?

7       A.    I believe he was going away from the children at

8   that point.  Like, he turned away, yeah.

9       Q.    Okay.  And then you --

10      A.    At least I believe he did, yeah.

11      Q.    And you continued to follow him.  Is that correct?

12      A.    Well, again, he turned.  And I didn't turn -- go up

13  and turn right behind him.  Again, I lost sight of him, so I

14  don't remember if I turned the same street or if I turned,

15  like, the block before, like, to get down -- you know, parallel

16  him.  I don't remember clearly where I turned.

17      Q.    I understand.  At that point in time, how many other

18  officers are, say, near you?

19      A.    There was a couple.  I don't remember how many.

20      Q.    Were there any other officers in your field of view

21  before he turns in whatever direction at that point?

22      A.    I don't -- I don't remember.  I don't know if I had

23  tunnel vision at that point or if I just didn't -- I might have

24  saw one come peripherally.  I don't remember anybody really

25  being in front of me at that particular moment.  There could

1 have been, though.

2     Q.    And at that point in time, Detective, what -- had

3 you learned any additional information about the actor and why

4 he had a knife?

5     A.    No, sir. I don't remember any of that.

6     Q.    Did you ask any other officers any questions about

7 what the origin of this situation was?

8     A.    I don't know if I heard it that day or from after

9 the case and all that. I can't remember what I knew -- what I

10 knew at the time. You know what I mean? It's -- I don't want

11 to say yeah, I knew this, when it could have been mentioned

12 three hours after the incident. So I don't want to --

13     Q.    Yeah.

14     A.    -- speculate on that.

15     Q.    No. That's fair. Please tell me, as you turn to

16 continue following him -- whether it's you're trying to cut him

17 off or follow him directly -- just please walk me through what

18 happens in the scenario.

19     A.    Well, again, I lost sight of him for a -- for a

20 moment of time again. And the last time that really sticks out

21 in my mind that I saw him, again, he was coming directly at me.

22 Now, he came in between two houses, and he came -- was coming

23 straight at me again. So I raised the Taser, and, again, I was

24 giving him commands, "Drop the knife. Drop the knife."

25         And, again, he replied, "Fuck you." And then he

22

1 started hopping fences. Because there was a fenced-in yard,

2 and I had a fence -- like a rear gate. I was at a rear gate.

3 And he was coming down the walkway between the two houses at me

4 when I was giving him the commands. And, again, he turns.

5 This time he turns to his left -- again, to my right, his

6 left -- and he starts hopping fences.

7         And I'm back in an alleyway. Like, I'm behind

8 houses, and I lose sight of him again. And the next thing I

9 hear is -- I don't know how long it took. I can't -- there was

10 a -- I heard gunshots.

11     Q.    Okay.

12     A.    So at that point, I really stepped it up, and I ran

13 around the building at that point.

14     Q.    Got you. If we could pause there, I just want to go

15 back and clarify a couple things. So you lose sight of the

16 actor for a while. And then at another point, you see he's

17 coming towards you. Is that right?

18     A.    Yes, sir.

19     Q.    And you -- you give him another verbal command to

20 drop the knife?

21     A.    Yes, sir.

22     Q.    Where were you when you encounter him there at that

23 moment?

24     A.    I was behind a house. Okay? And it was like, you

25 know, the city yards with every yard is fenced off. I remember

1    it being like that.  I know I had a rear gate in front of me,

2    and there was fences going through the yards.  And you know in

3    the old city-style houses, like, the walkway that goes in

4    between two houses?

5        Q.    Sure.

6        A.    I believe he -- he was coming out through there, but

7    in a fenced-in yard, towards me.  And I was on the other side

8    of the fence, in the alley behind it.  So he was coming at me,

9    and I had a fence in front of me in the fenced-in yard.  So

10   there was a fence between me and him and distance.

11       Q.    Do you know what street you were on or a cross

12   street?  Just some kind of landmark?

13       A.    It was -- it was near where the shooting occurred.

14   It was, like, around the corner.

15       Q.    And did you get -- from your observations of him, do

16   you think he knew that you were there when all of a sudden he's

17   coming towards you?  You're there.  Do you think he knew you

18   were there?

19       A.    Yeah.  He was looking right at me when I was telling

20   him, "Drop the knife.  Drop the knife."

21              And, again, he replied to me, "Fuck you," so...

22              And then he turns and starts hopping fences.

23       Q.    Now, how far were you from him when you give him

24   that verbal command?

25       A.    Again, probably about 15, 20 yards.  Somewhere in

 1    there.  The length of a yard.  Like, he was halfway through the

 2    yard, towards the -- he was between, like, the half of the

 3    house and -- I was close enough to where I thought he would get

 4    in Taser range if he got closer.

 5        Q.    Did you have your --

 6        A.    I didn't think he was quite --

 7        Q.    I'm sorry.

 8        A.    I had the Taser out again.

 9        Q.    Okay.

10        A.    And I didn't think he was quite in Taser range

11    because Taser range is, like, 20 feet.

12        Q.    And then he turns again to go in another direction?

13        A.    Yeah.  In my mind, he turns to his left.

14        Q.    And then he starts hopping fences.  Is that right?

15        A.    Yeah.

16        Q.    Okay.  And then did you follow him there as he's

17    hopping fences?

18        A.    I started to go back over.  I wasn't running after

19    him.  I wasn't -- you know what I mean?  I started trying to

20    figure out how I'm going to get over without jumping over a

21    bunch of fences at that point.  I kind of looked -- because I

22    wasn't really paying attention to what was around me at that

23    point because he was coming at me.

24        Q.    When -- did you actually watch him go over a fence?

25        A.    In my mind, yes.  And it's been a pretty long time,

1   but I -- I remember him turning and me not readily being

2   able -- it wasn't easy for me to follow him.

3       Q.    Did you see him put the knife away as he's

4   jumping -- going over a fence?

5       A.    No, sir.

6       Q.    Did you deploy your Taser at any time that day?

7       A.    No, sir.

8       Q.    Did you deploy OC spray or any type of other method

9   to subdue him?

10      A.    No, sir.

11      Q.    Okay.  When you see him that second time and you

12  give him the command, were there any children or adults in the

13  area?

14      A.    That would have been the third time.  The second

15  time I saw him was with the kids.

16      Q.    Correct.  Sorry.

17      A.    I don't remember anybody in the yards.

18      Q.    Okay.  Now, he's going over fences.  What do you do

19  then?

20      A.    I was kind of walking still, you know, towards that.

21  Like I said, there was -- I was very unfamiliar with the area.

22  Like, I had no idea where I was really at.  And, like, after I

23  lost sight of him again, it couldn't have been more than, you

24  know, a few seconds before I heard the gunshots.

25      Q.    Okay.

1    A.    And that's when I started running.

2    Q.    We'll get to that last, the gunshots.  Maybe ten

3  more minutes, 15, of questioning, just so you know.

4          Did he, this person, appear to be intoxicated?

5    A.    I couldn't tell, sir.

6    Q.    Did he appear to be exhibiting any mental health

7  issues?

8    A.    Not that I could tell.

9    Q.    Did he ever verbally threaten you?

10   A.    No.  What I told you is exactly what he said to me.

11   Q.    Did he ever walk towards you and try to initiate a

12  physical conflict?

13   A.    He was coming at me with the knife, but he turned

14  both times.

15   Q.    And he turned away from you?

16   A.    He turned to the side.  He didn't turn around and

17  retreat.  He just turned away, to the side of me.

18   Q.    So that he was no longer proceeding in your

19  direction?

20   A.    Exactly.

21   Q.    Okay.  Please tell me, in the minutes or moments

22  before you hear gunshots, what were you doing?

23   A.    Again, I was probably walking -- well, not -- I was

24  walking to go around to follow him again.

25   Q.    Are there -- is -- are any other officers with you

1  or in your area?

2       A.    I want to say the -- at one point, there was a

3  Wilkinsburg officer near me, especially when I was at the fence

4  giving the commands.

5       Q.    Do you know the name of that person?

6       A.    I want to say it was Granger.

7       Q.    Okay.  And then I think it's Sergeant Hahn.  I'm

8  using his last name.  Okay?  Yeah, not out of disrespect to

9  Sergeant Hahn.  What happened to Sergeant Hahn?  Initially you

10 described, I think, you were together there up on the busway.

11      A.    We were.  But after I went over the hill, I don't

12 remember what he was doing, to be honest with you.

13      Q.    So you separated from Sergeant Hahn?

14      A.    I don't know if he was behind me or not.  I don't

15 remember seeing him.  I wasn't paying attention to him.

16      Q.    Okay.  Tell me, what were you doing when you hear

17 gunshots?

18      A.    I was still back in the alley, like, walking towards

19 where he had went.

20      Q.    And tell me what you hear as far as number of

21 gunshots.

22      A.    I -- I don't remember off the top of my head.  But

23 the police report said -- stated that I said 5 to 7, and that's

24 probably about right.  I just heard, like, a crack of gunfire.

25      Q.    Could you tell at the time whether it was more than

1    A.    No.  Everybody was completely out of sight.

2    Q.    I think you just answered it, but could you see any

3  officers when you're hearing the gunshots?

4    A.    Not that were involved in that.  I want to say there

5  was another cop around me or two, like back in the alley.  It's

6  so hard to remember some of this stuff.  I want -- I know

7  Granger was near me at one point.  But when the shots went off,

8  I don't know, like --

9    Q.    That's -- I understand.  That's okay.  So what did

10  you do then when you hear the gunshots?

11    A.    I ran.  There must have been a break in the fence

12  because I don't remember jumping over any fences.

13          Okay.  Sorry.  You got me?

14    Q.    Sure.

15    A.    I got a phone call.  Okay.

16          I don't remember jumping over any fences.  I had to

17  find a way to where I can run around unabated.

18    Q.    Okay.  So tell me, how far did you have to run to

19  get to where the area was you heard gunshots?

20    A.    Anywhere between 20, 40 yards.

21    Q.    Okay.

22    A.    I mean, it was around the corner.

23    Q.    Tell me, please, what do you see?  When you get to

24  the area where you hear gunshots, what do you see?

25    A.    At that point, the male was down on the ground.  And

1    I remember them going over and getting the knife off of him.

2    And then they started, like, trying to -- like, they were going

3    to help him, you know.

4        Q.    And when he was down on the ground, is this in the

5    street?  In the yard?

6        A.    It was like a yard.

7        Q.    How was his body positioned?

8        A.    Flat on his back I remember, the way I remember.  By

9    the time I saw him, he was flat on his back.

10       Q.    Okay.  Now --

11       A.    I want to say the knife was in the left hand.

12   Don't quote me on that, but...

13       Q.    How long do you think it took you from when you hear

14   gunshots to you see his body on the ground?  You ran there.

15       A.    Yeah.  A couple seconds.  Well, again, time doesn't

16   really have -- in that situation -- you know what I mean, it's

17   hard to reference time in a situation like that.  It's a lot of

18   sensory overload.  You know?  It's just -- I'm assuming it took

19   me a couple seconds.  I don't know, in reality, how long it

20   took me to get there.

21       Q.    No.  I understand.  As you see his body on the

22   ground, what -- what do you see as far as who were the officers

23   who fired at him?

24       A.    I have no idea.  At that point, like, I have no --

25   there was a bunch of cops around.  There was a bunch of cops

1  over there.

2       Q.   And how were they situated?  Were they, I mean --

3       A.   Again, by the time I got there, he was on the

4  ground.  So I just remember, like, a group of guys, like,

5  converging on him, like, in a semicircle.

6       Q.   How many officers?

7       A.   Oh, I don't know.  Maybe five.  Maybe more.

8       Q.   The summary of your interview says you saw a police

9  K-9 on the ground.

10      A.   Yeah.

11      Q.   Okay.

12      A.   And then the K-9 handler was running over.  And I

13  remember him grabbing the dog and pulling him up, you know.

14      Q.   The dog that's on the ground, was that in the

15  street?  In a yard?

16      A.   I got that from my police report.  I don't directly

17  remember where the dog was.

18      Q.   Where was the dog in relation to the actor's body in

19  the yard?

20      A.   I can't remember.  I'm trying to think.

21      Q.   Okay.

22      A.   It was kind of -- it was chaotic at that point.  You

23  know, it was --

24      Q.   Tell me, what were officers saying?

25      A.   I don't remember.  I didn't really -- I remember,

32

1    like, calling for the hospital.  I remember them trying to get

2    a car -- somebody to get the dog to the hospital.  I remember

3    people talking about getting an ambulance for him.  I mean,

4    there was so much shit going on.  Excuse my language.

5        Q.    That's fine.

6        A.    There was a lot of stuff going on.

7        Q.    Your solicitor seems to have popped out of view

8    here.  Just as a courtesy, if we can hang on for a sec, I'm

9    almost done.  Okay.

10            MR. McTIERNAN:  I'm on.  When a phone call came in,

11   it took the video off.

12            MR. GEARY:  Sure.

13            MR. McTIERNAN:  I'm still on.

14   BY MR. GEARY:

15       Q.    Almost done, Detective.  What did you do there at

16   the scene, then?

17       A.    Nothing.

18       Q.    How long did you remain at the scene?

19       A.    I don't remember.  It might have been a long time.

20   It might have been, like, an hour or so or two.  You know what

21   I mean?

22       Q.    Did you learn at the scene which officers fired at

23   the actor?

24       A.    I don't know their names, but I know who they are.

25   Like, I can't tell you their names right now.  I don't --

1    have it present in front of you -- a copy of a summary of

2    interview that was typed by Allegheny County detective Dolfi

3    that was taken of you on February 1, 2016.  And my question is:

4    Did you, in fact, have a chance to read that before giving your

5    testimony today?

6         A.    I looked at it last night, yeah.

7         Q.    Of course, this incident occurred on January 31st,

8    2016.  So that's nearly five years ago, and I would understand

9    that memories fade in that time.  My question is:  When you

10   provided this interview and gave your statement to Detective

11   Dolfi on February 1, 2016, 11:05 a.m., the next day, do you

12   believe that the events of this incident, your involvement, and

13   what you witnessed were fresh in your mind?

14        A.    Yes.

15        Q.    And in reviewing that summary of the interview and

16   the report by Detective Dolfi of what you told to him, do you

17   believe the report and the attributed recitation of the events

18   by you is a true and correct statement of what you saw that

19   day?

20        A.    I believe it's true.

21        Q.    You testified when you first arrived -- so you had,

22   essentially, three encounters with him.  When you first saw

23   him, you were on the dirt trail that runs adjacent to the

24   busway, and you gave him a command to drop the knife.  Why did

25   you give that command?

1      A.    Because he was coming -- walking towards me with a

2  knife.

3      Q.    At any time of these three encounters with him, did

4  he ever exhibit any type of compliance with your commands or

5  instructions?

6      A.    No, sir.

7      Q.    Did you ever see him drop the knife?

8      A.    No, sir.

9      Q.    And as I heard you testify, on two separate

10  occasions he was walking directly towards you with the knife in

11  his hand in a position that you could visibly see.  Is that

12  correct?

13      A.    The first time, definitely.  On the dirt trail, yes.

14          Behind the fence, I can't clearly remember, but,

15  yeah, I'd say he still had the knife in his hand.  But I don't

16  clearly remember it.  I was looking at his face.

17      Q.    And --

18      A.    But when I told him to drop the knife back there,

19  again, he replied, "Fuck you," so...

20      Q.    Did you ever have an opportunity to deploy your

21  Taser?

22      A.    I never felt he got in range for me to deploy my

23  Taser.

24      Q.    If he had come in range, was it your intention to

25  use it if you felt the distance was appropriate?

1    A.    Yes, sir.

2    Q.    If he had complied with your commands, stopped, and

3  dropped the knife, was it your intention to take him into

4  custody?

5    A.    Yes, sir.

6    Q.    All right.  Looking at the summary of your

7  statement -- I know you don't have that in front of you, but

8  I'll refer to a few portions of it and ask you some questions.

9         You already testified to this too.  At one point

10 when you first saw him on the trail and you directed him to

11 drop the knife and the statement reports that he told you,

12 quote, "Fuck you.  I'm not dropping the knife," end of quote,

13 and raised it to his chest level -- and you told us about

14 that -- how did you perceive that action by him in raising the

15 knife from his side to his chest level?

16   A.    Well, it made me nervous.

17   Q.    Did you perceive that to be a threatening move, in

18 your eyes?

19        MR. GEARY:  Objection.  Leading.

20        MR. McTIERNAN:  I think the sergeant is allowed to

21 answer, isn't he --

22        MR. GEARY:  Sure.

23        MR. McTIERNAN:  -- Attorney Geary?

24        MR. GEARY:  Sure.

25        MR. McTIERNAN:  All right.  That's just for the

1  record, Sergeant.

2         MR. EVASHAVIK:  Yeah.  Occasionally, there will be

3  objections, sir, but you can always answer the question unless

4  your counsel, Mr. McTiernan, tells you not to.

5  BY MR. EVASHAVIK:

6      Q.    Do you remember the question?

7      A.    I do remember the question, and it's kind of a hard

8  question to answer because you're not thinking in that

9  situation.  I remember when he turned, I was slightly relieved.

10  Not to sound like, you know -- but, yeah, it was -- it was

11  making me nervous with every approaching step towards me that I

12  was going to have to use some kind of force on him.

13      Q.    Thank you.  Then another section of the summary of

14  your statement -- and you talked about this -- reports about

15  the kids playing in the yard and you yelled to them to get back

16  into the house.  And it states you said that for fear that the

17  male would harm them.  Did you have a fear at some point as he

18  was walking towards them with the knife that they may be in

19  danger?

20      A.    Yeah.  Because we don't know what the intention is

21  at that point.  And better to be safe than sorry.

22      Q.    And you arrived on the scene after hearing the

23  gunshots, and you told us you saw the male -- or the man with

24  the knife was lying on the ground.  And your statement

25  indicates he was on his back when you arrived and first saw

1  him.  Is that correct?

2      A.    That's how I remember it.

3      Q.    And the statement indicates that he still had the

4  knife in his hand, so I assume you actually saw that while he

5  was still on the ground?

6      A.    I remember them going to get the knife out of his

7  hand.  That's right when they were moving -- converging on him.

8  And then --

9      Q.    Did you -- so did you see officers actually approach

10  him to get the knife out of his hand when he was on the ground?

11      A.    That's --

12      Q.    Did you witness that?

13      A.    That's what I remember.

14      Q.    Well, that's in your statement.  Do you have any

15  reason to --

16      A.    No.

17      Q.    -- think that that's incorrect?

18      A.    No.  I'm not saying that.

19      Q.    All right.  Thank you.

20      A.    I'm saying it's so many years ago.

21      Q.    I understand that.  And that's why I refer back to

22  the statement which you gave the next day.  If you have any

23  reason to believe anything in there is incorrect or --

24      A.    No.

25      Q.    -- the detective -- the Allegheny County detective

1  misquoted you --

2      A.    No.

3      Q.    Okay.  You don't have any reason to believe that?

4      A.    No.

5      Q.    And you did --

6      A.    The only thing --

7      Q.    Go ahead.  I'm sorry.  Go ahead.

8      A.    The only thing in that whole report that -- that

9  was -- in my mind, was different was the kids weren't actually

10  in the yard.  They were on the street next to a yard.

11      Q.    And that would put them more in the direct path for

12  a time that the actor was headed, walking down the street.  Is

13  that correct?

14      A.    Yes.

15            MR. GEARY:  Objection.  Objection.  Leading.

16            THE REPORTER:  Can you please repeat the answer,

17  Officer?

18            THE WITNESS:  The only thing in my mind that stands

19  out in the police reports were the kids -- what I remember, the

20  kids were, like, in the street next to a yard, next to a

21  property.  They were playing -- they were, like, on the side of

22  the street.  So, I mean, I can understand why he said a yard,

23  because it was next to a yard.

24  BY MR. EVASHAVIK:

25      Q.    But having them closer to the street or in the

1  street, would that have put them more in the path of travel

2  that the actor was headed at some point when you were directly

3  behind him?

4       A.    Not any more than I testified to.

5       Q.    All right.  At the times you observed the actor, was

6  he continuously moving?

7       A.    No.  Oh.  Well, yeah, on the -- before, prior, yes,

8  he was constantly moving.

9       Q.    Before you saw him on the ground --

10      A.    Yes, sir.

11      Q.    -- he was constantly moving?

12      A.    Yes, sir.

13      Q.    And you described it earlier as a brisk pace.  Did

14  that seem to be consistent with --

15      A.    Yeah.

16      Q.    -- what you observed?

17      A.    Yes.

18      Q.    Did you believe that the suspect posed an immediate

19  threat to the safety of police officers and others?

20           MR. GEARY:  Objection.  Leading.

21           But you can answer.

22           THE WITNESS:  I can't speak for other officers.  At

23  times, when he was coming at me, I was nervous.  I was -- I

24  was -- I thought I was going to have to use force on him.  I

25  can't speak for anybody else.  He made me nervous a couple

42

times.  And when he turned, I was relieved.  I'm not going to

lie or try to make myself sound like some kind of hero.  So,

yeah, I was -- I was apprehensive at points.  Again, he didn't

get in Taser range of me.  He didn't get close enough for me to

deploy the Taser.  But, again, I can't speak for anybody else.

At times, he was coming at me.  I was -- the closer he got, I

was getting more apprehensive.  And then he would turn and --

BY MR. EVASHAVIK:

    Q.    Did you believe that he was resisting arrest or

attempting to evade arrest by flight?

        MR. GEARY:  Objection.  Leading.

        But you can answer.

        THE WITNESS:  I don't know what his intention was,

sir.  He wouldn't stop.  He wasn't following commands.  And he

wasn't -- he wasn't obeying orders to stop or drop the knife.

Besides that, I don't know what his intent was.

BY MR. EVASHAVIK:

    Q.    Did you observe any other officers deploying any

types of tools of less than lethal force in an attempt to gain

custody of him?

    A.    Now, again, I can't state that I remember it or I

was told about it, but I -- I know the male -- somebody

deployed a Taser on the male at least one time prior or maybe

two times.  But I don't remember hearing it or seeing it.

        MR. EVASHAVIK:  Okay, sir.  Thank you.  Those are

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3    CALISIA KELLEY and JOHNNIE      CIVIL ACTION
      MAE KELLEY, Co-Administrators
 4    of the ESTATE OF BRUCE KELLEY,
      JR., deceased,                  No. 2:17-cv-01599-NBF
 5
              Plaintiffs,
 6
      vs.
 7
      BRIAN O'MALLEY, both in his
 8    Official and Individual
      Capacities as Sergeant for
 9    the Allegheny County Port
      Authority; and DOMINIC
10    RIVOTTI, in both his Official
      and Individual Capacities as
11    Officer for the Allegheny
      County Port Authority,
12
              Defendants.
13                                    TRANSCRIPT

14                                    DEPOSITION OF
                                      SHAWN GRANGER
15
                                      MONDAY,
16                                    SEPTEMBER 14, 2020

17                                    Taken on behalf of
                                      Plaintiffs
18
                                      Counsel of Record
19                                    for this Party:

20                                    Noah Geary, Esquire
                                      30 E. Beau Street
21                                    Suite 225
                                      Washington, PA  15301
22                                    724-222-3788

23

24

25
```

```
 1          Officers Ravotti and O'Malley, as I said.

 2                    So can you just please tell us your

 3          name again.

 4    A.    Officer Shawn Granger, G-R-A-N-G-E-R.

 5    Q.    And how old are you, sir?

 6    A.    I am 36 years old.

 7                    MR. EVASHAVIK:  Excuse me one second,

 8          for the record, the stipulation we entered at

 9          the first deposition, can we agree that will

10          continue for all future depositions without the

11          need to repeat it?

12                    MR. GEARY:  Sure, sure, that's fine.

13                    MR. EVASHAVIK:  Thank you.

14    BY MR. GEARY:

15    Q.    Your current employer, Wilkinsburg Police

16          Department; is that right?

17    A.    That's right.

18    Q.    And what is your rank?

19    A.    K-9 unit, K-9 patrol.

20    Q.    And how many years have you worked for this

21          Department?

22    A.    Five.

23    Q.    And out of the five, how many have you been a

24          K-9 officer?

25    A.    Just over one.
```

1    Q.   And before you were a K-9 officer , what was

2         your rank?

3    A.   Patrol.

4    Q.   And were you in law enforcement for any other

5         agency or department?

6    A.   Yes.

7    Q.   Prior to here?

8    A.   I was.

9    Q.   Okay.  Please tell me where.

10   A.   I started off in the Borough of Braddock, got

11        hired in Swissvale, and then I went to the Port

12        Authority.

13   Q.   How many years with Braddock?

14   A.   Less than six months I believe.

15   Q.   And then how long with Swissvale?

16   A.   Swissvale I was employed until I was hired here

17        in Wilkinsburg.

18   Q.   So roughly how long in Swissvale?

19   A.   I was here -- this is my fifth year.  I've been

20        an officer for almost twelve, so approximately

21        six years, give or take.

22   Q.   And how many years at the Port Authority?

23   A.   Two.

24   Q.   Were you a K-9 officer at any other of those

25        three departments?

1   A.   No, I was not.

2   Q.   And where did you graduate from high school,

3        please?

4   A.   Penn Hills.

5   Q.   What year?

6   A.   '03.

7   Q.   I'm sorry?

8   A.   2003.

9   Q.   Gotcha.  And then what education did you do

10       after high school, please.

11  A.   I have my Associate's degree in criminal

12       justice.

13  Q.   From what institution?

14  A.   It's the ICM School of Business which no longer

15       exists.

16  Q.   I'm aware of it, thank you.  Again, almost all

17       the questions are going to be relating to the

18       period of January of 2016.  Now, you were

19       employed by Wilkinsburg Police Department at

20       that time; is that true?

21  A.   That's true.

22  Q.   And did you in fact respond to some type of call

23       on January 31st, 2016?

24  A.   I did.

25  Q.   Okay.  Do you remember what shift you were

1    working that day?

2  A.    I was on daylight.

3  Q.    And at that time frame, you were not a K-9

4        officer; is that true?

5  A.    That's true.

6  Q.    And please tell me what you were doing when you

7        get the call, and then we'll get to what the

8        nature of the call was.

9  A.    The call came in at 15:38 hours.  Our shift ends

10       at 16:00, so I was currently back into the

11       police parking lot finishing up with my

12       paperwork for the day and was getting ready to

13       leave.

14 Q.    And how did you receive the call?  Is that in

15       the car on the car radio or how did it come in

16       to you?

17 A.    It would have been on the car radio as well as

18       the MDT.

19 Q.    MDT?

20 A.    Correct.

21 Q.    What's the MDT, please?

22 A.    Mobile Data Terminal, it gives us our dispatch

23       calls with address and call notes of exactly

24       what's going on.

25 Q.    The MDT is separate from the dispatch?

```
 1    A.   No, dispatch, is part of the dispatch center.

 2         It's a program that gives the information

 3         verbal over the air as well as on the screen

 4         itself.

 5    Q.   So did you get one -- I just want to be clear on

 6         the difference, if there is one, between a

 7         dispatch and the MDT?

 8    A.   It's the same thing.  It gives us two different

 9         ways to look at it.

10    Q.   And did you have a partner on that day?

11    A.   I did not.

12    Q.   And so the call, who was issuing the call?

13    A.   It was our dispatch center that received the

14         call from the Port Authority dispatch.

15    Q.   Okay.  What was the nature of the call?

16    A.   I believe, again, this is a while ago, but I

17         believe it was for two officers involved in some

18         sort of confrontation, as far as I can remember.

19    Q.   Gotcha.  And in your communications with other

20         officers, what do you have, a radio, how do you

21         communicate with other officers?

