IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CALISIA KELLEY and JOHNNIE MAE
KELLEY, Co-Administrators of the
ESTATE OF BRUCE KELLEY JR.,
deceased,

                    Plaintiffs,

Vs.

BRIAN O'MALLEY, both
in his Official and Individual Capacities
as Sergeant for the Allegheny County Port
Authority and DOMINIC RIVOTTI, in both his
Official and Individual Capacities as Officer for
the Allegheny County Port Authority,

        Defendants, Jointly and Severally.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 2:17-cv-1599 NBF

TYPE OF PLEADING:

PLAINTIFFS' APPENDIX IN
OPPOSITION TO
DEFENDANTS' SUMMARY
JUDGMENT MOTION.

NATURE OF COMPLAINT:
Section 1983 Civil Rights Action
Excessive/Deadly Force

FILED ON BEHALF OF:
Calisia Kelley and Johnnie Mae
Kelley, Co-Administrators of
the Estate of Bruce Kelley, Jr.,
deceased.

BY:
Noah Geary, Esquire
Suite 225
Washington Trust Building
Washington, PA 15301
724-222-3788
PA ID 78382

June 4, 2021

## TABLE OF CONTENTS:

|  |  |  | *Page #:* |
|---|---|---|---|
| 1. | EXHIBIT 1 | AUTOPSY REPORT OF BRUCE KELLEY, JR. | 1 |
| 2. | EXHIBIT 2 | AERIAL VIEW OF WHITNEY AVENUE FROM THE DEFENDANTS' OWN EXHIBIT, THEIR "TIMELINE OF EVENTS" | 22 |
| 3. | EXHIBIT 3 | AFFIDAVIT OF DISTANCES, PLAINTIFFS' INVESTIGATOR | 24 |
| 4. | EXHIBIT 4 | USE OF FORCE POLICY- PORT AUTHORITY POLICE DEPARTMENT (PAT) | 28 |
| 5. | EXHIBIT 5 | K-9 POLICY- PAT | 33 |
| 6. | EXHIBIT 6 | MENTAL HEALTH RECORDS OF BRUCE KELLEY, JR. | 42 |
| 7. | EXHIBIT 7 | DEPOSITION TRANSCRIPT OF DEFENDANT BRIAN O'MALLEY | 46 |
| 8. | EXHIBIT 8 | DEPOSTION TRANSCRIPT OF DEFENDANT DOMINIC RIVOTTI | 198 |
| 9. | EXHIBIT 9 | DEPOSITION TRANSCRIPT OF OFFICER THOMAS ADAMS | 298 |
| 10. | EXHIBIT 10 | DEPOSITION TRANSCRIPT OF OFFICER EMILY HAMPY | 306 |
| 11. | EXHIBIT 11 | PHOTOGRAPHS OF UTILITY KNIFE POSSESSED BY BRUCE KELLEY, JR. | 310 |

|  |  |  | *Page #:* |
|---|---|---|---|
| 12. | EXHIBIT 12 | DEPOSITION TRANSCRIPT OF OFFICER ANDREW KAUPINIS | 316 |
| 13. | EXHIBIT 13 | TRANSCRIPT OF INTERVIEW OF DEFENDANT BRIAN O'MALLEY BY ALLEGHENY COUNTY POLICE DEPARTMENT (ACPD) | 339 |
| 14. | EXHIBIT 14 | INTERVIEW SUMMARY OF DEFENDANT DOMINIC RIVOTTI BY ACPD | 369 |
| 15. | EXHIBIT 15 | DEFENDANTS' TIMELINE OF EVENTS (18 PAGES) | 398 |
| 16. | EXHIBIT 16 | PREMILIMINARY HEARING TRANSCRIPT OF BRUCE KELLEY, SR, MARCH 3RD, 2016. | 417 |
| 17. | EXHIBIT 17 | DEPOSITION TRANSCRIPT OF OFFICER KYHROE SANDERS | 420 |
| 18. | EXHIBIT 18 | INTERVIEW SUMMARY OF OFFICER EMILY HAMPY BY ACPD | 423 |
| 19. | EXHBIT 19 | INTERVIEW SUMMARY OF OFFICER THOMAS ADAMS BY ACPD | 426 |
| 20. | EXHIBIT 20 | INTERVIEW SUMMARY OF OFFICER BRIAN O'MALLEY BY ACPD | 429 |
| 21. | EXHIBIT 21 | INTERVIEW SUMMARY OF OFFICER DOMINIC RIVOTTI BY ACPD | 432 |
| 22. | EXHIBIT 22 | DEPOSITION TRANSCRIPT OF OFFICER GRANGER | 435 |

_Page #:_

23.   **EXHIBIT 23**      **PHOTOGRAPHS OF BRUCE KELLEY, JR.'S**        439
                          **BODY**

24.   **EXHIBIT 25**      **D.A. ZAPPALA'S REPORT**                     443

# EXHIBIT 1

1

 **COUNTY OF**  **ALLEGHENY**

RICH FITZGERALD
COUNTY EXECUTIVE

BRUCE  KELLEY JR                                        FEBRUARY 01, 2016

CASE NO.:  16COR00901

FINAL PATHOLOGICAL DIAGNOSES:

I. **PENETRATING GUNSHOT WOUND OF THE TRUNK (A):**
   A. Entrance location:  Right anterior lateral neck
   B. Range:  Indeterminate
   C. Injuries:  The bullet lacerates the skin, subcutaneous tissues and muscles of the neck/chest, the right anterior 1st intercostal space, right lung, vena cava, right lobe and caudate lobe of the liver, terminal ilium, and muscles of the left anterior inguinal region
   D. Direction:  Right to left and downward
   E. Recovery:  Medium caliber jacketed hollow point bullet from the left anterior inguinal region

II. **PENETRATING GUNSHOT WOUND OF THE TRUNK (B):**
   A. Entrance location:  Right upper back
   B. Range:  Indeterminate
   C. Injuries:  The bullet lacerates the skin, subcutaneous tissues and muscles of the back and fractures the right posterior ribs 3 – 9
   D. Direction:  Back to front and downward
   E. Recovery:  Medium caliber deformed and fragmented jacketed hollow point bullet from the right mid back

III. **PERFORATING GUNSHOT WOUND OF THE TRUNK (C):**
   A. Entrance location:  Left upper lateral chest
   B. Range:  Indeterminate
   C. Injuries:  The bullet lacerates the skin, subcutaneous tissues and muscles of the chest, left 3rd intercostal space, left lung, heart, right lung and fractures the right 5th rib laterally
   D. Direction:  Front to back, left to right and downward
   E. Exit location:  Right lateral chest

KARL WILLIAMS, MD, MPH, MEDICAL EXAMINER
OFFICE OF THE MEDICAL EXAMINER
1520 PENN AVENUE • PITTSBURGH, PA 15222
PHONE (412) 350-4800 • FAX (412) 350-4899
WWW.ALLEGHENYCOUNTY.US

AUTOPSY REPORT

Case No.:   16COR00901

Page 2 of 20

IV.     PENETRATING GUNSHOT WOUND OF THE CHEST (D):
   A. Entrance location:  Midline anterior chest
   B. Range:  Indeterminate
   C. Injuries:  The bullet lacerates the skin, subcutaneous tissues and muscles
      of the chest, sternum at the 2nd intercostal space and right 3rd rib
      anteriorly, right lung, aorta and $T_9$ vertebral body
   D. Direction:  Front to back
   E. Recovery:  Medium caliber deformed jacketed hollow point bullet from $T_9$
      vertebral body

V.     PENETRATING GUNSHOT WOUND OF THE TRUNK (E):
   A. Entrance location:  Left lateral flank
   B. Range:  Indeterminate
   C. Injuries:  The bullet lacerates the skin, subcutaneous tissues and muscles
      of the flank, fractures the left 9th rib, left lobe of the liver and stomach near
      the gastroesophageal junction
   D. Direction:  Front to back, left to right and downward
   E. Recovery:  Medium caliber deformed jacketed hollow point bullet from the
      right lower back

VI.    PENETRATING GUNSHOT WOUND OF THE TRUNK (F):
   A. Entrance location:  Right mid back
   B. Range:  Indeterminate
   C. Injuries:  The bullet lacerates the skin, subcutaneous tissues and muscles
      of the right mid back, right posterior ribs 6 – 7, left lung and left main
      bronchus
   D. Direction:  Back to front, right to left and upwards
   E. Recovery:  Medium caliber deformed jacketed hollow point bullet from the
      thoracic spine region

VII.   PERFORATING SUPERFICIAL GUNSHOT WOUND OF THE RIGHT UPPER
       EXTREMITY (G)
   A. Entrance location:  Right anterior medial forearm
   B. Range:  Indeterminate
   C. Injuries:  The bullet lacerates the skin, subcutaneous tissues and muscles
      of the right forearm
   D. Direction:  Front to back
   E. Exit location:  Right anterolateral forearm

AUTOPSY REPORT

Case No.:   16COR00901

Page 3 of 20

VIII.    EVIDENCE OF BLOOD ASPIRATION IN THE LUNGS

IX.    POSTMORTEM TOXICOLOGY TO FOLLOW WHEN COMPLETE

OPINION:

    Bruce Kelley, Jr., a 37 year old African-American male, died as a result of multiple gunshot wounds of the trunk.

MANNER OF DEATH:    Homicide

Todd Luckasevic, D.O., Associate Medical Examiner
alb

4

AUTOPSY REPORT

Case No.:   16COR00901

Page 4 of 20

NARRATIVE SUMMARY:

The autopsy was performed on February 01, 2016 at 9:00 A.M.

Todd Luckasevic, D.O., Associate Medical Examiner, Prosector

Lisa Leon, Autopsy Room Technician

Donald Kanai, Photographer

Detective Kevin McCool from Allegheny County Homicide was present during the examination

EXTERNAL EXAMINATION:

The body is that of a well-developed, adequately nourished African-American male, weighing 213 pounds, measuring 74 inches, and appearing to be consistent with the age of 37 years.

The body is unembalmed.

The body is clad in the following articles of wearing apparel:

- 1 pair of gray socks

- 1 pair of white socks

- Brown leather boots

- Black coveralls

- Black fleece gloves

- Black denim jeans

AUTOPSY REPORT

Case No.:   16COR00901

Page 5 of 20

- Brown leather belt with brown metal buckle

- Orange shorts

- Blue boxer briefs

- Gray hooded jacket

- Brown/black/white sweater

- Black ski mask

- Tan thermal long-sleeved shirt

- Gray thermal long-sleeved shirt

- White t-shirt

- Gray t-shirt

- White sleeveless t-shirt

There are 6 Taser probes attached to the black coveralls.  There are numerous gunshot holes of the coveralls, jacket, sweater, shirts and t-shirts corresponding to the gunshot wounds of the trunk.

The clothing is intact, soiled and wet with blood


The following articles of jewelry are present on the body:

- Yellow metal necklace with yellow metal cross pendant

- 4 rubber bracelets around the right wrist

- 5 rubber bracelets around the left wrist

AUTOPSY REPORT

Case No.:   16COR00901

Page 6 of 20

The temperature of the body is cool to the touch.  Rigor mortis is moderately well developed and present to an equal extent in all joints.  Pink, non-fixed, scanty livor mortis is evident over the posterior parts of the body, except in areas exposed to pressure, where it is absent.  The body shows no evidence of decomposition.

The skin is soiled, pale and wet with blood.

The head is normocephalic.

The head and face exhibit trauma which will be described below.  The head hair is black and of a short length.  The eyes are brown with pale conjunctivae.  The corneae and lenses are transparent.  No petechial hemorrhages are noted in the conjunctivae.  The pupils are regular, round, equal, central and measure 0.4 cm in diameter.  The external ears and external auditory canals are unremarkable.  The skeleton of the nose is intact, and no foreign material is present in the nostrils.  No foreign material is present in the oral cavity.  The gums are normal.  The upper and lower teeth are natural and in a fair state of dental repair.  The front upper teeth are remotely absent.  The lips, oral mucosa and the tongue reveal no evidence of trauma.

A black mustache and beard are present.  There are elastic blue yellow and black ties in the beard.

The neck is symmetrical and reveals trauma to be described below.  No increased mobility on manipulation is detected.

The shoulders are symmetrical.

7

AUTOPSY REPORT

Case No.:   16COR00901

Page 7 of 20

The chest is symmetrical and exhibits trauma which will be described below. The breasts are symmetrical.

The abdomen is flat and no masses can be palpated through the abdominal wall.

The back is symmetrical and exhibits trauma which will be described below.

The external genitalia and the anus are unremarkable.   The testes are palpable in the scrotum.   No injuries of the upper thighs, perineum or anus are detected.  No foreign bodies or hemorrhages are noted in the anal canal.

The extremities are symmetrical and exhibit trauma which will be described below.   Brown paper bags have been placed about both hands and secured at the area of the wrists by tape.  No broken or missing fingernails are noted.  The hands are bloody and soiled with dirt.   The fingernails are regular, dirty, short and unremarkable.   The toenails are dirty, short and unremarkable.   There is some clubbing of the fingernails.   The skin of the legs does not exhibit brown dyspigmentation or dystrophic changes.  Pitting edema is not present in the ankles or legs.  The soles of the feet are clean and unremarkable.

Manipulation of the neck, shoulders, elbows, wrists, fingers, hips, knees and ankles fails to elicit any bony crepitus or abnormal motion.

8

AUTOPSY REPORT

Case No.:   16COR00901

Page 8 of 20

The body shows the following evidence of recent physical injury:

I.   <u>Multiple Gunshot Wounds of the Trunk and Extremities (7 lettered for convenience without regard to chronology)</u>

A.   <u>Penetrating Gunshot Wound of the Trunk</u>

On the right anterolateral neck, centered 8 ½ inches from the top of the head and 3 ½ inches right of the anterior midline is a ¼ inch round gunshot wound of entrance with a concentric abrasion margin measuring up to ⅛ inch.   There are associated irregular abrasions located at the 11 o'clock position of the wound measuring up to ½ inch and ¼ inch at the 9 o'clock position.   There is no soot or gunpowder stippling present on the skin.   The bullet creates a hemorrhagic and destructive wound path through the skin, subcutaneous tissues and muscles of the right neck and upper right chest.   The bullet then courses between the clavicle and right anterior 1st intercostal space.   The bullet then lacerates the right lung, vena cava, right lobe and caudate lobe of the liver, the terminal ileum, and muscles of the left anterior inguinal region.   Within the muscles of the left anterior inguinal region, centered 28 inches from the top of the head and 4 inches left of the anterior midline a medium caliber jacketed hollow point bullet is recovered.   The path of the bullet is from right to left and downward.

