# EXHIBIT 9



ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CALISIA KELLEY; and            CIVIL ACTION
JOHNNIE MAE KELLEY,
Co-Administrators of the       No. 2:17-cv-01599-NBF
ESTATE OF BRUCE KELLEY,
JR., deceased,

Plaintiffs,

vs.                            TRANSCRIPT

BRIAN O'MALLEY, both in his    VIDEOTAPED
Official and Individual        DEPOSITION OF
Capacities as Sergeant for     THOMAS ADAMS
the Allegheny County Port
Authority; and DOMINIC
RIVOTTI, in both his
Official and Individual
Capacities as Officer for
the Allegheny County Port
Authority,

Defendants,
Jointly and Severally.         TAKEN VIA ZOOM VIDEO CONFERENCE

                               TUESDAY, SEPTEMBER 29, 2020


                               Taken on behalf of Plaintiffs,
                               Calisia Kelley and Johnnie Mae
                               Kelley


                               Counsel of Record for this Party:

                               Noah Geary, Esquire
                               Washington Trust Building
                               6 South Main Street, Suite 225
                               Washington, PA  15301
                               724-222-3788

Thomas Adams - Examination by Mr. Geary

12

1    West would be anything west of the West Busway.

2         We also have Oakland and the Hill District, which is

3    just as it sounds.  That would cover Oakland and the Hill

4    District.

5         We also have a zone that is a utility zone.  That

6    zone is basically the -- the entire -- all the zones combined.

7    You can travel anywhere within those zones.

8         Q.    Thank you.  And I'm going to ask you just to kind of

9    lay out what happened that day, and then I'll be interrupting

10   with questions.  But I think in your report you and Hampy are

11   on patrol, and then you notice something on the Linear Trail.

12        So can you kind of take it from there, please?

13        A.    Sure.  We were traveling outbound on the East Busway

14   at approximately 3:30 that day.  While traveling outbound, we

15   observed two individuals on the trail.  It appeared when they

16   saw our marked police unit, they ducked down behind a divider

17   wall between the East Busway and the Linear Trail as we

18   approached and passed.

19        Q.    And do you remember kind of roughly what time in

20   your shift that happened, that you noticed these two

21   individuals?

22        A.    It was around 3:30 p.m.

23        Q.    Okay.  And can you give me an identity or

24   description -- a description of the two individuals you saw?

25        A.    I don't recall.

13

1   Q.    Okay.  And you say you saw them duck down?

2   A.    Yes.

3   Q.    Okay.  So when -- when you're driving -- you saw

4   them when you're in your unit.  Is that correct?

5   A.    Yes, a marked police unit.

6   Q.    Okay.  Were you driving or Officer Hampy?

7   A.    I don't recall that, sir.

8   Q.    Okay.  And what was it about the two individuals

9   that got your attention?

10   A.    They ducked down behind the sound wall as our marked

11   police unit was approaching, which is, in my training and

12   experience as a police officer, suspicious in nature.

13   Q.    Okay.  And were they male?  Female?

14   A.    I -- I don't recall, sir.

15   Q.    And what about race?  Do you -- any -- do you know

16   what their race was?

17   A.    I don't recall.  We saw them at a distance.

18   Q.    Okay.  And so in response to them ducking down, what

19   did you do, please?

20   A.    We traveled outbound on the busway to Hamnett

21   Station.  We turned our marked patrol unit around, parked at --

22   at an access point on the busway, notified dispatch that we

23   would be conducting a park-and-walk up the Linear Trail.

24   Q.    And I think I -- I know, but what's a park-and-walk?

25   A.    It's where you park your vehicle, exit the vehicle,

Thomas Adams - Examination by Mr. Geary

30

1    Q.    Okay.  Did you have any -- get any impression that
2  this person had some mental health issues?
3    A.    No.
4    Q.    Do you tell him to let go of the gazebo, in whatever
5  words you used?
6    A.    At this point, I'm -- I'm advising him verbally that
7  he's under arrest and to place his hands behind his back.  He's
8  not complying with any of those orders that I'm giving him.
9    Q.    Okay.  So what did you decide to do then?
10   A.    At that point, around that general time frame --
11 based upon him assaulting me, being noncompliant and combative,
12 around that time is when I elected to deploy a burst of OC
13 spray.
14   Q.    And is OC spray considered, on the continuum of
15 force, a use of force?
16   A.    Yes.
17   Q.    Okay.  And did you deploy the OC spray?
18   A.    Yes.
19   Q.    And tell me, when you deploy OC spray, in that time
20 period, in your training, what are you aiming for with the
21 spray?
22   A.    His facial area.
23   Q.    And specifically his eyes?
24   A.    Facial area, sir.
25   Q.    Okay.  And if the deployment of the OC spray is

Thomas Adams - Examination by Mr. Geary

31

1    effective, how -- what is it supposed to do to the suspect?

2        A.    It's supposed to blur their vision.  It's supposed

3    to make their -- some of their -- their nose to begin to run,

4    begin to make them cough and have effects of like the oleoresin

5    capsicum that's inside of it to allow -- allow them to become

6    more compliant with -- with an officer.

7        Q.    Okay.  Sorry.  You just used maybe some fancy words

8    there.  Resin.  Captimum -- capti-something.  I didn't catch

9    that.

10       A.    OC spray.  Oleoresin capsicum spray is the

11   terminology for the spray.

12       Q.    Okay.  Is it -- does the OC spray have the effect of

13   burning their eyes?

14       A.    I can only go off of my experience.  When I was

15   pepper sprayed, it burned my eyes.  I can't go off of what it

16   would do to somebody else, sir.

17       Q.    Understood.  And so when you deploy the OC spray,

18   are you trained -- say, you do that in, say, two bursts or one

19   or -- what was your training?  How were you taught to deploy

20   it?

21       A.    I was taught to deploy it in one short burst.

22       Q.    Okay.  And then is that aimed at his face, then?  Is

23   that what the training is?  You aim at their face?

24       A.    The facial area, yes.

25       Q.    Okay.  And so you deployed the OC spray.  And how

Thomas Adams - Examination by Mr. Geary

32

1   was his body positioned when you deployed that?

2       A.    I was able to get my arm around towards his facial

3   area and deploy the spray at that point.  I was kind of

4   positioned to the right side of him.

5       Q.    Was his back still to you?

6       A.    I was on the right side of his body at this point.

7       Q.    Okay.  Was he still holding the gazebo with his

8   right arm?

9       A.    It was either at that moment or just after when he

10  broke free from the gazebo.  I don't recall the exact moment.

11      Q.    And there's reference in your report to a large gust

12  of wind.  Tell me what happened after you deploy the OC spray.

13      A.    I was very close to him when I deployed -- deployed

14  the OC spray.  Very close in proximity to him.  When I deployed

15  the OC spray, some of the -- some of the OC spray either

16  bounced off of him or some of the vapors also got on my facial

17  area and my hand.

18      Q.    And what effect did that have on you when it got in

19  your facial area?

20      A.    Just a burning sensation, an uncomfortable

21  sensation.

22      Q.    And did that distract you even, say, temporarily

23  from what you were trying to accomplish?

24      A.    No.

25      Q.    Okay.  What does he do then at that point?

Thomas Adams - Examination by Mr. Geary

33

1     A.     In my opinion, it didn't have any effect on him.  He

2  kind of pushed his arm up, it appeared, to try to wipe some of

3  the OC spray off.  And at that point is when he   he broke

4  free from us and began to walk around the back of his --

5  towards -- around the gazebo, closest to the Linear Trail on

6  the back side.

7     Q.     And so he was walking away from you and Officer

8  Hampy at that point.  Is that true?

9     A.     I -- I don't know where -- I can't say to what --

10  where he was going.  I can just say that he was walking around

11  the gazebo, you know, to the left.  To the left, I should say.

12     Q.     But he's walking away from you.  Is that true?

13     A.     Yes.  Yes.

14     Q.     Okay.  And then do you and Officer Hampy then deal

15  with Bruce, Sr., for a little while, or do you proceed after

16  Bruce Kelley, Jr., at that moment?

17     A.     I stayed with Bruce Kelley, Jr.  I don't know -- I

18  can't speak for what Officer Hampy was doing at that moment.

19     Q.     Okay.  Understood.  Tell me what you do then, as

20  Bruce, Jr., is walking away from you.

21     A.     As he is walking away, attempting to flee from me, I

22  attempted to get him down onto the ground to -- to put him into

23  handcuffs at that point.

24     Q.     And do you notice, are there any other civilians

25  around in --

# EXHIBIT 10



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CALISIA KELLEY; and
JOHNNIE MAE KELLEY,
Co-Administrators of the
ESTATE OF BRUCE KELLEY,
JR., deceased,

    Plaintiffs,

vs.

BRIAN O'MALLEY, both in his
Official and Individual
Capacities as Sergeant for
the Allegheny County Port
Authority; and DOMINIC
RIVOTTI, in both his
Official and Individual
Capacities as Officer for
the Allegheny County Port
Authority,

Defendants,
Jointly and Severally.

CIVIL ACTION

No. 2:17-cv-01599-NBF

TRANSCRIPT

VIDEOTAPED
DEPOSITION OF
EMILY (HAMPY) NIEBEL

TAKEN VIA ZOOM VIDEO CONFERENCE

MONDAY, OCTOBER 5, 2020

Taken on behalf of Plaintiffs,
Calisia Kelley and Johnnie Mae
Kelley

Counsel of Record for this Party:

Noah Geary, Esquire
Washington Trust Building
6 South Main Street, Suite 225
Washington, PA  15301
724-222-3788

44

1      Q.     Does -- the contact between Adams and Kelley, Jr.,

2   does it occur in the gazebo or outside of the gazebo?

3      A.     In the gazebo.

4      Q.     Okay.  And when you saw the contact, you yourself

5   were in the -- standing in the gazebo.  Is that correct?

6      A.     Yes.

7      Q.     Okay.  What happens next, please?

8      A.     I am referring to my report.  Like I said, I began

9   to help assist Officer Adams place handcuffs on Bruce Kelley,

10  Jr., and giving him multiple verbal commands to comply.

11     Q.     And what were the verbal commands?  Like what were

12  you actually saying to Bruce, Jr.?

13     A.     We were letting him know that he was under arrest

14  and that we were going to put handcuffs on him.

15     Q.     And was he saying anything in response?

16     A.     At that exact moment, no.

17     Q.     Did he try to punch you at that point in time?

18  Kelley, Jr.

19     A.     At that time, he wrapped his arm around the gazebo.

20     Q.     Okay.  And in your report at 20, the first

21  paragraph, closer to the bottom, it said "Kelley, Jr., bear

22  hugged the gazebo with his right arm and would not release

23  himself from the gazebo."  Did I read that correctly?

24     A.     Yes.

25     Q.     And are those your words?

Emily (Hampy) Niebel - Examination by Mr. Geary

45

1    A.    Yes.

2    Q.    Then it says "Myself and Officer Adams continued to

3 give multiple verbal commands to comply and release himself

4 from the gazebo and that he was under arrest, however, he did

5 not comply."  What was your thought process when he's -- when

6 he's hugging -- bear hugging the gazebo?

7    A.    That he was attempting to resist arrest.

8    Q.    Okay.  Did that -- was that peculiar or odd to you

9 that he -- he hugs the gazebo?

10   A.    No.

11   Q.    Did it give you any impression he may have mental

12 health issues?

