# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CALISIA KELLEY and JOHNNIE MAE
KELLEY, Co-Administrators of the
ESTATE OF BRUCE KELLEY JR.,
deceased,

          **Plaintiffs,**

          Vs.

BRIAN O'MALLEY, both
in his Official and Individual Capacities
as Sergeant for the Allegheny County Port
Authority and **DOMINIC RIVOTTI**, in both his
Official and Individual Capacities as Officer for
the Allegheny County Port Authority,

      **Defendants, Jointly and Severally.**

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 2:17-cv-1599 NBF

**TYPE OF PLEADING**:

**PLAINTIFFS' RESPONSIVE
CONCISE STATEMENT OF
UNDISPUTED MATERIAL
FACTS and ADDITIONAL
UNDISPUTED MATERIAL
FACTS.**

**NATURE OF COMPLAINT:**
Section 1983 Civil Rights Action
Excessive/Deadly Force

**FILED ON BEHALF OF**:
Calisia Kelley and Johnnie Mae
Kelley, Co-Administrators of
the Estate of Bruce Kelley, Jr.,
deceased.

**BY:**
Noah Geary, Esquire
Suite 225
Washington Trust Building
Washington, PA 15301
724-222-3788
PA ID 78382

June 4, 2021

1. – 5.        Disputed. Officers Adams and Hampy were incapable of providing any type of identifying information whatsoever about these alleged "two suspicious individuals" that they allegedly saw on the Linear Trail; they could provide no physical description whatsoever, no identification of clothing. They could not identify their race, or gender, nor articulate any conduct or behavior that was suspicious. The alleged observation of these "suspicious individuals" was pretext to try to justify Adams and Hampy's approach of the Kelleys in the Gazebo. (*Plaintiff's Appendix to RCSUMF, Exhibit 9, Pages 300-301- Deposition Transcript of Officer Thomas Adams p.12 L23 - p.13 L17*).

6.        It is disputed that Adams and Hampy could see open containers from the Trail.

7.        Admitted.

8. – 9.        Admitted in part and disputed in part; it is admitted that these allegations are true. It is disputed that it is a material fact germane to this Court's Summary Judgment analysis.

10. - 11.        Disputed. Adams' own report composed that very day contained no mention of an assault. Instead, he documents that Kelley, Jr. merely "**attempted** to physically push past [Officer Adams] in an attempt to flee". (**Emphasis added**). Further, Officer Hampy lied at the Preliminary Hearing of Bruce Kelley, Sr. at page 33, lines 12-17 when she claimed that Kelley, Jr. shoved Officer Adams. When pressed on cross-examination, she admitted that she saw no such thing. (*Appendix, Exhibit 19, 427-428, Interview Summary of Officer Thomas Adams by ACPD p.2; Appendix Page 419, Exhibit 16 Preliminary Hearing Transcript of Bruce Kelley, Sr. p.33 L12-17,*).

12.        Disputed that a physical struggle occurred between Kelley, Jr. and Adams as Officer Adams was attempting to place Kelley, Jr. in handcuffs. If a physical struggle occurred,

it was initiated wholly by Adams. Further, Kelley, Jr. had committed no crime and Adams had no legal justification to place Kelley, Jr. in handcuffs. In the Commonwealth of Pennsylvania, Police Officers are not permitted per the Rules of Criminal Procedure to arrest someone for a Summary Offense, i.e. an Open Container Violation. (*Plaintiff's Appendix, Page 428, Exhibit 19; Interview Summary of Officer Thomas Adams by ACPD p. 2*).

13. – 14.     Disputed. Neither Kelley, Sr. or Kelley, Jr. are alive to dispute this allegation. Kelley, Sr. passed away of natural causes while this case was on appeal from the Rule 12 ruling. However, the other false and exaggerated claims of Hampy and Adams which are disputed in #10-12 above demonstrate that Hampy and Adams are not credible on this allegation.

15.     Admitted in part and disputed in part; it is admitted that Adams deployed OC Spray at Kelley, Jr. It is disputed that it "had no effect" on Kelley, Jr. To claim that it "had no effect" implies that the OC Spray deployment was successful, i.e. the spray got into Kelley, Jr.'s eyes. This is not what happened. Adams somehow got the OC Spray in his **own** eyes.[1] (**Emphasis added**). (*Appendix, Exhibit 9 Pages 302-305: Deposition Transcript of Officer Thomas Adams p.30 L12 - p.33 L13*).

16—19.     Disputed. Adams made no mention in his call requesting back-up that Kelley, Jr. brandished the knife or swung it in the direction of Adams, or that Adams was in fear of being stabbed. The content of Adams' call was merely that Kelley, Jr. "had a knife". Obviously, if any of the allegations contained in these two paragraphs had actually occurred, this information would have been contained in Adams' call for back-up. Likewise, had Kelley, Jr. struck Hampy in her face, this would have been communicated in Adams' call. (**See** *Defense Appendix in support of Defense #20*). Any injuries sustained by Adams were by his own doing. The nature of

---

[1] Like Officer Adams, Officer Kaupinis, later in the encounter, was also incapable of competently deploying OC Spray at Kelley, Jr.. See Plaintiffs' Concise Statement of Additional Disputed Facts, #s 19-21.

