# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CALISIA KELLEY and JOHNNIE MAE KELLEY**, Co-Administrators of the **ESTATE OF BRUCE KELLEY JR.**, deceased, | Civil Action No. 2:17-cv-1599 NBF |
| Plaintiffs, | **TYPE OF PLEADING**: PLAINTIFFS' <u>Lombardo</u> BRIEF. |
| | **NATURE OF COMPLAINT:** Section 1983 Civil Rights Action Excessive/Deadly Force |
| Vs. | **FILED ON BEHALF OF**: Calisia Kelley and Johnnie Mae Kelley, Co-Administrators of the Estate of Bruce Kelley, Jr., deceased. |
| **BRIAN O'MALLEY,** both in his Official and Individual Capacities as Sergeant for the Allegheny County Port Authority and **DOMINIC RIVOTTI**, in both his Official and Individual Capacities as Officer for the Allegheny County Port Authority, | |
| Defendants, Jointly and Severally. | **BY:** Noah Geary, Esquire Suite 225 Washington Trust Building Washington, PA 15301 724-222-3788 PA ID 78382 |

August 24, 2021

**JURY TRIAL DEMANDED.**

**AND NOW COME** the Plaintiffs and respond as follows:

Introduction.

This Court directed the parties to address the applicability of the recent Lombardo decision to aid in this Court's Summary Judgment analysis.

The Lombardo majority emphasized that **"details could matter"** and faulted the 8th Circuit Court of Appeals for characterizing certain facts in the discovery record as "insignificant" when those same facts could be construed as "potentially important". The Court reiterated the long-standing principle in excessive force cases that a careful, context-specific analysis must be conducted by the trial court at the Summary Judgment stage.

The details that matter here[1]:

The Lombardo decision cited Kingsley vs. Hendrickson, 576 U.S. 389, 135 S.Ct. 2466 and Graham vs. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, cases which forbid a "mechanical" application of the Summary Judgment standard. Kingsley and Graham require a careful analysis of, inter alia, the following factors:

1. the relationship between the **need** for the use of force and the **amount** of force used;

2. the extent of Plaintiff's injury;

3. any effort made by the Defendants to temper or limit the amount of force used;

4. the severity of the security problem at issue;

5. the threat reasonably perceived by the officers; and

6. whether the suspect was actively resisting arrest vs. passively resisting.

---

[1] The Plaintiffs hereby incorporate all of their papers already filed in Opposition to the Defendants' Summary Judgment Motion. Plaintiffs' Counsel has attempted in this filing to avoid redundancy, but some is necessary.

1.  As to the relationship between the **need** for the use of force and the **amount** of force used here, Kelley, while certainly frustrating to the Defendants and all of the other Officers who responded, did two things: (i) refused to put his 2 inch utility knife down; and (ii) would not stop walking away from the Officers. Defendant O'Malley admitted to hearing Kelley say "Shoot me. Just shoot me" to O'Malley and the other officers. When asked if he took that as an indication that Kelley had mental health issues, O'Malley replied:

**A.      No.**

When asked why not, O'Malley answered:

**A.      No reason.**

*(O'Malley depo transcript page 118, line 24 – page 119, line 6).*

Objectively speaking, a suspect saying "shoot me, just shoot me", is indicative of someone in mental health crisis. Defendant O'Malley has **no reason** why he did not interpret this statement of Kelley as an indication of mental crisis/illness? **This** is **objectively unreasonable.** Secondly, the need for lethal force here was none-existent. This Court cannot take away from a jury its right to assess the Defendants' demeanors on the witness stand and determine the credibility of both Defendant Officers and conclude that they fired out of anger for Kelley injuring O'Malley's K-9 partner. The first factor goes to the Plaintiffs.

2.  The extent of Plaintiff's injury was the ultimate injury: death. This should go to the Plaintiffs.

3.  As to any effort made by the Defendants to temper or limit the amount of force used, O'Malley was determined to deploy his K-9 in a use of force regardless of the actual circumstances and whether it was necessary, reasonable, or justified. This is exactly what an

Officer is not to do. Upon his arrival on scene, Defendant O'Malley concluded immediately, without asking one question about what actually occurred at the Gazebo:

> *"I'm going to go get my K-9.*
>
> *This is going to be a K-9 call".*

O'Malley was directly asked:

> Q. Before you deployed Aren, was there any thinking by you to somehow get behind Bruce Kelley, Jr., physically to –you get behind him and – and try to apprehend him some way from behind?

He candidly admitted:

> A. **No. I was committed to K-9 deployment).**

> *(See O'Malley Interview, page 7, lines 5-7, where O'Malley, only having been on scene for several minutes and having obtained little to no information to that point, stated to Sgt. Robert DiPippa; also, see O'Malley deposition transcript, page 118 lines 3-7).*

What should be dispositive as to this factor is that O'Malley also bluntly admitted that he did **nothing** to de-escalate the situation before releasing the K-9 on Kelley:

> Q. Did you do anything before you released Aren to try to de-escalate the situation?
>
> **A.** No.
>
> *(O'Malley depo transcript page 103, lines 21-23).*

4

This factor goes to the Plaintiffs.

4. The severity of the security problem at issue was minimal: 22 Officers responded with at least 10-16 different Officers at varying points in time dealing directly with Kelley, all very close to him in physical proximity. It was 22 vs. 1. This factor goes to the Plaintiffs.

