# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CALISIA KELLEY and JOHNNIE MAE KELLEY, Co-Administrators of the ESTATE OF BRUCE KELLEY JR., deceased, | Civil Action No. 2:17-cv-1599 NBF |
| | TYPE OF PLEADING: |
| Plaintiffs, | APPENDIX TO PLAINTIFFS' Lombardo BRIEF. |
| | NATURE OF COMPLAINT: Section 1983 Civil Rights Action Excessive/Deadly Force |
| Vs. | FILED ON BEHALF OF: Calisia Kelley and Johnnie Mae Kelley, Co-Administrators of the Estate of Bruce Kelley, Jr., deceased. |
| BRIAN O'MALLEY, both in his Official and Individual Capacities as Sergeant for the Allegheny County Port Authority and DOMINIC RIVOTTI, in both his Official and Individual Capacities as Officer for the Allegheny County Port Authority, | |
| Defendants, Jointly and Severally. | BY: Noah Geary, Esquire Suite 225 Washington Trust Building Washington, PA 15301 724-222-3788 PA ID 78382 |

August 24, 2021

**JURY TRIAL DEMANDED.**

## APPENDIX TO LOMBARDO BRIEF:

Table of Contents

Excerpts from deposition of Defendant Rivotti

Excerpts from deposition of Defendant O'Malley

57

1  sidewalk, walking towards like -- like kind of at a diagonal
2  away from us.
3      Q.   And he's in front of you.  Correct?
4      A.   Yes.
5      Q.   And to the extent he's walking at a diagonal, was
6  Bruce Kelley, say, walking off more to your left or more off to
7  your right?
8      A.   To the left, towards the houses on the left side of
9  the street.
10     Q.   Okay.  Were there any civilians in that immediate
11 vicinity out in their yards?
12     A.   Not outside at that point, no.
13     Q.   Okay.
14     A.   That I know of.
15     Q.   Okay.
16     A.   Again, the female that was screaming, but I don't --
17 she was -- I don't know which house she was in.
18     Q.   And the female that was screaming, what, she was in
19 a house?
20     A.   I did not -- I did not see her, so...
21     Q.   Okay.  So when O'Malley shouts the commands to stop
22 or he's going to release the dog, whatever words he used,
23 Kelley was in motion.  Is that right?
24     A.   Correct.
25     Q.   And he's walking away from you.  Is that correct?

1   A.   Yes.

2   Q.   Are you the closest officer to Kelley?

3   A.   I don't know if it was me or O'Malley. I can't
4   specifically tell you.

5   Q.   How many feet do you say you were from Kelley?

6   A.   I -- I can't tell you. I don't know a specific
7   distance at that point.

8   Q.   Okay. Well, how about a general -- a general
9   distance. Can you just give me an estimate?

10  A.   I can't.

11  Q.   10 feet?

12  A.   It was farther than 10 feet. I can't -- again, I
13  can't tell you a specific distance.

14  Q.   Was it within, say, 10 and 20 feet?

15  A.   I can't tell you if it was that. I can't give you a
16  specific number, sir. I'm sorry.

17  Q.   Why can't you give me just an estimate of distance?

18  A.   Because I'm -- I can't -- I can't tell you exactly.
19  He was still moving. We were all moving. It was a rapidly
20  moving situation. I was more paying attention to the suspect
21  that had a knife that was attempting stab officers every time
22  we got close to him. So I was at least keeping distance enough
23  that if he turned around and tried to come at me, I had the
24  appropriate amount of time to react to that.

25  Q.   How far were you from O'Malley?

1  slashed one of them?

2      A.    If Officer -- specifically stating whenever Officer

3  Sanders attempted to -- to knock the knife out of his hand, if

4  Officer Sanders would not have jumped backwards and kept

5  retreating, yes, Bruce Kelley would have stabbed him.

6      Q.    Okay. Aside from Sanders -- because you said he

7  tried to -- Bruce Kelley was trying --

8      A.    Every time -- every time an officer got any -- if he

9  felt the fact that -- the presence of somebody behind him, he

10 would spin around and slash the knife in our direction. So

11 anytime an officer -- he felt the presence of somebody behind

12 him, he would spin around and slash the knife in our direction.

13     Q.    Okay. But each time he did that, you were all far

14 enough away from him that he didn't slash anybody. Correct?

15     A.    Yes. So we did not get stabbed. Correct.

16     Q.    Now, we're back to you say Bruce Kelley is diagonal.

17 So he's going towards the houses on Whitney Avenue, to your

18 left. Correct?

19     A.    Yes.

20     Q.    Okay. And as he's going towards the houses, is he

21 now in a yard?

22     A.    Yes.

23     Q.    Okay. Please tell me what you hear or see next as

24 far as O'Malley and the dog.

