IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CALISIA KELLEY and JOHNNIE MAE KELLEY, Co-Administrators of the ESTATE OF BRUCE KELLEY JR., deceased, | ) ) ) | |
| | ) | Civil Action No. 17-1599 |
| Plaintiffs, | ) | Judge Nora Barry Fischer |
| | ) | |
| v. | ) | |
| | ) | |
| BRIAN O'MALLEY, both in his Official and Individual Capacities as Sergeant for the Allegheny County Port Authority; DOMINIC RIVOTTI, in both his Official and Individual Capacities as Officer for the Allegheny County Port Authority, | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

Calisia Kelley and Johnnie Mae Kelley, co-administrators of the Estate of Bruce Kelley, Jr., sued Allegheny County Port Authority police officers Brian O'Malley and Dominic Rivotti under 42 U.S.C. § 1983 for violating Kelley's Fourth Amendment right to be free from excessive force. Presently before the Court are the officers' motion for summary judgment, concise statement of material facts, brief in support, and several supplemental filings. (Docket Nos. 119, 120, 121, 127, 128, 133, 135, 139, and 146). Also, before the Court are Plaintiffs' brief in opposition, response to the officers' concise statement of material facts, and several additional filings. (Docket Nos. 122, 123, 124, 131, 136, and 145). After careful consideration of the parties' positions and for the following reasons, the officers' motion for summary judgment [119] is granted, and the Court will enter judgment in favor of the officers.

### II. FACTUAL BACKGROUND

The parties hotly contest many of the facts, both material and immaterial. As such, the Court remains keenly aware of its duty under Federal Rule of Civil Procedure 56 to draw "[a]ll reasonable inferences from the record . . . in favor of the nonmoving party." *Goldstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016). Much of the evidence in this excessive force case comes from police officer eyewitness testimony. Given same, the Court keeps in mind the Third Circuit's admonition that "[t]he test of reasonableness under the Fourth Amendment is whether under the totality of the circumstances, 'the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations." *Williams v. City of York*, 967 F.3d 252, 259 (3d Cir. 2020).

### A. Background Events

In the afternoon of January 31, 2016, Port Authority police officers Thomas Adams and Emily Hampy were on patrol when they saw Kelley and his father sitting in a gazebo near a Port Authority busway in Wilkinsburg, Pennsylvania. (Docket Nos. 120 at ¶ 6; 123 at ¶ 6). The officers testified that the men had open beer cans around them, which the parties agree would constitute an open container violation under Pennsylvania law. (Docket No. 123 at ¶ 12). Plaintiffs dispute that the officers could see the cans until they neared the gazebo. (Docket Nos. 120 at ¶ 6; 123 at ¶ 6). Regardless, in keeping with their duty to patrol and investigate violations of the law in order to protect the safety of Port Authority patrons, the officers approached the gazebo and "made verbal inquires" of the two men, but received no response. (Docket Nos. 120 at ¶¶ 7-9; 123 at ¶¶ 7-9). Kelley weighed approximately 213 pounds and measured six feet and two inches tall at the time of his encounter. (Docket No. 122 at 9).[1] He was wearing thick clothing. (Docket No. 123 at ¶¶

---

[1]      The size of Kelley's father, who passed away during the course of the present litigation, is unknown. (Docket Nos. 120-1 at 194; 123 at ¶¶ 13-14). The parties did not include his deposition in the record, assuming it even exists.

25-26). According to Plaintiffs, Kelley then "attempted to physically push past [Officer Adams] in an attempt to flee." (Docket No. 123 at ¶¶ 10-11). In response, Adams initiated a physical struggle in an attempt to put Kelley in handcuffs, at least in Plaintiffs' version of events. (Docket No. 123 at ¶ 12). Hampy sustained a physical injury during the tussle, possibly a mild concussion. (Docket No. 120-1 at 177-78). As the struggle continued, Kelley eventually produced a knife. (Docket Nos. 120-1 at 140-44; 123 at ¶¶ 16-19). As shown in the picture below, the knife had a single, foldable blade, which was several inches long. (Docket No. 133-2 at 56).



Kelley then walked away from the officers and the gazebo. (Docket Nos. 120-1 at 144-45; 120 at ¶ 23; 123 at ¶ 23). Adams radioed for assistance and said that Kelley had a knife. (Docket Nos. 120 at ¶ 20; 123 at ¶¶ 16-19, 20). In response, a number of officers from the Port Authority and other jurisdictions arrived in Wilkinsburg to attempt to apprehend Kelley. (Docket Nos. 120 at ¶¶ 24, 27-30; 123 at ¶¶ 24, 27-30).

Kelley walked down several streets in Wilkinsburg and in-between several houses. (Docket Nos. 120 at ¶¶ 34-35; 123 at ¶¶ 34-35). Several of the officers walked behind him. (Docket Nos. 120 at ¶¶ 34-35; 123 at ¶¶ 34-35). On numerous occasions, officers ordered Kelley to stop walking, drop the knife, and surrender. (Docket Nos. 120-1 at 243-44, 325, 350, 393-94, 459; 120 at ¶ 37; 123 at ¶¶ 37, 46). Kelley continued walking and often responded to the officers with profane language. (Docket Nos. 120-1 at 19, 75, 81, 354-55, 393-94; 123 at ¶¶ 39-43).

Plaintiffs agree that on three occasions an officer attempted to disable Kelley by using pepper spray. (Docket No. 123 at ¶¶ 3, 24). Each time an officer employed the spray, Kelley continued walking. (Docket No. 123 at ¶¶ 3, 24). Additionally, Plaintiffs agree that officers fired taser darts at Kelley on two occasions. (Docket Nos. 120-1 at 118, 445; 120 ¶¶ 26, 79; 123 at ¶ 25-26; 124 at 8). In response, Kelley kept walking. (Docket No. 123 at ¶¶ 25-26). According to Plaintiffs, Kelley was able to keep walking because the thick clothing he was wearing prevented the taser darts from piercing his skin. (Docket No. 123 at ¶¶ 25-26). Finally, Plaintiffs agree that Officer Kyhnroe Sanders attempted to sneak up behind Kelley and use a baton to strike Kelley's arm, with the objective of causing Kelley to drop the knife. (Docket Nos. 120-1 at 254, 325-29; 120 at ¶ 40; 123 at ¶ 40). As Officer Sanders approached him, Kelley turned around. (Docket Nos. 120-1 at 254, 325-29; 120 at ¶ 41; 123 at ¶ 41). Plaintiffs maintain that Kelley then "turned his body towards Officer Sanders and momentarily pointed his knife at Sanders." (Docket Nos. 120-1 at 618; 123 at ¶¶ 39-43). Kelley walked through the streets of Wilkinsburg for about 20 minutes when he turned onto Whitney Avenue and began walking down the street. (Docket Nos. 120 at ¶ 44; 123 at ¶ 44). Kelley proceeded down Whitney Avenue until he encountered Officer Brian O'Malley and his K-9 German Shepherd, Aren.

**B. O'Malley's Encounter with Kelley**

The parties agree that before encountering Kelley on Whitney Avenue, O'Malley knew the following information based on radio broadcasts:

- Kelley was armed with a knife and had been walking away from officers. (Docket Nos. 120 at ¶¶ 120-23; 123 at ¶¶ 120-23).

- Kelley had responded to officers' commands with profanities. (Docket Nos. 120 at ¶¶ 125, 134; 123 at ¶¶ 125, 134).

- Officers had attempted to subdue Kelley with pepper spray and tasers. (Docket Nos. 120-1 at 103, 111; 120 at ¶ 139; 123 at ¶ 139).

- Kelley was walking down Whitney Avenue, where O'Malley expected to intercept him with his K-9. (Docket Nos. 120 at ¶ 133; 123 at ¶ 133).

O'Malley testified to the following events. He was positioned next to a bush in the front yard of one of the homes on Whitney Avenue with the K-9, waiting for Kelley to approach. (Docket No. 120-1 at 82-83). The yard was on the other side of the street from a house located at 710 Whitney Avenue. (Docket No. 120-1 at 82-83). As Plaintiffs emphasize, before O'Malley actually saw Kelley, he heard someone say, "Go ahead. Fucking shoot me. Fucking shoot me." (Docket No. 120-1 at 81; 123 at ¶ 21). He also heard an unknown officer say "Drop the knife. Stop." (Docket No. 120-1 at 82). He did not notice if any civilians were nearby. (Docket No. 120-1 at 82).

As he stood in the yard, O'Malley saw Kelley walking down Whitney Avenue and testified as follows: "[H]e's on [Whitney Avenue], and he's walking on a diagonal towards me but away. So he's not perpendicular coming towards me; he's diagonal away from me." (Docket No. 120-1 at 82). O'Malley estimated that Kelley was "[m]aybe 20 yards" away from him and "gaining rapidly." (Docket No. 120-1 at 83). Based on his position by the bush, O'Malley suspected that

5

Kelley did not see him yet. (Docket No. 120-1 at 85). As O'Malley observed Kelley, he saw Kelley turn back toward the direction of the pursuing officers. (Docket No. 120-1 at 83). O'Malley heard one of the pursuing officers say, "We're going to send the police dog." (Docket Nos. 120-1 at 83-84; 120 at ¶ 136; 123 at ¶ 136). Kelley replied that he would "kill that fucking dog" and proceeded to "thrash[] the knife around." (Docket Nos. 120-1 at 83-84; 120 at ¶ 136; 123 at ¶ 136).

After the exchange of words, Kelley continued walking down Whitney Avenue and neared 710 Whitney Avenue. (Docket No. 120-1 at 85). O'Malley then "stepped out," from the bush and initiated the apprehension with the K9. O'Malley explained, "I made sure my dog saw him. Gave several commands [to Kelley], 'Police K-9. Stop.' I yelled it. And he didn't stop. So at that point, I sent K-9 Aren on an apprehension."[2] (Docket No. 120-1 at 85-86). When O'Malley released the K-9, Kelley was "on the other side of the street directly in front of me, like angling down. So he was walking from my left to right." (Docket No. 120-1 at 86). O'Malley further stated that "at this point, [Kelley] had reached the other side of the street, so he was about 10 yards away." (Docket No. 120-1 at 86). Kelley was still walking rapidly when O'Malley released the K-9. (Docket No. 120-1 at 87-88). O'Malley insisted that Kelley remained on the street and had not entered the front yard of 710 Whitney Avenue when he released the K-9. (Docket No. 120-1 at 86; *see also* Docket No. 122-3 at 359-60).