22    A.   It would be radio, yes.

23    Q.   And is that on a certain channel?

24    A.   Our channel, yes, I mean there's channels for

25         every jurisdiction.  Some departments have a few
```

|    |                                                              |
|----|--------------------------------------------------------------|
| 1  | THE COURT REPORTER:  Yes.                                     |
| 2  | MR. GEARY:  Okay, thank you.                                  |
| 3  | - - - -                                                      |
| 4  | (Deposition Exhibit No. 2 was                                |
| 5  | presented to the witness.)                                    |
| 6  | - - - -                                                      |
| 7  | BY MR. GEARY:                                                 |
| 8  | Q.   If you could just take a look for a moment, I'm          |
| 9  | going to be asking you obviously about what you               |
| 10 | did that day, working off of this a little bit.              |
| 11 | I'll give you a couple minutes.                               |
| 12 | - - - -                                                      |
| 13 | (Whereupon, the witness reviewed the                         |
| 14 | document.)                                                    |
| 15 | - - - -                                                      |
| 16 | BY MR. GEARY:                                                 |
| 17 | Q.   Okay.  Have you had a chance to read that, sir?          |
| 18 | A.   Yes.                                                     |
| 19 | Q.   Thank you.  One other question on the radio             |
| 20 | communications, if you wanted to communicate                 |
| 21 | something by radio to another officer but you                |
| 22 | didn't want it recorded, is there a way to do                |
| 23 | that?                                                         |
| 24 | A.   Not that I know of.                                      |
| 25 | Q.   Now, when you responded to the call that day,          |

```
 1        where did you first go to?
 2    A.  Straight to the gazebo which is on Wood
 3        Street.
 4    Q.  And what did you see?
 5    A.  I saw two officers with Port Authority along
 6        with two other males -- I'm sorry, one other
 7        male who was walking up the steps towards the
 8        Linear Trail.
 9    Q.  So two Port Authority officers and one other
10        male?
11    A.  Yes.
12    Q.  And that male was walking up the steps?
13    A.  Towards the busway.
14    Q.  Did you recognize the male?
15    A.  I did from previous dealings.
16    Q.  And did you know the person's name from previous
17        dealings?
18    A.  I believe not at the time, no.
19    Q.  So you didn't know the person's name, but you
20        recognized them?
21    A.  Correct.
22    Q.  And as we sit here today looking back, did you
23        learn who that was?
24    A.  I did.
25    Q.  Okay.  Who was it?
```

1   A.   That would have been Bruce Kelley, Jr.

2   Q.   Junior.  Now, as of that day when you first

3        arrived, where are the two Port Authority

4        officers?

5   A.   They're still in the area of the gazebo.

6   Q.   And was it Hampy and Adams?

7   A.   Correct.

8   Q.   And did you watch who you learned to be Bruce

9        Kelley, Jr., did you watch him until he went out

10       of your sight, how far did you watch him?

11  A.   He was never out of my sight at that moment.

12  Q.   When you first laid eyes on him, he's going up

13       the steps; is that right?

14  A.   That's right.

15  Q.   Okay.  Did he have anything in his hands at that

16       point that you saw?

17  A.   He did, he did have a knife in his hand.

18  Q.   Which hand?

19  A.   I believe it was his right.

20  Q.   And what did you learn from Hampy and Adams

21       there?

22  A.   Well, I spoke with Adams, I clearly could tell

23       he had an injury to his hand, and he was

24       bleeding, and Officer Adams said that he had a

25       knife and that he was stabbed.

1    Q.    And did he say who stabbed him?

2    A.    He pointed to a gentleman who was refusing

3          to -- who was walking away.

4    Q.    Okay.  And you saw blood?

5    A.    I did.

6    Q.    And was it minor, moderate, a lot?

7    A.    I would say moderate.

8    Q.    Okay.  And did you see some type of wound on his

9          hand?

10   A.    Not at the time.

11   Q.    Okay.  Tell me everything Adams told you

12         separate from his hand injury.

13   A.    Basically all he told me was, is that he

14         resisted and he got stabbed and he had a wound.

15   Q.    And so Adam was trying to place Bruce Kelley,

16         Jr. under arrest, Bruce Kelley, Jr. resisted?

17   A.    Correct.

18                   MR. EVASHAVIK:  Object to form.

19   BY MR. GEARY:

20   Q.    Is that what he told you?

21   A.    Correct.

22   Q.    What was Adams placing Bruce Kelley, Jr. under

23         arrest for?

24   A.    At the moment I was not told.

25   Q.    Okay.  Did you ask?

1   Q.   Two?

2   A.   Two, yeah, two.

3   Q.   Did you ever issue any open container violation

4       citations while you were a Port Authority

5       officer?

6   A.   No.  You already asked that.  I never did; I

7       never have.

8   Q.   Sorry, I don't mean to repeat a question, it may

9       happen.  Now, you had had some prior

10      interactions with Bruce Kelley, Jr.?

11  A.   Yes, I have.

12  Q.   And I'd like to go through those.  Please tell

13      me what they were, when and the nature.

14  A.   It wasn't long before this incident, and it was

15      also him -- we were having a lot of problems in

16      the area of the gazebo, so us as well as Port

17      Authority Police would patrol that area, and he

18      had an open container and was intoxicated.

19  Q.   So I mean say within six weeks prior to the day

20      the shooting happened?

21  A.   I can't say that for certain, but I believe so.

22  Q.   Two or three months, something like that?

23  A.   Right.

24  Q.   So you personally encountered Bruce Kelley, Jr.

25      and dealt with him; is that right?

1   A.   Correct.

2   Q.   Did you have a partner with you at the time?

3   A.   I believe -- I got called out which I would

4        have, but yes, somebody.  I would not have had a

5        partner, but another officer would have backed

6        me.

7   Q.   And so what, it was an open container violation

8        by Bruce Kelley, Jr.?

9   A.   Correct.

10  Q.   And what else was going on that got your

11       attention on that?

12  A.   Just the loitering in the area where there was

13       multiple people.

14  Q.   And did you give him a citation, open container

15       violation?

16  A.   No, he was cooperative that day, I dumped it out

17       and sent him on his way.

18  Q.   Thank you.  The loitering, what's the elements

19       of loitering, as far as the crime of loitering?

20  A.   A large group gathering, somewhere where it may

21       be posted where no loitering is permitted.

22  Q.   So what about what he was doing that day

23       constituted loitering?

24  A.   Again, there's a large group of people and he

25       was one of the group -- sorry, you mean the day

```
 1        of this incident?
 2   Q.   No, the prior, the prior?
 3   A.   Yeah, there's a large group, and we're
 4        instructed during our patrols to push along any
 5        heavy groups of people.
 6   Q.   And where was that, where did that occur?
 7   A.   I believe that was at the gazebo.
 8   Q.   Thank you.  And did you have a prior -- another
 9        prior dealing?
10   A.   Not that I'm aware of.
11   Q.   Okay. So as of the date of the shooting, you had
12        had one prior dealing with Kelley, Jr.?
13   A.   I believe.
14   Q.   Was he a resident of Wilkinsburg Borough?
15   A.   He was.
16   Q.   Did you know or have any information about his
17        father Bruce Kelley, Sr.?
18   A.   As in who he is?
19   Q.   Correct.
20   A.   I believe he was with him that day as well.
21   Q.   Right.  So the day of the shooting, at some
22        point there's Bruce Kelley, Sr.  I didn't know
23        as of the day of the shooting, you had any
24        personal prior interactions with Bruce Kelley,
25        Sr.?
```

```
1    A.   The day that I experienced with them beforehand,
2         I believe he was with him as well.
3    Q.   Oh, okay.  What was -- you talked to him that
4         day, Senior?
5    A.   I believe so, yes.
6    Q.   Was he cooperative?
7    A.   They were both cooperative.
8    Q.   Okay.  Now, back to the day of the shooting, you
9         respond.  From your prior dealings with them or
10        from any other information, did you have any
11        indication that Bruce Kelley, Jr. had mental
12        health issues of any type?
13   A.   Not that I was aware of.
14   Q.   Did you have any indication that his father had
15        any mental health issues?
16   A.   No.
17   Q.   What about being intellectually disabled, having
18        any kind of cognitive difficulties, Bruce
19        Kelley, Jr., were you aware of any?
20   A.   Due to their level of intoxication that day,
21        it's hard to judge if it's either -- they're
22        level of intoxication or if there is possibly a
23        problem.
24   Q.   On the prior occasion?
25   A.   Right.
```

1  Q.   So Bruce Kelley is going up the stairs, the

2       steps, and what did you then do?

3  A.   Due to me having a more positive note with him

4       prior, I thought he would actually recognize me,

5       so I yelled for him to, hey, drop the knife.

6       And when he looked back and saw it was me, I

7       thought it was going to be a more positive

8       outcome, but he disregarded all my orders.

9  Q.   Did he keep walking?

10 A.   He did.

11 Q.   So say from your view, is he walking to your

12      left, I mean in your field of view, he's walking

13      to your left; is that right?

14 A.   Yes, he was -- as he was walking up the

15      staircase which there is I believe one landing

16      and he refused my orders is whenever I started

17      to follow behind, and then he made a left onto

18      the trail.

19                    - - - -

20            (Deposition Exhibit No. 5 was

21      presented to the witness.)

22                    - - - -

23 BY MR. GEARY:

24 Q.   Thank you.  I have a couple basic questions

25      and they're really basic and I apologize.

         1       I've walked it myself.  The Linear Trail,

         2       right, Exhibit 5, please, it's a two-pager, I

         3       know there's the busway and then there's the

         4       Linear Trail, the Linear Park, is the trail on

         5       say street level so to speak?

         6    A. The busway level, yes.

         7    Q. So when you say busway level, is the busway up

         8       higher?

         9    A. Correct.

        10    Q. And is the Linear Trail at the bottom of the

        11       busway runs along the bottom of the busway, is

        12       that true or not?

        13    A. No, that's not true.

        14    Q. If you could just explain --

        15    A. So the busway runs above the gazebo.  You walk

        16       up the set of steps from the gazebo to get to

        17       the busway.  The trail -- at that section of the

        18       trail at least is level with the busway, so

        19       you're still above.

        20    Q. Thank you.

        21    A. It's an old train track, I believe.

        22    Q. So the Linear Trail, part of it goes along the

        23       busway; is that right?

        24    A. Correct.

        25    Q. But some of it goes lower along the base of the

1  busway; is that right?

2  A.  Correct, this section here where we were at is

3     level with the busway.

4  Q.  Thank you.  And then the Linear Trail, do people

5     walk dogs or jog or ride their bikes on the

6     trail?

7  A.  Not so much, it's more used for people going to

8     and from the bus stop to their vehicles.

9  Q.  The Linear Park, what is the Linear Park?

10 A.  Linear Park.

11 Q.  Sorry, on Page 1, see, it's kind of a little

12    window, gazebo upper left, and if you go due

13    south, it has a little window there, a little

14    reference to the Linear Park and there's just

15    some reference in the reports to Linear Park so

16    I just wanted to ask.

17 A.  What street is that off of, I can't -- is that

18    the park and ride?

19 Q.  I'm not sure, that's why I'm asking.  If you go

20    to Page 2, there's kind of a bigger window

21    there, Linear Park, and there's kind of arrows

22    there along Pennwood Avenue so, again, I'm not

23    trying to trick you, I'm trying to get some of

24    the basic landmarks down.

25 A.  I believe that's going to be the park and ride.

```
1    Q.    Because on Page 2, a little farther down, it

2          says Hamnett Park and Ride.

3                            - - - -

4                    (Whereupon, the witness reviewed the

5          document.)

6                            - - - -

7    BY MR. GEARY:

8    A.    So that's running right to the -- is that I

9          guess what the gazebo's called?  I've never even

10         heard of that in my life so I'm just as --

11   Q.    Yeah, that's fine.

12   A.    There's Franklin Avenue that goes, Wood is right

13         there.

14   Q.    Right, and I'm just saying on Page 1 of Exhibit

15         5, I'll just with my pen, I'm just referencing

16         pointing at the exhibit, so there's reference to

17         a gazebo upper left, and about halfway down due

18         south of the gazebo, it says Linear Park, and

19         then kind of all the way bottom left it says

20         Hamnett Busway Station, and then Hamnett Park

21         and Ride, so I understand the gazebo's the

22         gazebo.  I understand what the park and ride is.

23         I understand what the bus station is.  I just

24         didn't know what Linear Park is referring to.

25         It may have no significance to this case at all.
```

 1    A.    I believe it doesn't.

 2    Q.    Okay.  What did you say to Bruce Kelley, Jr.

 3          then as he's going up the steps?

 4    A.    To drop the knife.

 5    Q.    Did he say anything back?

 6    A.    Fuck you.

 7    Q.    You remember he specifically said that?

 8    A.    Oh, yeah.

 9    Q.    And then what did you do in response?

10    A.    That went back and forth as he continued to walk

11          away from us, and due to him holding a knife and

12          refusing to drop it, I closed my distance on

13          him, and I deployed on a Taser.

14    Q.    So when you say you closed your distance, you're

15          walking toward him; is that right?

16    A.    Correct.

17    Q.    But as you're walking towards him, is he

18          standing still or is he walking?

19    A.    He's still walking.

20    Q.    And is he walking away from you?

21    A.    Correct.

22    Q.    And were Adams and Hampy, were they accompanying

23          you and walking towards him?

24    A.    They were.

25    Q.    Okay.  What was the status of Adam's hand wound?

```
 1   A.   I'm not sure at this time.  I was more focused
 2        on him.
 3   Q.   Okay.  And please tell me, how close do you
 4        get to Bruce Kelley, Jr. when you deploy your
 5        Taser?
 6   A.   Approximately 15 foot.
 7   Q.   Okay, thank you.  Now, the one document, you've
 8        been given, Exhibit 2, this is a summary of what
 9        you said to a detective, but separate from this,
10        would you have composed a report about your
11        involvement in this, responding to the call that
12        day, would you have composed a report?
13   A.   Yes.
14   Q.   Okay.  And if you deployed your Taser, were you
15        required to fill out a use of force form?
16   A.   Yes.
17   Q.   And would you have that as well?
18   A.   I believe so, I should have.
19   Q.   Okay, no, thank you.  Now, some Tasers have
20        video surveillance footage on them, did your
21        Taser have video surveillance footage?
22   A.   No.
23   Q.   So in your department at that time, your
24        department, some of the Tasers had video
25        surveillance capability and some did not; is
```

1    that right?

2    A.    I don't believe so.  We all use the same

3          equipment.

4    Q.    Okay.  What about now, does your department have

5          Tasers with video surveillance?

6    A.    No.

7    Q.    2016, did your department, did the officers

8          utilize body cams?

9    A.    No.

10   Q.    How about now?

11   A.    No.

12   Q.    Where were you and where was Kelley when you

13         deployed your Taser, please?

14   A.    We were locked -- still on the Linear Trail, and

15         then closed about 15 foot and deployed my Taser.

16   Q.    And this is up on the busway; is that right?

17   A.    Right.

18   Q.    And so when you're following him, the busway

19         would have been to your right?

20   A.    Yes.

21   Q.    And I mean is it literally only busses are

22         allowed on the busway, not cars or trucks?

23   A.    Any authorized cars and trucks, yes.

24   Q.    Were any cars or trucks going by, do you recall?

25   A.    I don't recall.

|    |    |                                                          |
|----|----|----------------------------------------------------------|
| 1  | Q. | When you deployed your Taser, were Hampy and             |
| 2  |    | Adams nearby?                                            |
| 3  | A. | Yes.                                                    |
| 4  | Q. | Okay.  And why did you deploy your Taser?               |
| 5  | A. | Because he failed to obey our orders of dropping        |
| 6  |    | the knife.                                              |
| 7  | Q. | And when you deployed the Taser, tell me how            |
| 8  |    | that works, you pull the trigger, what happens?        |
| 9  | A. | You pull the trigger, two darts are deployed,           |
| 10 |    | and once they make a connection which generates         |
| 11 |    | the shock throughout the body.                          |
| 12 | Q. | And so his back is towards you when you deploy           |
| 13 |    | the Taser; is that right?                               |
| 14 | A. | Right.                                                  |
| 15 | Q. | And then the metal prongs came out, correct?            |
| 16 | A. | Correct.                                                |
| 17 | Q. | Did you connect with his body?                          |
| 18 | A. | Obviously not, no.                                      |
| 19 | Q. | I mean did the prongs go in his back?                   |
| 20 | A. | They went into his jacket, his coveralls, but I         |
| 21 |    | don't think they actually penetrated his skin.         |
| 22 |    | If it would have been a clear connection, he           |
| 23 |    | wouldn't -- he wouldn't have continued to walk.        |
| 24 | Q. | And when you fire at one time, and you refer            |
| 25 |    | to that as one deployment of the Taser?                 |

```
 1    A.   Correct.

 2    Q.   And is there what, is there like a second

 3         cartridge with two more metal prongs in it?

 4    A.   Correct.

 5    Q.   Okay.  So from your observations, your first

 6         deployment of the Taser had no effect?

 7    A.   That's correct.

 8    Q.   And do you know if your Taser was working as far

 9         as was it maybe faulty, was maybe the

10         electricity malfunctioned, your Taser, do you

11         know?

12    A.   No, it was not faulty.  Every day we test our

13         Tasers to assure that they're working.  It's

14         called a spark test, and if the Taser was any

15         bit of not having the battery power, whatever

16         else the prongs, but it wouldn't have been

17         deployed.

18    Q.   Thank you.  So what was your reaction then to

19         the deployment of the Taser the first time being

20         unsuccessful?

21    A.   Correct.

22    Q.   What did you do next or what was your reaction

23         to that?

24    A.   Aired over dispatch 911 that I deployed my Taser

25         and it had no effect, and we continued to walk.
```

```
 1   Q.   Were you required to report your use of the
 2        Taser on dispatch?
 3   A.   I'm not sure if it was required, but I like to
 4        be -- have everything logged, so it's just a
 5        habit of mine to do.
 6   Q.   Thank you.  Was that your first communication on
 7        the radio?
 8   A.   Other than calling out and that the male was now
 9        walking away from us and giving the direction.
10   Q.   Thank you.  So does he keep walking away from
11        you after the Taser deployment failed?
12   A.   Correct.  He knew that the Taser was deployed.
13        He turned around, looked at me and said, fuck
14        you, and then kept walking.
15   Q.   And then do you then follow him some more or
16        deploy the Taser again?
17   A.   Not at this point, I don't deploy another Taser
18        cartridge.
19   Q.   I just need to walk you through it.  So what
20        happened next, please.
21   A.   I just continued to air out our location because
22        there was officers coming from other agencies,
23        and at that point, multiple officers arrived in
24        the busway and they begin to gather, I call it a
25        team, as you say, there's a group of officers,
```

|     |     |                                                              |
| --- | --- | ------------------------------------------------------------ |
| 1   |     | and they were now walking directly towards our               |
| 2   |     | location -- towards myself, Officer Adams and                |
| 3   |     | --                                                           |
| 4   | Q.  | Hampy?                                                        |
| 5   | A.  | Right.                                                        |
| 6   | Q.  | So say what, they're at 12 o'clock, you're at 6              |
| 7   |     | o'clock?                                                      |
| 8   | A.  | Correct.                                                     |
| 9   | Q.  | And Kelley's in the middle of the two groups?                |
| 10  | A.  | Correct.                                                     |
| 11  | Q.  | Understood.  From that point, had Hampy told you             |
| 12  |     | anything about Kelley's behavior in the gazebo               |
| 13  |     | or near the gazebo?                                          |
| 14  | A.  | No, we were more focused on the threat and how               |
| 15  |     | we're going to resolve this.  There's no talking             |
| 16  |     | other than strictly calling out locations and                |
| 17  |     | giving the other officers the best descriptions              |
| 18  |     | possible for everyone's safety.                              |
| 19  | Q.  | There was some information in the reports that               |
| 20  |     | before you arrived, Bruce Kelley, Jr. hugged the             |
| 21  |     | gazebo; did Hampy relay that to you?                         |
| 22  | A.  | No.                                                          |
| 23  | Q.  | What about Adams?                                            |
| 24  | A.  | No.                                                          |
| 25  | Q.  | Okay.  Now, how many officers then are in this               |

|  |  |  |
|---|---|---|
| 1 |  | other team that I just referenced they were at |
| 2 |  | 12 o'clock, but they're coming towards you, how |
| 3 |  | many officers? |
| 4 | A. | I'd say approximately six, maybe more. |
| 5 | Q. | And it's three, you, Hampy and Adams where you |
| 6 |  | were; is that right? |
| 7 | A. | And Detective Catanzaro, he was with us as well. |
| 8 | Q. | Around what point in time did he join you? |
| 9 | A. | Whenever -- after I -- I believe -- I believe it |
| 10 |  | was after I deployed the Taser, he pulled up on |
| 11 |  | the busway and stopped his police car and got |
| 12 |  | out to assist. |
| 13 | Q. | Thank you. And then what happens at that point, |
| 14 |  | does someone else employ use of force at that |
| 15 |  | point in time? |
| 16 | A. | No. |
| 17 | Q. | And Bruce Kelley, again, he's walking away from |
| 18 |  | you? |
| 19 | A. | Correct. |
| 20 | Q. | But at that point in time, he's walking towards |
| 21 |  | the other six officers; is that right? |
| 22 | A. | Yes. |
| 23 | Q. | Okay. And did you keep a certain distance from |
| 24 |  | him? |
| 25 | A. | At that point, we took cover due to the fact |

1       that Kelley is armed walking towards a line of
2       officers and just to -- in case there was any
3       firearms discharged, we took cover behind some
4       trees, just in case the other group of
5       officers fired upon him.
6   Q.  If you could look at Exhibit 5 for a moment.
7       I don't know if it shows on there but -- so
8       you're walking along the busway, you're on the
9       upper part, so to speak, and there are trees
10      that you could get cover behind or are now,
11      did you drop down kind of to the lower part
12      street level now?
13  A.  No, we weren't street level.  As I said, busway,
14      still at this point is above street level so
15      therefore there's a grade of woods that is a
16      hillside, so we remained on that hillside as we
17      continued to watch Kelley.
18  Q.  Understood.  And is there someone mentions watch
19      the crossfire?
20  A.  I believe I did, I believe.
21  Q.  Now, when you say watch the crossfire, is that
22      said in contemplation that someone is going to
23      shoot at Kelley, Jr.?
24  A.  Well, possibly, due -- possibly, so for our
25      safety, I wasn't going to second-guess that.

| | | |
|---|---|---|
| 1 | Q. | Did you have your gun out of its holster? |
| 2 | A. | No. |
| 3 | Q. | At that point in time? |
| 4 | A. | No. |
| 5 | Q. | Did Hampy? |
| 6 | A. | I don't know. |
| 7 | Q. | What about Adams? |
| 8 | A. | I don't know. |
| 9 | Q. | Catanzaro? |
| 10 | A. | I don't know, I'm not sure. |
| 11 | Q. | Okay.  Did you see -- you could see the six |
| 12 | | officers who were coming in the other direction |
| 13 | | toward you and Kelley, right? |
| 14 | A. | Correct. |
| 15 | Q. | Did any of them have their guns out? |
| 16 | A. | I'm not sure. |
| 17 | Q. | If you looked at them, is that something you |
| 18 | | would have been able to see? |
| 19 | A. | Yeah, but I'm in charge of my own weapon, and I |
| 20 | | make sure, I'm aware of where my weapon was and |
| 21 | | as far as those officers, again, there's a group |
| 22 | | of them, they're approximately 30 yards away |
| 23 | | from us, I was more focused on Kelley's hands |
| 24 | | and not the assisting officer. |
| 25 | Q. | So you got behind a tree? |

```
 1    A.    Correct.

 2    Q.    Did Hampy do the same?

 3    A.    Yes.

 4    Q.    All four of you, Adams --

 5    A.    Yes.

 6    Q.    Okay.  And then what do you see happen?

 7    A.    I see Kelley now cutting to the left going down

 8          the same hillside as we were, as we were staging

 9          behind.

10    Q.    Okay.  And there's no stairs or steps where he

11          -- I mean he just starts going through trees

12          down the hillside?

13    A.    Correct.

14    Q.    And what do the six officers do?

15    A.    They go down the hillside as well.

16    Q.    And what did you do?

17    A.    Same.

18    Q.    And when he goes down through the hillside there

19          at that point in time, how far away is he from

20          you?

21    A.    I'd say approximately, still 20 yards -- 15, 20

22          yards.

23    Q.    Thank you.  And does he make it down to street

24          level, is that a fair description, calling it

25          street level?
```

| | |
|---|---|
| 1 | A. Yes, now we're at street level, yes. |
| 2 | Q. Okay. And then all the officers also make it |
| 3 | down to street level; is that correct? |
| 4 | A. Correct. |
| 5 | Q. When he hits street level, does he just keep |
| 6 | walking? |
| 7 | A. Yes, he keeps walking. |
| 8 | Q. And where does he go, what does he do when he |
| 9 | hits street level, please. |
| 10 | A. I believe at that point I lost sight of him and |
| 11 | the other group, team, as you say, did not. |
| 12 | Q. They did -- |
| 13 | A. They did not lose sight. I lost sight of him -- |
| 14 | our team lost sight of him for a short period of |
| 15 | time. The other -- the other team I believe did |
| 16 | not. |
| 17 | Q. Okay. How did you lose sight of him? |
| 18 | A. Because he went in between a, I believe like a |
| 19 | home or two. |
| 20 | Q. So you can't see him because of houses? |
| 21 | A. He's cutting through yards, correct. |
| 22 | Q. Okay. But when you cannot actually see him, are |
| 23 | you still walking and you're going to be looking |
| 24 | for him; is that right? |
| 25 | A. Correct. |

1    Q.  And you then at some point in time, then you see

2        him again?

3    A.  Yeah, it goes and then he was -- got sight of

4        him behind the -- refer to my notes, yeah,

5        behind the 700 block of Whitney Avenue (looking

6        at document). At one point he went through the

7        park and ride and off of Center Street, and I

8        was not there for that situation.

9    Q.  At any point did you get say another call and

10       you had to respond to another call?

11   A.  No.

12   Q.  And when you lose sight of him, but you're with

13       the other three officers, what are the four of

14       you talking about, what are you saying?

15   A.  Where his location would be.

16   Q.  Okay. And he goes near the park and ride and

17       then what happens, please?

18   A.  Then he pops up behind the 700 block of Whitney

19       Avenue.

20   Q.  And is your gun still in its holster?

21   A.  My gun never left the holster.

22   Q.  How about the other three who are with you?

23   A.  I can't recall.

24   Q.  Was Adams angry that he got wounded?

25   A.  Not that I'm aware of.

```
 1   Q.   Is he talking about his injury like, hey,
 2        listen, guys, I got to go to the hospital, is he
 3        talking about his injury?
 4   A.   No, he was more focused on the threat.
 5   Q.   Now, when Bruce Kelley's walking up the steps,
 6        up to the busway, are there any other civilians
 7        around?
 8   A.   It was 3:30 in the afternoon.  It was a Sunday
 9        but -- so the level would have been light, if
10        any.
11   Q.   So there were civilians around?
12   A.   I can't recall.
13   Q.   Okay.  If there were civilians, did Bruce
14        Kelley, Jr. at any time approach a civilian and
15        try to harm them?
16   A.   No.
17   Q.   Or threaten a civilian?
18   A.   Not that I'm aware of.
19   Q.   Okay.  And as he's going, you catch up with him,
20        he's in the park and ride, are there any
21        civilians in the area there?
22   A.   I wasn't present for that.
23   Q.   Okay.  And then he ends up on Whitney Avenue,
24        correct?
25   A.   Behind Whitney Avenue, yeah.
```

|    |    |                                                              |
|----|----|--------------------------------------------------------------|
| 1  | Q. | And you end up there also, correct?                          |
| 2  | A. | Correct.                                                     |
| 3  | Q. | And are there any civilians out at that point?               |
| 4  | A. | Not that I'm aware of.  Again, I mean people                 |
| 5  |    | were -- police were screaming, I mean, drop the              |
| 6  |    | knife, drop the knife, to where I think if                   |
| 7  |    | civilians had any common sense, they wouldn't be             |
| 8  |    | -- they'd get out of the area.                               |
| 9  | Q. | No, I understand.  I just want to -- but at no               |
| 10 |    | point, to the extent there were any civilians                |
| 11 |    | out in their yards, sidewalks, Kelley, Jr. never             |
| 12 |    | threatened a civilian; is that true?                         |
| 13 | A. | Not that I'm aware of.                                       |
| 14 | Q. | Again, I'm just asking --                                    |
| 15 | A. | I'm just being honest with you.                             |
| 16 | Q. | Right, from what you saw --                                  |
| 17 | A. | I know, no, but I can't speak for everybody.                 |
| 18 | Q. | Sure.  Now, okay, you get, when you say behind               |
| 19 |    | Whitney Avenue, what do you mean behind Whitney              |
| 20 |    | Avenue?                                                       |
| 21 | A. | The backyards of Whitney Avenue.                             |
| 22 | Q. | And then where does he end up?                               |
| 23 | A. | He's cutting through the backyards of Whitney                |
| 24 |    | Avenue walking over fences, and at that point                |
| 25 |    | there's an alleyway, and I was able to catch up              |

1       with him and get to his side as he was climbing

2       over a fence.

3   Q.  How many different times did he climb a fence to

4       go over -- to go over a fence?

5   A.  Honestly, I'm not aware.

6   Q.  But at least in one point in time, what, you're

7       behind him and you're close to him, and he's

8       going over them?

9   A.  I'm actually beside him because I took the

10      alleyway because there's no fences there, you

11      can go out, watched him go over a few fences

12      until the final one which is the one I deployed

13      my Taser the last time.

14  Q.  Did you deploy your Taser then twice total?

15  A.  Correct.

16  Q.  Okay.  Now, when you said you saw him from an

17      alleyway go over some fences, there were

18      officers, were they following him at that point

19      in time?

20  A.  Yes.

21  Q.  And they were always behind him, correct?

22  A.  Correct.

23  Q.  Okay.  Well, when he's climbing the fences, did

24      any of the officers try to apprehend or subdue

25      him as he's climbing the fence?

1   A.   Not that I'm aware of.

2   Q.   Would that have been an opportunity for an

3       officer to subdue him or try to subdue him when

4       he's climbing a fence?

5               MR. EVASHAVIK:  Object to form.

6  BY MR. GEARY:

7   A.   If possibly, but again, he still had the knife

8       in his hand so being a threat.  You know,

9       officers kept their distance and continued to

10      yell, drop the knife, drop the knife, drop the

11      knife.

12   Q.   Do you know if he put the knife away momentarily

13      when he was climbing the fences?

14   A.   I'm not sure.

15   Q.   And then you said the final time he goes over a

16      fence, you were near him?

17   A.   I was to his right, yes.

18   Q.   How close to his body were you, just how close?

19   A.   Ten foot.

20   Q.   Okay.  And did he ever fall when he climbed the

21      fence, does he ever -- he falls on either side

22      of the fence?

23   A.   He didn't fall on that side of the fence.

24   Q.   Did he fall at any point while climbing fences?

25   A.   Not that I'm aware of, I'm not sure.