AUTOPSY REPORT

Case No.:   16COR00901

Page 9 of 20

B.  <u>Penetrating Gunshot Wound of the Trunk</u>

On the right upper posterior back, centered 9 ½ inches from the top of the head and 4 inches right of the posterior midline is a ¼ inch round gunshot wound of entrance with a concentric abrasion margin measuring up to ⅛ inch.  There is no soot or gunpowder stippling present on the skin.  The bullet creates a hemorrhagic and destructive wound path through the skin, subcutaneous tissues and muscles of the right upper back.  The bullet then fractures the posterior paraspinal surfaces of the right posterior ribs 3 – 9.  Within the subcutaneous tissues of the right mid back centered 22 ½ inches from the top of the head and 4 ¼ inches right of the posterior midline is a 1 inch triangular defect with underlying deformed and fragmented medium caliber jacketed hollow point bullet that is recovered. The path of the bullet is from back to front and downward.

C.  <u>Perforating Gunshot Wound of the Trunk</u>

On the left upper lateral chest, centered 12 ¾ inches from the top of the head and 5 ½ inches left of the anterior midline is a ¼ inch round gunshot wound of entrance with a concentric abrasion margin measuring up to $1/16$ inch.   There is no soot or gunpowder stippling present on the skin. The bullet creates a hemorrhagic and destructive wound path through the skin, subcutaneous tissues and muscles of the chest.   The bullet then enters the left chest cavity by coursing through the left 3rd intercostal space

AUTOPSY REPORT

Case No.:   16COR00901

Page 10 of 20

anteriorly.  The bullet then lacerates the left lung, the heart, and the right lung.  The bullet then exits the right lateral chest by fracturing the right 5th rib laterally.  On the right lateral chest, centered 19 inches from the top of the head and 8 ½ inches right of the anterior midline is a ½ inch linear gunshot wound of exit.  The path of the bullet is from front to back, left to right, and downward.

D.  Penetrating Gunshot Wound of the Chest

On the anterior midline chest, centered 14 ¾ inches from the top of the head and at the anterior midline is a ¼ inch round gunshot wound of entrance with a concentric abrasion margin measuring up to $1/16$ inch. There is no soot or gunpowder stippling present on the skin.  The bullet creates a hemorrhagic and destructive wound path through the skin, subcutaneous tissues and muscles of the chest.  The bullet then fractures the sternum at the 2nd intercostal space and right 3rd rib anteriorly.  The bullet then lacerates the right lung, aorta, and the T9 vertebral body. Within the vertebral body of the 9th thoracic vertebra, a deformed medium caliber jacketed hollow point bullet is recovered.  The path of the bullet is from front to back.

E.  Penetrating Gunshot Wound of the Trunk

On the left lateral flank, centered 21 ¼ inches from the top of the head and 9 ½ inches left of the anterior midline is a ¼ inch round gunshot wound of

AUTOPSY REPORT

Case No.:   16COR00901

Page 11 of 20

entrance with a concentric abrasion margin measuring up to $1/16$ inch. There is no soot or gunpowder stippling present on the skin. The bullet creates a hemorrhagic and destructive wound path through the skin, subcutaneous tissues and muscles of the left flank. The bullet then enters the left abdominal cavity by fracturing the left 9[th] rib laterally. The bullet then injures the left lobe of the liver and the stomach near the gastroesophageal junction. Within the subcutaneous tissues of the right lower back, a medium caliber deformed jacketed hollow point bullet is recovered. This bullet is recovered from the right lower back centered 24 ½ inches from the top of the head and 4 inches right of the posterior midline creating a small slit-like ⅛ inch laceration to the skin. The path of the bullet is front to back, left to right and downward.

F.   Penetrating Gunshot Wound of the Trunk

On the right mid back, centered 21 ½ inches from the top of the head and 4 ½ inches right of the posterior midline is a ¼ inch round gunshot wound of entrance with a concentric abrasion margin measuring up to $1/16$ inch. There is no soot or gunpowder stippling present on the skin. The bullet creates a hemorrhagic and destructive wound path through the skin, subcutaneous tissues and muscles of the right mid back. The bullet then fractures the right posterior ribs 6 – 7. The bullet then lacerates the left lung including the left main bronchus. Within the left main bronchus near

AUTOPSY REPORT

Case No.:   16COR00901

Page 12 of 20

the mid thoracic spine region, a deformed medium caliber jacketed hollow point bullet is recovered.  The path of the bullet is from back to front, right to left and upwards.

G.  <u>Superficial Perforating Gunshot Wound of the Right Upper Extremity</u>

On the right anterior medial forearm, centered 18 inches from the top of the right acromion process is a ½ inch round gunshot wound of entrance. There is no soot or gunpowder stippling present on the skin.  The bullet creates a hemorrhagic and destructive wound path through the skin, subcutaneous tissues and muscles of the right forearm.  On the right anterior lateral forearm, centered 18 inches from the right acromion process is an oval-shaped, 1 inch gunshot wound of exit.  The path of the bullet is from front to back.

<u>Additional Injuries</u>:

- Red abrasion ¼ x ¼ inch of the right mid abdomen

- Small superficial laceration ¼ x $^1/_{16}$ inch of the anterolateral base of the left thumb

- Superficial laceration ¼ x $^1/_{16}$ inch of the left ear


Evidence of recent medical/surgical treatment:

1.  There are 4 adhesive electrocardiogram electrodes on the chest.

AUTOPSY REPORT

Case No.:   16COR00901

Page 13 of 20

Other identifying features:

- Tattoo depicting the name "Bruce" of the left upper arm

- Remote linear scar 3 x ½ inch of the left antecubital fossa

- Remote hyperpigmented scar 1 ½ x ½ inch of the dorsal left middle finger

- Remote scar ¼ x ¼ inch of the left anterior medial knee

- Remote scar 1 x 1 inch of the left anterior knee

- Remote scar 1 ½ x ½ inch of the right anterior knee

- Remote scar 2 x 1 inch of the right anterior knee

- Remote linear scar 2 x ¼ inch of the right anterior thigh


An Allegheny County Medical Examiner's identification tag is present around the left ankle.

No fresh needle marks or punctiform scars are noted in either antecubital fossa, interphalangeal spaces of the hands or feet, under the tongue or on the gums.

14

AUTOPSY REPORT

Case No.:   16COR00901

Page 14 of 20

INTERNAL EXAMINATION:

BODY CAVITIES:

The body is opened by a "Y" shaped incision.  The abdominal fat pad is 2.4 cm thick at the umbilicus.  The muscles of the chest and abdominal wall are normal in color and consistency.  The ribs, sternum and spine exhibit fractures as described above.  The pleurae are smooth.  Each pleural cavity contains 500 cc of blood.  The domes of the diaphragm are normally positioned.  The peritoneum is smooth and thin and contains brown gastric contents.  The peritoneal cavity contains 500 cc of blood.  The liver and spleen do not extend below the costal margins.  The bladder lies below the symphysis pubis.  The organs of the pleural and peritoneal cavities are in their usual positions in situ.  The mesentery and omentum are unremarkable.  The pulmonary artery is opened in situ and no emboli are seen.

At this time representative samples of blood, urine, bile and eye fluid are taken for toxicological examination.

CARDIOVASCULAR SYSTEM:

The heart weighs 340 grams.  The pericardium is thin, smooth and contains 50 cc of blood.  The epicardial surface is smooth.  There is a moderate amount of epicardial fat.  The external configuration of the heart is unremarkable.  The chambers of the heart are of normal size.  The right and left ventricles reveal bullet lacerations.  The endocardium and valve leaflets are smooth, transparent and exhibit no thrombi, vegetations or fibrosis. The circumference of the valves are as follows:

AUTOPSY REPORT

Case No.:   16COR00901

Page 15 of 20

tricuspid: 12 cm; pulmonic: 8.1 cm; mitral: 12 cm and aortic: 7.2 cm. The mitral valve is lacerated by a bullet path. The trabeculae carneae and papillary muscles are unremarkable. The chordae tendineae are usual. The right ventricle is 0.4 cm thick, and the left ventricle is 1.4 cm thick. The septum is 1.6 cm thick. The coronary arteries have their usual distribution with a right predominance. The right and left coronary ostia are normal in patency. Multiple cross-sections of the coronary arteries, at 0.2 cm intervals show the following pathological changes: Left anterior descending coronary artery reveals tunneling for a length of 2 cm and depth of 0.3 cm. The myocardium is of the usual consistency, red-brown and grossly homogeneous.

The aorta is lined by a smooth, tannish-yellow endothelium and is unremarkable except for a large bullet laceration at the level of T9.

The bifurcation of the iliacs is patent.

The venae cavae reveals bullet lacerations as described above.

RESPIRATORY SYSTEM:

The right lung weighs 430 grams, and the left lung weighs 470 grams. The tracheal mucosa is unremarkable. The pleurae are smooth, delicate and glistening. The lungs are not distended and are variegated pink-gray to dark purple. The lung parenchyma is of the usual consistency and mottled with a slight amount of anthracotic pigment. The lung tissue is moderately congested and reveals blood aspiration. No purulent exudate is expressed from the parenchyma on compression.

AUTOPSY REPORT

Case No.:   16COR00901

Page 16 of 20

No nodularity and no focal or diffuse lesions are seen.  There are numerous bullet lacerations of the lungs.

The extra and intra-pulmonary bronchi are opened longitudinally, patent and unremarkable.  The pulmonary arteries and veins exhibit no pathological change. The hilar and mediastinal lymph nodes are unremarkable.

HEPATOBILIARY SYSTEM:

The liver weighs 1690 grams.  The capsule of Glisson is transparent.  The external surface is smooth, glistening and reddish-brown.  The borders are sharp. The parenchyma is of the usual consistency, congested and brown/red with the usual lobular architecture and no focal or diffuse lesions.  There are bullet lacerations of the liver as described above.

The gallbladder has delicate walls, contains 10 cc of green thin bile and has a smooth mucosa.  No stones are present.

The intra and extra-hepatic biliary ducts are patent.  The hepatic and portal veins and the hepatic artery are unremarkable.

HEMOLYMPHATIC SYSTEM:

The spleen weighs 110 grams and is of the usual consistency.  The capsule is glistening and intact.  The internal architecture is blurred due to congestion.  The parenchyma is homogeneous.

There are no enlarged lymph nodes identified.

AUTOPSY REPORT

Case No.:   16COR00901

Page 17 of 20

GASTROINTESTINAL SYSTEM:

The esophagus is empty and unremarkable.  The stomach contains 50 cc of brown, partially digested food.  There are no drug-like residues, pills or capsules in the stomach.  The stomach mucosa is pale with the usual rugal folds.  The remainder of the gastrointestinal system is unremarkable.  There is a bullet perforation of the terminal ileum.

The vermiform appendix is identified and contains no obstructions.

The retroperitoneum is unremarkable.

PANCREAS:

The pancreas weighs 130 grams.  The parenchyma is tan-white and homogeneous.

UROGENITAL SYSTEM:

The kidneys are in the usual position and without malformation.  The right kidney weighs 160 grams, and the left kidney weighs 190 grams.  The surfaces are slightly granular.  The capsules strip easily, revealing a gray-brown surface.  The cortico-medullary junctions are well-defined.  The renal papillae have no hemorrhage or necrosis.  The calyceal and collecting systems are not remarkable.  The renal arteries and veins are unremarkable.

The ureters are not dilated or obstructed.

The bladder contains 50 cc of clear yellow urine.  The bladder exhibits the usual tannish-pink mucosa with no focal lesion.  The ureteral orifices are patent.

AUTOPSY REPORT

Case No.:   16COR00901

Page 18 of 20

The prostate is not enlarged and does not impinge upon the urethra.   The tissue of the prostate is lobulated, tan and moderately firm.

ADRENALS:

Both adrenals are of the usual size and shape.   The cut surface shows a thin yellow cortex and brown-gray medulla.

MUSCULOSKELETAL SYSTEM:

There are no gross bony deformities.   The muscles are well-developed and of the usual color and consistency.   No fractures, dislocations, compressions or hemorrhages are noted upon examination of the spine.   The vertebral bodies are not remarkable.   No hemorrhages are noted in the paravertebral muscles.   The sternum, ribs and spine exhibit the usual bone density and marrow.

NECK:

The soft tissues of the neck, the thyroid and cricoid cartilages, larynx, and the hyoid bone show no hemorrhages or evidence of traumatic injury.   The thyroid gland weighs 20 grams.   The parenchyma is reddish-brown and homogeneous.   The laryngeal mucosa is pink/smooth with no focal lesions.   There are no paratracheal hemorrhages or masses.   There is no food, vomitus or foreign material in the upper airway.   The epiglottis and vocal cords are unremarkable.   The neck has been examined at the conclusion of the autopsy, after the blood has drained and the tissues are dry.

AUTOPSY REPORT

Case No.:   16COR00901

Page 19 of 20

CENTRAL NERVOUS SYSTEM:

The scalp is reflected from mastoid process to mastoid process, revealing a 1 x 1 inch left temporal subgaleal hemorrhage.   The calvarium is intact and when removed, there is no evidence of epidural or subdural hemorrhages.  The dura mater is white, smooth and does not exhibit any stains or discolorations.   The leptomeninges are not remarkable.

The brain weighs 1560 grams and is of usual consistency.   The gyri occupy their usual position, and the sulci exhibit a normal depth.  The blood vessels at the base do not reveal any aneurysms or atherosclerosis.  The cranial nerves are grossly unremarkable.   The cerebral and cerebellar hemispheres are symmetrical and the surface does not display any scar tissue.  The ventricles contain the usual amount of colorless fluid.  The cerebellar tonsils are not herniated.  The left and right unci and hippocampus are not herniated.   Multiple sections through the cerebrum, cerebellum, pons, midbrain and medulla exhibit the usual internal pattern with no focal or diffuse lesions.

The pituitary gland is unremarkable.

The dura covering the vault and the base of the cranium is removed.

The basilar skull is intact.

The atlanto-occipital articulation is intact.   The odontoid process shows no fractures or dislocations.  The cervical spine appears to be intact.

AUTOPSY REPORT

Case No.:   16COR00901

Page 20 of 20

NOTE:

Gunshot residue testing from both hands was obtained at the beginning of the autopsy.

Other evidence obtained includes samples of scalp and pubic hair, fingernail clippings from both hands, clothing, and recovered bullets.

All evidence is obtained by Autopsy Technician Lisa Leon and placed in an appropriately labeled envelope, with the name of the deceased.   They will be submitted to the Forensic Science Laboratory Division of Allegheny County Medical Examiner's Office

MICROSCOPIC EXAMINATION:

The microscopic examination is held at the stage of block preparation.