13   A.    No.

14   Q.    Or that he was, say, mentally slow?

15   A.    No.

16   Q.    Okay.  So when he's bear hugging the gazebo, his

17 back is to you.  Correct?

18   A.    Correct.

19   Q.    And his back is to Officer Adams.  Is that right?

20   A.    Correct.

21   Q.    Are there any civilians in the area now?

22   A.    Not from my viewpoint.

23   Q.    Okay.  And your report says you're giving him verbal

24 commands to comply, and I get that.  What -- what were you

25 actually saying to him?

# EXHIBIT 11











# EXHIBIT 12



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CALISIA KELLEY; and
JOHNNIE MAE KELLEY,
Co-Administrators of the
ESTATE OF BRUCE KELLEY,
JR., deceased,

Plaintiffs,

vs.

BRIAN O'MALLEY, both in his
Official and Individual
Capacities as Sergeant for
the Allegheny County Port
Authority; and DOMINIC
RIVOTTI, in both his
Official and Individual
Capacities as Officer for
the Allegheny County Port
Authority,

Defendants,
Jointly and Severally.

CIVIL ACTION

No. 2:17-cv-01599-NBF

TRANSCRIPT

DEPOSITION OF
ANDREW KAUPINIS

TAKEN VIA ZOOM VIDEO CONFERENCE

THURSDAY, SEPTEMBER 24, 2020

Taken on behalf of Plaintiffs,
Calisia Kelley and Johnnie Mae
Kelley

Counsel of Record for this Party:

Noah Geary, Esquire
Washington Trust Building
6 South Main Street, Suite 225
Washington, PA  15301
724-222-3788

Andrew Kaupinis - Examination by Mr. Geary

15

1       MR. GEARY:  I think the witness said "the Wood

2   Street gazebo."

3   BY MR. GEARY:

4       Q.    Is that --

5       A.    Yes.

6       Q.    Just -- the stenographer just didn't hear the last

7   part of your sentence.  Is that correct?  The Wood Street

8   gazebo?

9       A.    Yes.

10      Q.    Thank you.  Now, when you heard Adams, did you hear

11  him on, say, your own personal radio, which is, say, a mike on

12  your shoulder?

13      A.    Yes.

14      Q.    Okay.  And at that time, did the Port Authority have

15  its own dispatcher?

16      A.    Yes.

17      Q.    And I assume the dispatcher worked in the police

18  station for the Port Authority.  Is that correct?

19      A.    Yes.

20      Q.    Okay.  Now, what was the -- what do you recall was

21  the nature of Adams' communication?

22      A.    He called out with a group consuming alcohol within

23  the Wood Street gazebo.

24      Q.    And did he initially ask for others to respond, or

25  did he just communicate what he was doing?

17

1  multiple reasons why we're using the radio.

2      Q.      Thank you.  So initially, was Adams asking for

3  backup?  Initially.

4      A.      Initially, no.

5      Q.      Okay.  And then please just -- we're going to have

6  to walk through the whole episode.  So please tell me what

7  happened next or what you heard or what you did.

8      A.      That's when I started out -- I started -- I got to

9  my car.  I started going towards that direction.  He called a

10 Code 1 response, which means no lights, no sirens.

11          While I was en route, he called out a Code 2.  That

12 would be they were resisting with the officers.

13          And then before I even got to the scene, he was

14 calling a Code 3.

15     Q.      And Code 1 means what?

16     A.      Code 1 is just a -- I'm responding to the area, but

17 I'm not going lights; I'm not going sirens.  I'm just going at

18 a normal -- normal speed, following the traffic laws.

19     Q.      And so when you initially left the station to go

20 there in your patrol unit, had he not requested for backup yet?

21     A.      When I asked him if he was -- his code status, I

22 can't recall if he -- I can't recall his response at this time.

23     Q.      And what is the Code 2, please?

24     A.      Code 2 is lights and sirens.  It's a -- a fast

25 response.

Andrew Kaupinis - Examination by Mr. Geary

23

1      A.     Adams was, I would assume, 60 to 70 feet away from

2 Bruce Kelley, Jr.  Sorry.  And he was following him.

3           MR. EVASHAVIK:  Let me give an instruction to the

4 witness, Noah.  And I know you agree on this.  We don't want

5 the witness to guess or assume anything.

6           If you don't know something, that's fine.  Tell us

7 that.  If you have a reasonable idea and you think you do know,

8 then we want that answer.

9           Do you agree with that, Noah?

10          MR. GEARY:  Sure.

11          MR. EVASHAVIK:  Okay.  He said he assumed something.

12 That's why I said that.

13 BY MR. GEARY:

14     Q.     Where was Adams?  Was he directly behind Kelly or

15 off to the side?  I know he's a distance away from Kelley.

16 Where was he as far as -- directly behind him?  To the side?

17 As far as your field of view.

18     A.     I was able to see him, so that would make him to the

19 side.

20     Q.     And did you see Hampy as well?

21     A.     Yes.

22     Q.     And then did you say you saw Bruce Kelley, Jr., had

23 a knife?

24     A.     Yes.

25     Q.     Which hand did he have a knife in?

Andrew Kaupinis - Examination by Mr. Geary

24

1    A.    His right hand.

2    Q.    And at that point in time when you first saw the

3  knife, can you describe what the -- what the color was?

4    A.    I -- I don't recall what the color was.

5    Q.    What about, say, the size of the knife, the length

6  of the blade, when you first say you noticed a knife?

7    A.    I noticed it was a -- a utility blade.

8    Q.    And just so I know, what does "utility blade" mean

9  as far as length?

10    A.    Maybe a 6- -- a 6-inch handle with a blade coming

11  out about an inch or two.

12    Q.    A blade coming out about an inch or two.  Is that

13  correct?

14    A.    Yes.

15    Q.    Did Adams have his gun out of his holster?

16    A.    I don't remember seeing it.

17    Q.    At that point in time, did Hampy have her gun out of

18  her holster?

19    A.    I don't recall.

20    Q.    Thank you.  So what happens then?  You see him.

21  He's walking in your direction.  It seems like you've described

22  you're walking in his direction.  You have two officers with

23  you from neighboring jurisdictions.  If you could just -- just

24  keep going, and we'll just -- we'll go through it.

25    A.    As Kelley, Jr., was walking towards me, I had him at

1    Q.    And so you heard that on your radio.  Is that right?

2    A.    Yes.

3    Q.    And, again, at that point in time, is Adams behind

4    Kelley, Jr., following him?

5    A.    Yes.

6    Q.    Okay.  As far as cross-fire, were you the only

7    officer with their weapon drawn at that point?

8    A.    I don't know if the officers behind me had their

9    weapons out, and I don't know about -- if Adams or Hampy had

10   their weapons out either.

11   Q.    Okay.  Did you ask any questions when you arrived on

12   scene, over the radio, as to what exactly had happened at the

13   gazebo?

14   A.    I don't recall asking any questions.

15   Q.    Did Adams say anything over the radio or even just

16   shouting to you as to what happened at the gazebo?

17   A.    Well, he was calling Code 3 into the radio.  He was

18   calling that they were fighting with individuals and that one

19   had a knife.

20          THE REPORTER:  I didn't hear the very end.  "The

21   one" --

22          THE WITNESS:  One had a knife.

23   BY MR. GEARY:

24   Q.    Okay.  So there was reference by Adams to

25   "individuals," but you only see so far in this scenario one

Andrew Kaupinis - Examination by Mr. Geary

28

1    person.  Correct?  Which turns out to be Bruce Kelley, Jr.  Is

2    that correct?

3         A.    Correct.

4         Q.    Thank you.  Did -- did you learn anything at that

5    point in time so far in this scenario that Bruce Kelley, Jr.,

6    had been hugging the gazebo?

7         A.    No.  I don't recall that.

8         Q.    So when there's mention of possible cross-fire,

9    "Watch out for cross-fire," did you give any commands or give

10   any response over the radio or even shouting to the other

11   officers for officer safety?

12        A.    No.  I had sidestepped to my right as to more get an

13   angle that I was aiming my firearm only at Bruce Kelley, Jr.

14   Whereas, if I were -- if I had fired and missed, I wouldn't put

15   the other officers in the line of fire.

16        Q.    And then what did Bruce Kelley, Jr., do?

17        A.    He made a left-hand turn and walked into a small

18   wooded area towards the fence line, which there was a hole in

19   the fence that he had gone through.

20        Q.    That he had gone through?

21        A.    Yes.

22        Q.    Okay.  So when he makes a left-hand turn, is that in

23   front of you?

24        A.    Yes.

25        Q.    Okay.  So he didn't pass you and then make a

Andrew Kaupinis - Examination by Mr. Geary

34

1   of the streets.  He does have a report, as you know, that was

2   prepared shortly after the occurrence that may refresh his

3   memory on that, but he hasn't asked to look at it during this

4   line of questioning, just for the record.

5          MR. GEARY:  Sure.  Yeah.  We're going to get to the

6   report in a couple minutes.

7   BY MR. GEARY:

8       Q.    Just -- did you just -- so the stenographer heard,

9   Officer, you just mentioned something.  The Hamnett Street

10  Station?

11      A.    He came out of -- between some houses through an

12  alleyway onto Center Avenue by the Hamnett Park and Ride lot.

13      Q.    The Hamnett Park and Ride lot.  Thank you.

14            Now, do you see other officers now in your field of

15  view who have responded?

16      A.    Yes.

17      Q.    And how many officers do you see besides the

18  officers we've already talked about?

19      A.    I would say maybe ten.

20      Q.    Okay.  So, say, including the five, including

21  yourself -- you, Hampy, being -- the five being you, Hampy,

22  Adams, and the two original responders from the other

23  jurisdictions, that's five.  But, say, there are about, say,

24  ten additional officers now?

25      A.    I would say ten in total.

Andrew Kaupinis - Examination by Mr. Geary

35

1      Q.    Okay.  And what do you see happen next, as far as

2   what Bruce Kelley, Jr., does or any officer?

3      A.    Bruce Kelley, Jr., walked towards the Hamnett Park

4   and Ride.  As he was getting into the lot, I attempted to

5   OC spray him without effect.  The wind took it away, so it did

6   not hit him.  He continued to walk away at that point.

7           Officer Sanders then approached him with his ASP

8   baton out, trying to strike him.  Bruce Kelley, Jr., then

9   turned around and took a swing with his knife in his right hand

10  at Officer Sanders, turned around again, and continued to walk

11  away.

12     Q.    You -- would the word be "deployed" your OC spray,

13  or what would the word be?  You used it?  What would the word

14  be?

15     A.    Deployed.

16     Q.    And what was -- generally, what's the purpose of

17  deploying the OC spray?

18     A.    When you get hit with the OC spray, it narrows the

19  vision.  It causes a heat sensation to try to interact with the

20  vision, to get you off your equilibrium.

21     Q.    And so are you aiming specifically for the person's

22  eyes?

23     A.    Yes.

24     Q.    Okay.  And let's go to the timeline, because I think

25  maybe there's a still shot that captures you using the

Andrew Kaupinis - Examination by Mr. Geary

40

1   spray successful?

2       A.    No.

3       Q.    And why not?

4       A.    When I sprayed it, I could see the spray moving with

5   the wind away from Bruce Kelley, Jr.

6       Q.    And I've never dealt with mace or anything like

7   that.  I mean, when you spray it, is it visible?  The spray?

8       A.    It's an orange aerosol spray, yes.

9       Q.    Okay.  Was it -- do you recall, was it a windy day,

10  an especially windy day?