Adams' call for back-up was that there was a group consuming alcohol in the gazebo who began resisting. There is no mention of any aggravated assault against any Officer. Therefore, Kelley, Jr. was not a fleeing felon in this encounter. (*Appendix, Exhibit 12 Pages 318 -320; Deposition Transcript of Officer Andrew Kaupinis p.15 L20-23, p.17 L11 & 12, p.27 L15-22*).

20.     Admitted, and importantly, no mention whatsoever was made in Adams' radio calls that he was assaulted, or Hampy was assaulted, or that Kelley Jr. brandished the knife, tried to slash Adams with the knife. Therefore, inter alia, Kelley, Jr. was not a fleeing felon in this encounter. As far as Kelley, Jr. resisting arrest, he had committed no crime. At most, Kelley, Jr. had committed an Open Container Violation, a Summary Offense. In the Commonwealth of Pennsylvania, Police Officers are not permitted per the Rules of Criminal Procedure to arrest someone for a Summary Offense.

21.     Disputed: See #12 - 20, above.

22.     Admitted in part and disputed in part; it is admitted that this allegation is true. It is disputed that it is a material fact germane to this Court's Summary Judgment analysis.

23.     Admitted; and importantly, Kelley, Jr. walked away from the Officers. He did not initiate a confrontation with any Officer at the Gazebo – nor at any point in time in the entire 20 minute episode.

24.     Admitted.

25.—26.     Disputed. Granger's two Taser deployments cannot be said to have "no effect" on Kelley, Jr.. This is because the Taser Prongs did not pierce the heavy winter coat Kelley, Jr. was wearing over multiple layers of clothing. To claim that the Taser deployments "had no effect" implies that the prongs connected with Kelley, Jr. and shocked him but that he was so aggressive and dangerous that the shock had no effect on him. Therefore, it must be noted that throughout

this entire case, the Defendants repeatedly and falsely claim that the OC Spray deployments and Taser deployments "had no effect" on Kelley, Jr. (*Appendix, Exhibit 22, Pages 437-438; Deposition Transcript of Officer Granger p.33 L4-23; p.47 L1-21*).

27. – 28.        Admitted in part and disputed in part; it is admitted that this allegation is true. It is disputed that it is a material fact germane to this Court's Summary Judgment analysis.

29. - 30.        Admitted.

31.        Disputed: See above, # 10, 11, 12, 15, 18, 19, 25, 26.

32. – 35.        Admitted, and these allegations importantly underscore the point that Kelley, Jr. at no time, in 20 minutes, with approximately 20 Officers around him, (i) stopped and squared up with any Officer; (ii) ever moved in the direction of any Officer, (iii) threatened any Officer (iv) or tried to harm any Officer. This was, at most, passive resistance – not active resistance by Kelley, Jr., if it can even be said that he was lawfully under arrest, which he was not. He has committed no crime other than an Open Container violation. The Defendants failed to make the critical distinction between active resistance by Kelley, Jr. vs. passive resistance. This is pivotal in this Court's deadly force analysis.

36.        Disputed. See #15, 25, 26, above.

37.        It is disputed that Kelley, in light of his mental illness of Schizophrenia and Bi-Polar Disorder and intellectual disabilities was thinking rationally. As detailed in the Plaintiffs' Concise Statement of Additional Material Facts, Kelley, Jr. clearly exhibited signs of Mental Illness throughout the entire encounter. (*Plaintiff's Appendix, Exhibit 6, Pages 43-45 Mental Health Records of Bruce Kelley, Jr.*).

38.    Disputed that Kelley, Jr. could understand the Officers; he had serious mental illness as well as intellectual disabilities. (*Appendix, Exhibit 6, Pages 43-45 Mental Health Records of Bruce Kelley, Jr.*).

39.—43.    Disputed. In the entire 20 minute episode before the Defendants shot Kelley, Jr. to death, Kelley, Jr. raised his knife once momentarily when Officer Sanders made an attempt to deploy his ASP/baton. Then Kelley, Jr. continued **walking away** from all of the Officers. (**Emphasis added**). All Kelley, Jr. said to Sanders was: "Don't you do it!!! Don't you sneak up on me!". This is not a threat of violence or anything close to a threat of violence. It is further disputed that Kelley, Jr. "lunged" at Officer Sanders, or "slashed" his knife at Officer Sanders. Kelley Jr. merely turned his body towards Officer Sanders and momentarily pointed his knife at Sanders—then immediately continued walking away from Sanders and all of the other officers. (*Appendix, Exhibit 17, Page 422; Deposition Transcript of Officer Kyhroe Sanders p.22 L8-12*; ***See also** Defense Exhibit R 3:49:38 – 3:49:51*).

44.    Admitted in part and disputed in part. Admitted that O'Malley did take cover with the dog behind some bushes. However, O'Malley also testified that in his personal experience, a suspect can surrender merely upon seeing the K-9 German Shepherd. O'Malley did not give Kelley, Jr. the opportunity to see/view the German Shepherd. Had O'Malley given Kelley, Jr. this opportunity, it may have caused Kelley, Jr. to surrender immediately, thus eliminating the need for the deployment of the dog. (*Appendix, Page 90, lines 1-15; Exhibit 7 Deposition Transcript of Officer Brian O'Malley p.44 L1-7*).