5. Regarding the threat reasonably perceived by the Defendants, they have importantly already admitted in deposition testimony that they shot and killed Kelly, **in part:**

     (i)     to protect the "general public" and civilians - despite the **total absence** of any civilians in the area where Kelley was;

     (ii)     to protect other officers who were "on scene" - yet **nowhere near Kelley** at the critical junctures;

     (iii)     and in the interest of the K-9, a dog who is **not** considered an Officer in this legal context.

*(Plaintiffs' RCSUMF #109-114)*

Thus, the Plaintiffs have already established in this discovery record that the Defendants' shooting of Kelley was objectively unreasonable in light of the above three reasons stated by the Defendants as to why they shot and killed Kelley. If even one admitted, partial reason to use deadly force is objectively unreasonable, the use of deadly force was objectively unreasonable.

This factor goes to the Plaintiffs.

6. As to whether Kelley was actively resisting or engaged in passive resistance, this is critical in this case. Not putting the knife down and continually walking away from the Officers constitutes **passive** resistance. Not active resistance. One can resist arrest, obviously, by

5

punching the officer, kneeing the officer, elbowing the officer, etc., by striking (or attempting to strike) an officer. Kelley did nothing of the sort -at any time- in the lengthy, 20 minute episode. Passive vs. active resistance is critical because it is an indicator of a suspect's intentions. A suspect can harm or attempt to harm an officer by striking or attempting to strike an officer. On the contrary, walking away from the officers, for 20 minutes, is passive. Someone who engages in active resistance can more accurately be characterized as "dangerous". One who engages in active resistance, unlike Kelley, can more reasonably be considered a threat of immediate, serious bodily injury or death to an Officer (but not necessarily).

The Defendants continually claimed in depositions simply that Kelley was a "threat". But a threat **of what?** The only threat that justifies the use of deadly force is the objectively significant and immediate threat of death or serious bodily injury to the Defendant Officer. The requirement of "significant" is commonly left out of decisions, but is a requirement to justify the use of deadly force. <u>Tennessee vs. Garner</u> requires a (i) significant and (ii) immediate threat of (iii) death or serious bodily injury to the officer or others to justify the use of deadly force. <u>Garner</u>, at 1.

On what should be the weighty factor of passive resistance vs. active resistance, Kelley's behavior constituted mere passive resistance. This factor goes to the Plaintiffs.

In the case of <u>El vs. City of Pittsburgh and Kacsuta,</u> 3rd Circuit, No. 18-2856 (September 16, 2020), the 3rd Circuit emphasized that the situation unfolded over a few minutes, "not a few tense and dangerous seconds.". (<u>El</u>, at page 15). Here, the episode played out for close to **20 minutes.** The Defendants were in no way "confronted" with a "rapidly-evolving", tense, "split-second" decision to make. The temporal factor here goes to the Plaintiffs as well.

6

Highly pertinent to this case is what the Majority ruled in El in criticizing the dissent. The Majority ruled that the dissent "considerably undersells the officers' capabilities". (El, at 24). An officer cannot unsuccessfully (due to no fault of the suspect) deploy pepper spray, as Adams and Kaupinis both did here - somehow spraying Pepper Spray in their own eyes – then resort to an increased use of force by false claiming that the prior use of force was to "no effect". This is the definition of objective unreasonableness. Out of 22 Officers, why didn't a third Officer, in 20 minutes, simply approach Kelley and successfully spray Pepper Spray in Kelley's eyes? Of the remaining 20 Officers on scene? **None of them** could do this? O'Malley also hid the K-9 from Kelley, behind bushes. Yet O'Malley's own experience proved that the mere sighting of the dog caused a suspect to immediately surrender.

O'Malley further admits that contrary to his Crisis Intervention Training, he never attempted, once, to engage Kelley in verbal dialogue to inquire why Kelley, a Scizophrenic with bi-polar disorder, would not put down his knife. His excuse was that Kelley was "walking too fast". Looking at the facts in the light most favorable to the Kelleys, this is nonsense. *(deposition at 102, lines 13-22 - 103)*. O'Malley never once attempted to use his Crisis Intervention skills.

O'Malley also falsely claims that he was aware from the radio broadcasts of Officer Adams that Kelley had assaulted Adams. The problem for O'Malley is that the broadcasts of Adams mention no such thing. Adams only reported "a group drinking alcohol, resisting, and one had a knife.". (*Deposition, page 129, line 22).*

Finally, Defendant Ravotti admitted *(depo. Page 60 , lines 6-15)* that the instances Kelley gestured with his 2 inch Utility Knife was when no officers were in close proximity to Kelley. Defendant Ravotti also admitted that no civilian or other Officer was in the vicinity of Kelley, and that the "threat" Kelley posed was theoretical: Kelley was a threat to "anybody he **would**

7

**have** encountered" *(depo. Page 84 , lines 18-24).* The threat (significant and immediate threat of death or serious bodily injury) must be actual - not theoretical.

Conclusion.

In sum, numerous genuine disputes of material fact exist here which warrant the denial of the Defendants' Motion.

Respectfully submitted,

/s/ Noah Geary
Noah Geary, Esquire
Washington Trust Building
Suite 225
Washington, PA 15301
(724) 222-3788
PA I.D.#: 78382

August 24, 2021

**CERTIFICATE OF SERVICE:**

I, Noah Geary, Esquire, do hereby certify that a true copy of the foregoing **Lombardo BRIEF of the PLAINTIFFS** was served via electronic mail on this day to the below-listed counsel of record:

Greg Evashavik, Esquire
*(Counsel for Port Authority Defendants)*

Respectfully submitted,

/s/ Noah Geary
Noah Geary, Esquire
Washington Trust Building
Suite 225
Washington, PA 15301
(724) 222-3788
PA I.D.#: 78382

August 24, 2021

9