25     A.    K-9 Aren engaged this -- Kelley on his left, upper

1  date.
2  Q.  No. Understood. But as of the date of this
3  incident, you were not a K-9 officer. Is that correct?
4  A.  Correct.
5  Q.  Had you ever been a K-9 officer?
6  A.  No.
7  Q.  And from that date forward, have you become a K-9
8  officer?
9  A.  No.
10 Q.  At the Port Authority, for the police officers, did
11 you ever receive any crisis intervention training?
12 A.  No.
13 Q.  In your dealings with Bruce Kelley, Jr., that day,
14 did you get the impression he had some mental health issues?
15 A.  No.
16 Q.  Did you -- did you do anything to try to flesh out
17 whether or not he may have had some mental health issues?
18 A.  No. I don't under- -- I don't really understand
19 what you're asking.
20 Q.  Say, did -- did you ask him any questions? Separate
21 from giving him commands to drop the knife, did you say
22 anything to him to try to figure out why he wouldn't drop the
23 knife and he just kept walking?
24 A.  No.
25 Q.  One sec, please.

1  looking straight up, I would have been facing west.
2       Q.    Okay.  You would have been facing west.  And when
3  you fired your weapon, you fired your weapon in a westerly
4  direction?
5       A.    I mean, west -- it would have been more
6  west-southwest, yes.
7       Q.    Okay.  O'Malley the same?  In that direction,
8  southwesterly direction?
9       A.    I can't speak for O'Malley.  I would -- he would
10 have to tell you how he was.
11      Q.    Okay.  And, again, just so we're clear here, you're
12 telling me that you cannot identify on this aerial view of
13 Whitney Avenue where you were or where Bruce Kelley was when
14 you shot him?
15      A.    Not on this picture, no.
16      Q.    When you fired your two rounds at Bruce Kelley, Jr.,
17 why did you fire your rounds?
18      A.    I felt he was an immediate threat to Sergeant
19 O'Malley and the rest of the public.
20      Q.    And who in -- who in the public was he a threat to?
21      A.    Anybody that he would have encountered, I believe.
22      Q.    Well, who -- who was there that he could have
23 encountered in that yard?
24      A.    Nobody in that specific yard.
25      Q.    And you say he was a threat to O'Malley.  Is that

1  movements towards O'Malley.
2     Q.   Why didn't you shoot him after he made the first
3  step towards O'Malley?
4     A.   Because he had -- the -- the K-9 was attempting
5  re-engage him.
6     Q.   And you've testified before in court in criminal
7  proceedings, I assume?
8     A.   Yes.
9     Q.   And, I mean, you've been asked as a witness to give
10 estimates, correct, in feet, distance, before as a witness?
11    A.   Yes.
12    Q.   Okay. So I'm just going to give you one last
13 opportunity. Will you please give me an estimate in feet how
14 many -- how far Kelley was from O'Malley when you concluded you
15 needed to shoot Kelley.
16    A.   I will answer you again and say that I do not know
17 where O'Malley was specifically, so I cannot estimate the exact
18 feet that he was from O'Malley.
19    Q.   If you didn't know where O'Malley was specifically,
20 how did you know Kelley, Jr., was a threat to O'Malley?
21    A.   I know where -- I know the -- this general area
22 where O'Malley was standing, and I know that he was taking
23 movements towards O'Malley. At that point, that's when I felt
24 he was a threat towards O'Malley, and I fired my weapon.
25    Q.   Did you consider -- at the time, was your

1  resisting any form of engagement that we gave him.
2     Q.    Did you have any opinion whether or not Kelley, Jr.,
3  during this pursuit, was willing to cooperate or was attempting
4  to evade arrest by flight?
5     A.    He was absolutely evading arrest by flight.
6     Q.    And -- and did you believe that Kelley, Jr., posed a
7  significant threat of death or serious physical injury to you
8  or others?
9     A.    Yes, I did.
10    Q.    And did you believe that at the time you discharged
11 your weapon?
12    A.    Yes, I did.
13    Q.    Did you believe that prior to the time you
14 discharged your weapon?
15    A.    Yes, I did.
16    Q.    Did you believe that during the encounter that's
17 demonstrated on the videotape, Deposition Exhibit No. 6, the
18 Hamnett Street Station Park and Ride?
19    A.    Yes.
20          MR. EVASHAVIK:  Those are all the questions I have.
21                          EXAMINATION
22 BY MR. GEARY:
23    Q.    Just one last question, please, Officer.
24 Mr. Evashavik just asked did you believe Kelley was a threat
25 prior to the time you fired your weapon, and you said yes.