Before releasing the K-9, O'Malley was holding the K-9 by a leash in his right hand. (Docket No. 120-1 at 89). His gun remained in his holster. (Docket No. 120-1 at 89). When O'Malley unleashed the K-9, the K-9 went "downrange" and bit Kelley on the "left tricep area of the suspect." (Docket No. 120-1 at 89). O'Malley elaborated that the K-9 "raised up off his hind

---

[2]     An "apprehension" is when a police K-9 is deployed to bite a suspect, so that the police can take physical control of the suspect. (Docket No. 120-1 at 89-90).

legs" and bit Kelley in the "tricep/shoulder area." (Docket No. 120-1 at 91). At this point, Kelley was holding the knife in his right hand. (Docket No. 120-1 at 91). When the K-9 bit Kelley, Kelley responded by "stabb[ing] Aren several times." (Docket No. 120-1 at 93). Kelley stabbed the K-9 in the left side of the dog's head. (Docket No. 120-1 at 93-94). O'Malley estimated that Kelley stabbed the K-9 two to three times. (Docket No. 120-1 at 94). The K-9, who was initially off the ground when he bit Kelley, dropped to all fours after being stabbed. (Docket No. 120-1 at 94). After dropping to all fours, the K-9 attempted to bite Kelley again, at which point Kelley began "thrashing upwards underneath . . . [the K-9's] jaw." (Docket No. 120-1 at 95).

In the meantime, O'Malley testified that he had taken "several" steps from his original position towards Kelley. (Docket No. 120-1 at 95). His gun remained holstered. (Docket No. 120-1 at 96). He intended for the K-9 to "apprehend" Kelley so that O'Malley "would be able to take control of [Kelley] under power." (Docket No. 120-1 at 99). The Court recounts O'Malley's version of what happened next in full: "So then once - - after he's done stabbing Aren, he spins toward me and takes a step with his knife, with the knife. And that's when I drop my leash and unholster my gun and - - and fire." (Docket No. 120-1 at 96). Upon prompting from Plaintiffs' counsel, O'Malley continued, "I said he raised the knife and stepped towards me. And that's when I unholstered and fired." (Docket No. 120-1 at 97). Again, when Plaintiffs' counsel repeated his question, O'Malley testified, "So I witnessed Aren get stabbed several times in the side of the head after making an apprehension. And then the suspect spun around and uppercutted the knife several times under Aren's jaw as [the K-9] was going back in to re-engage. And then Mr. Kelley took a step towards me with the knife."[3] (Docket No. 120-1 at 98-99).

---

[3]    The K-9 was an adult male weighing approximately eighty-five pounds. (Docket No. 133-1 at 2; 145 at 3). Photographs of the body show multiple stab wounds to the neck area and mouth. (Docket No. 133-1 at 11-23).

O'Malley stated that when he fired his weapon he was on the street, standing about "8 feet" away from Kelley. (Docket No. 120-1 at 97, 99). Kelley was "on the east side of Whitney Avenue, right over the curb, like right over the curb in the grassy area. Like right at the street and curb area." (Docket No. 120-1 at 100). O'Malley testified that he "fired until [Kelley] fell," approximately six to nine times. (Docket No. 120-1 at 101). He aimed for the "upper chest area" and fired the shots in a "second" without any pause. (Docket No. 120-1 at 101, 106-107). When Kelley fell to the ground, onto his back, O'Malley testified that he "immediately stopped discharging" his weapon. (Docket No. 120-1 at 102, 109). He estimated that ten seconds elapsed from the time when he released the K-9 to when Kelley fell to the ground after being shot. (Docket No. 120-1 at 109-110).

### C.  Rivotti's Encounter with Kelley

The Court now moves back in time to recount the testimony of Officer Dominic Rivotti. Rivotti joined the pursuit of Kelley mid-chase. (Docket No. 120-1 at 11). When he first spotted Kelley, while driving his police vehicle, Kelley was walking down a street with a knife in his right hand "thrashing the knife back and forth in front of him." (Docket No. 120-1 at 11). Along with other officers, Rivotti pursued Kelley through several streets. (Docket No. 120-1 at 15). At one point, Rivotti got out of his vehicle, drew his firearm, and began commanding Kelley to drop the knife, but Kelley continued walking. (Docket No. 120-1 at 15). Rivotti kept his firearm unholstered as he walked after Kelley. (Docket No. 120-1 at 25). Later in the pursuit, Rivotti observed Officer Anthony DiPippa twice deploy his taser in an attempt to stop Kelley. (Docket No. 120-1 at 17). Kelley continued walking, and Rivotti testified that he was unsure if the taser prongs made contact with Kelley. (Docket No. 120-1 at 18). In response to the taser deployments, Kelley stated, "That doesn't hurt," and "Fuck you," and "You're not hurting me." (Docket No. 120-1 at 19).

After DiPippa deployed the taser, Rivotti saw Officer Andrew Kaupinis attempt to use pepper spray against Kelley. (Docket No. 120-1 at 19). Kelley continued walking. (Docket No. 120-1 at 19). Next, Rivotti saw Officer Kyhnroe Sanders attempt to "sneak up and strike Kelley's right hand where the knife was" with a baton. (Docket No. 120-1 at 20). Rivotti stated, "As [Officer Sanders] started to attempt to get close to him, Kelley spun around with the knife, lunged at the officers with knife in his right hand. And then that's when Officer Sanders jumped backwards." (Docket No. 120-1 at 20). Kelley then proceeded to walk toward Whitney Avenue. (Docket No. 120-1 at 25, 27). As Kelley proceeded to Whitney Avenue, Rivotti said, "Drop the knife or we're going to have to shoot you because you won't stop." (Docket No. 120-1 at 25). Kelley responded, "Fuck you, pussy. You can't hurt me." (Docket No. 120-1 at 25). Kelley began walking down Whitney Avenue, either on the street itself or on the sidewalk. (Docket No. 120-1 at 29).

In sum, and as Plaintiffs concede, Rivotti knew the following as Kelley began to walk down Whitney Avenue:

- Kelley was armed with a knife and refused to obey police commands as he walked away from police officers, often shouting profanities at the officers. (Docket Nos. 120-1 at 19, 25; 120 at ¶ 77; 123 at ¶ 123).

- Officers had attempted to use pepper spray and tasers to subdue Kelley. (Docket Nos. 120-1 at 17-19; 120 at ¶¶ 79, 81; 123 at ¶¶ 79, 81).

- Officer Sanders had attempted to use a baton to knock the knife out of Kelley's hand. (Docket Nos. 120-1 at 20, 618; 120 at ¶ 82; 123 at ¶¶ 82-91).

- Kelley had turned and, as Plaintiffs state, "pointed his knife at Sanders." (Docket Nos. 120-1 at 618; 123 at ¶¶ 82-91).

As Kelley walked down Whitney Avenue and Rivotti followed, Rivotti heard O'Malley command his K-9 to bite Kelley. (Docket No. 120-1 at 29-30). Rivotti was unsure where O'Malley was standing, but he knew that O'Malley was "on the other side of the street" from Kelley and in Rivotti's peripheral vision. (Docket No. 120-1 at 30). All of the other officers were somewhere behind Rivotti. (Docket No. 120-1 at 30). At the exact moment O'Malley released the K-9, Rivotti testified that Kelley was on the sidewalk next to 710 Whitney Avenue. (Docket No. 120-1 at 31). In a February 2, 2016 statement about the incident, Rivotti said that Kelley "was almost on the stoop of that house," referring to 710 Whitney Avenue. (Docket No. 122-4 at 18). Rivotti was standing behind Kelley either on the sidewalk or just within the street, at least ten feet away. (Docket No. 120-1 at 31, 33). Rivotti did not notice how close O'Malley was to Kelley at this point. (Docket No. 120-1 at 34). In his February 2, 2016 interview, Rivotti said that both he and O'Malley "were basically standing on that sidewalk almost." (Docket No. 122-4 at 18).

Rivotti saw the K-9 bite Kelley's "upper shoulder, arm area." (Docket No. 120-1 at 35-36). When the K-9 bit him, Kelley began "slashing across his body and stabbing the K-9 in the head." (Docket No. 120-1 at 38). Rivotti saw at least two slashes. (Docket No. 120-1 at 38). According to Rivotti, Kelley had turned to face O'Malley as he slashed the K-9. (Docket No. 120-1 at 39). The K-9 disengaged, Kelley took "about two steps" towards O'Malley, and the K-9 started to re-engage. (Docket No. 120-1 at 39). Rivotti testified, "And as K-9 Aren's head was coming up to re-engage again, Kelley took the knife and stabbed it into K-9 Aren's throat and continued in the direction of [O'Malley]." (Docket No. 120-1 at 39).

The K-9 then fell to the ground, and Kelley began "continuing towards [O'Malley] with the knife in his right hand." (Docket No. 120-1 at 39). Rivotti explained that "[Kelley's] knife was out in front of him, facing [O'Malley]." (Docket No. 120-1 at 39). Rivotti then fired his weapon

twice. (Docket No. 120-1 at 40-41). When he fired, he was standing within twenty feet of Kelley, and he aimed at Kelley's "center mass area." (Docket No. 120-1 at 40-41). Rivotti emphasized that when he fired his weapon, Kelley was "actively walking, attempting to get towards O'Malley." (Docket No. 120-1 at 42). Rivotti fired his weapon "within seconds" before Kelley fell to the ground onto his back. (Docket Nos. 120-1 at 44; 122-4 at 20). When Kelley fell to the ground, Rivotti ceased firing. (Docket No. 120-1 at 44). For his part, Rivotti said he was unsure of how far O'Malley was from Kelley when the shooting happened. (Docket No. 120-1 at 49).

In his deposition, O'Malley said he was unsure of who fired first at Kelley. (Docket No. 120-1 at 103). Rivotti stated that O'Malley fired first, but also said the officers were "firing simultaneously." (Docket No. 120-1 at 40, 44). Neither officer was sure if he hit Kelley. (Docket No. 120-1 at 45). Kelley died from the gunshot wounds. (Docket No. 122 at 8). Both officers used semi-automatic 9mm Smith & Wesson M&P9 handguns. (Docket Nos. 120-1 at 16, 102; 131-1 at 9).

### D. Other Witness Evidence

Officer Anthony Kaupinis stated in his incident report that "[i]mmediately after Kelly, Jr., stabbed K-9 Aren, he turned to face officers and made motions towards officers on scene." (Docket No. 120-1 at 291). Officer Shawn Granger noted in his deposition that Kelley was "facing" O'Malley when he was shot, although it appears that the purpose of questioning was to establish O'Malley's and Rivotti's whereabouts, not focus on Kelley's behavior. (Docket No. 120-1 at 478, 484). Like Officer Granger, Officer Michael Catanzaro said that Kelley was facing O'Malley when the officers fired but, again, the questioning seemed to focus on O'Malley, not Kelley. (Docket No. 120-1 at 584-85). Several officers also testified that they heard several shots in close proximity. (Docket No. 120-1 at 530 (Officer Hahn), 585 (Officer Catanzaro)). The rest of the officers

deposed in this case testified that they were either not on Whitney Avenue when the shooting occurred or that they were just walking (or driving) onto the street and did not see the shooting.