```
1    Q.   So the final time you deploy your Taser; is that
2         correct?
3    A.   Uh-huh.
4    Q.   So what, you had your second cartridge; is
5         that right?
6    A.   Correct.
7    Q.   What was he doing when you deployed your Taser?
8    A.   Getting over the last fence.
9    Q.   And where on his body do you aim?
10   A.   It would have been his right side, so it would
11        be one probe, got his arm, and the other one I'm
12        not sure if it made contact or not.
13   Q.   But one probe did make contact, you know that?
14   A.   Correct.
15   Q.   And the other one you're not sure if it did?
16   A.   Correct.
17   Q.   Do you know if the electricity worked?
18   A.   It would have worked, yes, if the contact was
19        made.
20   Q.   And what effect did it have?
21   A.   Fuck you.  That's all you got?
22   Q.   Okay.
23   A.   That was ineffective.
24   Q.   And then what happens?  What happens when he
25        climbs the fence?
```

| | | |
|---|---|---|
| 1 | A. | He proceeds towards Whitney Avenue, goes between |
| 2 | | two houses, the fence line there, and walks |
| 3 | | towards Whitney Avenue. |
| 4 | Q. | And then where does he end up? |
| 5 | A. | On Whitney Avenue. |
| 6 | Q. | Okay.  And in front of a house, near the end of |
| 7 | | it? |
| 8 | A. | Yeah, ultimately, yes, he's in front of a vacant |
| 9 | | home. |
| 10 | Q. | Okay.  Did anything happen before he gets there |
| 11 | | in front of some house on Whitney Avenue that is |
| 12 | | significant to you from what you just described? |
| 13 | A. | Yeah, again, it never stopped.  I was saying, |
| 14 | | police, drop the knife, drop the knife, drop the |
| 15 | | knife.  And obviously did not obey any of those |
| 16 | | orders, and then a K-9 was released. |
| 17 | Q. | Was there any discussion about the number of |
| 18 | | times he was asked to put the knife down and did |
| 19 | | not put the knife down, was there any discussion |
| 20 | | among the officers as far as, does this guy have |
| 21 | | a hearing impairment; was there any talk about |
| 22 | | that? |
| 23 | A. | No.  And I wouldn't have believed so because he |
| 24 | | obviously heard us because he would respond back |
| 25 | | fuck you, so he could clearly hear us. |

1   Q.   Understood.  But when you drew the X, that's

2         where his body was when he was shot; is that

3         right?

4   A.   Correct.

5   Q.   Now, on what you just said, he comes across, he

6         crosses Whitney Avenue; is that correct?

7   A.   Yes.

8   Q.   And he still has the knife in his hand; is

9         that right?

10   A.   Yes.

11   Q.   At any point in time, did he not have the knife

12         in his hand, either hand?

13   A.   Not that I'm aware of.

14   Q.   And when he crosses the street, Whitney Avenue,

15         you were -- where were you?

16   A.   As he was practically in the middle of the

17         street, I was on the sidewalk, and I left a safe

18         distance, within arm's reach of a blade,

19         basically enough room crossing.

20   Q.   Were you in his field of view?

21   A.   Absolutely.

22   Q.   At any point did he walk towards you and attempt

23         to physically engage you?

24   A.   No.

25   Q.   Did he verbally threaten you, he's going to kill

1    Q.    And what in the training, what are you

2          thoughts as far as how to identify whether

3          someone has say mental health issues?

4    A.    Of any like clear observations, you know,

5          again, it's such a wide-range question there,

6          it's hard to answer exactly what you're

7          talking about.  I know exactly what you're

8          looking for but, yes, I can clearly tell if

9          someone is having a mental issue or such as

10         like a breakdown and so on.

11                I also worked at Western Psych for six

12         years and have been extensively trained in that

13         sort of situation, so as far as like a verbal

14         de-escalation, and stuff like that, it was

15         attempted and it failed.

16   Q.    And it failed?

17   A.    Right.

18   Q.    What was your position at Western Psych?

19   A.    I was a safety officer there all through school.

20   Q.    Thank you.  Now, O'Malley arrives now, and he

21         has the dog Aren; is that correct?

22   A.    Correct.

23   Q.    Was there any other K-9 officer there with

24         another dog?

25   A.    I'm not sure.  There's no dog present.  I don't

```
 1        know if the other guy -- or I'm sorry, yes,

 2        Officer DiPippa was there.  I don't know if he

 3        arrived there after or before.

 4   Q.   I saw just one sentence in one report there was

 5        reference to a DiPippa with another dog Arco?

 6   A.   Yeah, DiPippa actually transported Aren.

 7   Q.   Afterwards?

 8   A.   Right.

 9   Q.   So did DiPippa have his K-9 there also though,

10        prior to the shooting of Bruce Kelley?

11   A.   Correct, but I don't think he was ever deployed

12        or anything.

13   Q.   Okay.  And when Bruce Kelley is standing in

14        front of the house and you're on the sidewalk,

15        is your gun still in its holster?

16   A.   Yeah, my gun never left its holster.

17   Q.   Thank you.  And how close to you are other

18        officers?

19   A.   It was, from what I believe, it was O'Malley,

20        Ravotti and me, and Officer Baughman and White.

21        There was a group of officers, I can't recall

22        them all or their exact placement.

23   Q.   Now, O'Malley, his partner, so to speak, that's

24        Aren; is that right?

25   A.   Yes.
```

| | | |
|---|---|---|
| 1 | Q. | Did Ravotti have a partner? |
| 2 | A. | I don't -- I'm not sure. |
| 3 | Q. | Okay. And just please break it down for me, |
| 4 | | what you saw immediately before -- well, I'm |
| 5 | | sorry, how long is O'Malley on scene before he |
| 6 | | releases the dog? |
| 7 | A. | Again, whenever I walked out to the street with |
| 8 | | Kelley, O'Malley was there, so I don't know how |
| 9 | | long he was there for. |
| 10 | Q. | Okay. But from when you first realize O'Malley |
| 11 | | is there, how many minutes go by before he |
| 12 | | releases the dog, looking back at this |
| 13 | | situation? |
| 14 | A. | Probably less than two. |
| 15 | Q. | And can you tell me, did O'Malley say anything |
| 16 | | to the other officers as in, I'm the officer in |
| 17 | | charge, did he say anything like that? |
| 18 | A. | I don't recall. |
| 19 | Q. | Okay. And tell me everything that O'Malley said |
| 20 | | before he releases the dog? |
| 21 | A. | Police K-9, drop the knife, police K-9, drop the |
| 22 | | knife, police K-9, you will be bit. |
| 23 | Q. | And then he released the dog? |
| 24 | A. | Yes. |
| 25 | Q. | And where is Ravotti in relation to O'Malley? |

1  A.  I believe he was to his left.

2  Q.  Okay.  Are you to O'Malley's right?

3  A.  I would be to O'Malley's left as well.

4  Q.  Oh, okay, I'm sorry.  You're to O'Malley's left,

5      is Ravotti in between you and O'Malley?

6  A.  Correct.  O'Malley was -- as we, again, I don't

7      know where Ravotti came from, but as we got on

8      to the street, O'Malley was already there staged

9      with his dog out in the middle of the road so --

10 Q.  Gotcha.  If we can look at Exhibit 5, maybe the

11     last time hopefully, all of the officers are on

12     Whitney Avenue at that point in time or on the

13     sidewalk; is that correct?

14 A.  Correct.

15 Q.  And say if just looking at Exhibit 5, Page 1, if

16     you go downwards down the page with your eyes,

17     so there's houses, and behind the houses, I

18     don't know if it's some woods, and then you get

19     to the Hamnett Park and Ride, correct?

20 A.  Correct.

21 Q.  No officers stayed back there; is that true?

22 A.  I don't know, I'm not sure.  I wasn't, I know

23     that, so I can tell you where I was, but as far

24     as everybody else, I can't.

25 Q.  When O'Malley fires and Ravotti, they're firing

```
 1          in the direction say south on the page; is that
 2          correct?
 3   A.     Correct.
 4   Q.     So there could have been people behind these
 5          houses; is that true?
 6   A.     Well, they are vacant homes so I'd hope that
 7          there was not, and the area he was shot was in
 8          front of the home, so the house would be a good
 9          backdrop for any rounds that may have not have
10          hit their target, but those are vacant homes.
11   Q.     And behind the houses, there's this wooded area;
12          is that right?
13   A.     Yeah.
14   Q.     And then there's the park and ride, correct?
15   A.     Correct.
16   Q.     And did you officers know as a fact that these
17          houses were vacant or -- vacant?
18   A.     As far as them being --
19                  MR. EVASHAVIK:  Object to form.
20   BY MR. GEARY:
21   A.     -- boarded up and boards with flowers painted
22          over top of them, and weeds, heavily weeded
23          throughout the entire building, I would hope
24          that they were vacate.
25   Q.     Were some of the homes on Whitney Avenue not
```

1    vacant though, they were occupied?

2  A.  Not at that block, on that side of the street,

3    just in the block there, no, they're all vacant.

4    I know the one, two, three, four, at least four

5    or five were vacant.

6  Q.  At least four or five were vacant?

7  A.  Onto the -- if you're looking at where he was

8    killed going towards the busway, yes, but the

9    houses to the left and right of the home of this

10    house where he was killed at were vacant.  That

11    entire half of that block is pretty much vacant.

12  Q.  And so say just moving from the left to right on

13    the houses along Whitney, starting on the

14    farthest most left heading to the right, you're

15    saying what, the first four or five would have

16    been vacant to your knowledge?

17  A.  To my knowledge, yes.

18  Q.  Okay.  Now, did it ever happen in Wilkinsburg

19    Borough that say homeless people lived in vacant

20    boarded up houses?

21  A.  There could be.  It doesn't happen often, we

22    don't get calls that often, but we have.

23  Q.  Right before O'Malley gives the commands, the

24    drop the knife or he's going to release the dog,

25    you say Ravotti is to your immediate right,

| | | |
|---|---|---|
| 1 | | correct? |
| 2 | A. | I believe so. |
| 3 | Q. | Did he have his gun out of its holster? |
| 4 | A. | I don't know. |
| 5 | Q. | You did not? |
| 6 | A. | (Witness nods head side to side.) |
| 7 | Q. | No.  Did some of the officers have their guns |
| 8 | | out of their holsters? |
| 9 | A. | You'd have to ask them, I don't know. |
| 10 | Q. | And say just an estimate in feet, how far is |
| 11 | | O'Malley from Bruce Kelley, Jr.? |
| 12 | A. | Approximately maybe 20, 25 feet before sending |
| 13 | | the dog? |
| 14 | Q. | Right. |
| 15 | A. | Yeah, probably about 20 feet, give or take. |
| 16 | Q. | Okay.  So would that say be from you to |
| 17 | | Mr. Evashavik or would it be farther? |
| 18 | A. | Maybe a little further, maybe like toward the |
| 19 | | chairs maybe. |
| 20 | Q. | Was any officer closer to Bruce Kelley than say |
| 21 | | O'Malley was? |
| 22 | A. | Not that I'm aware of. |
| 23 | Q. | And Kelley, the house is behind him, correct? |
| 24 | A. | Correct. |
| 25 | Q. | And is his body positioned so that he's facing |

| 1 | | O'Malley? |
| 2 | A. | He is bladed towards O'Malley. |
| 3 | Q. | I'm sorry, he was what? |
| 4 | A. | His body was bladed. |
| 5 | Q. | What does that mean? |
| 6 | A. | As of like his shoulder -- right shoulder was |
| 7 | | pointed towards O'Malley. He was not walking |
| 8 | | his direction, but he was walking to the side of |
| 9 | | him, as if you're crossing the street and you're |
| 10 | | in the middle of the street. |
| 11 | Q. | So say if O'Malley's at 6 o'clock, Bruce is |
| 12 | | facing 3 o'clock, and his right-hand side is |
| 13 | | going towards O'Malley, facing O'Malley, his |
| 14 | | right-hand side? |
| 15 | A. | Yes. |
| 16 | Q. | Thank you. And again, I apologize -- |
| 17 | A. | At this point I can confirm 110 percent that |
| 18 | | that knife was in his hand. |
| 19 | Q. | Which hand? |
| 20 | A. | His right hand. |
| 21 | Q. | What was the size of the knife? |
| 22 | A. | It was a -- I'd say a medium sized knife. It |
| 23 | | wasn't like a Buck knife of some sort, but it |
| 24 | | was a knife enough to do some damage. |
| 25 | Q. | What about say the length of the blade? |

| | | |
|---|---|---|
| 1 | A. | Approximately five inches, six inches. |
| 2 | Q. | Okay.  Does Bruce Kelley, Jr. say anything in |
| 3 | | response to O'Malley saying, drop it, drop it, |
| 4 | | or I'm going to release the dog and you're going |
| 5 | | to get bit, does Bruce Kelley say anything? |
| 6 | A. | Fuck you. |
| 7 | Q. | Okay.  Anything else? |
| 8 | A. | Not that I'm aware of. |
| 9 | Q. | And at that point in time, did you say anything |
| 10 | | to Kelley? |
| 11 | A. | No. |
| 12 | Q. | Did Ravotti? |
| 13 | A. | Not that I'm aware of. |
| 14 | Q. | Any other officer? |
| 15 | A. | Not that I'm aware of. |
| 16 | Q. | Are there cars or busses going up on the busway |
| 17 | | at that point in time? |
| 18 | A. | Not that I'm aware of. |
| 19 | Q. | Okay.  And then what does O'Malley do? |
| 20 | A. | Releases the dog. |
| 21 | Q. | Okay.  Now, I don't know anything about this, I |
| 22 | | Googled a little.  How is O'Malley holding the |
| 23 | | dog? |
| 24 | A. | By his collar or his harness, whatever it may |
| 25 | | be, and then he sent him -- when he sends him it |

```
 1        means taking him off leash and sending him.
 2    Q.  So was Aren on the right side of O'Malley?
 3    A.  I can't recall.
 4    Q.  Okay.  But he would kind of be on his right or
 5        his left?
 6    A.  Or in front.
 7    Q.  Could be right in front?
 8    A.  Uh-huh, yes.
 9    Q.  Is the dog snarling at Bruce Kelley?
10    A.  The dog was on target which means the dog is
11        fixed on an object that he knows is the threat
12        and they don't snarl or growl, they mostly be
13        like a cry because, you know, they're trained to
14        apprehend.
15    Q.  And you're there and you see O'Malley release
16        the dog, is that right, and please tell me what
17        you saw?
18    A.  I saw Kelley with the knife handle in his hands,
19        blade -- I don't know how to put this in words,
20        but the blade was coming out of the back of his
21        hand, such as my pen, and he watched the dog
22        come up.  He saw the dog released, and then as
23        the dog went to engage, he stuck the knife in
24        the back of his throat.
25    Q.  Okay.  And just so the record's clear, Officer
```

1        Granger described that Bruce had the knife in

2        his hand such that the blade would be coming

3        out the opposite side of the hand from the

4        thumb?

5  A.    Correct.

6  Q.    And --

7  A.    He held the knife, okay, on the opposite side of

8        his thumb, and the knife was raised towards like

9        the right side of his chest as he watched the

10       dog approach and --

11  Q.   Let me interrupt.  And when the dog approaches,

12       is the dog going very fast like full speed

13       directly at Bruce Kelley, Jr.?

14  A.   Correct.

15  Q.   And then what did you see the dog do?

16  A.   The dog went to apprehend, is trained and at

17       that point Bruce Kelley stuck the knife into the

18       dog's throat.

19  Q.   And when you say -- I mean did the dog -- does

20       the dog leap up?

21  A.   The dog would have -- I mean, I can't recall

22       that, but the dog does not walk up and bite,

23       he's trained to sprint, as you call it, and then

24       to engage.

25  Q.   And in your training, what's the dog -- is there

|   |   |   |
|---|---|---|
| 1 |    | a target area of Kelley's body the dog is |
| 2 |    | trained to bite? |
| 3 | A. | I can't -- I don't train with the Port Authority |
| 4 |    | Police so I don't know exactly where their dogs |
| 5 |    | are trained to apprehend. |
| 6 | Q. | Okay.  I'll ask them, but just so -- how is your |
| 7 |    | dog trained? |
| 8 | A. | My dog's trained for -- we train on every body |
| 9 |    | part, chest, back, arms, legs because, again, |
| 10 |    | there's situations of where an arm might not be |
| 11 |    | accessible, so the dog goes to legs and such. |
| 12 | Q. | Appreciate it.  Did the dog like jump up or just |
| 13 |    | stay on the ground as it approached Kelley? |
| 14 | A. | I don't recall.  All dogs are different, I'm not |
| 15 |    | sure.  Honestly I don't recall. |
| 16 | Q. | What reaction did the dog have? |
| 17 | A. | A yipe and then fell to the ground, and then |
| 18 |    | circled back around towards our location. |
| 19 | Q. | And so was it one motion by Kelley with his hand |
| 20 |    | and the knife? |
| 21 | A. | I believe so.  I could be wrong. |
| 22 | Q. | And the dog yipes, I think maybe that's the word |
| 23 |    | you said, and then comes back towards where, |
| 24 |    | O'Malley? |
| 25 | A. | Towards, yes. |

| | | |
|---|---|---|
| 1 | Q. | Okay. And -- |
| 2 | A. | Actually not immediately. He was -- he |
| 3 | | circled around like a car. I think he stayed |
| 4 | | back there for a second before he came back. |
| 5 | Q. | And did you say anything at that point? |
| 6 | A. | As far as? |
| 7 | Q. | Just anything, do you say anything out loud |
| 8 | | about the situation? |
| 9 | A. | I air over K-9's stabbed reporting to dispatch. |
| 10 | Q. | You did a call, you radioed in? |
| 11 | A. | Radioed in, yes. |
| 12 | Q. | Okay. Did Ravotti say anything? |
| 13 | A. | I'm not aware. |
| 14 | Q. | Okay. And the dog, you watched the dog what, go |
| 15 | | around a car and then go over to O'Malley? |
| 16 | A. | Yes. |
| 17 | Q. | And then what does any other officer do at that |
| 18 | | point? Are other officers radioing in or are |
| 19 | | they going to check on the dog? |
| 20 | A. | Not at that point. |
| 21 | Q. | Was the dog wounded or could you tell yet |
| 22 | | whether the dog was wounded? |
| 23 | A. | Not yet because we're still focused on, you know |
| 24 | | -- |
| 25 | Q. | On Kelley? |

1    A.    On Kelley, yeah.

2    Q.    So you heard a yipe, but you don't know if the

3          dog is -- you can't physically tell that the

4          dog's wounded yet?

5    A.    Right, correct.

6    Q.    Okay.  Let's get back then to Kelley, what does

7          any officer do next?

8    A.    As far as O'Malley and Officer Ravotti, fire

9          upon Kelley.

10   Q.    And you said after the dog was stabbed by

11         Kelley, the dog came back in the direction of

12         O'Malley, went around the car?

13   A.    Well, this is after obviously the shooting, I

14         realized the dog was back.

15   Q.    Sorry, you realized the dog was what?

16   A.    Was back, like, after the shots were fired.

17   Q.    And again, just for the moment, I'm focusing on

18         before the shots are fired, so you see the dog

19         get stabbed?

20   A.    Correct.

21   Q.    And the dog comes back to O'Malley?

22   A.    Again, that was after everything was said and

23         done.  Everything was pretty much -- when the

24         dog was stabbed, shots were fired.  It happened

25         very quickly.  I mean I'm still focused on

```
 1        Kelley.
 2   Q.   How much time elapsed -- I know you're not
 3        thinking of it in that moment but looking back,
 4        in between the dog gets stabbed and the first
 5        shot is fired?
 6   A.   Seconds.
 7   Q.   And do you know who fired first?
 8   A.   I do not.
 9   Q.   As you're there, do you know who fired?
10   A.   Well, having O'Malley and Ravotti to my right, I
11        mean the shots came from my right, I assume it
12        was them.
13   Q.   Are they in your field of view, Ravotti and
14        O'Malley?
15   A.   They're to my right, yes.
16   Q.   I mean are they in your field of view though?
17   A.   No.
18   Q.   They're not?
19   A.   No.
20   Q.   So as this is happening, do you know if any
21        other officer, like, did a third officer fire
22        their gun at Kelley?
23   A.   Not that I was aware of.
24   Q.   When did Ravotti for the first point in time
25        take his gun out of his holster?
```

|    |     |                                                      |
|----|-----|------------------------------------------------------|
| 1  | A.  | You'd have to -- I don't know.                       |
| 2  | Q.  | And do you see Bruce Kelley as he's getting          |
| 3  |     | shot?                                                |
| 4  | A.  | I do.                                                |
| 5  | Q.  | And I just got your report here, he's facing         |
| 6  |     | O'Malley?                                            |
| 7  | A.  | At this point, yes.                                  |
| 8  | Q.  | Okay.  And Ravotti is just a few feet to the         |
| 9  |     | left of O'Malley; is that right?                     |
| 10 | A.  | He's in his proximity, yes.                          |
| 11 | Q.  | Okay.  So if Kelley's body was facing O'Malley,      |
| 12 |     | is it fair to say his body would also have been      |
| 13 |     | facing Ravotti?                                      |
| 14 | A.  | You can assume that, yes.                            |
| 15 | Q.  | I mean, and then again, I'm not saying assume?       |
| 16 | A.  | I'm just saying I'm not saying something that        |
| 17 |     | you're asking me questions that I really can't       |
| 18 |     | completely answer because, you know, I'm not one     |
| 19 |     | of those officers.  Like I said I can tell you       |
| 20 |     | where I was.                                         |
| 21 | Q.  | No, I understand.                                    |
| 22 | A.  | I can tell you where they were.                      |
| 23 | Q.  | No, no, I understand.                                |
| 24 | A.  | But I can't tell you who drew a weapon first.        |
| 25 |     | Again, because I focused on you, such as if          |

1    you're Kelley, if this is Ravotti to my right

2    and O'Malley's to his right, you know, my

3    attention's focused on you.

4  Q.  No, understood.  And then your interview here,

5    Page 2, I guess it's Exhibit 2, Granger states

6    he observed Kelley fall down to the ground onto

7    his back.  That's Page 2, kind of middle of the

8    paragraph, so I mean you saw Kelley fall; is

9    that correct?

10 A.  Correct.

11 Q.  What's the next thing you notice, after you see

12   Kelley get shot, about the dog?

13 A.  He opened up his mouth and bright red, thick

14   globs of blood is pouring out.

15 Q.  And what did you do then?

16 A.  I wasn't a K-9 handler then, and I wouldn't want

17   someone touching my own dog, you know, so

18   O'Malley -- actually I believe O'Malley, before

19   that even happened, checked the status of Kelley

20   for him and he was picked up by I believe Office

21   DiPippa and transported to whatever hospital

22   they went to.

23 Q.  Gotcha, thank you.  Almost done, just so you

24   know, almost done.

25 A.  That's fine, I'm good, I'm here all day.

1          is true and correct?

2    A.   Correct.

3    Q.   All right.  So for example, and it states in

4          there that the officers on the scene repeated at

5          least dozens of times the order to stop and drop

6          the knife; is that correct?

7    A.   That's correct.

8    Q.   And did he ever comply at any time with any of

9          those directions?

10   A.   Never, not once.

11   Q.   Okay.  And was this a continuously moving

12        pursuit; in other words, was he on the go, on

13        the move the whole time?

14   A.   Yes, he was.

15   Q.   So he never stopped and just stood still?

16   A.   Never once, no.

17   Q.   Okay.  You don't think he had any problem

18        hearing the commands because you said he was

19        responding to them?

20   A.   He was responding.

21   Q.   Okay.  You attempted and discharged your Taser

22        twice without any success whatsoever?

23   A.   Correct.

24   Q.   Do you know if anyone else attempted to deploy a

25        Taser?

1  A.  I believe there was, I don't know who.

2  Q.  What about OC spray or pepper spray, was that

3      attempted --

4  A.  No.

5  Q.  -- *to* be used?

6  A.  No.  I was not present for that, that's when I

7      lost sight of him, but there was.

8  Q.  Did you hear that on the radio that also OC

9      spray --

10  A.  Yes.

11  Q.  -- had been sprayed at him and had no effect;

12      did you hear that?

13  A.  I believe so, yes.

14  Q.  And what about an ASP or a baton --

15  A.  Yes.

16  Q.  -- were you aware that that had been attempted

17      to be used on him also?

18  A.  Yes.

19  Q.  And did that have any success?

20  A.  No.

21  Q.  And as we know, you've told us that there was a

22      K-9 deployment attempted and that was without

23      success also, correct?

24  A.  Correct.

25  Q.  So what you're aware of and what we've heard

1 about is dozens of verbal orders and

2 instructions to stop and drop the knife, were

3 used unsuccessfully, multiple deployments of

4 Tasers used unsuccessfully, a deployment of OC

5 or pepper spray used unsuccessfully, deployment

6 of an asp or baton used unsuccessfully and a K-9

7 deployment used unsuccessfully; did I say that

8 correctly?

9 A. Yes, that's correct.

10 Q. Is there anything in the non-lethal force

11 continuum that could have been attempted to try

12 to get this guy to listen?

13 A. Not any issued tools, no.

14    MR. GEARY:  I'm sorry, I didn't hear

15 you.

16    THE WITNESS:  Nothing that were

17 issued, no, nothing that we had on us.

18 BY MR. EVASHAVIK:

19 Q. Did you feel that there were any other

20 non-lethal tools available to try to get this

21 guy to drop his knife?

22 A. No, I was out of ideas.

23 Q. Okay.  And at the time this happened, you didn't

24 have him circle; in other words, the police

25 weren't around him 360 degrees, were you?

1    A.   No, we were not.

2    Q.   Okay.  So at the time this happened, he was

3         still moving, is that correct, you were still

4         pursuing him?

5    A.   Yes.

6    Q.   And at the time this happened, did you still

7         perceive him to be a threat?

8    A.   Yes.

9    Q.   At the time this happened and specifically the

10        deployment of the K-9 and the shooting, did he

11        still have that knife in his right hand?

12    A.   He did.

13    Q.   Were all of the officers to your knowledge

14        purposely keeping a safe distance from that

15        because of the threat of being stabbed with the

16        knife?

17    A.   Yes.

18    Q.   And did you do that as well?

19    A.   Yes.

20    Q.   I heard you testify earlier that even after the

21        deployment of the K-9 and he stabbed him, which

22        you read in your report multiple times, and then

23        the dog fell and left the area, Kelley, Jr. was

24        still holding the knife in his right hand?

25    A.   Correct.

1    Q.   And after he did that, he was facing in the

2         direction of O'Malley and Ravotti; is that

3         correct?

4    A.   Well, as I said, I could not visually see them

5         but they were to my right and he was -- Kelley

6         was bladed now away from me, so to the best of

7         my knowledge, yes, he was facing them.

8    Q.   They were not in your field of view; is that

9         correct?

10   A.   Correct.

11   Q.   You had an understanding of where they were

12        standing although you weren't looking at them?

13   A.   Right.

14   Q.   And after Aren, the K-9 was stabbed, Kelley, Jr.

15        was generally facing where you believe O'Malley

16        and Ravotti were standing?

17   A.   Correct.

18   Q.   At the time that he was shot, did you feel that

19        Kelley, Jr. was trapped and there was nowhere

20        for him to go at that point?

21   A.   No.

22   Q.   Did you feel that he was still able to keep

23        moving and continue his efforts to escape?

24   A.   He absolutely could have.

25   Q.   So the threat of his escape -- well, first of

```
 1        all, did you feel there was a danger of him
 2        escaping when he was attempting to evade
 3        arrest by his conduct?
 4    A.  Yes.
 5    Q.  Did you feel that had changed at the time that
 6        he was shot?
 7    A.  As far as him still wanting to escape?
 8    Q.  Yes.
 9    A.  No.
10    Q.  So did you, in your mind, believe that he was
11        still attempting to escape and a threat at the
12        time he was shot?
13    A.  Correct.
14    Q.  Do you have any knowledge if he ever swung the
15        knife at any of the officers at any time?
16    A.  I heard so, but I didn't physically see it
17        myself.
18    Q.  Okay.  And the pictures that were still photos
19        taken from the video of Hamnett Street Station,
20        you were not there to see that encounter?
21    A.  No.  And I was also concerned, as I said --
22    Q.  Sorry?
23    A.  I was also -- one of my main concerns was, okay,
24        what is he going to do with this knife if he
25        reaches a family who's out in their yard or
```

```
 1        something like that, you know what I mean?  What

 2        is he going to do to the community?  What's

 3        the next person he's going to run into?