# EXHIBIT 2

| Time | Type | Description |
|---|---|---|
| 155136 Hours | Audio | ● Officer reports on radio coming back out to Whitney Avenue.<br>000000107_PAAC_Police_2016-01-31_15_51_36_by_ui_startdate.asc.wav |
| 155153 Hours | Audio | ● Indiscernible transmission.<br>000000108_PAAC_Police_2016-01-31_15_51_53_by_ui_startdate.asc.wav |
| 155206 Hours | Audio | ● Officer Ravotti (5566) reports shots fired on Whitney Avenue and requests a medic.<br>● Dispatch acknowledges.<br>000000109_PAAC_Police_2016-01-31_15_52_06_by_ui_startdate.asc.wav |

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CALISIA KELLEY and JOHNNIE MAE KELLEY, Co-Administrators of the ESTATE OF BRUCE KELLEY JR.,** deceased, | ) ) ) ) | Civil Action No. 2:17-cv-1599 NBF |
| | ) | **TYPE OF PLEADING**: |
| **Plaintiffs,** | ) ) ) | **AFFIDAVIT of MICHAEL PALUSELLI.** |
| | ) ) ) | |
| | ) ) | **NATURE OF COMPLAINT:** Section 1983 Civil Rights Action Excessive/Deadly Force |
| Vs. | ) ) ) | **FILED ON BEHALF OF:** Calisia Kelley and Johnnie Mae |
| **BRIAN O'MALLEY,** both in his Official and Individual Capacities as Sergeant for the Allegheny County Port Authority and **DOMINIC RIVOTTI**, in both his Official and Individual Capacities as Officer for the Allegheny County Port Authority, | ) ) ) ) ) ) ) ) | Kelley, Co-Administrators of the Estate of Bruce Kelley, Jr., deceased. |
| **Defendants, Jointly and Severally.** | ) ) ) ) ) ) ) ) | **BY:** Noah Geary, Esquire Suite 225 Washington Trust Building Washington, PA 15301 724-222-3788 PA ID 78382 |

June 3, 2021

**JURY TRIAL DEMANDED.**

### AFFIDAVIT of MICHAEL PALUSELLI.

1.    My name is Michael Paluselli.

2.    I am an Investigator in the Commonwealth of Pennsylvania.

3.    I have been an Investigator since 1991.

4.    I was hired by attorney Noah Geary, Esquire to take measurements in this case from the scene of the shooting death of Bruce Kelley, Jr. in Wilkinsburg.

5.    If called to testify, I could testify competently to all of the facts set forth in this Affidavit.

6.    I have personal knowledge of all of the facts in this Affidavit.

7.    I personally measured the following distance from the following points this day:

   i.    From the bottom of the first step of the steps going up to the front entrance of 710 Whitney Avenue to the edge of the opposite (North) side of the sidewalk on the other (North) side of Whitney Avenue. This distance includes: the yard in front of 710 Whitney Avenue, the sidewalk adjacent to the yard in front of 710 Whitney Avenue, the section of grass in between the sidewalk and the (South) edge of Whitney Avenue, the entire width of and across Whitney Avenue, the section of grass in between the edge of Whitney Avenue on the North side of the street, and the sidewalk on the North side of Whitney Avenue.

   ii.    When I face the house at 710 Whitney Avenue, I am oriented facing South. The Busway is to my right (West). Center Avenue is to my left (East).

   iii.    The distance measures 58 feet.

June 3, 2021

_____
Michael Paluselli

**VERIFICATION:**

I, Michael Paluselli, hereby verify that the facts and statements made within are true and correct to the best of my knowledge, information and belief. I understand that false statements herein made are subject to the penalties of **Title 18 Pa. C.S.A. Section 4904,** relating to unsworn falsification to authorities.

Date:   June 3, 2021

Michael Paluselli

# EXHIBIT 4

Policy & Procedure Manual
PAAC Transit Police
July 2013

## Section 3-4
## USE OF FORCE

**PURPOSE:**

To provide police officers with guidelines on the use of deadly and non-deadly force.

**POLICY:**

The use of excessive and/or unnecessary force by a police officer is the ultimate discourtesy and misconduct. Brutality is the use of force where it is not required. The justifiable use of force where it is authorized under the law in making an arrest, in preventing the escape of a criminal or in protecting the life of the officer or of another person is not brutality. Officers will use physical force only when the exercise of persuasion, advice and warning is found to be insufficient to obtain cooperation and will use only the minimum degree of such physical force necessary on any particular occasion. This should not be interpreted to mean any officer should hesitate to act or retreat from the performance of his sworn duty when immediate physical response is required.

It therefore is the policy of this department that police officers shall use only the force that is reasonably necessary to effectively bring an incident under control while protecting the lives of the officer or another person.

**DEFINITIONS:**

**DEADLY FORCE** is defined as the force which is applied under circumstances that would cause a reasonable and prudent person to consider such circumstances as capable of causing death or serious bodily injury.

**NON-DEADLY FORCE** is defined as any force other than that which is considered deadly force.

**USE OF NON-DEADLY FORCE:**

Where deadly force is not authorized, officers should assess the incident in order to determine which non-deadly technique or weapon will best de-escalate the incident and bring it under control in a safe manner.

Police officers are authorized to use department approved non-deadly force techniques and issued equipment for resolution of incidents as follows:

   a.  To protect themselves or another from physical harm or

   b.  To restrain or subdue a resistant individual or

   c.  To bring an unlawful situation safely and effectively under control.

22

Policy & Procedure Manual
PAAC Transit Police
July 2013

Statistics show a significant decrease in police fatalities due to the use of body armor.  It is the aim of the Port Authority Police Department to provide each officer with a ballistic vest at no cost to the officer.

## NON-DEADLY FORCE WEAPONS AND METHODS:

1. A police officer is not permitted to use non-deadly weapons unless they have been trained by a qualified instructor in its proficient use as determined by training procedures.

2. The following non-deadly weapons are authorized:

   a. Night Stick
   b. ASP Tactical Police Baton
   c. Tactical OC Aerosol
   d. Taser X26/X2
   e. 40mm less lethal launcher
   f. NFDD-Noise Flash Diversionary Devices
   g. Shotgun Impact/ Oleresin Capsicum munitions
   h. 40 mm launchable gas/smoke

   - *The Taser shall not be used on pre-teen children or pregnant women.*
   - *All care shall be taken so as not to deploy the Taser in the area of the head and neck of a suspect.*
   - *The Taser shall not be deployed in close proximity to flammable liquids.*
   - *The Taser shall be holstered on the officers non gun side and shall be yellow or distinctively marked not to look like a service weapon*
   - *Taser care. Probes will be removed by qualified medical personnel on the scene of the incident or at the hospital. All suspects that have been tasered by either a "drive stun" or probe deployment will be treated at a hospital.*
   - *The probe impact sight or drive stun sight will be photographed and the photos added to the case file.*
   ***After every Taser deployment, the DPM will be downloaded and the printout will be placed in the case file.***

## OFF DUTY WEAPONS:

The Port Authority Police Department does not require officers to carry an off duty weapon, therefore there is no established policy on off duty weapons. *Officers are required to meet MPOETC firearm qualifications with all of their duty weapons every year.*

23

Policy & Procedure Manual
PAAC Transit Police
July 2013

## REPORTING DISCHARGE OF FIREARM:

Each discharge of firearm will be reported to the member's immediate supervisor whether or not someone is injured by such discharge. A written report on the appropriate form will be made as soon as time and circumstances permit but in no event later than the end of his or her current tour of duty. If a member is incapacitated as a result of a shooting incident, the officer's immediate supervisor will submit the initial report.

For purposes of reporting a discharged of firearm, each discharge will be classified in one of three categories:

1.  **Firearm discharge with no injuries, including accidental discharge**

    A.  The following report procedures will apply:

        1.  The officer involved will immediately report the incident to his or her immediate supervisor.

        2.  The immediate supervisor will notify the Chief of Police and the Lieutenant in charge of the shift.

        3.  The officer involved will make all the usual reports for the incident in question.

        4.  The officer involved will make a Weapon Discharge Report.

        5.  The Lieutenant and /or Chief of Police will conduct an investigation into the circumstances surrounding the incident and make a determination as to whether or not the discharge was justified and consistent with Port Authority Police Policy. The Lieutenant will sign the back of the Weapon Discharge Report in the appropriate space, along with his or her conclusion and recommendation. This report will then be forwarded to the Chief.

        6.  All reports will then be forwarded to the Chief of Police, who will personally review all incidents.

2.  **Firearm discharge with injuries**

    A.  When a firearm is discharged and the result is injury or death to another person, the following procedures will apply:

        1.  The officer will determine the physical condition of the injured party and render first aid when appropriate. Medical assistance will be called immediately.

        2.  Communications will be notified of the incident and location in order that the proper officials may be notified.

24

Policy & Procedure Manual
PAAC Transit Police
July 2013

3.  The shift supervisor will respond immediately and secure the scene pending the arrival of the appropriate Homicide Unit (Pittsburgh or Allegheny County).

4.  All discharge weapons and ammunition will be confiscated by the immediate supervisor and be submitted for testing.

5.  The appropriate Homicide Unit (Pittsburgh or Allegheny County) will be the investigation body in charge of all shootings resulting in death or injury.

6.  The officer involved will not discuss the case with anyone except his supervisor, homicide investigators, his attorney, or other internal investigative personnel.

7.  The officer involved will make all the usual reports for the incident in question.

8.  The officer involved will make a Weapon Discharge Report.

9.  All reports will be forwarded through the chain of command to the Chief of Police, who will personally review all such incidents.

## 3.  Destruction of Animal

When a weapon is discharged to destroy an animal, the Weapon Discharge Report will be filled out and distributed through channels to the Chief of Police. Officers will receive approval from shift supervisor prior to destroying animal.

## POST SHOOTING PROCEDURES

When a shooting has occurred which results in the death of a person, the officer involved in such a shooting will as soon as possible after the incident be scheduled to undergo an emotional debriefing with the Employee Assistance Program (EAP). All debriefing sessions will remain confidential.

Psychological counseling will also be extended to family members of the officer or officers involved, if requested.

Any officer involved in a shooting in which he or she takes the life of another person will be placed on administrative leave directly upon completion of the primary report of the event. This leave will be without loss of pay or benefits, pending the result of the investigation. An assignment to administrative duty may also be in order but will not be interpreted to imply or indicate that the officer has acted improperly.

A procedural debriefing will be held at a later date for officers involved in any discharge of firearm whether or not there are injuries. The procedural debriefing will not be interpreted to imply or indicate any wrongdoing or violation of policy by participating officers. The Chief of Police will schedule such debriefing when appropriate.

0094

32

# EXHIBIT 5

Policy & Procedure Manual
PAAC Transit Police
July 2013

## Section 3-15
## ~~K9 POLICY~~

**I.    PURPOSE:**

The purpose of this policy is to provide guidelines for the management of the Port Authority Transit Police Dept. K9 Teams and the use of K9's and Handlers in the field of operations.  Because of a superior sense of smell, hearing and potential aggressiveness, the trained law enforcement K9 is a valuable supplement to Police personnel.  However, the utilization of K9's requires adherence to procedures that properly control their use of force potential and channel their specialized capabilities into legally acceptable crime prevention and control activities.  Police K9 Teams are maintained by the Port Authority Transit Police as a valuable law enforcement tool for use in criminal apprehension, evidence detection, explosive detection, locating both missing/criminal persons, control of civil disturbances and public relations activities.  The effectiveness of the K9 teams is dependent upon the intelligent application of their capabilities by all Police personnel.

**II.   K9 UNIT:**

The K9 Unit of the Port Authority Transit Police will consist of a Police Service Dog (K9) owned by the Agency and trained in the performance of special duties designated by the Chief Of Police.  The handler shall be a sworn Police Officer with the Port Authority (K9 Officer) who is trained in the operation, deployment and care of the K9.  This Officer shall be selected to the K9 Unit by guidelines set forth by the Chief Of Police.

**III.  SUPERVISION:**

K9 Officers are Police Officers first and will abide by the same rules, regulations, orders, directives that govern all members of the Port Authority Transit Police.  K9 Officers are under the general supervision of the shift supervisor of the shift that they are working.  All matters relating specifically to the K9 unit shall be the responsibility of the K9 Unit Supervisor designated by the Chief Of Police.  K9 Officers are to direct any problems involving them or their K9 to the K9 Unit Supervisor.  The K9 Supervisor has the oversight responsibility for the administrative and training needs of the Unit.  The K9 Supervisors responsibilities are to provide:

1.  Assist and aid in selecting Police Service Dogs for the Unit,

2.  Oversee the training of the K9 teams,

3.  Prepare demonstration schedules for the K9 Officers,

4.  Maintain statistical files if required by the Chief Of Police,

5.  Order supplies and equipment (when properly approved)  for the proper function of the Unit,

6.  Maintain relations with the designated Veterinarian,

7.  Prepare K9 Unit budget requests and submit them to the Chief Of Police,

8.  Handle K9 correspondence,

9.  Oversee K9 maintenance training classes,

10. Assist the Shift Supervisors with the proper knowledge necessary for the deployment of the K9 Units in the filed of operations,

11. Receive and make available current or updated information regarding training seminars,

12. Coordinates events and /or materials related to maintaining and supporting the K9 Team,

13. Act as a liaison with Command elements within the Department,

14. Establish and maintain a good working relationship between the K9 Teams and other Police/Agency Personnel,

15. And receive orders from administrative personnel and inform K9 Officers.

IV.   **EQUIPMENT/UNIFORMS:**

The K9 Officer is responsible for care and condition of all equipment issued to them for the use and training of their K9. All equipment shall be inspected regularly and kept in good working condition. Any lost or damaged equipment shall be reported to the K9 Supervisor. The K9 Officer, because of duties that extend beyond the range of a Patrol Officer, will be required to wear a specialized uniform that will be maintained through the Officers allowance. Officers are expected to maintain a professional appearance while on Duty.

V.    **K9 VEHICLES/KENNELS:**

Each K9 Officer will be assigned a marked K9 patrol vehicle that the Officer will be required to store at his/her residence while the K9 remains in service. This vehicle will only be used for Official Police related duties. The K9 vehicle will be used solely for K9 patrol purposes and will not be used for any other patrol duty or by a non-K9 Officer, unless an emergency situation dictates the need to use such vehicle. The K9 compartment of the vehicle must be kept clean /sanitary at all times. These compartments will be subject to routine inspections by the K9 Supervisor. While the K9 is inside the vehicle, the inside temperature must be safely maintained via the thermometer (heat monitoring system). Windows shall be kept open enough to allow sufficient airflow into the K9 compartment. When the K9 Officer leaves the vehicle unattended without the K9, the vehicle will be locked to prevent entry by unauthorized personnel and the K9 will be secured within the compartment. K9

60

Policy & Procedure Manual
PAAC Transit Police
July 2013

vehicles will be stored at the Police Station when the K9 Officer will be away from home for an extended period of time (3 or more days). When the Police Department provides a fixed outdoor kennel at the Officers residence, the Officer will be required to clean and maintain the Kennel and regularly sanitize the K9's living quarters. The Kennel shall be posted with warning signs to prohibit civilians from approaching the K9 and will be locked when the K9 is left unattended. The K9 Officer shall take the necessary steps to protect the K9 from unsafe or uncomfortable effects of the weather. If dangerous weather conditions are present or forecast (i.e.: extreme heat/cold storms) the K9 shall be removed from the outdoor kennel and brought to a place of safety inside the Officers Home.