11      A.    I don't recall it being very windy, no.

12      Q.    And in your training to deploy the OC spray, are you

13  trained that you should be, say, a certain distance from a

14  person?  You should be -- say, 3 feet away is optimum or 6 feet

15  or 1 feet?  How are you -- how are you trained on that?

16      A.    Usually, the training says up to 15 feet.  Up to 15

17  feet, the OC spray is most effective.

18      Q.    In your deployment of the OC spray at that time, do

19  you think it was even partially successful?  Do you think you

20  did get some spray in his eyes?

21      A.    No.

22      Q.    If you could go to the next page, sir, of our

23  timeline.  Do you have another photo there?

24      A.    Yes.

25      Q.    Okay.  Please describe or identify who the officers

Andrew Kaupinis - Examination by Mr. Geary

102

1   have, Noah.  Did you have anything with this video?

2          MR. GEARY:  Just -- I think I have four total

3   questions left.  Two are on the video.

4                      EXAMINATION

5   BY MR. GEARY:

6          Q.    Just leaving the video as is for the moment,

7   Officer, when you say the OC spray had no effect on Kelley when

8   you tried to spray him there when he fell over the fence, when

9   you say it had no effect, are you suggesting that you did spray

10  him in the eyes successfully?

11         A.    On the second or first attempt?

12         Q.    Right here that's on the screen.  By the -- when

13  he's going over the fence, right after the fence.

14         A.    I hit him in the back -- in the back of the head,

15  and I don't -- I don't know if it made contact with his eyes.

16         MR. GEARY:  And could we please, Greg, just go back

17  to the -- it's Sanders -- Sanders is approaching Kelley, Jr.

18  Thank you.

19         And as it's playing, Officer, it's going to get to

20  the -- we're slowing it down.  I appreciate that.  And you're

21  saying that Kelley swung the knife at Sanders?

22         A.    Yes.

23         Q.    I don't agree with your characterization, but it

24  will speak for itself.  Be that as it may, when you claim

25  Kelley is swinging the knife at Sanders, how many feet would

Andrew Kaupinis - Examination by Mr. Geary

45

1    It was kind of a lag.

2        Q.    Okay.  The sentence at paragraph 2, the last

3    sentence, "I shouted, 'Police, drop the weapon' multiple times

4    with no compliance, with Kelley, Jr., continuing to advance

5    toward the assisting officers and I."

6        A.    Yes.

7        Q.    As far as the chronology in your report, you're

8    talking about the point in time on the busway before Kelley

9    makes a left to go through the hole in the fence.  Is that

10   correct?

11       A.    Yes.  On the Linear Trail.  Before.

12       Q.    Thank you.  Now, when it says in your report there,

13   second paragraph, last sentence, "...with Kelley, Jr.,

14   continuing to advance toward the assisting officers and I,"

15   when you say he's advancing towards you, he's walking in your

16   direction.  Is that correct?

17       A.    Correct.

18       Q.    Did he at any point in time -- at that juncture, did

19   he threaten you verbally with violence?

20       A.    No.

21       Q.    Did he make any movements towards you?  Instead of

22   making a left to go through the hole in the fence, did he start

23   coming towards you?  Make any movements actually towards you?

24       A.    He was walking towards me, then made the left.

25       Q.    Okay.  And if he had not made the left and kept

Andrew Kaupinis - Examination by Mr. Geary

47

1    A.    No.

2    Q.    And he didn't take the knife and swing it at you or

3 anything like that?

4    A.    No.

5    Q.    Now -- thank you.  Back to your report.  In

6 paragraph 3, there's reference -- kind of in the middle, it

7 says "Kelley, Jr., continued fleeing from police, ignoring

8 commands to stop and drop the weapon.  Kelley, Jr., fled

9 through a yard."  So when you're using the words in your report

10 "fleeing" and "fled," just so we're clear, at all times he was

11 walking.  Is that correct?

12   A.    Yes.

13   Q.    Okay.  If we could go to the fourth paragraph of

14 your report, please.  It says "Kelley, Jr., then entered the

15 Hamnett Park and Ride lot.  At this time, Officer Sanders

16 attempted strike [sic] Kelley, Jr., with his ASP, but when

17 close, Kelley, Jr., turned toward officers and took a fighting

18 stance.  Kelley, Jr., then turned and fled toward a fence line

19 leading to the yards of residences on Whitney Avenue."  Now, I

20 want to focus there.  First of all, what is an ASP?

21   A.    It's a collapsible baton.

22   Q.    Okay.  And did you actually see Sanders try to

23 strike Kelley with the ASP?

24   A.    Yes.

25   Q.    Where on Kelley's body did it appear that Sanders

1  officers are walking behind him.  Do you see the fence is

2  coming up?

3      A.    Yes.

4      Q.    Okay.  Did you at any time attempt to, say, push him

5  very, very forcefully from behind?  At any point in time, did

6  you do that?

7      A.    No.

8      Q.    Was that considered by you as perhaps a way where

9  you could cause him to fall forward, trip, and then maybe be on

10  the ground and then a bunch of you jump on him?

11      A.    I didn't think of it at the time, no.

12      Q.    Did any of the officers, as you're walking behind

13  him, mention that, say, tactic to subdue him, pushing him very

14  forcefully from behind?

15      A.    Not that I know of.

16      Q.    Okay.  That could have been done, though, as far as

17  you were close enough to push him from behind.  Correct?

18          MR. EVASHAVIK:  Object to form.

19  BY MR. GEARY:

20      Q.    You can answer.

21      A.    Yeah.  I would say -- I would say it could have been

22  possible.

23      Q.    Okay.  Just so you know, I think we're done with the

24  timeline.

25          Okay.  Let's just pick up with your testimony.

1   We'll refer to your report in a little bit.  What do you do

2   then?  He goes over the -- he goes over the fence.  He falls,

3   but he gets up.  What do you see him do?

4        A.    From that point, he walked towards the front of the

5   residence that he was in the backyard of.  And I climbed over

6   the fence and began to follow him as well.

7        Q.    Now, you had your gun out of its holster before you

8   climbed the fence.  Is that correct?

9        A.    Yes.

10       Q.    Did you holster your weapon as you were climbing the

11  fence?

12       A.    Yes.

13       Q.    Okay.  And then when you climbed the fence, did you

14  pull your weapon out of its holster again?

15       A.    Yes.

16       Q.    Thank you.  And then you see him walking through

17  some backyards?

18       A.    It was from the backyard of -- that was fenced in,

19  towards the front of that house.

20       Q.    Okay.  Were there any civilians in that backyard or

21  side yard?

22       A.    No.

23       Q.    Okay.  Were you the closest officer to him

24  physically as far as there -- in the photos, there's officers

25  to your left, to your right at various points.  There's some

Andrew Kaupinis - Examination by Mr. Geary

64

1   happened.   In the four years that you were with the Port
2   Authority, up until that point in time, had you ever cited
3   anyone with an open container violation?

4       A.    Yes.

5       Q.    Okay.  Did you also have instances where you
6   exercised your discretion and did not issue the citation
7   because the person was compliant or, otherwise, you just said
8   "Get rid of it" and they did, and then you just didn't issue
9   the citation?

10      A.    Yes.

11      Q.    Now, and I don't -- I don't intend at any time to
12  put words in your mouth.  So I want to get to the point where
13  Kelley is in front of the house right before O'Malley releases
14  the dog.  Okay?

15      A.    Okay.

16      Q.    And you described before we took a little break
17  where you were situated.  And where was O'Malley situated with
18  the dog?

19      A.    In the -- in the street, Whitney Avenue.

20      Q.    Was there another officer there with a K-9?  Did
21  DiPippa have a dog there named Arko?

22      A.    Arko was still in the vehicle.  He didn't take Arko
23  out of the vehicle.

24      Q.    Okay.  So there was -- there was just reference in
25  one report.  It was a little vague.  I didn't know if I was

Andrew Kaupinis - Examination by Mr. Geary

65

1  misreading it, but -- so there was a second K-9 unit there.  Is
2  that right?
3       A.   Yes.
4       Q.   And the unit was DiPippa and Arko?
5       A.   Yes.
6       Q.   But Arko remained in Arko's vehicle.  Is that right?
7       A.   Yes.
8       Q.   Okay.  Now, where is Bruce Kelley right before
9  O'Malley has the dog and starts issuing commands to Kelley?
10      A.   He is on the sidewalk, still walking towards the
11 busway.
12      Q.   Okay.  And how far away, in feet, is O'Malley from
13 Kelley?
14      A.   I can't say.
15      Q.   Can you give me an estimate?
16      A.   I would estimate 35 feet.
17      Q.   And you said O'Malley, he was in the -- standing in
18 the street?
19      A.   Yes.
20      Q.   And Kelley is at that point walking on the sidewalk?
21      A.   Yes.
22      Q.   Okay.  Where was Ravotti positioned at that point in
23 time?
24      A.   Behind Kelley, Jr., and in front of me.
25      Q.   And when you say -- no.  I understand.  I

Andrew Kaupinis - Examination by Mr. Geary

66

1   understand.

2          And then -- so when O'Malley is issuing commands to

3   Bruce Kelley, what was he saying?

4      A.    "Stop.   Police.   Drop the weapon or I'll release the

5   K-9."

6      Q.    And is he --

7      A.    I'm not sure --

8      Q.    I'm sorry.

9      A.    I'm sorry.   I'm not sure of their exact verbiage of

10  how they give the commands.

11     Q.    Were other officers shouting commands to Kelley?

12     A.    Yes.

13     Q.    Were you shouting or giving verbal commands to

14  Kelley as well?

15     A.    I was still yelling at him to drop the weapon.

16     Q.    And were other officers besides you and O'Malley

17  doing the same?

18     A.    Yes.

19     Q.    And this is near the busway.  Is that correct?

20     A.    Yes.

21     Q.    And was there cars or buses, traffic, going along --

22  along the busway?

23     A.    I don't recall.

24     Q.    And tell me what Kelley does after -- at some point,

25  he's walking along the sidewalk.  Where does he go?

Andrew Kaupinis - Examination by Mr. Geary

67

1     A.    When O'Malley starts giving him the commands to stop

2 or he'll release the dog, Kelly turns towards the house that

3 was directly in front of -- I'm sorry -- directly to his left

4 and walked into that front yard.

5     Q.    Okay.  Were there any civilians in that yard?

6     A.    No.

7     Q.    Were there any civilians in the yard next to Kelley?

8     A.    No.

9     Q.    Now, at that point in time, are all the officers who

10 responded to this -- to your knowledge, are they in the front

11 of the house?

12     A.    Yes.

13     Q.    Okay.  Are there any officers in the back of the

14 house?

15     A.    Not that I'm aware of.

16     Q.    And so Bruce Kelley, he has his back to O'Malley,

17 and he's walking towards the house.  Is that correct?

18     A.    Yes.

19     Q.    And that's when O'Malley is giving the commands.  Is

20 that right?

21     A.    He was giving the commands.  And then Bruce Kelley,

22 Jr., turned and walked towards the front of the house.

23     Q.    I'm sorry.  It just -- it trailed off.

24     A.    Before -- before Bruce Kelley, Jr., turned, Officer

25 O'Malley was giving him the commands to stop, giving the K-9

Andrew Kaupinis - Examination by Mr. Geary

67

1      A.      When O'Malley starts giving him the commands to stop

2   or he'll release the dog, Kelly turns towards the house that

3   was directly in front of -- I'm sorry -- directly to his left

4   and walked into that front yard.