45.    Disputed. In Rivotti's description of O'Malley's deployment of Aren, Rivotti fails to testify to **any warning** given by O'Malley to Kelley prior to O'Malley releasing the K-9 as a use of force against Kelley.  (*Appendix, Exhibit 21, Page 67; Interview Summary of Officer Ravotti).*

46.          Disputed. At the same time that Defendant O'Malley was allegedly giving commands to Kelley, Jr., other Officers were shouting at Kelley, Jr. to drop the knife. (*Appendix, Page 334 Exhibit 12 Deposition Transcript of Officer Andrew Kaupinis  p.66 L2-23*). Therefore, we have no idea that Kelley, Jr. **even heard** the alleged warnings/commands of O'Malley. Again, Ravotti made no mention of any warning given to Kelley, Jr. by O'Malley *(See #45, above)*.

47.          Admitted in part and disputed in part. It is admitted that O'Malley deployed the dog. It is disputed that it was necessary or a justified use of force. **Significantly, the dog bit Kelley, Jr. on his left arm. Kelley, Jr. had the knife in his right hand.** (*Appendix, Page 337, Exhibit 12 Deposition Transcript of Officer Andrew Kaupinis p.70 L1-7*). **Thus, the dog bit the wrong arm. The dog should have bitten his right arm because Kelley, Jr. had the weapon in his right hand. In fact, O'Malley admitted that no training was given to K-9 Aren to bite and hold a suspect who possessed a knife.** This is why the deployment of the dog was unreasonable. (*Appendix, Page 71, Exhibit 9 Deposition Transcript of Officer Brian O'Malley p.25 L18-p.26 L22*).

48. - 49.          Disputed. The Defendants claim that their 13 shots were fired without pause in between. This directly contradicts their claim that Kelley, Jr. was "turning" as they were shooting him: if he were actually turning while he was being shot, and the 13 shots were fired without pause as claimed, there is great likelihood that Kelley, Jr. would have been shot in either side of his body, or an arm. Instead, he sustained 5 shots directly to his chest (and stomach) and 2 shots directly in his back, close to his spine. (*Appendix, Exhibit 1 Autopsy Report of Bruce Kelley, Jr.*). The Defendants have testified that they have no idea who shot Kelley, Jr. in the back or how that occurred. As to the location and nature of the injuries to the dog, **where is the**

**Autopsy Report of the dog? Why is it not included in the Defendants' Appendix?** It is disputed that it is a fact that Kelley, Jr. stabbed the dog repeatedly in the face and neck area. Additionally, O'Malley deprived Kelley, Jr. the opportunity to see/view the dog and to surrender prior to deployment of the dog. Further, Kelley, Jr.'s back was to O'Malley and he was walking away from O'Malley and the other Officers when O'Malley released the dog. No civilians were in the area either. Kelley, Jr. was a threat to no one at the point in time. By way of further response, Kelley, Jr.'s actions towards the dog were defensive in nature and done out of fear and surprise. O'Malley was an estimated 35 feet from Kelley, Jr. when O'Malley gave commands to Kelley, Jr. (*Appendix, Page 333; Exhibit 12 Deposition Transcript of Officer Andrew Kaupinis p.65 L8-21*).

50.     Disputed. In his Interview with the Allegheny County Police Department just days after the Homicide, Defendant O'Malley described the shooting and significantly did **NOT** state that Kelley took any steps toward O'Malley before O'Malley started shooting Kelley. Kelley was fully engaged with defending himself from the K-9 dog and allegedly "spun" towards O'Malley and Rivotti when O'Malley starting shooting Kelley. *(Appendix, Page 340; O'Malley Interview Transcript, page 18, lines 1-14).* As far as Kelley allegedly "stepping" towards O'Malley (per Rivotti in one version; in Ravotti's other version, all Rivotti testified to was that Kelley was "taking movements" towards O'Malley, see #9, below), Kelley was fully engaged with the dog biting Kelley. (*Appendix, Pages 385-386; Exhibit 21 Interview Summary of Officer Rivotti, page 16, lines 23 -page 18, line 24).* Rivotti stated in his Interview 2 days after the incident that Kelley was standing "almost on the stoop of" the house and that O'Malley and Rivotti were across the street, Whitney Avenue, in the opposite yard, standing "almost" on the sidewalk when the K-9

started biting Kelley's left tricep, back of Kelley's left shoulder. (*Appendix, Exhibit 21 Interview Summary of Officer Rivotti by ACPD*).

By way of further response, and importantly, O'Malley repeatedly refused in his deposition to answer questions and mark his own Exhibit/Aerial View of Whitney Avenue as to where he was in relation to Kelley, Jr. at this critical moment. Out of thin air, O'Malley claims that he was 8 feet away from Kelley, Jr.. Defendant Ravotti, despite continuous refusals to answer the question, eventually gave a description of this distance. The distance was measured by Plaintiff's Investigator. It was 58 feet. Not 8 feet. (*Appendix Exhibit 3 Affidavit of Distance of Plaintiff's Investigator*). This dispute of material fact, alone, requires the denial of the Defendants' Motion.