1         MR. EVASHAVIK:  So I think we're on -- would this be
2  No. 31?
3         MR. GEARY:  Yes.
4         MR. EVASHAVIK:  All right.  I'll identify Exhibit
5  No. 31.  And, for the record, I'll put that on a thumb drive,
6  the actual audio and video recorded statement provided by
7  Lieutenant O'Malley to the Allegheny County Police Department
8  on February 2, 2016.
9         (Whereupon, Deposition Exhibit 31 was marked for
10 identification.)
11 BY MR. EVASHAVIK:
12    Q.   At the time that you decided to deploy Aren, did you
13 already know about attempts made by other officers to use other
14 means of less than lethal force, such as a Taser?
15    A.   Yes.
16    Q.   And how did you know about that?
17    A.   From radio broadcast.
18    Q.   And how about pepper spray, also known as OC -- OC
19 spray?  Did you know about that?
20    A.   Yes.
21    Q.   How did you know about that?
22    A.   Same thing.  Radio broadcast.
23    Q.   And how did you know about the assault by Bruce
24 Kelley, Jr., on Officer Adams?
25    A.   Radio broadcast by Officer Adams.

1   Q.   And you were aware of this before you deployed K-9
2   Aren?
3   A.   Yes.
4   Q.   At the time you deployed Aren and also at the time
5   you discharged your weapon towards Bruce Kelley, Jr., did you
6   believe that he was or was not actively resisting arrest?
7   A.   He was.
8   Q.   He was what?
9   A.   He was resisting arrest.
10  Q.   Did you see him at any time cooperate or comply with
11  the directives of the other officers and the commands to stop
12  and drop the knife?
13  A.   At no time did I see him comply.
14  Q.   Did you believe Bruce Kelley, Jr., posed a
15  significant threat of death or serious physical injury to you,
16  the other officers, and other people that may have been in the
17  area?
18  A.   Yes.
19  Q.   Why did you use deadly force and discharge your
20  weapon at Bruce Kelley, Jr.?
21  A.   My life was in danger.
22       MR. EVASHAVIK:  Thank you, sir.  Those are all the
23  questions I have.  Wait.  He may have more.
24       MR. GEARY:  Nothing further.
25       MR. EVASHAVIK:  Okay.  Thank you.  The witness will

1  turns back around and he keeps moving at a fast pace at that
2  angular motion towards me, from my right to left. And he's
3  just angling down the street.
4      Q.   Are you still behind the bush where you had had -- I
5  think you said concealment.
6      A.   I had concealment. Yeah, I was still behind the
7  bush.
8      Q.   Okay. Do -- do you know if he -- did you get the
9  impression he could see you at that point?
10     A.   No.
11     Q.   I'm sorry. Bad question. You didn't know or your
12 impression was he -- he could not see you?
13     A.   My impression is he did not see me.
14     Q.   Okay. And when you say "angling down the street,"
15 just the word "angling," do you mean he's walking at a specific
16 angle, or are you just using that term loosely, like he's just
17 continuing to walk down the street?
18     A.   Yeah. So he's walking on a pace down the street,
19 but not -- not a straight line towards me. It would be sort of
20 a -- like an angle, but down from my right to left.
21     Q.   Thank you. What happens next?
22     A.   At that point, I have my dog. I stepped out, and I
23 made sure my dog saw him. Gave several commands, "Police K-9.
24 Stop." I yelled it. And he didn't stop. So at that point, I
25 sent K-9 Aren on an apprehension.

1  exhibited various degrees of crises.  Mostly disturbed people.
2  Delirium.
3       Q.    And in the crisis intervention training, if you make
4  a determination that an individual has mental health issues or
5  is in delirium, those types of things, what are you -- what are
6  you supposed to do per the training?
7       A.    I think that would be based on the scenario you're
8  dealing with.
9       Q.    Okay.  Was -- this scenario with Mr. Kelley, did the
10 crisis intervention training you -- you participated in apply
11 to this situation?
12      A.    No.
13      Q.    And tell me how it did not apply.
14      A.    I had no dialogue with the suspect, so I had no
15 parameters to base anything off of.
16      Q.    And did you attempt any dialogue with him?
17      A.    My dialogue I had was -- was one sided.  His
18 dialogue was he was going to stab the dog, and that was it.
19      Q.    And when you say your side of the dialogue was one
20 sided, what do you mean by "one sided"?
21      A.    I advised him "Police K-9" and to stop, and he
22 didn't do it.
23      Q.    So you gave him a command, obviously?
24      A.    Several.
25      Q.    Okay.  Separate from giving him commands, did you