### E.  Autopsy and Allegheny County Office of the Medical Examiner Investigation

An autopsy revealed that Kelley had been shot seven times. (Docket No. 122 at 6-7). As denoted by "Entrance" or "Ent" points A through G in the autopsy, one bullet hit the side of Kelley's neck (A); two hit his back (B and F); two hit his chest (C and D); one hit his side (E); and one hit his forearm (G). (Docket Nos. 122 at 6-7; 133-4 at 99). Five of the bullets remained in the body. (Docket No. 122 at 6-7). Two exited his body: one that struck the chest and the one that struck the forearm. (Docket No. 122 at 6-7).

On the day the shooting took place, investigators with the Allegheny County Office of the Medical Examiner visited the scene of the shooting and took dozens of photographs of evidence. The photographs included the location of Kelley's body, blood splatters, and the shell casings. (Docket Nos. 133-1, 133-2, 133-3, and 133-4). The investigators prepared an inventory log that detailed the location of each piece of evidence they found. (Docket No. 133-4 at 74-76). Among these documents is an "Evidence Submittal Form" prepared by Detective Caruso on January 31, 2016 that was meant to keep track of the officers' firearms, but also included a short summary of the day's events. (Docket No. 131-1 at 8-9). Detective Caruso also prepared a "Mobile Unit: Fact Sheet/Request Form," that summarized the time period when the investigators visited the shooting scene and named the investigators present. (Docket No. 131-1 at 11-12). This form also included a short summary of the day's events and appears to have been prepared on January 31, 2016. (Docket No. 131-1 at 11). Additionally, Detectives James Grill and Patrick Miller of the Allegheny County Police Department conducted transcribed interviews of O'Malley and Rivotti on February 2, 2016 and prepared investigation reports. (Docket Nos. 122-3 at 43-65; 122-4 at 2-23, 62-66).

12

### III. PROCEDURAL HISTORY

Plaintiffs sued on December 11, 2017 and named the following defendants: Brian O'Malley; Dominic Rivotti; police officer John Doe #1; police officer John Doe #2; police supervisor John Doe #3; the Port Authority; chief of the Port Authority Police Department Matthew Porter; Allegheny County; and Allegheny County Port Authority Police Department. (Docket No. 1). In Count One, they sued O'Malley, Rivotti, and the two John Doe police officers for using excessive force against Kelley in violation of the Fourth Amendment. (Docket No. 1 at 8). In Count Two, Plaintiffs brought a *Monell* claim against Porter, John Doe #3, Allegheny County, the Port Authority, and the Allegheny County Port Authority Police Department. (Docket No. 1 at 10).

The defendants brought a motion to dismiss the complaint, which the Court granted, with prejudice, on September 13, 2018. (Docket Nos. 24, 25). As relevant here, for Count One, the Court held that the use of force against Kelley was reasonable, and thus no Fourth Amendment violation occurred. (Docket No. 24 at 9-10). Plaintiffs appealed, and the Third Circuit Court of Appeals vacated and remanded, in part, and affirmed, in part. (Docket No. 29-2). The Third Circuit affirmed the dismissal of all defendants except O'Malley and Rivotti and affirmed the dismissal of Count Two of the complaint. (Docket No. 29-2 at 4 n.3). For O'Malley and Rivotti on Count One, the Third Circuit held that "a reasonable jury could conclude that [O'Malley's] and [Rivotti's] actions were not objectively reasonable," based on the allegations in Plaintiffs' complaint. (Docket No. 2902 at 5-6). Accordingly, the Third Circuit vacated this Court's judgment, in part, and remanded for further proceedings as to the excessive force claim against O'Malley and Rivotti. (Docket No. 29-2 at 9). In its opinion, the Third Circuit emphasized that it "express[ed] no view

on the question of whether the officers' actions violated Kelley, Jr.'s Fourth Amendment rights under clearly established federal law at the time of the shooting." (Docket No. 29-2 at 9 n.7).

After the close of discovery, the remaining defendants, Officers O'Malley and Rivotti, moved for summary judgment and filed a concise statement of material facts and brief in support. (Docket Nos. 119, 120, 121). Plaintiffs submitted a response to the concise statement of material facts and added several additional material facts. (Docket No. 123). They also filed a brief in opposition. (Docket No. 124). The officers countered with a reply brief and response to Plaintiffs' concise statement of material facts. (Docket Nos. 127, 128). Plaintiffs filed a sur-reply. (Docket No. 131). The officers supplemented the record. (Docket No. 133). Newly handed down Supreme Court decisions prompted the Court to order additional briefing and the parties responded with supplemental briefs. (Docket Nos. 135, 136, 139, 145, and 146). The record also includes numerous photographs, along with audio recordings and video of some of the background events. Lastly, the Court held oral argument on November 3, 2021 and had the benefit of a transcript of the argument. (Docket No. 141). As such, after exhaustive briefing and argument, the officers' motion for summary judgment is ripe for review.[4]

### IV. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d

---

[4]    The parties engaged in a mediation session with Scott Dunlop, Esq. in December 2020. (Docket No. 81). After their mediation session, the parties engaged in further settlement talks, and the Court offered to conduct a judicial settlement conference in November 2021. Ultimately, the parties were unable to resolve the case through mediation or settlement discussions.

Cir. 2019) (citations omitted). Further, "[a] dispute is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Clews v. County of Schuylkill*, 12 F.4th 353, 358 (3d Cir. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

A party seeking summary judgment "must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof." *Conboy v. U.S. Small Bus. Admin.*, 992 F.3d 153, 160 (3d Cir. 2021) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once the moving party meets its initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations, speculations, unsupported assertions or denials of its pleadings." *Conboy*, 992 F.3d at 160; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In this regard, the non-movant must come forward with more than "some metaphysical doubt as to the material facts." *Conboy*, 992 F.3d at 160; *see also Matsushita*, 475 U.S. at 586-87.

For summary judgment motions in excessive force cases, the Third Circuit has stated:

> Because "the victim of deadly force is unable to testify," *Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir.1999), we have recognized that a court ruling on summary judgment in a deadly-force case "should be cautious ... to 'ensure that the officer[s are] not taking advantage of the fact that the witness most likely to contradict [their] story—the person shot dead—is unable to testify,'" *id.* (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir.1994)). Thus, a court should avoid simply accepting "'what may be a selfserving account by the officer[s]. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer[s'] story, and consider whether this evidence could convince a rational fact finder that the officer[s] acted unreasonably.'" *Id.* (quoting *Scott*, 39 F.3d at 915). This is not to say that the summary judgment standard should be applied with extra rigor in deadly-force cases. Rule 56 contains no separate provision governing summary judgment in such cases. *Cf. Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir.1997). Just as in a run-of-

15

the-mill civil action, the party opposing summary judgment in a deadly-force case must point to evidence—whether direct or circumstantial—that creates a genuine issue of material fact, "and may not rely simply on the assertion that a reasonable jury could discredit the opponent[s'] account."

*Lamont v. New Jersey*, 637 F.3d 177, 181-82 (3d Cir. 2011). Given same, the Court has carefully scrutinized the statements and deposition testimony of the officers at the scene and compared it to all circumstantial evidence in the record.

In order to determine whether a genuine issue of material fact exists, the Court's analysis begins with a review of the parties' filings to determine the realm of potentially disputed facts. As such, all summary judgment filings must comply with Federal Rule of Civil Procedure 56, as well as this Court's companion Local Rule 56. Both rules "allow facts to be deemed admitted where they are not properly opposed." *See Kelly v. DeJoy*, No. 19-204, 2021 WL 914207, at *4 (W.D. Pa. Mar. 10, 2021) (Hardy, J.); FED. R. CIV. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: . . . consider the fact undisputed for purposes of the motion."); LCvR 56(E) ("[M]aterial facts set forth in the moving party's Concise Statement of Material Facts . . . which are claimed to be undisputed, will for the purposes of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party.").

## V. DISCUSSION

Plaintiffs present three theories as to why the officers are liable. After providing the applicable legal framework, examining whether any disputes of fact are genuine, and defining Kelley's Fourth Amendment right at the appropriate level of particularity, the Court will address each of Plaintiffs' theories. In short, the Court finds that the officers possess qualified immunity as to all three of Plaintiffs' theories, and will therefore grant their motion for summary judgment.

### A. Qualified Immunity Standard

"Police officers, embodying the authority of the state, are liable under § 1983 when they violate someone's constitutional rights, unless they are protected by qualified immunity." *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021) (internal quotation marks and citations omitted). Included among those rights is the constitutional right of a person to be free from excessive force by government actors pursuant to the Fourth Amendment. *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985). "The doctrine of qualified immunity shields officers from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11-12 (2021) (internal quotation marks and citation omitted). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id.*

A police officer is shielded from suit by qualified immunity unless, (1) "the officer's conduct violated a constitutional right" and (2) "the right was clearly established, such that it would [have been] clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* "Courts may begin their inquiry with either prong." *Id.* At the summary judgment stage, "the burden is on the officer to establish an entitlement to qualified immunity," and "when multiple officers seek to invoke qualified immunity," a court must "separately consider each officer's actions." *Peroza-Benitez*, 994 F.3d at 165.

For the first prong of the qualified immunity analysis, in the excessive force context, "a plaintiff must show that a seizure occurred and that it was unreasonable." *Williams v. City of York*, 967 F.3d 252, 259 (3d Cir. 2020) (internal quotation marks and citation omitted). "The test of reasonableness under the Fourth Amendment is whether under the totality of the circumstances, 'the officers' actions are 'objectively reasonable' in light of the facts and circumstances

confronting them, without regard to their underlying intent or motivations." *Id.* A police officer may not use deadly force unless the "officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Garner*, 471 U.S. at 3. In officer-involved incidents, the Supreme Court has emphasized that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 387 (1989). Additionally, the Supreme Court has instructed courts to assess the use of deadly force from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Johnson v. City of Phila.*, 837 F.3d 343, 350 (3d Cir. 2016) (quoting *Graham*, 490 U.S. at 396-97).

Regarding the second prong of the qualified immunity analysis, the phrase "clearly established" means that "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *James v. N.J. State Police*, 957 F.3d 165, 169 (3d Cir. 2020) (internal quotation marks and citation omitted). "The inquiry is an 'objective (albeit fact-specific) question,' under which '[an officer]'s subjective beliefs . . . are irrelevant.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). The Court must "consider[ ] only the facts that were knowable to the defendant officer." *Id.* (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)). Also, the Court only considers "clearly established rights as of" the date of the shooting; here, January 31, 2016. *Id.* at 170.

The Supreme Court has "repeatedly told courts not to define clearly established law at too high a level of generality." *Bond*, 142 S. Ct. at 11. "It is not enough that a rule be suggested by then-existing precedent; the 'rule's contours must be so well defined that it is clear to a reasonable

officer that his conduct was unlawful in the situation he confronted." *Id.* (internal quotation marks and citation omitted). The Supreme Court has emphasized that "[s]uch specificity is especially important in the Fourth Amendment context," where it is "sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* at 11-12. Put another way, "settled law," *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018), must "squarely govern the specific facts at issue," *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018).