 4        What's going to happen to them?  The property

 5        we were at was vacant, so to the best of my

 6        knowledge it was empty.

 7   Q.   Is this primarily a residential area where you

 8        were pursuing him?

 9   A.   That specific block, the street was not,

10        however, the ones that run parallel to it and

11        the busway are all, yes, there's people.

12   Q.   And did you feel that there was any kind of

13        chance or likelihood that he would encounter

14        civilians as he continued to --

15   A.   Eventually he would have, yes.

16   Q.   You believe he would have?

17   A.   Yes, eventually he would have.

18   Q.   And did you think that that presented the

19        possibility of a threat or a danger that they

20        could be harmed by him?

21   A.   Absolutely.

22   Q.   And did you feel it was necessary to get him

23        into custody before that situation developed?

24   A.   Yes, the situation needed to end before, you

25        know, before we were able to take that chance of
```

| 1 | | him harming an unknown person that's not aware |
| 2 | | of the situation. |
| 3 | Q. | Did you feel that even during this entire |
| 4 | | encounter until the time that he was shot and on |
| 5 | | the ground, that he continued through that whole |
| 6 | | time to pose a serious threat potentially of |
| 7 | | death or harm to the officers or others? |
| 8 | A. | Yes. |
| 9 | Q. | And in your opinion during this pursuit, did you |
| 10 | | feel that he was actively resisting arrest? |
| 11 | A. | Yes. |
| 12 | Q. | Did you think that he was attempting to evade |
| 13 | | arrest by flight? |
| 14 | A. | Yes. |
| 15 | Q. | Going back to the prior encounter, I just want |
| 16 | | to make sure I understand this, so you |
| 17 | | encountered him prior to this day, he was |
| 18 | | drinking in the same gazebo? |
| 19 | A. | Correct. |
| 20 | Q. | And you felt he was intoxicated, correct? |
| 21 | A. | Correct. |
| 22 | Q. | But you were able to speak to him verbally and |
| 23 | | you felt he understood? |
| 24 | A. | He did.  He handed over his beer. |
| 25 | Q. | So did you tell him, hey, you can't be drinking |

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CALISIA KELLEY; and      CIVIL ACTION
JOHNNIE MAE KELLEY,
Co-Administrators of the    No. 2:17-cv-01599-NBF
ESTATE OF BRUCE KELLEY,
JR., deceased,

Plaintiffs,

vs.                  TRANSCRIPT

BRIAN O'MALLEY, both in his
Official and Individual     DEPOSITION OF
Capacities as Sergeant for   KEVIN ATKINS
the Allegheny County Port
Authority; and DOMINIC
RIVOTTI, in both his
Official and Individual
Capacities as Officer for
the Allegheny County Port
Authority,

Defendants,
Jointly and Severally.     TAKEN VIA ZOOM VIDEO CONFERENCE

                           MONDAY, OCTOBER 12, 2020


                           Taken on behalf of Plaintiffs,
                           Calisia Kelley and Johnnie Mae
                           Kelley


                           Counsel of Record for this Party:

                           Noah Geary, Esquire
                           Washington Trust Building
                           6 South Main Street, Suite 225
                           Washington, PA   15301
                           724-222-3788

1  name for the record?

2       A.    Kevin Atkins.

3       Q.    Okay.  And what is your age, please?

4       A.    54.

5       Q.    And are you originally from the Pittsburgh area?

6       A.    I am.

7       Q.    What part, sir?

8       A.    North Side, North Hills.

9       Q.    And where did you graduate from high school?

10      A.    North Hills High School.

11      Q.    And what year, please?

12      A.    1984.

13      Q.    And did you go to college?  Do any college after

14 high school?

15      A.    I went to Art Institute of Pittsburgh and also have

16 gone to La Roche College.

17      Q.    Got you.  Did you -- what were you studying at those

18 two places?

19      A.    At Art Institute, photography and multimedia.  And

20 La Roche, law -- well, its criminal justice program.

21      Q.    Thank you.  You're currently employed by the Port

22 Authority?

23      A.    I am.

24      Q.    And your rank now is detective sergeant?

25      A.    That's correct.

8

1    Q.    And what year did you -- were you first employed by

2  the Port Authority?

3    A.    2001.

4    Q.    And have you worked there continuously since 2001?

5    A.    That's correct.

6    Q.    Prior to 2001, did you work in law enforcement in

7  any capacity for any agency?

8    A.    I did.

9    Q.    Can you please break down your law enforcement

10  background for me?

11    A.    Prior to working at Port Authority, I worked for the

12  Borough of Port Vue.

13    Q.    I'm sorry.

14    A.    Prior to --

15    Q.    I'm sorry.  The Borough of?

16    A.    Port Vue.

17    Q.    Okay.  P-o-r-t V-u-e?

18    A.    V-u-e.  Correct.

19    Q.    Okay.  Where is that?

20    A.    Out by McKeesport, sir.

21    Q.    Okay.  Thank you.  Go ahead.  How about after that?

22    A.    Prior to that, I also worked for Hanover Township.

23  It was for the Star Lake Amphitheater, as a police officer.

24    Q.    Okay.  Anywhere else besides Borough of Port Vue and

25  Hanover Township?

1   detective sergeant up, above, till the chief, what are the

2   ranks?

3       A.    Yeah.  In our structure, the next is the

4   lieutenant's position and then the chief's position.

5           (Whereupon, Deposition Exhibit 32 was presented to

6   the witness.)

7   BY MR. GEARY:

8       Q.    Thank you.  Now, I provided by e-mail a two-page

9   report.  I think you composed it.  And I e-mailed it over to

10  Mr. Evashavik this morning.  Have you had a chance to look at

11  that?

12      A.    I have.

13      Q.    Okay.  So I'm going to ask you some questions off of

14  that.  Now, do you remember this day, the day of the shooting

15  incident?

16      A.    I do.

17      Q.    Okay.  And what shift were you working that day,

18  please?

19      A.    It was daylight shift, 8:00 to 4:00.  Our shift, as

20  a detective, is different than the patrol shifts.

21      Q.    Okay.  And what was your assignment that day?

22      A.    Just as part of the detectives' unit, deal with what

23  I dealt with whenever it comes in.

24      Q.    And so in your role as a detective, does that mean

25  you're not on patrol?  As a detective.

1          A.     Generally speaking, I would not be on patrol.

2                 And I handled a lot of the video and some other

3    things that we handle at the Port Authority.

4          Q.     Okay.  So I just want to get an idea.  So that shift

5    for you -- prior to whatever response you made to this incident

6    later in your shift, were you actually, say, at the police

7    station doing your duties that shift?

8          A.     No.  I was with a new officer, Officer Hudek, Mike

9    Hudek.  We were -- he was with me to discuss what the

10   detectives' units do.  He was with me that day.  We were out on

11   the road, just out and about, before the call came in.

12         Q.     And was he a trainee at the time, if you remember?

13         A.     He was a new officer within the department.  I don't

14   recall what his status was or where he was at.

15         Q.     Got you.  Thank you.  Could you please -- I'm going

16   to ask you just to kind of lay out what happened that day in

17   regard to the shooting incident with Bruce Kelley and what you

18   did.  We'll kind of take it chronologically.  I'll periodically

19   interrupt and have some follow-up questions, and we'll just

20   kind of walk through it and go through your report.

21                Can you tell me what you were doing on your shift

22   when you got some information about this incident?

23         A.     So I don't recall specifically what we had done

24   prior to the call.  We were in the Banksville area of the City

25   of Pittsburgh when the initial call came out.  And we started

1    in that direction of the call, but I -- I didn't expect that we

2    would even make it to the call.

3        Q.    And when you say you -- you didn't even expect that

4    you would make it to the call, I'm just -- what do you mean by

5    that?

6        A.    That the call would be ended or completed before we

7    got there.  It was -- because we were on the other side of the

8    city, sir.

9        Q.    Got you.  So when you got the call -- I'm sorry.

10   I'm just making a note.  You may have just answered this.  When

11   you got the call, did you immediately respond, or did you

12   continue doing whatever you were doing at first?

13       A.    We -- we were headed back towards the station, which

14   is in the same direction as the call, so we were just headed

15   back.

16       Q.    Thank you.  And did you hear additional radio

17   transmissions about this specific call?

18       A.    I did.  I can't tell you exactly what those were,

19   but I can tell you that Officer Adams requested a Code 3

20   response, which is that -- that the actor had a knife and that

21   he was requesting additional assistance.  More emergent.

22       Q.    And so I assume you went somewhere to where the call

23   was or the incident.  Is that correct?

24       A.    When he requested the Code 3 response, we -- I can't

25   recall exactly where we are -- were when that happened.  I want

14

1   to say that we were closer to the City of Pittsburgh.  And then

2   we started out the busway in the direction of that call.

3       Q.    And --

4       A.    We headed to the call.

5       Q.    I'm sorry.  And the call --

6       A.    We headed --

7             THE REPORTER:  Please just say it one more time,

8   Officer, so it's clear.

9             THE WITNESS:  We headed to -- we headed to the call.

10  BY MR. GEARY:

11      Q.    Apologize.  I was interrupting you there, which is

12  bad for the stenographer.

13            When you got to Wilkinsburg and arrived at wherever

14  you arrived, please tell me where exactly you arrived in

15  Wilkinsburg related to this incident.

16      A.    So when we got there, we turned onto Whitney Street.

17  And at that point, we saw everybody crossing the street.

18      Q.    Were you driving the unit?

19      A.    I was.

20      Q.    And when you say "We saw everyone crossing the

21  street," can you explain for me what that means?  Who was

22  "everyone"?

23      A.    Mr. Kelley, followed by several police officers.

24      Q.    And you turned onto Whitney Avenue.  Is that

25  correct?

15

1     A.    That's correct.

2     Q.    Do you remember -- so you would have had to be on

3    Center to turn onto Whitney.  Is that right?

4     A.    Yes, sir.

5     Q.    Do you remember if you made a left onto Whitney or a

6    right-hand turn?

7     A.    I'm sorry.  I don't recall, sir.

8     Q.    That's okay.  When you saw Mr. Kelley, did you

9    recognize him?

10     A.    No, sir.

11     Q.    And he was walking across the street.  Is that

12    right?

13     A.    That's correct.

14     Q.    Meaning Whitney Street -- or Whitney Avenue?

15     A.    He was crossing Whitney from the direction of the

16    park and ride, across, in front of me, so to the right.

17    Whitney is one way.  I was down at Center going onto Whitney.

18    He was crossing in front of me from left to right.

19     Q.    Thank you.  And was he -- was he walking?  Was he

20    running?  Can you describe for me just what -- as he's crossing

21    the street, what was he doing?  What was his manner in crossing

22    the street?

23     A.    He was just -- I didn't pay attention to any

24    particular manner.  I don't know how to describe it other than

25    crossing the street.  And then, again, officers behind him.

1    Q.    How far behind him were officers, say, in distance
2  or time?  When they then crossed the street, was there a bit of
3  a gap between when he crosses and they cross?

4    A.    I couldn't tell you exactly what the gap was.  I
5  couldn't tell you what the time is.  It wasn't -- you know what
6  I mean?  I -- I just saw them all going.  I don't know.

7    Q.    Did any officers have their guns drawn at that point
8  in time?

9    A.    I don't recall, sir.

10   Q.    Thank you.  What did you do next?

11   A.    Officer Hudek exited the car and joined up with the
12 officers that were going behind him.  I turned my car around to
13 try to get out in front of him.

14   Q.    And you want to get in front of Bruce Kelley, Jr.,
15 in your vehicle.  Is that right?

16   A.    That's correct.

17   Q.    And so tell me, please -- I assume maybe you came
18 out to Center and then went down Center.  Can you just tell me
19 what route you took?

20   A.    So I came back off of Whitney.  I went onto Center.
21 I started up Center.  And that's about the time -- I don't know
22 the exact time frame -- that it was reported that he had turned
23 back around and was headed back to Whitney.

24   Q.    Understood.  And at that point in time, Hudek is no
25 longer in your vehicle?

1      A.     That's correct.

2      Q.     He's on foot?

3      A.     That's correct.

4      Q.     Thank you.  So when Kelley then reverses course,

5   what did you do then, please?

6      A.     I turned back around and headed back down to Whitney

7   Street.

8      Q.     Okay.

9      A.     Or towards Whitney Street.  Because I wasn't sure

10  where he was going.

11     Q.     Thank you.  And as you're headed in the direction of

12  Whitney, do you see anything as far as him --

13     A.     I don't.

14     Q.     -- or the other officers?

15     A.     I don't.  I'm -- as I make the turn back onto

16  Whitney, I don't see them until I get further up.

17     Q.     So you make a right turn onto Whitney Avenue again?

18     A.     That's correct.

19     Q.     When you do that, you started driving up Whitney

20  Avenue, at least to some degree.  Is that right?

21     A.     That is correct.

22     Q.     Were there any citizens or civilians out in their

23  yards or on the sidewalk?  In the street?

24     A.     I don't recall, sir.  Because as I made the turn

25  back onto Whitney, I heard gunshots.  And then I just went up

1    to the scene, sir.

2         Q.    Okay.   As you're driving to Whitney Avenue -- I

3    think you were in Pittsburgh somewhere originally when you got

4    the call.   Were your lights and sirens on as you're driving

5    to -- over to -- back to Wilkinsburg, responding to this call?

6         A.    No, sir.   No, sir.   We were too far out.

7         Q.    Okay.

8         A.    Based on the initial call, we were too far out.

9         Q.    And as you get closer, did you activate lights or

10   sirens?

11        A.    Not until I got on the busway.   And that was just

12   for the benefit of the people along the busway that may or may

13   not be getting on any of the buses, to let them know that we

14   were coming through.

15        Q.    And when you initially pulled onto Whitney Avenue

16   the first time, did you have lights and sirens?

17        A.    I don't recall, sir.

18        Q.    Okay.   And I do a fair amount of criminal work, so I

19   get cases where there's dash camera video provided, whether

20   it's a DUI or something like that.   Were -- your cars at that

21   time, January of '016, did they have dash camera capabilities?

22        A.    No, sir.

23        Q.    Okay.   So, then, obviously, your unit would -- there

24   would be no dash camera footage of when you pulled up?

25        A.    That's correct, sir.

1   Q.   Okay.  So you're -- you're on Whitney Avenue for the

2   second time.  And please describe what you see or hear.

3   A.   As I pull up, there's other police vehicles already

4   on the -- on Whitney.  As I go to exit out my vehicle, I see

5   Sergeant O'Malley carrying his partner.  They're coming back

6   towards the marked unit that I was next to.  I tried to --

7   tried to do an evaluation of the dog.  He jumps in the car.

8   Sergeant DiPippa jumps in the front seat, and they take the dog

9   to the vet clinic or leave the area.

10  Q.   The dog jumped into the car?

11  A.   No, sir.  Sergeant O'Malley was carrying the dog.

12  Q.   And you may have testified.  Had you already heard

13  gunshots at that point in time?

14  A.   I did.

15  Q.   Okay.  I'd just like --

16  A.   Prior to me pulling up there, yes.

17  Q.   Okay.  So can you tell me where you were in your

18  unit when you heard gunshots?

19  A.   I don't understand your question, sir.

20  Q.   Were you about to make a right on Whitney Avenue

21  from Center or you had just turned onto Whitney?

22  A.   I was just turning onto Whitney when I heard

23  gunshots.

24  Q.   And were your windows down?

25  A.   I don't recall, sir.  January -- I don't recall what

1    the weather is, so I don't know.

2         Q.    How many gunshots did you hear?

3         A.    I didn't count them, sir.

4         Q.    Do you know if there was a pause in the shots, such

5    as, say, three shots, a brief pause, then four?  Or was it a

6    continuous rhythm of shots?  Do you --

7         A.    I don't recall either way, sir.

8         Q.    And you had your radio on in your vehicle, I assume.

9    Is that right?

10        A.    That is correct, sir.

11        Q.    And then you had a microphone, a radio, on your

12   shoulder as well?

13        A.    Not on my shoulder, sir.  As a detective, I have it

14   on my belt.  I don't carry a shoulder mike.

15        Q.    As a detective, were you in uniform, or were you,

16   say, in plainclothes?

17        A.    Plainclothes, sir.

18        Q.    And where did the shots seem to be originating from?

19        A.    Out in front of me on Whitney.

20        Q.    Okay.  Now, Whitney Avenue -- you may have referred

21   to it as a one-way street a few moments ago.  And I don't --

22        A.    A dead-end street, sir.

23        Q.    Okay.  That's what I -- so Whitney Avenue is a

24   dead-end street?

25        A.    Correct.

1    Q.    So did you get out of your vehicle as soon as you
2  hear gunshots?
3    A.    No, sir.  I had -- I had gone a little bit further.
4  That's when I stopped further up, next to another police unit.
5  And then I saw the sergeant and -- well, both sergeants.  They
6  jumped in that police unit and left the area.
7    Q.    And did you see them from the vantage point of
8  you're still -- you're still behind the wheel of your unit?
9    A.    That's correct.
10   Q.    Was the other sergeant DiPippa?
11   A.    Yes.
12   Q.    And, as sergeants, were those two higher in rank
13 than you on that day?
14   A.    Absolutely.
15   Q.    Okay.  What else could you see from the vantage
16 point of being in your unit?  Still at that point in time.
17   A.    So there was -- there was a multitude of people.  I
18 didn't pay attention to what it was.  As soon as I was -- I got
19 there, I see the sergeant carrying his K-9 partner.  A brief
20 interaction with them, then went further up to the scene on
21 foot.
22   Q.    And in the brief interaction, what did -- what did
23 you say to O'Malley or DiPippa?
24   A.    I asked him if he wanted me to check the dog.
25   Q.    And what did they say -- or he say?

1      A.    They were going to the vet.

2      Q.    Okay.  Do you remember who said --

3      A.    To be honest with you, I think that was -- I think

4  that was Sergeant DiPippa.  I don't think that Sergeant

5  O'Malley really said anything to me.  I can't -- I can't recall

6  if he did, if he did say anything to me.

7      Q.    What was O'Malley's demeanor as he's carrying his

8  partner?

9      A.    He seemed upset.

10     Q.    And upset as in -- can you just give me a little

11 more description on "upset"?  Like --

12     A.    That he's concerned about the condition of his

13 partner.

14     Q.    Did he appear to be angry?  When you say "upset,"

15 did he appear to be --

16     A.    No.  I think -- I would -- I would say that it was

17 more for the condition of his -- his partner.

18     Q.    And, roughly, how long do you stay in your unit

19 then?

20     A.    I couldn't tell you.

21     Q.    Okay.  But at some point you got out of your unit?

22     A.    That's correct.

23     Q.    Okay.  Now, after DiPippa and O'Malley leave with

24 the dog, approximately how many officers would you say are on

25 scene at that point?

1      A.     I'm not sure, sir.

2      Q.     Are there officers from other jurisdictions or

3 departments?

4      A.     I believe so, but I didn't -- I didn't take an

5 account of who was there at that point.

6      Q.     Okay.  Were there any citizens or civilians out in

7 the street or their yards right after the shooting?

8      A.     I didn't notice, sir.

9      Q.     Okay.  Tell me what -- what you did, please.

10      A.     At that point, I went over to Mr. Kelley, tried to

11 assess his -- what his -- assess him, how he was at the -- at

12 the time.  I felt a carotid pulse.  It did not appear as he was

13 breathing.  Then I started to render aid to him.

14      Q.     Where was his body positioned, please -- as far as

15 in the road? on the sidewalk? in a yard? -- when you went over

16 to his body?

17      A.     So I don't recall a hundred percent, but I believe

18 it was on the sidewalk or on the walkway from the house.  I'm

19 not a hundred percent sure, sir.

20      Q.     And when you first looked at his body, what was the

21 position of his body, please?

22      A.     I believe he was on his back.

23      Q.     And what -- with this carotid artery, you tried to

24 see if he had a pulse?

25      A.     That's correct.

24

1    Q.    And he did not have a pulse.  Is that true?

2    A.    No.  He did have a weak pulse.

3    Q.    And what did you do in response, then, to a weak

4    pulse?

5    A.    Got a medical kit out because he still has a pulse.

6    He did not appear to be breathing, so I started to try to

7    provide intervention with a bag valve mask to give him breaths.

8    Q.    I'm sorry.  Just for the reporter, whatever type of

9    mask you said?

10    A.    Bag valve mask.

11    Q.    Thank you.  And that's oxygen -- that was oxygen for

12    him?

13    A.    Just room air.  But a bag to force -- or help put

14    air into the lungs.

15    Q.    Okay.  Please tell me what else you personally did,

16    sir.

17    A.    I was trying to give him breaths.  And it was a

18    short time later -- I don't know the exact time -- when the EMS

19    arrived on scene.  Then they took over.

20    Q.    But you did check the pulse personally, and you

21    did --

22    A.    Try to give breaths.

23    Q.    With the bag valve mask?

24    A.    That's correct, sir.

25    Q.    Understood.  You did those two things.  Anything

1  else that you did?

2       A.    I had Officer Adams remove the handcuffs so --

3  again, the EMS wasn't there until I started giving the breaths

4  with the bag valve mask.  But in case we had to start doing

5  CPR, I had him remove the handcuffs so that he could be flat on

6  his back.

7       Q.    Thank you.  Did you -- when you go over to the body

8  initially, did Mr. Kelley -- did he have -- was there a knife

9  in his hand?

10      A.    I don't recall, sir.

11      Q.    Okay.  Do you remember anyone doing anything about

12 the knife?  Like taking it into evidence or anything like that?

13      A.    I did not see the knife at the scene.  And his hands

14 were already handcuffed, so if -- I would presume that

15 currently it wasn't in his hand.

16      Q.    And Adams unhandcuffed Mr. Kelley, and you watched

17 him do that?

18      A.    That's correct.

19      Q.    Okay.  And there was no knife in his hands at that

20 point?

21      A.    No, sir.

22      Q.    Adams removes the handcuffs and -- I'm sorry.  What

23 did you do after the handcuffs were removed?

24      A.    That's where -- well, had him back on his back.  We

25 had him take the handcuffs off him.  I had him take the

26

1   handcuffs off so that if I had to start CPR, he would be flat

2   on his back.  I was still doing bag -- bagging him, or giving

3   him respirations, when EMS came up and they took over.

4       Q.   And then when they take over, did you stand back and

5   observe for a few minutes what they were trying to do?

6       A.   I did.

7       Q.   What were they -- what techniques were they trying

8   to employ?  The EMTs.

9       A.   They put a monitor -- a cardiac monitor on him.

10  They determined at that point he was deceased and called him --

11  called his -- called him deceased.  And I don't recall the

12  time.  I would have to -- I have it in my report, sir.  I'm

13  looking for the time.  I'm sorry.

14      Q.   Sure.  No.  It's fine.

15      A.   1559 hours.

16           THE REPORTER:  Say it again, please.

17  BY MR. GEARY:

18      Q.   1559 hours?

19      A.   That's correct, sir.

20      Q.   Thank you.  Please walk me through what else you did

21  at the scene and roughly how long you were at the scene before

22  you left the scene that day.

23      A.   So after attending to Mr. Kelly, I went over and I

24  checked on Officer Adams, Officer Ravotti, and Officer Hampy.

25  Checked on them, found out if they had any injuries.

1          After they were seen also by medics -- the second

2    medic unit, Officer Ravotti was put into my patrol car to sit

3    and wait for the county police to talk to him.

4          Officer Adams went to the hospital via EMS, and

5    Office Hampy remained on scene.

6          Q.    And so, obviously, you described you were in your

7    unit when you heard gunshots, so I just need to ask to be

8    thorough:  Did you see the shooting of Bruce Kelley, Jr.?

9          A.    I did not.

10         Q.    Okay.  When did you learn which officers had fired

11   at him?

12         A.    To be honest with you, I -- I don't recall.  I don't

13   recall exactly when.  Somewhere on the scene, I heard that it

14   was the two officers involved, but I don't recall exactly when,

15   sir.

16         Q.    Do you recall who you learned that from, as to which

17   officers had deployed their firearms?

18         A.    I don't recall, sir.

19         Q.    Okay.  And you checked on Ravotti, Hampy, and Adams.

20   Is that correct?

21         A.    That's correct.

22         Q.    And your checking on Adams, what did that consist

23   of?  I assume you asked him questions?

24         A.    Just "Are you okay?  Are you injured?  Do you need

25   any medical attention?"  That was it.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


CALISIA KELLEY; and            CIVIL ACTION
JOHNNIE MAE KELLEY,
Co-Administrators of the       No. 2:17-cv-01599-NBF
ESTATE OF BRUCE KELLEY,
JR., deceased,

Plaintiffs,

vs.                            TRANSCRIPT

BRIAN O'MALLEY, both in his
Official and Individual        DEPOSITION OF
Capacities as Sergeant for     WILLIAM HAHN
the Allegheny County Port
Authority; and DOMINIC
RIVOTTI, in both his
Official and Individual
Capacities as Officer for
the Allegheny County Port
Authority,

Defendants,
Jointly and Severally.         TAKEN VIA ZOOM VIDEO CONFERENCE

                               THURSDAY, NOVEMBER 5, 2020


                               Taken on behalf of Plaintiffs,
                               Calisia Kelley and Johnnie Mae
                               Kelley


                               Counsel of Record for this Party:

                               Noah Geary, Esquire
                               Washington Trust Building
                               6 South Main Street, Suite 225
                               Washington, PA  15301
                               724-222-3788

6

1   an interview of you?

2       A.   I was.

3       Q.   Okay.  Thank you.  And did you read that, sir?

4       A.   Just briefly yesterday.

5       Q.   Okay.  Now, real quick, a couple questions on your

6   background, please.  What is your age, sir?

7       A.   I am 51.

8       Q.   And your current rank with Swissvale Police

9   Department?

10      A.   Sergeant.

11      Q.   And how long have you been with the department?

12      A.   I've been a police officer 27 years, I believe 23 or

13  24 with Swissvale.

14      Q.   Where were you before Swissvale?

15      A.   I was with the Braddock Hills police and the Rankin

16  police and also the City of Pittsburgh housing police.

17      Q.   And are you from this area originally?

18      A.   I'm born and raised in Edgewood, right next to

19  Swissvale.

20      Q.   What high school did you go to, please?

21      A.   Woodland Hills.

22      Q.   Okay.  Thank you.

23           Now, I'm going to ask you about the events of

24  January 31, 2016.  Were you working that day, sir?

25      A.   Yes.

7

1    Q.    Okay.  First question:  Did you compose any reports
2  memorializing your response to this incident and your
3  observations and what you did?
4    A.    I do not recall.
5    Q.    Okay.  So you may have.  Is that right?
6    A.    Correct.
7         MR. GEARY:  Okay.  I would ask just, Attorney
8  McTiernan, if this witness did compose a report or several,
9  if -- I would just ask for a copy of that, if that's okay.  I
10 can get it --
11        MR. McTIERNAN:  Yeah.  We're not aware of it, the
12 chief and I.  I will double-check.  I think the sergeant is
13 answering very honestly, but we -- we found nothing in our file
14 that was a report by the sergeant.
15        MR. GEARY:  Okay.
16        MR. McTIERNAN:  I'll just tell you that right now.
17 But I will double-check --
18        MR. GEARY:  Thank you so much.
19        MR. McTIERNAN:  -- and provide it if there is one.
20        MR. GEARY:  Thank you.
21 BY MR. GEARY:
22    Q.    Sergeant, what shift were you working on that day?
23    A.    The 3:00 p.m. to 11:00 p.m. shift.
24    Q.    Okay.  And what was your assignment?
25    A.    Patrol sergeant.  I supervised the -- the shift.

1    Q.    Okay.  What were you doing when you got a call about

2  this incident?

3    A.    I believe I was in the building or just outside the

4  building with Detective Sergeant Corrado.  We were talking, and

5  we heard the commotion on the radio.  And that's what drew our

6  attention to, obviously, a critical incident in Wilkinsburg.

7    Q.    What was the -- the nature of the incident?

8  Specifically, what did you learn?

9    A.    It was a Wilkinsburg officer coming across the

10  radio -- Officer Granger on the radio, yelling that there was

11  some type of fight with an individual, I believe, involving the

12  Port Authority police.

13    Q.    And did you drive to Wilkinsburg then?

14    A.    Yeah.  Myself and Detective Corrado jumped in my

15  patrol vehicle and went down Roslyn Street and got on the

16  actual East Busway and headed out the busway towards Hamnett

17  Station in Wilkinsburg.

18    Q.    And en route, did you learn any further information

19  over the radio transmissions?

20    A.    Yes.  As I recall, I believe it was Officer Granger

21  updating, stating that the individual had assaulted a Port

22  Authority officer and he was armed with a knife.

23    Q.    Okay.  When you got over to that area, please tell

24  me, you know, where did you park?  What did you do?

25    A.    I remember parking -- I believe it was Hamnett

9

Station, where the actual buses stop at.  We exited our patrol

vehicle and we went off the busway onto a long path that -- an

unpaved path.  It's obviously something that people just use on

their own that runs along the busway wall from, I believe,

where the incident occurred -- which as I hear them refer to it

as the gazebo, they have a lot of problems there -- and in our

location, which was probably 50 to 75 yards' distance, if I

were to guess.  And we were on this dirt path looking in that

direction, and we witnessed people down the other end.  And the

radio transmissions began with "This is the actor."

Q.    Thank you.  And so you're with Corrado.  Correct?

A.    Correct.

Q.    Were you with any other officers from any other

department in your general vicinity at that point in time?

A.    I kind of remember an officer being there before us

or after us that kind of got initially on our end because, like

I said, there was a group on the far end.  And then myself and

my detective got involved.  And maybe another officer might

have been with us, but I don't quite recall because of, you

know, the amount of time it's been.

Q.    And what -- if you could just continue and lay out

for us what happened, what you observed.

A.    Yes.  We -- like I said, we witnessed the

individual, and he was now walking towards us.  And myself or

Detective Corrado -- I forget which one of us -- radioed to be

1  aware of a potential cross-fire incident between law

2  enforcement because the male was armed with a knife, and we

3  didn't want to, obviously, trade ammunition with another law

4  enforcement agency.

5      Q.    And -- go ahead.  I'm sorry.

6      A.    Basically, at that point, the male was walking

7  towards us.  I'd say he -- he almost got halfway in between us

8  and the other group of officers, and that's when he cut into

9  the woods or the residential wooded area off that path.

10     Q.    And when he made that turn into the wooded area,

11 what was his distance from you?

12     A.    I would guess about close to halfway, but I would

13 say 40 -- 40 yards.  Maybe 50 yards.

14     Q.    Okay.  And so for a period of time, you observed him

15 walking on that path you've described?

16     A.    Yes.  In my direction.

17     Q.    And as he was walking, can you just -- was he doing

18 anything other than just walking?

19     A.    He just looked like a large male walking in my

20 direction.  He was not running or anything at this point.