## VI.   DUTIES:

The duties of the K9 Unit (Officer) will include, but not be limited to the following: The K9 Officer will engage in regular duties of a sworn Police Officer and will patrol areas on foot or in a vehicle as assigned. The K9 Officer will prepare and complete all reports required of a Patrol Officer except that of accident reports which he/she is not required to take unless no other Patrol Officer is available to take such report. In addition to all other required reports the K9 Officer will complete K9 Reports (i.e.: K9 Use report, K9 training Report, K9 apprehension report, K9 veterinary report). The K9 Officer will respond to calls for service when dispatched or requested by a Patrol Officer however the decision to deploy the Police K9 to a specific operation shall be the responsibility of the on-scene supervisor after conferring with the K9 Officer. The K9 Officer shall have the final decision not to deploy the K9. It is the responsibility of the K9 Officer to, when necessary, explain the K9's ability to the requesting Officer and determine if the K9's deployment is appropriate. All requests for Mutual Aid from other jurisdictions shall be coordinated and approved by the on-duty shift supervisor. However, subsequent to a review of the situation, the decision to physically deploy the K9 to a specific operation will remain with the Handler. If assistance to another agency is granted, the K9 Officer will have an additional Port Authority Police Officer sent to assist in the deployment of the Team.

## VII.   K9 OPERATIONS:

**Tracking (non criminal)** – A K9 Team may be utilized to track the scent trail of and locate humans. Examples of non criminal tracking would be missing children/persons, lost elderly or psychiatric patients. In the case of a non-criminal track the Patrol Officers should attempt to locate the exact area the missing person was last seen, and relay this information to the K9 Officer. All non criminal tracks should be done on a tracking lead however the K9 Officer should, if possible, explain to the family of the missing person that there is a risk of an accidental bite. The Family's approval should be obtained before the K9 is deployed.

**Tracking (criminal)** – When a suspect flees and contact is lost, Patrol Officers should attempt to pinpoint the area the suspect was last seen. This area should be protected from contamination and shown to the K9 Officer. The Patrol Officers should make an effort to set up a perimeter around the area to block the suspect's path of escape. If possible any unnecessary foot traffic should be avoided in the

61

36

Policy & Procedure Manual
PAAC Transit Police
July 2013

area where the suspect was last sent to avoid any type of contamination that could make the track more difficult for the K9 Team.

**Area Searches** – A K9 can be used effectively to search an area for hidden suspects who may be detected by scent or sound. When a suspect flees into an area where he may hide or conceal himself, unless in "hot pursuit," the Patrol Officers should not pursue him. Rather an evaluation of the need for a K9 team should be made if a crime has been committed and the suspect may be present. If the search is to be conducted in a locked or fenced in area, Police Communications shall be instructed to attempt to contact the owner to provide a key for safe entry of the K9 Team. A verbal warning or announcement shall be given stating that Police Officers are present and that a Police K9 will be released into the area if the suspect does not surrender immediately (i.e. "Port Authority Police K9 suspect surrender now or I will deploy a K9 and he will find you and bite you." In evaluating the search area for possible deployment of a K9, supervisors and K9 Officers shall consider the following:

1. Location,

2. Time of day,

3. Potential for injuries to Officers,

4. K9 Team and citizens,

5. Whether the search should be conducted on/off lead.

**Building Searches** – A primary use of a Police K9 Team is locating suspects in buildings or structures where a search by Patrol Officers may create an unnecessary risk. This type of search shall be governed by the following: The perimeter of the Building itself shall be secured by Patrol Officers. Whenever possible the Building owner shall be contacted to ascertain information of employees that may still be in the building. When a K9 search is anticipated the Patrol Officers should not conduct a preliminary search of the interior. The Officers shall not enter the search area without permission of the K9 Officer. Prior to conducting the search the Officers should make sure all tenants, employees etc. are out of the building in one secure location and remain outside until the operation is complete. Prior to releasing the K9 the K9 Officer will shout warnings into the structure that a Police K9 will be released. This warning will be repeated and a reasonable amount of time should be granted for response from the criminal. This warning shall be repeated inside the structure as the K9 Officer sees fit because buildings vary in size. (i.e. "Port Authority Police K9 surrender now or I will release a Police K9 and he will find you and bite you."

**Crowd Control** – Experience has shown that K9 Teams can provide valuable assistance in crowd control. However, some types of crowd control do not warrant the presence or use of a K9 Team. These include situations where the use of K9's would be divisive and psychologically damaging and may even create a

62

37

Policy & Procedure Manual
PAAC Transit Police
July 2013

more serious situation by disrupting a peaceful demonstration.  A K9 deployment
in a crowd control situation constitutes a "show of force "and should be approved
by the on Duty Supervisor.  If approval is granted the following procedures
should be followed: The K9 should remain on lead at all times, No offensive
action shall be taken unless instructed by the on Duty Supervisor or when the K9
Officer  reasonably believes  there is a threat of injury to Officers, the K9, or
innocent citizens.

## VIII.   CRIMINAL APPREHENSION/ARREST:

A K9 bite during an apprehension of a suspect will be classified as a use of force
incident. Thus, a K9 Officer must exercise good judgment when the possibility of an
injury to a suspect exists.  Port Authority Police K9's are considered less lethal
weapons in use of force incidents so when deployed the K9 Officer will consider the
following:

1.  The type and severity of the crime,

2.  Whether the suspect poses an immediate threat to the safety of Officers or the
    public,

3.  Whether the suspect is actively resisting arrest or attempting to avoid arrest by
    flight.

When a K9 is used to make an apprehension the K9 Officer shall, as soon as the
suspect is under control, command the K9 to release the suspect.  At no time will a
K9 be used in an apprehension situation for any summary offenses or to intimidate a
suspect after the suspect has been apprehended and under control of Officers. This,
however, should not be confused with a K9 escort where the K9 remains on lead and
is present while Officers may be placing a suspect inside a containment area (i.e.
Police vehicle, Holding Cell).  In any instance where the Handler encourages the K9
to make any unjustified apprehension on a person or takes part in any activity in
violation of Port Authority Police Department regulations, that K9 Officer shall be
subject to proper disciplinary action/or elimination from the K9 Unit.

## IX.   K9 APPREHENSIONS OF SUSPECT/INJURY TO CITIZEN/HANDLER INJURY:

The use of specially trained Police K9's for law enforcement purposes constitutes a
real or implied use of force.  Therefore, as in other cases, K9 Officers may employ
only that degree of force that is reasonable under circumstances known to the Officer
to apprehend or secure a suspect as governed by Port Authority Police Departments
Standards.  In all cases where a Police K9 is deployed or involved, a K9 Deployment
(Usage Report)  shall be completed.  Whenever a Police K9 apprehends (bites) an
individual, whether in the line of duty or not, the K9 Officer shall:

1.  Summon a Supervisor and Emergency Medical Personnel to the scene.

2.  Have the affected area examined to determine the seriousness of the
    ~~bite/wound.~~

3.  Take color photographs of the affected area (if possible, photographs should
    be taken prior to, as well as after medical treatment.

4.  Complete a K9 Usage report: This report must detail circumstances
    surrounding the incident, identity of the individual involved as well as
    witness, the extent of injury and measures taken in response to the incident.
    This report shall be completed as soon as possible and submitted through the
    chain of command.

In the event a K9 Officer is injured; fellow Officers shall take the following steps:

1.  Do not approach the K9 or K9 Officer.

2.  Do not attempt to give first aid unless the injury is life threatening.

3.  Attempt to have the K9 Officer control his K9.

4.  Contact another K9 Officer for assistance or the Handlers Family.

X.  **GENERAL GUIDELINES/DUTIES OF PATROL OFFICERS:**

For the safety of the K9 Officer, the general public and themselves, all members of
the Port Authority Police Department shall comply with the following guidelines
when in the presence of a K9 Team:

1.  Never agitate, engage in horseplay or use "K9 commands" without the
    permission of the K9 Officer.

2.  Always maintain a safe distance from the K9 team and make the K9 Officer
    aware of your presence and movements should he( K9 Officer) be engaged in
    K9 related matters.

3.  Do not attempt to pet or feed the K9 without permission of the K9 Officer.

4.  Should a Patrol Officer be confronted by a K9 the best tactic is to stand still
    and avoid any sudden movement or eye contact.  Any sudden movements may
    bring about an apprehension.  However, in the case of an accidental bite the
    Patrol Officer should not struggle or attempt to harm the K9 but rather notify
    the K9 Officer/Police Communications via radio.  In the event an Officer is
    accidentally bit see (IX).

Violations of the above conditions could result in disciplinary actions being taken
against the Officer(s).

64

## XI.   TRAINING/HEALTHCARE OF K9:

Port Authority Police K9 Officers shall maintain a membership in the North American Police Work Dog Association and train in accordance with the Standards established which is 16 hours a month. The Officers will remain a member "Good Standing " as long as they are active in the K9 Unit. All K9 Teams will maintain a yearly certification in all areas of Utility/Explosives, for which the K9 will be utilized, as per N.A.P.W.D.A. standards. The cost of this membership and any other membership beneficial to the K9 Unit and approved by the Chief Of Police will be covered by the Port Authority Police Department. All Departmental Police K9's will receive regular veterinary examinations and will receive all recommended vaccinations. In the event a Department K9 requires non-emergency veterinary care, the K9 Officer shall notify the K9 Unit supervisor prior to making the appointment with the Departments authorized veterinarian. In the event of a K9 life threatening medical emergency, the K9 Officer shall immediately transport the K9 to the designated K9 Trauma Center for immediate treatment. When possible the K9 Supervisor as well as the on duty Supervisor should be made aware of the situation. The cost of all K9 medical treatment (non/emergency) will be handled by the Port Authority Police Department while the K9 is classified as a "working Police K9". The K9 Officer is also responsible for maintaining proper feeding/grooming standards for the K9. When it is decided that the K9 is no longer able to perform its duties to the fullest the decision will be made to retire the K9. When this occurs the K9 Officer assumes responsibility for the retired Service Dog.

## XII.   EXPLOSIVE DETECTION TRAINING AIDS:

The Port Authority PD shall maintain on premises, in a designated area, a Type II Explosive Storage Magazine for the purpose of Explosive Detection K9 Training. The magazine will be approved by an Alcohol Tobacco and Firearms Inspector (ATF) as well as an agent from the Pennsylvania Dept. Of Environmental Protection and will not exceed 50 pounds of Explosives. On a designated area of the magazine will be posted a current copy of the PaDEP magazine storage license as well as an inventory of the stored explosives. The PaDEP explosive purchase permit will remain with the Chief Of Police and/or  K9 Supervisor and both permits shall be renewed yearly. The magazine shall also have a log sheet that will be utilized when any explosive is removed from the magazine for the purpose of K9 training. The K9 Officer that removes that explosives will document the name/amount of the explosive and the times it was removed/returned. Specific Keys for the magazine will be maintained by the K9 Officers and the Chief Of Police and /or K9 Supervisor. If keys to the magazine are lost/misplaced, the K9 Officer should report this immediately to the K9 Supervisor. Also, should there be a theft or loss of explosive material it should be reported immediately to the K9 Supervisor who will notify the ATF (1-888-ATF-2662). The designated K9 Supervisor shall be responsible for maintaining the Type II magazine in accordance with the regulations set forth by the ATF and Pennsylvania Dept Of Environmental Protection. At no time is the Type II magazine be used to store unapproved explosives or any item that is classified as an IED (improvised explosive device). In the event that explosive trainings are to transported by vehicle, they will be done so by utilizing an approved Explosive Storage Day box.

XIII.   **DUTIES OF THE PORT AUTHORITY POLICE COMMUNICATIONS PERSONNEL:**

In the event of a request from another Law Enforcement Agency, Communications Personnel shall immediately advise the Shift Supervisor on the particulars of the request. The Shift Supervisor will be responsible for approving the request and notifying the K9 Officer.

XIV.   **REQUEST FOR PUBLIC DEMONSTRATION:**

The Port Authority Police K9 unit may give public demonstrations to interested group(s) only on approval by the Chief Of Police.

41

# EXHIBIT 6

02/12/2014 document downloads, press CTRL+P to print. Then click on the contents close tab. Page 6/7

Confabulating:  No
Obsessive:  No
AFFECT
Yes No
Appropriate:  Yes
Inappropriate:  No
Suspicious:  No
Anxious:  No
Fearful:  No
Angry:  No
Elevated:  No
Labile:  No
Tearful:  No
Blunted:  No
Flat:  No
Sad:  No
COGNITIVE FUNCTION
Intellect: (Check if Yes):  Average
Orientation: (Check if Yes):  Person, Place, Time
THOUGHT CONTENT
Delusions:  No
Hallucinations:  Yes
BRUCE STATED HE HEARS VOICES WHEN HE'S NOT ON MEDICATION.
Hopelessness:  No
Helplessness:  No
Worthlessness:  No
Guilt:  No
Paranoid:  No
MEMORY IMPAIRMENT
Short Term:  No
Long Term:  No
Internal Motivation:  Fair
External Motivation:  Good
Judgment:  Poor
Insight:  Fair

## CONSUMER STRENGTHS

Consumer's Strengths:  .
"I'M GOOD AT PLAYING FOOTBALL, BASKETBALL AND DOMINOS. AND I LOVE TO COOK."