5      Q.      Okay.  Were there any civilians in that yard?

6      A.      No.

7      Q.      Were there any civilians in the yard next to Kelley?

8      A.      No.

9      Q.      Now, at that point in time, are all the officers who

10   responded to this -- to your knowledge, are they in the front

11   of the house?

12      A.      Yes.

13      Q.      Okay.  Are there any officers in the back of the

14   house?

15      A.      Not that I'm aware of.

16      Q.      And so Bruce Kelley, he has his back to O'Malley,

17   and he's walking towards the house.  Is that correct?

18      A.      Yes.

19      Q.      And that's when O'Malley is giving the commands.  Is

20   that right?

21      A.      He was giving the commands.  And then Bruce Kelley,

22   Jr., turned and walked towards the front of the house.

23      Q.      I'm sorry.  It just -- it trailed off.

24      A.      Before -- before Bruce Kelley, Jr., turned, Officer

25   O'Malley was giving him the commands to stop, giving the K-9

Andrew Kaupinis - Examination by Mr. Geary

70

1    Q.    Thank you.  What -- what do you see the dog do?

2    A.    Aren had bit Bruce Kelley, Jr., on his left arm.

3    Q.    Now, was Kelley still holding the knife at that

4    point?

5    A.    Yes.

6    Q.    In which hand?

7    A.    Right hand.

8    Q.    Now, as the dog is going towards Bruce Kelley, was

9    Bruce Kelley's back still to the dog?

10   A.    Yes.

11   Q.    And please tell me as precisely as you can what you

12   see the dog did.  Does he bite the back of the arm or the front

13   of the arm?

14   A.    He bites the back of the arm.  I believe it was

15   between -- right around the elbow.

16   Q.    And when he bites that, the way Kelley's body is

17   positioned, was his body still positioned with his back to

18   O'Malley and the dog?

19   A.    As Aren got on the bite, it pulled Kelley down

20   slightly to his left.  That's when Kelley, Jr., turned around

21   and stabbed Aren multiple times at that point.

22   Q.    And you saw Kelley stab Aren multiple times?

23   A.    Yes.

24   Q.    Where on Aren's body?

25   A.    The head and face area.

Andrew Kaupinis - Examination by Mr. Geary

79

1    evidence stayed in the place where it was.

2        Q.    And what was the evidence that was being secured?

3        A.    The knife.  Officer O'Malley's leash for K-9 Aren

4    was dropped in the street.  And I believe -- I don't know if

5    there was anything else on the scene.

6        Q.    Were you wearing a body camera?

7        A.    No.

8        Q.    Did your department utilize body cameras in -- as of

9    January of '016?

10       A.    No.

11       Q.    Did you have Tasers that had a video footage, video

12   surveillance component to them?

13       A.    No.

14       Q.    Now, you deployed the OC spray at two different

15   points.  Is that correct?

16       A.    Yes.

17       Q.    Okay.  And is that considered a use of force?

18       A.    Yes.

19       Q.    Did you fill out use of force forms?

20       A.    No.

21       Q.    And why not?

22       A.    I believe that's handled by our supervisors.

23       Q.    And who was your -- who were your supervisors?

24       A.    O'Malley was the supervisor that day.  And I can't

25   recall if -- at the time, DiPippa might have been a sergeant as

# EXHIBIT 13

IN RE:                          )
                                )
INTERVIEW OF                    )
                                )
SERGEANT BRIAN O'MALLEY         )




TRANSCRIBED FROM A VIDEO RECORDING

INTERVIEW DATE:  FEBRUARY 2, 2016

2

PERSONS PRESENT IN THE INTERVIEW ROOM:

Detective Patrick Miller
Allegheny County Police Department

Detective James Grill
Allegheny County Police Department

Sergeant Brian O'Malley
Port Authority Police Department

Kevin Abramowicz, Esquire

3

1          (Whereupon, the audio portion of the video recording

2   commenced.)

3          DETECTIVE PATRICK MILLER:  Just like the other day,

4   the room is on --

5          SERGEANT BRIAN O'MALLEY:  All right.

6          DETECTIVE PATRICK MILLER:  -- video equipment.

7          SERGEANT BRIAN O'MALLEY:  Yeah, yeah.  I'm good.

8          DETECTIVE PATRICK MILLER:  Okay.

9          MR. ABRAMOWICZ:  Thank you.  Appreciate it.

10         DETECTIVE JAMES GRILL:  Do you want another chair?

11         SERGEANT BRIAN O'MALLEY:  No, no.  That's all right.

12   I'll put it against the fucking wall.

13         (Whereupon, there were brief indiscernible

14   comments.)

15         DETECTIVE PATRICK MILLER:  All right, Brian.  Just a

16   standard --

17         SERGEANT BRIAN O'MALLEY:  Yeah, I got you.  I got

18   you.  I'm good.

19         DETECTIVE PATRICK MILLER:  All right.  You have the

20   right to remain silent.  Anything you say can and will be used

21   against you in a court of law.  You have the right to speak to

22   an attorney and have him present before and during questioning.

23   If you cannot afford an attorney, one will be appointed free of

24   charge before and during any questioning, if you so desire.

25         Do you understand each of the rights I've explained

4

1  to you?

2          SERGEANT BRIAN O'MALLEY:  Yes.

3          DETECTIVE PATRICK MILLER:  Okay.  If you could just

4  write yes on that line and your initials.

5          And No. 6, having these rights in mind, do you wish

6  to speak to us now?

7          SERGEANT BRIAN O'MALLEY:  Yes.

8          DETECTIVE PATRICK MILLER:  Again, yes, and then your

9  initials.  And then if you could print and then sign.

10          SERGEANT BRIAN O'MALLEY:  Yeah.

11          What's the date?

12          DETECTIVE PATRICK MILLER:  Today is the 2nd.

13          SERGEANT BRIAN O'MALLEY:  2/2?

14          DETECTIVE PATRICK MILLER:  Yes.

15          So this interview is being -- taking place at the

16  homicide office.  Sergeant Brian O'Malley, Port Authority

17  police.  Kevin Abramowicz, attorney for the Port Authority

18  policemen.  Detective James Grill and Detective Patrick Miller

19  are present for the interview.

20          Kevin, are you ready?

21          MR. ABRAMOWICZ:  Yes, sir.

22          DETECTIVE PATRICK MILLER:  Sarg, if you could, just,

23  you know, go through us [verbatim] the events that transpired--

24          SERGEANT BRIAN O'MALLEY:  Yeah.

25          DETECTIVE PATRICK MILLER:   -- the other day and --

5

1          SERGEANT BRIAN O'MALLEY:  So I was working as the

2     sergeant of the PM shift, which goes from 1400 to 2200.

3          About 3:30 on the same date, Officer Adams and

4     Officer Hampy called out with two suspects right on the Linear

5     Trail in -- in Wilkinsburg, in between Wilkinsburg Station and

6     Hamnett Station.  They were on a foot patrol.

7          Myself and Sergeant DiPippa started out to back them

8     up per their request.  I believe it was Officer Adams asked for

9     other units to start out to -- to their location.  So we --

10          DETECTIVE JAMES GRILL:  Were you -- were you in the

11     same vehicle?

12          SERGEANT BRIAN O'MALLEY:  No.  I'm sorry.  We -- we

13     were in separate vehicles.

14          DETECTIVE JAMES GRILL:  Okay.

15          SERGEANT BRIAN O'MALLEY:  So we started out.  Rob

16     was in front of me.  I was behind him.  We were about halfway

17     there, and Tommy Ad- -- Tom calls Code 2, which is a more rapid

18     response.  And he stated that they were starting to fight with

19     one of the -- one of the suspects.  Again, we continue out.

20     Now we're going lights and sirens.

21          And somewhere before us getting out, Tommy says that

22     the suspect has a knife and that there was a fight going on.

23          So we now go -- we're getting close.  And Tommy

24     says -- Officer Adams says the suspect now is running from the

25     scene on the Linear Trail into Wilkinsburg.  So --

6

1          DETECTIVE JAMES GRILL:  On the radio, is that Hampy?
2     Which one puts out that --
3          SERGEANT BRIAN O'MALLEY:  That's Tom.  Officer
4     Adams.
5          DETECTIVE JAMES GRILL:  Adams?
6          SERGEANT BRIAN O'MALLEY:  Adams, yeah.  Adams says
7     he's running from the scene.  The suspect is running from the
8     scene.  And he said he's going toward -- on the Linear Trail
9     into Wilkinsburg.  We just clarified because he's in
10    Wilkinsburg.  So we just need to know, like, eastbound or
11    westbound, inbound or outbound.  He says he's going outbound,
12    which would mean on the trail now towards Hamnett Station.
13         So that's where I went, and that's where Sergeant
14    DiPippa went.  We -- we pull into Wilkinsburg Station.  I get
15    out of the car.  I jump over the wall and start running now
16    inbound on the same Linear Trail.  And I get about -- kind of
17    halfway up the trail, and I could see the suspect from a
18    distance.  This was -- it was far.
19         DETECTIVE JAMES GRILL:  Who were you with at that
20    point?
21         SERGEANT BRIAN O'MALLEY:  Well, I was running.  And
22    Rob was kind of -- we were right by each other.  And there
23    was -- I think a sheriff deputy might have joined us.  But we
24    were just all kind of like running in a line.
25         And then that's when I stopped, and I could -- I

7

```
1   looked up the trail, and I could see him.  I could see the
2   officers kind of trailing behind him.  And I could hear him
3   yelling and -- just yelling, just loud, just -- I don't even
4   know what.  He was just yelling stuff.
5          And that's when I stopped, and I ran back to my car.
6   And I passed Rob, and I said, "I'm going to go get my K-9.
7   This is going to be a K-9 call."
8          And, literally, right when I get back to my car,
9   they -- I was getting my dog out.  They said over the -- over
10  the radio -- I could hear it over my earpiece -- that the
11  suspect went into the woods.
12         So what I -- I knew that to mean was then he went
13  down into the woods towards the houses in between -- I guess
14  the closest street would have been, like, Center Avenue and
15  Whitney Avenue.
16         And so I got my dog out.  I went down the bus
17  station steps into the Hamnett Park and Ride now because that's
18  the direction -- I would have almost been, like, paralleling
19  how this guy would have been going through the woods.  So now
20  I'm running through the parking lot towards Center Avenue.
21         Now I hear over the earpiece, "Hey, the guy is now
22  going in the direction of where we first got him."  That's now
23  back inbound.
24         So I'm like, "Fuck."  So I -- now I run back to my
25  car, up steps, put dog in car.  And now I -- I get in my car,
```

8

1  and I drive inbound on the busway about halfway in between

2  Hamnett Station and where they initially got him, the steps --

3  the gazebo steps, they call it.  I parked my car.

4           DETECTIVE JAMES GRILL:  You parked on?

5           SERGEANT BRIAN O'MALLEY:  I was on the busway, yeah.

6  If you go --

7           DETECTIVE JAMES GRILL:  You were up above, on --

8           SERGEANT BRIAN O'MALLEY:  Yeah.  So I'm on the

9  busway, and I -- I parked right where -- on the busway, that

10  Linear Trail, there's a wall that starts, like a sound-barrier

11  wall.  As soon as it starts to rise, that's exactly where we

12  usually jump over the wall when we get people hanging out on

13  the trail back there, just because there's no wall there.