51.—54.     Admitted that the Defendants committed Homicide. Disputed that it was justified. O'Malley shot and killed Kelley, Jr. in anger, in retaliation for, and in revenge for Kelley, Jr. wounding O'Malley's K-9 partner, the dog. O'Malley fired no shots out of fear for himself or anyone else. Further, there were no civilians in that area. (*Appendix, Exhibit 7 Deposition Transcript of Officer Brian O'Malley p.68 L1-p.69 L22: **See also** p.82 L14-16*). It is admitted that the Defendants used deadly force and discharged his weapon at Kelley, Jr. It is disputed that the Defendants' lives was in danger or that they had a reasonable belief that their lives were in danger. They were 58 feet away from Kelley, Jr. and were armed with semi-automatic guns.

55. - 56.     Admitted in part and disputed in part; it is admitted that this allegation is true. It is disputed that it is a material fact germane to this Court's Summary Judgment analysis.

57. - 58.     It is admitted that there was never any report over the radio that Kelley, Jr. assaulted any Officer or used/brandished the knife. (*See: #16—19, above).*

59.     Disputed. There were no civilians in the area at that point. (*Appendix, Page 331; Exhibit 12 Deposition Transcript of Officer Andrew Kaupinis p.55 L 20-22, p. 67 L5-8*). (*Appendix at 114, Exhibit 7 Deposition Transcript of Defendant O'Malley pages 68-69, describing a male citizen who was walking towards Whitney Avenue prior to Kelley even being on Whitney Avenue leading up to the ultimate and final events immediately preceding the shooting who was told to walk in the opposite direction and complied as well as a woman at her front door, was told to go inside her house and whom also immediately complied; ALSO, O'Malley deposition at page 82, lines 14-16;Rivotti deposition, page 28 lines 8-12; page 47, lines 18-22, Rivotti merely "hears" the voice of a female civilian, but does not see her in the area).*

60.     Admitted in part and disputed in part. It is admitted that Kelley, Jr. may have been continuously moving at all times. It is disputed that any disobedience of Police commands was out of willfulness. Instead, it may have been due to Kelley, Jr.'s mental illness, schizophrenia and bipolar disorder (*Appendix Exhibit 6*). Kelley, Jr. always walked **away** from the Officers. (*Appendix, Exhibit 12 Deposition Transcript of Officer Andrew Kaupinis p.28 L16-24*). At no time did Kelley, Jr. threaten any Officers verbally with violence. (*Appendix, Exhibit 12 Deposition Transcript of Officer Andrew Kaupinis p.45 L18-20*). When Kelley, Jr. was closest to Officer Kaupinis, he did not swing the knife at Kaupinis or do anything of the sort. (*Appendix, Exhibit 12 Deposition Transcript of Officer Andrew Kaupinis p.47 L2-4*).

61.     Admitted in part, disputed in part; it is admitted that this allegation is true. It is disputed that it is a material fact germane to this Court's Summary Judgment analysis.

62.     Disputed. All of the Officers who responded to this incident were situated in front of the house with Kelley, Jr.'s back to the house at 710 Whitney Avenue. Kelley, Jr. was surrounded

and cornered by the Officers. (*Appendix, page 335; Exhibit 12 Deposition Transcript of Officer Andrew Kaupinis p.67 L1-22*).

63.         Disputed, see #60, above.

64 – 67.     Disputed. See 51-54, above.

68. -78.     Admitted in part, disputed in part; it is admitted that this allegation is true. It is disputed that it is a material fact germane to this Court's Summary Judgment analysis.

79. – 81.     Disputed. See above, #s 15, 25-26.

82. – 91.     Disputed. In the entire 20 minute episode before the Defendants shot Kelley, Jr. to death, Kelley, Jr. raised his knife once momentarily when Officer Sanders made an attempt to deploy his ASP/baton. Then Kelley, Jr. continued **walking away** from all of the Officers. (**Emphasis added**). All Kelley, Jr. said to Sanders was: "Don't you do it!!!  Don't you sneak up on me!". This is not a threat of violence or anything close to a threat of violence. It is further disputed that Kelley, Jr. "lunged" at Officer Sanders, or "slashed" his knife at Officer Sanders. Kelley Jr. merely turned his body towards Officer Sanders and momentarily pointed his knife at Sanders—then immediately continued walking away from Sanders and all of the other officers. (*Appendix, Exhibit 17, Page 422;  Deposition Transcript of Officer Kyhroe Sanders p.22 L8-12*; ***See also*** *Defense Exhibit R 3:49:38 – 3:49:51*).

92.     Disputed. First of all, Defendant O'Malley described the knife as a large knife. (*Appendix, Exhibit 9 Deposition Transcript of Officer Brian O'Malley p.86 L14-16*). The knife was a utility knife with a 6 inch handle and a blade coming out an inch or two. (*Appendix, Exhibit 14 Deposition Transcript of Officer Andrew Kaupinis p.24 L5-14*). When Kelley, Jr. was closest to Officer Kaupinis, he did not swing the knife at Kaupinis nor attempt anything like that. (*Appendix, Exhibit 12 Deposition Transcript of Officer Andrew Kaupinis p.47 L2-4*).

93.          Disputed. Despite the fact that Kelley, Jr., for twenty minutes, was walking away

from the Officers, who numbered 10-20, no Officer attempted to push Kelley, Jr. forcefully from

behind to cause him to fall forward to the ground. Officer Kaupinis admitted that this would have

been possible to attempt, but claims that he just "didn't think of it". (*Appendix, Exhibit 12*

*Deposition Transcript of Officer Andrew Kaupinis p.54 L4-22*).