1  try to just talk to him?
2      A.   No.
3      Q.   Why not?
4      A.   I didn't have a chance.
5      Q.   Well, did you have a chance as he's walking down
6  Whitney Avenue and you're on the other side of Whitney Avenue?
7      A.   No. Based on how fast he was walking, I did not.
8      Q.   So your testimony is at no point did you have the
9  opportunity or the time to try to talk to him?
10     A.   Correct.
11     Q.   Okay. And when I say "talk to him," I'm thinking
12 of, like, asking him "Why won't you put down the knife?
13 What's -- what's the matter? Can we talk this out?" Things
14 like that.
15     A.   Correct.
16     Q.   Is that the kind of thing or -- in the crisis
17 intervention training, are you taught to try to verbally
18 de-escalate a situation like that?
19     A.   Yeah, I believe that's taught at some point during
20 the curriculum.
21     Q.   Okay. Did you do anything before you released Aren
22 to try to de-escalate the situation?
23     A.   No.
24     Q.   Now, the death of Aren -- is it your position -- are
25 you partly responsible for the death of Aren?

1  Q.    And how -- what's your reasoning?  Explain it for
2  me, how you did not violate that policy.
3  A.    Well, I knew I had been involved in a -- in a
4  shooting.  The usual report at that point would be making a
5  statement to -- it goes outside of the city, to county
6  homicide.  So I did that.
7  Q.    Okay.  And what about No. 8, "The officer involved
8  will make a Weapon Discharge Report."  You did not do that.
9  Correct?
10  A.    Correct.
11  Q.    So did you violate No. 8 of this policy?
12       MR. EVASHAVIK:  Object to form.  You can answer.
13       THE WITNESS:  I don't -- I don't know what that is.
14  BY MR. GEARY:
15  Q.    You don't know what what is?
16  A.    A weapons -- a weapon discharge report.
17  Q.    Okay.  As of January 31 of '016, how many years had
18  you been with the Port Authority?
19  A.    19.
20  Q.    Had you ever read this policy before at any point in
21  those 19 years?
22  A.    I had.
23  Q.    Okay.  Did you ever ask what the weapon discharge
24  report was?
25  A.    No.

1   Q.   After this incident, at any point did you inquire of
2   your chief what the weapon discharge report was?
3   A.   No.
4   Q.   Was there any reason you didn't ask?
5   A.   No reason.
6   Q.   When you were shooting at Bruce Kelley, was he
7   positioned in front of a house on Whitney Avenue?
8   A.   Yes.
9   Q.   Okay.  Did you know if the house was occupied?
10  A.   I -- I know from the area that some of those were
11  abandoned.  But, specifically, no, I don't know if it was
12  occupied or not.
13  Q.   And behind the houses, there are yards.  Correct?
14  A.   Yes.
15  Q.   And when you were firing at Bruce Kelley, there
16  could have been people in the yards behind the houses.  True?
17  A.   Possibly.
18  Q.   And then behind the yards, it's the park and ride.
19  Is that right?
20  A.   Yes.
21  Q.   And the park and ride, again, it's a large parking
22  lot.  Is that right?
23  A.   Yes.
24  Q.   And there could have been people in the parking lot.
25  Correct?

1  Q. Just winding down. Just going over my notes, so
2  you -- so that you know.
3     Before you deployed Aren, was there any thinking by
4  you to somehow get behind Bruce Kelley, Jr., physically to --
5  you get behind him and -- and try to apprehend him some way
6  from behind?
7  A. No. I was committed to K-9 deployment.
8  Q. And Aren was -- was trained in other areas. I think
9  explosives -- smelling explosives. Is that correct?
10 A. Yes.
11 Q. And what other areas was Aren trained in?
12 A. I don't know what you mean by that. What --
13 Q. Just say -- you may have already spoken to it. Drug
14 sniffing, explosives, tracking. Things like that.
15 A. So yes. His -- the discipline, along with explosive
16 detection, was tracking as well.
17 Q. Okay. Again, I'm just -- some odds and ends here to
18 wrap up. When you started shooting at Bruce, the dog was
19 wounded. Correct?
20 A. Yes.
21 Q. Okay. And at that point when you started shooting,
22 you did not know that the dog would ultimately die. Correct?
23 A. Correct.
24 Q. And you testified that he said several times, "Shoot
25 me. Just shoot me." Is that right?

## CERTIFICATE OF SERVICE:

I, Noah Geary, Esquire, do hereby certify that a true copy of the foregoing **Lombardo BRIEF APPENDIX of the PLAINTIFFS** was served via electronic mail on this day to the below-listed counsel of record:

Greg Evashavik, Esquire
*(Counsel for Port Authority Defendants)*

Respectfully submitted,

/s/ Noah Geary
Noah Geary, Esquire
Washington Trust Building
Suite 225
Washington, PA 15301
(724) 222-3788
PA I.D.#: 78382

August 24, 2021