After defining the right at issue at the appropriate level of generality, the Court must look to "analogous Supreme Court precedent, as well as binding opinions from" the Third Circuit to determine if the right is "clearly established." *Peroza-Benitez*, 994 F.3d at 165. The Court must also "consider whether there is a robust consensus of cases of persuasive authority in the Courts of Appeals," including taking account of "district court cases, from within the Third Circuit or elsewhere." *Id.* at 165-66 (internal quotation marks and citation omitted). In this regard, although the Supreme Court "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7-8 (2021). "In rare cases," a plaintiff may show that a right is clearly established if the "violation [is] obvious." *James*, 957 F.3d at 169 (internal quotation marks and citation omitted). An obvious violation of the Fourth Amendment is a situation where the use of force "obviously violated" the seminal Supreme Court case *Tennessee v. Garner*, 471 U.S. 1 (1985). *Id.*

In light of the prevailing standards, the Court holds that O'Malley and Rivotti are entitled to qualified immunity. The Court will decide the instant motion on the second prong of the qualified immunity analysis, whether the officers' actions violated a "clearly established right,"

and will forego a discussion of whether the officers' use of force was reasonable, the first prong of the analysis.

## B. Whether Genuine Disputes of Material Fact Exist

The present motion depends on whether a genuine dispute exists regarding two facts. First, the Court must examine the record regarding the distance between Kelley and O'Malley when the officers began firing their weapons. Second, the Court must review the record regarding whether Kelley was moving toward O'Malley when the officers opened fire. Both questions set the stage for whether O'Malley and Rivotti had a reasonable fear that Kelley would commit serious bodily harm to O'Malley. *Garner*, 471 U.S. at 3. The Court remains cognizant of the fact that Kelley could not present his version of events, so the Court has closely "look[ed] at the circumstantial evidence that, if believed, would tend to discredit the police officer[s'] story." *Lamont*, 637 F.3d at 181-82 (internal quotation marks and citation omitted). After review of the testimony of the officers at the scene as well as all circumstantial evidence in the record, it is the Court's view that Plaintiffs have failed to present sufficient evidence to demonstrate that there are genuine disputes of material fact that: (1) a distance of approximately eight feet separated Kelley and O'Malley when the officers fired their weapons, and (2) Kelley was beginning to make a forward movement towards O'Malley with the knife when the officers fired their weapons. No genuine dispute surrounds these facts.

### 1.   Distance Between Kelley and O'Malley

Plaintiffs repeatedly assert that Kelley and O'Malley were 58 feet from each other when the officers opened fire. (Docket No. 123 at ¶ 50). O'Malley estimated that he was eight feet away. (Docket No. 120-1 at 97, 99). To arrive at 58 feet, Plaintiff's counsel retained an investigator who measured the following distance: "From the bottom of the first step of the steps going up to the

front entrance of 710 Whitney Avenue to the edge of the opposite (North) side of the sidewalk on

the other (North) side of Whitney Avenue." (Docket No. 122 at 30). The distance included:

> [T]he yard in front of 710 Whitney Avenue, the sidewalk adjacent to the yard in front of 710 Whitney Avenue, the section of grass in between the sidewalk and the (South) edge of Whitney Avenue, the entire width of and across Whitney Avenue, the section of grass in between the edge of Whitney Avenue on the North Side of the street, and the sidewalk on the North side of Whitney Avenue. (Docket No. 122 at 30).

The investigator measured the distance as 58 feet. (Docket No. 122 at 30).

However, the investigator has not been proffered as a shooting reconstruction expert in this

case and has not offered an admissible expert opinion recreating the scene including the locations

of O'Malley and Kelley at the time of the shooting. Instead, the investigator appears to have taken

two points given to him by Plaintiffs' counsel and measured the distance between them. (Docket

No. 122 at 30).[5] Accordingly, the Court must determine if the two points given to the investigator,

where Kelley and O'Malley were supposedly standing, have support in the record.

Neither the investigator nor Plaintiffs' counsel explicitly stated the factual basis for the

location of the two end points used to arrive at 58 feet. Based on other statements by Plaintiffs'

counsel in Plaintiffs' concise statement of material facts, it appears these two end points came from

Rivotti's February 2, 2016 interview. (Docket No. 123 at ¶ 50). The investigator's placement of

---

[5]  The investigator, Michael Paluselli did not attach a resume or his credentials to his report. (Docket No. 122 at 30). It is unclear if he was deposed. If he was, the deposition transcript was not made part of the record. While he did not explicitly say that Plaintiffs' counsel gave him the two end points for his measurement, he implies it when he says the following: "I was hired by attorney Noah Geary, Esquire to take measurements in this case from the scene of the shooting death of Bruce Kelley, Jr. in Wilkinsburg." (Docket No. 122 at 30). Nothing in the record suggests that the physical dimensions of the scene of the shooting had changed in the intervening years between the shooting and when the investigator made his measurements on June 3, 2021. *See Newmill v. Campbell Trans. Co.*, 2015 WL 222438, at *4 (W.D. Pa. Jan. 14, 2015) (McVerry, J.) (rejecting attempt to exclude photographs taken on an unknown date of the scene of an accident because the photographs fairly depicted the scene on the date of the accident).

Kelley at the front steps of 710 Whitney Avenue for measurement purposes has support in the record. Both Rivotti and Kaupinis stated that Kelley was almost at the steps of 710 Whitney Avenue when the shooting occurred. (Docket No. 122-4 at 18 (Rivotti statement during February 2, 2016 investigation of the shooting incident); Docket No. 120-1 at 286 (Kaupinis deposition testimony)). Photographic evidence of the scene shows Kelley's body, with the knife a few feet away, lying in the front yard of 710 Whitney Avenue and within a couple feet of the front step. (Docket No. 122-4 at 72-74; Docket No. 133-2 at 24-29). For his part, O'Malley said that Kelley was "on the east side of Whitney Avenue, right over the curb, like right over the curb in the grassy area. Like right at the street and curb area" when the shooting occurred. (Docket No. 120-1 at 100; *see also* Docket No. 122-3 at 359-60). Thus, O'Malley placed Kelley several feet from the front steps, not right next to the steps. Nonetheless, given the evidence from Rivotti, Kaupinis, and the photographs, and keeping in mind its duty to weigh inferences in favor of the non-moving party, the Court will assume Kelley was standing at the foot of 710 Whitney Avenue when he was shot.

While the investigator had a basis in the record to place Kelley near the front steps of 710 Whitney Avenue at the time of the shooting, the investigator's placement of O'Malley at the furthest edge of the sidewalk opposite to 710 Whitney Avenue has no support in the record. To establish where O'Malley was standing at the time of the shooting, Plaintiffs apparently relied on a statement by Rivotti in his February 2, 2016 interview where he said that he and O'Malley "were basically standing on that sidewalk" when they opened fire. (Docket No. 122-4 at 18). From this statement by Rivotti, Plaintiffs claim that "O'Malley and Rivotti were across the street, [from 710] Whitney Avenue, in the opposite yard, standing 'almost' on the sidewalk." (Docket No. 123 at ¶ 50). Plaintiffs use Rivotti's reference to "that sidewalk" out of context to claim that both officers were on the other side of the street opposite to 710 Whitney Avenue. A complete review of

Rivotti's interview statements reveals that when Rivotti referred to "that sidewalk," he was referring to the sidewalk directly in front of 710 Whitney Avenue, not the sidewalk on the opposite side of the street.

During his interview, Rivotti explained that as the officers pursued Kelley through the streets of Wilkinsburg, Kelley entered the Hamnett Station park and ride lot and then turned and "started walking . . . towards Whitney Avenue, towards the rear of the houses that are on Whitney out of the park and ride lot." Once he approached the rear of the houses, he climbed a fence and began to walk towards the front of one of the houses. (Docket No. 122-4 at 16). Detective James Grill asked, "Okay. When he went through the fence and went between the houses . . . did you guys lose sight of him?" (Docket No. 122-4 at 17). Rivotti replied, "No. Never." (Docket No. 122-4 at 17). Grill continued, "You stayed with him?", and Rivotti said, "Yes." (Docket No. 122-4 at 17). Thus, as he pursued Kelley from the park and ride lot, Rivotti walked behind Kelley between two houses and onto Whitney Avenue. (Docket No. 122-4 at 16). From there, Grill asked, "So when he came out . . . onto Whitney from behind the houses, where did he go?" Rivotti replied as follows:

> As soon as – as soon as he comes out onto Whitney, *he started to walk towards the left a little bit.* And then that's whenever *we* were at the - - when *we got to where* [710 Whitney Avenue] was. And that's when I saw K-9 Sergeant O'Malley *coming at – coming at us*. . . . At this time - - so the suspect was standing - - he was basically facing us, but he was stepped back. He was almost on the stoop of that house. And [the K-9] bit him. K-9 Sergeant O'Malley was right to my right. We were basically standing on that sidewalk almost.

(Docket No. 122-4 at 17-18) (emphasis added).

In sum, and as the images below illustrate, Kelley walked from the "park and ride lot," walked between two houses that were facing Whitney Avenue, and walked "towards the left" until

he reached 710 Whitney Avenue, which was on the left side of the street from the perspective of someone facing M.L.K. Jr. East Busway.



(Docket No. 120-1 at 611).



(Docket No. 133-4 at 73). Rivotti's statements and the images above demonstrate that Kelley never crossed the street. Instead, he emerged from between two houses, turned to the "left," and walked to 710 Whitney Avenue, which was on the left from the perspective of someone facing M.L.K. Jr. East Busway. Given that Rivotti was walking behind Kelley, Rivotti also did not cross the street. Thus, Rivotti's reference to him and O'Malley standing on "that sidewalk," was a reference to the sidewalk on the same side of the street as 710 Whitney Avenue, not the opposite side of the street.

Lending further support to Rivotti's position on the sidewalk in front of 710 Whitney Avenue, is the fact that he said "we got to" 710 Whitney Avenue when he saw O'Malley "coming at [us]." (Docket No. 122-4 at 17-18). The "we" and "us" refer to Rivotti and Kelley and show that Kelley and Rivotti were on the same side of the street when O'Malley began to approach from the other side of the street. Accordingly, based on a close review of Rivotti's statement, Plaintiffs' placement of the officers on the opposite side of the street from 710 Whitney Avenue at the time of the shooting does not have support in the record. Rather, Rivotti's interview statement shows the reverse: Rivotti and O'Malley were standing on "that sidewalk" in front of 710 Whitney Avenue.

Moreover, Rivotti's deposition testimony repeats his statements from his February 2, 2016 interview about everyone's position at the time of the shooting. Rivotti said that as he and Kelley approached 710 Whitney Avenue, Rivotti "was on Whitney Avenue, walking behind Bruce Kelley" and "was either on the left side of the street or the sidewalk." (Docket No. 120-1 at 29, 31). O'Malley was "on the other side of the street" from Rivotti and Kelley. (Docket No. 120-1 at 30). Rivotti estimated that he was within twenty feet of Kelley when he opened fire. (Docket No. 120-1 at 40). Just as in his February 2, 2016 interview, Rivotti's deposition reveals that he was following behind Kelley on the same side of the street as Kelley. Rivotti never crossed the street, so the reference to "that sidewalk" in his February 2, 2016 interview was a reference to the sidewalk in front of 710 Whitney Avenue.