21     Q.    Was he saying anything?

22     A.    No.  He was too far away.  We wouldn't have been

23 able to speak to him at that distance.

24     Q.    Were you able to actually see a knife on -- you

25 know, on his person?

1    A.    At this point, no.

2    Q.    When he makes the turn into the wooded area, what

3  did you do?

4    A.    Myself and Detective Corrado also went into the

5  area, but not towards him, just -- we entered the area where we

6  were at, and we started basically paralleling what way we

7  assumed the direction he was going, in between where the Port

8  Authority officers and ours were.  Like, we were basically

9  paralleling.  If you were to say this is myself and Detective

10 Corrado, here's Port Authority Wilkinsburg, the actor was going

11 in between the middle of us, I assume in a residential backyard

12 or woods, something, initially.

13   Q.    Thank you.  And just so the record will reflect, you

14 just held up your left hand, then your right hand, indicating

15 you and Corrado and the Port Authority officers kind of in a

16 parallel direction going through the wooded area.  And he would

17 have been in between the two sets of officers.  Is that

18 correct?

19   A.    That's my assumption, yes.

20   Q.    Did you -- as he's going through the wooded area,

21 could you maintain sight of him?

22   A.    Initially, no.  I personally lost sight of him for

23 maybe a minute or two possibly.  And then we again made contact

24 with him out in the residential streets of Wilkinsburg.

25   Q.    Now, up until this point, did you have your gun out

12

1  of its holster at any time?

2      A.    I don't recall.  Not initially.  Because, again, he

3  was so far away that that would have been not prudent.

4      Q.    And, okay, when you go through the wooded area, then

5  there's streets and homes and yards.  Is that correct?

6      A.    Correct.

7      Q.    Okay.  Please tell me what you do next.

8      A.    Initially, I was telling residents to get in their

9  house because there was a male with a knife.  We had a legit

10  concern of possibly a hostage situation.

11          And then I remember him reappearing -- and I do not

12  know any of the streets where we initially made contact.  It

13  was just a random street.  And then that's when we began

14  following him for at least, I would say, 10 to 15 minutes,

15  attempting -- you know, attempting to get him to drop the

16  knife.

17      Q.    When you say "We had a legit concern of a hostage

18  situation," explain that for me, please.

19      A.    Well, it was 3 o'clock in the afternoon.  Kids were

20  just getting out of school.  There were kids walking in the

21  street.  There's people in the street, and they're seeing all

22  the police cars.  So we have an issue with people coming out

23  into the street, and, you know, people want to know what all

24  the police cars are doing.  And you would think that people

25  would go inside, but it's quite the opposite often.

1     Q.   Did you have any information that the actor might

2  take someone hostage?

3     A.   Do I?  No, I didn't receive any firsthand

4  information on that, no.

5     Q.   Okay.  And so you reacquire sight of him, correct,

6  at some point?

7     A.   Correct.

8     Q.   And when you reacquire sight of him, what was he

9  doing?

10     A.   He was walking through Wilkinsburg between

11  sidewalks, streets, between houses.  At one point in time, I

12  almost ran into the back of him in an alleyway between two

13  houses.

14     Q.   And as you observed -- we'll get into your almost

15  running into him in a moment.  But as you're observing him,

16  he's walking.  Is that correct?

17     A.   Correct.

18     Q.   Was he ever near -- physically near any civilians or

19  citizens?

20     A.   What would you consider near?

21     Q.   Within a -- within a distance that would lead you to

22  think, well, maybe he might try to do something to a civilian,

23  as in harm them or threaten them.

24     A.   I had a legit concern of that, yes.  I was very

25  concerned with that.  Did he ever get within arm's length of

1    any civilians?  Not while I was with him, no.

2         Q.    How close did he get to any civilian?

3         A.    I wouldn't know.  You know, we were walking down

4    these city blocks.  I would say within a half a block.

5              There was a lady yelling on her front porch to tell

6    him to drop the knife.  He walked right by her.

7         Q.    When you say -- I'm sorry.

8         A.    I remember that.

9         Q.    When you say "He walked right by her," where was she

10   and where was he?

11        A.    He was walking through her yard.

12        Q.    Okay.  And where was she?

13        A.    There was one lady on her porch yelling at him.  I

14   remember another lady up in the second floor screaming at him

15   to drop the knife.  That was all like -- they might have been

16   even neighbors.

17        Q.    Did he say anything to those women?

18        A.    Not to my knowledge.

19        Q.    Okay.  Did he make any movements or motions as if he

20   was going to walk towards them?

21        A.    He was walking towards them.  He walked up the front

22   sidewalk of the one lady's residence, but he continued down the

23   side of the house.

24        Q.    Did he verbally threaten either of those women?

25        A.    Not to my knowledge, no.

1    Q.    Did he, say, gesture with his knife towards those --
2  either of those two women?

3    A.    I did not witness it, no.

4    Q.    And describe for me.  You said at some point you
5  almost ran into him or something like this.

6    A.    Yes.  At one point in time, I knew we were having an
7  issue with -- you know, whether it was a psychological issue or
8  whatever issue he may be having, because he just didn't -- he
9  just wasn't responding to any commands.  And I got on the radio
10  and requested a K-9 unit, if there were any in the area.

11        Initially, they said Homestead was not available, I
12  remember.  And then they said that Port Authority police was
13  sending a K-9, but it was coming from a distance.

14        And right after that is when I ran around between
15  two buildings.  And as I ran into the alleyway between the two
16  houses -- it was really icy and I slid.  And as I looked up, I
17  was a few feet behind his back.  He wasn't aware I was behind
18  him.

19    Q.    Okay.  Just so I can picture this, what, you're
20  walking in a certain direction.  And at that point in time,
21  he's not in your field of vision right before this slip?

22    A.    He was in my field of vision, I believe.  And I
23  think I -- we were -- myself -- now there's multiple officers
24  there.  We were trying to go around a house to see if he was
25  going to come out the back.

1          And when he didn't, I came around to see where he

2   went.  And I went in between two houses and ran into him.  He,

3   luckily, not was facing in my direction.

4          Q.    And then --

5          A.    He didn't even know I -- I assume he didn't even

6   know I was there.

7          Q.    Okay.  How far was he away from you in feet?

8          A.    Oh, I'd say 6 feet.

9          Q.    Did he see you?

10         A.    No.

11         Q.    And I'm sorry.  Did --

12         A.    No.  I -- I stopped.  And he was continuing down the

13   alleyway between the two houses.

14         Q.    And then -- I just took a note.  You said it was

15   icy.  Did you -- did you slip and fall or something like that?

16         A.    I kind of slid into the alleyway.  I didn't fall.

17   But I braced myself, I guess, to keep myself from falling.

18         Q.    And --

19         A.    I do remember that.

20         Q.    -- a few moments ago, you testified that you didn't

21   know if this person had a psychological issue.

22         A.    Uh-huh.

23         Q.    So was that discussed among the officers, that this

24   person may have some type of psychological or mental health

25   issue?

17

1      A.    No.   I didn't discuss that with anybody.  We were
2  dealing with the task at hand.
3      Q.    Okay.  Well, you mentioned something about
4  consideration was -- something about whether he had a
5  psychological issue.  So what was your thinking along those
6  lines?
7      A.    That was -- that was my personal thoughts.  Because
8  he just wasn't responding to anything we were saying.  Multiple
9  officers were giving him a hundred commands to drop the knife,
10 and he just -- he didn't respond to anything.
11     Q.    And you requested a K-9 unit.  Is that correct?
12     A.    Correct.
13     Q.    Okay.  And why?
14     A.    Because we couldn't get him to stop.  We knew that
15 this was eventually going to probably come to a deadly force
16 issue.
17     Q.    And why was the thinking that this eventually was
18 going to come to a deadly force issue?
19     A.    Because he would not stop.  He had a knife, and he
20 already assaulted a couple police officers.
21     Q.    Had you had any crisis intervention training at that
22 point in time in your career?
23     A.    I'm sure I have.
24     Q.    Okay.
25     A.    I don't -- I don't know off the top of my head if I

1  could name it for you, but we have a lot of training.

2      Q.   Were you -- did you undergo training?

3      A.   Hostage negotiation -- hostage negotiation?  No,

4  I've never been certified in anything like that.

5      Q.   Okay.  As far as --

6      A.   But I've done interview techniques and other

7  negotiation trainings over the years, yes.

8      Q.   As far as crisis intervention training, what are you

9  trained to do?  Do you call someone in to talk to the person?

10  Do you just talk to them, or what's the -- what were you

11  trained to do?

12      A.   Well, if we had somebody contained, we can call in a

13  negotiator.  But under the circumstances -- it was so fluid and

14  it was moving and the location never stopped at any point in

15  time -- that was not feasible.

16      Q.   So in your training, if the person is contained,

17  then you call in someone to -- trained to kind of talk to them.

18  Is that right?

19      A.   A negotiator, yes, through the county.

20      Q.   And the negotiator, what, is trained to de-escalate

21  the situation just verbally, to talk to the actor?

22      MR. EVASHAVIK:  Object to form.

23      You can answer.

24      THE WITNESS:  Yeah.  They have specialized training

25  in trying to de-escalate the situations.

19

1   BY MR. GEARY:

2      Q.    Okay.  So a K-9 unit was requested.  Was at any time

3  a negotiator or an equivalent-type person called to the scene?

4      A.    Not by me.

5      Q.    Okay.  Do you know if any other officer made that

6  type of call?

7      A.    I do not.

8      Q.    Okay.  All right.  You described for us you kind of

9  came upon him.  He didn't see you.  I just kind of want to take

10  it chronologically.  If we can pick up wherever you were in the

11  streets, the yards, and you're following him, just kind of --

12  if you could continue to lay out what happened.

13      A.    I had been doing it more or less chronologically.

14  So after I almost ran into him in the backyard, I do remember

15  us walking down the middle of the street.  And we came around,

16  and then we arrived at Hamnett Station, I believe, parking lot.

17        And that's when officers had tried to deploy pepper

18  spray, or OC spray.  And another officer, Sanders, from Port

19  Authority attempted to approach him with an expandable baton.

20  And when Officer Sanders approached him, he -- he swung the

21  knife towards him.

22      Q.    And in your report, it says "Hahn stated that

23  Officer Sanders from PAPD tried to utilize his ASP on the male

24  but the male turned in a furtive manner toward the officer and

25  brandished the knife at him."  So that's what -- verbatim from

20

1  your report.

2          First off, when you say "in a furtive" --

3          MR. EVASHAVIK:  Wait.

4          MR. GEARY:  I'm sorry.

5          MR. EVASHAVIK:  Wait.  Wait.  Thank you.

6          I'm going to object to the form of the question.

7  It's not his report.  It's a summary of an interview.

8  BY MR. GEARY:

9      Q.    Okay.  In the summary of your interview, Sergeant,

10 to -- to the point you just testified to about Sanders, there's

11 a sentence that says "Hahn stated that Officer Sanders from

12 PAPD tried to utilize his ASP on the male but the male turned

13 in a furtive manner toward the officer and brandished the knife

14 at him."

15          Now, a couple questions off of that.  When you

16 say -- did you use the term "furtive" manner during the

17 interview?

18     A.    I -- I do not recall.

19     Q.    Okay.  Do you -- do use that word, "furtive," just

20 in your course of law enforcement duties?

21     A.    I have.  It's not my go-to word as it is for some

22 officers.

23     Q.    What is your definition of "furtive"?

24     A.    I would -- I would probably -- the way I would

25 better describe it is aggressive posture, like a motion like

21

1  "get back" or possibly a stabbing motion towards Officer

2  Sanders.  I don't remember exactly how it was, but I remember

3  Officer Sanders pulling back, realizing that he was in danger,

4  and backed away from the subject.

5      Q.    And where were you in relation to the actor and

6  Sanders at that moment?

7      A.    I was behind the actor.  I would probably say 20

8  yards behind at that time.

9      Q.    Did you have a Taser out?

10     A.    No.  I would have had my gun out at that point.

11     Q.    Okay.  Did you deploy a Taser at any point that --

12 that day?

13     A.    I did not.

14     Q.    Did you deploy any uses of force such as OC spray?

15     A.    I used no use of force whatsoever except for my

16 presence and verbal commands.

17     Q.    And please continue.  You just described what you

18 saw with Sanders there.  If you could just continue, walk us

19 through.

20     A.    Yes.  So at that point in time, the subject

21 continued through the parking lot and began climbing a fence.

22 I believe it was -- I believe it was Officer Granger.  It might

23 not have been.  I remember an officer trying to pepper-spray

24 him, but the pepper spray went over the back of his head or up

25 the back of his jacket.  And I believe someone else tried to

22

1    Taser him at that point, and none of which were effective, it

2    appeared, because he had big -- what appeared to be, like, a

3    Carhartt jacket on or multiple layers of clothing, because he

4    looked like a really big guy.  So that's when he went over the

5    one backyard and proceeded through the yard and began to cross

6    over the next street, whichever street that was.  I don't

7    recall which one it was.

8         Q.   Did you see him go over a fence?

9         A.   I think he went over the fence, and that's when

10   someone tried to deploy a Taser and the pepper spray on him.

11        Q.   Okay.  As far as the -- his clothing and the

12   thickness of his clothing, did you get the idea that this

13   person may be homeless?

14        A.   I -- I didn't -- I understand he was after the fact,

15   but I didn't think about that at the time.

16        Q.   Okay.  And please continue.  Did you see him go over

17   a fence?

18        A.   Yes, I saw him go over a fence.

19        Q.   Did he put the knife away to climb over the fence?

20        A.   I do not recall.

21        Q.   Okay.  Please just walk us through.  You know, we'll

22   go all the way to the end of the scenario.

23        A.   Okay.  So he walked -- he went over the fence.  He

24   went through a backyard, went over a street.  At one point in

25   time, I lose sight of him.  And then he doubles back and comes

23

1   back, I believe, in the same direction towards the yards that

2   he had just come through where the fence was.  And that's when

3   the confrontation and the shooting occurred with the Port

4   Authority.

5       Q.    Okay.  Let's get to the confrontation and the

6   shooting.  Did you watch that happen?  The shooting?

7       A.    Yeah.  I had come around the -- the corner.  I had

8   heard the -- at the time, I actually hadn't seen the Port

9   Authority police.  I don't know if they just pulled up and only

10  been there a second, but I did not see Officer O'Malley until I

11  doubled back along the subject, who now at this point was out

12  of my view.  And I was hearing the commands for the K-9 to be

13  released.

14      Q.    Okay.

15      A.    That's when I came out from between the houses.  And

16  at that time is when the gunfire started.

17      Q.    You heard commands to the K-9?  The dog?

18      A.    Correct.

19      Q.    Where were you when you heard those commands?

20      A.    I was walking up, I believe, between the houses.  So

21  at this point, I did not see the dog or -- Lieutenant O'Malley,

22  I believe it is now, at that time.  And when I came out, that's

23  when the subject had stabbed the dog.

24      Q.    When you are walking between two houses, after

25  hearing the commands to the K-9, please tell me, where were you

24

1   then when you can actually see the actor and other officers?

2       A.     I was -- again, I had just come out between two

3   houses.   The male was across the street and down the street,

4   I'd say, one house.   And I was behind Officer O'Malley and his

5   K-9, who was much closer to the subject than I was.

6       Q.     So the actor was on the opposite side of Whitney

7   Avenue from you?

8       A.     Correct.

9       Q.     Okay.   And what did you hear specifically regarding

10   commands to the K-9?

11       A.     I don't remember the specific verbiage.   It's

12   usually pretty boilerplate, usually along the lines of -- you

13   know, probably "Drop the knife" or "Drop your weapon or I'll

14   release my dog."   That's usually what you hear.   Or "Show your

15   hands or I'll release my dog."   I don't remember the exact

16   words, but it was the commands that my K-9s give that -- almost

17   every K-9.   And they just veer it a little bit towards whatever

18   the subject calls for.

19       Q.     Are you a K-9 officer?

20       A.     I am not.

21       Q.     Have you ever been one?

22       A.     I have not.

23       Q.     But, what, under your command you have K-9 officers?

24       A.     Yes, on almost every shift.

25       Q.     Okay.

25

1      A.     So I'm familiar how they work and how they deploy
2   them.
3      Q.     Okay.  So when you come between the two houses, you
4   see the actor, you see O'Malley.  Correct?
5      A.     Correct.
6      Q.     Do you see any other officers?
7      A.     There's many officers there at this point.  I don't
8   remember where anybody was in relation to anything.  I just --
9   it literally happened as I appeared between the houses.
10      Q.     The officers that you saw, did they all have their
11   guns drawn?
12      A.     I do not recall.  I would assume.
13      Q.     Okay.
14      A.     I know I did.
15      Q.     And I just want to nail this down.  So O'Malley is
16   in front of you in your field of vision.  Is that correct?
17      A.     Yes.
18      Q.     And let's say -- just using a clock, like, is he at
19   10 o'clock, noon, or 2?
20      A.     If he would have been -- I was coming out between
21   the houses, and he was probably near 1 o'clock.  I don't
22   remember how far.  I don't remember if he was on the other side
23   of the street or on my side of the street.  I just heard the
24   gunfire, and I saw the guy with the -- the bad guy with the dog
25   in the air.

1    Q.    Did you see O'Malley release the dog?

2    A.    I did not.

3    Q.    Okay.  So the first time you see the dog, where is

4  the dog?

5    A.    He's -- the subject had him and was stabbing him.

6    Q.    And where was the subject?

7    A.    He was in the front yard of Whitney Avenue, as you

8  described.  It was right in the front yard, near the sidewalk,

9  between the porch and the sidewalk.

10   Q.    And you're facing the actor.  Correct?

11   A.    Correct.

12   Q.    And O'Malley is facing the actor.  Correct?

13   A.    I -- I assume.  I just remember bits and pieces of

14  it.

15   Q.    Okay.  How was the actor's body positioned from your

16  point of view when you see him with the dog?

17   A.    If I remember it, like, he was stabbing the dog like

18  this.

19   Q.    Okay.

20   A.    Maybe an upward or something like this.

21   Q.    Was the actor facing you?

22   A.    I believe so.

23   Q.    Okay.  And, again, I'm not trying to -- yeah.  I'm

24  not trying to --

25   A.    I don't want to -- I don't want to speculate.  But,

27

1  yeah, I believe he was facing my direction.  What I recall,

2  yeah.

3      Q.    Okay.  I'm not trying to trick you.  I don't know if

4  he was facing you, to the side, whatever it is.

5      A.    I'm just giving you my best recollection.

6      Q.    And what do you then observe in the way of shots

7  being fired?

8      A.    I just heard a real quick few shots go off -- maybe

9  four or five or six -- and the subject drop.  That's when I ran

10  over with another officer.

11          And I assisted the other officer in handcuffing the

12  male, and I began to check his vital signs.  It -- it -- this

13  was probably within 30 seconds, and I believe he may have

14  already been expired.

15      Q.    Were you looking at the actor as he was shot?

16      A.    I believe so, yeah.

17      Q.    Did more than one officer fire shots at the actor?

18      A.    I don't recall, but I was told yes.

19      Q.    One moment.  Just looking at my notes for a sec.

20          Did you see -- what happened to the actor's body as

21  he's being shot?  Like, how does his body react to being shot,

22  as far as does his body go backwards?  Forwards?  To the left?

23  To the right?

24      A.    I don't recall.  When I approached him, I believe at

25  this point he was facedown.  Whether that other officer had

1  of his officers to get a car there.  And he grabbed his dog,

2  and they all jumped in the back of one of the marked Port

3  Authority units and took off.

4      Q.    Did you stay at the scene?

5      A.    I did.

6      Q.    What did you do?

7      A.    I assisted in securing the scene until homicide --

8  county homicide arrived.

9      Q.    And as you stayed at the scene, did you learn that a

10  second officer had also fired shots?

11      A.    I don't know if I learned that there or later that

12  day.  I'm not sure.  But I was told that.

13      Q.    Sorry.  Just looking at my notes.  Almost done.

14      A.    No problem.

15      Q.    In your interactions with the actor, Mr. Kelley, did

16  you do anything at any point to de-escalate the situation?

17      A.    Just my 40, 50 verbal commands to tell him to drop

18  the knife.

19      Q.    And is -- giving verbal commands, is that a method

20  of de-escalation?

21      A.    Yes.

22      Q.    Do you know O'Malley?

23      A.    Yeah, I know who he is.

24      Q.    How long have you known him?

25      A.    I don't know.  We've never hung out socially.  I

1 personal opinions.

2 BY MR. GEARY:

3     Q.    Okay.

4     A.    And those are those.

5     Q.    Did you take any action since the day this happened

6 to learn why Ravotti fired at the actor?

7     A.    No, not that I recall.

8     Q.    Did you take any action to learn why O'Malley fired

9 at Mr. Kelley?

10     A.    No.  Not action, no.

11     Q.    When I say "take action," I just mean ask questions

12 of other officers, you know.

13     A.    I thought it was quite obvious why he shot him.

14     Q.    And -- and what was it?  What was so obvious?

15     A.    He should have been shot multiple times before that,

16 in my opinion.

17     Q.    Okay.

18     A.    Multiple times.  When he went at Officer Sanders, he

19 should have been shot.  I should have shot him when I almost

20 ran into his back.  You know, when he displayed a knife the

21 very first second, he should have been shot.

22     Q.    Okay.

23     A.    But, unfortunately, we can't do that anymore.

24     Q.    Why didn't you --

25     A.    Actually, we get hurt or killed, and that's why.

1    Q.    Why didn't you shoot him when you encountered him

2  there and he was, like, 6 feet away?  Why didn't you shoot him?

3    A.    Because he didn't know I was there, and he wasn't an

4  immediate threat to my safety.

5    Q.    What about Sanders, the encounter with Sanders and

6  the ASP?  Why didn't you shoot Kelly then?

7    A.    I was one of the furthest officers away, actually,

8  at that point.  I was probably 20, 30 yards away.  I definitely

9  wasn't in an immediate threat, but certainly other officers

10  were.  And I certainly could have shot him in Officer Sanders'

11  safety.

12    Q.    Did you have any conversations with any of the

13  officers who were there as to why they didn't shoot Kelley

14  sooner?

15    A.    I don't recall conversations, no.

16        MR. GEARY:  That's all I have.  Thank you.

17        THE WITNESS:  You're welcome.

18                    EXAMINATION

19  BY MR. EVASHAVIK:

20    Q.    Sergeant, good afternoon.  This is Greg Evashavik.

21  I may have introduced myself while we were waiting to get

22  started.  I represent the Port Authority officers O'Malley and

23  Ravotti in this matter, and I do have some questions for you if

24  you can indulge me with your patience.  It shouldn't take too

25  long.

40

1   start.  What was your knowledge at the time you got this call

2   about problems at the gazebo in Wilkinsburg?

3       A.    I was just always hearing them getting out with

4   problems with the gazebo.  I don't even -- I don't know why it

5   comes to my memory, but I think that they had to go check it

6   often or something like that because of all the problems they

7   had.

8           MR. GEARY:  I'm sorry.  I just -- I didn't hear.

9   Something check it?

10          THE WITNESS:  Check it.  Patrol checks.

11          MR. GEARY:  Oh, okay.

12          THE WITNESS:  It's just coming back to my memory

13  that they were required to stop and check the gazebo.  I guess

14  there's a lot of loitering issues there -- or there was.

15  BY MR. EVASHAVIK:

16      Q.    You said that you had your gun out for -- was it

17  most of the pursuit or the entire pursuit you had your gun out?

18      A.    I would say the majority of it.

19      Q.    And why did you have your gun out during the

20  majority of this pursuit?

21      A.    I thought we were going to have to shoot this guy.

22      Q.    Based on your observation and interaction with the

23  suspect in your pursuit, did you believe that the suspect posed

24  a significant threat of death or serious physical injury to the

25  officers in pursuit and perhaps other civilians in the area?

1          MR. GEARY:  Objection.  Leading.

2          But you can answer.

3          THE WITNESS:  Yes, I did.

4   BY MR. EVASHAVIK:

5      Q.    And based on your personal observations and

6   involvement in the pursuit, did you believe or have an opinion

7   whether the suspect was actively resisting arrest or attempting

8   to evade arrest by flight?

9      A.    Yes, I did.

10     Q.    Did you believe he was or was not doing that?

11     A.    I believe he did, yes.

12     Q.    When you were testifying about the actor stabbing

13  the dog, you actually witnessed him stabbing the dog with the

14  knife?

15     A.    Yes.  That's, like, the first thing I came around

16  the corner and saw.

17     Q.    And you were describing by using arms.  And because

18  this is not a videotaped deposition, I just want to go back

19  through that so we can get this clear for the stenographer.

20  And I believe you described that the actor, when he was

21  stabbing the dog, was generally facing in your direction.  Is

22  that correct?

23     A.    As I recall, yes.

24     Q.    And tell me again -- or show me the motion and where

25  the dog was as the actor was stabbing the dog.

1      A.    Okay.  For the -- for court reporter, I will be

2  describing.  The subject would be standing up and either right

3  or left hand -- either had ahold of the dog or possibly the dog

4  had ahold of him as well.  And I saw some type of stabbing

5  motion.

6      Q.    And you're making an upper-cut motion?

7      A.    I -- I don't have firsthand knowledge exactly where

8  the dog was stabbed.  I thought it was up through the throat,

9  but that's just the way I remember it.  And then -- and then

10 that's when the gunshots occurred.

11     Q.    Did you see Police Officer Ravotti in the area when

12 this is happening?  In other words, the stabbing and the

13 gunshots?

14     A.    No, I did not.

15     Q.    So he was not in your field of vision?

16     A.    I don't believe so, no.

17     Q.    Were you focused on the actor, or were you looking

18 around to see what was in the vicinity around him?

19     A.    I literally came out around the corner as the dog

20 was being stabbed and the gunshots occurred.  And they were --

21 they were a second apart.  So I relied -- I was still gaining

22 my field of vision, I guess you would say, or the layout of

23 what was going on when that all occurred.  And then that's when

24 I went to the subject and assisted in placing him into

25 handcuffs.

1  Q. Did you witness officers on multiple occasions

2 attempt to deploy their Tasers --

3  A. Yes.

4  Q. -- on this actor?

5  A. Yes.  Many times.  I would say five, six, or seven

6 times, I think, that Tasers were attempted to be deployed.

7  Q. Did that have any success?

8  A. None that I could see whatsoever.

9  Q. Did you attempt -- did you see officers deploy OC

10 spray?

11  A. Yes.  I believe multiple times as well.

12  Q. And did that have any effect or use on this --

13 against this actor?

14  A. No.  No.  None whatsoever.

15  Q. Were other officers besides yourself giving verbal

16 commands to the actor to stop, drop the knife --

17  A. Yes.

18  Q. -- get on the ground?  Things of that nature?

19  A. Yes.  Probably in excess of 100 or 200 times he was

20 told to stop.

21  Q. Did he ever -- did he ever demonstrate any type of

22 behavior to show compliance or cooperation with these commands?

23  A. None whatsoever.

24  Q. Did he ever stop moving --

25  A. No.

44

1      Q.      -- while officers --

2      A.      At no point in time did he ever stop and, like, even

3  slow down.  He just kept going and going and going.  We never

4  stopped.

5              MR. EVASHAVIK:  Those are all the questions I have,

6  Sergeant.  Thank you.

7              THE WITNESS:  Thank you.

8                            EXAMINATION

9  BY MR. GEARY:

10     Q.      Sergeant, I just have two follow-up questions,

11  please.

12     A.      Yes, sir.

13     Q.      You testified, "I thought we were going to have to

14  shoot this guy."  My question is why.

15     A.      Well, the whole -- well, first, he assaulted an

16  officer and, apparently, he had a knife at the initial

17  incident.  That's my initial thoughts going in.

18              And then my concerns, like I stated before, was him

19  walking around the neighborhood when school let out and there's

20  people in the streets.  I was -- for sure thought somebody was

21  going to get grabbed by this guy because he just didn't seem

22  stable.  And my worst-case scenario was a child getting

23  grabbed.

24     Q.      And a final question.

25     A.      And, obviously, the incident with -- when he -- when

1   he went towards Officer Sanders, that's when I knew that this

2   guy didn't care.  Because there was at this point 15 officers,

3   probably half of them with guns drawn towards him, and he still

4   didn't care.  He just didn't care.

5       Q.    And when you say "he didn't care," just what do you

6   mean by that?

7       A.    Well, whether it's a "suicide by cop" situation, I

8   don't know.  But most people, when they see that many officers

9   in an open area -- at this point, I mean, he could have easily

10  been shot for what he did, and officers still showed the

11  restraint that they did.  That guy -- I don't know if he had a

12  death wish or wasn't comprehending what he was doing.  I can

13  only speculate, again.  But as far as justifiable shootings, in

14  my 27 years, he should have been shot.

15      Q.    And when you said "suicide by cop," I know what you

16  mean by that.  Is -- a suicide by cop situation, is that --

17  does the actor have mental health or psychological issues?

18              MR. EVASHAVIK:  Object to form.

19              Go ahead.

20              THE WITNESS:  I wouldn't speculate.  It's just -- we

21  all know what the term is.  It's -- you know, now that I sit

22  here in a comfortable living room, it's certainly something

23  that could have been possible.

24  BY MR. GEARY:

25      Q.    Okay.  But when you say "suicide by cop," we all may

46

1  have slightly different, like, definitions of what that means.

2  So what's your definition of a suicide by cop situation?

3       MR. EVASHAVIK:  Object to form.

4  BY MR. GEARY:

5       Q.    Go ahead.

6       A.    My only -- my definition would be somebody that's

7  either, A, mentally not -- their mental capacities are

8  diminished, and they have mental issues, or an emotional,

9  stressful incident that snapped -- made them snap.  We've all

10  been upset before.  We didn't act like our normal selves, and

11  made a horrible mistake; and, unfortunately, law enforcement

12  are intervening at that moment.  Those are a couple scenarios

13  where that might occur.