## DIAGNOSTIC IMPRESSION

Axis I: Clinical Disorders; Other Conditions That May be a Focus of Clinical Attention

Primary:  295.90 - UNSPEC SCHIZOPHRENIA, UNSPEC STATE

Secondary:  296.80 - 03 - BIPOLAR DISORDER, UNSPECIFIED

Axis II: Personality Disorders and Mental Retardation

Primary:  799.9 - DIAGNOSIS DEFERRED ON AXIS II

Axis III: General Medical Conditions

Primary:  NONE

Stressors:  Occupational, Housing, Economic, Access Healthcare

Axis V: Global Assessment of Functioning (GAF) Score:  46

02/12/2020 After downloads, press CTRL+P to print. Then either click on the Cancel to close, or a Page 7 of 7

| ADDITIONAL COMMENTS |
| --- |

**Additional Comments: :**
BRUCE WANT TO SEE A DOCTOR FOR MEDICATION MANAGEMENT. HE MAY CONSIDER SEEING A
THERAPIST AS WELL. BRUCE WAS SCHEDULED TO MEET WITH DENNIS ALEXY ON 9/19/14@9AM TO BEGIN
INDIVIDUALIZED OUTPATIENT TREATMENT SERVICES. HE WAS ALSO SCHEDULED TO MEET WITH
MICHELE G. FOR A BCM REFERRAL ON 9/22/14@1:15PM. HIS MEDICATION NECESSITY FORM WAS
COMPLETED AND SIGNED AND WILL BE MAILED BACK TO THE DPW OFFICE TODAY.

| Employee Signature | Consumer Signature | Supervisor Signature |
| --- | --- | --- |
| *Melody Day, BA* | | *Dawn Houston, MS* |
| 9/18/14 11:54 AM | 9/18/14 11:12 AM | 9/23/14 12:28 PM |
| Melody Day | | Dawn Houston |
| B.A. | | M.S. |

Supervisor's Signature
Approved by RLOBO on 9/19/14
Ronald Lobo, Psychiatrist, M.D. , Medical Director

02/12/2020   After document loads, press CTRL+P to print. Then click OK on the current tab or Page 2 of 7   Page: 2/7

## PSYCHIATRIC HISTORY

### MENTAL HEALTH

Outpatient:  Yes: Specify Next or Last Appointment
WASHINGTON COMMUNITIES - 3 YEARS AS A KID STARTING IN THE 5TH GRADE

Inpatient:  None

Family Psychiatric History / Treatment:  :
NONE REPORTED

### VEGETATIVE DISTURBANCES

VEGETATIVE DISTURBANCES: (Y if present/describe, N if not)

Yes No

Sleep:  Yes
"THAT'S WHY I'M TAKING THE BENADRYL." HE HAS TAKEN SLEEP MEDICATION FOR 4 YEARS.

Appetite:  No

Concentration:  No

## MEDICAL HISTORY

Medical Profile Details:
Date Created:09/18/2014Created By:Melody Day
Vision:Normal with correction
Hearing:Normal without correction
Mobility:Walks independently

Medical Conditions:Family Hx of Diabetes, Family Hx of Hypertension, Family Hx of Cardiovascular Disease

Current Medications / Dosages / Last Dose:
Medication:Benadryl 25 mg capsule
Start Date:9/18/2014
Dosage:3 tabs
Frequency:daily
Provider:

Medication:Risperdal 3 mg tablet
Start Date:9/18/2014
Dosage:1 tab
Frequency:daily
Provider:

Do you have a Medical Advanced Directive? (A Living Will directs your care when you are unable to do so):  No - Information not requested.

Do you have a Mental Health Advanced Directive? (Directs your care when you are unable to do so):  No - Information not requested.

Check all conditions that apply:

Possiblity of Recent Exposure (Y if present; N if not)

Pregnancy:  N/A

## SUBSTANCE ABUSE HISTORY

### TREATMENT

SUBSTANCE ABUSE / ADDICTIONS TREATMENT

Outpatient:  None

Inpatient:  None

Family Substance Abuse History / Treatment:  :
NONE REPORTED

Cigarette Smoking Status:  Current everyday smoker

### SUBSTANCE USE HISTORY

Current Usage: (within last 30 days):  Yes

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CALISIA KELLEY; and                     CIVIL ACTION
JOHNNIE MAE KELLEY,
Co-Administrators of the                No. 2:17-cv-01599-NBF
ESTATE OF BRUCE KELLEY,
JR., deceased,

Plaintiffs,

vs.                                     TRANSCRIPT

BRIAN O'MALLEY, both in his             VIDEOTAPED
Official and Individual                 DEPOSITION OF
Capacities as Sergeant for              BRIAN O'MALLEY
the Allegheny County Port
Authority; and DOMINIC
RIVOTTI, in both his
Official and Individual
Capacities as Officer for
the Allegheny County Port
Authority,

Defendants,
Jointly and Severally.                  TAKEN VIA ZOOM VIDEO CONFERENCE

                                        WEDNESDAY, OCTOBER 7, 2020


                                        Taken on behalf of Plaintiffs,
                                        Calisia Kelley and Johnnie Mae
                                        Kelley


                                        Counsel of Record for this Party:

                                        Noah Geary, Esquire
                                        Washington Trust Building
                                        6 South Main Street, Suite 225
                                        Washington, PA  15301
                                        724-222-3788

2

1   Videotaped deposition of Brian O'Malley, taken via Zoom video

2   conference on behalf of Plaintiffs, pursuant to Rule 30 of the

3   Federal Rules of Civil Procedure, by and before Rita A. Ross, a

4   Registered Professional Reporter and a Notary Public in and for

5   the Commonwealth of Pennsylvania, on Wednesday, October 7,

6   2020, commencing at 10:18 a.m., originating from the Law Office

7   of Noah Geary, 6 South Main Street, Suite 225, Washington,

8   Pennsylvania.

9                           -   -   -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1   APPEARANCES:

2

    On Behalf of the Plaintiffs:   (Mr. Geary and the Court Reporter
3   physically present at Mr. Geary's Washington office.)

4   Noah Geary, Esquire
    Washington Trust Building
5   6 South Main Street, Suite 225
    Washington, PA  15301
6   724-222-3788
    noahgearylawoffices@gmail.com

7

8   On Behalf of the Defendants:   (Mr. Evashavik and the Deponent
    physically present at Evashavik Law, LLC)
9

    Greg Evashavik, Esquire
10  Evashavik Law, LLC
    310 Grant Street, Suite 2901
11  Pittsburgh, PA  15219
    412-261-2813
12  greg@evashaviklaw.com

13

    Also Present:
14

    Robert Pealer, Videographer (Remotely)
15  Precise, Inc.
    429 Fourth Avenue, Suite 200
16  Pittsburgh, PA  15219
    866-277-3247
17

    Ms. Calisia Kelley (Present at Geary Law Office)
18  Ms. Johnnie Mae Kelley (Present at Geary Law Office)

19

20

21

22

23

24

25

4

                        I N D E X

WITNESS                                                    PAGE

BRIAN O'MALLEY

Examination by Mr. Geary                                      5

Examination by Mr. Evashavik                               125


DEPOSITION EXHIBITS PRESENTED TO THE WITNESS              PAGE

6       Incident 16-00683 - Assault Knife - Wilkinsburg    75
        Borough - Timeline

14      Use of Force Policy                               104

24      Answers to Interrogatories Directed to             11
        Defendant Brian O'Malley

25      Responses to Request for Production of Documents   14
        Directed to Defendant O'Malley

26      K-9 Policy                                        120

27      Facebook Posts                                    123

28      Interview of Jermaine Wofford and Interview of     --
        Kevin Abramovitz (exhibit not used)

29      NAPWDA K-9 Team Certification Test Sheet           49

30      Interview of Sergeant Brian O'Malley              109


DEPOSITION EXHIBIT MARKED FOR IDENTIFICATION             PAGE

31      Audio/Video Recorded Statement of Sergeant        129
        Brian O'Malley (digital media)

Brian O'Malley - Examination by Mr. Geary

5

1          (Whereupon, the deposition of Brian O'Malley

2    commenced at 10:18 a.m.)

3          THE VIDEOGRAPHER:  We are going on the record at

4    10:18 a.m. on Wednesday, October 7th, 2020.  This video is the

5    remote videotaped deposition via Zoom video conference of Brian

6    O'Malley, taken by the plaintiff in the matter of Calisia

7    Kelley versus Brian O'Malley, filed in the United States

8    District Court for the Western District of Pennsylvania.

9          My name is Bob Pealer, videographer and computer

10   technician employed by Precise, Inc.  And our court reporter is

11   Rita Ross, representing Ross Reporting Service.

12         Counsel, beginning with Plaintiff, please identify

13   yourselves for the record, and will the court reporter then

14   please swear in the witness.

15         MR. GEARY:  My name is Noah Geary.  I'm lawyer for

16   the plaintiffs in this case, Calisia Kelley and Johnnie Mae

17   Kelley, sister and mother of Bruce Kelley, Jr.

18         MR. EVASHAVIK:  I am Greg Evashavik.  I represent

19   both defendants.

20                    BRIAN O'MALLEY,

21   having been first duly sworn, was examined and testified as

22   follows:

23                    EXAMINATION

24   BY MR. GEARY:

25         Q.   Sir, good morning.  My name is Noah Geary.

Brian O'Malley - Examination by Mr. Geary

6

1    Obviously, I'm the lawyer for Calisia and Johnnie Mae Kelley.

2         A.    Good morning.

3         Q.    Can you see me?

4         A.    Yes, sir.

5         Q.    And can you hear me?

6         A.    Yes, sir.

7         Q.    Have you ever had your deposition taken before?

8         A.    No.

9         Q.    Okay.  So every lawyer at the beginning of a

10   deposition kind of lays out what -- you know, how -- what it is

11   and how we're to conduct ourselves.  So just a couple things.

12              Number one, you're under oath, obviously, so you

13   must testify truthfully.

14              A deposition is a question-and-answer session.  I go

15   first, and then Mr. Evashavik goes after me.  We can go back

16   and forth a little bit after that, if necessary.

17              If my questions are unclear or vague, you can ask me

18   to repeat it or to rephrase.  I'll try to make it more clear.

19   If I go too fast, you can tell me to slow down.

20              Sometimes a witness will jump in and anticipate an

21   answer and maybe talk over the lawyer a little bit or maybe the

22   lawyer kind of talks over the witness.  If that happens, not a

23   big deal, but the stenographer will interrupt us and make sure

24   that -- she has to write down everything that everybody says

25   during this, and if we're talking over each other, she just

7

1   needs to separate us and make sure she gets it down.

2           If you give verbal responses, please -- some

3   witnesses will shake their head yes or no.  Some witnesses will

4   answer uh-huh or huh-uh.  If that happens, I'll prod you "Is

5   that a yes or a no?"

6           If you need a break, please let me know.

7           I'll show you some exhibits, and I'll ask you some

8   questions off of those exhibits.  Before I do that, I want you

9   to take your time and read the entire exhibit, be comfortable

10  with it.  So when I ask you questions off the exhibits, I just

11  want you to be comfortable with the exhibit before I ask you

12  questions.  I think that's it.

13          Do you have any questions about any of -- any of

14  those things?

15      A.    No, sir.

16      Q.    Okay.  Are you ready to proceed?

17      A.    Yes, sir.

18      Q.    Okay.  Please state your name again and spell it for

19  us.

20      A.    Brian O'Malley.  B-r-i-a-n.  O'M-a-l-l-e-y.

21      Q.    And your age, please?

22      A.    47.

23      Q.    And do you still work for the Port Authority Police

24  Department, sir?

25      A.    Correct.

Brian O'Malley - Examination by Mr. Geary

8

1    Q.    Okay.  What's your rank as of today?

2    A.    Lieutenant.

3    Q.    And are there different levels of lieutenant or just

4    one level?

5    A.    One level.

6    Q.    Okay.  And can you give me the -- what's the

7    hierarchy at the Port Authority as far as rank?

8    A.    So it would be chief of police, lieutenant,

9    sergeant, detective sergeant, patrolman.

10   Q.    Are you on duty today, sir?

11   A.    Yes, sir.

12   Q.    What shift are you on?

13   A.    Today I work 1400 to 2200.  That's 2 p to 10 p.

14   Q.    Are you originally from the Pittsburgh area?

15   A.    Yes.

16   Q.    What part?

17   A.    South Hills.

18   Q.    And where did you go to high school, please?

19   A.    Canevin Catholic.

20   Q.    What year did you come out of there?

21   A.    1991.

22   Q.    And, what, did you go to W&J for college?

23   A.    Correct.

24   Q.    What year did you graduate from W&J?

25   A.    1995 into '96.  So '95-'96.

Brian O'Malley - Examination by Mr. Geary

9

1     Q.   And what was your major at W&J, please?

2     A.   Sociology.

3     Q.   What did you do immediately after you graduated from

4 college as far as employment or further education?

5     A.   I was employed with Dietrich Industries.  It's a

6 steel company in La Porte, Indiana.

7     Q.   Okay.  And, roughly, how long were you there?

8     A.   Through that summer.

9     Q.   And then what was your next employment, please?

10     A.   Well, then I attended the -- I left Dietrich

11 Industries to attend the Allegheny County Police Academy.

12     Q.   And there's reference in your interrogatories you

13 worked for Bean Beverage in Pittsburgh as a manager in 1996.

14 Is that correct?

15     A.   Yes.

16     Q.   Were you still in college at that point?

17     A.   No.  I had left.  I -- so when I left college, it

18 was Dietrich Industries, went to the police academy.  So there

19 was sort of an overlap.  And then I was pre-service, so I

20 didn't have -- I didn't have a job when I left the police

21 academy because you're pre-service, so that's when I ended up

22 getting hired with Bean Beverage.

23     Q.   And what do you mean "pre-service"?

24     A.   So in the state of Pennsylvania, when you attend --

25 if you're not hired by an agency, you can -- you can obtain an

Brian O'Malley - Examination by Mr. Geary

10

1  Act 120 certification, which is the police academy.  You can

2  pay to attend various institutions.  I know IUP.  I attended

3  the Allegheny County Police Academy, but some -- there's some

4  college institutions where you could attend and obtain that as

5  well.  So you're pre-service.  You don't have a job waiting for

6  you.

7       Q.    And then there's reference to a Banksville Beer in

8  Pittsburgh as a manager in '97.

9       A.    That's correct.

10      Q.    How long were you there roughly?

11      A.    Maybe -- I believe it might have been a few months,

12 close to a year.  Because that's when -- in '97 into '98 is

13 when I got hired with the Port Authority.

14      Q.    Okay.  So the academy, how long was the training

15 there in the academy?

16      A.    So when I attended, no longer than four months.  It

17 might have been 3 1/2 months, but it was no longer than four.

18      Q.    Okay.  And so prior to being hired by the Port

19 Authority, did you work in any job anywhere in your life in law

20 enforcement?

21      A.    Briefly, I worked for the Hanover Police Department,

22 which is -- I guess it's still called Star Lake.  They patrol

23 Star Lake.  I worked a couple shifts out there.  I don't know

24 if it's still called Star Lake.

25      Q.    Who was the chief there at the time?

Brian O'Malley - Examination by Mr. Geary

11

1    A.    I couldn't even tell you.

2    Q.    Roughly, how long were you at Hanover?

3    A.    Weeks.

4    Q.    Okay.  Separate from Hanover, any other work

5  experience at any law enforcement agency?

6    A.    No, sir.

7    Q.    Did you serve in the military?

8    A.    No, sir.

9          (Whereupon, Deposition Exhibit 24 was presented to

10  the witness.)

11  BY MR. GEARY:

12    Q.    If you could take a look at what's Exhibit 24.  It's

13  answers to interrogatories.  You already answered some written

14  questions.  I have some questions for you on a couple answers,

15  please.  And specifically, if you could take a look at No. 20.