14           So I let my partner out, off leash.  We're jump- --

15  I jump over the wall, and we're -- literally, now we're running

16  back outbound on the trail because they said over the radio he

17  now reversed his travel again and he's heading towards the park

18  and ride again, meaning Hamnett Park and Ride.

19           DETECTIVE PATRICK MILLER:  Where you just came from?

20           SERGEANT BRIAN O'MALLEY:  Where I just came from.

21  So now I'm running back outbound in that same direction.

22           Well, as we're running, somebody put on the radio

23  he's running toward Whitney Avenue.  Well, the way I'm running

24  is -- I'm running, literally, right towards Whitney Avenue.

25           And there's a tunnel that goes under the busway.

9

1  It's called the Whitney Avenue Tunnel.  Whitney Avenue goes
2  right under the busway.  And then there's a ramp that leads
3  down from the Linear Trail to Whitney Avenue.  I'm literally
4  running in that direction.  So that's sort of like -- I knew
5  that I was above him and parallel with this guy.
6            DETECTIVE JAMES GRILL:  So you're still on the
7  busway?
8            SERGEANT BRIAN O'MALLEY:  I'm still on the Linear
9  Trail.
10           DETECTIVE JAMES GRILL:  Oh, you're on the Linear
11  Trail.
12           SERGEANT BRIAN O'MALLEY:  I'm on the Linear Trail
13  running outbound.  The busway would have been to my right-hand
14  side.  And now that big sound wall -- now the sound wall and
15  the busway right below it.
16           DETECTIVE JAMES GRILL:  Okay.
17           SERGEANT BRIAN O'MALLEY:  The woods are now on my
18  left, the same woods that he cut through.  Okay?
19           So now I'm running.  And then I get to the Whitney
20  Avenue -- the ramp that leads down to Whitney.
21           DETECTIVE JAMES GRILL:  Is that the one that goes
22  like --
23           SERGEANT BRIAN O'MALLEY:  Exactly.  The diagonal
24  one.
25           And now I can hear screaming again, so I knew I'm

10

1  kind of like -- I'm above him now.  I can kind of see maybe

2  what was going on.  I hear a little bit of screaming.  So I

3  hear the screaming, but I don't see anybody yet.  I'm trying to

4  look.  And there's a railing.  I go kind of up to the railing.

5  And I remember seeing -- there's a house -- there's houses on

6  both sides of Whitney.  But there was a house right on the

7  corner.

8           DETECTIVE JAMES GRILL:  Which side?

9           SERGEANT BRIAN O'MALLEY:  It would have been -- if

10  I'm looking down Whitney Avenue from the Linear Trail, it was

11  right on the corner.

12           DETECTIVE JAMES GRILL:  The left?

13           SERGEANT BRIAN O'MALLEY:  The left.

14           Okay.  And there was a black couple there.  Male --

15  I think it was a male and female.  And they were looking -- if

16  I'm up here looking down Whitney, they were looking up Whitney

17  like to where the yelling was coming from.

18           DETECTIVE JAMES GRILL:  Was it the first, second,

19  third house?

20           SERGEANT BRIAN O'MALLEY:  I think it was the first

21  one on --

22           DETECTIVE JAMES GRILL:  The first house on Whitney?

23           SERGEANT BRIAN O'MALLEY:  Yeah.  And I could hear --

24  I could see them looking up to where the screaming was coming

25  from, and then I see them kind of look at me.  And they're

11

1   like, "Go, go, go.  He's coming.  He's coming."  They pushed

2   themselves through the door.

3            And then that's then I was like, "He's -- he's got

4   to be close," so I just started down the ramp.

5            And I remember I leashed -- I hooked my dog up on

6   a -- on a collar -- on a -- on his leash and just walked -- ran

7   down the ramp.

8            And then, boom, I could see -- I could see him now,

9   and I could see the officers following.  And he's now walking

10  in my direction, but he's probably maybe 30 yards away, 40

11  yards away.  So he's walking towards me now.

12            DETECTIVE JAMES GRILL:  Is he in the street?

13  Sidewalk?

14            SERGEANT BRIAN O'MALLEY:  He -- he was, like, in

15  the -- he was in the street.

16            DETECTIVE JAMES GRILL:  In the middle of the street?

17            SERGEANT BRIAN O'MALLEY:  Yeah, he was in the middle

18  of the street.  Not walking down -- he was coming -- like

19  diagonalling off towards what would have been my left now.

20  And --

21            DETECTIVE JAMES GRILL:  Coming from the left to the

22  right or from the right --

23            SERGEANT BRIAN O'MALLEY:  Yeah.

24            DETECTIVE JAMES GRILL:  -- to the left?

25            SERGEANT BRIAN O'MALLEY:  So if I'm -- if I get to

12

1    the bottom of the ramp --

2              DETECTIVE JAMES GRILL:  Okay.

3              SERGEANT BRIAN O'MALLEY:  -- that trail that I was

4    on is now behind me.

5              DETECTIVE JAMES GRILL:  Correct.

6              SERGEANT BRIAN O'MALLEY:  So I'm looking up Whitney

7    Avenue.  He's walking towards me, and he's kind of like

8    diagonalling towards the sidewalk on Whitney Avenue.  It would

9    have been the west side of the --

10             DETECTIVE JAMES GRILL:  Okay.

11             SERGEANT BRIAN O'MALLEY:  -- the street.

12             And now he changes directions again, and he starts

13   to go between some houses.  So --

14             DETECTIVE JAMES GRILL:  On what side of the street?

15             SERGEANT BRIAN O'MALLEY:  On the left side of the

16   street where I saw that couple.

17             DETECTIVE JAMES GRILL:  So he cuts in?

18             SERGEANT BRIAN O'MALLEY:  Yeah, he cuts in the cut.

19   Yeah.  There's like -- there's a lot of space between those

20   houses.  So he cut between the -- into one of those yards.  But

21   he's still a considerable -- you know, that's still that 30

22   yards, maybe, away.

23             But I was like, "Cool," because I'm going to now --

24   there was an opening where I could go through on the other side

25   of the house to maybe, like, cut him off.  So I start to cut

13

1  through one of the yards.

2            And then they said again -- he's changed back

3  directions again.  Now he's coming back towards Whitney Avenue.

4            DETECTIVE JAMES GRILL:  Now, when you say you went

5  into the yard, which side -- you followed on the same side?

6            SERGEANT BRIAN O'MALLEY:  The same side as he

7  started to cut through, but I was, like, one house over.

8            DETECTIVE JAMES GRILL:  Before him?

9            SERGEANT BRIAN O'MALLEY:  Yeah.  Like towards the

10  trail, one house over.  So if he's here -- he cut through,

11  like, a big yard.  Then there's a house.  I was over here.

12            DETECTIVE JAMES GRILL:  Okay.

13            SERGEANT BRIAN O'MALLEY:  So I was just going to,

14  like, parallel and meet over here somewhere.

15            DETECTIVE JAMES GRILL:  Okay.  Was that a vacant lot

16  that you cut through?  Was it a bigger lot?

17            SERGEANT BRIAN O'MALLEY:  Yeah.  They're like --

18  those houses are -- have a little bit of space, so...  They're

19  yards.  It's like -- where he started to cut through, I think

20  was a little bit bigger than where I was going to cut through.

21            DETECTIVE JAMES GRILL:  Okay.

22            SERGEANT BRIAN O'MALLEY:  And so they said he

23  reversed again.  So then in the course of doing that, I -- they

24  said he reversed again, so I, like, ran back around.  And now

25  what I did is I -- I kind of closed in a little bit our

14

 1   distance where -- closer to that lot that he cut through.

 2            And I knew -- when I came back around the front of

 3   the house on Whitney, I could see that there was, like, some

 4   bushes or hedges that would -- kind of gave me some

 5   concealment, so I ran up close to those.  And I knew that he

 6   would be emerging -- with those bushes right here, he was going

 7   to be emerging out now back onto Whitney Avenue.  Okay?

 8            DETECTIVE JAMES GRILL:  And your -- your back is to

 9   the Linear Trail?

10            SERGEANT BRIAN O'MALLEY:  Yeah.  So now, like, my

11   back is to it.  So the Linear Trail is here; those bushes are

12   here.  I kind of hunkered down.  And now this dude -- the

13   suspect was going to walk back towards Whitney, which is right

14   here.  The busway -- or the Linear Trail --

15            DETECTIVE JAMES GRILL:  Okay.

16            SERGEANT BRIAN O'MALLEY:  -- being back here.

17            All right.  So I could hear him yelling.  And I

18   remember him saying, "Go ahead and fucking shoot me.  Go ahead

19   and fucking shoot me."  Now I could start hearing shit.  You

20   know, he just kept telling the guys, "Fucking shoot me.

21   Fucking shoot me."

22            So now I -- in kind of looking through the bushes, I

23   see him now.  He's now going to be on, like, my left side.  And

24   as he starts back onto Whitney Avenue, I kind of take, like,

25   half a step out.  And I -- I kind of have my leash in my right

15

1    hand, and I grabbed Aren's collar, grabbed him from behind.

2              And I -- we cal it "target acquisition" with the

3    K-9.  You want him to be on whatever you're sending him to.  So

4    I made sure that he saw the guy, saw the suspect.  And he had

5    target acquisition because -- I know it because his ears -- now

6    his ears kind of perked up and his -- he was looking at him.

7    The guy was probably -- maybe like 10 yards away.  And I just

8    said -- I kind of said, "Watch him," and he started to whine.

9    Like I knew he knew that he was looking at the right guy.  He

10   was looking at his target.

11             DETECTIVE JAMES GRILL:  What's the term that you're

12   using that -- target acquisition?

13             SERGEANT BRIAN O'MALLEY:  Yeah.  It's -- it's just

14   trying to get, like, target acquisition.  So you're not just

15   taking the collar off and giving his bite command.

16             DETECTIVE PATRICK MILLER:  You don't want to send

17   him in blind.

18             SERGEANT BRIAN O'MALLEY:  Yeah.  You're not sending

19   him in blind.  It's just, like, you want him to kind of be

20   looking at what you're sending him to, so in the right

21   direction.

22             So once he gave me that characteristic that I knew

23   he was locked onto this guy, that's when I said, "Police K-9.

24   Stop."

25             And the dude just kept walking.  And that's when I

16

1    un- -- unleashed Aren.  I unhooked his collar, and I kind of --

2    from the back, I just kind of pushed him off.  And he went --

3    he went downrange pretty fast.

4            DETECTIVE JAMES GRILL:  Okay.  Was he saying

5    anything?  From the time he emerged to the time you released,

6    did you hear him yelling anything or saying anything to you

7    guys?

8            SERGEANT BRIAN O'MALLEY:  I heard him shout -- he --

9    he said, "I'll fucking kill that fucking dog."  But he was

10   still walking.  He goes, "I'll kill that fucking dog."

11           Which I was kind of glad because I knew he didn't --

12   he was walking and saying it, but he didn't, like, see which

13   direction my partner was coming from.  That's where I kind of

14   felt I sort of had the advantage to do a -- a nice takedown

15   because he was going to be surprised when the apprehension came

16   in.  So he didn't have any reaction time coming.

17           And I remember him saying it, but I was -- I'm like,

18   "I'm still good because he's kind of still walking."  So then

19   Aren goes --

20           DETECTIVE JAMES GRILL:  Was your dog barking?  Was

21   it --

22           SERGEANT BRIAN O'MALLEY:  He barked -- like, he kind

23   of whimpered one time when I sent him, and then I just sent

24   him.  And when they're running downrange, it's no bark.