94. – 99.          Disputed. Defendant O'Malley described the shooting and did **NOT** state that

Kelley took any steps toward O'Malley before O'Malley started shooting Kelley. Kelley was

fully engaged with defending himself from the K-9 dog and merely "spun" towards O'Malley

and Rivotti when O'Malley starting shooting Kelley. (O'Malley Interview Transcript, page 18,

lines 1-14). As far as Kelley allegedly "stepping" towards O'Malley (per Rivotti in one version;

in his other version, all Rivotti testified to was that Kelley was "taking movements" towards

O'Malley, see #9, below), Kelley was fully engaged with the dog biting Kelley as Kelley

supposedly "stepped towards" O'Malley. Kelley's body was  positioned sideways to O'Malley

while Kelley was engaged with the dog, defending himself. At no time did Kelley square up to

O'Malley, face O'Malley, and start walking towards O'Malley.


*(Rivotti Interview by Allegheny County Police Department,*
*page 16, lines 23 -page 18, line 24).*


Further, O'Malley actually testified that he, O'Malley, started taking steps ("several") **towards**

**Kelley** as Kelley was slashing at O'Malley's dog.


*(O'Malley deposition transcript page 91, lines 11-19).*

100. – 103. Disputed. In his Interview with the Allegheny County Police Department just days after the Homicide, Defendant O'Malley described the shooting and significantly did **NOT** state that Kelley took any steps toward O'Malley before O'Malley started shooting Kelley. Kelley was fully engaged with defending himself from the K-9 dog and allegedly "spun" towards O'Malley and Rivotti when O'Malley starting shooting Kelley. *(Appendix, Page 340; O'Malley Interview Transcript, page 18, lines 1-14).* As far as Kelley allegedly "stepping" towards O'Malley (per Rivotti in one version; in Ravotti's other version, all Rivotti testified to was that Kelley was "taking movements" towards O'Malley, see #9, below), Kelley was fully engaged with the dog biting Kelley. *(Appendix, Pages 385-386; Exhibit 21 Interview Summary of Officer Rivotti, page 16, lines 23 -page 18, line 24).* Rivotti stated in his Interview 2 days after the incident that Kelley was standing "almost on the stoop of" the house and that O'Malley and Rivotti were across the street, Whitney Avenue, in the opposite yard, standing "almost" on the sidewalk when the K-9 started biting Kelley's left tricep, back of Kelley's left shoulder. *(Appendix, Exhibit 21 Interview Summary of Officer Rivotti by ACPD).*

By way of further response, and importantly, Ravotti repeatedly refused in his deposition to answer questions and mark his own Exhibit/Aerial View of Whitney Avenue as to where he was in relation to Kelley, Jr. at this critical moment. Out of thin air, O'Malley claims that he was 8 feet away from Kelley, Jr.. Defendant Ravotti, despite continuous refusals to answer the question, eventually gave a description of this distance. The distance was measured by Plaintiff's Investigator. It was 58 feet. Not 8 feet. *(Appendix Exhibit 3 Affidavit of Distance of Plaintiff's Investigator).* This dispute of material fact, alone, requires the denial of the Defendants' Motion.

104. – 108.    Admitted in part, disputed in part; it is admitted that this allegation is true. It is disputed that it is a material fact germane to this Court's Summary Judgment analysis.

109. – 114.    O'Malley and Rivotti testified that they shot Kelley, in part, to protect the general public/civilians. *(Rivotti, Interview transcript, page 19, lines 3-15; O'Malley deposition transcript page 130  lines 14-21; also, O'Malley deposition page 122 lines 5-16).*

Yet, no civilians were in the area who could possibly have been endangered by Kelley.

> *(O'Malley Deposition pages 68-69, describing a male citizen who was walking towards Whitney Avenue prior to Kelley even being on Whitney Avenue leading up to the ultimate and final events immediately preceding the shooting who was told to walk in the opposite direction and complied as well as a woman  at her front door, was told to go inside her house and whom also immediately complied; ALSO, O'Malley deposition at page 82, lines 14-16;Ravotti deposition, page 28 lines 8-12;page 47, lines 18-22, Ravotti merely "hears" the voice of a female civilian, but does not see her in the area).*

O'Malley and Ravotti also stated and testified that they shot Kelley, in part, because the lives of their fellow officers were in danger.

> *(Ravotti, Interview transcript, page 19, lines 3-15; O'Malley deposition page 122 lines 5-16).*

Yet, no other Officers in the area were close enough to be harmed by Kelley.

> *(O'Malley deposition transcript page 86, lines 2-4; Ravotti deposition transcript page 84, lines 22-24).*

Ravotti admitted that he shot Kelley twice in the interest of/on behalf of Aren, who had just run away from Kelley; Ravotti further admitted that he did not learn until later of the injuries to the K-9 and how serious the injuries were.