The rest of the record fills in the narrative as to how O'Malley reached Rivotti and Kelley. In his deposition, O'Malley estimated that he was about 10 yards, or 30 feet, from Kelley when he ordered Kelley to stop walking. (Docket No. 120-1 at 86). O'Malley was standing next to the bush in the yard across the street from 710 Whitney Avenue when he gave this command. (Docket No.

120-1 at 82). Kaupinis corroborated O'Malley's account and said that O'Malley was about 35 feet from Kelley when O'Malley gave the command, an estimate Plaintiffs accept. (Docket Nos. 120-1 at 284; 123 at ¶ 49). According to O'Malley, once he released the K-9, he took "several steps" towards Kelley in order to complete an arrest of Kelley, meaning O'Malley had moved from his position next to the bush and towards 710 Whitney Avenue after he released the K-9. (Docket No. 120-1 at 95, 99). The combination of Rivotti's, Kaupinis' and O'Malley's statements reveal that O'Malley started about 30 to 35 feet from Kelley on the other side of the street from 710 Whitney Avenue, moved in to arrest Kelley, and had reached the sidewalk in front of 710 Whitney Avenue when he opened fire.

Additional evidence corroborates Rivotti's belief that he and O'Malley were standing on or near the sidewalk in front of 710 Whitney Avenue when they opened fire. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (relying on video evidence to hold that no genuine dispute of material fact existed); *Malbrough v. Stelly*, 814 F. App'x 798, 804-05 (5th Cir. May 14 2020) (citing *Scott* and holding that photographic evidence "blatantly contradicts" the non-moving party's version of events, thus entitling officers to qualified immunity); *Brax v. City of Grand Rapids*, 742 F. App'x 952, 957 (6th Cir. July 23, 2018) (same). In their investigation of the scene in the late afternoon and early evening of January 31, 2016, members of the Allegheny County Office of the Medical Examiner recorded locating eleven shell casings, marked as B, C, D, N, O, P, W, X, Y, Z, and AA, in an inventory log. (Docket No. 133-4 at 74-75). From the orientation of someone facing 710 Whitney Avenue, one casing, B, appears on the sidewalk in front of 710 Whitney Avenue and the rest are located in the front yard. (Docket No. 133-4 at 76). A screenshot of the log's summary is below.



A picture of 710 Whitney Avenue, (Docket No. 133-3 at 83), is below:



Photographs from the scene support the inventory log. B appears on the sidewalk in front of Kelley's body. (Docket No. 133-2 at 13-17, 42-43). C appears just inside the front yard, a foot

or two from B and a few feet from Kelley's body. (Docket No. 133-2 at 18-20, 44). D appears in the front yard a couple of feet to the right of Kelley's body. (Docket No. 133-2 at 18, 21-23, 45-46). N, O, and P appear near each other in the front yard and to the right of D. (Docket No. 133-2 at 59-68). Just to the right of N, O, and P are three additional casings: W, X, and Y. (Docket No. 133-3 at 87-93). Lastly, Z and AA appear just to the right of W, X, and Y. (Docket No. 133-2 at 94-96). Thus, the photographs support the investigator's inventory log that eleven shell casings appear on the sidewalk or in the front yard of 710 Whitney Avenue, just a few feet from Kelley's body. The investigators did not locate any shell casings in the street or on the other side of the street opposite to 710 Whitney Avenue. Additionally, the investigators did not locate any bullets or bullet fragments in the yard, near Kelley, or underneath Kelley's body. The photographs of the location of the shell casings are compelling evidence showing where the officers were standing when they opened fire. *Scott*, 550 U.S. at 378 (reversing appellate court because video evidence "clearly contradicts" the version of events adopted by the appellate court at summary judgment); *El v. City of Pittsburgh*, 975 F.3d 327, 335 (3d Cir. 2020).

Aside from Rivotti's February 2, 2016 interview that the Court has addressed, Plaintiffs point to nothing in the record suggesting that O'Malley was standing on the far end of the sidewalk on the other side of the street from 710 Whitney Avenue when he opened fire. To that end, no shell casings were located anywhere in the street or on the other side of the street where Plaintiffs' investigator assumed O'Malley was standing when he opened fire. Plaintiffs put forward no expert witness evidence casting doubt on the testimony of the witnesses at the scene or the Allegheny County Office of the Medical Examiner's work. Thus, the 58-foot designation exaggerates the distance, based on what the record reveals and is an "unsupported assertion" that cannot create a genuine dispute of material fact regarding where O'Malley was standing. *Conboy*, 992 F.3d at 160;

*see also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Instead, all evidence in the record indicates that Kelley and O'Malley were standing mere feet away from each other. As the Third Circuit has declared, "the party opposing summary judgment in a deadly-force case must point to evidence—whether direct or circumstantial—that creates a genuine issue of material fact, 'and may not rely simply on the assertion that a reasonable jury could discredit the opponent[s'] account.'" *Lamont*, 637 F.3d at 181-82. Accordingly, in light of the testimony of Rivotti, O'Malley, and Kaupinis, the corroborating photographic evidence, and the lack of record evidence put forward by Plaintiffs, Plaintiffs have failed to show that there is a genuine dispute of material fact that O'Malley was standing approximately eight feet from Kelley when the officers opened fire.

### 2.   Whether Kelley Moved Toward O'Malley

Plaintiffs assert that "[a]t no time did Kelley square up to O'Malley, face O'Malley, and start walking towards O'Malley," before the officers shot him. (Docket No. 123 at ¶¶ 94-99). On the other hand, O'Malley, on three occasions, testified that Kelley took a step toward him immediately after stabbing the K-9. (Docket No. 120-1 at 96-99). Rivotti testified that just after the K-9 then fell to the ground, "[Kelley] was continuing towards [O'Malley] with the knife in his right hand. His knife was out in front of him, facing [O'Malley]." (Docket No. 120-1 at 39). He reiterated, "[Kelley] was continuing towards [O'Malley] with the knife in his right hand." (Docket No. 120-1 at 39). In his incident report prepared shortly after the shooting, Kaupinis stated, "Immediately after Kelly, Jr., stabbed K-9 Aren, he turned to face officers and made motions towards officers on scene." (Docket No. 120-1 at 291).

To support their claim that Kelley never faced O'Malley or took steps towards him, Plaintiffs claim that circumstantial evidence suggests that Kelley made no movement towards the officers after stabbing the K-9. (Docket No. 123 at ¶¶ 94-99). They point to an "Evidence Submittal Form" prepared by Detective Caruso from the Allegheny County Office of the Medical Examiner on or around January 31, 2016. (Docket No. 131-1 at 8). The form summarizes the facts of the shooting incident. It reads:

> Actor was involved in a physical altercation with PATPD at first contact. A foot pursuit ensured [*sic*]. After multiple attempts to subdue actor with tasers, a police K-9 was deployed on the actor. The actor stabbed the canine prompting officers to open fire on the actor. (Docket No. 131-1 at 8).

The form appears to serve as an inventory record for the two officers' firearms and a means to preserve evidence of the shooting incident. (Docket No. 131-1 at 9). Plaintiffs assert that the evidence submittal form reveals that O'Malley and Rivotti shot Kelley because he stabbed the K-9, not because Kelley was a threat to O'Malley or someone else. (Docket No. 131 at 8-9).

Additionally, in a "Mobile Unit: Fact Sheet/Request Form," prepared on or about January 31, 2016 by Detective Caruso, the shooting incident is briefly described:

> Victim was involved in a physical altercation with police at Wood St. and Franklin Ave. The victim led officers on a foot pursuit where multiple less than lethal options were attempted to stop him. A police dog was released on the victim, and the victim stabbed the police dog. Officers subsequently opened fire on the victim. (Docket No. 131-1 at 11).

The form appears to document which members of the investigation team visited the shooting site and when they were there. (Docket No. 131-1 at 11-12). Again, Plaintiffs claim that the form shows that Kelley was making no movement towards O'Malley when he was shot. (Docket No. 131 at 8-9).

In both documents, the summary of the facts is handwritten in a small text box. The writer,[6] who was not present at the scene to witness the shooting, filled in the text boxes in just a few sentences describing an extremely complex and lengthy police incident. (Docket No. 131-1 at 8, 11). The writer leaves out details about who shot Kelley, where everyone was standing, what was said, how many times Kelley was shot, etc. As such, the recitation of the facts in the documents was meant to briefly sketch out what happened to give color to the inventory log and fact sheet. These documents were being used to document the firearms and record which investigators went to the scene and when they were there, not provide a narrative of what occurred. The documents do not reveal how Detective Caruso learned about the facts, whether it was from a witness or third-hand information passed on to him. That they left out mention of Kelley's movements is not surprising. At the very least, the documents do not contradict O'Malley's and Rivotti's testimony: the documents simply omit mention of Kelley's movements; they do not say he stood still before being shot. *See Van Horn v. Suhor Indus. Inc.*, 829 F. Supp. 2d 321, 327 (W.D. Pa. 2011) (observing that statements made by nonparties did not contradict statements made by a witness, and therefore the witness' statement was not disputed); *Bolton v. Air & Liquid Sys., Inc.*, 2013 WL 2477239, at *1 n.1 (E.D. Pa. May 3, 2013) ("The Court has considered Defendant's argument, but concludes that the subsequent statements in Plaintiff's declaration do not contradict Plaintiff's earlier deposition testimony, as both sets of testimony may be true simultaneously.").

Another set of documents that Plaintiffs bring up is the Allegheny County Police Department interview summaries created after investigators interviewed O'Malley and Rivotti. (Docket No. 122-4). Over two pages, Detective Patrick Miller provided a bullet point summary of

---

[6]     It is unclear if Detective Caruso was deposed. If he was, a transcript of the deposition was not included in the record.

the interview with O'Malley. (Docket No. 122-4 at 62-63). When recounting the shooting, Miller

wrote:

> -Aren was originally on his hind legs when he acquired the male but fell to all fours
> once he was stabbed.
> -After [Aren] reached the ground the male lunged toward Aren again and slashed
> him at least 2 more times
> -O'Malley drew his weapon and fired at least 6 times at the suspect
> -The suspect fell to the ground and O'Malley kept cover on him until the threat was
> over

(Docket No. 122-4 at 63).

> Detective James Grill prepared Rivotti's interview summary and wrote the following:

> • Rivotti stated Aren disengaged the suspect but tried to re-engage the suspect
> and Kelley lunged at Aren and thrusted the knife into him again and began to make
> furtive movements toward O'Malley
> • O'Malley drew his weapon and fired his weapon toward the suspect while
> Rivotti also drew his weapon and fired 2 times
> • The suspect fell backwards onto his back and his right arm crossed his chest
> and he still was in possession of the knife, which is in his right hand
> • Rivotti kept cover on the suspect, went towards him and kicked the knife
> away from the suspect and assisted other officers in handcuffing the suspect

(Docket No. 122-4 at 65-66).