14       THE WITNESS:  Can you kill that light, hon?

15  BY MR. GEARY:

16       Q.    Last question, please:  In this scenario, when in

17  the scenario did you first think "We're going to have to shoot

18  this guy"?

19       A.    Probably when we were walking with him and when my

20  concerns about the general safety of the public, of the people

21  out in the street.  And we were yelling at people to get

22  inside.  To criticize the public, they weren't going inside,

23  some of them.  I mean, my concern was more people were coming

24  out.

25       Q.    And how close was he ever from any member of the

1   public?  The actor.

2       A.    The closest that I think I recall was the lady on

3   the porch.

4       Q.    And what was the distance between those two people?

5       A.    15 feet.

6       Q.    Okay.

7       A.    She was on the porch.  He walked right down her

8   sidewalk and then walked down the alleyway between two houses.

9       Q.    Right.  He did not physically advance towards her.

10  Correct?

11      A.    He was walking towards her the whole time.  Did he,

12  like, in aggressive?  No.  He just -- he was on his own path.

13      Q.    And he didn't turn to her and brandish the knife.

14  Correct?

15      A.    Not to my knowledge, no.

16      Q.    And he didn't verbally threaten her?

17      A.    Not to my knowledge, no.

18      Q.    Okay.  And when -- just -- if he -- I want to get

19  the precise vantage point of that woman.  As he's walking --

20  let's just say he's walking and, you know, 12 noon is straight

21  ahead.  Where was she?

22      A.    He was walking straight down her sidewalk.  Like, he

23  went up her front short set of stairs, as I recall.  And then

24  starts the sidewalk that approaches her front porch, and she's

25  on her front porch.  So he's walking at her at 12 o'clock.  And

48

then he just turns down the cement, like when your cement goes

around the side of your house.  And that's the way he walked.

So he just walked right towards her, turned, and kept walking.

Q.    So before he reaches her, he made a -- what, a left?

A.    Correct.  As I remember, yeah, it was a left.

Q.    Okay.  And then he -- and as he makes a left, is he

now going into the street?

A.    No.  He's walking behind this lady's house.

Q.    Okay.

A.    He was approaching from the front of the house like

he was going to go on her front porch.  And she's saying

something about he should drop the knife, and he just continued

around the side of her house.

Q.    And then heads towards her -- heads in the direction

of her backyard?

A.    Correct.

MR. GEARY:  Got you.  Thank you for clarifying.

That's -- that's all I have.

EXAMINATION

BY MR. EVASHAVIK:

Q.    One quick follow-up, Sergeant.  You've been a police

officer for 27 years?

A.    That's correct.

Q.    And based on your years of training and experience

as a police officer and your observations of these events as

1   they occurred, did you believe the use of deadly force was

2   justified in this situation?

3                MR. GEARY:  Objection.

4                But you can answer.

5                THE WITNESS:  Yes.  In multiple cases -- in multiple

6   times, yes.

7                MR. EVASHAVIK:  Thank you.  I don't have any further

8   questions.

9                MR. McTIERNAN:  Do you want to talk about waiver, or

10  is there anything else?  Anyone else have any questions?

11               MR. GEARY:  Sergeant, when someone's deposition is

12  taken, they have the right to review the transcript from the

13  stenographer for accuracy purposes.  So you have the right to

14  review it and approve it before the stenographer releases it to

15  the attorneys on the case.  You can waive that right and say,

16  "Well, I trust her to have typed it up" -- what just happened

17  here -- "accurately."  So whatever your preference is, we --

18  we just need to know right now what your preference is.

19               MR. McTIERNAN:  Do you want to read the transcript,

20  Bill, or do you want to --

21               THE WITNESS:  I'm comfortable with it, if you are,

22  Mr. McTiernan.

23               MR. McTIERNAN:  Okay.  That's fine.  We'll waive.

24               MR. GEARY:  Thank you so much.

25               Sergeant, thank you.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


CALISIA KELLEY; and           CIVIL ACTION
JOHNNIE MAE KELLEY,
Co-Administrators of the      No. 2:17-cv-01599-NBF
ESTATE OF BRUCE KELLEY,
JR., deceased,

Plaintiffs,

vs.                           TRANSCRIPT

BRIAN O'MALLEY, both in his   DEPOSITION OF
Official and Individual       RICHARD SUSALLA
Capacities as Sergeant for
the Allegheny County Port
Authority; and DOMINIC
RIVOTTI, in both his
Official and Individual
Capacities as Officer for
the Allegheny County Port
Authority,

Defendants,
Jointly and Severally.        TAKEN VIA ZOOM VIDEO CONFERENCE

                              THURSDAY, SEPTEMBER 24, 2020


                              Taken on behalf of Plaintiffs,
                              Calisia Kelley and Johnnie Mae
                              Kelley


                              Counsel of Record for this Party:

                              Noah Geary, Esquire
                              Washington Trust Building
                              6 South Main Street, Suite 225
                              Washington, PA  15301
                              724-222-3788

1   Q.   Okay.  Thank you.

2        MR. GEARY:  Tim, are you ready to go?

3        MR. BARRY:  Yes.

4        MR. GEARY:  Okay.  Greg?

5        MR. EVASHAVIK:  Yes.

6        MR. GEARY:  Thank you.

7   BY MR. GEARY:

8   Q.   Tell us your name again, please, sir.

9   A.   Richard Susalla.

10  Q.   And are you still employed by Edgewood Borough, sir?

11  A.   Yes.

12  Q.   And what is your rank?

13  A.   Patrolman.

14  Q.   How long have you been there?

15  A.   Going on nine years.

16  Q.   I have just maybe two or three questions on your

17  background, and we'll get straight to the events of that day,

18  July 31, '016.

19       Are you a Pittsburgh native, sir?

20  A.   I am.

21  Q.   What part of town?

22  A.   Monroeville.

23  Q.   And what high school did you go to?

24  A.   Plum Senior High School.

25  Q.   And what year did you graduate?

8

1      A.    1984.

2      Q.    Thank you.  Did you work in law enforcement anywhere

3 prior to Edgewood Borough?

4      A.    Yes.

5      Q.    Where?

6      A.    Rankin.  Rankin Police Department.

7      Q.    How many years did you put in there?

8      A.    About six months.

9      Q.    And were you there immediately prior to starting at

10 Edgewood?

11     A.    Yes.

12     Q.    Thank you.  Do you have the exhibits in front of

13 you, sir?

14     A.    Yes.

15           (Whereupon, Deposition Exhibit 10 was presented to

16 the witness.)

17 BY MR. GEARY:

18     Q.    Okay.  So No. 10 is your -- the one-page interview

19 summary.  Did you have a chance to read that before today?

20     A.    Yes.

21     Q.    So just so you know, I'm going to kind of just ask

22 you to describe from your recollection what happened that day.

23 I'll refer you to the report.  And then I'll show you the other

24 exhibit, which is the timeline.

25           Now, obviously, it appears you were working on

1  January 31, '016.  Is that correct, sir?

2      A.    Yes.

3      Q.    And the report reflects the 2:30 p.m. to 10:30 p.m.

4  shift.  Would that be correct?

5      A.    Yes.

6      Q.    And were you on patrol, or what detail were you on

7  that shift?

8      A.    Patrol.

9      Q.    Okay.  Did you work with a partner at the time?

10     A.    Yes.

11     Q.    Okay.  And what was your partner's name, please?

12     A.    Dan White.

13     Q.    Okay.  There was a summary of his interview.  Do you

14  know where he works presently?

15     A.    To my knowledge, he's no longer in law enforcement.

16     Q.    Got you.  Thank you.

17           Would you please just start explaining what you were

18  doing when you got a call, the nature of the call that you

19  responded to that led to the shooting incident in Wilkinsburg

20  that day.

21     A.    At the time of the incident, I was -- like you said,

22  I was working the afternoon shift, 2:30 to 10:30.  I was on the

23  Parkway dealing with an automobile crash, which we normally --

24           THE REPORTER:  Officer, I'm so sorry to interrupt,

25  but your screen froze there.

1          THE WITNESS:  Okay.

2          THE REPORTER:  The last thing I heard was "I was on

3    the Parkway dealing with an automobile crash, which we

4    normally" --

5          THE WITNESS:  We normally assist the Pennsylvania

6    State Police when there are crashes on the Parkway.

7    BY MR. GEARY:

8        Q.    Thank you.  And then there was a dispatch or a radio

9    call that you responded to.  Can you explain what the -- what

10   the nature of the call was?

11       A.    I don't know the exact specifics of how the call

12   came in, but I do recall that there was a call over the radio

13   about a guy with a knife in the Wilkinsburg area, you know,

14   over in Wilkinsburg.

15       Q.    Were you -- I'm sorry.

16       A.    And that's -- I went to -- I went to assist those

17   officers.

18       Q.    Did you go with Officer White?

19       A.    I did.  He was in his -- we operate separate

20   vehicles.  We were in our own vehicles.  So he was wherever he

21   was in town, and I was doing whatever I was doing.  And we both

22   went into Wilkinsburg to assist with the incident.

23       Q.    Thank you.  Were you able to finish up or finalize

24   whatever you were doing with that car accident?

25       A.    I really don't recall where I was in the nature of

11

1  that accident at the time.

2      Q.    Thank you.  As you're driving toward Wilkinsburg to

3  respond to this call, were there additional radio

4  communications that you heard or participated in?

5      A.    There was some talk on the radio, but what that talk

6  was -- I don't recall the conversations.

7      Q.    Do you recall if you asked any questions to just

8  acquire more information about the call that you were

9  responding to?

10     A.    I don't recall.

11     Q.    Thank you.  Now, when you arrived in Wilkinsburg, if

12 you can just explain for me.  Where did you arrive, and what

13 did you do when you got there?

14     A.    I believe -- I know I went onto the busway.  I

15 believe there was some sort of transmissions that he was at one

16 of the park and rides in Wilkinsburg, the Hamnett Station,

17 heading towards -- towards Edgewood on the busway, so I

18 responded on the busway to the Hamnett Station.  And that's

19 where I parked.  I parked on the busway.  And the Hamnett

20 Station is below the busway.

21     Q.    Thank you.  And when you got out of your unit, did

22 you see anything initially?

23     A.    No.  We didn't see anything initially on the busway.

24 So I proceeded to go down the steps into the Hamnett Station to

25 try to find where the other officers were at that time.

12

1    Q.    Did you and Officer White arrive in the same

2 location?

3    A.    I believe so.  I believe so.

4    Q.    And when you got out of your vehicle, were there any

5 other officers in view?

6    A.    I don't recall if there was anybody in the

7 station -- in the park and ride or not.  I don't recall that.

8    Q.    Okay.  Thank you.  Please explain, just if you could

9 continue, where you went and who you may have spoken to, to

10 learn, you know, more info as far as what was going on there.

11    A.    I believe once we got down into the Hamnett Street

12 Station Park and Ride area, the parking lot, we continued out

13 onto -- I believe that's Center Street, where we met with some

14 other officers.  And I believe there was some radio

15 transmission back and forth giving location of where the

16 gentleman was.  And we were advancing, trying to locate him.

17 We were just kind of running around the particular area trying

18 to -- trying to locate him.

19    Q.    Did you learn anything as far as if -- the initial

20 call was placed by an Officer Tom Adams.  Did you learn

21 anything as to whether or not Adams had sustained any injuries

22 or not?

23    A.    I do not recall any of that.

24    Q.    And in these communications, was anyone using the

25 person's name?  Bruce Kelley?

13

1       And just so we're clear, there was a Bruce Kelley,

2  Jr., and there was a Bruce Kelley, Sr.  They were together

3  originally.  So I'll just -- I'll say Bruce, Jr., or Bruce

4  Kelley, Jr., his full name, when I refer to him.

5       Was his name used in any of these conversations

6  there initially?

7       A.   Not that I can recall.

8       Q.   Okay.  And please continue.  What did you do or

9  where did you go as far as addressing the situation at hand?

10      A.   I know we were just kind of chasing locations of

11 where he was seen or where he was heading to for -- you know,

12 it seemed like a long time.  I can't tell you the exact amount

13 of time that they were advancing towards him or going to areas

14 that they -- he responded.  But it could have been -- I don't

15 know how long it was.

16      Then there was reports that he was back at the

17 Hamnett Street Station, which we then went back there.  A lot

18 of the officers were there.  And, you know, I did see him back

19 at the Hamnett Street Station at that time, once we finally --

20 where I could see him.

21      Q.   Thank you.  And before you actually saw him for the

22 first time that day, did you learn anything as far as any uses

23 of force that had been deployed prior to you seeing him?

24      A.   I know that there were -- they tried to use their

25 Tasers on him to subdue him.  And I know at one time one of the

1  officers were using an ASP to try to -- you know, to try to

2  knock the knife out of his hand.

3      Q.    Was there any talk as far as to why he was acting

4  the way he was acting that day?

5      A.    I don't recall any of that, that I -- that I heard.

6      Q.    Do you recall, was there any discussion, anything

7  about this person may have had mental illness or some type of

8  mental issues?

9      A.    Not that I'm aware of.  I don't recall any of that

10  conversation.

11      Q.    Any talk about he may have some type of intellectual

12  disabilities?  Anything along those lines?

13      A.    Not that I can recall.

14            (Whereupon, Deposition Exhibit 6 was presented to

15  the witness.)

16  BY MR. GEARY:

17      Q.    Thank you.  If you could take a look at Exhibit 6.

18  It's this timeline.

19      A.    Yes.

20      Q.    It's 18 total pages.  And the other witnesses have

21  gone through it, and the other witnesses -- there were certain

22  officers in certain photos they could not identify.  I don't

23  know if you're in any of the photos or not, but if you could

24  please go through it with me.

25            And the exhibit is not page numbered, but just going

15

1  by the number of pages, including the first page, it looks to

2  be page 10 or 11.  It's the first photo.  And the hours in the

3  upper left would read "154195 Hours."  I just want to make sure

4  we're on the same page.

5      A.    I'm on the same page.

6      Q.    Okay.  The top bullet point says "Sergeant O'Malley

7  asks if the tunnel is secure."

8      A.    Yes.  I'm on that page.

9      Q.    Okay.  Thank you.  So in the photo that's depicted

10 there, are you in that photo?

11     A.    No.

12     Q.    Okay.  If we could turn two pages.  And then there's

13 another photo, and this is numbered "154939 Hours."  Bullet

14 point, (as read) "Officer Kaupinis -- Kaupinis appears to be

15 deploying pepper spray."  Do you see that photo, Officer?

16     A.    I do.

17     Q.    Are you in that photo?

18     A.    No.

19     Q.    If you turn the page, the next page, the number

20 "154948 Hours."  "Suspect in Hamnett Park and Ride lot."  If

21 you could take a look there and tell me if you're in that photo

22 anywhere.

23     A.    I am not in that photo.

24     Q.    Thank you.  Next page.  I think it's the last photo

25 in the whole exhibit, if you could give a look there.  And it's

1  "155014 Hours" and a fence.  There's some officers and

2  Mr. Kelley there.  Are you in that photo, sir?

3      A.    No.

4      Q.    Okay.  Now, when you testified a few moments ago

5  that you were -- I think you may have said you were somewhere

6  near the park and ride when you first saw Bruce Kelley, Jr.,

7  that day.  Is that correct?

8      A.    When I first arrived, he was not there.

9      Q.    Right.  But when you first did see him that day --

10     A.    Yes.  Yes.  I saw him at the park and ride, yes.

11     Q.    Thank you.  And those photos there in the exhibit,

12  the last several, are some shots near the park and ride.

13  Now --

14     A.    I am in -- I am in none of those shots.

15     Q.    No.  Understood.  Thank you.

16          What was -- what was Bruce Kelley, Jr., doing when

17  you first lay eyes on him that day?

18     A.    Not -- not obeying the commands of the officers and

19  walking away from the officers.

20     Q.    And what commands were they giving?

21     A.    Just to stop, put the knife down.

22     Q.    And when you first spotted him, do you recall, was

23  he stationary?  Was he walking?

24     A.    He was walking.

25     Q.    Okay.  And how many officers would you estimate were

17

1  in his vicinity there dealing with him at that moment?

2      A.    I mean, I could look at a photograph and tell you,

3  but I don't recall the number.

4      Q.    That's fine.  And was he walking away from the

5  officers?

6      A.    He was kind of walking around in circles.

7      Q.    Okay.  And at that juncture, say, how close or far

8  were you from him?  An estimate in feet.

9      A.    Me personally?

10     Q.    Yes, sir.

11     A.    I could have been anywhere from -- best guess, maybe

12  20-some feet.

13     Q.    And you said he's kind of walking in circles.  What

14  do you see him do next?

15     A.    He -- when he was at the station, he walked up

16  towards the busway like he was going to go up the steps.  He

17  made a right-hand turn, walked over to the guardrail, stepped

18  over the guardrail, and went over -- there was -- a couple

19  feet, there was a fence.  He climbed over the fence and then

20  walked in between the two houses towards Whitney.

21     Q.    At any point in time that day, did you deploy any

22  use of force of any degree?

23     A.    No, none.

24     Q.    Did you ever have your gun out of its holster?

25     A.    No.

1      Q.    Were you armed with a Taser?

2      A.    Yes.

3      Q.    Did you ever have your Taser out?

4      A.    No.

5      Q.    Were you wearing a body camera that day?

6      A.    No.

7      Q.    Did your department have body cameras in January of

8  '016?

9      A.    No.

10      Q.    Okay.  So before he goes over the fence, did he --

11  Kelly, Jr., did he threaten to kill any of the officers?

12      A.    I don't recall.

13      Q.    Is that something you would have recalled?

14      A.    I know there was conversation back and forth, but I

15  don't recall what was being said.

16      Q.    Did he try to stab any officer with his knife?

17      A.    I do recall on a few occasions where he was wielding

18  his knife towards the officers.

19      Q.    Did he ever advance towards an officer?  Start

20  walking towards an officer?

21      A.    I really don't recall.

22      Q.    Is that something you would have recalled?

23            MR. EVASHAVIK:  Object to form.

24            THE WITNESS:  I mean, he was all -- he was all over

25  the place.  He was walking all around.  I can't recall if he

1  was advancing towards an officer or just walking around.  I

2  can't recall.  What his -- his intentions were at that time, I

3  can't answer that.

4  BY MR. GEARY:

5      Q.    And when I -- and, again -- right.  I'll maybe ask a

6  better question.

7            I'm not asking for you to know what his intentions

8  were.  When I say "advance to an officer," did you see him at

9  any time, I mean, in an aggressive way to initiate a physical

10  confrontation, start moving towards or walking towards an

11  officer?

12      A.    As I stated before, he was walking around in

13  circles.  He would walk away from them.  He'd walk towards

14  them.  He'd walk to the left of them.  He'd walk to the right

15  of them.  To say that he was advancing to someone, I can't -- I

16  can't say that that's what his intentions were because he

17  was -- he was constantly on the move.  So I can't say that he

18  was advancing because I don't know what he was doing.

19      Q.    Did you get the impression he may have been under

20  the influence?  Drugs or alcohol?

21      A.    I was never close enough to really observe or -- or

22  consider any of that.  I wasn't close enough to make that

23  determination.

24      Q.    Was there any talk among officers in your presence

25  who may have been closer to him that said, "This guy is drunk"?

1  "This guy is high"?  Something along those lines?

2      A.    I don't recall those conversations.

3      Q.    You say he goes -- I'm sorry.

4            Were there any civilians in the area when -- you say

5  he's walking around and he's in circles and going in different

6  directions.  You didn't know what he was doing or where he was

7  going.  Were there any civilians in the area?

8      A.    While we were on the -- on the street -- on the

9  sidewalks on Center and whatever streets we were on -- I don't

10 remember all the streets we were on -- I do recall civilians

11 being out and about on the sidewalk, in their yards.  But I

12 don't recall any of them being at the Hamnett Station.

13     Q.    Did you receive any information that day that he had

14 threatened any civilian at any point during that -- this whole

15 episode that day?

16     A.    Not that I could recall, no.  I don't know.

17     Q.    Okay.  How about after that day?  Did you receive

18 any reports or information that he tried to harm any civilian

19 he may have encountered?

20     A.    After the incident?

21     Q.    Yes.

22     A.    No.

23     Q.    Okay.  So when he goes over the fence, please tell

24 me what direction he goes and then what you did at that point.

25     A.    When he went over the guardrail and then over the

1  fence between the two houses, I was further down the parking

2  lot.  They were further up -- up the parking lot towards the

3  busway.  I was closer to Center -- Center Street at the time.

4         So I said to myself, "I'm not going to run all the

5  way up there to jump over a guardrail, jump over a fence, to go

6  to Whitney."  I turned around and went down Center Street to go

7  around the house, to come up Whitney, thinking if he was going

8  to come down Whitney, I could, you know, be down in that -- be

9  down in that area.

10     Q.    Thank you.  So would you have been making, say, a

11  left to get onto Whitney?

12     A.    I would have been making a left off -- yes, out of

13  Hamnett Street Station, I would have made a left onto Center,

14  up to the next street, make a left to go up the street.  Yes.

15     Q.    Say, did you have an officer or two with you?  Did

16  they join you when you had that idea, well, you're going to go

17  the other way, or were you by yourself at that point?

18     A.    No.  I was by myself at that point.

19     Q.    Okay.  Thank you.  And then you did make a left on

20  Whitney.  That's correct?

21     A.    Correct.

22     Q.    And then you're walking up Whitney.  Is that right?

23     A.    I made -- yes.  I made the left, and I was running

24  up Whitney at that time.

25     Q.    Okay.  So you actually started running at that

22

1  point?

2      A.    Well, I was running from Hamnett Street to go around

3  the bend.  Yes, to go up to Whitney, I was running the entire

4  time.

5      Q.    And were you in the street?  On the sidewalk?  In

6  the yard?  As you're running up Whitney.

7      A.    I was on the sidewalk.

8      Q.    Thank you.

9      A.    No.  I'm sorry.  I was on the -- let me rephrase.

10         I was on the sidewalk when I got to Center Street.

11  Then on Whitney, I was on the road.

12      Q.    Thank you.  Now, at that point in time, had -- had

13  there been any conversation as far as "Let's call a K-9 unit

14  in"?

15      A.    I believe the K-9 was already there.  They were part

16  of the incident the entire time, I believe.

17      Q.    Okay.  And before you're coming up Whitney there,

18  when you're still in the parking lot and you decide to go left

19  on Center, left on Whitney, was there, say, an officer in

20  charge, so to speak, on scene?

21      A.    I don't recall.  I don't recall that.  I know

22  there -- there were multiple officers on scene, giving multiple

23  locations, but I don't recall if there was anybody -- anyone in

24  particular in charge.  I can't answer that question.

25      Q.    And in that -- in your experience at that time

23

period, in a situation like this where there's multiple

departments from multiple municipalities responding, I mean,

how would it work as far as -- is someone in charge?  Is there

an officer who is a superior?  How did that work between the

departments?

           MR. EVASHAVIK:  Object to form.

           THE WITNESS:  I can't -- I can't answer for what

other departments do.

BY MR. GEARY:

    Q.    No.  I'm just asking for you, in your department.

Edgewood.

    A.    Well, we have officers, the most senior officer --

if there's not a sergeant on duty, then the highest-ranking or

highest-senior -- highest officer who has the most amount of

time is the officer in charge.

    Q.    And if you wouldn't mind, for Edgewood at that time,

what was the rank from, say, lowest to highest?

    A.    I was the lowest.  Dan was above me.

    Q.    You were a patrolman?

    A.    Both Dan and I were patrolmen.  Dan was the officer

in charge of our shift.

    Q.    Okay.  And as you're running up Whitney Avenue, what

do you see?

    A.    As I turned the corner onto Whitney -- I might have

been, you know, maybe one or two houses on Whitney -- I heard

1  gunshots.  I took cover.

2      Q.    And before you heard gunshots -- I'm sorry.

3      A.    No.  Go ahead.

4  BY MR. GEARY:

5      Q.    Before you heard gunshots, as you're running down

6  Whitney, do you see other officers or Kelley, Jr., up ahead of

7  you?

8      A.    No.  I knew they were there, but I didn't see

9  anybody.  I mean, I was coming around the bend.  I was kind of

10 paying attention to making sure when I came off of Center onto

11 Whitney that I -- you know, because I was going into the

12 roadway, I was looking -- making sure I didn't get hit by a

13 vehicle.

14     Q.    Thank you.  And how many shots did you hear?

15     A.    I have no idea.  I couldn't tell you.

16     Q.    And you took cover.  And, I mean, I know what that

17 means, but what specifically did you do?

18     A.    I got behind -- I ducked down behind a vehicle.

19     Q.    Okay.  And are you continuing to look down Whitney

20 Avenue at that point?

21     A.    I -- I was.

22     Q.    What did you see?

23     A.    Once -- once I ducked behind the car, I looked up.

24 I really couldn't see a lot going on because of the cars in the

25 roadway, so I advanced towards the end of the street.  When I

1  got closer, I saw an officer with the K-9 in his arms, the K-9

2  bleeding, then putting the K-9 in the car and speeding off.

3     Q.   And when you say cars in the street, are you

4  referencing parked cars or cars moving or both?

5     A.   There were parked cars on both sides of the street,

6  and I believe there might have been a patrol car or two there

7  as well.  I don't recall how many patrol cars, but I believe

8  there were some there.

9     Q.   And as you got closer, you said the dog is in an

10 officer's arms.  Is that correct?

11    A.   I believe, yes, they had the dog in someone's arms.

12 The dog was bleeding out.  They put him in the car, and they

13 rushed away.  They rushed the dog away.

14    Q.   And what -- what was being said as far as who -- who

15 got shot?

16    A.   I don't recall.  I don't recall anything being said.

17    Q.   Okay.  Who was saying what, as far as the dog?

18    A.   I have no idea.

19    Q.   And so some officers took the dog and rushed the dog

20 to wherever?

21    A.   Uh-huh.

22    Q.   Okay.

23    A.   Yes.

24    Q.   Thank you.  And as far as the officers who were

25 still on scene and whoever else is on scene or people coming

42

1  answer that question because everybody is different.  I can't

2  answer the question.

3  BY MR. GEARY:

4      Q.    Okay.  Well, I'm asking it because you put in your

5  report you observed that the OC spray had -- was used to no

6  effect on him.  So I was just asking for the basis for that

7  observation in your report.  That's why I'm asking the

8  question.

9      A.    What I'm -- what I'm referring to is they used --

10  they deployed their OC spray on the subject, and it had no

11  effect on him.  Did it get into his eyes?  I don't know that

12  question.  All I know is what I saw.  OC spray was deployed.

13  It wasn't effective on him.  Where it went?  How it went?  I

14  can't answer how it went.

15      Q.    Got it.  Understood.  Thank you.

16          MR. GEARY:  That's all I have.

17                        EXAMINATION

18  BY MR. EVASHAVIK:

19      Q.    Sorry, Officer.  Just a few follow-up.

20      A.    Sure.

21      Q.    Based on your involvement in this encounter and your

22  observations, did you believe at the time that the suspect,

23  Bruce Kelley, Jr., posed a threat to the officers and others?

24      A.    Yes.

25      Q.    Based on your involvement in this encounter and your

1  observations, did you believe the suspect was actively

2  resisting arrest --

3      A.    Yes.

4      Q.    -- arrest by flight?

5            THE REPORTER:  I'm sorry.

6            MR. GEARY:  Yeah.  One second.  There was a delay

7  there.  We missed the very last question.

8  BY MR. EVASHAVIK:

9      Q.    Based on your involvement in this encounter and your

10 observations, do you believe and did you believe at the time

11 that the suspect, Bruce Kelley, Jr., was attempting to evade

12 arrest by flight?

13     A.    Yes.

14           MR. GEARY:  Objection just as to the leading nature

15 of the questions.

16           MR. EVASHAVIK:  I have nothing further.

17                        EXAMINATION

18 BY MR. GEARY:

19     Q.    Sir, just a quick follow-up.  So when you say

20 "threat," a threat of what?

21     A.    A threat of bodily harm and to the general public.

22     Q.    Okay.  Who in the general public was at risk of a

23 bodily threat by Bruce Kelley that you saw?

24     A.    As I stated before, when we were up -- when we were

25 on the streets trying to apprehend him, there were people out.

1      Q.    How close to him?

2      A.    I can't answer that question.  I don't recall.

3      Q.    Well, how do you -- how do you know he's a threat to

4  them if you don't know how far they were from him?

5      A.    Well, anybody wielding a knife could be a possible

6  threat.  It could be a threat to the public, as to the

7  officers.  A threat to the officers.

8      Q.    And as far as the threat for justification on deadly

9  force, is your understanding that the threat has to be an

10 immediate and significant threat of death or serious bodily

11 injury?

12           MR. EVASHAVIK:  Objection.

13           MR. BARRY:  Objection as to form.  Are you -- are

14 you asking this witness to be your expert?

15           MR. GEARY:  No.  I'm asking for his understanding at

16 the time as to justification for use of deadly force, because

17 Attorney Evashavik was asking him identical questions.

18           MR. BARRY:  This -- this witness used no force

19 whatsoever, so I don't know why you're asking him about

20 something that he had no participation in.

21           MR. GEARY:  Well --

22           MR. EVASHAVIK:  You're asking him for a legal --

23           MR. BARRY:  And he also -- and he also testified

24 that he was not there when any force was used.  So I think

25 you're really asking him to guess and speculate, and I don't --

<pre>
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3   CALISIA KELLEY and JOHNNIE      CIVIL ACTION
     MAE KELLEY, Co-Administrators
 4   of the ESTATE OF BRUCE KELLEY,
     JR., deceased,                  No. 2:17-cv-01599-NBF
 5
             Plaintiffs,
 6
     vs.
 7
     BRIAN O'MALLEY, both in his
 8   Official and Individual
     Capacities as Sergeant for
 9   the Allegheny County Port
     Authority; and DOMINIC
10   RIVOTTI, in both his Official
     and Individual Capacities as
11   Officer for the Allegheny
     County Port Authority,
12
             Defendants.
13                                   TRANSCRIPT

14                                   DEPOSITION OF
                                     MICHAEL CATANZARO
15
                                     MONDAY,
16                                   SEPTEMBER 14, 2020

17                                   Taken on behalf of
                                     Plaintiffs
18
                                     Counsel of Record
19                                   for this Party:

20                                   Noah Geary, Esquire
                                     30 E. Beau Street
21                                   Suite 225
                                     Washington, PA  15301
22                                   724-222-3788

23

24

25
</pre>