16          I'm sorry.  I'm sorry.  I'm going to ask you about

17  No. 12 first, then 20.  Sorry.  So let's start with No. 12.

18  Did you get a chance to reread that?

19    A.    I'm reading it now.  Okay.

20    Q.    Have you had a chance to read that?

21    A.    Yes, sir.

22    Q.    Okay.  So No. 12, "Did any citizen or other officer

23  or superior ever make any complaint against you for use of

24  excessive/unreasonable force during your employment with the

25  Port Authority Police Department?"

Brian O'Malley - Examination by Mr. Geary

12

1    Your answer was "Yes."

2    Did I read that correctly?

3    A.    Yes.

4    Q.    Okay.  Detail for me who made the complaint against

5    you, what -- what time frame it was, and the nature of the

6    complaint.

7    A.    So that was a 2008 lawsuit.  It involved -- the

8    complainant was -- well, his last name was Bugno, and it

9    resulted from an arrest.  And it was a civil complaint, which

10   went to state court.

11   Q.    And what were the charges that you filed against

12   that person?

13   A.    I -- I did not file charges.

14   Q.    Okay.  What were the charges that were filed against

15   him, though.  The plaintiff.

16   A.    You know what, without looking at the case -- I

17   mean, this is in 2008.  I can't remember the exact charges.  I

18   believe it involved narcotics and resisting arrest.  There may

19   have been other charges.  I -- I just can't say right now.  But

20   I believe it was narcotics and resisting arrest and possibly an

21   aggravated assault.

22   Q.    What was the disposition of the criminal charges?

23   A.    I can't say.

24   Q.    And were you the only defendant named in the suit,

25   or were other officers sued as well?

Brian O'Malley - Examination by Mr. Geary

13

1    A.    There was another officer.

2    Q.    And who was that, please?

3    A.    Ron Fukas.

4    Q.    Okay.  And what were the -- what was the nature of

5  the allegations as far as excessive force?

6    A.    Excessive force.

7    Q.    I mean, like, physical?  Was it physical touching,

8  or was it the use of an ASP or what was the allegation against

9  you?

10    A.    So the main part of the allegation against myself

11  and Sergeant Fukas was the use of a Taser.

12    Q.    Okay.  And who -- who was your attorney defending

13  you in that case?

14    A.    Nick Evashavik.

15    Q.    And did it go to trial?

16    A.    Yes, sir.

17    Q.    What was the jury verdict?

18    A.    The jury ruled in our favor.

19    Q.    And so looking at Nos. 12 and 20 there on these

20  written interrogation, 12 was "Did any citizen, officer, or

21  superior ever make a complaint against you for excessive

22  force?"

23          And, then, 20 is were you ever actually sued.  So

24  you just explained the lawsuit.  Was that the only lawsuit ever

25  filed against you in your career for excessive force?

Brian O'Malley - Examination by Mr. Geary

14

1      A.      Yes, sir.

2      Q.      Okay.  Separate from that lawsuit, were -- were any

3    complaints made against you by citizens or suspects?  Complaint

4    being not a lawsuit, but a verbal or written complaint to your

5    chief or to the department.

6      A.      No, sir.

7      Q.      What about any other coworker make any allegation

8    against you for use of excessive or unreasonable force?

9      A.      No, sir.

10     Q.      So in your career, the only thing in your background

11   as far as allegations of excessive force was this lawsuit by

12   Bugno?  B-u-g-n-o.

13     A.      Yes.  That's correct.

14             (Whereupon, Deposition Exhibit 25 was presented to

15   the witness.)

16   BY MR. GEARY:

17     Q.      If we could go to the request for production of

18   documents, which is No. 25 -- Exhibit No. 25, No. 3, please.  I

19   asked about dashcam video and any other type of video on No. 3.

20   And your answer was "Not applicable."  Is that correct?

21     A.      Yes, sir.

22     Q.      So January of '016, the shooting and killing of

23   Bruce Kelley, Jr., were you wearing a body camera that day?

24     A.      No, sir.

25     Q.      And did the Port Authority Police Department just

Brian O'Malley - Examination by Mr. Geary

15

1    not -- not have body cameras for officers at that time?

2        A.    That's correct.

3        Q.    Now, we'll get to the events of that day in a

4    moment.  Did you drive your unit to the scene at some point

5    that day?

6        A.    I drove my police car to Hamnett Station.

7        Q.    And did the -- did your unit have dashcam -- dash

8    camera capabilities?

9        A.    No.

10       Q.    Did any of the Port Authority units have dash camera

11   capabilities?

12       A.    No, sir.

13       Q.    Do they have that now?

14       A.    No, sir.

15       Q.    If we can move to January of '016, obviously, I'm

16   going to ask you many questions about the day of this incident,

17   January 31, '016.  Before we get to that, January of '016, how

18   many years had you had with the Port Authority at that point?

19       A.    18, into 19.

20       Q.    And were you a K-9 officer as of January of '016?

21       A.    Of January of '16?

22       Q.    Yes, sir.

23       A.    Yes.

24       Q.    And how long had you been a K-9 officer?

25       A.    Since 2003.

Brian O'Malley - Examination by Mr. Geary

16

1     Q.    Okay.  Now, in the time period of January '016 and

2   you being a K-9 officer when you worked for the Port Authority

3   Police Department, were you always working in a role as a K-9

4   officer, or was it sometimes you were and other times you were

5   in a different type of capacity?

6     A.    Clarify the other type of capacity.

7     Q.    Just anything other than K-9.  Just, say, you were a

8   sergeant doing, say, patrol or duties that had nothing to do

9   with K-9.

10     A.    Well, K-9s are assigned to patrol.

11     Q.    Okay.

12     A.    So I was a sergeant assigned to patrol as well as

13   having a K-9.

14     Q.    So did -- every shift you worked in January of '016,

15   in that time period, were you in the capacity as a K-9 officer?

16     A.    Correct.

17     Q.    Okay.  And your K-9 partner was Aren.  Is that

18   correct?

19     A.    Correct.

20     Q.    A German Shepherd?

21     A.    Yes.  Aren was full German Shepherd.

22     Q.    Okay.  Now, is it correct that you and Aren were a

23   team, a K-9 team, as far as how it's phrased?

24     A.    That is -- that's a phrase that's often -- often

25   used and written down.  Correct.

Brian O'Malley - Examination by Mr. Geary

17

1    Q.    And is the team you and -- and Aren, or was it, say,

2    you, another officer, and Aren?

3    A.    It was myself and Aren.

4    Q.    Okay.  How long, as of '016, had you and Aren been a

5    K-9 team or unit?

6    A.    Several years.

7    Q.    Okay.  And how many is several?

8    A.    I think I had Aren on the street for -- it was maybe

9    three, going into four.  So I don't believe it was longer than

10   four.  It was maybe coming up on four.

11   Q.    And in that time frame, how many other K-9 teams, or

12   units, did the Port Authority Police Department employ?

13   A.    We had two other teams.

14   Q.    And who were they, please?

15   A.    So that was Ron Fukas, who at the time was a

16   patrolman, and Sergeant Rob DiPippa.

17   Q.    And in the, say, three to four years you worked with

18   Aren, did you always work with Aren when you were working as a

19   K-9 officer?

20   A.    Yes, sir.

21   Q.    And DiPippa, his partner was whom?  What was the

22   name of the K-9?

23   A.    Arko, A-r-k-o.

24   Q.    And I think you said Fukas.  Can you spell Fukas,

25   please?

Brian O'Malley - Examination by Mr. Geary

18

1    A.    F- -- F-u-k-a-s.  F-u-k-a-s.  First name is Ron,

2  R-o-n.

3    Q.    Thank you.  And what was his K-9 partner's name?

4    A.    It's slipping my mind.  Cordon, C-o-r-d-o-n.

5    Q.    Thank you.  Now, prior to Aren, did you have a

6  different K-9 partner?  A different dog?

7    A.    Yes.

8    Q.    Who was prior to Aren?

9    A.    My partner -- my first partner's name was Lord,

10  L-o-r-d.

11    Q.    What kind of dog was that, please?

12    A.    German Shepherd.

13    Q.    Okay.  So you became a K-9 officer in '03.  Is that

14  correct?

15    A.    Correct.

16    Q.    And Lord, was he your first partner?

17    A.    Yes, sir.

18    Q.    What kind of dog was Lord?

19    A.    A German Shepherd.

20    Q.    How long were you and Lord K-9 partners?

21    A.    I think Lord passed away in '10, into '11.  Around

22  that time frame.

23    Q.    So how long were you and Lord partners?

24    A.    Eight years.  It might have been eight years.

25    Q.    And then was there a K-9 partner in between Lord and

Brian O'Malley - Examination by Mr. Geary

19

1  Aren that was your partner?

2      A.    No, sir.

3      Q.    Was there a gap in time where you did not have a K-9

4  partner?

5      A.    I mean, there's a gap for the selection period, so

6  I -- I don't know how long, but, I mean, it's -- it's -- by the

7  time -- I don't know how long that period was.  It might have

8  been a couple weeks.

9      Q.    Okay.  But -- so you've had two K-9 partners up and

10 to the date of this incident:  Lord and Aren.  Is that correct?

11     A.    Yes, sir.

12     Q.    Okay.  Explain for me, please.  How did it come

13 about that you became a K-9 officer?

14     A.    Post 9/11, the department chose to initiate a K-9

15 program.  That program was to be patrol dogs and explosive

16 detection dogs.  There was an interview process.  I interviewed

17 with the chief at the time and was selected.

18     Q.    Who was the chief at the time?

19     A.    William McArdle.

20     Q.    And at that time, '03, did the Port Authority have

21 three K-9 units?

22             MR. EVASHAVIK:  '03?

23             THE WITNESS:  Yeah.  I was the first one.

24 BY MR. GEARY:

25     Q.    Okay.  Because you said about '016, there were three

Brian O'Malley - Examination by Mr. Geary

20

1    K-9 teams.  Fukas, DiPippa, and yourself as of '016.  So in '03

2    when it started out with K-9 teams -- the Port Authority having

3    K-9 teams -- did they start out with just one team or more than

4    one?

5         A.    I was -- I was the first one.

6         Q.    Okay.  And Lord was your partner?

7         A.    Yes, sir.

8         Q.    Okay.  Now, starting in '03 with Lord, you and Lord

9    obtained different credentials or certifications.  Is that

10   correct?

11        A.    Yes, sir.

12        Q.    And who -- who issued those citations and

13   credentials to you?

14        A.    The North American Police Work Dog Association.

15        Q.    And was there any other agency or entity that you

16   obtained credentialing through?

17        A.    With Lord, yes.

18        Q.    Okay.  Who else with Lord, please?

19        A.    The Alcohol, Tobacco and Firearms.  ATF.

20        Q.    And with Lord, with the North American -- what is

21   it? -- Man Dog Work Association?

22        A.    So it's the North American Police Work Dog

23   Association.  N-A-P-W-D-A.

24        Q.    Sorry.

25        A.    Often referred to -- referred to as NAPWDA.

Brian O'Malley - Examination by Mr. Geary

21

1     Q.    Okay.  Police Work Dog Association.

2     A.    Yes.

3     Q.    What -- what areas did Lord get qualified in as far

4 as drug detection, bomb sniffing, suspect apprehension, so

5 forth?

6     A.    So his scent discipline -- all of our dogs up and to

7 this point -- even current -- are all explosive detection dogs.

8 And then --

9     Q.    I don't mean to interrupt.  I'm sorry.  There was

10 just one word I didn't catch.  You said his something

11 discipline.

12     A.    So all -- all of our dogs, their disciplines are

13 explosive -- their scent work are all explosive detection.  So

14 all of our dogs are explosive detection dogs.

15     Q.    Are you saying --

16     A.    So that was his scent -- that was -- his scent

17 discipline was -- Lord's discipline on the odor end was

18 explosive detection.

19     Q.    And I'm sorry.  Just -- are you saying "said" or

20 "scent"?  I just can't get the S-word.

21     A.    Scent, s- -- s-c-e-n-t.  Scent.  Scent discipline

22 was explosive detection.

23     Q.    Okay.  Thank you.  Was Lord qualified or

24 credentialed in other areas separate from the explosive

25 detection?

Brian O'Malley - Examination by Mr. Geary

22

1          MR. EVASHAVIK:   Object to the form of the question.
2          You can answer.
3          THE WITNESS:   So his patrol discipline was -- there
4     was several areas.   That would be area search, tracking,
5     obedience, aggression control.
6     BY MR. GEARY:
7          Q.    And what is aggression control?
8          A.    So aggression control is the discipline involved in
9     making apprehensions.
10         Q.    Okay.  Now --
11         A.    It's tied in with obedience.
12         Q.    I've done some research on suspect apprehension.
13    I've read some literature on the bite-and-hold technique.   I
14    don't know if -- what words you used in the training or what,
15    you know, the proper usage in the industry is, so I'll ask.
16    Suspect apprehension, that was included under aggression
17    control?
18         A.    Correct.
19         Q.    And as of '03, was there something called a
20    bite-and-hold technique?
21         A.    I don't know.
22         Q.    Okay.  What were the -- for suspect apprehension, as
23    of '03, what were the techniques you were trained under to
24    apprehend a suspect?
25         A.    Can you clarify?

Brian O'Malley - Examination by Mr. Geary

23

1    Q.    Right.   I read things about bite and hold where the
2  K-9 officer deploys the dog and the dog is supposed to bite a
3  body part or an arm of the suspect to get the suspect to comply
4  or otherwise drop a weapon.   So some literature said
5  "bite-and-hold technique" under suspect apprehension.   So I
6  think you just said -- well, I'm just asking.   On suspect
7  apprehension, what techniques were you trained to deploy Lord?
8    A.    So the techniques taught were suspect apprehension
9  on arm, shoulders.
10    Q.    Was it not called the bite-and-hold technique?
11    A.    No.   It was aggression control.
12    Q.    Okay.   So for suspect apprehension, if you deployed
13  Lord, just generally speaking, Lord was -- Lord was to do what?
14    A.    Well, I don't know what's -- you say "deployed."
15  How do you mean?
16    Q.    Well, say, in the training, what would -- yeah.
17  What would be the situations where it would be appropriate and
18  necessary to deploy Lord to apprehend a suspect?
19    A.    In training?
20    Q.    Yes.
21    A.    Well, there's different facets, but the garden
22  variety would be training a dog up to using a bite suit.
23    Q.    Okay.   And what would -- what would be the criteria
24  you were to consider for when it would be appropriate and
25  necessary to deploy Lord versus, well, maybe this is not the

Brian O'Malley - Examination by Mr. Geary

24

1    right situation to deploy Lord to apprehend a suspect?

2               MR. EVASHAVIK:  Are you still referring to training?

3               MR. GEARY:  Yes.

4               THE WITNESS:  Well, I mean, if you are training,

5    you're setting yourself up for a training scenario.  So I -- I

6    don't understand your question.  If it's training, then you've

7    set the scenario up to train.