25           DETECTIVE JAMES GRILL:  Okay.

17

1      SERGEANT BRIAN O'MALLEY:  They're just -- they're

2   just silent, but they're going in for the apprehension.

3      So kind of -- just as the guy sort of gets across

4   the street, that's when Aren engaged him on his -- I think his

5   right -- or I'm sorry -- his left tricep area.  And the guy

6   sort of, like, took, like, two steps forward.  And then I could

7   see -- I could see a knife in his right hand.  And then that's

8   when he spun.  And he spun, like, backwards -- no, he spun

9   around.  And as he's spinning, I'm seeing him.  He's kind of

10  like doing, like, a thrusting.  I could see that he's -- you

11  know where the knife is going into Aren.

12      So then I saw Aren kind of -- he was up on two legs.

13  He was up on his hind legs on the apprehension.  Then I could

14  see him kind of go down to all four legs and he disengaged.

15  And -- but I could now see now the guy.  Now he's --

16      DETECTIVE JAMES GRILL:  How many -- how many strikes

17  did you see him --

18      SERGEANT BRIAN O'MALLEY:  It was like -- I think I

19  saw it twice into him while he was on the apprehension, like

20  thrust back towards him.  And then when Aren went from two legs

21  to four legs -- he's now off the bite -- I could see him now

22  spinning.  Now he's -- now he's now progressing back towards

23  us, and he's just, like, thrusting at him, at my dog and --

24      DETECTIVE JAMES GRILL:  Do you know how many

25  times -- after the dog broke free, how many times you saw him

1  hit the dog?

2          SERGEANT BRIAN O'MALLEY:  It was like maybe one or

3  two more times.  It was coming from, like, Aren's -- it would

4  be like -- like this side of his face.

5          And that's when I -- I saw him.  I mean, his arm was

6  out, and he -- now he spun towards us.  And from where I was

7  now, that's when I just -- I took my pistol out, and I just --

8  I just fired.  And I remember firing and just watching him

9  just -- I followed him down to the ground and stayed on him

10 when he was on the ground, and then I just reholstered.  And

11 then I looked for my dog, and I couldn't find him anywhere.

12         So I hear -- I heard -- like when we went down, I

13 hear, like, just a shot and then one -- the shot.  And then I

14 reholstered.

15         And then I'm looking for my dog, and I don't see

16 him.  I hear a couple of the officers that were off to my left

17 start to say, "Whoa, whoa, whoa."  And I kind of like looked

18 backwards, and I see Aren kind of just spinning around in a

19 circle.  And my fear was -- I didn't want him to go into a

20 panic mode and -- and bite one of the officers that might be

21 there because he was -- I didn't know if he was injured or

22 what.  So I heard, you know, "Whoa, whoa, whoa," and I quickly,

23 like, looked over.  And I said, "Aren, platz," which is his

24 "down."  It's -- it's German for "place."  I said, "Platz.

25 Platz."  And he started to go down.  I could just see, like, a

1   stream of blood coming from his mouth.  And so I knew,

2   obviously, he was injured.

3            So at that time, I just walked over.  I kind of

4   scooped him up.  And Sergeant DiPippa got on scene, and we just

5   scooped him in the car.  And then that's when he rode me to

6   the -- we -- we were on our way to PVSEC, the vet hos- -- the

7   trauma hospital.

8            DETECTIVE JAMES GRILL:  Who took you?

9            SERGEANT BRIAN O'MALLEY:  Sergeant DiPippa.  Rob.

10  The guy who I was following up out on the busway.

11           DETECTIVE PATRICK MILLER:  How many times did you

12  fire, if you -- if you remember?

13           SERGEANT BRIAN O'MALLEY:  I -- I think it was six

14  times.

15           DETECTIVE PATRICK MILLER:  Okay.

16           SERGEANT BRIAN O'MALLEY:  That's -- that's when I

17  left.  I was gone from the scene.

18           DETECTIVE PATRICK MILLER:  Right.

19           SERGEANT BRIAN O'MALLEY:  We -- we drove to the

20  hospital.  And he -- he just died.  I mean, he was bleeding too

21  much from his mouth.

22           I just -- I mean, I just remember hearing things on

23  the radio.  I remember Tommy saying at one time -- and I

24  don't -- I don't remember when it was, if it was when I was --

25  I think it was when I was running down the trail.  I was

20

1    starting to get pretty gassed from running through the lot.  So

2    I was running back down the trail towards Whitney.  I remember

3    hearing OC was used and Taser was used, and that's -- that's

4    all I remember hearing.  But I don't know when they did it, or

5    what, or who did it.  I just remember hearing at some point

6    that the OC and Taser was used.  And that's when I ended up at

7    the top of the trail -- or the top of the -- the ramp, the

8    Whitney ramp.

9              DETECTIVE PATRICK MILLER:  So you kind of knew going

10   with the dog that he -- they're -- they're -- they're using

11   alternate means to subdue him, and it's just not working.

12             SERGEANT BRIAN O'MALLEY:  Yeah.  That's when I -- I

13   mean, it was like -- I was just thinking in my head.  I'm

14   like -- I was like, "What the hell is going on that this guy --

15   something is going on.  I mean they're using Taser -- Taser and

16   then OC, but then he's still moving around."  You know, I'm

17   like -- so that's why -- I mean, I'm just glad I had Aren.  I

18   was like, "Okay.  Then this is going to be a K-9 -- a K-9

19   apprehension," so...

20             DETECTIVE JAMES GRILL:  Did you hear that on the

21   radio, or did you hear the guys yelling?

22             SERGEANT BRIAN O'MALLEY:  No.  I heard that on the

23   radio.  I -- I have an earpiece, so I heard it in my earpiece.

24   I just -- I don't remember if it was when we were driving up

25   from Hamnett to where we jumped out over the wall or when we

21

1  were kind of running down -- back down the trail.  It was

2  somewhere in that time I remember hearing that Taser and OC was

3  used -- "to no avail" I think was the actual words.  But I

4  remember -- I know Tommy said it.  Tommy -- Officer Adams.

5          DETECTIVE PATRICK MILLER:  DiPippa.  D-i-P-i- --

6          SERGEANT BRIAN O'MALLEY:  Yeah.  D-i-P-i-p-p-a.

7          DETECTIVE PATRICK MILLER:  I got it right.

8          DETECTIVE JAMES GRILL:  I did too.  I usually don't

9  get it right.

10          All right.  How you doing?

11          SERGEANT BRIAN O'MALLEY:  I'm just hurting, man.

12          DETECTIVE JAMES GRILL:  Yeah.

13          SERGEANT BRIAN O'MALLEY:  I mean, it was a rough

14  night last night.  I went into where he sleeps and shit and, I

15  mean, I'm smelling his blanket and stuff, so...

16          I mean, I just beat myself up because -- I mean,

17  I -- I've been through all the -- the K-9 stuff with combat

18  casualty care with dogs and with -- with the humans and shit.

19  And I just couldn't get his bleeding stopped.

20          DETECTIVE JAMES GRILL:  Yeah.

21          SERGEANT BRIAN O'MALLEY:  And it was in his mouth,

22  and I just was -- literally, I'm trying to put my hands in a

23  hole.  Because I knew he was stabbed somewhere.  I didn't know.

24  I was trying to put my hand in a hole, my fingers in a hole to

25  plug something.  I mean, I got my combat gauze on me and shit.

1    And I remember yelling to Rob -- I'm like, "I can't

2    get" -- literally, his blood was just pouring out.  So I tried

3    to cup his snout and just calm him.  And then he just started

4    throwing up, and it was that deep red blood.

5          DETECTIVE PATRICK MILLER:  Yeah.

6          SERGEANT BRIAN O'MALLEY:  I mean, my -- I was just

7    covered in it.  It was frustrating because I just -- I mean, he

8    died.  I knew he sunk down because he just -- I lost him.  And

9    I just couldn't get the freaking bleeding stopped.  I reached

10   my hand in his mouth, you know.  I mean, I couldn't -- I knew

11   something wasn't right because there was a lot of blood and --

12   but, yeah, it's just fucked.

13         DETECTIVE JAMES GRILL:  I'm sorry.

14         SERGEANT BRIAN O'MALLEY:  I mean, it is what it is,

15   man.  It fucking sucks.

16         DETECTIVE PATRICK MILLER:  Can you think of anything

17   else?

18         DETECTIVE JAMES GRILL:  No, I don't think so.

19         DETECTIVE PATRICK MILLER:  Kevin, do you have any

20   questions for us?

21         MR. ABRAMOWICZ:  No.

22         SERGEANT BRIAN O'MALLEY:  I don't.  Man, I mean, it

23   was -- it's all good.  Fuck it.

24         DETECTIVE PATRICK MILLER:  All right.  Well, this

25   completes Sergeant O'Malley's interview.  The time is now

23

1      3:35 p.m.

2              DETECTIVE JAMES GRILL:  (Indiscernible) my card.  It

3      has my number on it.

4              SERGEANT BRIAN O'MALLEY:  Thanks, man.  I appreciate

5      it.

6              DETECTIVE JAMES GRILL:  Condolences here.

7              SERGEANT BRIAN O'MALLEY:  Thank you.

8              (Whereupon, the audio portion of the video recording

9      ended.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ross Reporting Service
724-695-3911

24

# C E R T I F I C A T E

I, Rita A. Ross, Registered Professional Reporter, do hereby certify that the foregoing pages containing the videotaped interview of SERGEANT BRIAN O'MALLEY were transcribed by me from a video recording.

I hereby certify that the foregoing pages are a true and accurate transcript of said interview to the best of my hearing ability.

I do further certify that I am not a relative of any party hereto, nor am I otherwise interested in the event of this action.

The foregoing certification does not apply to any reproduction of this transcript in any respect unless under the direct control and/or supervision of the certifying reporter.