*(Ravotti, Interview transcript, page 20, lines 20-22).*

Ravotti testified that in part, he shot Kelley twice on behalf of himself, even though Kelley did not move toward Ravotti, Ravotti was armed with a 9mm semi-automatic and Kelley was armed with a knife. Further, roughly 18 other Officers were in the vicinity with loaded semi-automatic weapons, watching Kelley's every move As to the distance between both Ravotti and O'Malley at the time of their shooting and killing of Kelley, please see #9, below.

*(Ravotti, Interview transcript, page 19, lines 3-15).*

O'Malley testified that in part, he shot Kelley because he was afraid for this life, yet he, like Ravotti, was armed with a 9mm semi-automatic, and roughly 18 other Officers were in the vicinity with loaded semi-automatic weapons, watching Kelley's every move. Also, O'Malley was actually walking **towards Kelley** while O'Malley was shooting at Kelley.

*(O'Malley deposition transcript, page 130, lines 19-21: "My life was in danger"; O'Malley deposition transcript page 91, lines 11-19).*

There were no civilians in the yards. (*Appendix, Exhibit 12 Deposition Transcript of Officer Andrew Kaupinis p.55 L20-22, p.67 L5-8*).

115. -117.      Admitted in part, disputed in part; it is admitted that this allegation is true. It is disputed that it is a material fact germane to this Court's Summary Judgment analysis.

118. – 119.      Disputed. Admitted in part and disputed in part. It is admitted that O'Malley deployed the dog. It is disputed that it was necessary or a justified use of force. **Significantly, the dog bit Kelley, Jr. on his left arm. Kelley, Jr. had the knife in his right hand.** (*Appendix, Page 337, Exhibit 12 Deposition Transcript of Officer Andrew Kaupinis p.70 L1-7*). **Thus, the dog bit the wrong arm. The dog should have bitten his right arm because Kelley, Jr. had the weapon in his right hand. In fact, O'Malley admitted that no training was given to K-9 Aren to bite and hold a suspect who possessed a knife.** This is why the deployment of the dog was unreasonable. (*Appendix, Page 71, Exhibit 9 Deposition Transcript of Officer Brian O'Malley p.25 L18-p.26 L22*).

120. – 122.      Admitted; there is no mention by Adams in the call for back-up that Kelley, Jr. had used the knife, or brandished it, at the Gazebo. Second, there is no mention in Adams' call of any aggravated assault on an Officer. Was Kelley, Jr. illegally placed under arrest for committing a Summary Offense?

123-124.      Admitted in part, disputed in part; it is admitted that this allegation is true. It is disputed that it is a material fact germane to this Court's Summary Judgment analysis.

125. – 134.      Admitted in part, disputed in part; it is admitted that this allegation is true. It is disputed that it is a material fact germane to this Court's Summary Judgment analysis.

135. – 138. Admitted in part and disputed in part. Admitted that O'Malley did take cover with the dog behind some bushes. However, O'Malley also testified that in his personal experience, a suspect can surrender merely upon seeing the K-9 German Shepherd. O'Malley did not give Kelley, Jr. the opportunity to see/view the German Shepherd. Had O'Malley given Kelley, Jr. this opportunity, it may have caused Kelley, Jr. to surrender immediately, thus eliminating the need for the deployment of the dog. (*Appendix, Page 90, lines 1-15; Exhibit 7 Deposition Transcript of Officer Brian O'Malley p.44 L1-7*).

139.     Disputed. O'Malley asked no questions at any time on the scene to acquire the true threat level posed by Kelley, Jr., if any.


140. – 151.     Disputed. Kelley was walking *away from* O'Malley when O'Malley deployed/released the dog to perform a "suspect apprehension" of Kelley.

> *(Ravotti deposition transcript, page 57 line 25 into page 58, line 1; ALSO, page 61, line 23).*

In Rivotti's description of O'Malley's deployment of Aren, Rivotti fails to testify to **any warning** given by O'Malley to Kelley prior to O'Malley releasing the K-9 as a use of force against Kelley.

> *(Rivotti Interview Transcript, page 16 line 23 -  page 17 line 24: Rivotti describes O'Malley giving the command to the K-9 to sic Kelley, but makes **no mention** of any warning by O'Malley to Bruce Kelley that O'Malley is about to deploy the K-9 on Kelley).*

152.   Disputed. Ravotti stated in his Interview 2 days after the incident that Kelley was standing "almost on the stoop of" the house and that O'Malley and Ravotti were across the street, Whitney Avenue, in the opposite yard, standing "almost" on the sidewalk when the K-9 started biting Kelley's left tricep, back of Kelley's left shoulder. *(Ravotti Interview by Allegheny County Police Department, page 17, lines 20-24).*

153. – 157.   Disputed. As far as Kelley allegedly "stepping" towards O'Malley (per Rivotti in one version; in his other version, all Rivotti testified to was that Kelley was "taking movements" towards O'Malley, see #9, below), Kelley was fully engaged with the dog biting Kelley as Kelley supposedly "stepped towards" O'Malley. Kelley's body was positioned sideways to O'Malley while Kelley was engaged with the dog, defending himself. At no time did Kelley square up to O'Malley, face O'Malley, and start walking towards O'Malley.