Relying on these two interview summaries, Plaintiffs assert that O'Malley and Rivotti

inserted the fact about Kelley moving towards O'Malley at their depositions in an attempt to justify

their shooting of Kelley. (Docket No. 145 at 2). The problem for Plaintiffs, however, is that the

interviews were transcribed. Instead of relying on a few bullet points written by a detective, the

Court can rely on the exact statements made by the officers at the February 2, 2016 interviews.

In his interview, when recounting the exact moment of the shooting, O'Malley stated:

> [Kelley stabbed the K-9] like maybe one or two more times. It was coming from,
> like, Aren's – it would be like - - like this side of his face. And that's when I - - I
> saw him. I mean, his arm was out, and he - - now he spun towards us. And from
> where I was now, that when I just - - I took my pistol out, and I just - - I just fired.
> (Docket No. 122-3 at 60).

Thus, while the interview summary might have glanced over Kelley's behavior subsequent to him stabbing the K-9, O'Malley mentioned how Kelley "spun towards us." (Docket No. 122-3 at 60).

Rivotti was more fulsome in his description of Kelley's movements. He stated:

> So at that point, Aren hit the ground. Aren come back up at him. It appeared that he was going to re-engage. As he was re-engaging, the suspect was, like, slashing at him, trying to - - to stab him again. And that's when he actually started taking steps towards - - more towards Sergeant O'Malley than myself. But he took about - - almost two full steps at Sergeant O'Malley. And on the third one is whenever he - - he slammed the knife into K-9 Aren. . . . At that time, he was still progressing towards K-9 Sergeant O'Malley. That's when K-9 Sergeant O'Malley, I believe, began to fire. . . . So Aren took like a - - he started to run behind us. . . . At that point, I did fire two rounds, aiming for center mass on the suspect. (Docket No. 122-4 at 19-20).

Rivotti described Kelley "progressing towards" O'Malley before the officers began to fire. (Docket No. 122-4 at 19-20).

Whether it was spinning towards, progressing towards, or stepping towards O'Malley, the record demonstrates that Kelley made a forward movement of some kind in the direction of O'Malley. The best Plaintiffs can do is claim that two short descriptions of events prepared on January 31, 2016 by someone who was not at the scene did not explicitly mention Kelley's forward movement. As explained previously, these two small textboxes showing up in the investigators' paperwork did not purport to provide a factual narrative of what occurred, and they fall far short of creating a genuine dispute of fact. *See Goode v. City of Phila.*, 776 F. App'x 80, 84 (3d Cir. June 6, 2019) (noting "insubstantial" discrepancy between a police officer's testimony and statement during an internal investigation and holding that the discrepancy did not create a genuine dispute).

33

In sum, after careful consideration, the Court finds that no genuine dispute exists that (1) Kelley and O'Malley were standing approximately eight feet from one another when the officers opened fire and (2) Kelley made a forward movement towards O'Malley just before the shooting.

### C. Defining the Constitutional Right at Issue

Now that the Court has determined that no genuine issue of fact exists about the distance between Kelley and O'Malley and whether Kelley made a forward movement toward O'Malley, it turns to defining the constitutional right at issue. Plaintiffs define the right as follows:

> Kelley's 4th Amendment right under both *Tennessee v. Garner*, 471 U.S. 1 (1985) and *Graham vs. O'Connor*, 490 U.S. 386 (1989) to be free from the seizure of his body by the use of deadly/excessive force when, looking at the facts in the light most favorable to the Plaintiffs, Kelley did not pose a (i) significant and (ii) immediate threat of death or serious bodily injury to either Defendant nor anyone else. (Docket No. 145 at 2).

Plaintiffs' definition of the right is too broad. As the Supreme Court has repeatedly explained, "[T]here is no doubt that *Graham v. Connor, supra,* clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. Yet that is not enough." *Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004) (internal quotation marks and citation omitted). Rather, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (internal quotations marks and citation omitted). Thus, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (internal quotations marks and citation omitted). Said another way,

defining the right "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 198 (internal quotation marks and citation omitted).

Plaintiffs say that Kelley had the right to be free from deadly force "when [he] did not pose a (i) significant and (ii) immediate threat of death or serious bodily injury" to O'Malley. (Docket No. 145 at 2). But Plaintiffs' defined right is simply the "general proposition" of *Graham* and *Garner*. *See Brosseau*, 543 U.S. at 198-99. They needed to define the right at issue using the "specific context of the case" or "situation [the officers] confronted." *See id.* Given the overbreadth of Plaintiffs' definition, the Court will define Kelley's right as of January 31, 2016 in accordance with *Brosseau*.

Mindful of its duty to define Kelley's right at the appropriate level of generality, *Bond*, 142 S. Ct. at 11, the Court defines Kelley's purported right as follows: the right to be free from being shot seven times from two different officers in the space of a few seconds until falling to the ground, when the officers knew that the victim was holding a knife, repeatedly refused commands to stop walking and drop the knife, and made a forward movement with the knife towards one of the officers who was standing approximately eight feet away.

### D. Whether the Shooting Violated Kelley's Clearly Established Right

Based on the Court's definition of the right at issue, it must determine if "clearly established" law, as of January 31, 2016, held that the officers' use of deadly force was objectively unreasonable. *Bond*, 142 S. Ct. at 11-12; *Williams*, 967 F.3d at 259. Put another way, the Court must determine if clearly established law showed that the officers did not have a reasonable fear that Kelley would inflict serious bodily harm on O'Malley when they shot him. *Garner*, 471 U.S. at 3. The Court holds that clearly established law at the time of the shooting did not make the officers' actions unreasonable.

For one thing, Plaintiffs have not identified any precedent factually analogous to the present situation that would show that the officers violated a clearly established right on January 31, 2016. Even more, they have not shown that Fourth Amendment precedent, whether from the Supreme Court, Third Circuit, or elsewhere would put the question "beyond debate." The Court, after careful independent review, has not found any caselaw remotely analogous that would establish the existence of Kelley's right, let alone a right that is "clearly established." *Richardson v. City of Newark*, 820 F. App'x 98, 102 (3d Cir. Aug. 14, 2020) (observing that a police shooting victim "conced[ed] that he cannot cite precedent that is factually on point," and thus the police officer was entitled to qualified immunity); *Bland v. City of Newark*, 900 F.3d 77, 85 (3d Cir. 2018) (holding that police officers were entitled to qualified immunity "because Bland identifies no caselaw indicating that the officers violated clearly established law extant in 2011"). Instead, Plaintiffs maintain that the Court cannot make a ruling about whether Kelley's right was clearly established "due to the ocean of genuine disputes of material facts which exist here." (Docket No. 145 at 6).

Plaintiffs' argument is misplaced; the Court has determined which material facts are in genuine dispute, and has drawn "[a]ll reasonable inferences from the record . . . in favor of the nonmoving party." *Goldstein*, 815 F.3d at 146. Only after exhaustively reviewing the voluminous record and determining which facts are genuinely disputed did the Court define Kelley's alleged Fourth Amendment right at the appropriate level of particularity and consider whether this right was clearly established. *Rivas-Villegas*, 142 S. Ct. at 7-8. Thus, Plaintiffs' position that the Court must forego deciding the question of qualified immunity because of supposed genuine disputes of material fact fails, and the Court will review excessive-force precedent to determine if Kelley's rights were clearly established on January 31, 2016.

### 1.   Excessive Force Precedent – First Prong of Qualified Immunity

Precedent demonstrates that not only do the Plaintiffs lack favorable case law needed to show a clearly established right but they face numerous cases where a court held that an officer had a reasonable fear of serious bodily harm, in circumstances similar to the ones faced by O'Malley and Rivotti. In *Lamont v. New Jersey*, officers shot and killed a suspect whom they had surrounded after the officers "repeatedly ordered [the suspect] to show his hands and to freeze;" he "refused to comply;" and instead "stood with his right hand concealed in his waistband, apparently clutching an object;" before "suddenly pull[ing] his right hand out of his waistband— a movement uniformly described by those on the scene as being similar to that of drawing a gun." 637 F.3d 177, 183 (3d Cir. 2011). The suspect was standing between five and eight feet away from the officers. *Id.* at 180. The Third Circuit held that the officers' use of force was reasonable given what they observed from the suspect. *See id.* at 184. While the Third Circuit observed that the officers never saw a gun, it explained that "[a]n officer is not constitutionally required to wait until he sets eyes upon [a] weapon before employing deadly force to protect himself against a fleeing suspect who . . . moves as though to draw a gun." *Id.* at 183 (internal quotation marks and citation omitted). It observed that "[w]aiting in such circumstances could well prove fatal. Police officers do not enter into a suicide pact when they take an oath to uphold the Constitution." *Id.*

*Lamont* provides useful guidance for this Court about whether the actions of O'Malley and Rivotti were reasonable and, in turn, whether their actions violated clearly established law. Here, the officers encountered someone armed with a knife, who made a forward movement toward O'Malley from about eight feet away, and who had demonstrated a physical ability to use the knife by stabbing an eighty-five pound adult male K-9. Similarly, in *Lamont*, a man made an "abrupt, threatening movement" that caused the officers to fear that the suspect would draw a handgun.

*Lamont*, 637 F.3d at 179. Like the officers in *Lamont*, O'Malley (with Rivotti watching nearby) faced an armed suspect who took a physical action that could be interpreted as the beginning of an act of violence towards him. *See also Salaam v. Wolfe*, 806 F. App'x 90, 93 (3d Cir. Apr. 29, 2020) ("[A] reasonable officer could believe that when Salaam *started to turn towards them*, with his gun in the leading-hand, that he posed a serious risk of harm to them and those around them." (emphasis added)).

*Lamont* also demonstrates that O'Malley and Rivotti did not need to wait until Kelley was in a full charge before firing at him. If *Lamont* permitted officers to fire upon observing "abrupt" movements, then O'Malley and Rivotti could fire their weapons when Kelley made a forward movement toward O'Malley with a knife. *See Salaam*, 806 F. App'x at 93. At the very least, *Lamont* demonstrates that O'Malley and Rivotti did not violate a clearly established law prohibiting them from opening fire. *Knight v. Babonic*, 807 F. App'x 161, 163 (3d Cir. Apr. 22, 2020) (holding that police shooting did not violate clearly established law when victim raised a gun "slightly for just a moment of time" in the direction of the officer).