```
 1    Q.    What high school?

 2    A.    Deer Lakes High School.

 3    Q.    What year?

 4    A.    In '96.

 5    Q.    Where is Deer Lakes, is that Allegheny County?

 6    A.    Yes.

 7    Q.    You're currently employed by Wilkinsburg Police

 8          Department?

 9    A.    Wilkinsburg Borough.

10    Q.    Borough.  How many years in do you have?

11    A.    21.

12    Q.    All with Wilkinsburg?

13    A.    Yes.

14    Q.    Were you in law enforcement before with another

15          agency?

16    A.    No.

17    Q.    And do you recall the shooting incident back in

18          January of 2016?

19    A.    I do.

20    Q.    Thank you.  Were you working that day?

21    A.    I was.

22    Q.    Do you remember what shift you were on?

23    A.    10 to 6 -- 10 a.m. to 6 p.m.

24    Q.    And do you recall what your assignment was that

25          day?
```

1   A.   My general assignments are narcotics

2       investigations, general investigations, and I

3       have some admin work that I do.

4   Q.   Okay, thank you.  Did you respond to a call

5       about some type of incident that day?

6   A.   I responded to I'm sure several incidents that

7       day.

8   Q.   Okay.  One of them was the Kelley incident; is

9       that correct?

10   A.   Yes.

11   Q.   So you would have responded to some incidents

12       prior to that day; is that correct?

13   A.   I believe so, yes.

14   Q.   Okay.  And where were you when you got a call

15       about the Kelley incident, if you recall?

16   A.   Without referring to this report?

17   Q.   Either way.  You can refer to it.

18   A.   I don't recall where I was, but according to

19       this report, I stated that I was on South

20       Avenue.

21   Q.   Did you have a partner with you or another

22       officer?

23   A.   No.

24   Q.   So obviously you're in your vehicle and was it a

25       dispatch or a radio communication from another

```
 1        officer, what was the source of the call?
 2   A.   I don't recall.  Port Authority operates on a
 3        different frequency.  They have the ability to
 4        switch over to East -- the East PD, Allegheny
 5        County channels.  I don't recall if they
 6        switched, if an officer switched over, if it
 7        came over from our 911 center, I'm not sure.
 8   Q.   Understood.  Now, for Wilkinsburg on the radio,
 9        do you have the capability to switch over?
10   A.   We do now.  We did not at the time I don't
11        believe.
12   Q.   Okay.  And at the time it just one channel so to
13        speak?
14   A.   No.
15   Q.   You could not switch over January of 2016?
16   A.   No, not to Port Authority's.
17   Q.   Okay.  So does that mean you had one channel, so
18        to speak, you in 2016, Wilkinsburg PD?
19   A.   No, we had multiple channels.  We did not have
20        ability to switch to that channel.
21   Q.   To the Port Authority?
22   A.   Correct.
23   Q.   Okay, thank you, I'm sorry, okay.  How many
24        channels did you have within Wilkinsburg
25        Borough?
```

1    A.    I don't recall.  That was several years ago.  We

2          have since switched.

3    Q.    Would it be say two or three?

4    A.    No, it was multiple.  I'd say more than ten.

5    Q.    Okay.  And when you would get a call and you

6          have to respond, is the call either going to be

7          from the 911 center which is the dispatch or an

8          officer?

9    A.    Both.

10   Q.    Could be both or one or the other; is that

11         right?

12   A.    Both, yes.

13   Q.    Okay.  So please tell me what was the nature of

14         the call and you responded and kind of how it

15         started to play out.

16   A.    Officers from Port Authority requested immediate

17         backup, so I responded.

18   Q.    And when you responded, did you pull up on the

19         East Busway somewhere?

20   A.    No, I don't believe so.  I believe I pulled up

21         on -- I believe I pulled up on Wood Street.

22         There's a gazebo off of Wood Street and Franklin

23         Avenue.  I believe that's where I responded

24         from.

25   Q.    Thank you.  And when you got out, what was going

1        on, what did you see?

2    A.    I didn't know what was going on.  There was

3        several officers ahead of me that were walking

4        toward a set of steps that led to the actual

5        busway.

6    Q.    And were there a lot of people around or was

7        only there the officers?

8    A.    I only recall several officers, I believe two

9        Port Authority officers, possibly Officer

10       Granger, that's all I recall.

11    Q.    Who's the first person you spoke with on scene?

12    A.    I don't recall.

13    Q.    What's the first thing you did when you arrived

14       on scene?

15    A.    I followed the officers.

16    Q.    And you said they were going up the steps to the

17       busway?

18    A.    Yes.

19    Q.    Okay.  And you caught up with them I assume?

20    A.    At one point, yes, I did.

21    Q.    And what did you learn was the reason they had

22       called?

23    A.    That wasn't until later.  I learned that they

24       were attempting to take a male in custody, that

25       that male resisted.  One officer was injured,

1          the subject was fleeing.

2     Q.   They didn't tell you that initially?

3     A.   What?

4     Q.   What you just said, the reason why you were

5          called?

6     A.   Initially they were walking away.  They were

7          probably 30 feet ahead of me.

8     Q.   Right.  And when you caught up to them, did they

9          tell you why they had called you?

10    A.   No, not initially.

11    Q.   Did you ask?

12    A.   I believe I asked what's going on, and they said

13         that they were attempting to take this male that

14         was further ahead into custody, he resisted, and

15         he was walking away.

16    Q.   And did you recognize the male?

17    A.   I did not.

18    Q.   Did you come to learn at some point it was Bruce

19         Kelley, Jr.?

20    A.   I did.  I don't recall if it was that day or

21         not.

22    Q.   And prior to this day of the shooting, did you

23         know him?

24    A.   I don't believe so.

25    Q.   And then apparently at some point his father was

```
1           information and who was kind of the lead

2           investigator I guess you could say, and at that

3           time I did not know.  I did not know.  I knew it

4           was one of the Port Authority officers, but I

5           believe Adams you referred to.  I heard his name

6           before.  I don't have a clue who that is.

7    Q.     Thank you.  So the guy you're following, he's

8           walking away from you, correct?

9    A.     Yes, sir.

10   Q.     Did you follow him for a while on foot?

11   A.     I did.

12   Q.     And at a certain point, did that change or how

13          did it develop?

14   A.     At one point he left a trail that is referred to

15          as Linear and kind of cut down over a hillside.

16          There were several officers in front of us.  You

17          know, I had seen a knife in his hand, so I knew

18          the situation could be deadly at some point

19          based on his  -- the way he was carrying the

20          knife, his non-compliance, and at one point

21          officers were kind of facing one another and,

22          you know, being an officer, situations are very

23          fluid at all times, so you kind of prepare for

24          the worst and hope for the best, so one of the

25          officers stated that, you know, that there was a
```

```
1          possible crossfire potential if that arose, so
2          we kind of held back.  I believe it was when he
3          was a portion of the way down the hill or maybe
4          when he had started to go down the hill, I don't
5          recall exactly, but it was within that portion
6          when he left Linear Trail and headed toward the
7          residential area of Wilkinsburg.
8     Q.   Thank you.  In the reports there's some
9          information that Bruce Kelley, Jr. was hugging
10         the gazebo prior to your arrival.  Was that
11         relayed to you, that information?
12    A.   I don't believe so.
13    Q.   And he goes down a hillside, down to the more
14         residential area; is that correct?
15    A.   Yes.
16    Q.   And did you continue to follow him?
17    A.   Well, there was like a hesitation at one point,
18         and then we did, you know, the group kind of
19         just stayed together, how many of us there were
20         stayed together and kind of followed along after
21         a short period of time.
22    Q.   Was there some discussion among you as far as
23         what to do next, as far as addressing the
24         situation?
25    A.   I don't recall.  I know that at some point there
```

```
 1        was Tasers deployed, you know, it was the Port
 2        Authority's investigation, so I was relying on
 3        their judgment at that time I guess you could
 4        say, and I was there in support.
 5    Q.  Thank you.  As it continued to play out, did you
 6        end up say following him again further?
 7    A.  Yes.
 8    Q.  And other officers are doing the same; is that
 9        right?
10    A.  Yes.
11    Q.  And say, how many officers roughly did it seem
12        to be following him?
13    A.  At which point?
14    Q.  Just really when he gets down to the residential
15        area?
16    A.  I can only say I remember a couple more when we
17        first got to the residential area.  I would say
18        between -- you mean total or just in the group
19        that I was in?
20    Q.  Say total.
21    A.  I don't know, maybe between -- maybe between
22        eight and ten I guess maybe, I believe.
23    Q.  No, understood.  At any time while you're
24        watching Kelley, does he start walking towards
25        an officer and initiate physical confrontation?
```

1    A.    How would you define physical confrontation?

2    Q.    You know, he's got a knife in his hand, he tries

3          to stab an officer?

4    A.    He did swing at an officer.  He did turn and

5          swing at an officer.  It was at a point where it

6          was a failed Taser deployment or I believe a

7          pepper spray was utilized at one point, but

8          somewhere along his travels down the residential

9          area, he did turn and, like, swing the knife at

10        one of the officers.

11    Q.    Separate from that, at any other point in time

12        that you were observing him and officers are

13        following him, including yourself, did he, say,

14        stop walking, turn around, and start

15        approaching, walking toward any officer and

16        cussing him out, anything like that?

17    A.    Well, there's kind of a couple different

18        questions there.  He did cuss at officers

19        numerous times along the trail, along the -- you

20        know, when we were in the residential area, but

21        I only recall the one time that he turned and

22        kind of -- made like a slashing motion with the

23        knife.  There could have been more, but that

24        sticks in my mind, that one situation.

25    Q.    Thank you.  And that one situation dealt with

1      maybe an officer was Tasing him?

2   A.   I believe so, yeah.

3   Q.   Thank you.  Did you see him going over fences at

4      certain points?

5   A.   I do recall him going over one fence.  I want to

6      say there was possibly like a small wall that he

7      may have climbed over that was no more than a

8      couple of feet high, but I do recall him going

9      over a fence.  I think that was at a portion

10      where he was in like a parking lot area of

11      Hamnett Station which is a Port Authority lot

12      which leads to the backyard area of one of the

13      residential streets.

14   Q.   Thank you.  Do you know, did he fall at any

15      point, say he's climbing a fence and he falls?

16   A.   I don't recall.

17   Q.   Do you know if he, when he's climbing a fence or

18      wall, did he put the knife away momentarily?

19   A.   I don't remember that as well.

20   Q.   And if you would please, just continue to walk

21      us through as far as what you see him do during

22      this scenario?

23   A.   Well, he, you know, continued to disobey police

24      commands to drop the knife, to stop.  I believe

25      an officer said to get on the ground.  There

1       were failed Taser applications -- two or three.

2       He was -- one of the officers, I don't recall

3       who, attempted to pepper spray him or may have

4       pepper sprayed him.  I know pepper spray was

5       deployed.  He again refused commands from

6       officers, and he was approaching that more

7       residential area, and I do recall thinking that,

8       you know, the situation could turn much worse if

9       he decided to take a hostage or attack a

10      citizen, passerby, you know, a lot of thoughts

11      were racing through my mind, and at one point I

12      believe it was on Whitney Avenue, he was kind

13      of -- he was in front of a vacant house, and he

14      was -- he was standing face-to-face with the

15      officers that were there holding the knife out,

16      and at one point bring a K-9 officer gave him

17      additional commands.  He refused to submit, and

18      the K-9 was sent on him.

19   Q. Thank you.  At that time did you through your

20      department have crisis intervention training?

21   A. We did CIT training, uh-huh.

22   Q. What was the criteria for say the scenarios?  I

23      know there could be multiple types of scenarios

24      when say an officer says, we need to employ our

25      crisis intervention training, what are the

```
 1        scenarios that you could utilize to go down that
 2        path?
 3   A.   Well, you can't just sit here and say it's time
 4        to employ them.  In every situation that we're
 5        in, it's very rarely that a police officer,
 6        especially in Wilkinsburg, gets called for a
 7        birthday party or they want you to help them
 8        sing happy birthday so, you know, crisis
 9        intervention is utilized on an hourly basis, so
10        that involves a lot of, you know, verbal Judo
11        skills as far as trying to change somebody's
12        state of mine or demeanor, you know, try to get
13        some kind of compliance, but that had all -- had
14        failed attempts from the officers.  I did not
15        engage the subject, Mr. Kelley at all so, you
16        know, those tools are very valuable, like, CIT
17        training, but it's not an end all be all for
18        some people we encounter.
19   Q.   So the CIT training, whatever tools were learned
20        in that training, were they used or not used in
21        this situation?
22   A.   I honestly -- I don't -- I don't know if there
23        was ever a chance.  Like, you can't try to
24        utilize critical incident training to try to
25        de-escalate a situation when you just have a
```

```
 1          total non-compliant person that you're dealing

 2          with.  You know, it was a very fluid situation

 3          that nobody could predict what was going to

 4          happen, but like I testified before, you plan

 5          for the worst and hope for the best.

 6    Q.    Right.  So I understand.   So were some of those

 7          tools utilized or not, the crisis intervention?

 8    A.    I did not utilize any of those tools.  Based on

 9          the situation that I saw of the non-compliance,

10          I didn't feel as though that officers were going

11          to reach a point where the subject complied.

12    Q.    Did any other officer -- not you -- to your

13          observation try to employ any of the CIT

14          training techniques or tools?

15    A.    There was some -- I do recall an officer

16          reasoning with him -- trying to reason with him,

17          but it was just it fell on deaf ears.  It was

18          like, it wasn't even talking to him or he didn't

19          hear them, but the officer was within a

20          proximity that he would be able to hear because

21          he did respond to different things, different

22          words, commands that were given.

23    Q.    Did you have any thought at any point that this

24          person was mentally ill?

25    A.    I had nothing that would lead me to believe
```

1   Q.   And what is Kelley doing right before O'Malley

2       releases the dog?

3   A.   Well, he's disobeying police orders and has the

4       knife pointed at several officers.  I remember

5       him going back and forth, like, kind of scanning

6       the officers.  Officers were giving commands to

7       drop the knife, to get down on the ground.  I

8       remember -- I didn't remember prior to reading

9       the narrative from the County detective, but I

10      do recall a woman screaming, just listen to

11      them, just listen to them.

12   Q.   Gotcha.  What do you see or hear O'Malley do

13      then?

14   A.   He gave some commands, I don't recall verbatim

15      what he stated, but it was along the lines of,

16      you know, police K-9, drop the knife or I'll

17      send my dog.  There may have been another

18      command.

19   Q.   Gotcha.  And did he release the dog?

20   A.   He did.

21   Q.   And I've never been in a situation like this so

22      I mean is the dog, before he releases the dog,

23      is the dog like snarling at Bruce Kelley, like,

24      what's the dog's demeanor and how's the dog

25      acting right before he's released?

1    A.    The dog is from what I remember and in most

2          situations is they're focused on a target and

3          may have barked a couple of times, but it was

4          just awaiting its orders.

5    Q.    Okay. And when he released the dog, please tell

6          me just what you watched, what you saw happen?

7    A.    The dog approached Mr. Kelley. He kind of took

8          a defensive -- I take that back, kind of an

9          offensive stance, like ready to engage the dog

10         as he saw the dog coming at him. The dog jumped

11         at him, I want to say it was his left -- he had

12         his left arm leading closest to the dog, kind of

13         leaning forward, knees slightly bent, kind of in

14         a fighting stance. The dog I believe bit his

15         left arm, and I recall him making an upward

16         motion with the knife underneath the dog's jaw

17         (indicating). I believe after that, he may have

18         tried to stab the dog one more time but the dog

19         disengaged. The dog walked a short distance

20         back towards its handler. It kind of made like

21         a coughing sound, and then just started spewing

22         blood out of its mouth.

23    Q.    Now, when you say, now you described kind of an

24         upward motion with Kelley with the knife, kind

25         of like an uppercut like a boxer?

1    A.    Yes.

2    Q.    And the dog comes back to its handler which is

3          O'Malley; is that right?

4    A.    I didn't say it came back to O'Malley.  It went

5          in that direction.  I don't remember it going

6          right back to him, but it disengaged and went

7          right back toward him and started to -- it

8          wasn't vomiting up blood, but it looked like it

9          was because it was just a massive amount of

10         blood coming from its mouth.

11   Q.    And what did you see as far as officers firing

12         at Kelley?

13   A.    Well, my focus was on the dog at the time the

14         shots were fired just for that split second.  I

15         heard a series of gunshots and Mr. Kelley fell

16         to the ground.

17   Q.    Okay.  And right before O'Malley releases the

18         dog is Kelley's body positioned, I mean like

19         he's facing O'Malley?

20   A.    Yes.

21   Q.    Kind of head on, straight on?

22   A.    Yes.

23   Q.    And when he gets shot, is Kelley's body facing

24         O'Malley?

25   A.    When he -- are you talking like when the bullets

1          actually contacted him, that kind of very short

2          period of time?

3     Q.   Yes.

4     A.   I can't say for certain because I wasn't, you

5          know, at that angle, but I believe he was.

6     Q.   And did you know how many different officers

7          were firing their weapon at that moment when you

8          hear shots fired?

9     A.   No.

10    Q.   Did you know it was more than one officer?

11    A.   I kind of suspected because the rounds were that

12         fast.

13    Q.   Did you ever even pull --

14    A.   Not fast, I'll say within close time proximity.

15    Q.   Did you at any point have your gun out of its

16         holster?

17    A.   I already answered that.

18    Q.   Which was no?

19    A.   It was no several times.

20    Q.   Did you see Bruce Kelley's body fall when he

21         fell?

22    A.   I did.

23    Q.   And how did his body, like, if you can describe

24         what you saw, as far as the direction his body

25         fell?

```
 1        notifications.  I may have called our OI -- not
 2        our OIC, but our lieutenant, you know, it was
 3        kind of like from the get-go I was supporting
 4        the officers that were, you know, initiating
 5        this incident.  I can't honestly say I did
 6        anything of worth after that.  There you,
 7        know, a lot of officers there.
 8   Q.   I understand.  When Bruce is standing in front
 9        of the house right before O'Malley releases the
10        dog, are there any civilians in the area?
11   A.   Yes.  I know that for a fact because there was
12        at least one woman screaming to him.
13   Q.   And where was she in proximity to Bruce Kelley?
14   A.   I was fixed on Mr. Kelley.
15   Q.   Okay.
16   A.   She could have been standing right behind me.  I
17        don't know, but it sounded like it was from my
18        rear.
19   Q.   Okay.  So this person was not in your field of
20        vision?
21   A.   No, no.
22   Q.   Were there any civilians, like, that Bruce
23        Kelley could have grabbed, was there any
24        civilian in your field of vision that Bruce
25        Kelley could have actually grabbed, you know,
```

```
 1        incident, that evening at 7:20 p.m.; is that
 2        correct?
 3   A.   Yes, that's what it says, yes.
 4   Q.   Yeah, that's what it says on here.  And this
 5        would be Deposition Exhibit -- I didn't get this
 6        number, for the record.
 7             THE COURT REPORTER:  That's Exhibit
 8        No. 3.
 9             MR. EVASHAVIK:  3, okay, so we're
10        talking about No. 3.
11                        - - - -
12             (Deposition Exhibit No. 3 was marked
13        for identification.)
14                        - - - -
15   BY MR. EVASHAVIK:
16   Q.   And I know, sir, that you already said you had a
17        chance to read this before you began your
18        testimony today?
19   A.   This?
20   Q.   Yes.
21   A.   No.
22   Q.   Oh, you didn't?
23   A.   No, I was trying to leaf through it quickly, I
24        got about halfway.
25   Q.   Okay.  Well, let me ask you this:  I know it's
```

1    written by someone else, but I definitely want

2    to have you read it carefully because I'm going

3    to ask you if it's true and correct or if

4    there's anything that you think is a mistake, so

5    how about if we just take a minute and I allow

6    you to do that; is that okay?

7  A.    Yes, sir.

8                    - - - -

9              (Whereupon, the witness reviewed the

10   document.)

11                   - - - -

12  BY MR. EVASHAVIK:

13  A.    Okay.

14  Q.    All right.  Having read this, first of all, when

15        you conducted this interview, I assume that the

16        events of the occurrence were fresh in your

17        mind?

18  A.    Yes.

19  Q.    Okay.  And everything you read in here, is that

20        true and correct?

21  A.    I believe so.

22  Q.    Okay.  There's nothing that you want to change

23        at this point?

24  A.    I didn't author the report, so I would trust

25        that the County Police memorialized what I had

| | |
|---|---|
| 1 | stated to them. Some of the stuff I don't, you |
| 2 | know, is a little foggy, I guess you could say. |
| 3 | Q. I understand, many years have passed. And my |
| 4 | question is: Having read this, is there |
| 5 | anything in here that you think possibly could |
| 6 | be incorrect? |
| 7 | A. I mean there's a couple things that are I would |
| 8 | say a little bit speculative as far as followed |
| 9 | -- paragraph number 2, followed 15 feet behind, |
| 10 | I would probably in my own words state |
| 11 | approximately. |
| 12 | Q. Okay. |
| 13 | A. You know, he responded by saying FU which wasn't |
| 14 | accurate. He used the full four-letter word. |
| 15 | Q. So for the record, what did he say, I have to |
| 16 | ask you? |
| 17 | A. He said the full, F-U-C-K, Y-O-U. |
| 18 | Q. Okay. All right. Let me ask you, let's look at |
| 19 | the end of the -- on Page 2, the second full |
| 20 | paragraph, the end of that. |
| 21 | A. Yes. |
| 22 | Q. And I'll read it, it says: During -- this is a |
| 23 | quote -- during this time the suspect would not |
| 24 | let officer approach him and would swing the |
| 25 | knife around if officers got too close to him, |