8    BY MR. GEARY:

9        Q.    Right.  And what scenarios were set up that you were

10   trained in?

11       A.    Well, you -- at times, you would have a person in a

12   bite suit.  At times, you would have a person -- the decoy, as

13   it's known -- to be not in a bite suit because the dog would be

14   in a muzzle.  So those are two that are probably used

15   predominantly.

16       Q.    Is decoy the suspect?

17       A.    Yeah.  So the decoy is often referred to as the

18   trainer who acts in a way as the suspect.

19       Q.    And the bite suit -- I think I know what you mean,

20   but can you describe the bite suit?

21       A.    Well, there's several -- there's many kinds.  But a

22   bite suit garden variety would be a jacket and a set of pants

23   that cover your entire body minus your feet and your hands and

24   your head, that give protection while you're decoying for a

25   particular dog through a scenario.  So it's a heavier -- sort

Brian O'Malley - Examination by Mr. Geary

25

1    of the material that would be similar to, like, a heavy-duty

2    fire hose that fire departments use.  It's that type of heavy

3    material, if you were to feel it.  But there's several kinds,

4    so that's -- that's sort of the garden variety kind.

5         Q.    And what would be the scenarios that you

6    participated in with Lord in those training sessions?  Again,

7    the time frame right now I'm focusing on, say, '03 when you

8    started out.

9         A.    In training.  Correct?

10        Q.    Yes, sir.

11        A.    So those would be agitation, building searches in a

12   bite suit, suspect mocking, running from a particular area,

13   pretending to be a fleeing felon in a bite suit.  A person

14   attacking the -- the decoy would attack the officer and mimic

15   an attack on the officer to get a reaction from the dog, to

16   make an apprehension.  So anything that the dog, or Lord, would

17   see on the street, we trained.

18        Q.    And in some of those scenarios, would the decoy, or

19   suspect, be armed?

20        A.    There is a part -- so clarify being armed.

21        Q.    Well, would the decoy, you know, posing as a

22   suspect, have a knife or, say, a rubber knife in his hand, a

23   weapon, or a gun?

24        A.    No for the knife.

25        Q.    What about gun?

Brian O'Malley - Examination by Mr. Geary

26

1          A.     Gunfire is used for a certification test.

2          Q.     Okay.  So in any of those scenarios with Lord, were

3   you trained with Lord in scenarios where the suspect has a gun?

4          A.     Yes.  Because you acclimate the K-9 to gunfire.

5          Q.     Okay.  What about --

6          A.     It's blanks.  Blanks.

7          Q.     I'm sorry.

8                 THE REPORTER:  I didn't hear.

9                 THE WITNESS:  It's a blank -- it's a blank gun,

10  obviously, because you're -- you know, you're not on a gun

11  range.  Yeah.  So they're shooting a blank gun, so mimicking

12  gunfire.  I should clarify.

13  BY MR. GEARY:

14         Q.     No.  I get it.

15                You said no as to the knife.  Gun, yes.  Any other

16  type of weapon that the decoy would -- would possess in these

17  scenarios where Lord was trained in suspect apprehension?

18         A.     So there's -- the other tool that's used by decoys

19  are what's called a bamboo stick, an agitation stick, padded

20  schlags.  And what those are used for is to act as a

21  distraction device when the dog is decoying and progressing

22  through training.

23         Q.     And so can you explain for me how -- how would the

24  agitation stick be used in the training of the -- of the dog?

25         A.     Well, when a dog starts to exhibit the right amount

Brian O'Malley - Examination by Mr. Geary

27

1   of confidence and you start to progress through training, any

2   type of secondary device used as a distraction starts to get

3   implemented in training.

4           So, for instance, the bamboo stick is a rattle

5   stick.  And it does just that; it rattles.  So you're trying to

6   elicit a response from the dog that would go against any type

7   of confidence that you're trying to build up.  So if you rattle

8   and the dog -- if you rattle the stick and the dog backs off,

9   then you know that, you know, there's been that type of -- you

10  want to try to build on that confidence of him being around

11  that rattle.  That sound may not be -- he may not like that

12  sound.  So those -- those are how those tools are used.

13          Dogs -- or Lord, the dogs that we train with, we

14  never hit the dog.  So although those are called -- like, it's

15  a padded schlag and a bamboo stick, the dogs are never hit with

16  those in our training.

17      Q.    And what's the difference between an agitation stick

18  and the bamboo stick?

19      A.    Nothing really.

20      Q.    I assume the agitation stick is silent, does not

21  make noise.

22      A.    So a -- that's referred to as, like, a padded

23  schlag.  And it's, again, just something that you are

24  introducing -- introducing into the training to act as a

25  confidence builder and to elicit a response.  So it's just

Brian O'Malley - Examination by Mr. Geary

28

1  something that the decoy can hold and -- and swing around and

2  stand above the dog to try to act as a distraction to see what

3  kind of response you've   you're training into them.

4          MR. GEARY:  Did you get "schlag"?

5          THE REPORTER:  Uh-huh.

6          MR. GEARY:  Okay.  I just asked the stenographer if

7  she got "schlag" down.

8          THE WITNESS:  Yeah.  Don't ask me for spelling on

9  that one.  I'm not real sure.

10 BY MR. GEARY:

11     Q.    Now, as far as a gun with blanks in it, with Lord,

12 did you and Lord undergo training on suspect apprehension where

13 the decoy is holding a gun?

14     A.    I do not think I did that with Lord.

15     Q.    Okay.  At any point in your partnership with Lord,

16 did you do -- did you do that type of training?

17     A.    I can't recall if there was a changeover in the

18 NAPWDA training standards.  There are times where the board

19 looks at their standards and, when it comes to gunfire, that

20 has changed over the years.  So I don't know if Lord -- he may

21 have partaken in where the -- the decoy mocked a gun battle.  I

22 know he was exposed to the blanks as well as being exposed to

23 live fire on our range when we would go to range days.  So in

24 his time frame, I don't know if that was part of the

25 certification test.  I would have to go back and look.

Brian O'Malley - Examination by Mr. Geary

29

1    Q.    And you say Lord was certified or credentialed

2    through ATF at some point?

3    A.    Yes, sir.

4    Q.    Was that prior to Lord obtaining Lord's

5    certification through NAPWDA?

6    A.    Well, I mean, we have -- we obtain NAPWDA

7    certification every year.  But Lord's certification through the

8    ATF was in the latter part of his career.  It might have been

9    in '08.  It was for explosive detection.

10    Q.    And was that the only thing for the ATF, their

11    purposes, explosive detection?

12    A.    Yes, sir.

13    Q.    Okay.  And did you ever -- and is the word "deploy"?

14    When I say the word "deploy," just from the literature, it's if

15    you, using layman's terms, like sic the dog on a suspect for

16    suspect apprehension.  The literature seems to use the word

17    "deploy."  I don't know if that's the correct word.  What's the

18    proper word there?

19    A.    Well, for us, it would just be a K-9 deployment, but

20    that carries many terms.  If I say I deployed -- it was a K-9

21    deployment on the aggression part of that, then that would

22    mean, to me, either an apprehension with a bite or an

23    apprehension with a no-bite.

24    Q.    Okay.  Thank you.  Can you explain to me the

25    difference between apprehension with bite versus apprehension

Brian O'Malley - Examination by Mr. Geary

30

1   with no bite?  How was Lord trained -- and you trained?

2       A.    So in your training, if you deploy a K-9 in a felony

3   situation and suspect or suspects are running and the suspect

4   surrenders, you would use a call-off technique.  And so

5   although -- that would be a deployment no bite because the

6   suspect surrendered.  You do a recall on your dog, and you call

7   the dog back to the heel because the person is no longer

8   resisting arrest and fleeing.

9       Q.    In that scenario, in the moment that you deployed

10  the dog, if the suspect had not yet surrendered, what was the

11  dog supposed to do in that deployment?

12      A.    That would be make an apprehension.

13      Q.    And how was the dog to do that?

14      A.    How he was trained.

15      Q.    And how was he trained?

16      A.    The arm/shoulder area.

17      Q.    And what about the arm/shoulder area?  What exactly

18  was the dog supposed to do to the suspect to effect a

19  successful deployment?

20      A.    To make an apprehension.

21      Q.    And how so?

22      A.    With -- with his mouth.

23      Q.    Okay.  Yeah.  I didn't know if we're talking about

24  the no-bite technique versus the bite technique.  Let's start

25  with the no-bite technique.

Brian O'Malley - Examination by Mr. Geary

31

1          MR. EVASHAVIK:   I'm going to object to the form of

2     the question.

3     BY MR. GEARY:

4          Q.    Did you explain -- did you explain that there were

5     two techniques for suspect apprehension, and one was the bite

6     technique and one was no-bite?

7          A.    So I said the two techniques that are used in the

8     certification are the -- it would be a deployment.  We talked

9     about deployment.  It was deployment, either bite or no bite.

10          Q.    Okay.  And when you deploy the dog, though, is the

11     initial intent that the dog is to bite the suspect?

12          A.    Yes, sir.

13          Q.    And on the arm or the shoulder.  Is that correct?

14          A.    Yeah.  Arm, shoulder, middle of the back.  But

15     that -- that area.

16          Q.    Any -- on the arm, any particular area on the arm?

17     Say, you know, lower arm?  Upper arm?

18          A.    I think that would depend on the suspect, if he's

19     running away.  But physiologically how a body is moving, it's

20     hard to say.  So if they always target, like, an elbow or it's

21     just where the dog has acquisition at the time.  So it's hard

22     to say any particular area.  It's just those areas that we

23     trained in.

24          Q.    And so was there a specific -- in the training,

25     was -- was Lord supposed to bite, say, the upper arm as opposed

32

1   to the lower arm of a suspect?

2       A.      You pointed -- you pointed to your bicep, though.

3   Is that where you were referring to?

4       Q.      Yeah.   I just gestured to upper arm versus lower arm

5   on my own arm.

6       A.      No.

7       Q.      Okay.   There's no preference as to what area of the

8   arm the dog is to bite?

9       A.      Well, you're pointing to, like, your front bi- --

10  are you demonstrating it, or...

11      Q.      I have -- I have no -- yeah, I have no idea.   I just

12  gestured to my arm, so...

13      A.      Okay.   No.   I think it's just on the arm/shoulder

14  area, that back area, from right to left.   So those areas are

15  trained.

16      Q.      So it can be anywhere on the arm?

17      A.      Running away, it would be on the triceps/shoulder

18  area, to across the back, to the other triceps/shoulder area.

19      Q.      And what if the suspect is stationary, not moving,

20  and, say, facing the dog?

21      A.      Then it would be an apprehension to the chest area.

22      Q.      And is that an apprehension with a bite?

23      A.      Well, I don't know what scenario we're using, so...

24      Q.      Well, I just want to go through each scenario you

25  were trained in as far as, say, apprehension of any suspect

Brian O'Malley - Examination by Mr. Geary

33

1    with the bite technique.

2         A.    So we're not talking no bite now.  Right?

3         Q.    Right.  I'd like to --

4         A.    I'll -- I'll base this off what you just said.  So

5    if the suspect is facing me and I have grounds to deploy my K-9

6    to make an apprehension?

7         Q.    Yes.

8         A.    And he does not surrender.  Correct?

9         Q.    Correct.

10        A.    Okay.  So if he's facing me.  So then that bite --

11   we teach our dogs that could be in the frontal area.  Correct.

12        Q.    And specifically the chest?

13        A.    It could be the chest, shoulders.

14        Q.    Is the dog trained to do anything other than bite?

15        A.    No, sir.

16        Q.    Is the dog trained to, say, just jump up and lunge

17   and impact the suspect and knock the suspect backwards or to

18   the ground?

19        A.    No, sir.

20        Q.    And we were -- I prefaced all this talking about

21   '03, and I just -- as of '016, January, the date of this

22   incident, was Aren trained to do anything other than bite?

23        A.    No, sir.

24             MR. EVASHAVIK:  Well, I'm going to object to the

25   form of the question.  Are you limiting that to an

Brian O'Malley - Examination by Mr. Geary

34

1  apprehension?  Because he may have had training in other areas

2  as well.

3         MR. GEARY:  Yeah.  No.  I mean, we'll    we'll

4  get -- okay.  We'll just -- we'll deal with Aren separately.

5  But I follow you on the bite technique.

6  BY MR. GEARY:

7      Q.   And just so we're clear, so the dog is to bite.  And

8  in the training, the dog is not trained to, say, lunge and

9  knock the suspect backwards or over?

10         MR. EVASHAVIK:  Again, object to the form of the

11  question.  You mean without a bite?

12         MR. GEARY:  With or without.

13         THE WITNESS:  I can't answer that.  You're using two

14  different -- you're saying two different things.  Are you

15  saying with their paws, knock them over?

16  BY MR. GEARY:

17      Q.   Or however.  Yeah.  Is the dog trained to --

18  separate from biting, as an alternative or in addition to

19  biting, is the dog trained to, like, knock the suspect

20  backwards or knock the suspect over?

21      A.   I think that would happen from the suspect, not the

22  dog.

23      Q.   Right.  Well, I'm just asking on the training.  What

24  the dog specifically is trained to do.  What the dog is trained

25  to do when it's released for a suspect apprehension.

Brian O'Malley - Examination by Mr. Geary

35

1      A.    Trained to make apprehension.

2      Q.    Okay.  And that's through bite only?

3      A.    Yes.

4      Q.    Okay.  Tell me about the -- the no-bite scenario.

5      A.    A no-bite would be -- well, paint the picture.  I

6  don't know how you want to use that.  Are you referring to the

7  fleeing person again?

8      Q.    Well, let's say the person is not fleeing.  They're

9  stationary, and they're facing the dog.

10     A.    So -- and they surrender?

11     Q.    No surrender.  In this scenario so far, no surrender

12  by the suspect.

13     A.    So then it would be an apprehension then.

14     Q.    Okay.  And what does that mean?  On an apprehension

15  in that scenario we just explained, what is the dog supposed to

16  do?

17     A.    Make an apprehension in the areas we just talked

18  about.

19     Q.    And make an apprehension by biting?

20     A.    Yes.

21     Q.    Okay.  Now, did you say there's an apprehension

22  where -- that does not involve the dog biting a suspect?

23     A.    No.

24     Q.    With the NAPWDA, you were -- both you and Lord were,

25  what, certified yearly through that entity?

Brian O'Malley - Examination by Mr. Geary

36

1    A.    Yes, sir.

2    Q.    And what were the requirements, please?  Yearly

3  requirements.

4    A.    Well, on the -- there's two different -- there was a

5  test that you would take in front of a master trainer who is

6  certified with the North American Police Work Dog in the

7  various disciplines that you wanted to certify in, the ones

8  that we -- we just talked about that were mentioned.