_Rita A. Ross_
_____                    February 15, 2021
RITA A. ROSS, RPR

**[**

[verbatim] (1)
4:23

**A**

above (3)
8:7;9:5;10:1
ABRAMOWICZ (4)
3:9;4:17,21;22:21
acquisition (4)
15:2,5,12,14
across (1)
17:3
actual (1)
21:3
Ad- (1)
5:17
Adams (8)
5:3,8,24;6:4,5,6,6;
21:4
advantage (1)
16:14
afford (1)
3:23
Again (10)
4:8;5:19;8:17,18;
9:25;12:12;13:2,3,23,
24
against (2)
3:12,21
ahead (2)
14:18,18
almost (1)
7:18
alternate (1)
20:11
appointed (1)
3:23
Appreciate (2)
3:9;23:4
apprehension (5)
16:15;17:2,13,19;
20:19
area (1)
17:5
Aren (9)
16:1,19;17:4,11,12,
20;18:18,23;20:17
Aren's (2)
15:1;18:3
arm (1)
18:5
around (5)
13:24;14:2;17:9;
18:18;20:16
attorney (3)
3:22,23;4:17
audio (2)
3:1;23:8
Authority (1)

4:16,17
avail (1)
21:3
Avenue (15)
7:14,15,20;8:23,
24;9:1,1,3,20;10:10;
12:7,8;13:3;14:7,24
away (4)
11:10,11;12:22;
15:7

**B**

back (23)
5:7;7:5,8,23,24;
8:13,16,21;13:2,3,24;
14:2,7,8,11,13,16,24;
16:2;17:20,22;20:2;
21:1
backwards (2)
17:8;18:18
bark (1)
16:24
barked (1)
16:22
barking (1)
16:20
beat (1)
21:16
behind (4)
5:16;7:2;12:4;15:1
below (1)
9:15
big (2)
9:14;13:11
bigger (2)
13:16,20
bit (4)
10:2;13:18,20,25
bite (3)
15:15;17:21;18:20
black (1)
10:14
blanket (1)
21:15
bleeding (3)
19:20;21:19;22:9
blind (2)
15:17,19
blood (4)
19:1;22:2,4,11
boom (1)
11:8
both (1)
10:6
bottom (1)
12:1
BRIAN (66)
3:5,7,11,15,17;4:2,
7,10,13,16,24;5:1,12,
15;6:3,6,21;8:5,8,20;
9:8,12,17,23;10:9,13,
20,23;11:14,17,23,

25;12:3,6,11,15,18;
13:6,9,13,17,22;
14:10,16;15:13,18;
16:8,22;17:1,18;
18:2;19:9,13,16,19;
20:12,22;21:6,11,13,
21;22:6,14,22;23:4,7
brief (1)
3:13
broke (1)
17:25
bus (1)
7:16
bushes (4)
14:4,6,11,22
busway (11)
8:1,5,9,9,25;9:2,7,
13,15;14:14;19:10

**C**

cal (1)
15:2
call (2)
7:7;8:3
called (2)
5:4;9:1
calls (1)
5:17
calm (1)
22:3
came (4)
8:19,20;14:2;16:15
can (4)
3:20;9:25;10:1;
22:16
car (8)
6:15;7:5,8,25,25,
25;8:3;19:5
card (1)
23:2
care (1)
21:18
casualty (1)
21:18
Center (2)
7:14,20
chair (1)
3:10
changed (1)
13:2
changes (1)
12:12
characteristic (1)
15:22
charge (1)
3:24
circle (1)
18:19
clarified (1)
6:9
close (3)
5:23;11:4;14:5

closed (1)
13:25
closer (1)
14:1
closest (1)
7:14
Code (1)
5:17
collar (1)
11:6;15:1,15;16:1
combat (2)
21:17,25
coming (11)
10:17,24;11:1,1,18,
21;13:3;16:13,16;
18:3;19:1
command (1)
15:15
commenced (1)
3:2
comments (1)
3:14
completes (1)
22:25
concealment (1)
14:5
Condolences (1)
23:6
considerable (1)
12:21
continue (1)
5:19
Cool (1)
12:23
corner (2)
10:7,11
couple (2)
10:14;12:16;18:16
course (1)
13:23
court (1)
3:21
covered (1)
22:7
cup (1)
22:3
cut (11)
9:18;12:18,20,25,
25;13:7,10,16,19,20;
14:1
cuts (2)
12:17,18

**D**

date (2)
4:11;5:3
day (2)
3:3;4:25
deep (1)
22:4
deputy (1)
6:23

desire (1)
3:24
DETECTIVE (72)
3:3,6,8,10,15,19;
4:3,8,12,14,18,18,22,
25;5:10,14;6:1,5,19;
8:4,7,19;9:6,10,16,
21;10:8,12,18,22;
11:12,16,21,24;12:2,
5,10,14,17;13:4,8,12,
15,21;14:8,15;15:11,
16;16:4,20,25;17:16,
24;19:8,11,15,18;
20:9,20;21:5,7,8,12,
20;22:5,13,16,18,19,
24;23:2,6
diagonal (1)
9:23
diagonalling (2)
11:19;12:8
died (2)
19:20;22:8
D-i-P-i- (1)
21:5
DiPippa (5)
5:7;6:14;19:4,9;
21:5
D-i-P-i-p-p-a (1)
21:6
direction (7)
7:18,22;8:21;9:4;
11:10;15:21;16:13
directions (2)
12:12;13:3
disengaged (1)
17:14
distance (2)
6:18;14:1
dog (13)
7:9,16,25;11:5;
16:9,10,20;17:23,25;
18:1,11,15;20:10
dogs (1)
21:18
door (1)
11:2
down (20)
7:13,16;9:3,20;
10:10,16;11:4,7,18;
14:12;17:14;18:9,12,
24,25;19:25;20:2;
21:1,1;22:8
downrange (2)
16:3,24
drive (1)
8:1
driving (1)
20:24
drove (1)
19:19
dude (2)
14:12;15:25
during

3:22,24

**E**

earpiece (4)
7:10,21;20:23,23
ears (2)
15:5,6
eastbound (1)
6:10
else (1)
22:17
emerged (1)
16:5
emerging (2)
14:6,7
ended (2)
20:6;23:9
engaged (1)
17:4
equipment (1)
3:6
even (1)
3:7
events (1)
4:23
exactly (2)
8:11;9:23
explained (1)
3:25

**F**

face (1)
18:4
far (1)
6:18
fast (1)
16:3
fear (1)
18:19
felt (1)
16:14
female (1)
10:15
fight (2)
5:18,22
find (1)
18:11
fingers (1)
21:24
fire (1)
19:12
fired (1)
18:8
firing (1)
18:8
first (4)
7:22;10:18,20,22
followed (2)
13:5;18:9
following (2)
11:9;19:10

foot (1)
5:6
forward (1)
17:6
four (1)
17:14,21
freaking (1)
22:9
free (1)
3:23;17:25
front (1)
5:16;14:2
frustrating (1)
22:7
Fuck (1)
7:24;22:23
fucked (1)
22:12
fucking (9)
3:12;14:18,19,20,
21;16:9,9,10;22:15

**G**

gassed (1)
20:1
gauze (1)
21:25
gave (2)
14:4;15:22
gazebo (1)
8:3
German (1)
18:24
gets (1)
17:3
giving (1)
15:15
glad (2)
16:11;20:17
goes (6)
5:2;8:25;9:1,21;
16:10,19
good (4)
3:7,18;16:18;22:23
grabbed (2)
15:1,1
GRILL (48)
3:10;4:18;5:10,14;
6:1,5,19;8:4,7;9:6,10,
16,21;10:8,12,18,22;
11:12,16,21,24;12:2,
5,10,14,17;13:4,8,12,
15,21;14:8,15;15:11;
16:4,20,25;17:16,24;
19:8;20:20;21:8,12,
20;22:13,18;23:2,6
ground (2)
18:9,10
guess (1)
7:13
guy (12)
7:19,21;9:5;15:4,7,

9,23;17:3,5,15;19:10;
20:14
guys (3)
14:20;16:7;20:21

**H**

half (1)
14:25
halfway (3)
5:16;6:17;8:1
Hamnett (6)
5:6;6:12;7:17;8:2,
18;20:25
Hampy (2)
5:4;6:1
hand (4)
15:1;17:7;21:24;
22:10
hands (1)
21:22
hanging (1)
8:12
head (1)
20:13
heading (1)
8:17
hear (14)
7:2,10,21;9:25;
10:2,3,23;14:17;
16:6;18:12,13,16;
20:20,21
heard (5)
16:8;18:12,22;
20:22,23
hearing (5)
14:19;19:22;20:3,
4,5;21:2
hedges (1)
14:4
hell (1)
20:14
Hey (1)
7:21
hind (1)
17:13
hit (1)
18:1
hole (3)
21:23,24,24
homicide (1)
4:16
hooked (1)
11:5
hos- (1)
19:6
hospital (2)
19:7,20
house (9)
10:5,6,19,22;
12:25;13:7,10,11;
14:3
houses (5)

7:13;10:5;12:13,
20;13:18
humans (1)
21:18
hunkered (1)
14:12
hurting (1)
21:11

**I**

inbound (4)
6:11,16;7:23;8:1
indiscernible (2)
3:13;23:2
initially (1)
8:2
initials (2)
4:4,9
injured (2)
18:21;19:2
interview (3)
4:15,19;22:25
into (6)
5:25;6:9,14;7:11,
13,17;12:20;13:5;
17:11,19;18:19;
21:14

**J**

JAMES (48)
3:10;4:18;5:10,14;
6:1,5,19;8:4,7;9:6,10,
16,21;10:8,12,18,22;
11:12,16,21,24;12:2,
5,10,14,17;13:4,8,12,
15,21;14:8,15;15:11;
16:4,20,25;17:16,24;
19:8;20:20;21:8,12,
20;22:13,18;23:2,6
joined (1)
6:23
jump (3)
6:15;8:12,15
jump- (1)
8:14
jumped (1)
20:25

**K**

K-9 (7)
7:6,7;15:3,23;
20:18,18;21:17
kept (2)
14:20;15:25
Kevin (3)
4:17,20;22:19
kill (1)
16:9,10
kind (33)
6:16,22,24;7:2,

10:1,1,4,25;12:7;
13:25;14:4,12,22,24,
25;15:6,8,19;16:1,2,
11,13,18,22;17:3,9,
12,14;18:17,18;19:3;
20:9;21:1
knew (14)
7:12;9:4,25;14:2,5;
15:9,9,22;16:11;
19:1;20:9;21:23;
22:8,10
knife (3)
5:22;17:7,11

**L**

last (1)
21:14
law (1)
3:21
leads (2)
9:2,20
leash (3)
8:14;11:6;14:25
leashed (1)
11:5
left (11)
9:18;10:12,13;
11:19,21,24;12:15;
14:23;17:5;18:16;
19:17
legs (5)
17:12,13,14,20,21
lights (1)
5:20
line (2)
4:4;6:24
Linear (13)
5:4,25;6:8,16;8:10;
9:3,8,10,12;10:10;
14:9,11,14
literally (6)
7:8;8:15,24;9:3;
21:22;22:2
little (4)
10:2;13:18,20,25
location (1)
5:9
locked (1)
15:23
look (2)
10:4,25
looked (4)
7:1;18:11,17,23
looking (12)
10:10,15,16,16,24;
12:6;14:22;15:6,9,10,
20;18:15
lost (1)
22:8
lot (7)
7:20;12:19;13:15,
16;14:1;20:1;22:11

loud (1)
7:3

## M

**Male (2)**
10:14,15
**man (4)**
21:11;22:15,22;
23:4
**many (5)**
17:16,16,24,25;
19:11
**maybe (6)**
10:1;11:10;12:22,
25;15:7;18:2
**mean (18)**
6:12;7:12;18:5;
19:20,22;20:13,15,
17;21:13,15,16,16,
25;22:6,7,10,14,22
**meaning (1)**
8:18
**means (1)**
20:11
**meet (1)**
13:14
**middle (2)**
11:16,17
**might (2)**
6:23;18:20
**MILLER (24)**
3:3,6,8,15,19;4:3,8,
12,14,18,22,25;8:19;
15:16;19:11,15,18;
20:9;21:5,7;22:5,16,
19,24
**mind (1)**
4:5
**mode (1)**
18:20
**more (2)**
5:17;18:3
**mouth (4)**
19:1,21;21:21;
22:10
**moving (1)**
20:16
**much (1)**
19:21
**Myself (2)**
5:7;21:16