*(Rivotti Interview by Allegheny County Police Department, page 16, lines 23 -page 18, line 24).*

By way of further response, and importantly, O'Malley repeatedly refused in his deposition to answer questions and mark his own Exhibit/Aerial View of Whitney Avenue as to where he was in relation to Kelley, Jr. at this critical moment. Out of thin air, O'Malley claims that he was 8 feet away from Kelley, Jr.. Defendant Ravotti, despite continuous refusals to answer the question, eventually gave a description of this distance. The distance was measured by Plaintiff's Investigator. It was 58 feet. Not 8 feet. (*Appendix Exhibit 3 Affidavit of Distance of Plaintiff's Investigator*). This dispute of material fact, alone, requires the denial of the Defendants' Motion.

158. – 159.    Disputed. At one point, Ravotti claimed that he shot Kelley twice because Kelley was a threat to O'Malley. Yet Ravotti could not testify where O'Malley was. When pressured:

> **Q.      If you didn't know where O'Malley was specifically,**
> how did you know Kelley Jr. was a threat to O'Malley?
>
> A.      I know where – I know the ---this general area where
> O'Malley was standing, and I know that he was taking
> movements towards O'Malley. At that point, that's when
> I felt he was a threat towards O'Malley, and I fired my
> weapon."

> *(O'Malley deposition transcript pages 76, 77, 80, 81, 85,*
> *95, 96, 97, 98, 99; Ravotti deposition transcript pages 82,*
> *83; ALSO Ravotti deposition transcript page 86, lines 12-*
> *24).*

160.    Disputed. O'Malley shot and killed Kelley, Jr. in anger, in retaliation for, and in revenge for Kelley, Jr. wounding O'Malley's K-9 partner, the dog. O'Malley fired no shots out of fear for himself or anyone else. Further, there were no civilians in that area. (*Appendix, Exhibit 9 Deposition Transcript of Officer Brian O'Malley p.68 L1-p.69 L22: **See also** p.82 L14-16*).

161.    Disputed. What O'Malley considered goes to his state of mind which involves a credibility determination which is for a jury to make at trial. Furthermore, Kelley Jr.'s resistance to arrest was, at most, passive resistance. It is disputed that there was active resistance by Kelley Jr. O'Malley wholly failed to consider PAT's own Use of Force of Policy which required a distinction to be made between active resistance and passive resistance. (*Appendix, Exhibit p.* ).

162.    Admitted in part and disputed in part. It is admitted that O'Malley used deadly force and discharged his weapon at Kelley, Jr. It is disputed that O'Malley's life was in danger or that he had a reasonable belief that his life was in danger.

By way of further response, the Defendants shot Kelley in the back, twice.

       Location of entrance wound #1 in the back: right upper back

       Direction: back to front and downward *(Page 1, II., (B); also Page 9, Autopsy*

*Report)*

       Location of entrance wound #2 in the back: right mid back

       Direction: back to front, right to left and upwards. (*(Page 2, VI., (F); also Pages*

*11-12, Autopsy Report).*

<u>Yet neither</u> <u>Defendant can explain who shot Kelley in the back, or how the shooting of Kelley in</u>

<u>the back, twice, occurred.</u>

       *(Ravotti deposition, page 76, lines 1-5; O'Malley deposition, page 114, lines 5-6).*

**PLAINTIFFS' ADDITIONAL UNDISPUTED MATERIAL FACTS:**

1.  Kelley, Jr. attempted to de-escalate Officers Adams and Hampy approaching him in the gazebo for an Open Container Violation, by getting up and walking toward a garbage can and throwing a container in it. (*Appendix, Page 424, Exhibit 18 Report of Officer Hampy by ACPD, 2nd Paragraph, 2nd to last sentence*).

2.  Kelley, Jr. began "hugging the gazebo." (*Appendix, Page 309 Exhibit 10; Deposition Transcript of Officer Hampy, p. 44 L19- p.45 L20*).

3.  Defendant O'Malley heard Kelley, Jr. say: "Go ahead. Fucking shoot me. Fucking shoot me." (*Appendix, Page 116; Exhibit 9 Deposition Transcript of Officer Brian O'Malley p.70 L6-14*).

4.  O'Malley heard Kelley say "Shoot me. Just shoot me" to O'Malley as well as to other officers. When asked if he took that as an indication that Kelley had mental health issues, O'Malley replied:

    **A.     No.**

When asked why not, O'Malley answered:

    **A.     No reason.**

(*Appendix, Pages 164-165, Deposition Transcript of Officer O'Malley p.118, L24 – p.119 L6*).

5.  Kelley, Jr. "just kept yelling crazy stuff" (*Appendix, Page 383, Exhibit 21 Interview Summary of Officer Rivotti by ACPD, p.14 L17-20*).

6.  Civilian witness Danielle Smith stated that Kelley, Jr. looked "crazy". (*Appendix, page 444, Exhibit 24, D.A. Zappala's Report*).

7.      Defendant O'Malley had undergone Crisis Intervention Training involving suspects that, "exhibit various degrees of crisis. Mostly disturbed people, delirium." (*Appendix, Exhibit 7, Pages 147-148; Deposition Transcript of Officer Brian O'Malley, p.101 L21-p.102 L2*).

8.      Contrary to his Crisis Intervention Training, O'Malley attempted no dialogue with Kelley, Jr., because he was "committed" to deploying his K-9. (*Appendix, Exhibit 7, Pages Deposition Transcript of Officer Brian O'Malley, p.102 L3-p.103 L23; p.118 L3-7*).