Other non-published Third Circuit decisions provide persuasive authority that O'Malley and Rivotti did not violate Kelley's clearly established right. In *Manigault v. King*, police officers responded to a 911 call about a man who had entered a home and attacked two people with a knife. 339 F. App'x 229, 230 (3d Cir. July 13, 2009). When police arrived at the home, they encountered a man who was covered in blood and who retreated from the officers into the home's backyard, despite the officers repeatedly commanding him to drop the knife. *Id.* As the officers closed to within fifteen feet of the man, he said, "Go ahead and kill me," and then charged the officers, who responded by firing their guns and killing him. *Id*. The Third Circuit held that the shooting was not an unreasonable use of force. *Id.* at 231. It explained, "[a]t the time he was shot, Manigault had

stabbed a man and invaded a home. He was covered in blood, armed with a deadly weapon, did not respond to commands, and was in the process of lunging at an officer." *Id.* Several of the material facts in *Manigault* appear in the present case. Akin to *Manigault*, O'Malley and Rivotti encountered a man armed with a knife who had repeatedly refused commands to drop a knife and who made a movement towards O'Malley, like the "lunge" described in *Manigault*. *Id.* Further, O'Malley was approximately eight feet away from Kelley while the officers in *Manigault* were fifteen feet away from the suspect. *Id.* Lastly, O'Malley and Rivotti encountered a large man (213 pounds and 6.2 feet (Docket No. 122 at 9)) who had demonstrated his physical ability to use his knife by stabbing an eighty-five pound adult male K-9 multiple times, a situation comparable to the officers in *Manigault* who encountered a man who had demonstrated his ability to use the knife by stabbing someone. 339 F. App'x at 230.  Although the two cases are not perfectly comparable, *Manigault* shows that Kelley's alleged right at issue here is far from being "clearly established."

In *Williams v. City of Scranton*, several police officers were standing in the apartment of a mentally disturbed person filling out paperwork for a disorderly conduct citation when the person came out from her kitchen with a knife and pointed it at one of the officers. 566 F. App'x 129, 131 (3d Cir. May 7, 2014). "The officers pulled their service weapons and ordered Williams to stop and put down her knife, but she refused and moved toward" one of the officers, at which point the officers opened fire. *Id.* The Third Circuit held that "the officers' use of deadly force against Williams was reasonable as a matter of law" because"[t]he undisputed facts reveal that Williams rapidly moved toward Smith with a large knife, ignored repeated warnings to stop and drop the knife, and was no more than five feet away from Smith at the time she was shot." *Id.* at 132. It continued, "Under these circumstances, the SPD officers had probable cause to believe that Williams posed a significant threat of serious bodily injury or death. Likewise, it was objectively

reasonable for the officers to believe that using deadly force was necessary." *Id.* at 132. Just as the officers in *Williams* faced a mentally disturbed person holding a knife, ignoring their commands, and moving towards one of the officers, O'Malley and Rivotti faced Kelley (a mentally ill person according to Plaintiffs) who had ignored commands to drop the knife and who made a movement towards O'Malley. *Id.* Likewise, O'Malley was approximately eight feet away from Kelley at the time of the shooting, while the person in *Williams* was a similar distance of five feet from one of the officers. *Id.*

In sum, the holdings in *Lamont*, *Manigault*, and *Williams*, all of which predate the events of this case, show that O'Malley's and Rivotti's use of force was not a violation of clearly established law.

### 2.  Excessive Force Precedent – Second Prong of Qualified Immunity

Supreme Court precedent declaring what actions were not a violation of clearly established law also guide this Court's view. In *City of Tahlequah v. Bond*, decided in 2021,[7] three officers encountered Dominic Rollice in the garage of a residential home after his ex-wife called for aid. 142 S. Ct. at 10. Upon arriving at the scene, the officers knew that Rollice was intoxicated, was "fidgeting with something in his hands," and "appeared nervous." *Id.* As the officers spoke to Rollice from the doorway of the garage, an officer took one step toward the doorway and gestured with his hands. *Id.* In response, Rollice took a single step backwards and then turned around and walked to the back of the garage where several tools were hanging over a workbench. *Id.* The three officers entered the garage, although they remained more than six feet from Rollice. *Id.* Rollice

---

[7]      The Tenth Circuit's decision was issued in 2020 so any analysis that might have survived the Supreme Court's vacatur would have no effect here since it post-dated January 31, 2016, the date of events in the present case. 981 F.3d 808.

"then grabbed a hammer from the back wall over the workbench and turned to face the officers." *Id.* Rollice grabbed the handle of a hammer with both hands, "as if preparing to swing a baseball bat, and pull it up to shoulder level." *Id.* at 10-11. The officers drew their guns, backed up, and yelled at Rollice to drop the hammer. *Id.* at 11. According to the Supreme Court, Rollice "did not" drop the hammer. *Id.* "Instead, Rollice took a few steps to his right, coming out from behind a piece of furniture so that he had an unobstructed path to" one of the officers and "then raised the hammer higher back behind his head and took a stance as if he was about to throw the hammer or charge at the officers." *Id.* In response, two of the officers fired their weapons, killing Rollice. *Id.*

The Supreme Court reversed the Tenth Circuit's denial of qualified immunity to the officers at the summary judgment stage, explaining that "[o]n this record, the officers plainly did not violate any clearly established law," when they shot and killed Rollice. *Id.* The Court emphasized that "[i]t is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (internal quotation marks and citation omitted). The Supreme Court then reviewed the precedent relied on by the Tenth Circuit, distinguished it, and reversed the Tenth Circuit. *See id.* at 11-12. The Supreme Court reasoned that the officers enjoyed qualified immunity unless prior precedent showed that the "particular conduct" (i.e. officers shooting someone who was holding a hammer, standing between six and ten feet away, and who had "took a stance as if he was about to throw the hammer or charge" the officers) violated a person's Fourth Amendment rights. *See id.*

The Supreme Court's holding that the officers in *Bond* "plainly" did not violate "clearly established law" has much relevance here. Along the same lines as Rollice, Kelley was armed with a weapon (a knife instead of a hammer) and refused to obey commands to drop the weapon. Similar

41

to the situation in *Bond*, O'Malley was standing within a short distance of Kelley. Lastly, as in *Bond*, Kelley took an action that suggested that he would act in a violent manner toward one of the officers; Kelley made a forward movement towards O'Malley while holding a knife, which is similar to how Rollice took a "stance" that suggested he might throw the hammer or charge the officers. In short, *Bond*, with its holding and close factual analogy to the situation with Kelley, reveals that O'Malley and Rivotti did not violate clearly established law.

Another Supreme Court case supporting O'Malley and Rivotti is *Kisela v. Hughes*, 138 S. Ct. 1148. In *Kisela*, a case decided in 2018,[8] an officer shot Amy Hughes when "Hughes was holding a large kitchen knife, had taken steps toward another woman standing nearby, and had refused to drop the knife after at least two commands to do so." 138 S. Ct. at 1150. Officers had responded to a 911 call about a woman acting erratically and wandering around a neighborhood with a knife. *Id.* at 1150-51. Officers approached a home where a woman, named Sharon Chadwick, was standing in the driveway next to a car. *Id.* "The officers then saw another woman, Hughes, emerge from the house carrying a large knife at her side." *Id.* "Hughes walked toward Chadwick and stopped no more than six feet from her." *Id.* At this point, the officers drew their guns and at least twice told Hughes to drop the knife. *Id.* at 1151. Chadwick told the officers to "take it easy." *Id.* Hughes "appeared calm," although she did not obey the officers' commands to drop the knife. *Id.* One of the officers then fired four shots at Hughes.

Reversing the Ninth Circuit's denial of the officers' motion for summary judgment, the Supreme Court held that "even assuming a Fourth Amendment violation occurred—a proposition

---

[8]     The Ninth Circuit's decision came down in November 2016, so any analysis that might have survived the Supreme Court's vacatur would have no effect here since it post-dated January 31, 2016, the date of events in the present case. 862 F.3d 775.

that is not at all evident—on these facts Kisela was at least entitled to qualified immunity." *Id.* at

1152. The Supreme Court explained:

> [A]lthough the officers themselves were in no apparent danger, [they] believed
> [Hughes] was a threat to Chadwick. Kisela had mere seconds to assess the potential
> danger to Chadwick. He was confronted with a woman who had just been seen
> hacking a tree with a large kitchen knife and whose behavior was erratic enough to
> cause a concerned bystander to call 911 and then flag down Kisela and Garcia.
> Kisela was separated from Hughes and Chadwick by a chain-link fence; Hughes
> had moved to within a few feet of Chadwick; and she failed to acknowledge at least
> two commands to drop the knife. Those commands were loud enough that
> Chadwick, who was standing next to Hughes, heard them. This is far from an
> obvious case in which any competent officer would have known that shooting
> Hughes to protect Chadwick would violate the Fourth Amendment. *Id.* at 1153.

Similarly to *Kisela*, the officers in the present case encountered someone wandering around

a neighborhood armed with a knife who was refusing to obey commands to drop the knife. The

knife holder was also close to a potential victim. Indeed, the situation in *Kisela* appears less fraught

than the present case, given that Kelley had taken a forward movement toward O'Malley when the

officers fired, while the knife holder in *Kisela* was not moving towards anyone when the officers

fired. Again, the Supreme Court's holding that the officers did not violate clearly established law

shows that O'Malley and Rivotti did not violate clearly established law under parallel

circumstances.

As a final matter and as the analysis above shows, the officers' decision to shoot Kelley

does not come close to "obviously violat[ing]" *Tennessee v. Garner*, 471 U.S. 1. *See James*, 957

F.3d at 169. In *Garner*, a police officer shot a fleeing suspect in the back of the head despite being

"reasonably sure" the suspect was unarmed. *Garner*, 471 U.S. at 3. In this case, Kelley was armed

with a knife, and he made a forward movement toward O'Malley from a distance of approximately

eight feet away, thus distinguishing the instant facts from *Garner*. *See Bland*, 900 F.3d at 85-86

(holding that officers' shooting of a suspect did not violate *Garner* because the officers reasonably believed that the suspect had a gun, thus distinguishing the case from the facts in *Garner*).

### 3.  Conclusion

Multiple cases show that an officer's use of deadly force is objectively reasonable when a person is holding a weapon and moves aggressively towards an officer from a close distance. Whether it is *Lamont* ("abrupt" hand movement suggesting the brandishing of a handgun while standing five to eight feet away), *Manigault* (holding a knife and "lung[ing]" at an officer from fifteen feet away), or *Williams* (holding a knife and "mov[ing] toward" an officer from five feet away), the Third Circuit has declared the use of force reasonable. The situation here closely matches this precedent.

Additionally, multiple cases show what factual situations have not led to a violation of clearly established law. *Bond* (a person holding a hammer and "t[aking] a stance as if he was about to throw the hammer or charge at the officers" from about six feet away) and *Kisela* (a person holding a knife and standing six feet from a potential victim) are extremely similar to the case at hand. Simply put, a review of the precedent makes clear that Kelley's right was not clearly established as of January 31, 2016 and the officers are entitled to qualified immunity for their use of deadly force against him.