```
 1        end of quote.
 2                    Was this at the Hamnett Park and Ride
 3        parking lot area?
 4   A.   Yeah, as I testified to earlier, the one
 5        situation where I believe an officer was
 6        attempting to deploy -- or had to deploy a Taser
 7        or pepper spray, he swung the knife around in an
 8        offensive manner I would say.
 9   Q.   Okay.  And then the next to the last paragraph:
10        Detective Catanzaro stated that he was standing
11        in the middle of the street when he observed the
12        K-9 officer order the suspect to drop the knife
13        --
14   A.   I'm sorry, I lost you there, second to the last,
15        where are you at?
16   Q.   Yes, on Page 2.
17   A.   Yes, uh-huh, second to the last paragraph.
18   Q.   Yes, Detective Catanzaro --
19   A.   Okay.
20   Q.   See that?
21   A.   Yep, yep, yep, yep, yes, sir.
22   Q.   Stated that he was standing in the middle of the
23        street when he ordered the K-9 officer or the
24        suspect to drop the knife or he would release
25        his K-9?
```

1    A.    Yes.

2    Q.    Detective Catanzaro stated the officer released

3          his K-9, and as the K-9 ran towards the suspect,

4          the suspect stabbed the K-9 twice in the head

5          and neck area.  The suspect turned towards the

6          K-9 officer and the officer fired his weapon.

7          Detective Catanzaro stated a second Port

8          Authority officer also fired his weapon.

9                    So is that correct, what's stated

10         there?

11   A.    Yes.

12   Q.    All right.  So that as I'm reading this, so

13         after the suspect, in this case, Kelley, Jr.,

14         stabbed the K-9 twice in the head and the neck

15         area and the dog dropped off and released,

16         Kelley, Jr. then turned towards the K-9 officer

17         who was O'Malley; is that correct?

18   A.    Like I stated, you know, I was interviewed by

19         the Allegheny County Police that day, and I

20         would hope that they, you know, documented my

21         statement well.  The uppercut wound as counsel

22         referred to sticks most in my mind, as far as

23         the injury that was applied to the K-9.

24   Q.    Okay.  Did you personally perceive Kelley, Jr.

25         to be a threat to some of the officers and

1  others during this pursuit?

2  A.  I did.

3  Q.  And did you perceive him to still be a threat to

4  other officers and possibly others in the area,

5  even after the K-9 had been stabbed?

6  A.  Yes.

7  Q.  Okay.  And you explained earlier that the path

8  he was on was taking him more into a populated

9  residential area; is that correct?

10  A.  Yes.

11  Q.  And you had personally concerns about him

12  encountering civilians which on his direction of

13  travel that you believed that he would have?

14  A.  Yes, it's a residential area.

15  Q.  Okay.  In the manner in which he was holding the

16  knife when he stabbed the K-9, I just want to

17  clarify that for the record, so that as you were

18  demonstrating it, the handle would have been

19  squeezed inside the palm of his hand, and the

20  blade would have been projecting from where the

21  thumb area or the bottom of the hand?

22  A.  The thumb area.

23  Q.  Okay.  So it was like a closed fist squeezing

24  the handle of the knife?

25  A.  Yes.

1   Q.   And the blade sticking out of the thumb area;

2       did I say that correctly?

3   A.   Yes.

4   Q.   And that's how he was holding it when he made

5       the uppercut, slash, stabbing the dog?

6   A.   Yes.

7   Q.   Okay.  And you also made another demonstration,

8       I just want to make sure it was good for the

9       record.  When I say record, meaning her

10      recording.

11            Just before the K-9 was released, you

12      indicated that he held the knife with the blade

13      sticking out and you held your arm out in front

14      of you and were moving it back and forth in sort

15      of a like a half circle area; did I see that

16      correctly?

17   A.   Yes.

18   Q.   And was the knife actually pointed at the

19      officers?

20   A.   Yes.

21   Q.   And did you perceive that to be a threatening

22      gesture by Kelley, Jr.?

23   A.   Yes.

24   Q.   And was that just prior to the release of K-9

25      Aren?

1          (Whereupon, the video was not shown to

2      the witness.)

3                    - - - -

4  BY MR. EVASHAVIK:

5  Q.   During this entire process, you were pursuing

6      the suspect Kelley, Jr. until the time he was

7      shot, did you feel that he was actively

8      resisting arrest?

9  A.   Absolutely.

10 Q.   Did you feel that he was attempting to evade

11     arrest by flight?

12 A.   Yes.

13          MR. EVASHAVIK:   That's all I have.

14     Thank you, Detective.

15                 EXAMINATION

16 BY MR. GEARY:

17 Q.   Just two more, please.

18 A.   Yes.

19 Q.   On questions about civilians and possible harm

20     to civilians by Kelley, at the point in time

21     he's in front of the abandoned house right

22     before O'Malley releases the dog, isn't it true

23     that there were no civilians in that area that

24     could have been harmed by Kelley?

25 A.   I did not see any civilians in the immediate

```
 1        area between Kelley and the officers.
 2    Q.  Did you see any -- so is that true then that
 3        there were no civilians in the area to be harmed
 4        by Kelley?
 5              MR. EVASHAVIK:  Object to the form.
 6    BY MR. GEARY:
 7    A.  I mean I can't answer that question.  That's,
 8        you know, that's very open-ended.  I mean for
 9        all I know Kelley could have had a gun or five
10        guns on his person that were concealed, another
11        knife that he could have thrown, a ballistics
12        vest for all I know that could have exploded.
13        There were no -- I'll testify and answer your
14        question that there were no officers -- no
15        civilians between Kelley and the officers that
16        were actively engaging him at that time with
17        commands.
18    Q.  Including yourself?
19    A.  I was not actively engaging Kelley at that time.
20    Q.  But there were no civilians --
21    A.  I've answered that question.
22    Q.  -- between you and Kelley?
23    A.  I've answered that question three times.
24    Q.  It's a different question.
25    A.  There were no civilians between Kelley and the
```

1      officers, and I was an officer on scene at that

2      time, so it is the same question.

3   Q.   Gotcha.  And then as far as the use of deadly

4      force, Mr. Evashavik has asked about the threat

5      to the officer, the threat Kelley posed, so

6      there was -- how was there a threat that an

7      officer could have been killed by Kelley, if

8      Kelley was say 25 feet from any officer and each

9      officer was armed with a loaded gun?

10                  MR. EVASHAVIK:  Object to form.

11  BY MR. GEARY:

12  A.   I don't believe we were at that distance but,

13      you know, there's a -- we're trained to keep,

14      you know, a space time distance, a reactionary

15      distance, and that could have changed within a

16      very short period of time.  How long does it

17      take a grown man to run the distance of 15 feet,

18      maybe a little bit more, a matter of seconds?

19  Q.   Yeah, and I'm just asking when Kelley was

20      standing right before the dog's released?

21  A.   Okay.

22  Q.   How is any officer in threat of losing their own

23      life?

24  A.   You had a grown man standing with a knife, so I

25       would say 100 percent, there was a threat.

1    Q.    Of officers losing their lives?

2    A.    Absolutely.

3    Q.    Even though you were armed with loaded guns,

4          each officer?

5    A.    Absolutely, guns misfire, guns -- people misaim,

6          so 100 percent.

7                   MR. GEARY:  Okay.  Thank you.

8                        -  -  -  -

9                   (Whereupon, the proceedings were

10         concluded at 3:11 p.m.)

11                       -  -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


CALISIA KELLEY; and          CIVIL ACTION
JOHNNIE MAE KELLEY,
Co-Administrators of the     No. 2:17-cv-01599-NBF
ESTATE OF BRUCE KELLEY,
JR., deceased,

Plaintiffs,

vs.                          TRANSCRIPT

BRIAN O'MALLEY, both in his
Official and Individual      DEPOSITION OF
Capacities as Sergeant for   VENERANDO COSTA
the Allegheny County Port
Authority; and DOMINIC
RIVOTTI, in both his
Official and Individual
Capacities as Officer for
the Allegheny County Port
Authority,

Defendants,
Jointly and Severally.       TAKEN VIA ZOOM VIDEO CONFERENCE

                             MONDAY, OCTOBER 19, 2020


                             Taken on behalf of Plaintiffs,
                             Calisia Kelley and Johnnie Mae
                             Kelley


                             Counsel of Record for this Party:

                             Noah Geary, Esquire
                             Washington Trust Building
                             6 South Main Street, Suite 225
                             Washington, PA  15301
                             724-222-3788

5

1          (Whereupon, the deposition of Venerando Costa

2   commenced at 9:05 a.m.)

3                    VENERANDO COSTA,

4   having been first duly sworn, was examined and testified as

5   follows:

6                    EXAMINATION

7   BY MR. GEARY:

8       Q.     Good morning, Detective.  My name is Noah Geary.

9   I'm lawyer for Plaintiffs in a 1983 Civil Rights Action filed

10  in federal court against Officers O'Malley and Ravotti of the

11  Port Authority Police Department from a shooting of Bruce

12  Kelley, Jr., that occurred on January 31st, 2016, so I will be

13  asking questions of you on their behalf.

14          They're present with me, just so you know.  I'm here

15  in my office in Washington County with both Calisia Kelley, who

16  is the sister of Bruce, and Johnnie Mae, the mother.  And then

17  the stenographer, Ms. Ross.  So there's four of us here in my

18  office, just so you know, because, obviously, you're testifying

19  remotely.

20          Have you had your deposition taken before, sir?

21      A.     Yes.

22      Q.     Okay.  Could you please just tell us your name for

23  the record?

24      A.     Venerando Costa.

25      Q.     And your age, please?

6

1    A.    47.

2    Q.    And were you employed by Allegheny County Police

3    Department as of January 31st, 2016?

4    A.    I was.

5    Q.    Okay.  And were you -- did you play a role and

6    participate in an investigation into the shooting of Bruce

7    Kelley, Jr.

8    A.    I did.

9    Q.    Okay.  And was there a lead investigator or lead

10   detective on the case?

11   A.    It would probably have been Detective Caruso, since

12   he did the crime scene.

13   Q.    Thank you.  And what -- what would your role have

14   been?

15   A.    Interviews and assisting any way I could.

16   Q.    Thank you.  So I have been provided some of your

17   reports or -- on what I have, it's called "Activity - Memo to

18   the File."  And I provided those to you through your counsel.

19   I just have some questions as far as some things you did in the

20   investigation, some things you found, just so you know.  So if

21   we could look at --

22        MR. GEARY:  And, Greg -- Mr. Evashavik, just so you

23   know, the stenographer has labeled as Deposition Exhibit 35

24   collectively what I'm calling all the reports of Detective

25   Costa related to his role in the investigation as Depo

40

1     Q.    And Edgewood police officer Richard Susalla.

2  Correct?

3     A.    Yes.

4     Q.    And Wilkinsburg police officer Michael Catanzaro?

5     A.    Yes.

6     Q.    Can you turn your attention to that interview

7  report, please, Catanzaro, from Wilkinsburg?

8     A.    Yes.  I have it.

9     Q.    Okay.  The next-to-the-last paragraph, if you would

10  please read that.

11     A.    "Detective Catanzaro stated he was standing in the

12  middle of the street when he observed the K-9 officer order the

13  suspect to drop the knife or he would release his K-9.

14  Detective Catanzaro stated the officer released his K-9 and as

15  the K-9 ran towards the suspect the suspect stabbed the K-9

16  twice in the head and neck area.  The suspect turned towards

17  the K-9 officer and the officer fired his weapon.  Detective

18  Catanzaro stated a second Port Authority officer also fired his

19  weapon."

20     Q.    And this interview, according to the report, was

21  taken on the day of the incident, January 31, 2016, at

22  7:20 p.m.  Did I see -- read that correctly?

23     A.    Yes.

24     Q.    And is your report an accurate recitation of what

25  Detective Catanzaro reported to you during the interview on

1   January 31, 2016?

2       A.    Yes, it is.

3       Q.    Now, if I can ask you to look at an exhibit I sent

4   over.  It's part of your interview, but it was not included by

5   Attorney Geary in the exhibits he sent this morning.  Did you

6   receive that, the interview of Bruce Kelley, Sr.?

7       A.    Yeah.  I have that.

8       Q.    Okay.

9       A.    Let me --

10          MR. EVASHAVIK:  Yeah.  I sent that over.  I'd like

11  to mark that as an exhibit if we haven't done so.  I think the

12  next exhibit -- 37?  Is that okay, Rita?

13          THE REPORTER:  Yes.

14          MR. EVASHAVIK:  All right.  So we'll mark this as

15  Deposition 37.

16          MR. GEARY:  What page is this, Greg, please, or

17  Bates stamp?

18          MR. EVASHAVIK:  I actually don't see a Bates stamp

19  on it, but it's page 18 of 36 of the county reports.  I don't

20  know why I'm not seeing a Bates stamp on it.

21          MR. GEARY:  Got you.  Yeah.  Mine has Bates

22  stamp 59, just so you know.  18 of 36.

23          MR. EVASHAVIK:  Yeah.  I must have pulled -- I have

24  a copy of this without a Bates stamp.  That's the one I sent.

25          (Whereupon, Deposition Exhibit 37 was presented to

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CALISIA KELLEY; and **JOHNNIE MAE**
**KELLEY**, Co-Administrators of the ESTATE
OF BRUCE KELLEY JR., deceased,

          Plaintiffs,

    v.

**BRIAN O'MALLEY**, both in his Official and
Individual Capacities as Sergeant for the
Allegheny County Port Authority; and **DOMINIC**
**RIVOTTI**, in both his Official and Individual
Capacities as Officer for the Allegheny
County Port Authority,

          Defendants,

CIVIL ACTION

No. 2:17-cv-01599 -NBF

**JURY TRIAL DEMANDED**

## AFFIDAVIT

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF ALLEGHENY

    ss:

Shawn Hudzinski, Lieutenant for the Port Authority of Allegheny County Police Department, being duly sworn, says that he was employed in that capacity with the Port Authority of Allegheny County on and after January 31, 2016 through the present. Acting in that capacity, Lieutenant Hudzinski retrieved and obtained the original police dispatch radio call recordings pertaining to the subject incident on January 31, 2016 involving Plaintiffs' Decedent Bruce Kelley, Jr. Lieutenant Hudzinski says that he also retrieved and obtained the original Port Authority of Allegheny County video surveillance camera tape recordings from the Hamnett Street Station Park and Ride Lot for the date and times of the subject incident involving Plaintiffs' Decedent, identified

601

as Exhibit No. 8 (Hamnett Station Video Pole No. 2) in the witness depositions conducted in this lawsuit. Lieutenant Hudzinski says that he used said radio recordings and surveillance camera videotape to prepare a document titled "Incident 16-00683 Assault Knife Wilkinsburg Borough" which has been identified as Exhibit No. 6 in the witness depositions conducted in this lawsuit. Lieutenant Hudzinski says that this document identified as Exhibit No. 6 is true and correct to the best of his information and knowledge based on the review of the radio calls and videotape surveillance.

Shawn Hudzinski

Sworn to and subscribed before me this
26 day of April , 2021
Melissa G Hunt
Notary Public

My commission expires:

Commonwealth of Pennsylvania - Notary Seal
Melissa G. Hunt, Notary Public
Allegheny County
My commission expires August 28, 2023
Commission number 1076267
Member, Pennsylvania Association of Notaries

Incident 16-00683

Assault Knife

Wilkinsburg Borough

Primary sources of information are Radio and Phone Audio recordings retrieved from Port Authority Police and CCTV footage retrieved from Port Authority Police.  Time stamps of audio and video are not synced and are all approximate.

| 153249 Hours | Officer Adams (5564) calls out "Hold us out on foot checking the Linear Trail." Officer Adams (5564) and Officer Hampy (5573) are operating a two Officer patrol unit in the East Zone. |
|---|---|
| Audio | 0000000084_PAAC_Police_2016-01-31_15_32_49_by_ui_startdate_asc.wav |

**Google Earth**



Gazebo

Linear Trail

Officer Adams/Hampy park vehicle

| **153512 Hours** | Officer Adams (5564) calls dispatch reporting that they will be getting out with two or three at the Gazebo. |
|---|---|
| **Audio** | 🎵 WAV |
| | 0000000085_PAAC_Police_2016-01-31_15_35_12_by_ui_startdate_asc.wav |

**Google Earth**



Linear Trail

Stairwell leading to Gazebo

Gazebo

| | |
|---|---|
| **153644 Hours** | • Officer Kaupinis (5561) calls Officer Adams (5564) asking what his status is.<br>• Officer Adams (5564) responds asking for additional units because one is resisting.<br>• Officer Kaupinis (5561) calls responding from the station.<br>• Sgt. DiPippa (5584K) tells dispatch to notify Wilkinsburg Police. |
| **Audio** | 0000000086_PAAC_Police_2016-01-31_15_36_44_by_ui_startdate_asc.wav |
| **153749 Hours** | • Officer Adams (5564) reports "one sprayed." |
| **Audio** | 0000000087_PAAC_Police_2016-01-31_15_37_40_by_ui_startdate_asc.wav |
| **153819 Hours** | • Dispatch informs Sgt. DiPippa (5584K) that Wilkinsburg has been notified.<br>• Officer Adams (5564) reporting Code 2. |
| **Audio** | 0000000088_PAAC_Police_2016-01-31_15_38_19_by_ui_startdate_asc.wav |
| **153848 Hours** | • Sgt. O'Malley (5580K) asks Officer Adams (5564) if anyone is running and if he has a description.<br>• Officer Adams (5564) reports that he has one on the ground resisting. |
| **Audio** | 0000000089_PAAC_Police_2016-01-31_15_38_48_by_ui_startdate_asc.wav |
| **153905 Hours** | • Sgt. DiPippa (5584K) tells dispatch to update Wilkinsburg. |
| **Audio** | 0000000090_PAAC_Police_2016-01-31_15_39_05_by_ui_startdate_asc.wav |
| **153947 Hours** | • Officer Adams (5564) Tells dispatch "Male armed with a knife, Code 3."<br>• Officer Adams (5564) Reports description of male and that he is heading toward the Linear Trail and that he is armed with a knife.<br>• Officer Kaupinis (5561) reports that he is on the Brilliant Bridge heading there.<br>• Officer Adams (5564) reports that the male is heading toward Wilkinsburg Station on the trail and is armed with a knife. |
| **Audio** | 0000000091_PAAC_Police_2016-01-31_15_39_47_by_ui_startdate_asc.wav |

| | |
|---|---|
| **154048 Hours** | • Sgt. O'Malley (5580K) asks if Officer Adams (5564) is in pursuit or is staying with the other suspects.<br>• Officer Adams (5564) states that he is following him at a distance, he is armed with a knife and he still needs more units. He also reports that he is heading towards Hamnett Station.<br>• Officer Kaupinis (5561) confirms with Officer Adams (5564) that the actor is going towards Hamnett Station.<br>• Sgt. DiPippa (5584K) states that someone should go down Pennwood toward the tunnel.<br>• Officer Sanders (5565) responds that he and Officer Ravotti (5566) will take that, referring to the tunnel detail.<br>• Officer Kaupinis (5561) calls out at Hamnett.<br>• Sgt. DiPippa (5584K) asks Sgt. O'Malley (5580K) if he wants to jump the wall with him, referring to the wall along the Linear Trail. |
| **Audio** | 0000000092_PAAC_Police_2016-01-31_15_40_48_by_ui_startdate_asc.wav |
| **154149 Hours** | Officer Kaupinins (5561) and Sgt. Hahn and Det, Sgt. Corrado with Swissvale Police arrive on scene at Hamnett Station as verified by CCTV. |
| **154206 Hours** | • Sgt. DiPippa calls dispatch to ask for a status on Officer Hampy (5573).<br>• Officer Hampy (5573) responds that she is with Officer Adams (5564).<br>• Officer Adams (5564) informs another Police unit on the radio that the actor has a knife in his hand.<br>• Officer Kaupinis (5561) acknowledges Officer Adams (5564).<br>• Officer Adams (5564) advises on the radio to "watch cross fire." |
| **Audio** | 0000000093_PAAC_Police_2016-01-31_15_42_06_by_ui_startdate_asc.wav |
| **154233 Hours** | Sgt. DiPippa arrives at Hamnett Station as verified by CCTV. |
| **154244 Hours** | • Officer Adams (5564) informs dispatch that the knife is in the actors right hand.<br>• Officer Adams (5564) reports that the actor has been Tasered and pepper sprayed with no effect. |
| **Audio** | 0000000094_PAAC_Police_2016-01-31_15_42_44_by_ui_startdate_asc.wav |
| **154347 Hours** | • Officer states "cutting through the woods." |
| **Audio** | 0000000095_PAAC_Police_2016-01-31_15_43_47_by_ui_startdate_asc.wav |

| | |
|---|---|
| **154401 Hours** | • Multiple Officers reporting that he cut through the woods. Officer Adams (5564) confirms that and states that he is cutting towards Center St. |
| **Audio** | 0000000096_PAAC_Police_2016-01-31_15_44_01_by_ui_startdate_asc.wav |
| **154430 Hours** | • Officer requests a description and Officer Adams (5564) provides a description. |
| **Audio** | 0000000097_PAAC_Police_2016-01-31_15_44_30_by_ui_startdate_asc.wav |
| **154446 Hours** | Sgt. O'Malley (5580K) and Edgewood Police Unit arrive on scene and are met by Officer Kaupinis and Sgt. O'Malley gets K-9 Aren out and proceeds onto Linear Trail as verified by CCTV. |

| 154512 Hours | • Officer Ravotti (5566) states that a Wilkinsburg unit saw the suspect walking through Whitney Ave. |
| | • Officer Adams (5564) reports that the suspect is walking back towards the Gazebo through an alley. |
| **Audio** | 0000000098_PAAC_Police_2016-01-31_15_45_12_by_ui_startdate_asc.wav |

**Google Earth**



| 154608 Hours | • Officer Adams (5564) reports that the suspect is heading back toward Jeanette Street. |
| | • Officer Kaupinis (5561) reports that he sees the suspect. |
| Audio |  |
| | 0000000099_PAAC_Police_2016-01-31_15_46_08_by_ui_startdate_asc.wav |

**Google Earth**



| 154718 Hours | • Sgt. O'Malley (5580K) requests an update.<br>• Officer Kaupinis (5561) reports that the suspect is on Wagner Way. |
|---|---|
| Audio | <br>0000000100_PAAC_Police_2016-01-31_15_47_18_by_ui_startdate_asc.wav |

**Google Earth**



| | |
|---|---|
| **154750 Hours** | Sgt. O'Malley is observed putting K-9 Aren back in his vehicle and leaving Hamnett Station proceeding inbound on East Bus Way as verified by CCTV |
| **154737 Hours** | <ul><li>Sgt. O'Malley (5581) asks where Wagner Way is in relation to the Gazebo.</li><li>Officer Adams (5564) reports that the actor is on Center Ave. between Rebecca Ave. and the Park and Ride lot.</li></ul> |
| **Audio** |  0000000101_PAAC_Police_2016-01-31_15_47_37_by_ui_startdate_asc.wav |
| **154837 Hours** | <ul><li>Officer Kaupinis (5561) reports that suspect has cut through some houses and is now on Whitney Avenue</li></ul> |
| **Audio** |  0000000102_PAAC_Police_2016-01-31_15_48_37_by_ui_startdate_asc.wav |

| 154915 Hours | • Sgt. O'Malley (5580K) asks if the tunnel is secure, referring to the Whitney Avenue Tunnel. |
| | • Officers report that suspect is walking towards Hamnett Park and Ride lot and dispatch reports that they have one at gun point. |
| | • Officers at scene as confirmed by CCTV Officer Ravotti (5566), Officer Sanders (5565), Officer Kaupinis (5561), Sgt. DiPippa (5584K), and local Officers. |
| Audio |   0000000103_PAAC_Police_2016-01-31_15_49_15_by_ui_startdate_asc.wav |
| CCTV Image |  |



Officers and Suspect

Hamnett Park and Ride

| 154939 Hours | • Officer Kaupinis appears to be deploying pepper spray. |
| --- | --- |
| CCTV Image |  |

1/31/2016 3:49:39 PM

| **154948 Hours** | Suspect in Hamnett Park and Ride lot swings knife at Officer Sanders when he attempts an ASP strike. |
|---|---|
| **CCTV Image** |  1/31/2016 3:49:48 PM |
| **154959 Hours** | • Officer reports that he walking towards bus way. |
| **Audio** |  0000000104_PAAC_Police_2016-01-31_15_49_59_by_ui_startdate_asc.wav |

| 155014 Hours | Suspect is observed climbing fence and proceeding back towards Whitney Avenue. Officer Kaupinis is observed deploying mace on suspect as he climbs over fence. |
|---|---|
| CCTV Image |  |
| 155019 Hours | • Officer reports that he is going back towards Whitney Avenue through houses. |
| Audio | <br>0000000105_PAAC_Police_2016-01-31_15_50_19_by_ui_startdate_asc.wav |
| 155044 Hours | • Officer suggests using the car to stop suspect. |
| Audio | <br>0000000106_PAAC_Police_2016-01-31_15_50_44_by_ui_startdate_asc.wav |

| 155136 Hours | • Officer reports on radio coming back out to Whitney Avenue. |
|---|---|
| Audio | 0000000107_PAAC_Police_2016-01-31_15_51_36_by_ui_startdate_asc.wav |
| 155153 Hours | • Indiscernible transmission. |
| Audio | 0000000108_PAAC_Police_2016-01-31_15_51_53_by_ui_startdate_asc.wav |
| 155206 Hours | • Officer Ravotti (5566) reports shots fired on Whitney Avenue and requests a medic.<br>• Dispatch acknowledges. |
| Audio | 0000000109_PAAC_Police_2016-01-31_15_52_06_by_ui_startdate_asc.wav |



| | |
|---|---|
| **155217 Hours** | • Dispatcher Fabus calling county 911 to report shots fired and requesting medics. |
| **Audio** | 811014006075115.wav |
| **155258 Hours** | • Officer Ravotti (5566) is on radio stating that he needs his bag out of the car.  He is reportedly referring to his medic bag.  At this time based on Officer reports Sgt. O'Malley (5580K) and Sgt. DiPippa (5584K) are or have already put K-9 Aren into Unit 224 to take him for emergency care. |
| **Audio** | 0000000110_PAAC_Police_2016-01-31_15_52_58_by_ui_startdate_asc.wav |
| **155344 Hours** | • Officer Ravotti (5566) is calling for 5584K (Sgt. DiPippa) |
| **Audio** | 0000000111_PAAC_Police_2016-01-31_15_53_44_by_ui_startdate_asc.wav |
| **155353 Hours** | • Allegheny County 911 calls Dispatcher Fabus and informs him that the dog has been stabbed and they want to know where he is being taken to. |
| **Audio** | 811014006075120.wav |
| **155426** | • Allegheny County 911 calls back again to ask where the dog is being taken to. |
| **Audio** | 811014006075122.wav |
| **155439** | • Dispatcher Fabus calling 5580K to determine which hospital he is going to.<br>• Officer Sanders (5565) responds stating that 5580K is off the air. |
| **Audio** | 0000000112_PAAC_Police_2016-01-31_15_54_39_by_ui_startdate_asc.wav |
| **155538** | • Sgt. O'Malley (5580K) calls Dispatcher Fabus to contact Northview Animal Hospital to inform them that they are en route. |
| **Audio** | 0000000113_PAAC_Police_2016-01-31_15_55_38_by_ui_startdate_asc.wav |
| **155622 Hours** | • Dispatcher Fabus calls North View Animal Hospital and informs them. |
| **Audio** | 811014006075128.wav |

| | |
|---|---|
| **160000 Hours** | • North View Animal Hospital calling and advising that the Officers should take K-9 Aren to Pittsburgh Veterinary Specialty and Emergency Center located at 807 Camp Horne Rd. Pittsburgh Pa. 15237. |
| **Audio** | 811014006075143.wav |
| **160046 Hours** | • Allegheny County 911 Calls and advises Dispatcher Fabus that the suspect is Code Zero (deceased) and Dispatcher Fabus advises that the dog is now going to be taken to Pittsburgh Veterinary Specialty and Emergency Center located at 807 Camp Horne Rd. Pittsburgh Pa. 15237. |
| **Audio** | 811014006075147.wav |
| **160118 Hours** | • Dispatcher Fabus advising Sgt. O'Malley (5580K) and Sgt. DiPippa (5584K) to deviate to Pittsburgh Veterinary Specialty and Emergency Center. |
| **Audio** | 0000000115_PAAC_Police_2016-01-31_16_01_18_by_ui_startdate_asc.wav |
| **160200 Hours** | • Dispatcher Fabus advises that they have been notified. |
| **Audio** | 0000000116_PAAC_Police_2016-01-31_16_02_00_by_ui_startdate_asc.wav |
| **160545 Hours** | • Officer Sanders (5565) advising Dispatcher Fabus that Officer Adams (5564) suffered a laceration and is en route to the hospital. |
| **Audio** | 0000000117_PAAC_Police_2016-01-31_16_05_45_by_ui_startdate_asc.wav |