9    Q.    And the master trainer, is that -- is that someone

10  who is associated with NAPWDA, or is it someone, say, from a

11  different entity or agency?

12    A.    The master trainers were from NAPWDA.

13    Q.    Okay.  And how much training on suspect apprehension

14  did -- let's focus on Aren now -- was Aren required to

15  participate in and complete in the years leading up to '016,

16  including '016?

17    A.    It was the same standards through NAPWDA.

18    Q.    Okay.  What was the yearly requirement for suspect

19  apprehension training for you and the dog?

20    A.    Are you referring to the test?

21    Q.    Just -- just the training and any other requirements

22  you were obligated to undergo to obtain the certification.

23    A.    Well, the training is 16 hours a month that we did.

24  But we didn't train just in suspect apprehension.  We trained

25  in tracking, area search, building search, explosive detection.

Brian O'Malley - Examination by Mr. Geary

37

1   So that was training monthly, four hours a week.

2        Q.    And where would the four hours a week training go?

3   Again, we're focusing on Aren, say, '014, '015, '016.  Where

4   would the training occur?

5        A.    All over the county.

6        Q.    Okay.  And -- and the trainer would be the person

7   you -- you identified as the master trainer?

8        A.    Yes.  There were several master trainers that we

9   used, that we, as a training group -- and that group consists

10  of our dogs and dogs from various other agencies.

11       Q.    So in the time period of '015, January of '016 when

12  you and Aren would undergo these four hours a week training on

13  suspect apprehension, who was the master trainer?

14       A.    There were several.  Pat Moloney.  Bill Sombo.

15  Franco Angelini.  Bill Castle.  I think that's it.

16       Q.    And you said the requirement of the NAPWDA was 16

17  hours a month.  Is that right?

18       A.    Yes.  For the disciplines that you're certifying on,

19  yes.

20       Q.    Okay.  How many -- was there a minimum requirement

21  of how many of those 16 hours a month had to be dedicated to

22  suspect apprehension?

23       A.    I'm not sure if that's mentioned in the bylaws.

24  That's more -- that's -- the training weekly is -- is left up

25  to the handlers and the unit itself.

Brian O'Malley - Examination by Mr. Geary

38

1    Q.    So do you not know whether there was a minimum

2    requirement of the 16 monthly hours?

3    A.    The    I would have to refer to the -- the bylaws

4    themselves.  I know the 16 hours that you get monthly encompass

5    the disciplines that you're certifying in.  So those 16 hours a

6    month involve tracking, aggression, building search, obedience.

7    Q.    How many hours of the 16 -- aside from whatever the

8    minimum requirement was for suspect apprehension, how many

9    hours of the 16 per month were devoted to suspect apprehension?

10   I'm talking about --

11           MR. EVASHAVIK:  I'm going to object to the form.

12   Let me object to the form of the question.  The witness didn't

13   answer affirmatively that there was a minimum number of hours

14   required of the 16 for apprehension.  That's -- that was the

15   foundation of this question.

16           MR. GEARY:  Right.

17   BY MR. GEARY:

18   Q.    So my next question is:  If you don't know what the

19   minimum number was, I understand that.  In practice, how many

20   hours a month would you train with Aren in suspect

21   apprehension?

22           MR. EVASHAVIK:  And, again, I'm going to object to

23   the form of the question.  You're presuming that there is a

24   minimum number of hours that must be dedicated to apprehension.

25   So for that basis, I object to the form of your question.

39

BY MR. GEARY:

Q.   Okay.  You can answer.

A.   So at times -- if you look at a month, our training -- there's, you know, four Tuesdays.  We would train on Tuesdays.  We generally try to split it eight and eight, eight hours to scent detection work and eight hour to patrol work.  To say we did that all the time -- there would be times where we spent 12 hours a month to patrol work and four to detection work only because detection work is a little easier to work one-on-one while you're working the shift.  It's a matter of just placing training aids out as opposed to the patrol work where you require extra decoys to help you out.

Q.   Thank you.  So on the -- on the scent detention work versus the patrol work -- the scent detention work -- sorry -- detection.  Scent detection, did that not involve suspect apprehension?

A.   No.

Q.   Did the patrol work involve scent detection?

A.   No.

Q.   Did the patrol work involve suspect apprehension?

A.   It could.

Q.   Okay.  Did you ever -- now, not training but on a shift -- deploy Lord to apprehend a suspect?

A.   Yes.

Q.   Okay.  How many times?

Brian O'Malley - Examination by Mr. Geary

40

1    A.    Twice.

2    Q.    Okay.  What year was the first time?

3    A.    I can't recall.

4    Q.    Can you just give me an -- an approximate?

5    A.    No, I really -- I really can't.  I would have to go

6    back and look at my training records.

7    Q.    Okay.  So you were partners '03 to '010 roughly.  Is

8    that right?

9    A.    Yeah.  Into that time frame, yes.

10   Q.    Okay.  Was this first deployment of Lord closer to

11   '010 or closer to '03?

12   A.    It was probably right in the middle.

13   Q.    Thank you.  Please explain what -- what the scenario

14   was that developed and what happened and the deployment and was

15   it successful or not, so forth.

16   A.    So it was a fleeing felon with a handgun, and that

17   involved the City of Pittsburgh.  And he fled into the woods,

18   and Lord made an apprehension.

19   Q.    Were there other K-9 teams on scene?

20   A.    I don't recall.

21   Q.    Okay.  And what -- what was the name of the -- the

22   suspect?

23   A.    I don't recall.

24   Q.    Was it male or female?

25   A.    Male.

Brian O'Malley - Examination by Mr. Geary

41

1       Q.    Okay.  And was the male -- were they white?  Black?

2  Hispanic?  Asian?

3       A.    It could have been an African American male.

4       Q.    Okay.  And describe for me, please, the actual

5  deployment.  What was happening right before you decided to

6  deploy Lord?

7       A.    The -- Lord was deployed in a section of woods that

8  were a heavy thicket.  And it was an area search, which is an

9  off-lead search.  Off lead, meaning off leash.  And he fled

10  into the woods, which posed a threat to officers actually going

11  into the woods, so the K-9 was sent.  And shortly after being

12  sent, located the suspect.

13       Q.    Was the suspect armed?

14       A.    Yes.

15       Q.    With what?

16       A.    A handgun.

17       Q.    So when you deployed Lord, could you even see the

18  suspect?

19       A.    No.

20       Q.    And was Lord to find the suspect, in part, using the

21  scent of the suspect?

22       A.    That would be part of it.  Correct.

23       Q.    And what other tools would Lord have used to locate

24  and apprehend that suspect?

25       A.    Well, he could have used scent, and he could have

Brian O'Malley - Examination by Mr. Geary

42

1   used hearing, sight.  So, you know, probably those three.

2   Q.   And did Lord bite that suspect?

3   A.   Yes.

4   Q.   Okay.  And how -- how did you realize that Lord had

5   successfully located the suspect?

6   A.   I believe I could hear a commotion in the woods.

7   Q.   And so did you just follow whatever noises you

8   heard, and that led you to where the dog and the suspect were?

9   A.   Yes.

10   Q.   Okay.  And in that instance, did you learn where on

11   the suspect's body that Lord had bit?

12   A.   Yes.

13   Q.   Where on the suspect's body?

14   A.   He had -- there was two areas.  I think -- again, I

15   would have to go back to my records.  It was determined that he

16   was -- he was fighting Lord.  Because when we came upon him, he

17   was kicking him in the face several times.  So I believe it

18   might have been like the lower -- lower foot and arm, but I

19   would have to look at my records.

20   Q.   The suspect was kicking Lord?

21   A.   Yeah.  He was fighting him.

22   Q.   And then did you or other officers have to intervene

23   in that?

24   A.   He was -- yes, he was handcuffed.

25   Q.   And I think you said you deployed Lord for a suspect

Brian O'Malley - Examination by Mr. Geary

43

1    apprehension one other time in your career.  Is that right?

2         A.    Correct.

3         Q.    Please lay that out for me.

4         A.    A robbery that occurred at the South Hills junction,

5    which is located in the Beltzhoover -- Beltzhoover area.  It's

6    a terminus where the Port Authority transit buses are located.

7    And the suspects ran -- it was up into Beltzhoover.  And I

8    sent -- I located them running and sent Lord on an

9    apprehension.

10        Q.    Was the suspect armed?

11        A.    No.

12        Q.    And in that instance when you deployed Lord, could

13   you see the suspect?

14        A.    Yes.

15        Q.    Okay.  And what was the distance from you and Lord

16   to that suspect, please?

17        A.    10 yards.

18        Q.    What was that suspect's name?

19        A.    I would have to look at my records.  I don't know.

20   I don't recall.

21        Q.    Male?

22        A.    It was a male.

23        Q.    Okay.  Black?  White?  Other?

24        A.    He was a black -- black male.

25        Q.    And tell me what -- when you deployed Lord, what did

Brian O'Malley - Examination by Mr. Geary

44

1   you see Lord do?

2       A.   Lord ran downfield, which was -- downfield,

3   referring to towards the suspect.

4       Q.   And then tell me what you watched Lord do.

5       A.   I watched the suspect stop, raise his hands up in

6   the air, and say "I surrender."  And then I recalled Lord back

7   to my side.

8       Q.   And I'm sorry.  You said the suspect was armed?

9       A.   No, he was not.

10      Q.   Oh, okay.  I'm sorry.

11           So those were two deployments of Lord, is that

12  correct, in your career?

13      A.   Yes.

14      Q.   And were they both successful deployments?

15      A.   Correct.

16      Q.   Okay.  Did you ever deploy Aren prior to January 31

17  of '016 with this Bruce Kelley, Jr., incident?

18      A.   Are we -- when we use "deployment," are you

19  referring to apprehension?  Correct?

20      Q.   Yes, sir.

21      A.   No.

22      Q.   Okay.  Had Aren undergone training on how to

23  apprehend a suspect?

24      A.   Yes, sir.

25      Q.   Okay.  And would the training of Aren be the same or

Brian O'Malley - Examination by Mr. Geary

45

1   equivalent of the training that Lord underwent?

2       A.    No.

3       Q.    Okay.   And tell me how the trainings of the two dogs

4   were different, please.

5       A.    If you remember me saying, the certification at some

6   point changed, and it involved gunfire in the actual

7   certification test.   So he -- Aren may have got more extensive

8   certification training than what Lord got in his initial

9   training.

10      Q.    Okay.

11      A.    So that -- there was a changeover.   So, actually, in

12  short, the test got harder.

13      Q.    And separate from what you just explained, were

14  there any other differences in the training between Aren and

15  Lord?

16      A.    No.

17      Q.    Lord had some credentials or qualifications through

18  ATF.   Did Aren have any certifications or qualifications

19  through any other entity separate from NAPWDA?

20      A.    No.

21      Q.    Using January 31st, '016, as a reference point, when

22  was the most recent time, the date on which Aren had undergone

23  suspect apprehension training?

24      A.    Probably that month.

25      Q.    Okay.   And when you say "probably that month," when

46

1   you use the word "probably," does that -- does that mean maybe

2   in January of '016 Aren did not undergo any training regarding

3   suspect apprehension?

4        A.    No, that's not what I mean.  So he -- we do -- that

5   was the end of the month, the 31st.  So during that month, we

6   did patrol training.

7        Q.    Okay.  And are there records that prove that Aren

8   actually underwent suspect apprehension training in that month

9   of January?

10            MR. EVASHAVIK:  Object to the form.

11            THE WITNESS:  Yes.

12  BY MR. GEARY:

13       Q.    Okay.  How many hours of suspect apprehension

14  training did Aren have in January of '016?

15       A.    Well, he had gone through several certification --

16  NAPWDA certification, yearlies, so Aren had had hundreds of

17  hours.

18       Q.    Well, I'm focusing on the month of January of '016.

19  This happened on January 31st.  How many hours of suspect

20  apprehension training did Aren have that month, January of

21  '016?

22       A.    I don't know.

23       Q.    Okay.  What about December of '15?

24       A.    I would have to look at my records.

25       Q.    Okay.  What about November of '15?

Brian O'Malley - Examination by Mr. Geary

47

1    A.    Again, I would have to look at my records.

2    Q.    Okay.  Would that be the same for all the months in

3    '015?  You would have to look at your records?

4    A.    Correct.

5    Q.    Okay.  Do you have your records with you?

6    A.    No.

7    Q.    I'm looking at a -- at a document.  I can scan this

8    in and e-mail it to you.  I didn't intend to reference it, but

9    if you -- I can scan it over.  It says -- it's 10/13/015 NAPWDA

10   K-9 Team Certification Test Sheet.  Last name, O'Malley.  K-9

11   name, Aren.  James Moloney is the master trainer.  He signed

12   it.

13       And then there's pass -- there's phases tested in,

14   and then there's pass and fail.  So it has categories:

15   Obedience, pass.  Area search, pass.  Tracking, pass.  Building

16   search, pass.  Aggression control, pass.  And then Moloney

17   signs those and dates them all the same date.

18       So, for instance, on October of '015 on this

19   training session, it says -- it's titled "Certification Test

20   Sheet."  It says "Aggression Control, pass."  Can we tell from

21   this piece of paper how many hours of aggression control

22   training Aren underwent in that training session?

23       MR. EVASHAVIK:  Object to the form of the question.

24   We haven't seen the paper.

25       MR. GEARY:  Okay.  Give me -- yeah.  If you just

1    give me, like, two minutes, please, I'll just go up, scan it

2    in, and e-mail it to you, Greg.

3              MR. EVASHAVIK:  Well, why don't we -- it's been an

4    hour and a half.  Let's take a restroom break.

5              MR. GEARY:  No.  That's fine.

6              MR. EVASHAVIK:  All right.  Off the record.

7              THE VIDEOGRAPHER:  We're going off the record at

8    11:28 a.m.

9              (Whereupon, a brief recess was taken.)

10             THE VIDEOGRAPHER:  Back on the record at 11:40 a.m.

11   BY MR. GEARY:

12        Q.    Okay.  Lieutenant, are you ready?

13        A.    Yes, sir.

14             MR. EVASHAVIK:  Let me just say, Noah, for the

15   record, whatever you sent me wasn't attached.  But we found it

16   anyway in -- I think what you're referring to, we found in the

17   documents that he produced to you.  This document.

18             MR. GEARY:  Oh, I'm sorry.  Can you just, like, give

19   me ten seconds?  I just want to look to my computer, because it

20   went through on my end that it was attached.  I apologize.

21             MR. EVASHAVIK:  I think I have the same thing, so it

22   won't matter.  No, it wasn't attached on my end.  But let's --

23   can you identify it?  We might have it anyway, so you don't

24   have to check.

25             MR. GEARY:  Sure.  No.  So this would be Exhibit 29.