## N

**need (1)**
6:10
**nice (1)**
16:14
**night (2)**
21:14,14
**number (1)**
23:3

## O

**obviously (1)**
19:2
**OC (4)**
20:3,6,16;21:2
**off (7)**
8:14;11:19;12:25;
15:15;16:2;17:21;
18:16
**office (1)**
4:16
**Officer (6)**
5:3,4,8,24;6:3;21:4
**officers (4)**
7:2;11:9;18:16,20
**O'MALLEY (65)**
3:5,7,11,17;4:2,7,
10,13,16,24;5:1,12,
15;6:3,6,21;8:5,8,20;
9:8,12,17,23;10:9,13,
20,23;11:14,17,23,
25;12:3,6,11,15,18;
13:6,9,13,17,22;
14:10,16;15:13,18;
16:8,22;17:1,18;
18:2;19:9,13,16,19;
20:12,22;21:6,11,13,
21;22:6,14,22;23:4,7
**O'Malley's (1)**
22:25
**once (1)**
15:22
**one (16)**
3:23;5:19,19;6:2;
9:21,24;10:21;12:20;
13:1,7,10;16:23;18:2,
13,20;19:23
**onto (3)**
14:7,24;15:23
**opening (1)**
12:24
**out (19)**
5:4,7,9,15,19,21;
6:2,15;7:9,16;8:12,
14;14:7,25;18:6,7;
19:10;20:25;22:2
**outbound (5)**
6:11,11;8:16,21;
9:13
**over (15)**
6:15;7:9,9,10,21;
8:12,15,16;13:7,10,
11,14;18:23;19:3;
20:25

## P

**panic (1)**
18:20
**parallel (2)**
9:5;13:14

**paralleling (1)**
7:18
**Park (3)**
7:17;8:17,18
**parked (3)**
8:3,4,9
**parking (1)**
7:20
**partner (2)**
8:14;16:13
**passed (1)**
7:6
**PATRICK (24)**
3:3,6,8,15,19;4:3,8,
12,14,18,22,25;8:19;
15:16;19:11,15,18;
20:9;21:5,7;22:5,16,
19,24
**patrol (1)**
5:6
**people (1)**
8:12
**per (1)**
5:8
**perked (1)**
15:6
**pistol (1)**
18:7
**place (2)**
4:15;18:24
**platz (3)**
18:23,24,25
**plug (1)**
21:25
**PM (2)**
5:2;23:1
**point (2)**
6:20;20:5
**police (2)**
4:17;15:23
**policemen (1)**
4:18
**Port (2)**
4:16,17
**portion (2)**
3:1;23:8
**pouring (1)**
22:2
**present (2)**
3:22;4:19
**pretty (2)**
16:3;20:1
**print (1)**
4:9
**probably (2)**
11:10;15:7
**progressing (1)**
17:22
**pull (1)**
6:14
**pushed (2)**
11:1;16:2
**put (5)**

3:12;7:25;8:22;
21:22,24
**puts (1)**
6:2
**PVSEC (1)**
19:6

## Q

**quickly (1)**
18:22

## R

**radio (7)**
6:1;7:10;8:16,22;
19:23;20:21,23
**railing (2)**
10:4,4
**ramp (7)**
9:2,20;11:4,7;12:1;
20:7,8
**ran (4)**
7:5;11:6;13:24;
14:5
**rapid (1)**
5:17
**reached (1)**
22:9
**reaction (1)**
16:16
**ready (1)**
4:20
**recording (1)**
3:1;23:8
**red (1)**
22:4
**reholstered (2)**
18:10,14
**released (1)**
16:5
**remain (1)**
3:20
**remember (16)**
10:5;11:5;14:18;
16:17;18:8;19:12,22,
23,24;20:2,4,5,24;
21:2,4;22:1
**request (1)**
5:8
**response (1)**
5:18
**reversed (3)**
8:17;13:23,24
**Ride (3)**
7:17;8:18,18
**right (31)**
3:5,11,15,19,20,21;
5:4;6:22;7:8;8:9,24;
9:2,15;10:6,11;11:22,
22;14:6,13,17,25;
15:9,20;17:5,7;
19:18;21:7,9,10;

22:11,24
**right-hand (1)**
9:13
**rights (2)**
3:25;4:5
**rise (1)**
8:11
**Rob (5)**
5:15;6:22;7:6;
19:9;22:1
**rode (1)**
19:5
**room (1)**
3:4
**rough (1)**
21:13
**run (1)**
7:24
**running (21)**
5:24;6:7,7,15,21,
24;7:20;8:15,21,22,
23,23,24;9:4,13,19;
16:24;19:25;20:1,2;
21:1

## S

**same (7)**
5:3,11;6:16;8:21;
9:18;13:5,6
**Sarg (1)**
4:22
**saw (7)**
12:16;15:4,4;
17:12,19,25;18:5
**saying (6)**
14:18;16:4,6,12,
17;19:23
**scene (5)**
5:25;6:7,8;19:4,17
**scooped (2)**
19:4,5
**screaming (4)**
9:25;10:2,3,24
**second (1)**
10:18
**seeing (2)**
10:5;17:9
**send (1)**
15:16
**sending (3)**
15:3,18,20
**sent (2)**
16:23,23
**separate (1)**
5:13
**SERGEANT (71)**
3:5,7,11,17;4:2,7,
10,13,16,24;5:1,2,7,
12,15;6:3,6,13,21;
8:5,8,20;9:8,12,17,
23;10:9,13,20,23;
11:14,17,23,25;12:3,

6,11,15,18;13:6,9,13,
17,22;14:10,16;
15:13,18;16:8,22;
17:1,18;18:2;19:4,9,
9,13,16,19;20:12,22;
21:6,11,13,21;22:6,
14,22,25;23:4,7
**sheriff (1)**
6:23
**shift (1)**
5:2
**shit (4)**
14:19;21:14,18,25
**shoot (4)**
14:18,19,20,21
**shot (2)**
18:13,13
**shout (1)**
16:8
**side (11)**
9:14;10:8;12:9,14,
15,24;13:5,5,6;14:23;
18:4
**sides (1)**
10:6
**Sidewalk (2)**
11:13;12:8
**sign (1)**
4:9
**silent (2)**
3:20;17:2
**sirens (1)**
5:20
**six (1)**
19:13
**sleeps (1)**
21:14
**smelling (1)**
21:15
**snout (1)**
22:3
**somebody (1)**
8:22
**somewhere (4)**
5:21;13:14;21:2,23
**soon (1)**
8:11
**sorry (3)**
5:12;17:5;22:13
**sort (4)**
9:4;16:14;17:3,6
**sound (2)**
9:14,14
**sound-barrier (1)**
8:10
**space (2)**
12:19;13:18
**speak (2)**
3:21;4:6
**spinning (3)**
17:9,22;18:18
**spun (4)**
17:8,8,8;18:6

**stabbed (1)**
21:23
**standard (1)**
3:16
**start (5)**
5:9;6:15;12:25;
14:19;18:17
**started (8)**
5:7,15;11:4;13:7,
19;15:8;18:25;22:3
**starting (2)**
5:18;20:1
**starts (4)**
8:10,11;12:12;
14:24
**stated (1)**
5:18
**Station (6)**
5:5,6,6;12,14;7:17;
8:2
**stayed (1)**
18:9
**step (1)**
14:25
**steps (5)**
7:17,25;8:2,3;17:6
**still (8)**
9:6,8;12:21,21;
16:10,18,18;20:16
**Stop (1)**
15:24
**stopped (4)**
6:25;7:5;21:19;
22:9
**stream (1)**
19:1
**street (9)**
7:14;11:12,15,16,
18;12:11,14,16;17:4
**strikes (1)**
17:16
**stuff (3)**
7:4;21:15,17
**subdue (1)**
20:11
**sucks (1)**
22:15
**sunk (1)**
22:8
**sure (1)**
15:4
**surprised (1)**
16:15
**suspect (7)**
5:22,24;6:7,17;
7:11;14:13;15:4
**suspects (2)**
5:4,19

**T**

**takedown (1)**
16:14

**target (5)**
15:2,5,10,12,14
**Taser (5)**
20:3,6,15,15;21:2
**telling (1)**
14:20
**term (1)**
15:11
**Thanks (1)**
23:4
**thinking (1)**
20:13
**third (1)**
10:19
**throwing (1)**
22:4
**thrust (1)**
17:20
**thrusting (2)**
17:10,23
**times (5)**
17:25,25;18:3;
19:11,14
**Today (1)**
4:12
**Tom (2)**
5:17;6:3
**Tommy (6)**
5:17,21,23;19:23;
21:4,4
**took (3)**
17:6;18:7;19:8
**top (2)**
20:7,7
**toward (2)**
6:8;8:23
**towards (16)**
6:12;7:13,20;8:17,
24;11:11,19;12:7,8;
13:3,9;14:13;17:20,
22;18:6;20:2
**Trail (24)**
5:5,25;6:8,12,16,
17;7:1;8:10,13,16;
9:3,9,11,12;10:10;
12:3;13:10;14:9,11,
14;19:25;20:2,7;21:1
**trailing (1)**
7:2
**transpired- (1)**
4:23
**trauma (1)**
19:7
**travel (1)**
8:17
**tricep (1)**
17:5
**tried (1)**
22:2
**trying (4)**
10:3;15:14;21:22,
24
**tunnel (2)**

8:25;9:1
**twice (1)**
17:19
**two (2)**
5:4;17:6,12,20;
18:3

**U**

**un- (1)**
16:1
**under (2)**
8:25;9:2
**unhooked (1)**
16:1
**units (1)**
5:9
**unleashed (1)**
16:1
**up (21)**
5:8;6:17;7:1,25;
8:7;10:4,16,16,24;
11:5;12:6;14:5;15:6;
17:12,13;19:4,10;
20:6,24;21:16;22:4
**used (5)**
3:20;20:3,3,6;21:3
**using (3)**
5:12;20:10,15
**usually (2)**
8:12;21:8

**V**

**vacant (1)**
13:15
**vehicle (1)**
5:11
**vehicles (1)**
5:13
**vet (1)**
19:6
**video (3)**
3:1,6;23:8

**W**

**walk (1)**
14:13
**walked (2)**
11:6;19:3
**walking (8)**
11:9,11,18;12:7;
15:25;16:10,12,18
**wall (10)**
3:12;6:15;8:10,11,
12,13,15;9:14,14;
20:25
**Watch (1)**
15:8
**watching (1)**
18:8
**way (2)**

8:23;19:6
**west (1)**
12:9
**westbound (1)**
6:11
**What's (2)**
4:11;15:11
**Whereupon (3)**
3:1,13;23:8
**whimpered (1)**
16:23
**whine (1)**
15:8
**Whitney (22)**
7:15;8:23,24;9:1,1,
3,19,20;10:6,10,16,
16,22;12:6,8;13:3;
14:3,7,13,24;20:2,8
**Whoa (6)**
18:17,17,17,22,22,
22
**Wilkinsburg (6)**
5:5,5,25;6:9,10,14
**wish (1)**
4:5
**woods (5)**
7:11,13,19;9:17,18
**words (1)**
21:3
**working (2)**
5:1;20:11
**write (1)**
4:4

**Y**

**yard (2)**
13:5,11
**yards (5)**
11:10,11;12:20,22;
13:1,19;15:7
**yelling (8)**
7:3,3,4;10:17;
14:17;16:6;20:21;
22:1

**1**

**10 (1)**
15:7
**1400 (1)**
5:2

**2**

**2 (1)**
5:17
**2/2 (1)**
4:13
**2200 (1)**
5:2
**2nd (1)**
4:12

| | |
|---|---|
| **3** | |

**3:30 (1)**
  5:3
**3:35 (1)**
  23:1
**30 (2)**
  11:10;12:21

| | |
|---|---|
| **4** | |

**40 (1)**
  11:10

| | |
|---|---|
| **6** | |

**6 (1)**
  4:5