9.      Defendant O'Malley candidly admitted that he did nothing to de-escalate the situation before releasing his K-9 on Kelley, Jr. (*Appendix, Exhibit 7, Page 149; Deposition Transcript of Officer Brian O'Malley, p.103 L21-23*).

10.     O'Malley was determined to deploy his K-9 in a use of force regardless of the circumstances and whether it was necessary, reasonable, or justified:

*(Appendix, Page 346; Interview Transcript of Officer Brian O'Malley, p. 7, L5-7) O'Malley, only having been on scene for several minutes and having obtained little to no information to that point, stated to Sgt. Robert DiPippa:*

**"I'm going to go get my K-9.**

**This is going to be a K-9 call".**

Also:

> Q.      Before you deployed Aren, was there any thinking
> by you to somehow get behind Bruce Kelley, Jr.,
> physically to –you get behind him and – and
> try to apprehend him some way from behind?
>
> A.      **No. I was committed to K-9 deployment).**
>
> *(O'Malley deposition transcript, p.118 L3-7:)*

11.     O'Malley admitted to "beating himself up" over the shooting. (*Interview Summary of Officer O'Malley Transcript, page 21 L16*).

12.    Defendant O'Malley continuously and obstinately refused to mark on his own Exhibit where he was and where Kelley, Jr. was when O'Malley deployed the K-9. (*Appendix, Page 122; Exhibit 7, Deposition Transcript of Officer Brian O'Malley p.76 L6-p.77 L7, and p.80 L22-p.81 L10; **See also** p.85 L5-p.86 L1*).

13.    Defense Counsel directed Defendant O'Malley not to guess where he was at critical points in time. (*Appendix, 122-126; Exhibit 7 Deposition Transcript of Officer Brian O'Malley p.76 L6-p.80 L10-15*).

14.    Defendant O'Malley continuously and obstinately refused to mark on his own Exhibit  as to where he was when he started firing at Kelley, Jr. (*Appendix, Exhibit 7 Deposition Transcript of Officer Brian O'Malley, p.96 L21-p.99 L14*).

15.    Defense Counsel objected to the question asking Defendant O'Malley to mark on his own Exhibit where O'Malley was when he started shooting Kelley, Jr. because O'Malley wasn't "comfortable" doing so. (*Appendix, Exhibit 9 Deposition Transcript of Officer Brian O'Malley, p.98 L5-p.99 L14*).

17.    Defendant O'Malley violated PAT Policy by failing to make the usual Incident Report for this incident, a Weapon Discharge Report, and failed to complete a K-9 Usage Report (*Appendix, Exhibit 7 Deposition Transcript of Officer Brian O'Malley, p.110 L4-p.113 L5; **See also** Exhibit 5 Use of Force Policy, p.24-25, Exhibit 6 K-9 Policy-PAT, p.64 #4 top of page*).

18.    Defendant O'Malley's excuse for directly violating PAT Policy was that he was "interviewed" by the Allegheny County Police Department regarding the incident. However, a review of the interview transcript clearly shows that his fellow Officers from the ACPD asked him no probing questions, nor was any legitimate, thorough, challenging questioning conducted.

*(Appendix, Exhibit 13, Interview Transcript of Officer Brian O'Malley by Allegheny County Police Department)*.

19.  When an Officer deploys OC Spray at a suspect, the Officer is to aim specifically for the suspects' eyes. (*Appendix, Exhibit 14 Deposition Transcript of Officer Andrew Kaupinis p.35 L12-23*).

20.  Officer Kaupinis attempted to deploy OC Spray twice. (*Appendix, Exhibit 14 Deposition Transcript of Officer Andrew Kaupinis p. 35 L1-6, p.40 L4-21, p.102 L11; **See also** Defense Exhibit Timeline of Events p.13 & p.15*).

21.  Officer Kaupinis deployed OC Spray; Kaupinis claims that "the wind" took it away, despite the fact that it was not a windy day. Officer Kaupinis deployed OC Spray a second time; at that point in time, Kelley, Jr.'s back was towards Officer Kaupinis. The OC Spray did not make it into Kelley, Jr.'s eyes. The Spray hit Kelley, Jr.'s body in the back of Kelley, Jr.'s head. (*Appendix, Exhibit 14 Deposition Transcript of Officer Andrew Kaupinis p. 35 L1-6, p.40 L4-21, p.102 L6-15*).

Respectfully submitted,

/s/ Noah Geary, Esquire
Noah Geary
Suite 225
Washington Trust Building
Washington, PA 15301
724-222-3788
PA ID 78382

**CERTIFICATE OF SERVICE:**

I, Noah Geary, Esquire, hereby certify that a true and correct copy of the foregoing

**PLAINTIFFS' RESPONSIVE CONCISE STATEMENT OF UNDISPUTED MATERIAL**

**FACTS AND ADDITIONAL UNDISPUTED MATERIAL FACTS** was served via electronic

filing this 4th day of June, 2021 on the below-listed counsel of record:

Greg Evashavik, Esquire
*(Counsel for Port Authority Defendants)*

June 4, 2021

s/ Noah Geary, Esquire
Noah Geary, Esquire
Suite 225
Washington Trust Building
Washington, PA 15301
724-222-3788
PA ID 78382