### E.  Whether Prior Acts of Police Officers Unreasonably Caused the Shooting

As an alternative theory for establishing their excessive force claim, Plaintiffs argue that O'Malley's supposedly unreasonable deployment of the K-9 caused the officers to use lethal force. Plaintiffs point to the following to argue that O'Malley acted unreasonably:

44

- O'Malley did not attempt any other de-escalation techniques (talking to Kelley, using pepper spray, etc.) before resorting to the use of the K-9, even though he must have known that Kelley was mentally ill. (Docket Nos. 136 at 3-5, 7).

- O'Malley should have shown Kelley the K-9 before releasing him, because this could have made Kelley surrender out of fear of being bitten. (Docket No. 123 at ¶¶ 44-45).

- The K-9 was improperly trained, so that it bit Kelley's left arm when it should have bit Kelley's right arm (where Kelley gripped the knife), thus allowing Kelley to stab the K-9. (Docket No. 123 at ¶ 47).

Plaintiffs also extend their criticism to O'Malley's fellow officers and claim that these officers were incompetent in their use of tasers and pepper spray. (Docket Nos. 124 at 7-8; 131 at 2). They say the officers should have fired the taser darts at Kelley's leg to avoid his thick clothing. (Docket Nos. 124 at 7-8). They further maintain that the officers should have kept trying to use pepper spray after their first three attempts. (Docket Nos. 124 at 7-8). Plaintiffs even posit that one of the officers should have tried to "push" Kelley to the ground instead of allowing him to continue walking. (Docket No. 123 at ¶ 93). According to Plaintiffs, these negligent acts supposedly caused the later use of lethal force.

Even assuming that O'Malley or his fellow officers were negligent in their handling of Kelley before the K-9 bit him, Plaintiffs' argument fails because it was Kelley, not the officers, who caused the fatal situation, at least in a proximate cause sense. *Johnson v. City of Phila.*, 837 F.3d 343, 351 (3d Cir. 2016) ("Whether or not [an officer] acted unreasonably at the outset of his encounter with [a police shooting victim], Plaintiff must still prove that [the officers]'s allegedly unconstitutional actions proximately caused [the victim]'s death."). The Third Circuit has long held that "even where the officer's initial actions violate the Fourth Amendment," under "ordinary

tort principles, a superseding cause breaks the chain of proximate causation." *Johnson*, 837 F.3d at 351-52. In *Johnson*, a plaintiff argued that an officer's negligent failure to wait for backup before engaging with a suspect meant that the officer's later shooting of the suspect was excessive force. *Id.* at 350. But, the Third Circuit rejected the argument: "Whatever harms we may expect to ordinarily flow from an officer's failure to await backup when confronted with a mentally disturbed individual, they do not include the inevitability that the officer will be rushed, choked, slammed into vehicles, and forcibly dispossessed of his service weapon." *Id.* at 352.

*Johnson* controls here. After O'Malley released the K-9, however negligently, it was Kelley who refused to drop the knife after he was bitten. More importantly, it was Kelley who moved towards O'Malley with a knife, at a distance of approximately eight feet away. Kelley's behavior after O'Malley released the K-9 was the superseding cause of his death. *Johnson*, 637 F.3d at 351; *Lamont*, 637 F.3d at 186 ("[W]e conclude that the troopers' decision to enter the woods did not proximately cause Quick's death. Rather, Quick's noncompliant, threatening conduct in the woods was a superseding cause that served to break the chain of causation between the entry and the shooting."). In light of *Johnson*, it is the Court's opinion that Kelley's alleged rights were definitely not "clearly established" on January 31, 2016.

### F.  Whether the Number of Shots Fired Was Excessive

As another alternative argument, Plaintiffs argue that the number of bullets fired at Kelley was excessive, and thus the officers violated Kelley's clearly established right.[9] In *Lamont*, the

---

[9]     The Court notes that Plaintiffs repeatedly claim that the officers fired thirteen shots at Kelley, but provide no citation in the record to where they arrived at this figure. (*See, e.g.*, Docket No. 145 at 4). The lack of a supporting citation to the record violates Local Rule 56(b)(1) ("A party must cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record supporting the party's statement."). All evidence in the record indicates that the officers fired eleven shots. Investigators with the Allegheny County Office of the Medical

46

Third Circuit explained that "[e]ven where an officer is initially justified in using force, he may not continue to use such force after it has become evident that the threat justifying the force has vanished." 637 F.3d at 184. There, the Third Circuit held that several police officers shooting at a suspect thirty-nine times and hitting him eighteen times (including eleven times in the back), was a violation of a clearly established right prohibiting excessive force. *Id.* at 185.

Leading up to the shooting, police officers had chased a man into the woods at night. *Id.* at 184. When the officers located the man in the woods, his right hand was tucked inside the waistband of his shorts. *Id.* He removed his hand suddenly, prompting the officers to open fire out of fear that the man was pulling out a gun. *Id.* As noted previously, the Third Circuit held that the decision to open fire on the man was a reasonable use of force because the officers reasonably feared that the man was about to pull out a gun. *Id.*

Continuing on, the Third Circuit explained that after the man "made this sudden movement, his right hand was visible to the troopers, who were standing between five and eight feet away and had their flashlights trained on him." *Id.* The man's "weaponless right hand was fully visible immediately after the troopers began firing," but "the troopers continued to fire for roughly 10 seconds, shooting a total of 39 rounds." *Id.* The Third Circuit continued, "We are, moreover, concerned by the fact that 11 of the 18 bullets that struck Quick hit him from behind." *Id.* It observed that because "more than half of the 18 bullets that struck Quick hit him from behind," it

---

Examiner found eleven casings. (Docket No. 133-4 at 74-76). O'Malley said he fired up to nine shots. (Docket No. 120-1 at 101). Rivotti said he fired two shots. (Docket No. 120-1 at 40-41). Given the evidence in the record and Plaintiffs' failure to comply with Local Rule 56 by providing a citation to support their assertion of thirteen shots, the Court will disregard Plaintiffs' assertion and use the number of shots supported by the record. As such, the Court will use the eleven-shot figure, although its analysis would not change even if Plaintiffs were correct that thirteen shots were fired.

was possible that "a jury may find that the troopers improperly continued firing after Quick had turned away from them and no longer posed a threat." *Id.* at 184-85.

*Lamont* is distinguishable from the present case for several reasons. In *Lamont*, the officers fired at the suspect for ten seconds, discharging thirty-nine bullets. Here, it is undisputed that the firing lasted only a few seconds, which resulted in eleven bullets being fired, far fewer than in *Lamont*. (Docket Nos. 120-1 at 44-45, 101, 106-09; 120 at ¶¶ 53, 103, 155-56; 123 at ¶¶ 53, 103, 155-56). In *Lamont*, the Third Circuit declared that the police officers continued firing even after they knew the suspect was not armed and no longer a threat. In this case, the officers could see that Kelley was armed with a knife throughout the encounter. *See Gregor v. Johnsen*, 2017 WL 11368374, at *7 (M.D. Pa. Nov. 3, 2017) ("*Lamont* does not address the crucial issue at play here of when, or if, a suspect may no longer present a threat even though he remains armed."). Most importantly, the officers ceased their rapid firing when Kelley fell onto his back. (Docket Nos. 120-1 at 44-45, 101, 106-09); *Gregor*, 2017 WL 11368374, at *7 ("The troopers in *Lamont* also fired for approximately 10 seconds, whereas Gregor does not posit that a specific amount of time elapsed between Officer Johnsen's first and third shots although it is apparent that these shots were fired in a rapid succession."). Plaintiffs do not dispute that the officers stopped firing when Kelley no longer posed a threat to them, (Docket Nos. 120 at ¶¶ 53, 103, 155-56; 123 at ¶¶ 53, 103, 155-56), and no evidence in the record suggests otherwise. For example, investigators from the Allegheny County Office of the Medical Examiner did not locate any bullets underneath Kelley's body suggesting that someone fired while standing over top of him. (Docket No. 133-4 at 74-74).

Plaintiffs point out that two of the seven bullets that struck Kelley entered through his back. To recap, the autopsy revealed that one bullet hit the side of Kelley's neck; two hit his back; two hit his chest; one hit his side; and one hit his forearm. (Docket Nos. 122 at 6-7; 133-4 at 99. Five

of the bullets remained in the body. (Docket No. 122 at 6-7). Two exited his body, one that struck the chest and the one that struck the forearm. (Docket No. 122 at 6-7). That two of the bullets entered through the back is immaterial when considering the rest of the record. The officers fired their weapons for a few seconds from different angles as Kelley began to move toward O'Malley and then fell onto his back on the ground. Most importantly, and as Plaintiffs do not dispute, they ceased firing when Kelley fell onto his back. (Docket Nos. 120 at ¶¶ 53, 103, 155-56; 123 at ¶¶ 53, 103, 155-56). The *Lamont* Court took umbrage with the eleven shots to the victim's back because it was possible that "a jury may find that the troopers improperly *continued* firing after Quick had turned away from them and no longer posed a threat." 637 F.3d at 184-85 (emphasis added). Here, O'Malley and Rivotti did not *continue* firing their weapons after Kelley fell to the ground onto his back. Instead, they ceased firing when the threat ended, exactly what *Lamont* requires. In the Court's view, whatever the trajectory of the shots to the back, the officers' cessation of fire once Kelley fell to the ground means the officers did not violate the holding of *Lamont*.

The present case is much more like *Salaam v. Wolfe*, where the Third Circuit distinguished *Lamont* and held that the number of shots fired at a victim was a reasonable use of force. 806 F. App'x 90, 94 (3d Cir. Apr. 29, 2020). As the Third Circuit summarized, "Salaam was visibly armed, and the officers shot a total of nine bullets between them; seven bullets hit Salaam and one grazed him." *Id.* The plaintiff admitted "that he was still standing when the third shot hit him and that he does not know for sure if any other bullets hit him before he hit the ground." *Id.* Further, it was "undisputed that the bullets were fired from the officers' semi-automatic handguns in continuous, rapid succession," and it was "also undisputed that Salaam fell down next to his gun." *Id.* The Court of Appeals had little trouble holding that "there is no evidence that the officers

intentionally fired after the perceived threat had been eliminated, no reasonable jury could conclude that their actions constituted a constitutionally impermissible use of force." *Id.*

Similar to the facts in *Salaam*, Rivotti and O'Malley fired their shots from semi-automatic handguns in "continuous, rapid succession," while facing a visibly armed suspect, and they ceased firing when Kelley fell to the ground. (Docket Nos. 120-1 at 44-45, 101, 106-09; 120 at ¶¶ 53, 103, 155-56; 123 at ¶¶ 53, 103, 155-56). At the very least, *Salaam* shows that Kelley's right was not "clearly established" when the officers fired at him. *See also Gregor*, 2017 WL 11368374, at *7 (distinguishing *Lamont* along similar factual lines as the present case).

### VI. CONCLUSION

Based on the foregoing, the officers' motion for summary judgment [119] is hereby GRANTED. An appropriate order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
Senior U.S. District Judge

Date:   March 18, 2022

cc/ecf:  All counsel of record.